```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
 2                          SOUTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA  :  Criminal Action No.

 5        v.                   :  PJM 10-271

 6   PATRICK J. SWEENEY,       :  Greenbelt, Maryland

 7            Defendant.       :  Monday, March 26, 2012

 8   _____/  10:10 A.M.

 9

10              TRANSCRIPT OF MOTION PROCEEDINGS
             BEFORE THE HONORABLE PETER J. MESSITTE
11                 UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   FOR THE GOVERNMENT:     ARUN G. RAO, Esquire
                             DEBORAH A. JOHNSTON, Attorney-at-Law
14                           Office of the United States Attorney
                             6500 Cherrywood Lane, Suite 400
15                           Greenbelt, Maryland  20770
                             301-344-4126
16

17   FOR THE DEFENDANT:      WILLIAM C. BRENNAN, JR., Esquire
                             BRETT JARRED COOK, Esquire
18                           Brennan, Sullivan & McKenna LLP
                             6305 Ivy Lane, Suite 700
19                           Greenbelt, Maryland  20770
                             301-474-0044
20

21

22   OFFICIAL COURT REPORTER:  LINDA C. MARSHALL,(301) 344-3229

23          COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES

24

25
```

1                              I–N–D–E–X

2                              WITNESSES

3    On behalf of the Government:

4                                  Direct   Cross   Redirect   Recross

5    David Jacobs

6        (By Mr. Rao)                30

7        (By Mr. Brennan)                    41

8        (By Mr. Rao)                                 52

9        (By Mr. Brennan)                                        55

10   Richard Cress

11       (By Ms. Johnston)           62

12       (By Mr. Brennan)                    78

13       (By Ms. Johnston)                            91

14

15

16

17

18

19

20

21

22

23

24

25

1                    P–R–O–C–E–E–D–I–N–G–S

2          THE DEPUTY CLERK:  The matter now coming before this

3    Court is Criminal Action Number PJM–2010–0271, United States of

4    America versus Patrick Fitzgerald Sweeney.  The matter is now

5    before this Court for a motions hearing.

6          THE COURT:  All right.  Counsel, identify yourselves

7    for the government and defendant, please.

8          MR. RAO:  Arun Rao for the United States.  Good

9    afternoon, Your Honor –– or excuse me, good morning, Your Honor.

10   With me at counsel table is Deborah Johnston, she's also an

11   Assistant U.S. District Attorney here, in the District of

12   Maryland.  Also, here at counsel table is Dave Jacobs; he's a

13   task force officer with DEA.

14         THE COURT:  All right.  You're in the spotlight,

15   Mr. Brennan.

16         MR. BRENNAN:  Yeah.  Sorry, Your Honor, we're actually

17   blind over here is the way this is going.

18         Good morning, Your Honor.  William Brennan and

19   Brett Cook on behalf of the defendant, Patrick Sweeney.

20   Mr. Sweeney is seated to the far left, Your Honor.

21         THE COURT:  All right.  I have listed open at least

22   four motions.  I'm not sure whether all are in play now; to

23   exclude evidence, file additional motions, severance, suppress

24   evidence.

25         Mr. Rao?

1           MR. RAO:  They all are active, Your Honor.

2           THE COURT:  All right.  What's the right sequence

3    here?

4           MR. RAO:  Your Honor, having spoken with Mr. Brennan,

5    we believe the proper sequence would be to begin with the Motion

6    to Severe and then, turn to the 404(b) Motion, upon resolution

7    of the Motion to Severe.  And then handling the Motion to

8    Suppress afterwards.

9           THE COURT:  Very well.

10          All right.  You have a severance motion then, Mr. --

11          MR. BRENNAN:  Your Honor, if the Court please, it's

12   actually a little easier for me to stand here because of the

13   reflection.

14          But, Your Honor, our motion -- the government's

15   response in our Motion to Sever, Your Honor, we're really

16   focusing on Count Two of the indictment.  Count Two is a count

17   that I don't think we too often see, Your Honor, but Count Two

18   charges, looking at the indictment now, distribution on

19   March 23, 2009, because the government alleges a death resulted

20   therefrom.  That is, the person who received the alleged heroin

21   on that day, Your Honor, died of an overdose.

22          Instead of the penalty being as it is on Count One,

23   the maximum penalty, I think, as we looked at Count One, which

24   is possession with intent to distribute on March 23rd, the

25   statutory maximum is 20 years, and it would be a regular

1    guideline sentence for Count One.

2         Count Two charges a distribution on the same day,

3    March 23, 2009, but because death resulted, the mandatory

4    minimum is 20 years and the statutory maximum is life.  So,

5    although the, although the events occurred on the same day, they

6    are substantially different in penalties.

7         Which then gets into, Your Honor -- so, Counts One and

8    Two, and I guess, Three which charges use of a communication

9    device, those events, Your Honor, we do not have a problem with

10   those being tried together because they pertain to the events on

11   March 23, 2009, Your Honor.  So, those are fine.

12        The other events that are charged in the indictment,

13   Your Honor, do not carry anywhere near the same statutory

14   maximum penalty, nor the statutory mandatory minimum.  We think

15   under the analysis that the other counts are certainly not of

16   the same character, if you will, with respect to the Count Two

17   which is charged on March 23.  So, we would ask that Counts One,

18   Two and Three be severed out from the remainder counts, because

19   they essentially are much different character given the possible

20   penalties in the other counts.  And that's the basis of our

21   argument, Your Honor.

22        THE COURT:  Mr. Rao.

23        MR. RAO:  Your Honor, in response to Mr. Brennan's

24   argument, I would first note by -- I would start by noting that

25   the offenses are -- all the offenses charged in Counts One

6

1    through Seven are all of the same or similar character.  These

2    are all narcotics offenses; possession with intent to

3    distribute, distribution, use of a communication device to

4    further distribution of heroin.  The only thing that differs is

5    the dates.

6            And what we're talking about, ultimately, is an eight

7    month or so -- or excuse me, a four month or so range.  And I

8    would point the Court to *United States versus Branch* which is a

9    decision of the Fourth Circuit from 2008, in which the Court

10   found that episodes of drug possession with intent to distribute

11   and drug distribution itself over a two month period were

12   certainly so related as to permit joinder under the broad scope

13   of Rule 8(a).

14           Mr. Brennan seems to imply that the fact that Count

15   Two carries a greater statutory penalty somehow makes it not of

16   the same character, but I have -- I did not hear any authority

17   for that proposition.  And more importantly, should there be any

18   prejudice, with respect to Count Two, I'm fairly certain that

19   any prejudice could be meliorated by an instruction to the jury

20   to consider the merits of each incident that was being charged

21   separately.  Again, the burden on showing prejudice lies on the

22   defendant as the party to, as the party seeking the severance.

23           I'd also point out that in each of the set of counts;

24   Counts One, Two and Three, and then Counts Four and Five, and

25   then Counts Six and Seven, each of which are on slightly

1    separate dates, involved the same parties, involved the same

2    pattern and involved offenses of the same character.  Severance

3    in this case would be unnecessary.  It would lead to wasteful

4    duplication of effort.  And so, for those reasons, the

5    government believes that a severance is not warranted.

6              THE COURT:  Any further on that, Mr. Brennan?

7              MR. BRENNAN:  Well, Your Honor, if the -- I think the,

8    the essential issue, Your Honor, is this:  If there were just

9    simply a collection of distribution counts or possession with

10   intent to distribute, or the use of a communication device over

11   a given period of time, then they would all relate and they

12   might even group, okay.

13             The problem becomes, Your Honor, is with Count Two it

14   really is, given what the government's allegations are, a much

15   different count than the remaining seven counts in the

16   indictment.

17             Count Two, Your Honor, instead of having a statutory

18   maximum of 20 years incarceration, has a statutory mandatory

19   minimum of 20 years incarceration and a statutory maximum of

20   life.  They have to prove that a death resulted on

21   March 23, 2009.  That is a much different offense than the

22   distribution on February 16, '09, charged in Counts Four and

23   Five and the distribution charged in December of '08 in Counts

24   Six and Seven.

25             Counts Four and Five do not carry a mandatory minimum

8

1    of 20 or statutory maximum of life, nor do Counts Six and Seven

2    carry a mandatory minimum of 20 years or a statutory maximum of

3    life.  They are substantially different counts, substantially

4    different charges than that alleged in Count Two.  And we think

5    the prejudice that enures to the defendant in this case as a

6    result of having other distributions of heroin alleged in Counts

7    Four and Five, and Six and Seven is unduly prejudicial with

8    respect to Count Three, which is the --

9             THE COURT:  How is it prejudicial?

10            MR. BRENNAN:  Well, because it creates more of a

11   propensity, Your Honor, that maybe on March 23, 2009, he may

12   have been distributing heroin.  That's how, that's how it's

13   prejudicial.

14            THE COURT:  Take that a little further.

15            MR. BRENNAN:  Well, the, the critical issue on

16   March 23, 2009, is that my client allegedly distributed heroin.

17   That's the allegation, he distributed heroin to Mr. Wade.  And

18   as a result therefrom, Mr. Wade overdosed on that and died.

19   They're going to have to call the medical examiner to show that

20   a death resulted.

21            If they prove the distribution and the death from

22   heroin intoxication, that's what the Autopsy Report says, it was

23   heroin intoxication.  So, if they prove that Mr. Wade died and

24   they prove my client distributed, under the statute, Your Honor,

25   it's a mandatory minimum of 20 years with a statutory maximum of

9

1     life.  That's a, that's a serious charge.

2             THE COURT:  But how does the penalty have any effect

3     on the joinder issue?  I mean, I -- you still get, you get

4     sentenced by the Court.  The jury doesn't know what the numbers

5     are as far as sentencing.

6             MR. BRENNAN:  No, but what the jury does, does know

7     and does have to find, Your Honor, is unlike Counts Four and

8     Five, and Counts Six and Seven, the government does not have to

9     prove that a death resulted on those other counts.  They have to

10    prove as a matter of law on count, Count Two that a death

11    resulted, not just the distribution occurred.  I mean, if they

12    just want to prove that a distribution occurred, Your Honor,

13    they don't want to prove that, that there was a distribution

14    that resulted in a death, then they walk away from the

15    penalties.

16            But the count, Count Two, the events on

17    March 23, 2009, they have to prove a distribution.  Don't stop

18    there, prove that a death resulted.  They're going to need to

19    call the medical examiner.  The medical examiner is going to

20    give an opinion.

21            THE COURT:  All right.  I understand all that.  Tell

22    me how it prejudices, though, when you try it to the jury?

23    What's the prejudice?  I mean, they -- it's maybe a little more

24    dramatic as far as -- it is considerably more dramatic than just

25    a distribution, but what then?

```
 1                  MR. BRENNAN:  I don't have a problem, Your Honor, with

 2      trying Counts One, Two and Three together.  The government wants

 3      to try that.  What I have a problem with, Your Honor, is trying

 4      Counts Five and Six, which allege a distribution on

 5      February 16, 2009 -- or excuse me, Counts Four and Five which

 6      allege a distribution on February 6, 2009; and Counts Six and

 7      Seven which allege a distribution on December 8th -- December of

 8      2008.  Those counts, Your Honor, create a more likely than not

 9      that my client did the distribution on March 23rd, and I think

10      that, Your Honor, becomes prejudicial.

11                  THE COURT:  Why is it not part and parcel of that?

12      What you got here, though, is distribution of heroin in, what, a

13      four month period, all the same pattern.  Why is this different

14      from any case where you put together, someone who on several

15      different days in a limited period of time is doing the same

16      kind of thing, where the only difference from the count I hear

17      is that somebody died?  That's the only additional charge.

18                  MR. BRENNAN:  And I think that's a significant

19      difference, Your Honor.  If it were not a death that they had to

20      prove on the 23rd, you know -- I think that we don't have a lot

21      of, a lot of --

22                  THE COURT:  Do you think it's more likely that people

23      will find him guilty of the distribution that didn't involve the

24      death because they have to prove the distribution that did

25      involve the death?  Is that where we're going with this?
```

1          MR. BRENNAN:  Well, we're going there and we're also

2     going to the reverse of that, Your Honor, which is that my

3     client -- if they found that he had a distribution in December

4     of '08, as well as a distribution in February of '09, it's more

5     likely than not that he's also the person that did the

6     distribution in December of '09.

7          THE COURT:  Well, but isn't that always the case?  I

8     mean, when you put in the --

9          MR. BRENNAN:  Well --

10         THE COURT:  Do you have to try every alleged

11    distribution in a different trial, because one is apt to

12    implicate another?

13         MR. BRENNAN:  Well, if it's offered for --

14         THE COURT:  The whole purpose of joinder is his loss

15    there.

16         MR. BRENNAN:  But, Your Honor, I think the concern

17    that we have, Your Honor, is that in this case it becomes

18    propensity evidence.  And then when you look at the prejudicial

19    impact of that propensity evidence, Your Honor, given the, given

20    the consequences therefrom, Your Honor, I think that the Court

21    should sever out Counts One, Two and Three from Counts Four,

22    Five, Six and Seven.

23         THE COURT:  All right.  No need to respond further.

24         The defendant has moved to sever a number of the

25    counts before the Court.  Specifically, he wants to sever Counts

1    One, Two and Three from Counts Four and Five, and Counts Six and

2    Seven.  Essentially, the implication being three separate trials

3    to be held in this case.

4         He bears the burden of making an appropriate showing

5    that the Court should do this.  Rule 8 of the Criminal Rules

6    does provide that an indictment may charge a defendant in

7    separate counts with two or more offenses if the offenses

8    charged, whether felonies or misdemeanors or both, are of the

9    same or similar character, or are based on the same act or

10   transaction, or are connected with or constitute parts of a

11   common scheme or plan.  This case falls exactly within those

12   parameters.

13        This is a situation where the offenses, in fact, are

14   of the same or similar nature.  The first three counts charge

15   possession with intent to distribute, distribution of heroin,

16   use of a communication device to further that distribution

17   March 23rd, 2008.

18        Counts Four and Five charge distribution of heroin and

19   the use of a communication device to further the distribution,

20   this in February of 2009 and March of 2009.

21        Counts Six and Seven charge distribution of heroin and

22   use of a communication device to further distribution in

23   December of 2008.

24        So, they clearly are of the same character.  They

25   clearly are connected with parts of a common scheme or plan, and

1   they occurred over a four month period.  One element that does

2   show a difference is the fact that during this period of time

3   with regard to one of these counts that the defendant allegedly

4   supplied heroin to an individual who died, although a telephone

5   was used there.  That seems to me to be classically within Rule

6   8.

7        The undue prejudice, frankly, is not enough.  And I'm

8   still not sure I even see what the prejudice is, other than that

9   there are several incidents of possession with intent to

10  distribute, which is very common in these cases.  Classically,

11  it seems to me a situation in which joinder is appropriate.  The

12  motion is denied.

13       Next motion.

14       MR. COOK:  Thank you, Your Honor.

15       I think next we'll address Defendant's 404(b) Motion.

16  I think kind of narrowing what the defendant says in that

17  motion, there's really three types of other acts evidence the

18  government intends to introduce in this case.  One of them is

19  the defendant's personal use of heroin before the offenses

20  charged in the indictment.  One is the defendant's personal use

21  of heroin after the offenses charged in the indictment.  And

22  then the last one is the defendant's, I guess, habit of going

23  with his friends to buy heroin.

24       Now, the defendant is charged with, with having the

25  intent to distribute heroin and actually distributing heroin in

1    the indictment.  I don't think any of these other acts are

2    properly admissible under *Queen* or 404(b), because they're,

3    they're just not relevant to proving the intent to distribute

4    heroin or the actual distribution.

5         I mean, someone's personal use of a controlled

6    substance is quite different than someone's distribution for

7    some type of commercial advantage of the same controlled

8    substance.  And that's really the crux of the defendant's

9    argument.

10        The government cited a number of cases in its

11   response, where generally prior convictions for controlled

12   substance offenses were admissible in possession with intent to

13   distribute trials and distribution trials, but I think in each

14   of those cases the prior conduct or the prior offense involved a

15   distribution or some type of sale or transaction.

16        And here, that's just not the case.  I think the other

17   acts are that Mr. Sweeney was a heroin user before the offenses

18   in the indictment and after the offenses in the indictment, and

19   that he went with his friend sometimes to buy heroin.  I don't

20   think any of those facts, even if they're true, make it anymore

21   likely that he distributed heroin or had the intent to

22   distribute heroin as charged.

23        And I think the prejudicial nature of those other acts

24   substantially outweighs any probative value.  Even if they do

25   provide some sort of context that Mr. Sweeney was familiar with

1    heroin, the prejudice is that the jury knows now that

2    Mr. Sweeney is an addict.  You know what addicts do, they

3    probably do anything for money.  He probably had to sell to

4    support his habit.  All of those things, I think, I think would

5    outweigh any probative value that the other acts have.  And that

6    would be the defendant's position.

7                    THE COURT:  Mr. Rao.

8                    MR. RAO:  Your Honor, I want to start by talking about

9    what exactly the government seeks to introduce through and in

10   this case, it's the evidence of Mr. Sweeney, the defendant's use

11   and familiarity with heroin.

12           The government would introduce this evidence through

13   testimony from Mr. Sweeney's girlfriend, who's also the victim,

14   Harrison Wade's mother, regarding her observations of

15   Mr. Sweeney injecting heroin in the bathroom.  This, I guess,

16   falls into the category of personal use of heroin before the

17   date in question.

18           She's also going to testify, the government expects,

19   about traveling with him to a bar off of Kenilworth Avenue to

20   obtain heroin.  And the government also expects that she will

21   testify regarding the daily use of heroin by Mr. Sweeney at the

22   time of his death.

23           The government also expects that this case would

24   involve evidence of the use of heroin by Mr. Sweeney and one of

25   his associates.  And that, specifically, those two individuals

1   between late 1994 and the time of this associate's arrest would

2   obtain heroin with Mr. Sweeney.  And this evidence is

3   admissible -- excuse me, is relevant for a number of reasons.

4           Most importantly, it demonstrates the defendant's

5   knowledge of heroin.  It demonstrates his intent to possess

6   heroin.  Specifically, obtaining heroin with another heroin user

7   is probative of his intent to distribute and to share that

8   heroin with Mr. Wade, the victim in this case, and Mr. Wade's

9   co-worker, which is what the government believes occurred on

10  March 23rd of 2009.

11          It also demonstrates the absence of any mistake or any

12  accident with respect to the circumstances under which

13  Mr. Sweeney was found with heroin at the time of his arrest, and

14  it's necessary to the government's case.  It's necessary in that

15  the government must prove that the defendant knowingly possessed

16  heroin and that he distributed it, or that he intended to

17  distribute it.

18          That knowledge and that intent are essential elements

19  of Counts One, Two, Four and Six.  And the Fourth Circuit has

20  repeatedly noted that it need not be critical to the

21  government's case.  It must simply be something that is

22  necessary to establishing some of the elements of the crime

23  charged, which is clearly the case here.  It's reliable.  It's

24  based upon direct, personal observations of this defendant and

25  there is a low danger of prejudice in this case.

```
 1              The 404(b) evidence is of the same caliber, the same
 2    type, essentially, as the charged counts.  And in fact, the
 3    charged counts include a distribution where an individual died
 4    as the result of the use of heroin, which the government would
 5    submit is much less inflammatory than the evidence that we're
 6    seeking to introduce through 404(b).
 7              THE COURT:  Tell me about -- now, one of the prior
 8    events is a conviction.  The other one though is a witness
 9    talking about daily use and such.  What is it?  Tell me about
10    that.
11              MR. RAO:  With respect to the prior conviction,
12    Your Honor, at this point the government is not going to seek to
13    introduce the prior conviction.
14              THE COURT:  What are you going to offer?  Just to call
15    a witness then?  Is it not a conviction?  A witness is going to
16    talk about a prior --
17              MR. RAO:  Yeah, the prior conviction was for, it was
18    for crack cocaine.
19              THE COURT:  Yeah.
20              MR. RAO:  And so we're not going to introduce that --
21              THE COURT:  All right.
22              MR. RAO:  -- in the trial here.
23              And if Your Honor could restate your second question?
24              THE COURT:  Well, tell me what you are offering?
25    You'll call a witness to testify?
```

18

1          MR. RAO:  Yes, we are going to be -- we expect to call

2     at least two witnesses to testify regarding Mr. Sweeney's prior

3     use of heroin.

4          THE COURT:  Who are they or do we know that?

5          MR. RAO:  One is going to be the defendant's

6     girlfriend, who is also the mother of the victim, Harrison Wade.

7     And she is going to testify, specifically, regarding

8     observations of Mr. Sweeney injecting heroin in the bathroom at

9     about the time of the events charged in Counts One through Three

10    of the indictment.  She's also going to testify about traveling

11    to a location off of Kenilworth Avenue for the purposes of

12    obtaining heroin.

13         THE COURT:  Now, what is that?  Be a little more

14    specific about that.  Traveling to, to obtain -- she was with --

15         MR. RAO:  She was with him.

16         THE COURT:  -- him in the car?

17         MR. RAO:  Yes, she was with him.

18         THE COURT:  She saw him purchase?

19         MR. RAO:  Yeah, she was with him.  She was with him in

20    a vehicle.  She understood the purpose of the trip was to obtain

21    heroin.  She went to a location with him, and I believe she was

22    present when the heroin was obtained by Mr. Sweeney.

23         And then the other witness that the government expects

24    to call in this matter would be an associate of Mr. Sweeney who

25    traveled with Mr. Sweeney on a number of different occasions to

 1    obtain heroin, and this links directly to what the government

 2    believes occurred on March 23rd of 2009, in that it is an

 3    instance in which the defendant, accompanied by another,

 4    traveled to a location to purchase heroin, in essence, pulling

 5    their efforts together to acquire the heroin, and then sharing

 6    that heroin after it's obtained.

 7              THE COURT:  Well, let's talk a minute or two about the

 8    events leading up to the arrest of the defendant so that we see

 9    this.

10              There's the death first.  Is that what brings the

11    attention of the investigators to -- take it from there.  I want

12    to see how you, you put the defendant in the picture from that

13    point forward.

14              MR. RAO:  Yes, Your Honor.  There was a death that

15    occurred on March 23rd of 2009.  Subsequent to that death,

16    members of law enforcement interviewed a number of individuals

17    regarding the circumstances surrounding Mr. Sweeney's death, and

18    learned that Mr. Sweeney had been -- excuse me, Mr. Wade's

19    death, and then had learned that Mr. Sweeney had been seen with

20    Mr. Wade immediately prior to that date; that the purpose of

21    that meeting was to obtain heroin, and that shortly after that

22    meeting occurred, Mr. Sweeney was -- excuse me, Mr. Wade was

23    found to have overdosed from the heroin.

24              THE COURT:  And --

25              MR. RAO:  There was, there was a, there was a girl --

1    Mr. Wade's girlfriend was with him at the time that he obtained

2    the heroin from Mr. Sweeney.  She observed -- she handed the

3    victim a pill bottle.  That pill bottle then apparently was used

4    to obtain the heroin, because at the time of Mr. Wade's death

5    which was shortly after that incident, there was an amount of

6    heroin found inside of this pill bottle.  It was a distinctive

7    pill bottle, pink in color.

8            And that supports the conclusion that the item that

9    Mr. Wade obtained from Mr. Sweeney earlier that evening was in

10   fact the same heroin that ended up killing him that day.

11           THE COURT:  Now, is there testimony that the defendant

12   and Wade were using drugs on a regular basis prior?  Is that

13   part of the everyday use that you're talking about?

14           MR. RAO:  Yes, not together, but separately.  There's,

15   the government expects that there was a --

16           THE COURT:  Wait, wait a minute.  I didn't catch that.

17   Not together, but separately?

18           MR. RAO:  Yes, in terms of the use, the government

19   expects that there will be testimony that Mr. Wade along with a

20   co-worker met with Mr. Sweeney on a number of different

21   occasions for the purpose of obtaining heroin from Mr. Sweeney.

22           THE COURT:  Okay.  And so how again would the

23   defendant's use of the heroin factor in?  Is he using it with

24   Wade?

25           MR. RAO:  No.

```
 1          THE COURT:  Give me the concept of use here.  I

 2   understand distribution, but what about use, what does use do

 3   here?

 4          MR. RAO:  The use I think in this case, Your Honor,

 5   would show that his knowledge of heroin, the absence of mistake

 6   and the fact that he was associated with heroin at the time of

 7   his arrest was an accident, that heroin having been found in his

 8   residence at the time of this death, but there was not an

 9   allegation that Mr. Sweeney and Mr. Wade were ever using heroin

10   together.

11          THE COURT:  Okay.

12          MR. RAO:  Their association was at the, at the time of

13   acquisition of the heroin.

14          THE COURT:  All right.  Mr. Brennan or Mr. --

15          MR. COOK:  Yes, Your Honor.

16          THE COURT:  -- Mr. Cook, I'm sorry.

17          MR. COOK:  There was a quantity of heroin or at least,

18   drug paraphernalia seized from Mr. Sweeney's residence when he

19   was arrested, which was about a year after the death in this

20   case.  I don't think -- look, the defense in this case is

21   Mr. Sweeney did not intend to distribute, he did not distribute

22   heroin, and that's it.  It's not about whether it was a mistake

23   or it was an accident, it's just that he didn't do it.  And I

24   don't think that it's, that that evidence, first of all, the

25   2010 seizure is at all relevant.
```

```
 1              THE COURT:  I'm not sure where you're going with that.
 2   If you say, your defense is that he didn't distribute it, and
 3   they've got testimony that he was using it and distributing it
 4   prior, why isn't that relevant?
 5              MR. COOK:  Well --
 6              THE COURT:  There isn't, there wasn't an undercover
 7   buy here.  So, nobody saw him distribute it from the
 8   government's standpoint.  So, the idea that he had drugs, and
 9   had on prior occasions, he was using and was distributing.
10              Hold on.  Before you go any further --
11              MR. COOK:  Yes, sir.
12              THE COURT:  -- tell me about the subsequent
13   distribution.  When does that occur or are you going to call
14   somebody on that point?
15              MR. RAO:  There is no subsequent distribution,
16   Your Honor.
17              THE COURT:  All prior?
18              MR. RAO:  All prior.
19              THE COURT:  Okay.
20              MR. BRENNAN:  It's just a subsequent possession.
21              MR. COOK:  Possession, right.
22              THE COURT:  Subsequent -- well, a subsequent
23   possession, what does that do?
24              MR. RAO:  The subsequent possession, the only, the
25   only incident subsequent that the government is seeking to
```

```
 1    introduce is the recovery of heroin at Mr. Sweeney's residence

 2    at the time of his arrest in 2010.

 3              THE COURT:  What is, what does use do at that point?

 4    Who's going to -- so who's going to -- how are you going to

 5    bring in the issue of use?  Yes, you've got the paraphernalia.

 6    What's the relevance at that point of use?

 7              You've got prior distribution -- evidence of prior

 8    distribution, you've got evidence of the crime itself, you've

 9    got evidence of paraphernalia post.  What does use in between

10    do?

11              MR. RAO:  Court's indulgence.  If I could have a

12    minute.

13         (Pause.)

14              MR. RAO:  The drug paraphernalia recovered from the

15    defendant's residence in 2010, Your Honor, as was the same as

16    the heroin paraphernalia that we anticipate one of the witnesses

17    will testify about regarding the prior acquisitions, it's going

18    to show baggies.  It will, it will -- baggies of, you know --

19              THE COURT:  Well, that's just distribution.  That goes

20    to distribution.  What about use?  What is the relevance of use?

21              MR. RAO:  There's nothing, there's nothing with

22    respect to use.

23              THE COURT:  I think we're talking about district --

24    the key element here is distribution.  That's the essential

25    defense -- the essential charge, charges.  Anything, in my view,
```

 1   that shows prior or even subsequent evidence of distribution is,

 2   is fair game.

 3            MR. BRENNAN:  I --

 4            THE COURT:  Now, I -- the issue of, of prior use

 5   really, the way I understand the testimony, it's going to kind

 6   of blend into distribution.  There's use distribution, use

 7   distribution.  It doesn't have any particular relevance post,

 8   because all it does is lead the investigators to the

 9   paraphernalia at the end.  But it's really hard to sort out one

10   and the other.  I mean, as I understand it, there's use, there's

11   distribution, there's use distribution fairly continuously for a

12   period of time prior.

13            I think it comes in.  I think under 404(b), it's

14   relevant.  I think it is necessary to show that there was in

15   fact an intent to distribute.  I think it's reliable.  I'm

16   assuming the people who were on the scene and saw it done,

17   they're subject to cross, but there's no reason to say that

18   they're fabricating their evidence.

19            You know, it does obviously prove some difficulty for

20   the defendant, but there's no problem here of confusion or

21   unfair prejudice.  I think it's fairly in play.  So, your

22   motion, as to any issue of distribution at any time, your motion

23   as to any use prior to the -- and when we're saying prior to,

24   are we talking prior to all the offenses here?  I guess we are.

25            MR. RAO:  Yes, sir.

```
 1              THE COURT:  All right.  Prior to use and distribution,

 2   but not post the last, the last charge, which would be sometime

 3   in March, I gather, 2009?

 4              MR. RAO:  Yes.

 5              MR. COOK:  And, Your Honor, if we could address how

 6   far prior we're going, I think the government --

 7              THE COURT:  Well, let me hear you on that.  What are

 8   we talking about, how far prior?

 9              MR. RAO:  We're, we're going as far back as 2005, I

10   believe.

11              Is that right?  Between 1994 and 2005, right?

12              As far back as between 1994 and 2005 is what we're

13   talking about.

14              THE COURT:  Well, how many episodes are we speaking

15   about here?

16              MR. RAO:  We don't have a number.  That witness will

17   testify that it was a routine act, a routine, repetitive act.

18   We would not have to necessarily go all the way back to 1994,

19   Your Honor, but it is -- the range that we are aware of at this

20   point is from 1994 to 2005, and of a repetitive nature.

21              THE COURT:  Are you going to allege distribution that

22   far back or just use?  Where are we there?  I mean, because

23   there's the intervening conviction for what -- was it for the

24   crack?

25              MR. RAO:  What we're talking about is, essentially,
```

1    the kind of tied together use and distribution that we're

2    talking about before.

3              THE COURT:  But are you -- is somebody going to say,

4    though, as far as back as '94, there was distribution and use?

5              MR. RAO:  Yes.

6              THE COURT:  Well, all right.  Let's be clear on that.

7    I think until you have somebody in the past able to talk about

8    distribution, then you don't need to get into the use issue.

9    So, you need, you need to sort of cabin that in time.

10             MR. RAO:  Okay.

11             THE COURT:  I mean, right now I don't know that you're

12   clear on when that person is going to say, this is where I first

13   saw evidence of distribution.  That's the, that's the base date,

14   it seems to me, we're talking about, whatever that is.

15             MR. RAO:  Okay.

16             THE COURT:  All right.  Prior to that, you've got some

17   confusion with crack cocaine and some other things as far as

18   use.

19             All right.  That's the way we --

20             MR. RAO:  Thank you, Your Honor.

21             THE COURT:  -- end that.

22             And so, the motion is granted in part, denied in part,

23   but essentially denied on the major points, that prior to all

24   the offenses, any distribution, any evidence of distribution

25   and --

```
 1              MR. RAO:  And just so we're --

 2              THE COURT:  -- use, beginning with the first evidence

 3      of distribution comes in.  Any post alleged crime, use is not

 4      relevant, but the distribution would be.

 5              MR. RAO:  And just so we're clear, the Court's ruling

 6      with respect to the paraphernalia that was found in the house?

 7              THE COURT:  Paraphernalia is obviously in evidence.  I

 8      don't mean to say otherwise.

 9              MR. RAO:  Okay.

10              THE COURT:  But you don't need to show between the

11      last alleged crime and the finding of the paraphernalia that

12      there was use.

13              MR. RAO:  Additional use.

14              THE COURT:  Your theory is, paraphernalia goes back to

15      the earlier -- to the crime itself, so.

16              MR. RAO:  That's correct.

17              MR. COOK:  Yeah, I'm not -- I'm unclear on the last

18      point about what the, what the relevance of the drug

19      paraphernalia found a year after the death in this case is?  I

20      don't think -- I think the government is contending it's

21      similar; the spoon, the needles are similar.

22              THE COURT:  I didn't hear him say that.  He said that

23      the paraphernalia was the same.

24              MR. COOK:  I don't understand that to be the evidence.

25              THE COURT:  Or why wouldn't it permit an inference
```

1    that it was the same?

2           MR. RAO:  Some of the paraphernalia is clearly the

3    same.  I mean, we're not alleging that there were spoons

4    involved in the prior acquisitions, but what we are alleging is

5    that the baggies, the multiple baggies --

6           THE COURT:  This is the evidence of distribution

7    that's going on after.  Use is not relevant in that crime, but

8    this is more than use.  This evidence clearly comes in that

9    there was paraphernalia found.  Whether it's exactly the same or

10   substantially the same, it still comes in.

11          MR. RAO:  Thank you, Your Honor.

12          THE COURT:  All right.

13          Next.  Next motion.

14          MR. RAO:  Your Honor, at this point we'd like to

15   address the Motion to Suppress the Statement.  We'll handle that

16   first.

17          THE COURT:  All right, all right.  You have a

18   statement made when?

19          MR. RAO:  This is a statement that was made on --

20          MR. BRENNAN:  Court's indulgence, Your Honor.

21          THE COURT:  The 21st?

22          MR. RAO:  -- on May 24th of 2010.

23          THE COURT:  The 21st, yeah.

24          MR. RAO:  Just -- we're going to have one with respect

25   to the statement.  And then one witness with respect to -- at

```
 1    least one depending -- at least one, yeah.

 2            THE COURT:  Is it a statement or is there physical

 3    evidence, Mr. Brennan?

 4            MR. RAO:  It's both, Your Honor, it's both.

 5            MR. BRENNAN:  There was a statement made and there was

 6    a seizure as well.

 7            THE COURT:  And you say it was a, it was an arrest

 8    warrant without a search warrant?

 9            MR. BRENNAN:  That's correct, Your Honor.

10            MR. RAO:  And we'd like to address it a little bit out

11    of order based upon the presence of the witnesses here today at

12    this point.  We'd like to start with --

13            THE COURT:  Before you go any further --

14            MR. BRENNAN:  We would invoke the rule on witnesses,

15    Your Honor.

16            THE COURT:  All right.  Anybody who would be a witness

17    should wait outside until called.

18            Go ahead.

19            MR. RAO:  That rule has been complied with,

20    Your Honor.

21            At this time, the government would call Task Force

22    Officer, David Jacobs.

23            THE COURT:  I'm sorry, sir.  Did you want to say

24    something first, though?  I missed that.

25            MR. RAO:  Yes, there are, there are two motions to
```

1    suppress here.  The first is with respect to items that were

2    found in the defendant's residence at the time of his arrest.

3    And the second are statements that were made by the defendant

4    three days after that that occurred during the transportation of

5    the defendant from the Calvert County Detention Center to the

6    Greenbelt courthouse here.

7                 THE COURT:  All right.

8                 MR. RAO:  We'd like to address it out of sequence.  We

9    have Task Force Officer Jacobs here now, and we're prepared to

10   immediately address the question of the statements.

11                THE COURT:  All right.  Call him.

12                Come up here would you please, Officer.  Be sworn by

13   the clerk and then take the stand.  Come up here.  Face the

14   clerk first.

15                 **DAVID JACOBS, GOVERNMENT WITNESS, SWORN**

16                THE DEPUTY CLERK:  Sir, please speak directly into the

17   microphone.  State your name and please spell your last name.

18                THE WITNESS:  David Jacobs, J-A-C-O-B-S.

19                THE DEPUTY CLERK:  Thank you.

20                           **DIRECT EXAMINATION**

21   BY MR. RAO:

22   Q    Good morning, if you could please tell us by whom are you

23   employed?

24   A    Calvert County Sheriff's office.

25   Q    And how long have you been employed there?

**DAVID JACOBS – DIRECT EXAMINATION**

1  A    Ten years.

2  Q    Where are you currently assigned?

3  A    The Drug Enforcement Administration, HIDTA Task Force in

4  Greenbelt, Maryland.

5  Q    And what is your position?

6  A    I'm a task force officer.

7  Q    As a task force officer, what are your duties?

8  A    We investigate drug conspiracies in Southern Maryland.

9  Q    And what training have you received, briefly?

10  A    I attended the Federal Law Enforcement Training Academy,

11  Southern Maryland Training Academy, DEA Basic Narcotic School,

12  several cleaning lab schools, Baltimore County Canine Detection

13  School.

14  Q    And approximately how many arrests have you assisted with

15  during the course of your career?

16  A    Hundreds.

17  Q    Directing your attention now to May 24th, 2010, at about

18  eight in the morning at the Calvert County Detention Center in

19  Calvert County, Maryland.  Were you working at that date, time

20  and location?

21  A    Yes, sir.

22  Q    And who else was working with you?

23  A    Keith Anderson.

24  Q    All right.  For what purpose were you at the Calvert County

25  Detention Center that morning?

**DAVID JACOBS – DIRECT EXAMINATION**

1  A    To transport Mr. Sweeney from the Calvert County Detention

2  Center, excuse me, to the Greenbelt courthouse.

3  Q    And for what purpose was he to be transported that day?

4  A    For his initial appearance, for the -- he was arrested on a

5  warrant on that Friday by Calvert County Sheriff's Office.

6  Q    And was that in connection with the federal indictment in

7  this case --

8  A    Yes.

9  Q    -- that was initially issued in this case?

10  A    That's correct.

11  Q    Again, what was the name of the person you were

12  transporting that day?

13  A    Patrick Sweeney.

14  Q    Do you see Mr. Sweeney in the courtroom here today?

15  A    Yes, I do.

16  Q    If you could please point to him and identify something

17  he's wearing?

18  A    A tan button down shirt, sitting at defendant's table.

19        THE COURT:  All right.

20  BY MR. RAO:

21  Q    If you could describe the circumstances which led to your

22  encounter of Mr. Sweeney on May 24th of 2010.  When had he

23  initially been arrested?

24  A    The Friday before.

25  Q    And who had he been arrested by?

DAVID JACOBS – DIRECT EXAMINATION

1   A    Detective Cress.

2   Q    And with what agency is Detective Cress with?  I'm sorry.

3   A    Calvert County Sheriff's Office.

4   Q    Were you present at the time of the arrest?

5   A    No, I was not.

6   Q    Okay.  When you got -- how did you travel to the Calvert

7   County Detention Center on May 24th of 2010?

8   A    In my departmental vehicle.

9   Q    Was anybody else with you in that vehicle?

10  A    No, sir.

11  Q    Okay.  You previously told us that Special Agent Anderson

12  was with you.  Did he travel separately?

13  A    That's correct, he followed us in his vehicle.

14  Q    What happened when you arrived at the Calvert County

15  Detention Center?

16  A    I requested to have Mr. Sweeney brought out to me so I

17  could transport him to the courthouse.

18  Q    Okay.  And did you then take custody of Mr. Sweeney at the

19  detention center?

20  A    That's correct.

21  Q    Okay.  Was he in handcuffs at the time that you took

22  custody of him?

23  A    I handcuffed him when he came to me.

24  Q    Okay.  Did you say anything to Sweeney while you were

25  inside the Calvert County Detention Center?

**DAVID JACOBS – DIRECT EXAMINATION**

1  A    I explained to him that I was here to transport him for his

2  initial appearance at the courthouse.

3  Q    Okay.  Did you ask him any questions at that time?

4  A    No, I did not.

5  Q    Did he say anything to you at that time?

6  A    No, sir.

7  Q    Okay.  Once you met Mr. Sweeney at the Calvert County

8  Detention Center, where did you take him?

9  A    Out to the sally port to get into my vehicle.

10 Q    Okay.  And where was he seated in your vehicle?

11 A    Front-passenger seat.

12 Q    Was anybody else in the vehicle?

13 A    No, sir.

14 Q    Was the defendant, Mr. Sweeney, in handcuffs?

15 A    Yes, sir.

16 Q    What happened after you put Mr. Sweeney inside your police

17 vehicle?

18 A    We began to drive to the courthouse.

19 Q    And what happened as you began to drive away?

20 A    I explained to him that we were coming, again, to the

21 Greenbelt courthouse for his initial appearance and that -- he

22 wanted to -- he began talking, said he had wanted to make a

23 statement.  So, I stopped him and read him his rights off my

24 Advice of Rights card.

25 Q    Okay.  Let me stop you for a second.  When you said, he

**DAVID JACOBS – DIRECT EXAMINATION**

1  said he wanted to make a statement, what exactly did he say to

2  you?

3  A    Well, he started to --

4        THE COURT:  Start, start again.  He said to you, I

5  want to make a statement?

6        THE WITNESS:  I'm sorry, sir.  He started to talk and

7  I stopped him and just said, let me read you your rights first.

8        THE COURT:  But what did he say to you before that is

9  what I want to hear?

10       THE WITNESS:  He was talking about that, I believe

11  that this was, charge was BS.

12  BY MR. RAO:

13  Q    Okay.  So, wait.  When he told you that the charge was BS,

14  did you interrupt him at that point?

15  A    Yes, when he started to say something after that, I stopped

16  him, read him his Advice of Rights.

17  Q    Okay.  How did you read him his rights?

18  A    Off the Advice of Rights card.

19       THE COURT:  Where was he and where were you?

20       THE WITNESS:  I'm sorry.  He was in my passenger seat

21  in my vehicle and I was in the drivers seat.

22       THE COURT:  And he was cuffed?

23       THE WITNESS:  Yes, sir.

24  BY MR. RAO:

25  Q    Was the vehicle running?

**DAVID JACOBS - DIRECT EXAMINATION**

1   A    Yes, sir.

2   Q    And had you been driving at this point?

3   A    Yes, sir.

4   Q    How long had you been driving for?

5   A    At that point, maybe a minute or two, we were just at a

6   stop sign on Stafford Road getting ready to turn on to 231.

7   Q    Okay.  And at the time he said to you something in

8   substance, that this is BS, what did you do then?

9   A    I read him his Advice of Rights.

10        THE COURT:  What did you say to him though?  Why did

11   you tell him you were reading him his rights?

12        THE WITNESS:  Excuse me?  I'm sorry.

13        THE COURT:  For some reason, you started reading him

14   his rights.  Why did you do that?

15        THE WITNESS:  I just had a feeling that he was going

16   to make some comments, Your Honor.  So, I just wanted to --

17   before he even started talking, I didn't know what he was going

18   to say, so I just read him his Advice of Rights.

19   BY MR. RAO:

20   Q    Okay.  So, you did it just to be safe?

21   A    Yes, sir.

22   Q    Okay.  And at this point, you hadn't asked him any

23   questions, is that right?

24   A    No, I did not.

25   Q    How did you read him the warnings?

DAVID JACOBS – DIRECT EXAMINATION

1    A    Off the Advice of Rights card.

2    Q    Where is that Advice of Rights card kept?

3    A    In my wallet with my credentials.

4    Q    Okay.  Where was it that day?

5    A    In my middle console.

6    Q    Okay.  So, did you stop driving the car?

7    A    We were at a stop sign when I retrieved it from the middle

8    console.

9    Q    Did you ask the defendant any questions before you read him

10   the notations off the Advice of Rights card?

11   A    No, I did not.

12   Q    Did you ask him to sign a Waiver of Rights Form?

13   A    No, I did not.

14   Q    Why didn't you ask him to do that?

15   A    Because we were driving and he was handcuffed.

16   Q    Did you read the card to him?

17   A    Yes, I did.

18   Q    Did you read the entirety of the card?

19   A    Yes, sir.

20   Q    Did he indicate that he understood what was said to him?

21   A    Yes.

22   Q    Did he appear coherent?

23   A    Yes.

24   Q    Did he appear to be under the influence of alcohol?

25   A    No, sir.

**DAVID JACOBS – DIRECT EXAMINATION**

1  Q    Did he appear to be under the influence of drugs?

2  A    No, sir.

3  Q    Did he appear to be on medication?

4  A    No, sir.

5  Q    Okay.  I'm going to show to you what's been marked as

6  Government's Exhibit Suppression Hearing 1.  Do you recognize

7  that?

8  A    Yes, sir.

9  Q    What is that?

10  A    It's a photocopy of the Advice of Rights card.

11  Q    Okay.  Is that the Advice of Rights card, a copy of the

12  Advice of Rights card that you read to him on the morning of

13  May 24th, 2010?

14  A    Yes, sir.

15  Q    After you read him those statements, did he indicate -- in

16  response to the question, do you understand, what was his

17  response?

18  A    Yes.

19  Q    And in response to the question, are you willing to answer

20  some questions, what was his response?

21  A    He just started talking.

22  Q    Okay.

23  A    He just made a quick, he made a quick statement, that was

24  it.

25  Q    Okay.  And what did he say to you?

**DAVID JACOBS – DIRECT EXAMINATION**

1    A    Just that Harrison Wade met him to borrow money, that he's

2    not a drug dealer, and that he got his heroin from a subject

3    known as Bo and Mo who were related.

4    Q    Okay.  Did you ask him any questions at that point?

5    A    After that.

6    Q    What did you ask him?

7    A    Just where were they, where were they at?

8    Q    Where were they at, what do you mean by that?

9    A    Like, like what location he would see Bo and Mo at.

10   Q    And what was his response?

11   A    Freddy's Liquors in District Heights.

12   Q    Okay.  Did you ask him any other questions about the

13   identities of Bo and Mo?

14   A    No, I did not.

15   Q    Okay.  Did you ask him any questions regarding whether he

16   ever distributed heroin to Harrison Waite?

17   A    No, I did not.

18   Q    Did he say anything else?

19   A    Not in reference to this, he made comments about his,

20   something about his job and about, I believe, having an

21   infection.

22   Q    What did he say?  What did he say about his job?

23   A    Just, I believe, he was worried about losing his job or if

24   his job found out, and that he was supposed to -- I think he was

25   supposed to be at work that day.

**DAVID JACOBS – DIRECT EXAMINATION**

1  Q    Okay.  And you made mention of an infection earlier.  What

2  did he say about an infection?

3  A    I just believe that he was -- I believe he made a comment

4  that he was sick, had an infection.

5  Q    Okay.  How long did this conversation last?

6  A    Just several minutes.

7  Q    How long did it take you to drive from the Calvert County

8  Detention Center to the Greenbelt courthouse?

9  A    Approximately, an hour and 15 minutes, I would say.

10  Q    During the period of time you were driving, about how long

11  were you two in conversation in total?

12  A    The first statement about Mo -- excuse me, Bo and Mo was

13  made.  And then later on when we got towards the beltway, he was

14  talking about the, his job and the infection.  So it was like a

15  minute or two conversation.  And then another conversation when

16  we got to the beltway, for another couple minutes, if I recall.

17  Q    Was he largely silent then for the remainder of the ride?

18  A    From what I recall, yes.

19  Q    Did you ask him any other questions during the course of

20  that drive?

21  A    No, I did not.

22  Q    Did everything we covered here today take place here in the

23  District of Maryland?

24  A    Yes.

25  Q    Okay.

**DAVID JACOBS — CROSS EXAMINATION**

1          MR. RAO:  I'd like -- at this time, I'd ask that the

2    Government's Exhibit Suppression Hearing 1 be received in

3    evidence?

4          MR. BRENNAN:  No objection for the suppression

5    hearing, Your Honor.

6          THE COURT:  All right.  Received.

7          MR. RAO:  Okay.  Sir, that's it.

8          Thank you, Your Honor.

9          THE COURT:  Cross.

10                      **CROSS—EXAMINATION**

11   BY MR. BRENNAN:

12   Q    Good morning, Mr. Jacobs.

13   A    Good morning, sir.

14   Q    Now, you told the Court that you were not present at the

15   time of Mr. Sweeney's arrest a few days earlier, is that

16   correct?

17   A    That's correct, sir.

18   Q    Did you have any knowledge of the case at the time that you

19   appeared at the Calvert County Detention Center the morning to

20   pick him up?

21   A    Yes.

22   Q    You did?

23   A    Yes, sir.

24   Q    All right.  How did you acquire that knowledge of the case?

25   A    I'm the case agent for the case.

**DAVID JACOBS – CROSS EXAMINATION**

1  Q   You're the case agent for the case?

2  A   Yes, sir.  On the federal side, yes, sir.

3  Q   All right.  So, on the federal side, you're the case agent.

4  You knew the facts and circumstances surrounding Mr. Sweeney's

5  arrest, is that correct?

6  A   Correct.

7  Q   Okay.  And you knew the course of the investigation, is

8  that correct?

9  A   I'm sorry.

10  Q   You knew the course of the investigation, correct?

11  A   Yes, sir.

12  Q   Is it fair to say, on the federal side, you were the lead

13  investigator?

14  A   Yes, sir.

15  Q   Okay.  So, you picked up Mr. Sweeney that morning from the

16  Calvert County Detention Center.  Now, did the detention center

17  tell you that Mr. Sweeney was ill, that he had this infection?

18  A   I don't recall.

19  Q   Did the detention center tell you that Mr. Sweeney was on

20  any medication as a result of this infection?

21  A   I don't recall.

22  Q   Don't recall.  Okay.  So, you left the detention center in

23  Calvert County.  And I take it you knew Mr. Sweeney was in

24  custody for these charges; that is, the federal charges, is that

25  correct?

DAVID JACOBS – CROSS EXAMINATION

1  A    Yes, sir.

2  Q    Okay.  And did you have any discussions with anyone in the

3  case concerning whether or not you would interview Mr. Sweeney?

4  A    No, sir.

5  Q    Well, you were the lead case agent on the federal side,

6  correct?

7  A    Correct.

8  Q    Didn't you want to interview Mr. Sweeney?

9  A    Eventually, yes.

10  Q    I'm sorry.

11  A    Eventually, yes.

12  Q    Eventually.  So, that's what was in your mind that day.

13  Eventually you would like to interview Mr. Sweeney about the

14  facts of this case, correct?

15  A    Yes.

16  Q    Okay.  But when you took custody of him, you did not

17  immediately read him his rights, is that right?

18  A    When I took custody of him at the detention center?

19  Q    Yes.

20  A    No, I did not.

21  Q    But you eventually did want to interview him?

22  A    Correct.

23  Q    Okay.  Now, leaving the detention center, what exactly did

24  Mr. Sweeney say to you that caused you to pull out your, what's

25  known as the Miranda card?

**DAVID JACOBS – CROSS EXAMINATION**

1  A    I believe, like I said, he was just stating that the

2  charges that, the charges were BS.  I don't know his exact

3  wording.  I'm sorry, it's been almost two years.  Just that

4  basically that these -- he didn't think -- these charges were

5  BS.  So I was, like, hold on one second.  Just let me read you

6  your Advice of Rights.

7  Q    Okay.  So that -- did you -- so, other than what you just

8  told the Court that Mr. Sweeney said, these charges are BS.

9  A    Something along those lines, correct.

10 Q    Something along those lines?

11 A    Yes, I don't remember his exact words.

12 Q    You don't remember his exact words, but that's the best

13 recollection?

14 A    Yes, sir.

15 Q    That, that caused you to read him his rights; is that

16 correct?

17 A    Correct.

18 Q    Okay.

19         MR. BRENNAN:  And do you have the exhibit?

20         MR. RAO:  I sat it down.

21         MR. BRENNAN:  May I just approach, Your Honor?

22         THE COURT:  You want this, the Advice of Rights?

23         MR. BRENNAN:  Yes.

24         THE COURT:  I'm sorry.

25 BY MR. BRENNAN:

**DAVID JACOBS — CROSS EXAMINATION**

1   Q    Now, how long have you been a law enforcement officer, sir?

2   A    Since 1997.

3   Q    Okay.  Had you been trained that when you do what's known

4   as an Advice of Rights, there's two parts to it, correct?

5   There's the Advice of Rights and then there is a separate part.

6   It's the Waiver of Advice of Rights, correct?

7   A    Well, ours is one form.

8   Q    One form, but you know it's a two-step process, that you

9   must inform the defendant or the person in custody, what their

10  rights are.  And then, two, you must ascertain whether or not

11  they're waiving their rights, correct?

12  A    Correct.

13  Q    Okay.  And the part involving the waive of their rights

14  involves whether or not their able to read, write and understand

15  English, for example, correct?

16  A    Correct.

17  Q    What their educational background is, correct?

18  A    That's correct.

19  Q    Ascertain whether or not they're under the influence of any

20  drugs or narcotics; is that correct?

21  A    That's correct.

22  Q    And also, to ascertain whether they're under the influence

23  of any medicines or things like that; is that correct?

24  A    That's correct.

25  Q    Okay.  Now, with respect to when you -- now, did you pull

**DAVID JACOBS – CROSS EXAMINATION**

 1  over or just sit at the stop sign, right there?

 2  A    At the stop sign, sir.

 3  Q    Sat at the stop sign?

 4  A    Yeah, I didn't pull over out the road at all.

 5  Q    All right.  So, you sat there at the stop sign and just

 6  read what's, what's appeared here on the card; is that correct?

 7  A    Yes, sir.

 8  Q    All right.  So, there's no indication that -- and this is

 9  what you read to Mr. Sweeney that appears right here on

10  Government's Exhibit 1, for the purposes of this Motion --

11  A    Yes, sir.

12  Q    -- right?

13  A    Yes, sir.

14  Q    Okay.  So, nowhere on this card, nor did you inquire of

15  Mr. Sweeney, whether or not there was a knowing and intelligent

16  waiver of his rights, correct?

17  A    There was a formal not --

18         THE COURT:  Wait a minute.  You're asking for a legal

19  conclusion of what the last sentence means?

20         MR. BRENNAN:  Well, let me -- I'll rephrase it.  I'll

21  rephrase it, if I may, Your Honor.

22  BY MR. BRENNAN:

23  Q    You did not go through with Mr. Sweeney, at this time, what

24  his educational background was, did you, sir?

25  A    I don't believe so, no, sir.

DAVID JACOBS — CROSS EXAMINATION

1   Q     Right.  You did not go through with Mr. Sweeney whether or

2   not he received any medication at the detention center; is that

3   correct?

4   A     That's correct.

5   Q     Okay.  So, you did not know what, whether or not

6   Mr. Sweeney had the educational ability to understand these

7   rights, correct?  You didn't know that, did you?

8   A     I didn't ask him that.

9   Q     You didn't ask him that, right?

10  A     Correct.

11  Q     And you also didn't ask him about, whether or not he was

12  under the -- had received any medicine at the detention center,

13  correct?

14  A     Correct.

15  Q     Okay.  So, you read these rights and when he -- at the end,

16  what did he say?

17  A     I believe he just made that comment about, about when

18  the -- it wasn't a long conversation about this at all.

19  Q     All right.  Did you read them verbatim, as it appears on

20  the card?

21  A     Yes, sir.

22  Q     Okay.  When you got to the last one, are you willing to

23  answer some questions, what did he say?

24  A     I didn't --

25  Q     To that, to that specific question -- to that specific item

**DAVID JACOBS – CROSS EXAMINATION**

1  on the card, Are you willing to answer some questions, what

2  exactly did Mr. Sweeney say in response to that?

3  A    I believe, at the time he just started talking.

4  Q    All right.

5  A    I don't remember if he said yes or no.

6  Q    I didn't mean to interrupt you.  I'm sorry, detective.  You

7  can't recollect today whether or not he ever answered that

8  question, correct?

9  A    Correct.

10  Q    Okay.  So, you can't tell Judge Messitte that Mr. Sweeney

11  waived his rights by saying, Are you willing to answer some

12  questions.  You never got an answer to that question, correct,

13  sir?

14  A    Correct.

15  Q    Okay.  Now, what did Mr. Sweeney say?

16  A    The comment that I made.  You want me to repeat the whole

17  thing?

18  Q    Well, I'm trying to make --

19  A    Okay.  Just, basically, he stated --

20  Q    Well, I'm trying to pin down exactly what was said.  That's

21  --

22  A    Okay.  So, the report states that, he made a comment that

23  Mr. -- he lent, lent -- excuse me, lent Mr. Waite money or

24  Mr. Waite was there to borrow money, and that he was not a drug

25  dealer.  That he got his heroin from Bo and Mo.  And then I

**DAVID JACOBS – CROSS EXAMINATION**

1  asked, where were they at?  And he stated, Freddy's Liquors in

2  District Heights.

3  Q    And that's all that occurred at that time?

4  A    At that time, correct.

5  Q    And this is seated at the stop sign?

6  A    No, sir, at this time, we had already moved.  I had read

7  him his rights at the stop sign.  We were on 231 heading towards

8  Route 4 when that statement was made.  We were to the light at 4

9  and 231.

10  Q    Okay.  So, you read him his rights at the stop sign,

11  correct?

12  A    Correct.

13  Q    We've already established that there was no response, and I

14  won't go over it again to the question, are you willing to

15  answer some questions.  You pull out of that, pull out, make the

16  left to head down to Route 4, correct?

17  A    No, we head down 231.  We were on the way to Route 4.

18  Q    Right.

19  A    Correct.

20  Q    But you're stopped at the light coming out of the road from

21  the detention center to get onto 231, right?

22  A    When I read him the rights.

23  Q    That's where you were when you read him his rights?

24  A    Correct.

25  Q    So, you then made the left on to 231 to head down to Route

**DAVID JACOBS – CROSS EXAMINATION**

1  4?

2  A    Correct.

3  Q    Okay.  It's when you got to the light on Route 4 that he

4  then started saying these other things?

5  A    That's when he made the statement, yes.

6  Q    That's when he made the statement?

7  A    Yes.  It's not that far of a drive from Stafford to Route

8  4.

9  Q    I've made that drive many times, I'm familiar with the

10  drive?

11  A    Okay.  Yes, sir.

12  Q    All right.  So, but for the record, how long is that drive

13  from the stop sign at 231 where you make the left up to the

14  light at Route 4?  It's a few minutes, isn't it?

15  A    It could be depending on traffic, yes.

16  Q    Right, four or five minutes?

17  A    Could be, somewhere around there.

18  Q    Okay.  So, you read the rights at the stop sign.  Four or

19  five minutes later, you're at the stop light at 231 and Route 4

20  again to make the left to go up towards Greenbelt, correct?

21  A    Yes, sir.

22  Q    And that's when he then says these other things?

23  A    That's when he made the statement about Mr. Waite, yes.

24  Q    Right.

25  A    Yes, sir.

DAVID JACOBS – CROSS EXAMINATION

1   Q    The statement about Mr. Waite?

2   A    Yes, sir, uh-huh.

3   Q    Okay.  And then -- and that's all that was said at that

4   time?

5   A    Yes, sir.  From what I recall, yes, sir.

6   Q    But you asked him who Bo and Mo were?

7   A    Correct.

8   Q    Okay.

9   A    He stated, he didn't know that they were just related.

10  Q    All right.

11  A    Or he states that, yes, sir.

12  Q    Okay.  And you asked him where the, where this liquor store

13  was?

14  A    Yes, sir.

15  Q    And you were driving, you weren't taking any notes?

16  A    That's correct.

17  Q    All right.  And then the drive from that stop light at

18  Route 4 and 231 up to the beltway is how long?  How long is that

19  drive?

20  A    25 miles, maybe.  Yeah, somewhere around there.

21  Q    A half hour?

22  A    Could be, yes.

23  Q    Okay.  So, there's no conversation with Mr. Sweeney then

24  after this statement at the stop light to the beltway?  About

25  half hour, nothing is said in the vehicle?

**DAVID JACOBS — CROSS EXAMINATION**

1  A     Not that I recall, the next conversation I remember was we

2  were on the actual beltway.

3  Q     Okay.  And what's said at that time?

4  A     That was about, I believe, about his job, that he was

5  supposed to be at work.  He was worried about calling in for his

6  job.  And I believe that's when he mentioned about that he had

7  an infection.

8  Q     Okay.  And anything else said?

9  A     Not that I recall, sir.

10 Q     All right.  And again, so the record is clear, when that

11 statement is made also, Mr. Sweeney at that point still has not

12 answered your question, are you willing to answer some

13 questions, correct?

14 A     Correct.

15 Q     Cause he never did during the course of that time that you

16 spent with Mr. Sweeney that day, he never did answer, are you

17 willing to answer some questions, correct?

18 A     Not that I recall.

19 Q     Okay.

20        MR. BRENNAN:  Court's indulgence, Your Honor.

21     (Pause.)

22        MR. BRENNAN:  Nothing else.  Thank you, Your Honor.

23        THE COURT:  Redirect.

24                    **REDIRECT EXAMINATION**

25 BY MR. RAO:

DAVID JACOBS – REDIRECT EXAMINATION

1    Q    I want to turn you back, Officer Jacobs, to the morning of

2    May 24th of 2010, at the time that you were parked at the stop

3    sign with Mr. Sweeney.  At that time, you went over his rights

4    with him, is that correct?

5    A    Correct.

6    Q    You read him the Advice of Rights Card that we went over a

7    moment ago?

8    A    Correct.

9    Q    After you asked him the question, are you willing to answer

10   some questions, what happened?

11   A    That's when he made the, that statement.

12   Q    Did you ask him any questions at that point?

13   A    Afterwards, I asked him about Bo and Mo.

14   Q    Okay.  But that was -- was that before or after he spoke to

15   you and made the statement that you told us about before?

16   A    That was after.  That was a question in reference to what

17   he stated earlier.

18   Q    Okay.  So, you'd asked him no questions until after he had

19   spoken to you and made the statement that you told us about

20   before?

21   A    Correct.

22   Q    Okay.

23              MR. RAO:  I have no other questions.  Thank you.

24              THE COURT:  Just a couple questions.

25              How old did you take Mr. Sweeney to be when you were

**DAVID JACOBS — REDIRECT EXAMINATION**

1  talking to him?  How old did you think he was?

2          THE WITNESS:  Forty-five, 50.

3          THE COURT:  Okay.  And in terms of speaking with you,

4  did he seem coherent?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Was his speech slurred in any way?

7          THE WITNESS:  No, sir.

8          THE COURT:  Okay.  Was his movements -- were his

9  movements logy in any way in terms of whether he was with it or

10  possibly under the influence of anything?

11          THE WITNESS:  He seemed to be coherent, sir.  He

12  seemed to be coherent.

13          THE COURT:  All right.  Well, I mean, were the --

14          Very well.  Okay, nothing further.

15          Mr. Brennan, did you have something based on that?

16          MR. BRENNAN:  No.  Based on the Court's questions, no.

17  I have some arguments, Your Honor, but no questions based on

18  that.

19          THE COURT:  All right.

20          You may step down.  Thank you, sir.

21      (Witness excused.)

22          THE COURT:  Do you have, on this issue, do you have

23  any other witnesses from the government?

24          MR. RAO:  No, Your Honor.

25          THE COURT:  Is the defendant going to take the stand

**DAVID JACOBS – REDIRECT EXAMINATION**

1   on this or what are you going to do?

2          MR. BRENNAN:  Court's indulgence.

3          No, Your Honor, but he --

4          THE COURT:  But you don't have any witnesses you're

5   going to call?

6          MR. BRENNAN:  -- but he apparently needs an emergency

7   break to visit the restroom facility.

8          THE COURT:  All right, that's fine.  We'll take about

9   a seven or eight minute break.

10     (Recess.)

11         MR. BRENNAN:  Your Honor, if the Court please, because

12  we took them out of order; that is, we had the statement first

13  and the arrest of Mr. Sweeney occurred on the Friday before

14  this, there are two questions I wanted -- if I could recall

15  Officer Jacobs, Your Honor, and ask him two questions that

16  relate back to the arrest as opposed to the statement?  It may,

17  may help the Court in the analysis on this issue.

18         THE COURT:  All right.

19         All right.  Sir, just take the stand for a moment, if

20  you would then.  And you're under oath from before, so.

21         THE WITNESS:  Yes, sir.

22         MR. BRENNAN:  Thank you, Your Honor.

23                    **RECROSS EXAMINATION**

24  BY MR. BRENNAN:

25  Q   Officer Jacobs, the first question I asked you was that,

DAVID JACOBS – RECROSS EXAMINATION

1    was that you were the, for the federal side of things, the case

2    agent in this case, correct?

3    A    That's correct.

4    Q    And that, I asked you had you read the reports about

5    Mr. Sweeney's arrest, correct?

6    A    Correct.

7            THE COURT:  And your answer was, you had or had not?

8            THE WITNESS:  I have.

9            THE COURT:  You had read the report?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  All right, that's fine.

12   BY MR. BRENNAN:

13   Q    And you knew as a result of the review of those reports

14   that Mr. Sweeney had invoked his right to silence at the time of

15   his arrest, correct?

16   A    No, sir.

17   Q    Well, there was no waiver?

18           THE COURT:  Do I have the report?  I'd like to see the

19   report, if there is one.

20           THE WITNESS:  Are you talking about the initial

21   reports or the report that I wrote?

22           MR. BRENNAN:  Well --

23           THE WITNESS:  I wrote that report.

24   BY MR. BRENNAN:

25   Q    Let's forget about the report for a moment.  The question

DAVID JACOBS – RECROSS EXAMINATION

1    is, you knew at the time of Mr. Sweeney's arrest on Friday the

2    23rd, that Mr. Sweeney had invoked his right to silence,

3    correct?

4    A    No, sir.

5    Q    Well, there was no waiver taken, was there, sir?

6    A    Not that I know of, no, sir.

7    Q    Right.

8         THE COURT:  I'd like to see the report that he's

9    allegedly read and what it says.  I'm not sure what kind of

10   suggestion --

11        THE WITNESS:  I was.

12        THE COURT:  Wait a minute.

13        Did you read the report before you transported him?

14        THE WITNESS:  No, the report he's referring to, I

15   wrote.

16        THE COURT:  Okay.  You did not read a police report?

17        THE WITNESS:  I read the other reports about the death

18   and all that.

19        THE COURT:  Well, hold on.  Before you transported the

20   defendant, had you read any reports of the case?

21        THE WITNESS:  Yes, I wrote the reports.  It's my case.

22        THE COURT:  You had written a report before you

23   transported him?

24        THE WITNESS:  Yes, sir, but not about that incident.

25   I've written several reports.  I didn't know he was asking about

DAVID JACOBS – RECROSS EXAMINATION

1   the incident in particular.  I wrote that report the following

2   day.

3               THE COURT:  No, stay with me for a minute.  I want to

4   know what you had read about the case before you transported him

5   on the day when he purportedly made the statement.  What had you

6   read of other people, what had you written of, yourself?

7               THE WITNESS:  Sir, I wrote in the reports -- I wrote

8   the indictment for -- I wrote everything for the case.

9               THE COURT:  Okay.  Do I have those documents in this

10  case?

11              THE WITNESS:  But he was never talked -- Mr. Sweeney

12  was never talked to.

13              THE COURT:  What?

14              THE WITNESS:  Mr. Sweeney was never talked to before.

15              THE COURT:  No, no, I understand.  I'm just curious as

16  to what you had read is all.  Are there documents?

17              What are we talking about?  Was it a district court

18  case filed by the, filed by the officer?  What are we talking

19  about now?

20              MR. BRENNAN:  Your Honor, maybe I can clear it up,

21  maybe the government can clear it up.  I think that between the

22  time of Mr. Wade's death in March of '09, March 23 of '09

23  through the arrest of Mr. Sweeney on May 23, 2010, obviously

24  more than a year had gone by.  I think this detective -- excuse

25  me, this officer, Your Honor, had written a number of reports

1   about the investigation.

2           THE COURT:  Right.

3           MR. BRENNAN:  What I was focusing on, Your Honor, were

4   the circumstances of Mr. Sweeney's arrest on Friday, May 23, as

5   to whether, whether or not he knew whether Mr. -- or not

6   Mr. Sweeney asked for a lawyer at the time of his arrest on

7   May 23.

8           THE COURT:  That's what I'm asking you, what's the

9   document?  Are you relying on some document here?  I'm asking

10  you, Mr. Brennan.  I mean, are you saying, did he know whether

11  or not verbally something had been done?  Did he know whether or

12  not there had been an execution or refusal to sign a written

13  waiver?  I mean, I need to know what we're talking about here.

14  I can't follow your question the way it is, because you're

15  assuming a fact that's not in evidence right now.  I don't know

16  what he did prior.

17          MR. BRENNAN:  Well, I'm asking what if any knowledge

18  this witness has about whether or not at the time of

19  Mr. Sweeney's arrest he either invoked his right to remain

20  silent or requested counsel?  That's my question.

21          THE WITNESS:  I did not know any of that.

22          THE COURT:  Well, you didn't know one way or another.

23  I don't either right now --

24          MR. BRENNAN:  Right.

25          THE COURT:  -- is the problem.

DAVID JACOBS – RECROSS EXAMINATION

1     MR. BRENNAN:  And if the answer is, he didn't know one

2  way or the other, that's fine.  There's another witness that was

3  present at the time of Mr. Sweeney's arrest, Your Honor.

4     What I'm trying to ascertain from this witness is, was

5  he told by any other law enforcement officer or did he read a

6  report or did he have any knowledge of what transpired at the

7  time of Mr. Sweeney's arrest on Friday, May 23?

8     THE COURT:  That's the question?

9  BY MR. BRENNAN:

10 Q    That's the question.

11 A    When I picked up Mr. Sweeney, no, I did not know any,

12 anything about what happened, just that he was locked up.

13 Q    Just that he was locked up?

14 A    Correct.

15 Q    And did anyone from Calvert County or any other law

16 enforcement agency tell you prior to your contact with

17 Mr. Sweeney on Monday the 26th, anything at all involving the

18 circumstances surrounding Mr. Sweeney's arrest on the 23rd?

19 A    Only thing I knew is that when he was arrested, they found

20 some other paraphernalia and a cell phone.

21 Q    Okay.  Did you have any knowledge at all from any source as

22 to any questioning of Mr. Sweeney at the time of his arrest on

23 May 23?

24 A    After he was transported, when I wrote the report, I did

25 nothing prior to me writing the report.  No, sir.

DAVID JACOBS – RECROSS EXAMINATION

1   Q    Okay.  That was my question.

2        You told us that you had knowledge of Mr. Sweeney's arrest,

3   in the sense that they found some paraphernalia, is that

4   correct?

5   A    Correct.

6   Q    Do you know whether or not the Calvert County Detention

7   Center has a methadone program?

8   A    That I do not know.

9   Q    But do you know whether or not Mr. Sweeney was being

10  detoxed or whether he was being given any medicine for his

11  heroin addiction at the time that you had contact with him on

12  Monday, May 26th?

13  A    That I do not recall.

14       MR. BRENNAN:  That's all I have, Your Honor.

15       I would ask that we leave this part of the record

16  open, because I think I have to establish a few things that

17  occurred on Friday the 23rd, before the Court can rule on this

18  statement.

19       THE COURT:  Any further examination of the witness,

20  Mr. Rao?

21       MR. RAO:  One question, Your Honor.

22                    **REDIRECT EXAMINATION**

23  BY MR. RAO:

24  Q    Did Mr. Sweeney at the time that you transported him, did

25  he appear to be under the influence of any drugs at that time?

**DAVID JACOBS — RECROSS EXAMINATION**

1    A    No, sir.

2         THE COURT:  All right.

3         Thank you.  You may step down.

4         Your next witness.

5         MS. JOHNSTON:  Your Honor, I believe that concludes

6    the witnesses in terms of the statement that was made on

7    May 24th of 2010.

8         We have the motion then to suppress the evidence that

9    was seized at the time of the defendant's arrest on Friday,

10   May 21st -- May 21st of 2010.  And we would call Detective Cress

11   to testify about that arrest.

12        THE COURT:  All right.  Sir, if you'll come right up

13   to the front and face the clerk.  She'll swear you and then take

14   the witness stand.  Come right up here.

15            **RICHARD CRESS, GOVERNMENT WITNESS, SWORN**

16        THE DEPUTY CLERK:  Please have a seat on the witness

17   stand.  Sir, please speak directly into the microphone, state

18   your name and please spell your last name.

19        THE WITNESS:  Richard Cress, C-R-E-S-S.

20                    **DIRECT EXAMINATION**

21   BY MS. JOHNSTON:

22   Q    Detective Cress, where are you employed?

23   A    Calvert County Sheriff's Office.

24   Q    And how long have you been employed there?

25   A    Twelve years.

RICHARD CRESS - DIRECT EXAMINATION

1   Q    Could you describe for us the various assignments that

2   you've held?

3   A    I was in patrol.  I was assigned to the canine unit from

4   2002 to 2007.  I'm currently assigned to narcotic investigation

5   from 2007 till present.

6   Q    Now, calling your attention to May of 2010, were you

7   working with Task Force Officer Jacobs in relation to the

8   Sweeney investigation?

9   A    Yes, I was.

10  Q    And did there come a time when you responded to an address

11  to arrest Mr. Sweeney?

12  A    Yes.

13  Q    And what date was that?

14  A    I believe it was May 21st, 2010.

15  Q    And what address did you respond to?

16  A    I believe it was 9101 Hall Court.

17  Q    What city?

18  A    Owings, Maryland.

19  Q    And for what purpose did you respond to that address?

20  A    To arrest Mr. Sweeney on an indictment.

21  Q    Would that have been the federal indictment here?

22  A    Yes, it was.

23  Q    Who went with you to make that arrest?

24  A    Deputy Mike Tomlinson and Sergeant Roscoe Jones.

25  Q    Okay.  And what was Detective Mike Tomlinson's assignment

1   at that time?

2   A    He's assigned to the warrant unit.

3   Q    And were you assigned to the narcotics unit on that date?

4   A    Yes, I was.

5   Q    And how about the sergeant you mentioned who was there?

6   A    Sergeant Roscoe Jones is my supervisor assigned to the, to

7   the narcotics unit.

8   Q    And what are the duties of the warrant unit?

9   A    They serve all indictments, warrants, criminal summons that

10  are issued by the Courts.

11  Q    Do you know, approximately, what time during the day you

12  went there?

13  A    It was early afternoon.

14  Q    And what occurred when you got there?

15  A    I went and knocked on the front door with Mike Tomlinson.

16  A gentleman came to the door.  I advised him -- I identified

17  myself.  I advised him that we had a warrant for Mr. Sweeney.

18  He stepped outside of the door on to a concrete, like a landing

19  that was in front of the door outside.

20       I said, is he home?  He didn't want to answer any

21  questions.  He said my grandparents would be right back.  I'd

22  appreciate it if you wait for them.  We stayed outside until the

23  arrival of Mr. Sweeney's parents.  The individual that I spoke

24  with, his -- who he referred to was his grandparents.

25  Q    And do you know, approximately, how long you were out front

RICHARD CRESS - DIRECT EXAMINATION

1  with this gentleman?

2  A    It was a short period of time, maybe five minutes at the

3  most.

4  Q    And what did you -- what happened while you were waiting

5  out there?

6  A    We were standing there waiting.  He smoked a cigarette and

7  we were, we were waiting.

8  Q    And who arrived?

9  A    Mr. Sweeney's parents.

10 Q    And do you recall how they arrived?

11 A    They, they pulled up at the end of the driveway in a

12 vehicle.  I walked down to the end of the driveway and spoke to

13 both of them through the driver's side window.

14 Q    And what did you, what did you say to them?

15 A    I advised them that we had a warrant for Mr. Sweeney, that

16 we needed to go into the residence and, and get him.

17 Q    And what was there response?

18 A    They said, okay.  I turned around and walked back up to the

19 front of the house where the gentleman that was standing there

20 opened the front door.  We walked in and went downstairs.

21 Q    When you say, we walked in, who are you referring to?

22 A    Me, Mike Tomlinson -- Deputy Tomlinson, and the other

23 individual that was out, that was out front with us, which he --

24 the individual referred to me as them being, the owners of the

25 home being his grandparents.

**RICHARD CRESS – DIRECT EXAMINATION**

1  Q    Okay.  Now, let me get this straight.  The gentleman that

2  was standing, who stood outside with you was the person who

3  first answered the door when you first got there?

4  A    Yes.

5  Q    And did he go in the house with you --

6  A    Yes, he did.

7  Q    -- and Deputy Tomlinson?

8  A    Yes.

9  Q    Where was the sergeant at this point?

10  A    He was around to the -- if you're facing the residence, he

11  was to the left, rear corner.  There was a sliding glass door

12  that exited the basement, that we wanted to have covered and

13  also the back of the house where we wanted to have coverage.

14  Q    In the event Mr. Sweeney attempted to flee?

15  A    Yes.

16  Q    Now, once you walk inside the house, who goes down into the

17  basement?

18  A    Me and Deputy Tomlinson.

19  Q    Did you search up, up in the up -- on the first level of

20  the house?

21  A    No, we didn't.

22  Q    Where did you go when you got to the basement?

23  A    We went to Mr. Sweeney's room, which was to the left corner

24  of the, of the basement.

25  Q    And what did you observe there?

RICHARD CRESS – DIRECT EXAMINATION

1    A    We observed Mr. Sweeney sitting on the bed.

2    Q    Did you observe anything else as you went into his bedroom?

3    A    To the left-hand side was on a, on a book held -- on a

4    bookcase or a shelf was, was some drug paraphernalia.

5    Q    Did you move anything to see that drug paraphernalia?

6    A    No, we didn't.

7    Q    Can you describe what it was?

8    A    There was a -- the bottom of a, of a can, some baggies that

9    were ripped, some needles, a spoon.

10   Q    And were there also some little, like jeweler Ziploc

11   baggies?

12   A    Yes, yes.

13   Q    With some markings on the outside of those?

14   A    Yes.

15            THE COURT:  Did you say it was in the same room where

16   the defendant was as well?

17            THE WITNESS:  That's correct.

18            THE COURT:  And that was a bedroom?

19            THE WITNESS:  That's correct.

20   BY MS. JOHNSTON:

21   Q    And when you walked in, into the doorway, where was that

22   bookshelf in relation to the doorway?

23   A    It was to the left-hand side against the wall.

24   Q    Did you move anything to see those little baggies and the

25   other drug paraphernalia?

**RICHARD CRESS – DIRECT EXAMINATION**

1   A    No, it was all in plain view.

2   Q    And what did you say to Mr. Sweeney, who was sitting there

3   on the bed?

4   A    I advised him that we had a, had an indictment and that he

5   was under arrest.

6   Q    Was he then taken out of the bedroom?

7   A    We took him out of the bedroom and we sat him, what I refer

8   to would be like a living area, and he got dressed there.  He

9   had some type of medical issues that a nurse was going to come

10  by the house later on that day.

11  Q    How did you ascertain that he had some medical issues?

12  A    There was, there was medical supplies in that live-in area

13  and also, he had a port, I believe, in his arm.

14  Q    Did you ask him about the port in his arm or was there

15  conversation with him?

16  A    Yes, there was.  He said that he had been, been sick and

17  been off work for quite some time.

18  Q    Did he make any request of you at that point in time?

19  A    We needed -- there was a nurse that was, that was going to

20  come by the house later on that evening, and we needed to make

21  notification to the nurse that he wouldn't be there.  So, there

22  was a phone that was plugged into the wall directly beside this,

23  the slider -- the sliding glass door, that exited the basement

24  of the residence.  I retrieved that phone and I retrieved that

25  phone, and I believe Mr. Sweeney made contact with the nurse.

RICHARD CRESS – DIRECT EXAMINATION

1   Q    Okay.  Let me back up for a second here.  How did you come

2   to learn that there was a nurse that was supposed to be there

3   later that day?

4   A    Mr. Sweeney advised me of that.

5   Q    Did Mr. Sweeney also ask you if he could call the nurse?

6   A    Yes.  And he indicated that that was his phone plugged into

7   the charger at the wall.

8   Q    And did you allow him to call the nurse before he was

9   removed from the premises?

10  A    Yes.

11  Q    Now, after he called the nurse and was dressed, was he

12  removed from the premises?

13  A    Yeah, we took him upstairs and he was removed.  We went out

14  the front door.

15  Q    And was it Officer Tomlinson who took him from there?

16  A    Yes.

17  Q    Now, in addition to removing Mr. Sweeney, did you remove

18  any other items from the residence?

19  A    I removed the items that were in plain view, except the

20  needles.

21  Q    Which was what?

22  A    Several Ziploc baggies, some to be torn, some to be holed;

23  a spoon, the bottom of a can that had been cut and crushed.

24  Q    And what about the telephone?

25  A    And the telephone, yes.

**RICHARD CRESS – DIRECT EXAMINATION**

1  Q    And why did you take the telephone?

2  A    The telephone was evidence in the case that he was being

3  arrested on the indictment for.

4  Q    And at the time you were there to execute the arrest

5  warrant, were you familiar with his use of a telephone in

6  relation to the counts charged in this indictment?

7  A    Yes, I was.

8  Q    And what did you know about it?

9  A    I knew that the telephone that Mr. Sweeney owned was being

10  used, was used to have communication with the victim in this

11  case.

12  Q    It would have been Harrison Waite?

13  A    Yes.

14  Q    Now, did you conduct any search of his bedroom or any area

15  of the house?

16  A    No.

17  Q    Now, prior to leaving, did he have any conversation with

18  any of the other residents of the house?

19  A    He had a conversation with his, with Mr. Sweeney's mom and

20  dad.

21  Q    And what was that conversation?

22  A    They were elderly and I was very concerned with the drug

23  paraphernalia that I located downstairs, that they would go down

24  and try and clean the room up.  For their safety, I advised them

25  that there were several items of paraphernalia found in the

RICHARD CRESS - DIRECT EXAMINATION

1    house, to include needles -- and I'm sorry, in his bedroom, to

2    include needles.  And I advised them, please don't go try and

3    clean the room up, because of -- we didn't want you to hurt

4    yourself in a needle that wasn't kept.

5    Q    Could you describe the condition of his bedroom?

6    A    It was, it was a mess.

7    Q    What do you mean by, a mess?

8    A    There was stains everywhere, there was food everywhere.

9    There was -- I would say after, after eating dinner, the dishes

10   were -- after eating in his bedroom, the dishes would be to the

11   side.  It was --

12   Q    Do you see the individual whom you arrested that morning

13   and observed in that bedroom in the courtroom?

14   A    Yes, he's to my right.

15   Q    Can you describe what he's wearing for the record?

16   A    A tan, button up shirt.

17   Q    Now, did you advise Mr. Sweeney of his rights there in the

18   residence?

19   A    No, I didn't.

20   Q    Did you attempt to get any statements from him there?

21   A    No, I didn't.

22   Q    Was any effort made at that point to question him?

23   A    I can't recall.  What I do recall is that he didn't want to

24   make any statements.

25   Q    And how is -- how did it come up that he, you learned that

RICHARD CRESS – DIRECT EXAMINATION

1   he didn't want to make any statements?

2   A    I don't recall that.

3   Q    Did you ask him any questions there?

4   A    No.

5   Q    And other than the conversation about his health and

6   calling the nurse, do you have any other conversation with him?

7   A    No.

8   Q    You ask him any questions about the paraphernalia or

9   anything that you recovered and seized?

10  A    No.

11  Q    Now, let me show you what's been marked as Government's

12  Exhibit 2.  I'm going to put it up here on the screen.  Do you

13  recognize that?

14  A    That's the residence that we responded to to arrest

15  Mr. Sweeney.

16  Q    Now, can you tell us where the front door is to that

17  residence?

18  A    In the middle of this picture between the two trees,

19  there's a green bush.  Yes, just to the right of that is the

20  front door.

21  Q    And is that like a little stoop there in the photo?

22  A    Yes, that's where we waited.

23  Q    That's where who waited?

24  A    That's where me, Deputy Mike Tomlinson and the individual

25  that opened the front door.

RICHARD CRESS - DIRECT EXAMINATION

1   Q    How many cars did you take to that location?

2   A    Two.

3   Q    And where were those cars parked?

4   A    They were right at the beginning of the driveway.

5   Q    And is this the driveway you're talking about?

6   A    Yes, it is.

7   Q    Were they marked cars?

8   A    No, they weren't.  One was an unmarked police vehicle, one

9   was an undercover narcotics vehicle.

10  Q    And you mentioned Mr. Sweeney's parents arriving, where was

11  their vehicle when you walked up to speak to them?

12  A    On Hall Court which is the road that runs in front of the

13  driveway facing to the left.

14  Q    Facing towards the driveway?

15  A    No, facing towards the left, away from the driveway.  The

16  main road to get into the development when you're looking at

17  this picture, it's to the right-hand side.  They made a, made a

18  turn into Hall Court, which would make them facing to the left.

19  Q    So, facing --

20  A    That's correct.

21  Q    -- towards the point of the pen, in the direction of the

22  point of the pen?

23  A    That's correct.

24  Q    And they stopped right at the, right past the driveway?

25  A    That's, that's correct.

RICHARD CRESS - DIRECT EXAMINATION

1  Q    Did they have any questions for you when you told them that

2  you had an arrest warrant for Mr. Sweeney?

3  A    They wanted to know what it was for and I told them I would

4  explain everything to them when, when we had Mr. Sweeney in

5  custody.

6  Q    And did you tell them afterwards what it was for?

7  A    That's correct.

8  Q    Was that at the same time you had the discussion with them

9  about possible needles being in the basement, in the bedroom?

10  A    That's correct.

11  Q    Now, do you recall speaking with me sometime last week to

12  go over these events?

13  A    Yes, I do.

14  Q    Okay.  And at that time, had you -- did you recall the

15  events slightly different than you recall them today?

16  A    Yes, I did.

17  Q    Okay.  Explain to us what the difference was?

18  A    The time that we spoke last week, I was going off of, of

19  memory.  This event being two years ago, I recalled the events

20  of, in which I stated with you that Mr. Sweeney's dad actually

21  answered the front door.  When I thought about this over the

22  weekend and recalled the events, I'm 100 percent confident that

23  the events I'm testifying to today are the events that, that

24  occurred on that day.

25  Q    So, the difference would have been who answered the door?

**RICHARD CRESS — DIRECT EXAMINATION**

1    A    That's correct.

2    Q    And Mr. Sweeney's parents arrived shortly after you got

3    there?

4    A    That's correct.

5    Q    Did you make any search of the residence before his parents

6    arrived?

7    A    No.

8    Q    And in fact, did you search any part of the residence?

9    A    No.

10         MS. JOHNSTON:  Court's indulgence one moment.

11   BY MS. JOHNSTON:

12   Q    When you saw Mr. Sweeney in the basement, did you ask him

13   any questions concerning the charges in this case?

14   A    No.

15   Q    You ask him any questions concerning the paraphernalia?

16   A    No.

17   Q    Had you advised him, had you or Officer Tomlinson advised

18   him of his Miranda Rights in the basement?

19   A    Not that I can recall.

20   Q    But you do recall Mr. Sweeney not wanting to give a

21   statement?

22   A    Yes.

23         THE COURT:  Are you going to put the warrant in?

24         MS. JOHNSTON:  The warrant itself, Your Honor?

25         THE COURT:  Yeah.

**RICHARD CRESS – DIRECT EXAMINATION**

1          MS. JOHNSTON:  I don't know if we have it.  It may

2    actually be in the court file, if it was returned.

3          THE COURT:  I'd like to see it.

4          Did you present the warrant to somebody, to the

5    defendant?

6          THE WITNESS:  I did not.

7          THE COURT:  To somebody as far as you know?

8          THE WITNESS:  Yes, we did.

9          THE COURT:  Well, you mean, somebody physically gave

10   it to whom, to the defendant or somebody else?

11         THE WITNESS:  The warrant was in Detective Jacobs'

12   possession at the time of the service.  The service would have

13   been done at the detention center and that would not have been

14   done by me.

15         THE COURT:  The arrest warrant?

16         THE WITNESS:  The arrest warrant, that's correct.

17         THE COURT:  I'm losing the sequence here.  I thought

18   you arrested him.  Why were you in the house?

19         THE WITNESS:  To arrest him on that warrant.

20         THE COURT:  But you didn't have the warrant with you?

21         THE WITNESS:  No, we did not.

22         THE COURT:  So, how did you -- what did you say about

23   getting into the house when you got there, why were you there or

24   what did you tell somebody why you were there?

25         THE WITNESS:  We were there to arrest Mr. Sweeney on

**RICHARD CRESS – DIRECT EXAMINATION**

1  the indictment that had been issued by the Court.

2          THE COURT:  I know you were there to arrest him.  What

3  did you tell them about your authority to arrest him?

4          THE WITNESS:  I'm sorry.

5          THE COURT:  What did you tell somebody about your

6  authority to arrest him?  I know that's why you went.  You said,

7  we're here to arrest you on an indictment, but what, anything

8  about a warrant?

9          THE WITNESS:  That we had a warrant for your arrest.

10          THE COURT:  But you didn't have it with you?

11          THE WITNESS:  No.

12          THE COURT:  And you didn't serve it on anybody?

13          THE WITNESS:  I did not serve it on anybody.

14          THE COURT:  As far as you know, nobody served it on

15  him at the time of the arrest.  It was served on him when he was

16  brought back to the detention center?

17          THE WITNESS:  That's correct.

18          THE COURT:  Do you have the warrant?

19          MS. JOHNSTON:  Your Honor, no, I have a, I have the

20  copy of our request that a bench warrant be issued, that was

21  such signed by Judge DiGirolamo, DiGirolamo.

22          THE COURT:  Well, is there a warrant here in this

23  case?

24          THE DEPUTY CLERK:  There is a warrant, but I am

25  checking.  I don't see the return, but it is one.

RICHARD CRESS - DIRECT EXAMINATION

1    THE COURT:  Do you have the warrant?  Can you print

2    the warrant?

3    You have the return?

4    MS. JOHNSTON:  No, Your Honor.  I don't have the

5    return.  All I have is the order signed by Judge DiGirolamo

6    issuing the warrant on May 19th of 2010, that the officers went

7    there to arrest him based on that warrant.

8    THE COURT:  I'd like to see the warrant.

9    MS. JOHNSTON:  Your Honor, I have no other questions

10   of this witness at this time.

11   THE COURT:  All right.  You can start, Mr. --

12   Who's going to inquire, Mr. Brennan?

13   MR. BRENNAN:  Thank you, Your Honor.

14   MS. JOHNSTON:  If I may, before Mr. Brennan starts, we

15   do have a copy of the warrant.

16   THE COURT:  I have a copy as well here now.

17   **CROSS-EXAMINATION**

18   BY MR. BRENNAN:

19   Q    Good morning, Officer Cress.

20   MR. BRENNAN:  Court's indulgence.

21   THE COURT:  You don't show a return, madam clerk?

22   THE DEPUTY CLERK:  No, Judge.  I'm double checking.

23   BY MR. BRENNAN:

24   Q    Starting with the last area of inquiry, Officer Cress, you

25   told us you went there to the residence, which is the Government

**RICHARD CRESS – CROSS EXAMINATION**

1    Exhibit 2 which is on the screen.  Do you see that, sir?

2    A    Yes, sir.

3    Q    Okay.  Now, at the time you approached the residence, you

4    did not have, in your possession, an arrest warrant; is that

5    correct?

6    A    No, I didn't.

7    Q    That's correct, you did not.  And you also did not have a

8    search warrant?

9    A    That's correct.

10   Q    And you were admitted to the residence.  Exactly, who let

11   you in?

12   A    Repeat your question, I'm sorry.

13   Q    Tell us exactly who let you in the residence?

14   A    It was a male, a white male, approximately 6-foot two,

15   weighing about 260 pounds.

16   Q    And --

17   A    His identity -- I could identify him, however, his name, I

18   do not know.

19   Q    All right.  And so, you didn't make any notes, as to who

20   this person was that was at the residence?

21   A    No, I didn't.

22   Q    Did not.  Okay.  And he first declined to allow you in the

23   residence, is that correct?

24   A    That's correct.

25   Q    All right.  And you said, oh, okay.  He won't let us in and

**RICHARD CRESS – CROSS EXAMINATION**

1    you decided not to go in?

2    A    His decline to let us in the residence was hesitant. I

3    advised him that we had an arrest warrant for, for Mr. Sweeney,

4    that we needed to arrest him.  He said, I'd really prefer if

5    you, if you hold on and wait until my grandparents get here.

6    Q    All right.

7    A    And that's what we did.

8    Q    So, you took that as a no?

9    A    And we stood outside.

10   Q    And stood outside, because you did not in fact have the

11   warrant to show this individual, correct?

12   A    We stood outside because he wanted us to wait on his

13   grandparents.  We took his request.

14   Q    Okay.  And then when the grandparents arrived, did you know

15   who they were?  Had you seen photographs of them?

16   A    No, he identified, he indicated that that was his

17   grandparents.

18   Q    And so actually then, who let you in the residence then

19   when you actually went in?

20   A    When we went in the door.

21   Q    Well, I mean, you said that this person you described said,

22   no, you can't go in.  Who then changed their mind and said, you

23   can come in?

24   A    After I spoke with the grandparents.

25   Q    You spoke with the grandparents?

RICHARD CRESS – CROSS EXAMINATION

1   A    Yes.

2   Q    Which one said it was okay to go in?

3   A    Mr. Sweeney's dad.

4   Q    Okay.  And you went in and you knew where to go?

5   A    I can't recall how we were directed to go to the basement

6   where Mr. Sweeney was.  I don't know those -- I cannot recall

7   those events.

8   Q    But you told, you told Judge Messitte on direct examination

9   in response to a question asked by Ms. Johnston that you went

10  immediately to the, to the basement, correct?

11  A    That's correct.

12  Q    So, you did not go anywhere else in the house.  You walked

13  in and went immediately to the basement?

14  A    That's correct.

15  Q    But you don't know how you got there?

16  A    I don't know who directed us to the basement where

17  Mr. Sweeney was.

18  Q    Okay.  And you walked in and you told us, inside you saw

19  Mr. Sweeney seated on the bed?

20  A    Correct.

21  Q    And there was a bookcase to the right -- or excuse me, to

22  left as you walked in the door, is that correct?

23  A    That's correct.

24  Q    And on that bookcase was what you described as

25  paraphernalia, correct?

**RICHARD CRESS – CROSS EXAMINATION**

1   A    That's correct.

2   Q    All right.  And you saw what, a can?

3   A    The bottom of a can.

4   Q    The bottom of a can?

5   A    Correct.

6   Q    Okay.  Partially burned?

7   A    That's correct.

8   Q    You saw some hypodermic syringes, correct --

9   A    Correct.

10  Q    -- with caps off?

11  A    Correct.

12  Q    And you saw some very small little baggies, correct?

13  A    Correct.

14  Q    And was there any substance in them at all?

15  A    There was some, some white colored powder.

16  Q    White colored powder.  And how, how many of them had white

17  colored powder?

18  A    I can't recall how many.

19  Q    Can't recall, but you didn't see any scales, correct?

20  A    No.

21  Q    You didn't see any cutting agent, correct?

22  A    No.

23  Q    Saw just paraphernalia consistent with use, not

24  distribution, correct, sir?

25  A    That's correct.

RICHARD CRESS – CROSS EXAMINATION

1   Q    Okay.  Now, at that point, you were familiar with the

2   investigation.  You also saw this cell phone, correct?

3   A    Correct.

4   Q    And you told Ms. Johnston in response to a question, you

5   seized the cell phone because you thought the cell phone was

6   evidence, correct?

7   A    I didn't think that it was evidence, I knew that the

8   evidence –- that the cell phone was used in communication with

9   the victim in this case.

10  Q    Right.  So, you went in and you saw the paraphernalia which

11  I've already asked you about, and that was readily apparent to

12  you or maybe not?  Well, let me ask it this way:  Was it readily

13  apparent to you that the paraphernalia was evidence of

14  contraband?

15  A    Yes.

16  Q    Okay.  But the cell phone was not readily apparent that it

17  was contraband.  It was readily apparent that it was going to be

18  evidence, correct?

19  A    That's correct.

20  Q    So, you seized the paraphernalia because you knew that to

21  be contraband, but you seized the cell phone because you knew

22  that to be evidence, correct?

23  A    Correct.

24  Q    And you did not have a search warrant to authorize the

25  seizure of evidence, correct?

RICHARD CRESS - CROSS EXAMINATION

1  A    No, I did not.

2  Q    Okay.  Now, there came a point where, again, you told

3  Ms. Johnston that Mr. Sweeney did not want to make any

4  statements, correct?

5  A    That's what I recall, sir.

6  Q    That's what you recall.  And as a matter of fact, you knew

7  that he declined to be interviewed, correct?

8  A    That's correct.

9  Q    All right.  So, the word, declined to be interviewed and

10  did not want to make any statements means that someone from law

11  enforcement attempted to get a statement from him, correct?

12  A    Not necessarily.

13  Q    Well, someone from law enforcement wanted to interview him.

14  A    The, the course of action with this case and all the cases

15  is, if they want to speak about the incident, we would take them

16  to the sheriff's office.  If they do not want to speak to us

17  about the incident, they would go directly to the detention

18  center.

19  Q    Okay.

20  A    Mr. Sweeney went directly to the detention center.

21  Q    Mr. Sweeney went directly to the detention center.  As you

22  just told us, your protocol is if the person being arrested does

23  not want to make a statement, you take them to the detention

24  center.  If the person is willing to make a statement, you take

25  them to the sheriff's office?

**RICHARD CRESS – CROSS EXAMINATION**

1  A    That's correct.

2  Q    So, you knew that Mr. Sweeney did not want to make a

3  statement at the time of his arrest, correct?

4  A    Correct.

5  Q    Because he invoked his right to remain silent, correct?

6  A    Correct.

7  Q    Now --

8        THE COURT:  Can you tell me exactly what he said?

9        THE WITNESS:  I cannot recall the exact words that

10  Mr. Sweeney used in reference to not making a statement.

11  However, he was taken to the detention center, which would

12  indicate that he did not want to make a statement in reference

13  to that case.  So, the exact words that Mr. Sweeney used at the

14  time of the arrest, I cannot recall what they were.

15        THE COURT:  Well, but had you said, do you want to

16  make a statement?

17        THE WITNESS:  I advised him, do you want to talk about

18  this incident.  And I can't say what his statement was, but he

19  went to the detention center.  I don't say, I can't say -- I

20  can't recall whether he said, no, I don't want to make a

21  statement.  I don't want to talk about it.  I don't know what

22  the exact wording was that Mr. Sweeney would have used, but --

23        THE COURT:  Well, did he say I want a lawyer?

24        THE WITNESS:  I don't recall that.

25  BY MR. BRENNAN:

**RICHARD CRESS – CROSS EXAMINATION**

1  Q    Well, let me ask it this way:  How long have you been a

2  Calvert County -- I guess, a deputy sheriff they have in Calvert

3  County, right, not a police?

4  A    Yes.

5  Q    All right.  How long have you been in law enforcement, let

6  me ask you that way?

7  A    I been in law enforcement 15 years.

8  Q    Fifteen years.  And you are trained that when a person is

9  placed under arrest, they are read their rights, correct?

10  A    Not necessarily.

11  Q    Not necessarily.  Well, did you read Mr. Sweeney his

12  rights?

13  A    No, I didn't.

14  Q    You did not, but he made it clear to you, nonetheless, that

15  he was not going to talk to law enforcement, correct?

16  A    That's correct.

17  Q    And it was clear in your mind, correct?

18  A    That's correct.

19  Q    And in fact, you told Detective Jacobs that Mr. Sweeney

20  would decline to be interviewed, correct?

21  A    That's not correct.

22         THE COURT:  When did you tell the, Officer Jacobs

23  that?

24         THE WITNESS:  I don't recall telling Detective Jacobs

25  that he didn't want to be interviewed.

RICHARD CRESS – CROSS EXAMINATION

1    BY MR. BRENNAN:

2    Q    All right.  Have you reviewed, had an opportunity to review

3    the police reports in this case prior to coming to court for

4    your testimony here today?

5    A    Yes.

6    Q    Okay.

7              MR. BRENNAN:  Since he, since he doesn't recall,

8    Your Honor, I'm going to show him a document.  Unfortunately,

9    it's on my iPad, but --

10             THE COURT:  Well, do you have a document?

11             MR. RAO:  Yeah, here's the document right here.

12             MR. BRENNAN:  I have the document.  Let me show it to

13   the witness, Your Honor.

14             MS. JOHNSTON:  Is that the only document?

15             MR. RAO:  Yeah, that's the only one.

16             MS. JOHNSTON:  Okay.  All he has is one.  That's fine.

17   BY MR. BRENNAN:

18   Q    Detective Cress, I show you what's been marked as Defense

19   Exhibit 1 for identification, and ask you to read quietly to

20   yourself paragraph three.  And after, I'm going to ask you if

21   that refreshes your recollection?

22             THE COURT:  Well, what is this?

23             MR. BRENNAN:  It's -- I'll have it identified in a

24   moment, Your Honor.

25             MS. JOHNSTON:  Your Honor, we have no objection to

RICHARD CRESS – CROSS EXAMINATION

1     this being admitted for purposes of this hearing.

2              THE COURT:  I'd just like to know what it is.

3              MR. BRENNAN:  Okay.  It's called a Report of

4     Investigation prepared by Officer Jacobs who, who testified

5     earlier.

6     BY MR. BRENNAN:

7     Q    Have you had a chance to read it?

8     A    Yes.

9     Q    Okay.  Now, this -- just so we're clear, this is not your

10    document, is that correct?

11    A    That's correct.

12    Q    Does it refresh your recollection about what occurred on

13    the date of Mr. Sweeney's arrest, May 21st, 2010?

14    A    That refreshes my memory that I had a communication with

15    Detective Jacobs and advised him that Mr. Sweeney declined to be

16    interviewed.

17    Q    Okay.  So, it refreshes your recollection that, basically,

18    you told Detective Jacobs that at the time of Mr. Sweeney's

19    arrest, he declined to be interviewed, correct?

20    A    That's correct.

21    Q    Okay.  And to use your words which you had testified

22    earlier, he did not want to make any statement and you're clear

23    about that?

24    A    That's correct.

25    Q    Okay.

**RICHARD CRESS – CROSS EXAMINATION**

1    MR. BRENNAN:  Court's indulgence, Your Honor.

2  BY MR. BRENNAN:

3  Q    Now, the other thing you told us about Mr. Sweeney's

4  condition that day was that he was about to call a nurse because

5  he had what in his arm?

6  A    I believe he had a port in his -- a medical -- like to

7  where, I refer to it as a port.  It's where items can be put in

8  the body through a vein.

9  Q    Right.  Maybe try and do it this way:  He had a device in

10 his in his arm where he could attach an IV into it for the

11 purposes of putting medicine in it?

12 A    That's correct.

13 Q    Okay.

14 A    That's correct.

15 Q    Port on a computer, port on a body, that's fine.  Okay.

16    So he had that in his arm.  So you knew that he was

17 receiving medicine and that a nurse was going to come by and

18 give him medicine that day, correct?

19 A    I did not know the reason why the nurse was coming by.

20 Q    Did it have something to do with the port in his arm?

21 A    I didn't ask him about that.  He advised that the nurse was

22 coming by.

23 Q    Okay.  And did you know whether or not Mr. Sweeney was on

24 Methadone at that time, Methadone treatment, and that's why the

25 nurse was coming by to give him Methadone as getting off a

RICHARD CRESS - CROSS EXAMINATION

1 heroin withdrawal?

2 A    I did not know that.

3 Q    Do you know whether or not the Calvert County Detention

4 Center has any facilities for giving people Methadone for heroin

5 withdrawal?

6 A    I do not know.

7 Q    Do not know that.  Did you make any effort to ascertain

8 what the medical condition was that Mr. Sweeney was suffering

9 from, to where it was necessary to talk to a nurse?

10 A    No.

11 Q    Did you make any effort to ascertain what the medical

12 condition was that Mr. Sweeney was suffering from, that he had

13 to have this port or IV ready to go in his arm?

14 A    No.

15        MR. BRENNAN:  Nothing further, Your Honor.  Thank you.

16        MS. JOHNSTON:  All right.  Do you --

17        THE COURT:  Redirect.

18        MS. JOHNSTON:  Your Honor, we'll have this marked as,

19 I think it's marked as Defendant's Exhibit 1 or we can remark it

20 as Government's Exhibit 3.  It's the police report for the Court

21 to consider.

22        THE DEPUTY CLERK:  It's Defendant's 1.

23        THE COURT:  And let's mark the arrest warrant while

24 we're at it as well.

25        MS. JOHNSTON:  Excuse me, Your Honor.

RICHARD CRESS – REDIRECT EXAMINATION

1          THE COURT:  Mark the arrest warrant too as the

2   government's exhibit.

3          MS. JOHNSTON:  And that would be Government's Exhibit

4   3.

5          THE COURT:  All right.

6          MS. JOHNSTON:  If we're going to keep the report as

7   Defendant's 1.

8          THE COURT:  All right.  Go ahead.

9                    **REDIRECT EXAMINATION**

10  BY MS. JOHNSTON:

11  Q    Do you recall when you had the conversation with

12  Detective Jacobs advising him that Mr. Sweeney declined to be

13  interviewed?

14  A    It would have been shortly after the arrest of Mr. Sweeney.

15  Q    Now, at the time that you -- that Mr. Sweeney was arrested

16  in his home, had you or anyone advised him of his Miranda

17  Rights?

18  A    No, we had not.

19  Q    And why not?

20  A    Because we weren't going to question him.

21  Q    And did you in fact question him at that time?

22  A    No.

23  Q    So, there was no discussion of his Miranda Rights,

24  whatsoever?

25  A    No.

RICHARD CRESS - REDIRECT EXAMINATION

1  Q    You indicated that it's usually a practice to find out if

2  somebody wants to, wants to make a statement about the incident,

3  is that correct?

4          MR. BRENNAN:  Objection to leading on this critical

5  point, Your Honor.

6          THE COURT:  Don't lead.

7  BY MS. JOHNSTON:

8  Q    What is your practice in terms of when somebody is arrested

9  regarding any statements?

10  A    Our practice is if they're, if they wish to make a

11  statement in reference to the incident, we take them to the

12  sheriff's office.  We place them in an interview room, we -- and

13  they do not go to the, the detention center at that time.  When

14  they want to make a statement in reference to the events, we

15  Mirandize them and then we question them.  The Miranda Warning

16  is done at the sheriff's office.

17  Q    So, and in this case, do you have any reason to believe you

18  did not follow that procedure?

19  A    No.

20  Q    And he was transported where?

21  A    To the detention center.

22  Q    Because -- why was he transported there instead of to your

23  office?

24  A    Because he did not wish to make any comments.

25  Q    Now, in regards to his physical and mental state at that

**RICHARD CRESS – REDIRECT EXAMINATION**

1   time, was he able to follow your directions when you gave him

2   directions?

3   A   That's correct.

4   Q   And when he spoke to you regarding his nurse and needing to

5   call her, what was his tone of speech?

6   A   It was normal, like being -- like I'm talking right now.

7   Q   Did you have any trouble understanding him when he spoke to

8   you?

9   A   No.

10  Q   Any indication then that he was under the influence of any

11  drugs that affected his, affected his mental --

12  A   No.

13  Q   -- abilities?

14  A   No.

15  Q   Okay.

16          MS. JOHNSTON:  Court's indulgence.  I have nothing

17  further.

18          THE COURT:  Anything further?

19          MR. BRENNAN:  Nothing based on that.

20          THE COURT:  All right.

21          Thank you, sir.  You may step down.

22      (Witness excused.)

23          THE COURT:  Any other evidence for the government?

24          MS. JOHNSTON:  I have nothing further.

25          THE COURT:  For the defendant?

1          MR. BRENNAN:  Can I have the Court's indulgence for a

2     moment, Your Honor.

3          (A discussion was held off the record.)

4          MR. BRENNAN:  We have no, no testimony, Your Honor.

5     We'll just leave it there.

6          THE COURT:  All right.  Government want to go -- I

7     don't know how you want to argue this.  You want to argue the

8     motion first -- I mean, the statement first?

9          MS. JOHNSTON:  I think maybe because of what I

10    anticipate some of Mr. Brennan's argument to be, if I could

11    argue the Motion to Suppress the seizure of the evidence in

12    terms of the arrest of Mr. Cress first and then go into the

13    statement?

14         THE COURT:  All right.  Well, you have the burden on

15    the arrest then?

16         MS. JOHNSTON:  Your Honor --

17         THE COURT:  On the search, I guess, is what we're --

18         MS. JOHNSTON:  Yes, Your Honor, only to extent that,

19    in this instance, Detective Cress has testified that they had

20    a -- that there was an arrest warrant for Mr. Sweeney.  They did

21    not of course have it with them out there, but there was an

22    arrest warrant issued for him, that he advised not only the

23    person who answered the door, but then also Mr. Sweeney's

24    parents of the fact that they had an arrest warrant for him,

25    that the parents gave them permission to go into the house as we

1    cited in our memorandum.  That arrest warrant gives them

2    authority to go into the residence to effectuate an arrest upon

3    Mr. Sweeney without any search warrant.

4            The testimony of Mr. Cress, which is undisputed is

5    that when he went into the basement, he observed Mr. Sweeney

6    sitting on the bed.  He advised Mr. Sweeney that he was under

7    arrest for an, for the indictment out of Greenbelt, placed him

8    under arrest.  That going into the room, he observed what he

9    recognized to be drug paraphernalia, and he subsequently seized

10   that.

11           In addition to that, he seized the telephone which he

12   knew based on his knowledge of this investigation that

13   Mr. Sweeney had used the telephone to contact Mr. Harrison to

14   arrange the drug transaction which was the basis of the

15   indictment.

16           THE COURT:  Stop on that, though.

17           MS. JOHNSTON:  Mm-hmm.

18           THE COURT:  Does it have to be contraband or how do

19   you factor in the telephone?  I understand the baggies and the

20   --

21           MS. JOHNSTON:  Because it's evidence of a crime.  Any

22   evidence -- anything that's readily -- where it's readily

23   apparent to the officer that it is contraband or evidence of a

24   crime.

25           For example, if he were to go in and find a ski-mask

1    and he was arresting somebody for a bank robbery, and he knew

2    that a ski-mask was used and that was laying there on the

3    dresser.  They could seize that because it's evidence of a

4    crime.  And its nature of being evidence of a crime is subject

5    to seizure so long as it's readily apparent to the individual

6    that the item is in fact either evidence or contraband.  It does

7    not have to be contraband.

8         I think we cited some cases for the Court in our memo

9    where that -- it is that the incriminating nature of the items

10   is what has to be readily apparent.  Whether it be contraband or

11   it be evidence of the crime, it's subject to seizure so long as

12   the incriminating nature of it is readily apparent.

13        THE COURT:  Well, that's the question.  Is it a cell

14   phone?  I gather it was a cell phone.

15        MS. JOHNSTON:  It was a cell phone, and because

16   Detective Cress knew that Mr. Sweeney had used a cell phone to

17   contact Mr. Waite on the date of the distribution to set up that

18   distribution.  He recognized that as being evidence of the

19   crime, to find him in possession of the cell phone, when he knew

20   that a cell phone was used to engage in the drug distribution.

21   Certainly, that would be readily apparent to him that that was

22   evidence of a crime.

23        Now, if it had been Deputy Tomlinson, the officer who

24   was down there just executing an arrest warrant, the phone may

25   not have been readily apparent to him that it was incriminating,

1    but because Detective Cress was aware of the investigation, the

2    incriminating nature of that cell phone was apparent to

3    Detective Cress without doing anything further because he knew

4    that Mr. Sweeney had used a cell phone to arrange the

5    distribution of heroin that was charged in the indictment.

6           And I'm recalling a case, Your Honor, where there was

7    one where they recovered a ski-mask inside the house.  And if I

8    could -- I can't think of the case name for that right now, but

9    I know that there is a case where they recovered a ski-mask and

10   because the officer was aware that a ski-mask had been used, the

11   incriminating nature of the item was readily apparent to them.

12          And what's required is that they just have probable

13   cause to believe that the items have evidentiary value.  It

14   doesn't have to be a hundred percent, but merely that they have

15   probable --

16          THE COURT:  On an arrest warrant?  You're talking --

17   it sounds like you're talking about search warrants here.

18          MS. JOHNSTON:  No, Your Honor.  I'm not talking about

19   search warrants.  The arrest warrant -- they had an arrest

20   warrant, and so they were lawfully --

21          THE COURT:  They don't have to hand it to him, I

22   understand that.

23          MS. JOHNSTON:  They don't have to hand it to them.

24   The arrest warrant gives them authority to enter the defendant's

25   residence --

```
 1                 THE COURT:  All right.

 2                 MS. JOHNSTON:  -- to effectuate the arrest.

 3                 In this instance, when they went in to arrest him,

 4      they observed the drug paraphernalia which is --

 5                 THE COURT:  All right.  I understand that.

 6                 MS. JOHNSTON:  And then they observed -- he asked to

 7      use the phone to call his nurse.  They gave him the phone, he

 8      called the nurse and then they seized the cell phone because

 9      Detective Cress knew that Mr. Sweeney had used his cell phone to

10      call Mr. Waite to arrange the distribution that was subject to

11      the call.

12                 So, he seized that phone as incriminating evidence of

13      his involvement in the distribution.  And that is the basis for

14      the seizure of the telephone in the house.  I don't -- because

15      of its incriminating nature, it was readily apparent to the

16      detective.

17                 It may not have been readily apparent to somebody who

18      was not familiar with the investigation, but because

19      Detective Cress knew that Mr. Sweeney had used the cell phone to

20      contact Mr. Waite to arrange the charged distribution.  It was

21      apparent to him.  He had probable cause when he saw that phone

22      to believe that that was evidence of his involvement in the

23      charged distribution.

24                 THE COURT:  All right.  Mr. Brennan.

25                 MR. BRENNAN:  Thank you, Your Honor.
```

```
 1              Your Honor, I think, I think the timing here,
 2   Your Honor, is critical.  Mr. Wade's death, Your Honor, occurred
 3   on March 23, 2009.  The events that we're talking about here
 4   occurred more than a year later, occur on May 21st, 2010.  So,
 5   if we go through the plain view analysis, Your Honor, part one
 6   is lawfully on the premises.  Part two, plain view, you can see
 7   it, didn't have to search for it.  And three, that it's readily
 8   apparent that it's contraband.
 9              Well, for the paraphernalia, Your Honor, we have
10   testimony that he recognized it to be hypodermic syringes, a
11   burnt can and some baggies.  But he differentiated, on
12   cross-examination he differentiated.  He said, I seized those
13   items because they were paraphernalia.  I seized the cell phone
14   because it was evidence.
15              Now, how do we know that that phone that was being
16   used by Mr. Sweeney was his phone as opposed to the other
17   individual that was in the house or his parents?  We don't know
18   that necessarily was his telephone, although he was using it.
19   But more importantly, we don't know that it was the same phone
20   that was being used during the phone calls involving Mr. Waite
21   more than a year earlier?  We simply don't know that.  So, it's
22   not readily apparent that it's contraband and it's certainly,
23   Judge, not even --
24              THE COURT:  Is it limited only to contraband or could
25   incriminating evidence also be within the sweep of a search
```

1    incident?

2         MR. BRENNAN:  I think, I think it has to be

3    contraband, Your Honor.  They can't use an arrest warrant to do

4    away with the search warrant requirement.  And the whole

5    analysis that revolves around the Plain View Exception to the

6    warrant requirement gets you lawfully on the premises, gets you

7    to the point where there's something that's contraband that's

8    there, but it doesn't excuse the warrant requirement for

9    searches.  Because otherwise, that would be such an exception to

10   the warrant requirement for searches, you go, okay, we've got an

11   arrest warrant.  Let's go through the house and see anything

12   that may look like evidence and we can seize evidence pursuant

13   to an arrest warrant.

14        That's not the analysis.  The analysis on Plain View,

15   Your Honor, is that it's got to be contraband.  It's got to be

16   readily apparent to those -- and you seize it for that reason,

17   because you're lawfully there.  Otherwise, don't even bother to

18   get a, get a search warrant.  Just go in and look through houses

19   for evidence when you have a search, when you have an arrest

20   warrant.  That is certainly not the law, Your Honor.

21        And there was -- and they -- so, not only that, but

22   you know, the cell phone is not readily apparent that it's his

23   as opposed to the other individual, that it's his parents, that

24   in fact it's the same cell phone that was being used more than a

25   year earlier.

1          The death of Mr. Waite was on March 23, 2009.  This

2     warrant is being executed, Your Honor, on May 21st, 2010.  I

3     think, Your Honor, the, the cell phone -- the seizure of the

4     cell phone was not lawful, was not valid.  And the seizure of

5     the cell phone should be suppressed, Your Honor.

6          MS. JOHNSTON:  Your Honor, if I could, I think

7     Mr. Brennan is wrong.  The Plain View Doctrine does not just

8     apply to contraband, it applies to evidence as well.  And I

9     believe the case is *United States versus Wells* at 98 F.3d.

10         THE COURT:  You have that case?  Let me get it.

11         MS. JOHNSTON:  I don't have that case.

12         THE COURT:  Give me just a second, 98 F.3d and what?

13         MS. JOHNSTON:  At 810 is where they talk about the

14    Plain View Doctrine.

15         THE COURT:  98 F.3d 810, get that Ms. --

16         MS. JOHNSTON:  808 is the -- it would be 98 F.3d 808

17    at 810.  And, Your Honor, in that case they were executing a

18    warrant -- a search warrant for bank fraud investigation and the

19    supervising agent observed a firearm, which the agent then

20    seized because he knew that the defendant was a convicted felon.

21         So, he seized the firearm as evidence of the

22    defendant's illegal possession of a firearm.  It is not

23    necessary that -- and I know of no case that limits the Plain

24    View Doctrine to contraband.

25         Rather, the Plain View Doctrine requires that the

1    object -- the officer lawfully be in the place that he has --

2    that he's lawfully there.  The item is in plain view and the

3    object's incriminating character is immediately apparent to the

4    officer without him doing anything further.

5           And just as in as *Wells* where the bank fraud, during

6    the bank fraud search warrant, they observed a firearm, the

7    officer was allowed to seize that, not because it was

8    contraband, because it was evidence of the defendant possessing

9    a firearm and the officer knew that the defendant was a

10   convicted felon.

11          In addition to that, with regard to the phone and

12   counsel's argument that the detective's knowledge was, perhaps,

13   old because the distribution happened a little over a year

14   earlier, in this instance, I believe the detective testified

15   that the defendant identified that phone as being his phone when

16   he asked to use it to call the nurse.

17          So, I think there is more than ample evidence for the

18   agent to have probable cause to believe that the item was

19   evidence of a crime at the time of the seizure.  And in fact,

20   that's what the Court says in *Wells*.

21          THE COURT:  The case does, the cases do say,

22   incriminating evidence or contraband must be immediately

23   apparent that it is incriminating evidence.  Now, I need to sort

24   of see what you've said, that the --

25          MS. JOHNSTON:  Right.  Your Honor, and in *Wells*, the

1    Court talked -- and the Court actually talks about the

2    collective knowledge of the agents.  It doesn't have to be the

3    agent right there on the scene.  In this instance, it was our

4    agent on the scene who after the defendant asked to use the cell

5    phone, and my recollection of the testimony is that he said that

6    the defendant said it was his cell phone.

7         He took it.  He used it to call the nurse, and then

8    the officer seized that phone based on his knowledge that he

9    knew that the defendant had used his cell phone to arrange the

10   distribution that was the subject of the indictment.

11        And again, it's not -- readily apparent is sufficient

12   if the agents collectively had probable cause to believe the

13   item was evidence of a crime at the time of the seizure.  And we

14   think that Detective Cress' observation and his knowledge that

15   the defendant used his cell phone to contact Mr. Waite to

16   arrange the drug distribution, was sufficient to establish

17   probable cause to believe that the cell phone he asked to use to

18   call the nurse was evidence of a crime, and that being the

19   distribution.  So, we believe there was adequate basis for

20   seizing that under the Plain View Doctrine.

21        MR. BRENNAN:  Your Honor, the cases that talk about

22   the Plain View Doctrine talk about, certainly, contraband and

23   then evidence of an incriminatory character, but it has to be

24   readily apparent and there's no nexus, Your Honor, between

25   Mr. Sweeney's use of this cell phone -- let's see, March to

1   April to May -- 14 months after use of a cell phone earlier

2   that's, that's clear it's not -- Your Honor, there's no nexus

3   that it's clearly incriminatory evidence at that point.  That's

4   far different than arresting someone right after a bank robbery

5   and seeing a handgun next to them.  That's clearly different

6   than seeing someone use a cell phone 14 months after a crime has

7   been committed.

8           I don't think there's any comparable analysis of that,

9   Your Honor.  That's our point, is that it's clearly evidence

10  that's not obviously incriminatory at the time.  It's not like

11  it's a gun.  It's not like it's money that's got red dye on it.

12  It's a cell phone.  We don't even know exactly whose it is.  And

13  it's 14 months --

14          THE COURT:  Well, where was this?  What's the

15  evidence?  Where is the cell phone found?  Is it found in the

16  room?

17          MS. JOHNSTON:  Your Honor, the cell -- if the Court

18  will recall, Detective Cress testified that they removed him

19  from the bedroom and took him out into the living area in the

20  basement, and it was plugged into a wall in the charger.  And --

21          THE COURT:  In his bedroom, though, or somewhere else?

22          MS. JOHNSTON:  That was in the living area immediately

23  outside of his bedroom, in the basement and the defendant asked

24  to use the cell phone.  My recollection is that he had said that

25  was his cell phone, and he asked to use that cell phone to call

 1    the nurse.  They gave him the phone, he used it to call the

 2    nurse and they subsequently seized it based on that activity.

 3           And again, it does not have to be a certainty in terms

 4    of this immediately apparent language.  In fact, the Supreme

 5    Court said that all that is required is a practical,

 6    non-technical probability that incriminating evidence is

 7    involved.  And I'm quoting from --

 8           THE COURT:  You're sure they're talking about a -- now

 9    a search incident to an arrest there and not a search warrant?

10           MS. JOHNSTON:  No, Your Honor.  In *Texas versus Brown*,

11    the Supreme Court was referencing the use of the phrase,

12    immediately apparent, for the application of the Plain View

13    Doctrine.  This is in --

14           THE COURT:  All right.  Well, Plain View would apply

15    in a search incident, obviously, case, so.

16           MS. JOHNSTON:  I mean, tech -- it could apply as a

17    search incident to arrest.  Quite frankly, when they had him out

18    in the other room, they could have seized the phone just because

19    it was under his lunge and grasp under search incident to

20    arrest.  But what really was, I think, key for Detective Cress

21    was that the defendant asked for that phone, used that phone and

22    made the call to his nurse on that phone, which gave

23    Detective Cress reason to believe that that was a phone that

24    Mr. -- that that was Mr. Sweeney's phone.

25           And again, it's a probable cause standard.  And when

1    Detective Cress knew he had used the cell phone previously to

2    arrange the distribution, and then when Mr. Sweeney asked to use

3    that phone to call the nurse -- and my recollection is that

4    Mr. Sweeney said it was his phone -- that that is sufficient to

5    establish what the Supreme Court, that is needed.

6            And I'm quoting from *Texas versus Brown* at 460 U.S.

7    730 at page 741.  The Supreme Court said, if the use of the

8    phrase immediately apparent was very likely and --

9            THE COURT:  Slow down a bit, if you would.

10           MS. JOHNSTON:  The use of the phrase, immediately

11   apparent, was very likely an unhappy choice of words since it

12   can be taken to imply that an unduly high-degree of certainty as

13   to the incriminating character of evidence is necessary for an

14   application of the Plain View Doctrine.

15           The Court went on to say that all that is -- and this

16   is not quoted, but the Court goes on and explains, and in

17   quotes, practical non-technical probability that incriminating

18   evidence is involved.

19           THE COURT:  All right.

20           MS. JOHNSTON:  And we believe that that's what we have

21   here.

22           THE COURT:  That's fine.  All right.

23           Are we -- is there a further argument on the overall

24   package now?  I need to decide, I need to decide this case, so.

25   What else is there?

```
 1              MR. BRENNAN:  Your Honor, I've read, I've read -- I
 2    have, actually, Texas versus Brown in my hand, Your Honor.
 3    We've looked at that as well, but there does have to be,
 4    Your Honor, something more than just -- it has to be,
 5    Your Honor, I think, readily apparent that it's -- you know, I
 6    agree, the Court says -- I mean, the Supreme Court says that an
 7    unduly high-degree of certainty as the incriminatory nature --
 8    excuse me.
 9              The quote that the Supreme Court disagrees with is the
10    Court of Appeals in that case said that it was implied that
11    there was an unduly high-degree of certainty as to the
12    incriminatory character of evidence is necessary for an
13    application of a Plain View Doctrine.  So, they reject this
14    unduly high-degree of certainty, but there has to be some degree
15    of certainty --
16              THE COURT:  All right.
17              MR. BRENNAN:  -- that it's there.
18              THE COURT:  Let me, let me be clear, you've asserted
19    several times, Ms. Johnston, that one or both of the agents knew
20    that a telephone was involved.  Did they either testify to that
21    on the stand?
22              MS. JOHNSTON:  Yes, Your Honor.  Detective Cress was
23    the detective who was there, and he testified on the stand that
24    he knew that a telephone had been used.  That's my recollection.
25              THE COURT:  Is there any question about whether he
```

1    testified to that or not?

2              MR. BRENNAN:  We heard him say that, Your Honor.

3              THE COURT:  All right.  All right, have a seat, folks.

4    Let's walk through this now.

5              Let's do this now chronologically, rather than reverse

6    order, so we see where we are.  No question that there was an

7    arrest warrant that was issued prior to going to the residence.

8    No question that the agents did not have to have the arrest

9    warrant in hand when they went in.

10             They went in the home.  They were not permitted to go

11   in at first, and then they were permitted to go in where they

12   went into the bedroom, confronted the defendant.  So that

13   they're there legitimately.  And the question is whether the

14   Plain View Doctrine applies.  It certainly applies to drug

15   paraphernalia, baggies, and so on, and so forth, anything that

16   is obvious.  And that was the testimony, that it was there.

17             The only potential argument in the case deals with the

18   cell phone.  And the question is, can that come in within the

19   scope of Plain View?

20             Now, it is a tougher question, but it is, I think, a

21   correct statement of the law that it isn't just contraband

22   that's covered.  It's evidence of a crime.  And then the

23   question is, what does readily apparent mean?  There's a lot of

24   language from the different circuits, but basically it seems to

25   me that the current phrasing is that, that --

1    I have certain the Eight Circuit here.  Let me get

2  that.  This is from *U.S. versus Weinbender*.  I'm just looking at

3  this '97 case from the Eighth Circuit, 109 F.3d 1327 to 1330.

4  "The immediately apparent requirement means that officers must

5  have probable cause to associate the property with criminal

6  activity.  Probable cause demands not that an officer be sure or

7  certain, but only that the facts available to a reasonably

8  cautious man would warrant a belief that certain items may be

9  contraband or stolen property, or useful as evidence of a

10  crime."

11    They still have to be in plain view, which this was.

12  And I think that insofar as there was testimony that a phone was

13  used by the defendant to perpetrate his crimes so that this

14  would fall within the readily apparent Plain View Doctrine.  So,

15  the cell phone comes in, and the Motion is denied as to any

16  seizures that are made on, on May 21st of 2010.

17    Then we get to the statement.  Now, there apparently

18  was the understanding, not written, but the understanding of one

19  the officers on May 21st, I guess, the date of the arrest, that

20  the defendant did not want to make a statement.  Whether or not

21  it was transmitted to the second officer or not is not clear.

22    But according to the only testimony the Court has,

23  essentially you've got the defendant who otherwise appears to be

24  coherent, not speech slurred, not logy in the car, man in his

25  mid-40's who starts to talk about the whole thing being BS.  At

1    which point the officer says, essentially, hold up here.  If

2    you're going to say something, you better understand the

3    implications, and then reads the Miranda Warnings.

4          And the mere fact that he says, are you willing to

5    answer questions, is enough to constitute a waiver.  That's

6    clear.  The fact that the defendant just starts talking after

7    he's listened to these things is enough to constitute a waiver

8    under the circumstances.

9          And then he makes whatever statement he makes about

10   where he gets his drugs and so on, and so forth.  In fact, I

11   think he thought he was denying his liability in part in that

12   statement, so it's not exactly a exculpatory, entirely

13   exculpatory.  But clearly, there's no reason to believe that as

14   a matter of law at this juncture the Court must keep the

15   statement out because it would not be fair for a jury to hear it

16   otherwise.  You can always argue the involuntariness at the time

17   of the trial in the case.  So, that's up to you, Mr. Brennan,

18   but it doesn't justify exclusion of the statement at this time.

19   So, the Motion to Exclude the Statement is also denied.

20         Now, I think that disposes of the motion in its

21   entirety.  The only other issue is you reserve the right to file

22   other motions, and I'm not sure what you're talking about there.

23   The only thing that I could --

24         MR. COOK:  I don't think there's going to be any other

25   motions, Your Honor.

1    THE COURT:  Well, whatever there are, I mean, I was

2    going to deny that without prejudice.  If there's some

3    appropriate motion that you make along the way, that's fine.

4    So, that motion is denied without prejudice.

5         Now, I did tell you I was not going to be able to try

6    the case and I arranged for Judge Bredar to try it.  I used my

7    best efforts to get him to come down here, but that's not going

8    to be possible.  And so I regret to tell you, you're going to

9    have to try this case in Baltimore.

10        Have you been in touch with his chambers yet?

11        MR. RAO:  No.  No, Your Honor.

12        THE COURT:  Okay.  Well, I told him I would take the

13   case to this point.  If he tries it, he'll sentence as well, if

14   there's a conviction.  But at this point, I told him I would

15   hear the hearing and see where we come out.

16        So, we will now -- and he asked me, for one reason or

17   another to assign this case after April 1st, which is what I'll

18   do.  You're now at the March 26th.  So if something happens in

19   the next five days, I've got it.  And then after April 1st, he's

20   got it for all purposes after.

21        MS. JOHNSTON:  Your Honor, just so that we're all

22   clear, it's our understanding we're going to start on Tuesday,

23   April 10th, the day that we're set for trial down here, not on

24   Monday, April 9th.

25        THE COURT:  All right.  Well, that's something we want

1    to be clear with Judge Bredar, that we'll clear that up with him

2    today that we would start on Tuesday.

3           Now, what are you looking at here?

4           MS. JOHNSTON:  We have subpoenaed our witnesses for

5    Tuesday.

6           THE COURT:  Yeah.

7           MS. JOHNSTON:  We have checked with the medical

8    examiner.

9           THE COURT:  Yeah.  Well, are you going to bring him

10   here or are you going to take them there?

11         MS. JOHNSTON:  No, Your Honor.  We have been back in

12   touch -- we've subpoenaed them to be here, but we're getting in

13   touch with them, telling them that it's going to start on

14   Tuesday up in Baltimore.

15         THE COURT:  Well, I think that's fine.  I think you'll

16   be fine.

17         MR. BRENNAN:  Yeah, I was assuming Tuesday as well.  I

18   mean, as Your Honor knows, Baltimore is Monday through Thursday,

19   and here we're Tuesday through Friday.

20         THE COURT:  Right.

21         MR. BRENNAN:  So, I was like government counsel, I was

22   assuming a Tuesday start date.

23         THE COURT:  Well, we'll clear that up with Judge

24   Bredar.  There won't be a problem.  We'll clear that up tomorrow

25   with Judge Bredar's chambers today.

1              All right.  Is there anything else?

2          MR. RAO:  No, Your Honor.

3          MR. BRENNAN:  No, Your Honor.

4          THE COURT:  Thank you, folks.  You're excused.

5      (Recess at 12:30 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER

I, Linda C. Marshall, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
Linda C. Marshall, RPR
Official Court Reporter

'

'08 [2]   3/14 3/22
'09 [5]   7/22 11/4 11/6 58/22
58/22
'94 [1]   26/4
'97 [1]   109/3

0

0044 [1]   1/19
0271 [1]   3/3

1

10-271 [1]   1/5
100 percent [1]   74/22
109 [1]   109/3
10:10 [1]   1/8
10th [1]   111/23
12:30 p.m [1]   113/5
1327 [1]   109/3
1330 [1]   109/3
14 [3]   104/1 104/6 104/13
15 [2]   40/9 86/7
16 [1]   7/22
1994 [5]   16/1 25/11 25/12
25/18 25/20
1997 [1]   45/2
19th [1]   78/6
1st [2]   111/17 111/19

2

20 [7]   4/25 5/4 7/18 7/19 8/1
8/2 8/25
2002 [1]   63/4
2005 [4]   25/9 25/11 25/12
25/20
2007 [2]   63/4 63/5
2008 [4]   6/9 10/8 12/17 12/23
2009 [17]   4/19 5/3 5/11 7/21
8/11 8/16 9/17 10/5 10/6 12/20
12/20 16/10 19/2 19/15 25/3
99/3 101/1
2010 [19]   21/25 23/2 23/15
28/22 31/17 32/22 33/7 38/13
53/2 58/23 62/7 62/10 63/6
63/14 78/6 88/13 99/4 101/2
109/16
2012 [1]   1/7
20770 [2]   1/15 1/19
21st [10]   28/21 28/23 62/10
62/10 63/14 88/13 99/4 101/2
109/16 109/19
23 [11]   5/3 5/11 5/17 8/11
8/16 58/22 58/23 59/4 59/7
60/7 60/23
231 [9]   36/6 49/7 49/9 49/17
49/21 49/25 50/13 50/19 51/18
23rd [9]   4/24 10/9 10/20 16/10
19/2 19/15 57/2 60/18 61/17
24th [7]   28/22 31/17 32/22
33/7 38/13 53/2 62/7
25 miles [1]   51/20
26 [1]   1/7
260 pounds [1]   79/15
26th [3]   60/17 61/12 111/18
271 [1]   1/5

3

30 [1]   2/6
301 [1]   1/22
301-344-4126 [1]   1/15
301-474-0044 [1]   1/19
3229 [1]   1/22
344-3229 [1]   1/22

4

'

400 [1]   1/14
404 [6]   4/6 13/15 14/2 17/1
17/6 24/13
41 [1]   2/7
4126 [1]   1/15
460 [1]   106/6

5

50 [1]   54/2
52 [1]   2/8
55 [1]   2/9

6

6-foot [1]   79/14
62 [1]   2/11
6305 [1]   1/18
6500 [1]   1/14

7

700 [1]   1/18
730 [1]   106/7
741 [1]   106/7
78 [1]   2/12

8

808 [2]   101/16 101/16
810 [3]   101/13 101/15 101/17
8th [1]   10/7

9

91 [1]   2/13
9101 [1]   63/16
98 [4]   101/9 101/12 101/15
101/16
9th [1]   111/24

A

A.M [1]   1/8
abilities [1]   93/13
ability [1]   47/6
able [4]   26/7 45/14 93/1 111/5
about [106]   6/6 15/8 15/19
17/7 17/9 17/9 17/16 18/9
18/10 18/14 19/7 20/13 21/2
21/19 21/22 22/12 23/17 23/20
23/23 25/8 25/13 25/15 25/25
26/2 26/7 26/14 27/18 31/17
35/10 39/12 39/19 39/20 39/20
39/22 39/23 40/2 40/10 40/12
40/14 43/13 47/11 47/17 47/17
47/18 50/23 51/1 51/24 52/4
52/4 52/5 52/6 53/13 53/15
53/19 55/8 56/4 56/20 56/25
57/17 57/24 57/25 58/4 58/17
58/19 59/1 59/13 59/18 60/12
62/11 64/5 68/14 69/24 70/8
72/5 72/8 73/5 74/9 74/21
76/22 77/3 77/5 77/8 79/15
83/11 84/15 84/17 85/17 85/21
88/12 88/23 89/3 89/4 89/21
92/2 97/17 97/18 99/3 101/13
103/1 103/21 103/22 105/8
107/25 109/25 110/9 110/22
above [1]   114/4
above-entitled [1]   114/4
absence [2]   16/11 21/5
Academy [2]   31/10 31/11
accident [3]   16/12 21/7 21/23
accompanied [1]   19/3
according [1]   109/22
acquire [2]   19/5 41/24

acquisition [1]   21/13
acquisitions [2]   23/17 28/4
acre [2]   115/1 25/17
action [3]   1/4 3/3 84/14
active [1]   4/1
activity [2]   105/2 109/6
acts [5]   13/17 14/1 14/17
14/23 15/5
actual [2]   14/4 52/2
actually [9]   3/16 4/12 13/25
74/20 76/2 80/18 80/19 103/1
107/2
addict [1]   15/2
addiction [1]   61/11
addicts [1]   15/2
addition [3]   69/17 95/11
102/11
additional [3]   3/23 10/17
27/13
address [9]   13/15 25/5 28/15
29/10 30/8 30/10 63/10 63/15
63/19
adequate [1]   103/19
Administration [1]   31/3
admissible [3]   14/2 14/12 16/3
admitted [2]   79/10 88/1
advantage [1]   14/7
Advice [17]   34/24 35/16 35/18
36/9 36/18 37/1 37/2 37/10
38/10 38/11 38/12 44/6 44/22
45/4 45/5 45/6 53/6
advise [1]   71/17
advised [16]   64/16 64/17 65/15
68/4 69/4 70/24 71/2 75/17
75/17 80/3 85/17 88/15 89/21
91/16 94/22 95/6
advising [1]   91/12
affected [2]   93/11 93/11
after [35]   13/21 14/18 19/6
19/21 20/5 21/19 27/19 28/7
30/4 34/16 35/15 38/15 39/5
51/24 53/9 53/14 53/16 53/18
60/24 69/11 71/9 71/9 71/10
75/2 80/24 87/20 91/14 103/4
104/1 104/4 104/6 110/6 111/17
111/19 111/20
afternoon [2]   3/9 64/13
afterwards [3]   4/8 53/13 74/6
again [12]   6/21 20/22 32/11
34/20 35/4 49/14 50/20 52/10
84/2 103/11 105/3 105/25
against [1]   67/23
agency [2]   33/2 60/16
agent [12]   33/11 41/25 42/1
42/3 43/5 56/2 82/21 101/19
101/19 102/18 103/3 103/4
agents [4]   103/2 103/12 107/19
108/8
ago [2]   53/7 74/19
agree [1]   107/6
ahead [2]   29/18 91/8
AIDED [1]   1/23
alcohol [1]   37/24
all [101]   3/6 3/14 3/21 3/22
4/1 4/2 4/10 5/25 6/1 6/2 7/11
9/21 9/21 10/13 11/23 15/4
17/21 21/14 21/24 21/25 22/7
22/18 24/8 24/24 25/1 25/18
26/6 26/16 26/19 26/23 28/12
28/17 28/17 29/16 30/7 30/11
31/24 32/19 41/6 41/24 42/3
46/4 46/5 46/8 47/18 47/19
48/4 49/3 50/12 51/3 51/10

**A**

all...use [1]   32/11 54/18
54/19 55/8 55/18 55/19 56/11
57/18 58/16 60/17 60/21 61/14
62/2 62/12 64/9 68/1 78/5
78/11 79/19 79/25 80/6 82/2
82/14 84/9 84/14 86/5 87/2
87/16 90/16 91/5 91/8 93/20
94/6 94/14 98/1 98/5 98/24
105/5 105/14 106/15 106/19
106/22 107/16 108/3 108/3
111/20 111/21 111/25 113/1
allegation [2]   8/17 21/9
allegations [1]   7/14
allege [4]   10/4 10/6 10/7
25/21
alleged [6]   4/20 8/4 8/6 11/10
27/3 27/11
allegedly [3]   8/16 13/3 57/9
alleges [1]   4/19
alleging [2]   28/3 28/4
allow [2]   69/8 79/22
allowed [1]   102/7
almost [1]   44/3
along [4]   20/19 44/9 44/10
111/3
already [3]   49/6 49/13 83/11
also [24]   3/10 3/12 6/23 11/1
11/5 15/13 15/18 15/20 15/23
16/11 18/6 18/10 45/22 47/11
52/11 66/13 67/10 68/13 69/5
79/7 83/2 94/23 99/25 110/19
although [4]   5/5 5/15 13/4
99/18
always [2]   11/7 110/16
am [1]   77/24
AMERICA [2]   1/4 3/4
amount [1]   20/5
ample [1]   102/17
analysis [7]   5/15 55/17 99/5
100/5 100/14 100/14 104/8
and grasp [1]   105/19
Anderson [2]   31/23 33/11
another [8]   11/12 16/6 19/3
40/15 40/16 59/22 60/2 111/17
answer [14]   38/19 47/23 48/1
48/11 48/12 49/15 52/12 52/16
52/17 53/9 56/7 60/1 64/20
110/5
answered [6]   48/7 52/12 66/3
74/21 74/25 94/23
anticipate [2]   23/16 94/10
any [96]   6/16 6/17 6/19 7/6
9/2 10/14 14/1 14/20 14/24
15/5 16/11 16/11 22/10 24/7
24/22 24/22 24/23 26/24 26/24
27/3 29/13 34/3 36/22 37/9
39/4 39/12 39/15 40/19 41/18
42/20 43/2 45/19 45/23 47/2
47/12 51/15 53/12 54/6 54/9
54/23 55/4 57/20 59/17 59/21
60/5 60/6 60/11 60/15 60/21
60/21 60/22 61/10 61/19 61/25
64/20 68/18 69/18 70/14 70/14
70/17 70/18 71/20 71/22 71/24
72/1 72/3 72/6 72/8 74/1 75/5
75/8 75/13 75/15 79/19 82/14
82/19 82/21 84/3 84/10 88/22
90/4 90/7 90/11 92/9 92/17
92/24 93/7 93/10 93/10 93/23
95/3 95/21 104/8 107/25 109/15
110/24

anybody [5]   29/16 33/9 34/12
77/12 77/13
anyone [1]   43/2 60/15 91/16
anything [21]   15/3 23/25 33/24
34/5 39/18 52/8 54/10 60/12
60/17 67/2 67/5 67/24 72/9
77/7 93/18 95/22 97/3 100/11
102/4 108/15 113/1
anywhere [2]   5/13 81/12
apparent [31]   83/11 83/13
83/16 83/17 95/23 96/5 96/10
96/12 96/21 96/25 97/2 97/11
98/15 98/17 98/21 99/8 99/22
100/16 100/22 102/3 102/23
103/11 103/24 105/4 105/12
106/8 106/11 107/5 108/23
109/4 109/14
apparently [3]   20/3 55/6
109/17
Appeals [1]   107/10
appear [5]   37/22 37/24 38/1
38/3 61/25
appearance [3]   32/4 34/2 34/21
APPEARANCES [1]   1/12
appeared [2]   41/19 46/6
appears [3]   46/9 47/19 109/23
application [3]   105/12 106/14
107/13
applies [3]   101/8 108/14
108/14
apply [3]   101/8 105/14 105/16
appreciate [1]   64/22
approach [1]   44/21
approached [1]   79/3
appropriate [3]   12/4 13/11
111/3
approximately [5]   31/14 40/9
64/11 64/25 79/14
April [5]   104/1 111/17 111/19
111/23 111/24
April 10th [1]   111/23
April 1st [2]   111/17 111/19
apt [1]   11/11
are [80]   3/22 4/1 5/6 5/11
5/12 5/15 5/19 5/25 6/1 6/2
6/25 7/14 8/3 9/5 12/8 12/9
12/10 12/13 12/24 12/25 13/9
14/1 14/17 16/18 17/14 17/24
18/1 18/4 22/13 23/4 24/24
24/24 25/7 25/14 25/19 25/21
25/22 26/3 27/21 28/4 29/25
29/25 30/3 30/22 31/2 31/7
38/19 44/8 45/10 47/22 48/1
48/11 49/11 54/12 52/16 53/9
55/1 55/14 56/20 58/16 58/17
58/18 59/9 59/10 62/22 64/8
64/10 65/21 74/23 75/23 86/8
86/9 106/23 108/6 109/16 110/4
111/1 112/3 112/9 112/10
are going [1]   18/1
area [6]   68/8 68/12 70/14
78/24 104/19 104/22
argue [4]   94/7 94/7 94/11
110/16
argument [7]   5/21 5/24 14/9
94/10 102/12 106/23 108/17
arguments [1]   54/17
arm [7]   68/13 68/14 89/5 89/10
89/16 89/20 90/13
around [7]   50/17 51/20 65/18
66/10 100/5
arrange [7]   95/14 97/4 98/10

98/20 103/9 103/16 106/2
arranged [1]   111/6
arrangement [5]   6/13 19/8
21/7 23/2 29/7 30/2 33/4 41/15
42/5 55/13 55/16 56/5 56/15
57/1 58/23 59/4 59/6 59/19
60/3 60/7 60/18 60/22 61/2
62/9 62/11 63/11 63/20 63/23
68/5 70/4 72/14 74/2 76/15
76/16 76/19 76/25 77/2 77/3
77/6 77/7 77/9 77/15 78/7 79/4
80/3 80/4 85/3 85/14 86/9
88/13 88/19 90/23 91/1 91/14
94/12 94/15 94/20 94/22 94/24
95/1 95/2 95/7 95/8 96/24
97/16 97/19 97/19 97/24 98/2
98/3 100/3 100/11 100/13
100/19 105/9 105/17 105/20
108/7 108/8 109/19
arrested [11]   21/19 32/4 32/23
32/25 60/19 70/3 71/12 76/18
84/22 91/15 92/8
arresting [2]   96/1 104/4
arrests [1]   31/14
arrival [1]   64/23
arrived [6]   33/14 65/8 65/10
75/2 75/6 80/14
arriving [1]   73/10
ARUN [2]   1/13 3/8
as [93]   4/22 4/23 6/12 6/22
6/22 8/5 8/18 9/5 9/5 9/10
9/24 9/24 11/4 11/4 14/22 17/2
17/4 23/15 23/15 24/10 24/22
24/23 25/9 25/9 25/12 25/12
26/4 26/4 26/4 26/17 26/17
29/6 31/7 34/19 38/5 39/3
42/20 43/25 45/4 47/19 55/16
56/13 58/15 59/4 60/21 65/24
67/2 67/16 72/11 76/7 76/7
77/14 77/14 78/16 79/19 80/8
89/7 89/25 90/18 90/19 90/20
90/24 91/1 91/6 94/25 96/5
96/11 96/18 98/12 99/16 100/23
101/8 101/21 102/5 102/5
102/15 105/16 106/12 107/3
107/7 107/11 109/9 109/12
109/15 110/13 111/13 112/17
112/18
ascertain [7]   45/10 45/19
45/22 60/4 68/11 90/7 90/11
ask [29]   5/17 34/3 37/9 37/12
37/14 39/4 39/6 39/12 39/15
40/19 41/1 47/8 47/9 47/11
53/12 55/15 61/15 68/14 69/5
72/3 72/8 75/12 75/15 83/12
86/1 86/6 87/19 87/20 89/21
asked [21]   36/22 49/1 51/6
51/12 53/9 53/13 53/18 55/25
56/4 59/6 81/9 83/11 98/6
102/16 103/4 103/17 104/23
104/25 105/21 106/2 111/16
asking [5]   46/18 57/25 59/8
59/9 59/17
asserted [1]   107/18
assign [1]   111/17
assigned [6]   31/2 63/3 63/4
64/2 64/3 64/6
assignment [1]   63/25
assignments [1]   63/1
Assistant [1]   3/11
assisted [1]   31/14
associate [2]   18/24 109/5

## A

associ... [?]
associated [1]   21/6
associates [1]   15/25
association [1]   21/12
assuming [4]   24/16 59/15
  112/17 112/22
at [162]
attach [1]   89/10
attempt [1]   71/20
attempted [2]   66/14 84/11
attended [1]   31/10
attention [3]   19/11 31/17 63/6
Attorney [3]   1/13 1/14 3/11
Attorney-at-Law [1]   1/13
authority [5]   6/16 77/3 77/6
  95/2 97/24
authorize [1]   83/24
Autopsy [1]   8/22
available [1]   109/7
Avenue [2]   15/19 18/11
aware [3]   25/19 97/1 97/10
away [4]   9/14 34/19 73/15
  100/4

## B

back [14]   25/9 25/12 25/18
  25/22 26/4 27/14 53/1 55/16
  64/21 65/18 66/13 69/1 77/16
  112/11
background [2]   45/17 46/24
baggies [12]   23/18 23/18 28/5
  28/5 67/8 67/11 67/24 69/22
  82/12 95/19 99/11 108/15
Baltimore [4]   31/12 111/9
  112/14 112/18
bank [5]   96/1 101/18 102/5
  102/6 104/4
bar [1]   15/19
base [1]   26/13
based [11]   12/9 16/24 29/11
  54/15 54/16 54/17 78/7 93/19
  95/12 103/8 105/2
basement [15]   66/12 66/17
  66/22 66/24 68/23 74/9 75/12
  75/18 81/5 81/10 81/13 81/16
  95/5 104/20 104/23
Basic [1]   31/11
basically [4]   44/4 48/19 88/17
  108/24
basis [5]   5/20 20/12 95/14
  98/13 103/19
bathroom [2]   15/15 18/8
be [97]   4/5 4/25 5/18 6/17
  6/19 7/3 12/3 13/5 15/6 16/20
  16/21 18/1 18/5 18/13 18/24
  20/19 25/2 26/6 27/4 27/24
  29/16 30/12 32/3 36/20 37/24
  38/1 38/3 39/25 41/2 50/15
  50/17 51/22 52/5 53/25 54/11
  54/12 61/25 64/21 68/8 68/21
  69/2 69/22 69/22 71/10 76/2
  77/20 83/17 83/21 83/22 84/7
  84/9 86/20 86/25 88/15 88/19
  89/7 91/3 91/12 94/10 95/9
  95/18 96/7 96/10 96/10 96/11
  96/21 97/14 99/10 99/25 100/2
  100/9 100/15 100/15 101/5
  101/16 102/1 102/22 103/2
  103/23 105/3 106/12 107/3
  107/4 107/14 107/18 109/6
  109/8 109/11 109/23 110/15
because [47]   4/12 4/19 5/3
  5/10 5/18 8/10 10/24 11/11
  14/2 20/4 24/8 25/22 37/15
  55/11 59/14 61/16 71/3 80/10
  80/12 83/5 83/20 83/21 85/5
  89/4 91/20 92/22 92/24 94/9
  95/21 96/3 96/15 97/1 97/3
  97/10 98/8 98/14 98/18 99/13
  99/14 100/9 100/17 101/20
  102/7 102/8 102/13 105/18
  110/15
becomes [3]   7/13 10/10 11/17
bed [4]   67/1 68/3 81/19 95/6
bedroom [11]   67/2 67/18 68/6
  68/7 70/14 71/1 71/5 71/10
  71/13 74/9 104/19 104/21
  104/23 108/12
been [41]   8/12 19/18 19/19
  21/7 29/19 30/25 32/23 32/25
  36/2 36/4 38/5 44/3 45/1 45/3
  59/11 59/12 62/24 63/25 68/16
  68/16 68/17 69/23 70/12 72/11
  74/25 76/13 76/13 77/1 86/1
  86/5 86/7 87/18 91/14 96/23
  96/25 97/10 98/17 104/7 107/24
  111/10 112/11
before [28]   1/10 3/2 3/5 11/25
  13/19 14/17 15/16 22/10 26/2
  29/13 32/24 35/8 36/17 37/9
  53/14 53/15 53/20 55/13 55/20
  57/13 57/19 57/22 58/4 58/14
  61/17 69/8 75/5 78/14
began [3]   34/18 34/19 34/22
begin [1]   4/5
beginning [2]   27/2 73/4
behalf [2]   2/3 3/19
being [24]   4/22 5/10 6/20 12/2
  61/9 61/10 65/24 65/25 70/2
  70/9 74/9 74/19 84/22 88/1
  93/6 96/4 96/18 99/15 99/20
  100/24 101/2 102/15 103/18
  109/25
belief [1]   109/8
believe [32]   4/5 18/21 25/10
  35/10 39/20 39/23 40/3 40/3
  44/1 46/25 47/17 48/3 52/4
  52/6 62/5 63/14 63/16 68/13
  68/25 89/6 92/17 97/13 98/22
  101/9 102/14 102/18 103/12
  103/17 103/19 105/23 106/20
  110/13
believes [3]   7/5 16/9 19/2
beltway [5]   40/13 40/16 51/18
  51/24 52/2
bench [1]   77/20
beside [1]   68/22
best [2]   44/12 111/7
better [1]   110/2
between [8]   16/1 23/9 25/11
  25/12 27/10 58/21 72/18 103/24
bit [2]   29/10 106/9
blend [1]   24/6
blind [1]   3/17
Bo [7]   39/3 39/9 39/13 40/12
  48/25 51/6 53/13
body [2]   89/8 89/15
book [1]   67/3
bookcase [5]   67/4 81/21 81/24
bookshelf [1]   67/22
borrow [2]   39/1 48/24

both [5]   12/8 29/4 29/4 65/13
  107/19
bother [1]   110/8
bottle [4]   20/3 20/3 20/6 20/7
bottom [4]   67/8 69/23 82/3
  82/4
Branch [1]   6/8
break [2]   55/7 55/9
Bredar [3]   111/6 112/1 112/24
Bredar's [1]   112/25
BRENNAN [19]   1/17 1/18 2/7 2/9
  2/12 3/15 3/18 4/4 6/14 7/6
  21/14 29/3 54/15 59/10 78/12
  78/14 98/24 101/7 110/17
Brennan's [2]   5/23 94/10
BRETT [2]   1/17 3/19
Brett Cook [1]   3/19
briefly [1]   31/9
bring [2]   23/5 112/9
brings [1]   19/10
broad [1]   6/12
brought [2]   33/16 77/16
Brown [3]   105/10 106/6 107/2
BS [7]   35/11 35/13 36/8 44/2
  44/5 44/8 109/25
burden [1]   6/21 12/4 94/14
burned [1]   82/6
burnt [1]   99/11
bush [1]   72/19
but [83]   4/14 4/17 5/3 6/16
  9/2 9/6 9/16 9/25 11/7 11/16
  14/13 20/14 20/17 21/2 21/8
  24/9 24/17 24/20 25/2 25/19
  26/3 26/23 27/4 27/10 28/4
  28/7 35/8 43/16 43/21 44/12
  45/8 49/20 50/12 51/6 53/14
  54/17 55/3 55/4 56/5 57/24
  58/11 61/9 75/20 76/20 77/7
  77/10 77/24 77/25 81/8 81/15
  82/19 83/16 83/21 85/15 85/18
  85/22 86/14 87/9 94/21 94/23
  97/1 97/8 97/14 98/18 99/11
  99/19 100/8 100/21 103/23
  105/20 106/16 107/3 107/14
  108/20 108/24 109/7 109/18
  109/22 110/13 110/18 111/7
  111/14 112/12
button [2]   32/18 71/16
buy [3]   13/23 14/19 22/7

## C

C-R-E-S-S [1]   62/19
cabin [1]   26/9
caliber [1]   17/1
call [25]   8/19 9/19 17/14
  17/25 18/1 18/24 22/13 29/21
  30/11 55/5 62/10 69/5 69/8
  89/4 93/5 98/7 98/10 98/11
  102/16 103/7 103/18 104/25
  105/1 105/22 106/3
called [4]   29/17 69/11 88/3
  98/8
calling [3]   52/5 63/6 72/6
calls [1]   99/20
Calvert [22]   30/5 30/24 31/18
  31/19 31/24 32/1 32/5 33/3
  33/6 33/14 33/25 34/7 40/7
  41/19 42/16 42/23 60/15 61/6
  62/23 86/2 86/2 90/3
came [3]   33/23 64/16 84/2
can [25]   58/20 58/21 61/17
  67/7 67/8 69/23 71/15 72/16
  75/19 78/1 78/11 80/23 82/2

can... [3] 89/23 90/25 91/8
89/7 90/19 94/1 99/6 99/11
100/12 106/12 108/18 110/16
can't [13]   48/7 48/10 59/14
71/23 80/22 81/5 82/18 82/19
85/18 85/19 85/20 97/8 100/3
canine [2]   31/12 63/3
cannot [3]   81/6 85/9 85/14
caps [1]   82/10
car [3]   18/16 37/6 109/24
card [16]   34/24 35/18 37/1
37/2 37/10 37/16 37/18 38/10
38/11 38/12 43/25 46/6 46/14
47/20 48/1 53/6
career [1]   31/15
carries [1]   6/15
carry [3]   5/13 7/25 8/2
cars [3]   73/1 73/3 73/7
case [68]   7/3 8/5 10/14 11/7
11/17 12/3 12/11 13/18 14/16
15/10 15/23 16/8 16/14 16/21
16/23 16/25 21/4 21/20 21/20
27/19 32/7 32/9 41/18 41/24
41/25 41/25 42/1 42/1 42/3
43/3 43/5 43/14 56/1 56/2
57/20 57/21 58/4 58/8 58/10
58/18 70/2 70/11 75/13 77/23
83/9 84/14 85/13 87/3 92/17
97/6 97/8 97/9 101/9 101/10
101/11 101/17 101/23 102/21
105/15 106/24 107/10 108/17
109/3 110/17 111/6 111/9
111/13 111/17
cases [7]   13/10 14/10 14/14
84/14 96/8 102/21 103/21
catch [1]   20/16
category [1]   15/16
cause [9]   52/15 97/13 98/21
102/18 103/12 103/17 105/25
109/5 109/6
caused [2]   43/24 44/15
cautious [1]   109/8
cell [41]   60/20 83/2 83/5 83/5
83/8 83/16 83/21 96/14 96/14
96/15 96/16 96/19 96/20 97/2
97/4 98/8 98/9 98/19 99/13
100/22 100/24 101/3 101/4
101/5 103/4 103/6 103/9 103/15
103/17 103/25 104/1 104/6
104/12 104/15 104/17 104/24
104/25 104/25 106/1 108/18
109/15
center [32]   30/5 31/18 31/25
32/2 33/7 33/15 33/19 33/25
34/8 40/8 41/19 42/16 42/16
42/19 42/22 43/18 43/23 47/2
47/12 49/21 61/7 76/13 77/16
84/18 84/20 84/21 84/24 85/11
85/19 90/4 92/13 92/21
certain [4]   6/18 109/1 109/7
109/8
certainly [7]   5/15 6/12 96/21
99/22 100/20 103/22 108/14
certainty [6]   105/3 106/12
107/7 107/11 107/14 107/15
CERTIFICATE [1]   114/1
certify [1]   114/2
chambers [2]   111/10 112/25
chance [1]   88/7
changed [1]   80/22
character [11]   5/16 5/19 6/1

6/16 7/2 12/9 12/24 102/3
103/23 106/13 107/12
character... [3]   6/6 6/9 6/10
charge [7]   12/14 12/15 12/19
12/14 12/18 12/21 23/25 25/2
35/11 35/13
charged [19]   5/12 5/17 5/25
6/20 7/22 7/23 12/8 13/20
13/21 13/24 14/22 16/23 17/2
17/3 18/9 70/6 97/5 98/20
98/23
charger [2]   69/7 104/20
charges [12]   4/18 5/2 5/8 8/4
23/25 42/24 42/24 44/2 44/2
44/4 44/8 75/13
checked [1]   112/7
checking [2]   77/25 78/22
Cherrywood [1]   1/14
choice [1]   106/11
chronologically [1]   108/5
cigarette [1]   65/6
Circuit [4]   6/9 16/19 109/1
109/3
circuits [1]   108/24
circumstances [7]   16/12 19/17
32/21 42/4 59/4 60/18 110/8
cited [3]   14/10 95/1 96/8
city [1]   63/17
classically [2]   13/5 13/10
clean [2]   70/24 71/3
cleaning [1]   31/12
clear [19]   26/6 26/12 27/5
52/10 58/20 58/21 86/14 86/17
88/9 88/22 104/2 107/18 109/21
110/6 111/22 112/1 112/1
112/23 112/24
clear it's [1]   104/2
clearly [9]   12/24 12/25 16/23
28/2 28/8 104/3 104/5 104/9
110/13
clerk [4]   30/13 30/14 62/13
78/21
client [4]   8/16 8/24 10/9 11/3
co [2]   16/9 20/20
co-worker [2]   16/9 20/20
cocaine [2]   17/18 26/17
coherent [5]   37/22 54/4 54/11
54/12 109/24
collection [1]   7/9
collective [1]   103/2
collectively [1]   103/12
color [1]   20/7
colored [3]   82/15 82/16 82/17
come [14]   30/12 30/13 62/12
62/14 63/10 68/9 68/20 69/1
71/25 80/23 89/17 108/18 111/7
111/15
comes [5]   24/13 27/3 28/8
28/10 109/15
coming [7]   3/2 34/20 49/20
87/3 89/19 89/22 89/25
comment [4]   40/3 47/17 48/16
48/22
comments [3]   36/16 39/19 92/24
commercial [1]   14/7
committed [1]   104/7
common [3]   12/11 12/25 13/10
communication [9]   5/8 6/3 7/10
12/16 12/19 12/22 70/10 83/8
88/14
comparable [1]   104/8
complied [1]   29/19
computer [2]   1/23 89/15
COMPUTER-AIDED [1]   1/23

concept [1]   21/1
concern [1]   11/16
concerned [1]   111/18
concerning [3]   43/3 75/13
75/15
concludes [1]   62/5
conclusion [2]   20/8 46/19
concrete [1]   64/18
condition [4]   71/5 89/4 90/8
90/12
conduct [2]   14/14 70/14
confident [1]   74/22
confronted [1]   108/12
confusion [2]   24/20 26/17
connected [2]   12/10 12/25
connection [1]   32/6
consequences [1]   11/20
consider [2]   6/20 90/21
considerably [1]   9/24
consistent [1]   82/23
console [2]   37/5 37/8
conspiracies [1]   31/8
constitute [3]   12/10 110/5
110/7
contact [7]   60/16 61/11 68/25
95/13 96/17 98/20 103/15
contending [1]   27/20
context [1]   14/25
continuously [1]   24/11
contraband [21]   83/14 83/17
83/21 95/18 95/23 96/6 96/7
96/10 99/8 99/22 99/24 100/3
100/7 100/15 101/8 101/24
102/8 102/22 103/22 108/21
109/9
controlled [3]   14/5 14/7 14/11
conversation [14]   40/5 40/11
40/15 40/15 47/18 51/23 52/1
68/15 70/17 70/19 70/21 72/5
72/6 91/11
convicted [2]   101/20 102/10
conviction [7]   17/8 17/11
17/13 17/15 17/17 25/23 111/14
convictions [1]   14/11
COOK [3]   1/17 3/19 21/16
copy [4]   38/11 77/20 78/15
78/16
corner [2]   66/11 66/23
correct [141]
could [25]   6/19 17/23 23/11
25/5 30/22 32/16 32/21 33/17
50/15 50/17 51/22 55/14 63/1
69/5 71/5 79/17 89/10 94/10
96/3 97/8 99/24 101/6 105/16
105/18 110/23
counsel [5]   3/6 3/10 3/12
59/20 112/21
counsel's [1]   102/12
count [21]   4/16 4/16 4/16 4/17
4/22 4/23 5/1 5/2 5/16 6/14
6/18 7/13 7/15 7/17 8/4 8/8
9/10 9/10 9/16 9/16 10/6
counts [42]   5/7 5/15 5/17 5/18
5/20 5/25 6/23 6/24 6/24 6/25
7/9 7/15 7/22 7/23 7/25 8/1
8/3 8/6 9/7 9/8 9/9 10/2 10/4
10/5 10/6 10/8 11/21 11/21
11/25 12/1 12/1 12/1 12/7
12/14 12/18 12/21 13/3 16/19
17/2 17/3 18/9 70/6
County [23]   30/5 30/24 31/12
31/18 31/19 31/24 32/1 32/5
33/3 33/7 33/14 33/25 34/7

# C

County [1] 11/10  42/16 42/23 60/15 61/6 62/23 86/2 86/3 90/3
couple [2]  40/16 53/24
course [7]  31/15 40/19 42/7 42/10 52/15 84/14 94/21
court [43]  1/1 1/22 3/3 3/5 4/11 6/8 6/9 9/4 11/20 11/25 12/5 41/14 44/8 55/11 55/17 58/17 61/17 63/16 73/12 73/18 76/2 77/1 87/3 90/20 96/8 102/20 103/1 103/1 104/17 105/5 105/11 106/5 106/7 106/15 106/16 107/6 107/6 107/9 107/10 109/22 110/14 114/1 114/9
Court's [11]  23/11 27/5 28/20 52/20 54/16 55/2 75/10 78/20 89/1 93/16 94/1
courthouse [7]  30/6 32/2 33/17 34/2 34/18 34/21 40/8
courtroom [2]  32/14 71/13
Courts [1]  64/10
coverage [1]  66/13
covered [3]  40/22 66/12 108/22
crack [3]  17/18 25/24 26/17
create [1]  10/8
creates [1]  8/10
credentials [1]  37/3
Cress [23]  2/10 33/1 33/2 62/10 62/15 62/19 62/22 78/19 78/24 87/18 94/12 94/19 95/4 96/16 97/1 97/3 98/9 98/19 104/18 105/20 105/23 106/1 107/22
Cress' [1]  103/14
crime [19]  16/22 23/8 27/3 27/11 27/15 28/7 95/21 95/24 96/4 96/4 96/11 96/19 96/22 102/19 103/13 103/18 104/6 108/22 109/10
crimes [1]  109/13
criminal [5]  1/4 3/3 12/5 64/9 109/5
critical [4]  8/15 16/20 92/4 99/2
cross [6]  2/4 24/17 41/9 41/10 78/17 99/12
cross-examination [3]  41/10 78/17 99/12
crushed [1]  69/23
crux [1]  14/8
cuffed [1]  35/22
curious [1]  58/15
current [1]  108/25
currently [2]  31/2 63/4
custody [7]  33/18 33/22 42/24 43/16 43/18 45/9 74/5
cut [1]  69/23
cutting [1]  82/21

# D

dad [3]  70/20 74/20 81/3
daily [2]  15/21 17/9
danger [1]  16/25
date [10]  15/17 19/20 26/13 31/19 63/13 64/3 88/13 96/17 109/19 112/22
dates [2]  6/5 7/1
Dave [1]  3/12
David [4]  2/5 29/22 30/15

30/18
day [19]  4/21 5/2 5/5 20/10 52/16 58/5 64/11 68/10 69/3 74/24 89/4 89/18 111/23
days [4]  10/15 30/4 41/15 111/19
DEA [2]  3/13 31/11
dealer [2]  39/2 48/25
deals [1]  108/17
death [26]  4/19 5/3 7/20 8/20 8/21 9/9 9/10 9/14 9/18 10/19 10/24 10/25 15/22 19/10 19/14 19/15 19/17 19/19 20/4 21/8 21/19 27/19 57/17 58/22 99/2 101/1
DEBORAH [2]  1/13 3/10
December [6]  7/23 10/7 10/7 11/3 11/6 12/23
December 8th [1]  10/7
decide [2]  106/24 106/24
decided [1]  80/1
decision [1]  6/9
decline [2]  80/2 86/20
declined [6]  79/22 84/7 84/9 88/15 88/19 91/12
defendant [44]  1/7 1/17 3/7 3/19 6/22 8/5 11/24 12/6 13/3 13/16 13/24 16/15 16/24 19/3 19/8 19/12 20/11 24/20 30/3 30/5 34/14 37/9 45/9 54/25 57/20 67/16 76/5 76/10 93/25 101/20 102/8 102/9 102/15 103/4 103/6 103/9 103/15 104/23 105/21 108/12 109/13 109/20 109/23 110/6
defendant's [19]  13/15 13/19 13/20 13/22 14/8 15/6 15/10 16/4 18/5 20/23 23/15 30/2 32/18 62/9 90/19 90/22 91/7 97/24 101/22
defense [4]  21/20 22/2 23/25 87/18
degree [5]  106/12 107/7 107/11 107/14 107/14
demands [1]  109/6
demonstrates [3]  16/4 16/5 16/11
denied [6]  13/12 26/22 26/23 109/15 110/19 111/4
deny [1]  111/2
denying [1]  110/11
departmental [1]  33/8
depending [2]  29/1 50/15
deputy [7]  63/24 65/22 66/7 66/18 72/24 86/2 96/23
Deputy Mike Tomlinson [1]  72/24
Deputy Tomlinson [3]  66/7 66/18 96/23
describe [5]  32/21 63/1 67/7 71/5 71/15
described [2]  80/21 81/24
Detection [1]  31/12
detective [29]  33/1 33/2 48/6 58/24 62/10 62/22 63/25 76/11 86/19 86/24 87/18 88/15 88/18 91/12 94/19 96/16 97/1 97/3 98/9 98/16 98/19 102/14 103/14 104/18 105/20 105/23 106/1 107/22 107/23
Detective Cress [14]  33/2 62/10 87/18 94/19 96/16 97/1

97/3 98/9 98/19 104/18 105/20 105/23 106/1 107/22
Detective Jacobs [1]  103/14
Detective Jacobs [2]  86/19 91/12
detective's [1]  102/12
detention [32]  30/5 31/18 31/25 32/1 33/7 33/15 33/19 33/25 34/8 40/8 41/19 42/16 42/16 42/19 42/22 43/18 43/23 47/2 47/12 49/21 61/6 76/13 77/16 84/17 84/20 84/21 84/23 85/11 85/19 90/3 92/13 92/21
detoxed [1]  61/10
development [1]  73/16
device [7]  5/9 6/3 7/10 12/16 12/19 12/22 89/9
did [183]
didn't [41]  10/23 20/16 21/23 22/2 27/22 36/17 37/14 43/8 44/4 46/4 47/7 47/8 47/9 47/11 47/24 48/6 51/9 57/25 59/22 60/1 64/20 66/21 67/6 71/3 71/19 71/21 72/13 72/1 76/20 77/10 77/12 79/6 79/19 79/21 82/19 82/21 83/7 86/13 86/25 89/21 99/7
died [6]  4/21 8/18 8/23 10/17 13/4 17/3
difference [1]  10/16 10/19 13/2 74/17 74/25
different [16]  5/6 5/19 7/15 7/21 8/3 8/4 10/13 10/15 11/11 14/6 18/25 20/20 74/15 104/4 104/5 108/22
differentiated [2]  99/11 99/12
differs [1]  6/4
difficulty [1]  24/19
DiGirolamo [3]  77/21 77/21 78/5
dinner [1]  71/9
direct [5]  2/4 16/24 30/20 62/20 81/8
directed [2]  81/5 81/16
Directing [1]  31/17
direction [1]  73/21
directions [2]  93/1 93/2
directly [7]  19/1 30/16 62/17 68/22 84/17 84/20 84/21
disagrees [1]  107/9
discussion [3]  74/8 91/23 94/3
discussions [1]  43/2
dishes [2]  71/9 71/10
disposes [1]  110/20
distinctive [1]  20/6
distribute [17]  4/24 6/3 6/10 7/10 12/15 13/10 13/25 14/3 14/13 14/22 16/7 16/17 21/21 21/21 22/2 22/7 24/15
distributed [6]  8/16 8/17 8/24 14/21 16/16 39/16
distributing [4]  8/12 13/25 22/3 22/9
distribution [76]  4/18 5/2 6/3 6/4 6/11 7/9 7/22 7/23 8/21 9/11 9/12 9/13 9/17 9/25 10/4 10/6 10/7 10/9 10/12 10/23 10/24 11/3 11/4 11/6 11/11 12/15 12/16 12/18 12/19 12/21 12/22 14/4 14/6 14/13 14/15 17/3 21/2 22/13 22/15 23/7 23/8 23/19 23/20 23/24 24/1 24/6 24/6 24/7 24/11 24/11

## D

distributes [2] 24/22
25/1 25/21 26/1 26/4 26/8
26/13 26/24 26/24 27/3 27/4
28/6 82/24 96/17 96/18 96/20
97/5 98/10 98/13 98/20 98/23
102/13 103/10 103/16 103/19
106/2
distributions [1] 8/6
district [10] 1/1 1/1 1/11
3/11 3/11 23/23 39/11 40/23
49/2 58/17
DIVISION [1] 1/2
do [70] 5/9 5/13 7/25 8/1
10/22 11/10 12/5 14/24 15/2
15/3 18/4 21/2 21/23 22/23
23/3 23/10 32/14 32/15 36/8
36/14 37/14 38/6 38/16 39/8
44/19 45/3 54/22 54/22 55/1
56/18 58/9 61/6 61/8 61/9
61/13 64/11 64/25 65/10 71/7
71/12 71/23 72/6 72/12 74/11
74/13 75/20 77/18 78/1 78/15
79/1 79/18 84/16 85/15 85/17
87/10 89/9 89/20 90/3 90/6
90/7 90/16 91/11 92/13 92/17
95/18 99/15 100/3 102/21 108/5
111/18
Doctrine [11] 101/7 101/14
101/24 101/25 103/20 103/22
105/13 106/14 107/13 108/14
109/14
document [8] 59/9 59/9 87/8
87/10 87/11 87/12 87/14 88/10
documents [2] 58/9 58/16
does [23] 9/2 9/6 9/6 9/7 9/8
12/6 13/1 21/2 22/13 22/23
23/3 23/9 24/8 24/19 84/22
88/12 95/18 96/6 101/7 102/21
105/3 107/3 108/23
doesn't [7] 9/4 24/7 87/7
97/14 100/8 103/2 110/18
doing [3] 10/15 97/3 102/4
don't [55] 4/17 9/13 9/17 10/1
10/20 14/1 14/19 21/20 21/24
25/16 26/8 26/11 27/8 27/10
27/20 27/24 42/18 42/21 42/22
44/2 44/11 44/12 46/25 48/5
55/4 59/15 59/23 71/2 72/2
76/1 77/25 78/4 78/21 81/6
81/15 81/16 85/19 85/20 85/21
85/21 85/24 86/24 92/6 94/7
97/21 97/23 98/14 99/17 99/19
99/21 100/17 101/11 104/8
104/12 110/24
done [5] 24/16 59/11 76/13
76/14 92/16
door [17] 64/15 64/16 64/18
64/19 65/20 66/3 66/11 68/23
69/14 72/16 72/20 72/25 74/21
74/25 80/20 81/22 94/23
doorway [2] 67/21 67/22
double [1] 78/22
down [16] 32/18 44/20 48/20
49/16 49/17 49/25 54/20 62/3
65/12 66/16 70/23 93/21 96/24
106/9 111/7 111/23
downstairs [2] 65/20 70/23
dramatic [2] 9/24 9/24
dressed [2] 68/8 69/11
dresser [1] 96/3
drive [10] 34/18 34/19 40/7

40/20 50/7 50/9 50/10 50/12
51/17 51/19
drivers [1] 35/21
driveway [8] 65/11 65/12 73/4
73/5 73/13 73/14 73/15 73/24
driving [6] 36/2 36/4 37/6
37/15 40/10 51/15
drug [19] 6/10 6/11 21/18
23/14 27/18 31/3 31/8 39/2
48/24 67/4 67/5 67/25 70/22
95/9 95/14 96/20 98/4 103/16
108/14
drugs [7] 20/12 22/8 38/1
45/20 61/25 93/11 110/10
duplication [1] 7/4
during [9] 13/2 30/4 31/15
40/10 40/19 52/15 64/11 99/20
102/5
duties [2] 31/7 64/8
dye [1] 104/11

## E

each [4] 6/20 6/23 6/25 14/13
earlier [11] 20/9 27/15 40/1
41/15 53/17 88/5 88/22 99/21
100/25 102/14 104/1
early [1] 64/13
easier [1] 4/12
eating [2] 71/9 71/10
educational [3] 45/17 46/24
47/6
effect [1] 9/2
effectuate [2] 95/2 98/2
effort [4] 7/4 71/22 90/7
90/11
efforts [2] 19/5 111/7
eight [4] 6/6 31/18 55/9 109/1
Eighth [1] 109/3
either [4] 59/19 59/23 96/6
107/20
elderly [1] 70/22
element [2] 13/1 23/24
elements [2] 16/18 16/22
else [12] 31/22 33/9 34/12
39/18 52/8 52/22 67/2 76/10
81/12 104/21 106/25 113/1
emergency [1] 55/6
employed [4] 30/23 30/25 62/22
62/24
encounter [1] 32/22
end [5] 24/9 26/21 47/15 65/11
65/12
ended [1] 20/10
enforcement [11] 19/16 31/3
31/10 45/1 60/5 60/16 84/11
84/13 86/5 86/7 86/15
engage [1] 96/20
English [1] 45/15
enough [3] 13/7 110/5 110/7
enter [1] 97/24
entirely [1] 110/12
entirety [1] 37/18 110/21
entitled [1] 114/4
enures [1] 8/5
episodes [2] 6/10 25/14
Esquire [3] 1/13 1/17 1/17
essence [1] 19/4
essential [4] 7/8 16/18 23/24
23/25
essentially [7] 5/19 12/2 17/2
25/25 26/23 109/23 110/1
establish [3] 61/16 103/16

106/5
established [1] 49/13
especially [2] 68/6 106/22
even [9] 7/12 13/8 14/20 14/24
24/1 36/17 99/23 100/17 104/12
evening [2] 20/9 68/20
event [2] 66/14 74/19
events [17] 5/5 5/9 5/10 5/12
9/16 17/8 18/9 19/8 74/12
74/15 74/19 74/22 74/23 74/23
81/7 92/14 99/3
eventually [5] 43/9 43/11
43/12 43/13 43/21
ever [3] 21/9 39/16 48/7
every [1] 11/10
everyday [1] 20/13
everything [3] 40/22 58/8 74/4
everywhere [2] 71/8 71/8
evidence [73] 3/23 3/24 11/18
11/19 13/17 15/10 15/12 15/24
16/2 17/1 17/5 21/24 23/7 23/8
23/9 24/1 24/18 26/13 26/24
27/2 27/7 27/24 28/6 28/8 29/3
41/3 59/15 62/8 70/2 83/6 83/7
83/8 83/13 83/18 83/22 83/25
93/23 94/11 95/21 95/22 95/23
96/3 96/4 96/6 96/11 96/18
96/22 98/12 98/22 99/14 99/25
100/12 100/12 100/19 101/8
101/21 102/8 102/17 102/19
102/22 102/23 103/13 103/18
103/23 104/3 104/9 104/15
105/6 106/13 106/18 107/12
108/22 109/9
evidentiary [1] 97/13
exact [6] 44/2 44/11 44/12
85/9 85/13 85/22
exactly [12] 12/11 15/9 28/9
35/1 43/23 48/2 48/20 79/10
79/13 85/8 104/12 110/12
examination [11] 30/20 41/10
52/24 55/23 61/19 61/22 62/20
78/17 81/8 91/9 99/12
examiner [4] 8/19 9/19 9/19
112/8
example [2] 45/15 95/25
except [1] 69/19
exception [2] 100/5 100/9
exclude [2] 3/23 110/19
exclusion [1] 110/18
exculpatory [2] 110/12 110/13
excuse [15] 3/9 6/7 10/5 16/3
19/18 19/22 32/2 36/12 40/12
48/23 58/24 81/21 90/25 100/8
107/8
excused [3] 54/21 93/22 113/4
execute [1] 70/4
executed [1] 101/2
executing [2] 96/24 101/17
execution [1] 59/12
exhibit [11] 38/6 41/2 44/19
46/10 72/12 79/1 87/19 90/19
90/20 91/2 91/3
exited [2] 66/12 68/23
expect [1] 18/1
expects [6] 15/18 15/20 15/23
18/23 20/15 20/19
explain [2] 74/4 74/17
explained [2] 34/1 34/20
explains [1] 106/16
extent [1] 94/18

## F

F.3d [5] 101/9 101/12 101/15

Case 8:10-cr-00271-JKB    Document 100    Filed 10/29/12    Page 121 of 133

**F**

F.3d. [3] 8/10/15 9/1
fabricating [1] 24/18
face [2] 30/13 62/13
facilities [1] 90/4
facility [1] 55/7
facing [6] 66/10 73/13 73/14
 73/15 73/18 73/19
fact [21] 6/14 12/13 13/2 17/2
 20/10 21/6 24/15 59/15 75/8
 80/10 84/6 86/19 91/21 94/24
 96/6 100/24 102/19 105/4 110/4
 110/6 110/10
factor [2] 20/23 95/19
facts [4] 14/20 42/4 43/14
 109/7
fair [3] 24/2 42/12 110/15
fairly [3] 6/18 24/11 24/21
fall [1] 109/14
falls [2] 12/11 15/16
familiar [5] 14/25 50/9 70/5
 83/1 98/18
familiarity [1] 15/11
far [14] 3/20 9/5 9/24 25/6
 25/8 25/9 25/12 25/22 26/4
 26/17 50/7 76/7 77/14 104/4
February [5] 7/22 10/5 10/6
 11/4 12/20
February 16 [1] 7/22
February 16, 2009 [1] 10/5
February 6 [1] 10/6
federal [9] 31/10 32/6 42/2
 42/3 42/12 42/24 43/5 56/1
 63/21
feeling [1] 36/15
felon [2] 101/20 102/10
felonies [1] 12/8
few [3] 41/15 50/14 61/16
Fifteen [1] 86/8
file [3] 3/23 76/2 110/21
filed [2] 58/18 58/18
find [5] 9/7 10/23 92/1 95/25
 96/19
finding [1] 27/11
fine [10] 5/11 55/8 56/11 60/2
 87/16 89/15 106/22 111/3
 112/15 112/16
firearm [5] 101/19 101/21
 101/22 102/6 102/9
first [22] 5/24 12/14 19/10
 21/24 26/12 27/2 28/16 29/24
 30/1 30/14 35/7 40/12 55/12
 55/25 66/3 66/3 66/19 79/22
 94/8 94/8 94/12 108/11
Fitzgerald [1] 3/4
five [15] 6/24 7/23 7/25 8/7
 9/8 10/4 10/5 11/22 12/1 12/18
 50/16 50/19 54/2 65/2 111/19
flee [1] 66/14
focusing [2] 4/16 59/3
folks [2] 108/3 113/4
follow [3] 59/14 92/18 93/1
followed [1] 33/13
following [1] 58/1
food [1] 71/8
foot [1] 79/14
force [7] 3/13 29/21 30/9 31/3
 31/6 31/7 63/7
foregoing [1] 114/2
forget [1] 56/25
form [3] 37/12 45/7 45/8
formal [1] 46/17

forth [2] 108/15 110/10
Forty [1] 54/2
forward [1] 19/13
found [16] 6/10 11/3 16/13
 19/23 20/6 21/7 27/6 27/19
 28/9 30/2 39/24 60/19 61/3
 70/25 104/15 104/15
four [16] 3/22 6/7 6/24 7/22
 7/25 8/7 9/7 10/5 10/13 11/21
 12/1 12/18 13/1 16/19 50/16
 50/18
Fourth [2] 6/9 16/19
frankly [2] 13/7 105/17
fraud [3] 101/18 102/5 102/6
Freddy's [2] 39/11 49/1
Friday [9] 32/5 32/24 55/13
 57/1 59/4 60/7 61/17 62/9
 112/19
friend [1] 14/19
friends [1] 13/23
front [14] 34/11 62/13 64/15
 64/19 64/25 65/19 65/20 65/23
 69/14 72/16 72/20 72/25 73/12
 74/21
Front-passenger [1] 34/11
further [18] 6/4 7/6 8/14
 11/23 12/16 12/19 12/22 22/10
 29/13 54/14 61/19 90/15 93/17
 93/18 93/24 97/3 102/4 106/23

**G**

game [1] 24/2
gather [2] 25/3 96/14
gave [6] 76/9 93/1 94/25 98/7
 105/1 105/22
generally [1] 14/11
gentleman [4] 64/16 65/1 65/19
 66/1
get [18] 9/3 9/3 26/8 34/9
 49/21 65/16 66/1 71/20 73/16
 80/5 84/11 100/18 100/18
 101/10 101/15 109/1 109/17
 111/7
gets [4] 5/7 100/6 100/6
 110/10
getting [4] 36/6 76/23 89/25
 112/12
girl [1] 19/25
girlfriend [3] 15/13 18/6 20/1
give [6] 9/20 21/1 75/20 89/18
 89/25 101/12
given [6] 5/19 7/11 7/14 11/19
 11/19 61/10
gives [2] 95/1 97/24
giving [1] 90/4
glass [2] 66/11 68/23
go [35] 22/10 25/18 29/13
 29/18 46/23 47/1 49/14 50/20
 65/16 66/5 66/22 70/23 71/2
 74/12 80/1 80/22 81/2 81/4
 81/5 81/12 84/17 90/13 91/8
 92/13 94/6 94/12 94/25 95/2
 95/25 99/5 100/10 100/11
 100/18 108/10 108/11
goes [4] 23/19 27/14 66/16
 106/16
going [62] 3/17 8/19 9/19 9/19
 10/25 11/1 11/2 13/22 15/18
 17/12 17/14 17/15 17/20 18/1
 18/5 18/7 18/10 22/1 22/13
 23/4 23/4 23/4 23/17 24/5 25/6
 25/9 25/21 26/3 26/12 28/7

28/24 35/16 36/17 38/5 54/25
 55/1 55/5 68/9 68/19 72/12
 72/13 72/14 75/25 83/17 86/15
 87/8 87/20 89/17 91/6 91/20
 95/8 108/7 110/2 110/24 111/2
 111/5 111/7 111/8 111/22 112/9
 112/10 112/13
gone [1] 58/24
good [7] 3/8 3/9 3/18 30/22
 41/12 41/13 78/19
got [29] 10/12 22/3 23/5 23/7
 23/8 23/9 26/16 33/6 39/2
 40/13 40/16 47/22 48/12 48/25
 50/3 64/14 66/3 66/22 68/8
 75/2 76/23 81/15 100/10 100/15
 100/15 104/11 109/23 111/19
 111/20
government [34] 1/13 2/3 3/7
 4/19 7/5 9/8 10/2 13/18 14/10
 15/9 15/12 15/18 15/20 15/23
 16/9 16/15 17/4 17/12 18/23
 19/1 20/15 20/18 22/25 25/6
 27/20 29/21 30/15 54/23 58/21
 62/15 78/25 93/23 94/6 112/3
government's [12] 4/14 7/14
 16/14 16/21 22/8 38/6 41/2
 46/10 72/11 90/20 91/2 91/3
grandparents [9] 64/21 64/24
 65/25 80/5 80/13 80/14 80/17
 80/24 80/25
granted [1] 26/22
grasp [1] 105/19
greater [1] 6/15
green [1] 72/19
Greenbelt [10] 1/6 1/15 1/19
 30/6 31/4 32/2 34/21 40/8
 50/20 95/7
group [1] 7/12
guess [7] 5/8 13/22 15/15
 24/24 86/2 94/17 109/19
guideline [1] 5/1
guilty [1] 10/23
gun [1] 104/11

**H**

habit [2] 13/22 15/4
had [94] 10/19 11/3 14/21 15/3
 19/18 19/19 19/19 22/8 22/9
 32/22 32/25 34/22 36/2 36/4
 36/15 40/4 42/17 45/3 47/6
 47/12 49/6 49/6 52/6 53/18
 55/12 56/4 56/7 56/7 56/9
 56/14 57/2 57/20 57/22 58/4
 58/5 58/6 58/16 58/24 58/25
 59/11 59/12 61/2 61/11 64/17
 65/15 68/4 68/4 68/9 68/11
 68/13 68/16 69/23 70/19 74/2
 74/4 74/8 74/14 75/17 75/17
 77/1 77/9 80/3 80/15 82/16
 85/15 87/2 88/7 88/14 88/21
 89/5 89/6 89/9 89/16 90/12
 91/11 91/16 91/18 94/19 94/24
 95/13 96/16 96/23 97/4 97/10
 97/19 98/9 98/19 98/21 103/9
 103/12 104/24 105/17 106/1
 107/24
hadn't [1] 36/22
half [2] 51/21 51/25
Hall [3] 63/16 73/12 73/18
hand [7] 67/3 67/23 73/17
 97/21 97/23 107/2 107/8
handcuffed [2] 33/23 37/15
handcuffs [2] 33/21 34/14

## H

handed [2] 89/2
handgun [1] 104/5
handle [1] 28/15
handling [1] 4/7
happened [7] 33/14 34/16 34/19
 53/10 60/12 65/4 102/13
happens [1] 111/18
hard [1] 24/9
Harrison [6] 15/14 18/6 39/1
 39/16 70/12 95/13
Harrison Wade [1] 18/6
has [18] 7/18 11/24 16/19
 29/19 52/11 59/18 61/7 87/16
 90/4 94/19 96/10 100/2 102/1
 103/23 104/6 107/4 107/14
 109/22
have [136]
having [6] 4/4 7/17 8/6 13/24
 21/7 39/20
he [262]
he lent [1] 48/23
he'll [1] 111/13
he's [12] 3/12 11/5 32/17 39/1
 57/8 57/14 64/2 71/14 71/15
 102/2 110/7 111/19
head [3] 49/16 49/17 49/25
heading [1] 49/7
health [1] 72/5
hear [7] 6/16 10/16 25/7 27/22
 35/9 110/15 111/15
heard [1] 108/2
hearing [6] 3/5 38/6 41/2 41/5
 88/1 111/15
Heights [2] 39/11 49/2
held [4] 12/3 63/2 67/3 94/3
help [1] 55/17
her [2] 15/14 93/5
here [53] 3/11 3/12 3/17 4/3
 4/12 10/12 14/16 16/23 17/22
 21/1 21/3 22/7 23/24 24/20
 24/24 25/15 29/11 30/1 30/6
 30/9 30/12 30/13 32/14 34/1
 40/22 40/22 46/6 46/9 59/9
 59/13 62/14 63/21 69/1 72/12
 76/17 77/7 77/22 78/16 80/5
 87/4 87/11 97/17 99/1 99/3
 106/21 109/1 110/1 111/7
 111/23 112/3 112/10 112/12
 112/19
here's [1] 87/11
heroin [72] 4/20 6/4 8/6 8/12
 8/16 8/17 8/22 8/23 10/12
 12/15 12/18 12/21 13/4 13/19
 13/21 13/23 13/25 13/25 14/4
 14/17 14/19 14/21 14/22 15/1
 15/11 15/15 15/16 15/20 15/21
 15/24 16/2 16/5 16/5 16/6 16/6
 16/8 16/13 16/16 17/4 18/3
 18/8 18/12 18/21 18/22 19/1
 19/4 19/5 19/6 19/21 19/23
 20/2 20/4 20/6 20/10 20/21
 20/23 21/5 21/6 21/7 21/9
 21/13 21/17 21/22 23/1 23/16
 39/2 39/16 48/25 61/11 90/1
 90/4 97/5
hesitant [1] 80/2
HIDTA [1] 31/3
high [4] 106/12 107/7 107/11
 107/14
high-degree [4] 106/12 107/7
 107/11 107/14

him [145]
his [129]
hmm [1] 111/10
hold [5] 22/10 44/5 57/19 80/5
 110/1
holed [1] 69/22
home [4] 64/20 65/25 91/16
 108/10
Honor [129]
HONORABLE [1] 1/10
hour [3] 40/9 51/21 51/25
house [19] 27/6 65/19 66/5
 66/13 66/16 66/20 68/10 68/20
 70/15 70/18 71/1 76/18 76/23
 81/12 94/25 97/7 98/14 99/17
 100/11
houses [1] 100/18
how [47] 8/9 8/12 8/12 9/2
 9/22 19/12 20/22 23/4 25/5
 25/8 25/14 30/25 31/14 33/6
 35/17 36/4 36/25 40/5 40/7
 40/10 41/24 45/1 50/12 51/18
 51/18 53/25 54/1 62/24 64/5
 64/25 65/10 68/11 69/1 71/25
 71/25 73/1 76/22 81/5 81/15
 82/16 82/16 82/18 86/1 86/5
 94/7 95/18 99/15
however [2] 79/17 85/11
huh [1] 51/2
hundred [1] 97/14
Hundreds [1] 31/16
hurt [1] 71/3
hypodermic [2] 82/8 99/10

## I

I'd [10] 6/23 41/1 41/1 56/18
 57/8 64/21 76/3 78/8 80/4 88/2
I'll [4] 46/20 46/20 87/23
 111/17
I'm [48] 3/22 6/18 13/7 21/16
 22/1 24/15 27/17 27/17 29/23
 31/6 33/2 35/6 35/20 36/12
 38/5 41/25 42/9 43/10 44/3
 44/24 48/6 48/18 48/20 50/9
 57/9 58/15 59/8 59/9 59/17
 60/4 63/4 71/1 72/12 74/22
 74/23 76/17 77/4 78/22 79/12
 87/8 87/20 93/6 97/6 97/18
 105/7 106/6 109/2 110/22
I've [6] 50/9 57/25 83/11
 107/1 107/1 111/19
I-N-D-E-X [1] 2/1
idea [1] 22/8
identification [1] 87/19
identified [4] 64/16 80/16
 87/23 102/15
identify [3] 3/6 32/16 79/17
identities [1] 39/13
identity [1] 79/17
if [63] 4/11 5/16 7/7 7/8 8/21
 8/23 9/11 10/19 11/3 11/13
 12/7 14/20 14/24 17/23 22/2
 23/11 25/5 30/22 32/16 32/21
 39/23 40/16 46/21 48/5 55/11
 55/14 55/19 56/19 59/17 60/1
 62/12 64/22 66/10 69/5 76/1
 76/2 78/14 80/4 80/5 84/15
 84/16 84/22 84/24 87/20 91/6
 92/1 92/10 92/10 94/10 95/25
 96/23 97/7 99/5 101/6 103/12
 104/17 106/7 106/9 110/1 111/2
 111/13 111/13 111/18
ill [1] 42/17

illegal [1] 101/22
immediately [13] 19/20 30/10
 102/1 102/3 102/22 102/22
 104/22 105/4 105/12 106/8
 106/10 109/4
impact [1] 11/19
implicate [1] 11/12
implication [1] 12/2
implications [1] 110/3
implied [1] 107/10
imply [2] 6/14 106/12
importantly [3] 6/17 16/4
 99/19
in [310]
incarceration [2] 7/18 7/19
incident [15] 6/20 20/5 22/25
 57/24 58/1 84/15 84/17 85/18
 92/2 92/11 100/1 105/9 105/15
 105/17 105/19
incidents [1] 13/9
include [3] 17/3 71/1 71/2
incriminating [14] 96/9 96/12
 96/25 97/2 97/11 98/12 98/15
 99/25 102/3 102/22 102/23
 105/6 106/13 106/17
incriminatory [5] 103/23 104/3
 104/10 107/7 107/12
indicate [3] 37/20 38/15 85/12
indicated [3] 69/6 80/16 92/1
indication [2] 46/8 93/10
indictment [24] 4/16 4/18 5/12
 7/16 12/6 13/20 13/21 14/1
 14/18 14/18 18/10 32/6 58/8
 63/20 63/21 68/4 70/3 70/6
 77/1 77/7 95/7 95/15 97/5
 103/10
indictments [1] 64/9
individual [11] 13/4 17/3
 64/23 65/23 65/24 71/12 72/24
 80/11 96/5 99/17 100/23
individuals [2] 15/25 19/16
indulgence [9] 23/11 28/20
 52/20 55/2 75/10 78/20 89/1
 93/16 94/1
infection [8] 39/21 40/1 40/2
 40/4 40/14 42/17 42/20 52/7
inference [1] 27/25
inflammatory [1] 17/5
influence [7] 37/24 38/1 45/19
 45/22 54/10 61/25 93/10
inform [1] 45/9
initial [4] 32/4 34/2 34/21
 56/20
initially [2] 32/9 32/23
injecting [2] 15/15 18/8
inquire [2] 46/14 78/12
inquiry [1] 78/24
inside [6] 20/6 33/25 34/16
 66/16 81/18 97/7
insofar [1] 109/12
instance [5] 19/3 94/19 98/3
 102/14 103/3
instead [3] 4/22 7/17 92/22
instruction [1] 6/19
intelligent [1] 46/15
intend [1] 21/21
intended [1] 16/16
intends [1] 13/18
intent [14] 4/24 6/2 6/10 7/10
 12/15 13/9 13/25 14/3 14/12
 14/21 16/5 16/7 16/18 24/21
interrupt [2] 35/14 48/6
intervening [1] 25/23

## I

interview [7]   14/13 43/15
43/21 84/13 92/12
interviewed [8]   19/16 84/7
84/9 86/20 86/25 88/16 88/19
91/13
into [25]   5/7 15/16 24/6 26/8
30/16 34/9 62/17 65/16 66/16
67/2 67/21 68/22 69/6 73/16
73/18 76/23 89/10 94/12 94/25
95/2 95/5 95/8 104/19 104/20
108/12
intoxication [2]   8/22 8/23
introduce [7]   13/18 15/9 15/12
17/6 17/13 17/20 23/1
investigate [1]   31/8
investigation [11]   42/7 42/10
59/1 63/4 63/8 83/2 88/4 95/12
97/1 98/18 101/18
investigator [1]   42/13
investigators [2]   19/11 24/8
invoke [1]   29/14
invoked [4]   56/14 57/2 59/19
85/5
involuntariness [1]   110/16
involve [3]   10/23 10/25 15/24
involved [8]   7/1 7/1 7/2 14/14
28/4 105/7 106/18 107/20
involvement [2]   98/13 98/22
involves [1]   45/14
involving [3]   45/13 60/17
99/20
iPad [1]   87/9
is [265]
isn't [5]   11/7 22/4 22/6 50/14
108/21
issue [10]   7/8 8/15 9/3 23/5
24/4 24/22 26/8 54/22 55/17
110/21
issued [6]   32/9 64/10 77/1
77/20 94/22 108/7
issues [2]   68/9 68/11
issuing [1]   78/6
it [216]
it's [76]   4/11 8/12 8/25 9/23
10/22 11/4 11/13 15/10 16/14
16/14 16/23 16/23 19/6 21/22
21/23 21/24 22/20 23/17 24/5
24/9 24/13 24/15 24/21 27/20
28/9 29/4 29/4 38/10 44/3 45/6
45/8 50/3 50/7 50/14 57/21
73/17 87/9 87/23 88/3 89/7
90/19 90/20 90/22 92/1 95/21
95/22 96/3 96/5 96/11 99/7
99/8 99/21 99/22 99/22 100/15
100/15 100/22 100/23 100/24
103/11 104/2 104/3 104/9
104/10 104/11 104/11 104/11
104/12 104/13 105/25 107/5
107/17 108/22 110/12 111/22
112/13
item [7]   20/8 47/25 96/6 97/11
102/2 102/18 103/13
items [9]   30/1 69/18 69/19
70/25 89/7 96/9 97/13 99/13
109/8
its [4]   14/10 96/4 98/15
110/20
itself [4]   6/11 23/8 27/15
75/24
IV [2]   89/10 90/13
Ivy [1]   1/18

## J

Jacobs [18]   2/5 3/12 29/22
30/9 30/15 30/18 41/12 53/1
55/15 55/25 63/7 86/19 86/22
86/24 88/4 88/15 88/18 91/12
Jacobs' [1]   76/11
JARRED [1]   1/17
jeweler [1]   67/10
job [7]   39/20 39/22 39/23
39/24 40/14 52/4 52/6
JOHNSTON [8]   1/13 2/11 2/13
3/10 81/9 83/4 84/3 107/19
joinder [4]   6/12 9/3 11/14
13/11
Jones [2]   63/24 64/6
JR [1]   1/17
JUDGE [11]   1/11 48/10 77/21
78/5 78/22 81/8 99/23 111/6
112/1 112/23 112/25
juncture [1]   110/14
jury [6]   6/19 9/4 9/6 9/22
15/1 110/15
just [61]   7/8 9/11 9/12 9/24
14/3 14/16 17/14 21/23 22/20
23/19 25/22 27/1 27/5 28/24
35/7 36/5 36/15 36/16 36/18
36/20 38/21 38/23 39/1 39/7
39/23 40/3 40/6 44/1 44/3 44/5
44/7 44/21 46/1 46/5 47/17
48/3 48/19 51/9 53/24 55/19
58/15 60/12 60/13 72/19 82/23
84/22 88/2 88/9 94/5 96/24
97/12 100/18 101/7 101/12
102/5 105/18 107/4 108/21
109/2 110/6 111/21
justify [1]   110/18

## K

keep [2]   91/6 110/14
Keith [1]   31/23
Kenilworth [2]   15/19 18/11
kept [2]   37/2 71/4
key [2]   23/24 105/20
killing [1]   20/10
kind [5]   10/16 13/16 24/5 26/1
57/9
knew [29]   42/4 42/7 42/10
42/23 56/13 57/1 59/5 60/19
70/9 81/4 83/7 83/20 83/21
84/6 85/2 89/16 95/12 96/1
96/16 96/19 97/3 98/9 98/19
101/20 102/9 103/9 106/1
107/19 107/24
knocked [1]   64/15
know [60]   9/4 9/6 10/20 15/2
18/4 23/18 24/19 26/11 36/17
44/2 45/8 47/5 47/7 51/9 57/6
57/25 58/4 59/10 59/11 59/13
59/15 59/21 59/22 60/1 60/11
61/6 61/8 61/9 64/11 64/25
70/8 74/3 76/1 76/7 77/2 77/6
77/14 79/18 80/14 81/6 81/15
81/16 85/21 88/2 89/19 89/23
90/2 90/3 90/6 90/7 94/7 97/9
99/15 99/17 99/19 99/21 100/22
101/23 104/12 107/5
knowing [1]   46/15
knowingly [1]   16/15
knowledge [14]   16/5 16/18 21/5
41/18 41/24 59/17 60/6 60/21
61/2 95/12 102/12 103/2 103/8

## L

103/14
known [3]   39/3 43/25 45/3
knows [4]   43/20 43/20 62/18
lab [1]   31/12
landing [1]   64/18
Lane [1]   1/14 1/18
language [2]   105/4 108/24
largely [1]   40/17
last [13]   13/22 25/2 25/2
27/11 27/17 30/17 40/5 46/19
47/22 62/18 74/11 74/18 78/24
late [1]   16/1
later [6]   40/13 50/19 68/10
68/20 69/3 99/4
law [15]   1/13 9/10 19/16 31/10
45/1 60/5 60/15 84/10 84/13
86/5 86/7 86/15 100/20 108/21
110/14
lawful [1]   101/4
lawfully [6]   97/20 99/6 100/6
100/17 102/1 102/2
lawyer [2]   59/6 85/23
laying [1]   96/2
lead [5]   7/3 24/8 42/12 43/5
92/6
leading [2]   19/8 92/4
learn [1]   69/2
learned [3]   19/18 19/19 71/25
least [5]   3/21 18/2 21/17 29/1
29/1
leave [2]   61/15 94/5
leaving [2]   43/23 70/17
led [1]   32/21
left [14]   3/20 42/22 49/16
49/25 50/13 50/20 66/11 66/23
67/3 67/23 73/13 73/15 73/18
81/22
left-hand [2]   67/3 67/23
legal [1]   46/18
legitimately [1]   108/13
lent [3]   48/23 48/23 48/23
less [1]   17/5
let [21]   25/7 34/25 35/7 44/5
46/20 66/1 69/1 72/11 79/10
79/13 79/25 80/2 80/18 83/12
86/1 86/5 87/12 101/10 107/18
107/18 109/1
let's [8]   19/7 26/6 56/25
90/23 100/11 103/25 108/4
108/5
level [1]   66/19
liability [1]   110/11
lies [1]   6/21
life [5]   5/4 7/20 8/1 8/3 9/1
light [7]   49/8 49/20 50/3
50/14 50/19 51/17 51/24
like [29]   28/14 29/10 29/12
30/8 39/9 39/9 40/14 41/1
43/13 44/1 44/5 45/23 56/18
57/8 64/18 67/10 68/8 72/21
76/3 78/8 88/2 89/6 93/6 93/6
97/17 100/12 104/10 104/11
112/21
likely [6]   10/8 10/22 11/5
14/21 106/8 106/11
limited [2]   10/15 99/24
limits [1]   101/23
LINDA [3]   1/22 114/2 114/8
lines [2]   44/9 44/10
links [1]   19/1
liquor [1]   51/12

## L

Liquor [2] 83/10 90/2
listed [1] 3/21
listened [1] 110/7
little [10] 4/12 8/14 9/23
 18/13 29/10 67/10 67/24 72/21
 82/12 102/13
live [1] 68/12
live-in [1] 68/12
living [3] 68/8 104/19 104/22
LLP [1] 1/18
located [1] 70/23
location [6] 18/11 18/21 19/4
 31/20 39/9 73/1
locked [2] 60/12 60/13
logy [2] 54/9 109/24
long [16] 30/25 36/4 40/5 40/7
 40/10 45/1 47/18 50/12 51/18
 51/18 62/24 64/25 86/1 86/5
 96/5 96/11
look [4] 11/18 21/20 100/12
 100/18
looked [2] 4/23 107/3
looking [4] 4/18 73/16 109/2
 112/3
losing [2] 39/23 76/17
loss [1] 11/14
lot [3] 10/20 10/21 108/23
low [1] 16/25
lunge [1] 105/19

## M

madam [1] 78/21
made [32] 28/18 28/19 29/5
 30/3 38/23 38/23 39/19 40/1
 40/3 40/13 47/17 48/16 48/22
 49/8 49/25 50/5 50/6 50/9
 50/23 52/11 53/11 53/15 53/19
 58/5 62/6 68/25 71/22 73/17
 73/17 86/14 105/22 109/16
main [1] 73/16
major [1] 26/23
make [34] 14/20 34/22 35/1
 35/5 36/16 48/18 49/15 50/13
 50/20 63/23 68/18 68/20 71/24
 72/1 73/18 75/5 79/19 84/3
 84/10 84/23 84/24 85/2 85/12
 85/16 85/20 88/22 90/7 90/11
 92/2 92/10 92/14 92/24 109/20
 111/3
makes [3] 6/15 110/9 110/9
making [2] 12/4 85/10
male [2] 79/14 79/14
man [2] 109/8 109/24
mandatory [6] 5/3 5/14 7/18
 7/25 8/2 8/25
many [6] 25/14 31/14 50/9 73/1
 82/16 82/18
March [23] 1/7 4/19 4/24 5/3
 5/11 5/17 7/21 8/11 8/16 9/17
 10/9 12/17 12/20 16/10 19/2
 19/15 25/3 58/22 58/22 99/3
 101/1 103/25 111/18
March 23 [5] 5/3 5/11 8/11
 8/16 58/22
March 23, 2009 [5] 4/19 7/21
 9/17 99/3 101/1
March 23rd [4] 4/24 10/9 16/10
 19/15
March 23rd, 2008 [1] 12/17
March 26th [1] 111/18
mark [2] 90/23 91/1

marked [6] 38/5 72/11 73/7
 87/18 90/18 90/19
master's [1] 109/13
MARSHALL [3] 1/22 114/2 114/8
MARYLAND [11] 1/1 1/6 1/15
 1/19 3/12 31/4 31/8 31/11
 31/19 40/23 63/18
mask [5] 95/25 96/2 97/7 97/9
 97/10
matter [7] 3/2 3/4 9/10 18/24
 84/6 110/14 114/4
maximum [9] 4/23 4/25 5/4 5/14
 7/18 7/19 8/1 8/2 8/25
may [39] 8/11 12/6 28/22 31/17
 32/22 33/7 38/13 44/21 46/21
 53/2 54/20 55/16 55/17 58/23
 59/4 59/7 60/7 60/23 61/12
 62/3 62/7 62/10 62/10 63/6
 63/14 76/1 78/6 78/14 88/13
 93/21 96/24 98/17 99/4 100/12
 101/2 104/1 109/8 109/16
 109/19
May 19th [1] 78/6
May 21st [8] 62/10 62/10 63/14
 88/13 99/4 101/2 109/16 109/19
May 23 [5] 58/23 59/4 59/7
 60/7 60/23
May 24th [5] 28/22 31/17 38/13
 53/2 62/7
May 26th [1] 61/12
maybe [10] 8/11 9/23 36/5
 51/20 58/20 58/21 65/2 83/12
 89/9 94/9
McKenna [1] 1/18
me [57] 3/9 3/10 4/12 6/7 9/22
 10/5 13/5 13/11 16/3 17/7 17/9
 17/24 19/18 19/22 21/1 22/12
 25/7 26/14 32/2 33/16 33/23
 34/25 35/7 36/12 40/12 44/5
 46/20 48/16 48/23 58/3 58/25
 60/25 65/22 65/24 66/1 66/18
 69/1 69/4 72/11 72/24 74/11
 76/14 81/21 83/12 85/8 86/1
 86/6 87/12 90/25 101/10 101/12
 107/8 107/18 107/18 108/25
 109/1 111/16
mean [24] 9/3 9/11 9/23 11/8
 14/5 24/10 25/22 26/11 27/8
 28/3 39/8 48/6 54/13 59/10
 59/13 71/7 76/9 80/21 94/8
 105/16 107/6 108/23 111/1
 112/18
means [3] 46/19 84/10 109/4
medical [10] 8/19 9/19 9/19
 68/9 68/11 68/12 89/6 90/8
 90/11 112/7
medication [3] 38/3 42/20 47/2
medicine [5] 47/12 61/10 89/11
 89/17 89/18
medicines [1] 45/23
meeting [2] 19/21 19/22
meliorated [1] 6/19
members [1] 19/16
memo [1] 96/8
memorandum [1] 95/1
memory [2] 74/19 88/14
mental [2] 92/25 93/11
mention [1] 40/1
mentioned [3] 52/6 64/5 73/10
mere [1] 110/4
merely [1] 97/14
merits [1] 6/20
mess [2] 71/6 71/7

MESSITTE [3] 1/10 48/10 81/8
met [3] 20/20 34/7 39/1
message [4] 89/20 89/24 89/24
 89/25 90/4
microphone [2] 30/17 62/17
mid [1] 109/25
mid-40's [1] 109/25
middle [3] 37/5 37/7 72/18
might [1] 7/12
Mike [5] 63/24 63/25 64/15
 65/22 72/24
miles [1] 51/20
mind [3] 43/12 80/22 86/17
minimum [6] 5/4 5/14 7/19 7/25
 8/2 8/25
minute [9] 19/7 20/16 23/12
 36/5 40/15 46/18 55/9 57/12
 58/3
minutes [7] 40/6 40/9 40/16
 50/14 50/16 50/19 65/2
Miranda [6] 43/25 75/18 91/16
 91/23 92/15 110/3
Mirandize [1] 92/15
misdemeanors [1] 12/8
missed [1] 29/24
mistake [3] 16/11 21/5 21/22
Mm [1] 95/17
Mm-hmm [1] 95/17
Mo [8] 39/3 39/9 39/13 40/12
 40/12 48/25 51/6 53/13
mom [1] 70/19
moment [6] 53/7 55/19 56/25
 75/10 87/24 94/2
Monday [5] 1/7 60/17 61/12
 111/24 112/18
money [5] 15/3 39/1 48/23
 48/24 104/11
month [5] 6/7 6/7 6/11 10/13
 13/1
months [3] 104/1 104/6 104/13
more [17] 6/17 8/10 9/23 9/24
 10/8 10/22 11/4 12/7 18/13
 28/8 58/24 99/4 99/19 99/21
 100/24 102/17 107/4
morning [13] 3/9 3/18 30/22
 31/18 31/25 38/12 41/12 41/13
 41/19 42/15 53/1 71/12 78/19
most [2] 16/4 65/3
mother [2] 15/14 18/6
motion [26] 1/10 4/5 4/6 4/7
 4/7 4/10 4/14 4/15 13/12 13/13
 13/15 13/17 24/22 24/22 26/22
 28/13 28/15 46/10 62/8 94/8
 94/11 109/15 110/19 110/20
 111/3 111/4
motions [6] 3/5 3/22 3/23
 29/25 110/22 110/25
move [2] 67/5 67/24
moved [2] 11/24 49/6
movements [2] 54/8 54/9
Mr [16] 2/6 2/7 2/8 2/9 2/12
 3/15 4/10 21/14 21/16 48/23
 59/5 78/11 80/3 84/21 85/22
 105/24
Mr. [189]
Mr. Brennan [11] 4/4 6/14 7/6
 29/3 54/15 59/10 78/12 78/14
 98/24 101/7 110/17
Mr. Brennan or [1] 21/14
Mr. Brennan's [2] 5/23 94/10
Mr. Cress [2] 94/12 95/4
Mr. Harrison [1] 95/13
Mr. Jacobs [1] 41/12

## M

Mr. Ra [3] 3/25 60/25
61/20
Mr. Sweeney [112] 3/20 14/17
14/25 15/2 15/10 15/15 15/21
15/24 16/2 16/13 18/8 18/22
18/24 18/25 19/19 19/22 20/2
20/9 20/20 20/21 21/9 21/21
32/1 32/14 32/22 33/16 33/18
34/7 34/14 34/16 42/15 42/17
42/19 42/23 43/3 43/8 43/13
43/24 44/8 46/9 46/15 46/23
47/1 47/6 48/2 48/10 48/15
51/23 52/11 52/16 53/3 53/25
55/13 56/14 57/2 58/11 58/14
58/23 59/6 60/11 60/17 60/22
61/9 61/24 63/11 63/20 64/17
65/15 66/14 67/1 68/2 68/25
69/4 69/5 69/17 70/9 71/17
72/15 74/2 74/4 75/12 75/20
76/25 81/6 81/17 81/19 84/3
84/20 85/2 85/10 85/13 86/11
86/19 88/15 89/23 90/8 90/12
91/12 91/14 91/15 94/20 95/3
95/5 95/6 95/13 96/16 97/4
98/9 98/19 99/16 106/2 106/4
Mr. Sweeney had [1] 19/18
Mr. Sweeney's [29] 15/13 18/2
19/17 21/18 23/1 41/15 42/4
56/5 57/1 59/4 59/19 60/3 60/7
60/18 61/2 64/23 65/9 66/23
70/19 73/10 74/20 75/2 81/3
88/13 88/18 89/3 94/23 103/25
105/24
Mr. Wade [9] 8/17 8/18 8/23
16/8 19/20 19/22 20/9 20/19
21/9
Mr. Wade's [6] 16/8 19/18 20/1
20/4 58/22 99/2
Mr. Waite [10] 48/23 48/24
50/23 51/1 96/17 98/10 98/20
99/20 101/1 103/15
Ms [4] 2/11 2/13 83/4 101/15
Ms. [3] 81/9 84/3 107/19
Ms. Johnston [3] 81/9 84/3
107/19
much [4] 5/19 7/14 7/21 17/5
multiple [1] 28/5
must [7] 16/15 16/21 45/9
45/10 102/22 109/4 110/14
my [28] 8/16 8/24 10/9 11/2
23/25 33/8 34/9 34/23 35/20
35/21 37/3 37/3 37/5 57/21
59/20 61/1 64/6 64/21 71/14
80/5 87/9 88/14 103/5 104/24
106/3 107/2 107/24 111/6
myself [1] 64/17

## N

name [7] 30/17 30/17 32/11
62/18 62/18 79/17 97/8
narcotic [2] 31/11 63/4
narcotics [5] 6/2 45/20 64/3
64/7 73/9
narrowing [1] 13/16
nature [10] 12/14 14/23 25/20
96/4 96/9 96/12 97/2 97/11
98/15 107/7
near [1] 5/13
necessarily [5] 25/18 84/12
86/10 86/11 99/18
necessary [8] 16/14 16/14

16/22 24/14 90/9 101/23 106/13
107/12
needed [9] 26/10 17/4 10/9
26/8 26/9 26/9 27/10 59/13
102/23 106/24 106/24
needed [5] 65/16 68/19 68/20
80/4 106/5
needing [1] 93/4
needle [1] 71/4
needles [6] 27/21 67/9 69/20
71/1 71/2 74/9
needs [1] 55/6
never [6] 48/12 52/15 52/16
58/11 58/12 58/14
next [8] 13/13 13/15 28/13
28/13 52/1 62/4 104/5 111/19
nexus [2] 103/24 104/2
no [108] 1/4 9/6 11/23 20/25
22/15 24/17 24/20 33/5 33/10
34/4 34/6 34/13 36/24 37/11
37/13 37/25 38/2 38/4 39/14
39/17 40/21 41/4 43/4 43/20
46/8 46/25 48/5 49/6 49/13
49/17 51/23 53/18 53/23 54/7
54/16 54/16 54/17 54/24 55/3
56/16 56/17 57/4 57/5 57/6
57/14 58/3 58/15 58/15 60/11
60/25 62/1 66/21 67/6 68/1
70/16 71/19 71/21 72/4 72/7
72/10 73/8 73/15 75/7 75/9
75/14 75/16 76/21 77/11 77/19
78/4 78/9 78/22 79/6 79/21
80/8 80/16 80/22 82/20 82/22
84/1 85/20 86/13 87/25 90/10
90/14 91/18 91/22 91/23 91/25
92/19 93/9 93/12 93/14 94/4
94/4 97/18 101/23 103/24 104/2
105/10 108/6 108/8 110/13
111/11 111/11 112/11 113/2
113/3
nobody [2] 22/7 77/14
non [2] 105/6 106/17
non-technical [2] 105/6 106/17
nonetheless [1] 86/14
nor [3] 5/14 8/1 46/14
normal [1] 93/6
not [173]
notations [1] 37/10
note [1] 5/24
noted [1] 16/20
notes [3] 1/23 51/15 79/19
nothing [10] 23/21 23/21 51/25
52/22 54/14 60/25 90/15 93/16
93/19 93/24
notification [1] 68/21
noting [1] 5/24
now [59] 3/2 3/4 3/22 4/18
13/24 15/1 17/7 18/13 20/11
24/4 26/11 30/9 31/17 41/14
42/16 43/23 45/1 45/25 45/25
48/15 58/19 59/15 59/23 63/6
66/1 66/16 69/11 69/17 70/14
70/17 71/17 72/11 72/16 74/11
78/16 79/3 83/1 84/2 85/7 88/9
89/3 91/15 92/25 93/6 96/23
97/8 99/15 102/23 105/8 106/24
108/4 108/5 108/20 109/17
110/20 111/5 111/16 111/18
112/3
nowhere [1] 46/14
number [9] 3/3 11/24 14/10
16/3 18/25 19/16 20/20 25/16
58/25

numbers [1] 9/4
nurse [25] 68/9 68/19 68/21
68/22 68/23 68/24 68/25 69/8 69/11
72/6 89/4 89/17 89/19 89/21
89/25 90/9 93/4 98/7 98/8
102/16 103/7 103/18 105/1
105/2 105/22 106/3

## O

oath [1] 55/20
object [1] 102/1
object's [1] 102/3
objection [3] 41/4 87/25 92/4
observation [1] 103/14
observations [3] 15/14 16/24
18/8
observe [2] 66/25 67/2
observed [9] 20/2 67/1 71/13
95/5 95/8 98/4 98/6 101/19
102/6
obtain [7] 15/20 16/2 18/14
18/20 19/1 19/21 20/4
obtained [4] 18/22 19/6 20/1
20/9
obtaining [3] 16/6 18/12 20/21
obvious [1] 108/16
obviously [5] 24/19 27/7 58/23
104/10 105/15
occasions [3] 18/25 20/21 22/9
occur [2] 22/13 99/4
occurred [17] 5/5 9/11 9/12
13/1 16/9 19/2 19/15 19/22
30/4 49/3 55/13 61/17 64/14
74/24 88/12 99/2 99/4
of 2010 [1] 53/2
off [11] 15/19 18/11 34/23
35/18 37/1 37/10 68/17 74/18
82/10 89/25 94/3
offense [2] 7/21 14/14
offenses [14] 5/25 5/25 6/2
7/2 12/7 12/7 12/13 13/19
13/21 14/12 14/17 14/18 24/24
26/24
offer [1] 17/14
offered [1] 11/13
offering [1] 17/24
office [10] 1/14 30/24 32/5
33/3 62/23 84/16 84/25 92/12
92/16 92/23
officer [31] 3/13 29/22 30/9
30/12 31/6 31/7 45/1 53/1
55/15 55/25 58/18 58/25 60/5
63/7 69/15 75/17 78/19 78/24
86/22 88/4 95/23 96/23 97/10
102/1 102/4 102/7 102/9 103/8
109/6 109/21 110/1
Officer Cress [1] 78/24
Officer Jacobs [5] 30/9 55/15
55/25 63/7 88/4
Officer Tomlinson [2] 69/15
75/17
officers [3] 78/6 109/4 109/19
OFFICIAL [2] 1/22 114/9
often [1] 4/17
oh [1] 79/25
okay [105] 7/12 20/22 21/11
22/19 26/10 26/15 27/9 33/6
33/11 33/18 33/21 33/24 34/3
34/7 34/10 34/25 35/13 35/17
36/7 36/20 36/22 37/4 37/6
38/5 38/11 38/22 38/25 39/4
39/12 39/15 40/1 40/5 40/25
41/7 42/7 42/15 42/22 43/2

**O**

okay... [50] 6/5 6/22 14/18
44/18 45/3 45/13 45/25 46/14
47/5 47/15 47/22 48/10 48/15
48/19 48/22 49/10 50/3 50/11
50/18 51/3 51/8 51/12 51/23
52/3 52/8 52/19 53/14 53/18
53/22 54/3 54/8 54/14 57/16
58/9 60/21 61/1 63/25 65/18
66/1 69/1 74/14 74/17 79/3
79/22 79/25 80/14 81/2 81/4
81/18 82/6 83/1 83/16 84/2
84/19 87/6 87/16 88/3 88/9
88/17 88/21 88/25 89/13 89/15
89/23 93/15 100/10 111/12
old [3] 53/25 54/1 102/13
on [176]
on that [1] 93/19
once [2] 34/7 66/16
one [48] 4/22 4/23 5/1 5/7
5/17 5/25 6/24 10/2 11/11
11/21 12/1 13/1 13/3 13/18
13/20 13/22 15/24 16/19 17/7
17/8 18/5 18/9 23/16 24/9
28/24 28/25 29/1 29/1 44/5
45/7 45/8 47/22 56/19 59/22
60/1 61/21 73/8 73/8 75/10
77/25 81/2 87/15 87/16 97/7
99/5 107/19 109/18 111/16
only [17] 6/4 10/16 10/17
22/24 22/25 60/19 87/14 87/15
94/18 94/22 99/24 100/21
108/17 109/7 109/22 110/21
110/23
onto [1] 49/21
open [2] 3/21 61/16
opened [2] 65/20 72/25
opinion [1] 9/20
opportunity [1] 87/2
opposed [3] 55/16 99/16 100/23
or [114] 3/9 6/1 6/7 6/7 6/7
7/9 7/10 8/1 8/2 10/5 12/7
12/8 12/8 12/9 12/9 12/9 12/10
12/10 12/11 12/14 12/25 14/2
14/4 14/14 14/15 14/15 14/21
16/11 16/16 18/4 19/7 21/14
21/17 21/23 22/13 24/1 24/20
25/22 27/25 28/9 29/2 36/5
39/23 40/15 43/3 45/9 45/10
45/14 45/19 45/20 45/23 46/1
46/15 47/1 47/5 47/11 48/5
48/7 48/23 50/16 50/18 51/11
53/14 54/9 55/1 55/9 56/7
56/21 59/5 59/5 59/11 59/11
59/12 59/18 59/20 59/22 60/2
60/5 60/6 60/15 61/6 61/9
61/10 67/4 68/14 70/14 72/8
75/17 76/10 76/23 81/21 83/12
89/23 90/3 90/13 90/19 91/16
95/18 95/23 96/6 96/10 99/17
99/24 102/22 104/21 107/19
108/1 109/6 109/9 109/9 109/20
109/21 111/16 112/10
order [4] 29/11 55/12 78/5
108/6
other [43] 5/12 5/15 5/20 8/6
9/9 13/8 13/17 14/1 14/16
14/23 15/5 17/8 18/23 24/10
26/17 39/12 40/19 44/7 50/4
50/22 53/23 54/23 57/17 58/6
60/2 60/5 60/15 60/20 65/22
67/25 69/18 70/18 72/5 72/6

78/9 89/3 93/23 99/16 100/23
105/18 110/21 110/22 110/24
110/17 109/23 110/16
others [26] 27/18 29/19 30/6
100/17 109/23 110/16
our [11] 4/14 4/15 5/20 77/20
92/10 95/1 96/8 103/3 104/9
111/22 112/4
ours [1] 45/7
out [29] 5/18 6/23 11/21 24/9
29/10 30/8 33/16 34/9 39/24
43/24 46/4 49/15 49/15 49/20
55/12 64/25 65/5 65/23 65/23
68/6 68/7 69/13 92/1 94/21
95/7 104/19 105/17 110/15
111/15
outside [10] 29/17 64/18 64/19
64/22 66/2 67/13 80/9 80/10
80/12 104/23
outweigh [1] 15/5
outweighs [1] 14/24
over [12] 3/17 6/11 7/10 13/1
46/1 46/4 49/14 53/3 53/6
74/12 74/21 102/13
overall [1] 106/23
overdose [1] 4/21
overdosed [2] 8/18 19/23
Owings [1] 63/18
owned [1] 70/9
owners [1] 65/24

**P**

P-R-O-C-E-E-D-I-N-G-S [1] 3/1
p.m [1] 113/5
package [1] 106/24
page [1] 106/7
paragraph [1] 87/20
parameters [1] 12/12
paraphernalia [33] 21/18 23/5
23/9 23/14 23/16 24/9 27/6
27/7 27/11 27/14 27/19 27/23
28/2 28/9 60/20 61/3 67/4 67/5
67/25 70/23 70/25 72/8 75/15
81/25 82/23 83/10 83/13 83/20
95/9 98/4 99/9 99/13 108/15
parcel [1] 10/11
parents [9] 64/23 65/9 73/10
75/2 75/5 94/24 94/25 99/17
100/23
parked [2] 53/2 73/3
part [11] 10/11 20/13 26/22
26/22 45/5 45/13 61/15 75/8
99/5 99/6 110/11
Partially [1] 82/6
particular [2] 24/7 58/1
parties [1] 7/1
parts [3] 12/10 12/25 45/4
party [2] 6/22 6/22
passenger [2] 34/11 35/20
past [2] 26/7 73/24
PATRICK [4] 1/6 3/4 3/19 32/13
patrol [1] 63/3
pattern [2] 7/2 10/13
Pause [2] 23/13 52/21
pen [2] 73/21 73/22
penalties [3] 5/6 5/20 9/15
penalty [5] 4/22 4/23 5/14
6/15 9/2
people [4] 10/22 24/16 58/6
90/4
percent [2] 74/22 97/14
perhaps [1] 102/12
period [9] 6/11 7/11 10/13
10/15 13/1 13/2 24/12 40/10

65/2
permission [1] 94/25
permitted [2] 108/10 108/11
perpetrate [1] 109/13
person [12] 4/20 11/5 26/12
32/11 45/9 66/2 79/20 80/21
84/22 84/24 86/8 94/23
personal [5] 13/19 13/20 14/5
15/16 16/24
pertain [1] 5/10
PETER [1] 1/10
phone [67] 60/20 68/22 68/24
68/25 69/6 83/2 83/5 83/5 83/8
83/16 83/21 96/14 96/14 96/15
96/16 96/19 96/20 96/24 97/2
97/4 98/7 98/7 98/8 98/9 98/12
98/19 98/21 99/13 99/15 99/16
99/19 99/20 100/22 100/24
101/3 101/4 101/5 102/11
102/15 102/15 103/5 103/6
103/8 103/9 103/15 103/17
103/25 104/1 104/6 104/12
104/15 104/24 104/25 104/25
105/1 105/18 105/21 105/21
105/22 105/23 105/24 106/1
106/3 106/4 108/18 109/12
109/15
photo [1] 72/21
photocopy [1] 38/10
photographs [1] 80/15
phrase [3] 105/11 106/8 106/10
phrasing [1] 108/25
physical [2] 29/2 92/25
physically [1] 76/9
pick [1] 41/20
picked [2] 42/15 60/11
picture [3] 19/12 72/18 73/17
pill [4] 20/3 20/3 20/6 20/7
pin [1] 48/20
pink [1] 20/7
PJM [2] 1/5 3/3
PJM-2010-0271 [1] 3/3
place [3] 40/22 92/12 102/1
placed [2] 86/9 95/7
plain [21] 68/1 69/19 99/5
99/6 100/5 100/14 101/7 101/14
101/23 101/25 102/2 103/20
103/22 105/12 105/14 106/14
107/13 108/14 108/19 109/11
109/14
plan [2] 12/11 12/25
play [2] 3/22 24/21
please [12] 3/7 4/11 30/12
30/16 30/17 30/22 32/16 55/11
62/16 62/17 62/18 71/2
plugged [3] 68/22 69/6 104/20
point [33] 6/8 6/23 17/12
19/13 22/14 23/3 23/6 25/20
27/18 28/14 29/12 32/16 35/14
36/2 36/5 36/22 39/4 52/11
53/12 66/9 68/18 71/22 73/21
73/22 83/1 84/2 92/5 100/7
104/3 104/9 110/1 111/13
111/14
points [1] 26/23
police [6] 34/16 57/16 73/8
86/3 87/3 90/20
port [9] 34/9 68/13 68/14 89/6
89/7 89/15 89/15 89/20 90/13
port in [1] 89/6
position [2] 15/6 31/5
possess [1] 16/5

**P**

possess [3] 10/21 100/15
possessing [1] 102/8
possession [15] 4/24 6/2 6/10
 7/9 12/15 13/9 14/12 22/20
 22/21 22/23 22/24 76/12 79/4
 96/19 101/22
possible [3] 5/19 74/9 111/8
possibly [1] 54/10
post [4] 23/9 24/7 25/2 27/3
potential [1] 108/17
pounds [1] 79/15
powder [3] 82/15 82/16 82/17
practical [2] 105/5 106/17
practice [3] 92/1 92/8 92/10
prefer [1] 80/4
prejudice [12] 6/18 6/19 6/21
 8/5 9/23 13/7 13/8 15/1 16/25
 24/21 111/2 111/4
prejudices [1] 9/22
prejudicial [6] 8/7 8/9 8/13
 10/10 11/18 14/23
premises [4] 69/9 69/12 99/6
 100/6
prepared [2] 30/9 88/4
presence [1] 29/11
present [6] 18/22 33/4 41/14
 60/3 63/5 76/4
previously [1] 33/11 106/1
print [1] 78/1
prior [36] 14/11 14/14 14/14
 17/7 17/11 17/13 17/16 17/17
 18/2 19/20 20/12 22/4 22/9
 22/17 22/18 23/7 23/7 23/17
 24/1 24/4 24/12 24/23 24/23
 24/24 25/1 25/6 25/8 26/16
 26/23 28/4 59/16 60/16 60/25
 70/17 87/3 108/7
probability [2] 105/6 106/17
probable [9] 97/12 97/15 98/21
 102/18 103/12 103/17 105/25
 109/5 109/6
probably [2] 15/3 15/3
probative [3] 14/24 15/5 16/7
problem [7] 5/9 7/13 10/1 10/3
 24/20 59/25 112/24
procedure [1] 92/18
proceedings [2] 1/10 114/3
process [1] 45/8
program [1] 61/7
propensity [3] 8/11 11/18
 11/19
proper [1] 4/5
properly [1] 14/2
property [2] 109/5 109/9
proposition [1] 6/17
protocol [1] 84/22
prove [14] 7/20 8/21 8/23 8/24
 9/9 9/10 9/12 9/13 9/17 9/18
 10/20 10/24 16/15 24/19
provide [2] 12/6 14/25
proving [1] 14/3
pull [5] 43/24 45/25 46/4
 49/15 49/15
pulled [1] 65/11
pulling [1] 19/4
purchase [2] 18/18 19/4
purportedly [1] 58/5
purpose [7] 11/14 18/20 19/20
 20/21 31/24 32/3 63/19
purposes [5] 18/11 46/10 88/1
 89/11 111/20

pursuant [1] 100/12
put [7] 10/14 11/8 19/12 34/16
 89/12 91/11
putting [1] 89/11

**Q**

quantity [1] 21/17
Queen [1] 14/2
question [35] 15/17 17/23
 30/10 38/16 38/19 47/25 48/8
 48/12 49/14 52/12 53/9 53/16
 55/25 56/25 59/14 59/20 60/8
 60/10 61/1 61/21 71/22 79/12
 81/9 83/4 91/20 91/21 92/15
 96/13 107/25 108/6 108/8
 108/13 108/18 108/20 108/23
questioning [1] 60/22
questions [31] 34/3 36/23 37/9
 38/20 39/4 39/12 39/15 40/19
 47/23 48/1 48/12 49/15 52/13
 52/17 53/10 53/12 53/18 53/23
 53/24 54/16 54/17 55/14 55/15
 64/21 72/3 72/8 74/1 75/13
 75/15 78/9 110/5
quick [2] 38/23 38/23
quietly [1] 87/19
quite [3] 14/6 68/17 105/17
quote [1] 107/9
quoted [2] 106/16
quotes [1] 106/17
quoting [2] 105/7 106/6

**R**

range [2] 6/7 25/19
RAO [8] 1/13 2/6 2/8 3/8 3/25
 5/22 15/7 61/20
rather [2] 101/25 108/5
read [43] 34/23 35/7 35/16
 35/17 36/9 36/18 36/25 37/9
 37/16 37/18 38/12 38/15 43/17
 44/5 44/15 45/14 46/6 46/9
 47/15 47/19 49/6 49/10 49/22
 49/23 50/18 53/6 56/4 56/9
 57/9 57/13 57/16 57/17 57/20
 58/4 58/6 58/16 60/5 86/9
 86/11 87/19 88/7 107/1 107/1
readily [23] 83/11 83/12 83/16
 83/17 95/22 95/22 96/5 96/10
 96/12 96/21 96/25 97/11 98/15
 98/17 99/7 99/22 100/16 100/22
 103/11 103/24 107/5 108/23
 109/14
reading [2] 36/11 36/13
reads [1] 110/3
ready [2] 36/6 90/13
really [8] 4/15 7/14 13/17
 14/8 24/5 24/9 80/4 105/20
rear [1] 66/11
reason [24] 24/17 36/13 89/19
 92/17 100/16 105/23 110/13
 111/16
reasonably [1] 109/7
reasons [2] 7/4 16/3
recall [34] 40/16 40/18 42/18
 42/21 42/22 51/5 52/1 52/9
 52/18 55/14 61/13 65/10 71/23
 71/23 72/2 74/11 74/14 74/15
 75/19 75/20 81/5 81/6 82/18
 82/19 84/5 84/6 85/9 85/14
 85/20 85/24 86/24 87/7 91/11
 104/18
recalled [2] 74/19 74/22
recalling [1] 97/6

received [6] 4/20 31/9 41/2
 41/6 47/2 47/12
recess [1] 113/7
Recess [2] 55/10 113/5
recognize [2] 38/6 72/13
recognized [3] 95/9 96/18
 99/10
recollect [1] 48/7
recollection [8] 44/13 87/21
 88/12 88/17 103/5 104/24 106/3
 107/24
record [6] 50/12 52/10 61/15
 71/15 94/3 114/3
recovered [4] 23/14 72/9 97/7
 97/9
recovery [1] 23/1
Recross [2] 2/4 55/23
red [1] 104/11
Redirect [6] 2/4 52/23 52/24
 61/22 90/17 91/9
refer [2] 68/7 89/7
reference [6] 39/19 53/16
 85/10 85/12 92/11 92/14
referencing [1] 105/11
referred [2] 64/24 65/24
referring [2] 57/14 65/21
reflection [1] 4/13
refresh [1] 88/12
refreshes [3] 87/21 88/14
 88/17
refusal [1] 59/12
regard [2] 13/3 102/11
regarding [9] 15/14 15/21 18/2
 18/7 19/17 23/17 39/15 92/9
 93/4
regards [1] 92/25
regret [1] 111/8
regular [2] 4/25 20/12
reject [1] 107/13
relate [2] 7/11 55/16
related [3] 6/12 39/3 51/9
relation [3] 63/7 67/22 70/6
relevance [4] 23/6 23/20 24/7
 27/18
relevance of [1] 23/20
relevant [7] 14/3 16/3 21/25
 22/4 24/14 27/4 28/7
reliable [2] 16/23 24/15
relying [1] 59/9
remain [2] 59/19 85/5
remainder [2] 5/18 40/17
remaining [1] 7/15
remark [1] 90/19
remember [4] 44/11 44/12 48/5
 52/1
remove [1] 69/17
removed [5] 69/9 69/12 69/13
 69/19 104/18
removing [1] 69/17
repeat [2] 48/16 79/12
repeatedly [1] 16/20
repetitive [2] 25/17 25/20
rephrase [2] 46/20 46/21
report [20] 8/22 48/22 56/9
 56/18 56/19 56/21 56/23 56/25
 57/8 57/13 57/14 57/16 57/22
 58/1 60/6 60/24 60/25 88/3
 90/20 91/6
REPORTER [3] 1/22 114/1 114/9
reports [10] 56/4 56/13 56/21
 57/17 57/20 57/21 57/25 58/7
 58/25 87/3
request [3] 68/18 77/20 80/13

**R**

request [2]   13/14 13/24
required [2]   97/12 105/5
requirement [5]   100/4 100/6
100/8 100/10 109/4
requires [1]   101/25
reserve [1]   110/21
residence [25]   21/8 21/18 23/1
23/15 30/2 65/16 66/10 68/24
69/18 71/18 72/14 72/17 75/5
75/8 78/25 79/3 79/10 79/13
79/20 79/23 80/2 80/18 95/2
97/25 108/7
residents [1]   70/18
resolution [1]   4/6
respect [11]   5/16 6/18 8/8
16/12 17/11 23/22 27/6 28/24
28/25 30/1 45/25
respond [3]   11/23 63/15 63/19
responded [2]   63/10 72/14
response [13]   4/15 5/23 14/11
38/16 38/17 38/19 38/20 39/10
48/2 49/13 65/17 81/9 83/4
restate [1]   17/23
restroom [1]   55/7
result [5]   8/6 8/18 17/4 42/20
56/13
resulted [8]   4/19 5/3 7/20
8/20 9/9 9/11 9/14 9/18
retrieved [3]   37/7 68/24 68/24
return [4]   77/25 78/3 78/5
78/21
returned [1]   76/2
reverse [2]   11/2 108/5
review [2]   56/13 87/2
reviewed [1]   87/2
revolves [1]   100/5
Richard [3]   2/10 62/15 62/19
Richard Cress [1]   62/19
ride [1]   40/17
right [111]   3/6 3/14 3/21 4/2
4/2 4/10 9/21 11/23 17/21
21/14 22/21 25/1 25/11 25/11
26/6 26/11 26/16 26/19 28/12
28/17 28/17 29/16 30/7 30/11
31/24 32/19 36/23 41/6 41/24
42/3 43/17 46/1 46/5 46/8 46/9
46/12 47/1 47/9 47/19 48/4
49/18 49/21 50/12 50/16 50/24
51/10 51/17 52/10 54/13 54/19
55/8 55/18 55/19 56/11 56/14
57/2 57/7 59/2 59/15 59/19
59/23 59/24 62/2 62/12 62/12
62/14 64/21 71/14 72/19 73/4
73/17 73/24 73/24 78/11 79/19
79/25 80/6 81/21 82/2 83/10
84/9 85/5 86/3 86/5 87/2 87/11
89/9 90/16 91/5 91/8 93/6
93/20 94/6 94/14 97/8 98/1
98/5 98/24 102/25 103/3 104/4
105/14 106/19 106/22 107/16
108/3 108/3 110/21 111/25
112/20 113/1
right-hand [1]   73/17
rights [44]   34/23 34/24 35/7
35/16 35/17 35/18 36/9 36/11
36/14 36/18 37/1 37/2 37/10
37/12 38/10 38/11 38/12 43/17
44/6 44/15 44/22 45/4 45/5
45/6 45/10 45/11 45/13 46/16
47/7 47/15 48/11 49/7 49/10
49/22 49/23 50/18 53/3 53/6

71/17 75/18 86/9 86/12 91/17
91/23
rights [500]   1/1 1/1
road [5]   36/6 46/4 49/20 73/12
73/16
robbery [2]   96/1 104/4
room [8]   66/23 67/15 70/24
71/3 92/12 95/8 104/16 105/18
Roscoe [2]   63/24 64/6
Roscoe Jones [1]   63/24
Route [9]   49/8 49/16 49/17
49/25 50/3 50/7 50/14 50/19
51/18
routine [2]   25/17 25/17
RPR [1]   114/8
rule [6]   6/13 12/5 13/5 29/14
29/19 61/17
Rules [1]   12/5
ruling [1]   27/5
running [1]   35/25
runs [1]   73/12

**S**

safe [1]   36/20
safety [1]   70/24
said [39]   27/22 34/22 34/25
35/1 35/4 35/7 36/7 37/20 44/1
44/8 48/5 48/20 51/3 51/25
52/3 52/8 64/20 64/21 65/18
68/16 77/6 79/25 80/4 80/21
80/21 80/22 81/2 85/8 85/15
85/20 99/12 102/24 103/5 103/6
104/24 105/5 106/4 106/7
107/10
sale [1]   14/15
sally [1]   34/9
same [29]   5/2 5/5 5/13 5/16
6/1 6/16 7/1 7/1 7/2 10/13
10/15 12/9 12/9 12/14 12/24
14/7 17/1 17/1 20/10 23/15
27/23 28/1 28/3 28/9 28/10
67/15 74/8 99/19 100/24
sat [4]   44/20 46/3 46/5 68/7
saw [13]   18/18 22/7 24/16
26/13 75/12 81/18 82/2 82/8
82/12 82/23 83/2 83/10 98/21
say [41]   22/2 24/17 26/3 26/12
27/8 27/22 29/7 29/23 33/24
34/5 35/1 35/8 35/15 36/10
36/18 38/25 39/18 39/22 39/22
40/2 40/9 42/12 43/24 47/16
47/23 48/2 48/15 65/14 65/21
67/15 68/2 71/9 76/22 85/18
85/19 85/19 85/23 102/21
106/15 108/2 110/2
saying [4]   24/23 48/11 50/4
59/10
says [9]   8/22 13/16 50/22 57/9
102/20 107/6 107/6 110/1 110/4
scales [1]   82/19
scene [3]   24/16 103/3 103/4
scheme [2]   12/11 12/25
School [2]   31/11 31/13
schools [1]   31/12
scope [2]   6/12 108/19
screen [2]   72/12 79/1
search [23]   29/8 66/19 70/14
75/5 75/8 79/8 83/24 94/17
95/3 97/17 97/19 99/7 99/25
100/4 100/18 100/19 101/18
102/6 105/9 105/9 105/15
105/17 105/19
searches [2]   100/9 100/10

seat [5]   34/11 35/20 35/21
62/16 108/3
seconds [5]   48/9 49/1 49/5
81/19
second [7]   17/23 30/3 34/25
44/5 69/1 101/12 109/21
see [23]   4/17 13/8 19/8 19/12
32/14 39/9 56/18 57/8 67/5
67/24 71/12 76/3 77/25 78/8
79/1 82/19 82/21 99/6 100/11
102/24 103/25 108/6 111/15
seeing [2]   104/5 104/6
seek [1]   17/12
seeking [3]   6/22 17/6 22/25
seeks [1]   15/9
seem [1]   54/4
seemed [2]   54/11 54/12
seems [5]   6/14 13/5 13/11
26/14 108/24
seen [2]   19/19 80/15
seize [4]   96/3 100/12 100/16
102/7
seized [17]   21/18 62/9 72/9
83/5 83/20 83/21 95/9 95/11
98/8 98/12 99/12 99/13 100/20
101/21 103/8 105/2 105/18
seizing [1]   103/20
seizure [11]   21/25 29/6 83/25
94/11 96/5 96/11 98/14 101/3
101/4 102/19 103/13
seizures [1]   109/16
sell [1]   15/3
sense [1]   61/3
sentence [3]   5/1 46/19 111/13
sentenced [1]   9/4
sentencing [1]   9/5
separate [4]   7/1 12/2 12/7
45/5
separately [4]   6/21 20/14
20/17 33/12
sequence [4]   4/2 4/5 30/8
76/17
sergeant [4]   63/24 64/5 64/6
66/9
serious [1]   9/1
serve [3]   64/9 77/12 77/13
served [2]   77/14 77/15
service [2]   76/12 76/12
set [3]   6/23 96/17 111/23
seven [12]   6/1 6/25 7/15 7/24
8/1 8/7 9/8 10/7 11/22 12/2
12/21 55/9
sever [4]   4/15 11/21 11/24
11/25
several [8]   10/14 13/9 31/12
40/6 57/25 69/22 70/25 107/19
severance [5]   3/23 4/10 6/22
7/2 7/5
Severe [2]   4/6 4/7
severed [1]   5/18
share [1]   16/7
sharing [1]   19/5
she [13]   15/20 18/7 18/14
18/15 18/17 18/18 18/19 18/19
18/20 18/21 18/21 20/2 20/2
She'll [2]   62/13
she's [3]   3/10 15/18 18/10
shelf [1]   67/4
sheriff [1]   86/2
sheriff's [8]   30/24 32/5 33/3
62/23 84/16 84/25 92/12 92/16
shirt [2]   32/18 71/16
short [1]   65/2

S

shortly [3] 18/22 90/15
91/14
should [5] 6/17 11/21 12/5
29/17 101/5
show [13] 8/19 13/2 21/5 23/18
24/14 27/10 38/5 52/11 78/21
80/11 87/8 87/12 87/18
showing [2] 6/21 12/4
shows [1] 24/1
sick [2] 40/4 68/16
side [10] 42/2 42/3 42/12 43/5
56/1 65/13 67/3 67/23 71/11
73/17
sign [14] 36/6 37/7 37/12 46/1
46/2 46/3 46/5 49/5 49/7 49/10
50/13 50/18 53/3 59/12
signed [2] 77/21 78/5
significant [1] 10/18
silence [1] 56/14 57/2
silent [3] 40/17 59/20 85/5
similar [5] 6/1 12/9 12/14
27/21 27/21
simply [3] 7/9 16/21 99/21
since [4] 45/2 87/7 87/7
106/11
sir [72] 22/11 24/25 29/23
30/16 31/21 33/10 34/6 34/13
34/15 35/6 35/23 36/1 36/3
36/21 37/19 37/25 38/2 38/4
38/8 38/14 41/7 41/13 41/17
41/23 42/2 42/22 42/11 42/14
43/1 43/4 44/14 45/1 46/2 46/7
46/11 46/13 46/24 46/25 47/21
48/13 49/6 50/11 50/21 50/25
51/2 51/5 51/5 51/11 51/14
52/9 54/5 54/7 54/11 54/20
55/19 55/21 56/10 56/16 57/4
57/5 57/6 57/24 58/7 60/25
62/1 62/12 62/17 79/1 79/2
82/24 84/5 93/21
sit [1] 46/1
sitting [4] 32/18 67/1 68/2
95/6
situation [2] 12/13 13/11
Six [11] 6/25 7/24 8/1 8/7 9/8
10/4 10/6 11/22 12/1 12/21
16/19
ski [5] 95/25 96/2 97/7 97/9
97/10
ski-mask [5] 95/25 96/2 97/7
97/9 97/10
slider [1] 68/23
sliding [2] 66/11 68/23
slightly [2] 6/25 74/15
Slow [1] 106/9
slurred [2] 54/6 109/24
small [1] 82/12
smoked [1] 65/6
so [102] 5/4 5/7 5/11 5/17 6/7
6/7 6/12 7/4 8/23 12/24 17/20
19/8 20/22 22/7 22/8 23/4
24/21 26/9 26/22 27/1 27/5
27/15 33/16 34/23 35/13 36/16
36/18 36/20 37/6 40/14 42/3
42/15 42/22 43/12 44/5 44/7
44/7 46/5 46/8 46/14 46/25
47/5 47/15 48/10 48/22 49/10
49/25 50/12 50/18 51/23 52/10
53/18 55/20 68/21 73/19 74/25
76/22 79/19 80/8 80/18 81/12
83/10 83/20 84/9 85/2 85/13

88/9 88/17 89/16 89/16 91/23
92/17 96/5 96/11 97/20 98/12
102/17 103/19 105/15 106/24
107/13 108/6 108/12 108/15
108/15 109/13 109/14 110/10
110/10 110/12 110/17 110/19
111/4 111/8 111/16 111/18
111/21 112/21
some [41] 14/7 14/15 14/25
16/22 24/19 26/16 26/17 28/2
36/13 36/16 38/20 47/23 48/1
48/11 49/15 52/12 52/17 53/10
54/17 59/9 60/20 61/3 67/4
67/8 67/9 67/10 67/13 68/9
68/11 68/17 69/22 69/22 82/8
82/12 82/15 82/15 94/10 96/8
99/11 107/14 111/2
somebody [14] 10/17 22/14 26/3
26/7 76/4 76/7 76/9 76/10
76/24 77/5 92/2 92/8 96/1
98/17
somehow [1] 6/15
someone [5] 10/14 84/10 84/13
104/4 104/6
someone's [2] 14/5 14/6
something [16] 16/21 29/24
32/16 35/15 36/7 39/20 44/9
44/10 54/15 59/11 89/20 100/7
107/4 110/2 111/18 111/25
sometime [2] 25/2 74/11
sometimes [1] 14/19
somewhere [3] 50/17 51/20
104/21
sorry [15] 3/16 21/16 29/23
33/2 35/6 35/20 36/12 42/9
43/10 44/3 44/24 48/6 71/1
77/4 79/12
sort [4] 14/25 24/9 26/9
102/23
sounds [1] 97/17
source [1] 60/21
SOUTHERN [3] 1/2 31/8 31/11
speak [3] 30/16 62/17 73/11
84/15 84/16
speaking [3] 25/14 54/3 74/11
Special [1] 33/11
specific [3] 18/14 47/25 47/25
specifically [4] 11/25 15/25
16/6 18/7
speech [3] 54/6 93/5 109/24
spell [2] 30/17 62/18
spent [1] 52/16
spoke [8] 53/14 64/23 65/12
74/18 80/24 80/25 93/4 93/7
spoken [2] 4/4 53/19
spoon [3] 27/21 67/9 69/23
spoons [1] 28/3
spotlight [1] 3/14
Stafford [2] 36/6 50/7
stains [1] 71/8
stand [8] 4/12 30/13 54/25
55/19 62/14 62/17 107/21
107/23
standard [1] 105/25
standing [3] 65/6 65/19 66/2
standpoint [1] 22/8
start [10] 5/24 15/8 29/12
35/4 35/4 78/11 111/22 112/2
112/13 112/22
started [8] 35/3 35/6 35/15
36/13 36/17 38/21 48/3 50/4
Starting [1] 78/24

starts [3] 78/14 109/25 110/6
state [3] 30/17 62/17 92/25
straight [1] 54/17 106/13
53/17 74/20
statement [50] 28/15 28/18
28/19 28/25 29/2 29/5 34/23
35/1 35/5 38/23 40/12 49/8
50/5 50/6 50/23 51/1 51/24
52/11 53/11 53/15 53/19 55/12
55/16 58/5 61/18 62/6 75/21
84/11 84/23 84/24 85/3 85/10
85/12 85/16 85/18 85/21 88/22
92/2 92/11 92/14 94/8 94/13
108/21 109/17 109/20 110/9
110/12 110/15 110/18 110/19
statements [9] 30/3 30/10
38/15 71/20 71/24 72/1 84/4
84/10 92/9
states [10] 1/1 1/4 1/11 1/14
3/3 3/8 6/8 48/22 51/11 101/9
stating [1] 44/1
statute [1] 8/24
statutory [11] 4/25 5/4 5/13
5/14 6/15 7/17 7/18 7/19 8/1
8/2 8/25
stay [1] 58/3
stayed [1] 64/22
STENOTYPE [1] 1/23
step [4] 45/8 54/20 62/3 93/21
stepped [1] 64/18
still [5] 9/3 13/8 28/10 52/11
109/11
stolen [1] 109/9
stood [4] 66/2 80/9 80/10
80/12
stoop [1] 72/21
stop [19] 9/17 34/25 36/6 37/6
37/7 46/1 46/2 46/3 46/5 49/5
49/7 49/10 50/13 50/18 50/19
51/17 51/24 53/2 95/16
stopped [5] 34/23 35/7 35/15
49/20 73/24
store [1] 51/12
straight [1] 66/1
subject [6] 24/17 39/2 96/4
96/11 98/10 103/10
submit [1] 17/5
subpoenaed [2] 112/4 112/12
subsequent [9] 19/15 22/12
22/15 22/20 22/22 22/22 22/24
22/25 24/1
subsequently [2] 95/9 105/2
substance [5] 14/6 14/8 14/12
36/8 82/14
substantially [5] 5/6 8/3 8/3
14/24 28/10
such [3] 17/9 77/21 100/9
suffering [2] 90/8 90/12
sufficient [3] 103/11 103/16
106/4
suggestion [1] 57/10
Suite [2] 1/14 1/18
Sullivan [1] 1/18
summons [1] 64/9
supervising [1] 101/19
supervisor [1] 64/6
supplied [1] 13/4
supplies [1] 68/12
support [1] 15/4
supports [1] 20/8
supposed [4] 39/24 39/25 52/5
69/2
suppress [6] 3/23 4/8 28/15

**S**

suppress [3]   58/11 58/13 94/11
suppressed [1]   101/5
suppression [3]   38/6 41/2 41/4
Supreme [6]   105/4 105/11 106/5 106/7 107/6 107/9
sure [7]   3/22 13/8 22/1 57/9 105/8 109/6 110/22
surrounding [3]   19/17 42/4 60/18
swear [1]   62/13
SWEENEY [122]
Sweeney's [29]   15/13 18/2 19/17 21/18 23/1 41/15 42/4 56/5 57/1 59/4 59/19 60/3 60/7 60/18 61/2 64/23 65/9 66/23 70/19 73/10 74/20 75/2 81/3 88/13 88/18 89/3 94/23 103/25 105/24
sweep [1]   99/25
sworn [3]   30/12 30/15 62/15
syringes [2]   82/8 99/10

**T**

table [3]   3/10 3/12 32/18
take [21]   8/14 19/11 30/13 33/18 34/8 40/7 40/22 42/23 53/25 54/25 55/8 55/19 62/13 70/1 73/1 84/15 84/23 84/24 92/11 111/12 112/10
taken [4]   57/5 68/6 85/11 106/12
taking [1]   51/15
talk [12]   17/16 19/7 26/7 35/6 85/17 85/21 86/15 90/9 101/13 103/21 103/22 109/25
talked [4]   58/11 58/12 58/14 103/1
talking [31]   6/6 15/8 17/9 20/13 23/23 24/24 25/8 25/13 25/25 26/2 26/14 34/22 35/10 36/17 38/21 40/14 48/3 54/1 56/20 58/17 58/18 59/13 73/5 93/6 97/16 97/17 97/18 99/3 105/8 110/6 110/22
talks [1]   103/1
tan [2]   32/18 71/16
task [7]   3/13 29/21 30/9 31/3 31/6 31/7 63/7
tech [1]   105/16
technical [2]   105/6 106/17
telephone [14]   13/4 69/24 69/25 70/1 70/2 70/5 70/9 95/11 95/13 95/19 98/14 99/18 107/20 107/24
tell [21]   9/21 17/7 17/9 17/24 22/12 30/22 36/11 42/17 42/19 48/10 60/16 72/16 74/6 76/24 77/3 77/5 79/13 85/8 86/22 111/5 111/8
telling [2]   86/24 112/13
Ten [1]   31/1
terms [7]   20/18 54/3 54/9 62/6 92/8 94/12 105/3
testified [7]   88/4 88/21 94/19 102/14 104/18 107/23 108/1
testify [10]   15/18 15/21 17/25 18/2 18/7 18/10 23/17 25/17 62/11 107/20
testifying [1]   74/23
testimony [13]   15/13 20/11

20/19 22/3 24/5 87/4 94/4 95/4 99/10 103/5 108/16 109/12
Texas [3]   105/10 106/6 107/2
than [22]   7/15 7/21 8/4 9/24 10/8 11/5 13/8 14/6 17/5 28/8 44/7 58/24 72/5 74/15 99/4 99/21 100/24 102/17 104/4 104/6 107/4 108/5
Thank [15]   13/14 26/20 28/11 30/19 41/8 52/22 53/23 54/20 55/22 62/3 78/13 90/15 93/21 98/25 113/4
that [706]
that's [120]
That's not [1]   86/21
their [12]   19/5 21/12 24/18 45/9 45/11 45/13 45/14 45/17 70/24 73/11 80/22 86/9
them [40]   13/18 47/19 55/12 64/22 65/13 65/14 65/15 65/24 70/24 71/2 73/11 73/18 74/1 74/3 74/4 74/6 74/8 74/15 77/3 80/15 82/14 82/16 84/15 84/23 84/25 92/11 92/12 92/15 92/15 94/21 94/25 95/1 97/11 97/23 97/24 104/5 112/10 112/12 112/13 112/13
then [58]   4/6 4/7 4/10 5/7 6/24 6/25 7/11 9/14 9/25 11/18 13/22 17/15 18/23 19/5 19/19 20/3 26/8 28/25 30/13 33/18 36/8 40/13 40/15 40/17 45/5 45/10 48/25 49/25 50/4 50/22 51/3 51/17 51/23 55/20 62/8 62/13 68/6 80/14 80/18 80/18 80/22 92/15 93/10 94/12 94/15 94/23 98/6 98/8 101/19 103/7 103/23 106/2 108/11 108/22 109/17 110/3 110/9 111/19
theory [1]   27/14
there [137]
there's [27]   13/17 19/10 20/14 23/21 23/21 24/6 24/10 24/10 24/11 24/17 24/20 25/23 45/4 45/5 46/8 51/23 60/2 72/19 100/7 103/24 104/2 104/8 108/23 110/13 110/24 111/2 111/14
therefrom [3]   4/20 8/18 11/20
these [14]   6/1 13/3 13/10 14/1 42/24 44/4 44/4 44/8 47/6 47/15 50/4 50/22 74/12 110/7
they [93]   4/1 5/5 5/10 5/19 7/11 7/11 7/20 8/3 8/21 8/23 8/24 9/9 9/11 9/13 9/14 9/17 9/23 10/19 10/24 11/3 12/24 12/24 13/1 14/24 15/2 18/4 39/7 39/7 39/8 49/1 51/9 60/19 61/3 64/9 65/10 65/11 65/11 65/18 70/22 70/23 73/4 73/7 73/8 73/17 73/24 74/1 74/3 80/15 84/15 84/16 84/17 85/14 86/2 86/9 92/10 92/13 92/14 94/19 94/20 94/24 96/3 97/7 97/9 97/12 97/14 97/19 97/20 97/21 97/23 98/3 98/4 98/6 98/7 98/8 99/13 100/3 100/21 101/13 101/17 102/6 104/18 105/1 105/2 105/17 105/18 107/13 107/20 108/9 108/10 108/10 108/11 108/11 109/11
they're [13]   8/19 9/18 14/2

14/3 14/20 24/17 24/18 45/11 45/19 45/22 92/10 105/8 108/13
thing [7]   6/4 10/16 48/17 60/19 89/3 109/25 110/23
things [8]   15/4 26/17 45/23 50/4 50/22 56/1 61/16 110/7
think [62]   4/17 4/23 5/14 7/7 8/4 10/9 10/18 10/20 10/22 11/16 11/20 13/15 13/16 14/1 14/13 14/16 14/20 14/23 15/4 15/4 21/4 21/20 21/24 23/23 24/13 24/13 24/14 24/15 24/21 25/6 26/7 27/20 27/20 39/24 44/4 54/1 58/21 58/24 61/16 83/7 90/19 94/9 96/8 97/8 99/1 99/1 100/2 100/2 101/3 101/6 102/17 103/14 104/8 105/20 107/5 108/20 109/12 110/1 110/20 110/24 112/15 112/15
this [139]
those [24]   5/9 5/10 5/11 7/4 9/9 10/8 12/11 14/14 14/20 14/23 15/4 15/25 38/15 44/9 44/10 56/13 58/9 67/13 67/24 73/3 81/6 81/7 99/12 100/16
though [8]   9/22 10/12 17/8 26/4 29/24 36/10 95/16 104/21
thought [4]   74/21 76/17 83/5 110/11
three [14]   5/8 5/18 6/24 8/8 10/2 11/21 12/1 12/2 12/14 13/17 18/9 30/4 87/20 99/7
through [16]   6/1 15/9 15/12 17/6 18/9 46/23 47/1 58/23 65/13 89/8 99/5 100/11 100/18 108/4 112/18 112/19
Thursday [1]   112/18
tied [1]   26/1
till [1]   63/5
time [77]   7/11 10/15 13/2 15/22 16/1 16/13 18/9 20/1 20/4 21/6 21/8 21/12 23/2 24/12 24/22 26/9 29/21 30/2 31/19 33/4 33/21 34/3 34/5 36/7 40/10 41/1 41/15 41/18 46/23 48/3 49/3 49/4 49/6 51/4 52/3 52/15 53/2 53/3 56/14 57/1 58/22 59/6 59/18 60/3 60/7 60/22 61/11 61/24 61/25 62/9 63/10 64/1 64/11 65/2 68/17 68/18 70/4 74/8 74/14 74/18 76/12 77/15 78/10 79/3 85/3 85/14 88/18 89/24 91/15 91/21 92/13 93/1 102/19 103/13 104/10 110/16 110/18
times [2]   50/9 107/19
timing [1]   99/1
to arrange [1]   98/10
to when [1]   45/25
today [9]   29/11 32/14 40/22 48/7 74/15 74/23 87/4 112/2 112/25
together [8]   5/10 10/2 10/14 19/5 20/14 20/17 21/10 26/1
told [22]   33/11 35/13 41/14 44/8 53/15 53/19 60/5 61/2 74/1 74/3 78/25 81/8 81/8 81/18 83/4 84/2 84/22 86/19 88/18 89/3 111/12 111/14
Tomlinson [10]   63/24 64/15 65/22 65/22 66/7 66/18 69/15 72/24 75/17 96/23

**T**

Tomlin [1] 68/25
tomorrow [1] 112/24
tone [1] 93/5
too [2] 4/17 91/1
took [11] 33/21 43/16 43/18
 55/12 68/7 69/13 69/15 80/8
 80/13 103/7 104/19
torn [1] 69/22
total [1] 40/11
touch [3] 111/10 112/12 112/13
tougher [1] 108/20
towards [6] 40/13 49/7 50/20
 73/14 73/15 73/21
traffic [1] 50/15
trained [2] 45/3 86/8
training [3] 31/9 31/10 31/11
transaction [3] 12/10 14/15
 95/14
transcript [1] 1/10 114/3
TRANSCRIPTION [1] 1/23
transmitted [1] 109/21
transpired [1] 60/6
transport [3] 32/1 33/17 34/1
transportation [1] 30/4
transported [9] 32/3 57/13
 57/19 57/23 58/4 60/24 61/24
 92/20 92/22
transporting [1] 32/12
travel [2] 33/6 33/12
traveled [2] 18/25 19/4
traveling [3] 15/19 18/10
 18/14
treatment [1] 89/24
trees [1] 72/18
trial [4] 11/11 17/22 110/17
 111/23
trials [3] 12/2 14/13 14/13
tried [1] 5/10
tries [1] 111/13
trip [1] 18/20
trouble [1] 93/7
true [1] 14/20
try [9] 9/22 10/3 11/10 70/24
 71/2 89/9 111/5 111/6 111/9
trying [5] 10/2 10/3 48/18
 48/20 60/4
Tuesday [7] 111/22 112/2 112/5
 112/14 112/17 112/19 112/22
turn [4] 4/6 36/6 53/1 73/18
turned [1] 65/18
Twelve [1] 62/25
two [39] 4/16 4/16 4/17 5/2
 5/8 5/16 5/18 6/11 6/15 6/18
 6/24 7/13 7/17 8/4 9/10 9/16
 10/2 11/21 12/1 12/7 15/25
 16/19 18/2 19/7 29/25 36/5
 40/11 40/15 44/3 45/4 45/8
 45/10 55/14 55/15 72/18 73/2
 74/19 79/14 99/6
two-step [1] 45/8
type [4] 14/7 14/15 17/2 68/9
types [1] 13/17

**U**

U.S [3] 3/11 106/6 109/2
uh [1] 51/2
uh-huh [1] 51/2
ultimately [1] 6/6
unclear [1] 27/17
under [23] 5/15 6/12 8/24 14/2
 16/12 24/13 37/24 38/1 45/19
 45/22 47/12 54/10 55/20 61/25
 68/5 86/9 93/10 95/6 95/8
undercover [2] 22/6 73/9
understand [13] 9/21 21/2 24/5
 24/10 27/24 38/16 45/14 47/6
 58/15 95/19 97/22 98/5 110/2
understanding [4] 93/7 109/18
 109/18 111/22
understood [2] 18/20 37/20
undisputed [1] 95/4
undue [1] 13/7
unduly [5] 8/7 106/12 107/7
 107/11 107/14
unfair [1] 24/21
Unfortunately [1] 87/8
unhappy [1] 106/11
unit [5] 63/3 64/2 64/3 64/7
 64/8
UNITED [8] 1/1 1/4 1/11 1/14
 3/3 3/8 6/8 101/9
unlike [1] 9/7
unmarked [1] 73/8
unnecessary [1] 7/3
until [5] 26/7 29/17 53/18
 64/22 80/5
up [35] 19/8 20/10 30/12 30/13
 41/20 42/15 50/13 50/20 58/18
 58/20 58/21 60/11 60/12 60/13
 62/12 62/14 65/11 65/18 66/19
 66/19 66/19 69/1 70/24 71/3
 71/16 71/25 72/12 73/11 96/7
 110/1 110/17 112/1 112/14
 112/23 112/24
upon [4] 4/6 16/24 29/11 95/2
upstairs [1] 69/13
us [20] 30/22 33/11 33/13
 53/15 53/19 61/2 63/1 65/23
 72/16 74/17 78/25 79/13 79/25
 80/2 80/12 81/16 81/18 84/16
 84/22 89/3
use [65] 5/8 6/3 7/10 12/16
 12/19 12/22 13/19 13/20 14/5
 15/10 15/16 15/21 15/24 17/4
 17/9 18/3 20/13 20/18 20/23
 21/1 21/2 21/2 21/4 23/3 23/5
 23/6 23/9 23/20 23/20 23/22
 24/4 24/6 24/6 24/10 24/11
 24/23 25/1 25/22 26/1 26/4
 26/8 26/18 27/2 27/3 27/12
 27/13 28/7 28/8 70/5 82/23
 88/21 98/7 100/3 102/16 103/4
 103/17 103/25 104/1 104/6
 104/24 104/25 105/11 106/2
 106/7 106/10
used [28] 13/5 20/3 70/10
 70/10 83/8 85/10 85/13 85/22
 95/13 96/2 96/16 96/20 97/4
 97/10 98/9 98/19 99/16 99/20
 100/24 103/7 103/9 103/15
 105/1 105/21 106/1 107/24
 109/13 111/6
useful [1] 109/9
user [2] 14/17 16/6
using [6] 20/12 20/23 21/9
 22/3 22/9 99/18
usually [1] 92/1

**V**

valid [1] 101/4
value [3] 14/24 15/5 97/13
various [1] 63/1
vehicle [15] 18/20 33/8 33/9
 33/13 34/9 34/10 34/12 34/17
 35/21 35/25 51/25 65/12 73/8
 73/25
vein [1] 89/8
verbally [1] 59/11
verbatim [1] 47/19
versus [7] 3/4 6/8 101/9
 105/10 106/6 107/2 109/2
very [7] 4/9 13/10 54/14 70/22
 82/12 106/8 106/11
victim [6] 15/13 16/8 18/6
 20/3 70/10 83/9
view [22] 23/25 68/1 69/19
 99/5 99/6 100/5 100/14 101/7
 101/14 101/24 101/25 102/2
 103/20 103/22 105/12 105/4
 106/14 107/13 108/14 108/19
 109/11 109/14
visit [1] 55/7

**W**

Wade [13] 8/17 8/18 8/23 16/8
 18/6 19/20 19/22 20/9 20/12
 20/19 20/24 21/9 39/1
Wade's [7] 15/14 16/8 19/18
 20/1 20/4 58/22 99/2
wait [9] 20/16 20/16 29/17
 35/13 46/18 57/12 64/22 80/5
 80/12
Waite [12] 39/16 48/23 48/24
 50/23 51/1 70/12 96/17 98/10
 98/20 99/20 101/1 103/15
waited [2] 72/22 72/23
waiting [3] 65/4 65/6 65/7
waive [1] 45/13
waived [1] 48/11
waiver [8] 37/12 45/6 46/16
 56/17 57/5 59/13 110/5 110/7
waiving [1] 45/11
walk [3] 9/14 66/16 108/4
walked [9] 65/12 65/18 65/20
 65/21 67/21 73/11 81/12 81/18
 81/22
wall [4] 67/23 68/22 69/7
 104/20
wallet [1] 37/3
want [37] 9/12 9/13 15/8 19/11
 29/23 35/5 35/9 43/8 43/21
 44/22 48/16 53/1 58/3 64/20
 71/3 71/23 72/1 84/3 84/10
 84/15 84/16 84/23 85/2 85/12
 85/15 85/17 85/20 85/21 85/23
 86/25 88/22 92/14 94/6 94/7
 94/7 109/20 111/25
wanted [10] 34/22 34/22 35/1
 36/16 55/14 66/12 66/13 74/3
 80/12 84/13
wanting [1] 75/20
wants [4] 10/2 11/25 92/2 92/2
Warning [1] 92/15
warnings [2] 36/25 110/3
warrant [63] 29/8 29/8 32/5
 64/2 64/8 64/17 65/15 70/5
 74/2 75/23 75/24 76/4 76/11
 76/15 76/16 76/19 76/20 77/8
 77/9 77/18 77/20 77/22 77/24
 78/1 78/2 78/6 78/7 78/8 78/15
 79/4 79/8 80/3 80/11 83/24
 90/23 91/1 94/20 94/22 94/24
 95/1 95/3 96/24 97/16 97/19
 97/20 97/24 100/3 100/4 100/6
 100/8 100/10 100/11 100/13
 100/18 100/20 101/2 101/18

**W**

warrant [17]   104/24 105/2 105/5
105/9 108/7 108/9 109/8
warranted [1]   7/5
warrants [3]   64/9 97/17 97/19
was [370]
wasn't [3]   22/6 47/18 71/4
wasteful [1]   7/3
way [15]   3/17 24/5 25/18 26/19
49/17 54/6 54/9 59/14 59/22
60/2 83/12 86/1 86/6 89/9
111/3
we [128]
we'd [4]   28/14 29/10 29/12
30/8
we'll [8]   13/15 28/15 55/8
90/18 94/5 112/1 112/23 112/24
we're [34]   3/16 4/15 6/6 10/25
11/1 11/1 17/5 17/20 23/23
24/23 25/6 25/9 25/9 25/12
25/25 26/1 26/14 27/1 27/5
28/3 28/24 30/9 59/13 77/7
88/9 90/24 91/6 94/17 99/3
111/21 111/22 111/23 112/12
112/19
we've [4]   49/13 100/10 107/3
112/12
wearing [2]   32/17 71/15
week [2]   74/11 74/18
weekend [1]   74/22
weighing [1]   79/15
Weinbender [1]   109/2
well [61]   4/9 7/7 8/10 8/15
11/1 11/4 11/7 11/9 11/13
17/24 19/7 22/5 22/22 23/19
25/7 25/14 26/6 29/6 35/3 43/5
45/7 46/20 48/18 48/20 54/13
54/14 56/17 56/22 57/5 57/19
59/17 59/22 67/16 76/9 77/22
78/16 80/21 83/12 84/13 85/15
85/23 86/1 86/11 87/10 87/22
90/24 94/14 96/13 99/9 101/8
104/14 105/14 107/3 111/1
111/12 111/13 111/25 112/9
112/15 112/17 112/23
Wells [4]   101/9 102/5 102/20
102/25
went [29]   14/19 18/21 53/3
53/6 63/23 64/12 64/15 65/20
66/23 67/2 69/13 77/6 78/6
78/25 80/19 80/20 81/4 81/9
81/13 83/10 84/20 84/21 85/19
95/5 98/3 106/15 108/9 108/10
108/12
were [81]   6/11 7/8 10/19 14/12
20/12 21/9 24/16 28/3 30/1
30/3 31/19 31/24 32/11 33/4
33/24 34/20 35/19 36/5 36/11
37/7 37/15 39/3 39/7 39/7 39/8
40/10 40/11 41/14 42/12 43/5
44/2 44/4 49/1 49/7 49/8 49/17
49/23 51/6 51/9 51/15 52/2
53/2 53/25 54/8 54/13 56/1
59/3 63/6 64/3 64/25 65/4 65/6
65/7 65/7 67/9 67/10 69/19
70/4 70/5 70/22 70/25 71/10
73/3 73/4 73/7 76/18 76/23
76/24 76/25 77/2 79/10 80/15
81/5 83/1 85/14 95/25 97/20
99/13 101/17 108/10 108/11
weren't [3]   51/15 73/8 91/20
what [163]

what's [14]   4/2 9/23 23/6 38/5
43/24 45/3 46/6 46/6 52/3 59/8
60/13 60/21 61/19 110/9 111/1
whatever [3]   26/14 110/9 111/1
whatsoever [1]   91/24
when [79]   9/22 11/8 11/18
18/22 21/18 22/13 24/23 26/12
28/18 32/22 33/6 33/14 33/23
34/25 35/13 35/15 37/7 40/13
40/15 43/16 43/18 45/3 45/25
47/15 47/17 47/22 49/8 49/22
49/23 50/3 50/5 50/6 50/22
50/23 52/6 52/10 53/11 53/25
58/5 60/11 60/19 60/24 63/10
64/14 65/21 66/3 66/22 67/21
73/11 73/16 74/1 74/4 74/4
74/21 75/12 76/23 77/15 80/14
80/19 80/20 86/8 86/22 91/11
92/8 92/13 93/1 93/4 93/7 95/5
96/19 98/3 98/21 100/19 100/19
102/15 105/17 105/25 106/2
108/9
where [60]   10/14 10/16 10/25
12/13 14/11 17/3 22/1 25/22
26/12 31/2 34/8 34/10 35/19
35/19 37/2 37/4 39/7 39/7 39/8
49/1 49/23 50/13 51/12 51/12
62/22 65/19 66/9 66/13 66/22
67/15 67/21 72/16 72/22 72/23
72/24 73/3 73/10 81/4 81/6
81/16 84/2 89/7 89/7 89/10
90/9 92/20 95/22 96/9 97/6
97/7 97/9 100/7 101/13 102/5
104/14 104/15 108/6 108/11
110/10 111/15
whether [32]   3/22 12/8 21/22
28/9 39/15 43/3 45/10 45/14
45/19 45/22 46/15 47/1 47/5
47/11 48/7 54/9 59/5 59/5 59/5
59/10 59/11 59/18 61/6 61/9
61/10 85/20 89/23 90/3 96/10
107/25 108/13 109/20
which [44]   4/23 5/7 5/8 5/17
6/8 6/9 6/25 8/8 10/4 10/5
10/7 11/2 13/10 13/11 16/9
16/12 16/23 17/4 19/3 20/5
21/19 25/2 32/21 65/23 66/23
69/21 73/12 73/18 74/20 78/25
79/1 81/2 83/10 85/11 88/21
95/4 95/11 95/14 98/4 101/19
105/22 109/11 110/1 111/17
while [3]   33/24 65/4 90/23
white [12]   79/14 82/15 82/16
82/16
who [40]   4/20 10/14 13/4 18/4
18/6 18/24 24/16 29/16 31/22
32/25 39/3 51/6 63/23 64/5
64/24 65/8 65/21 66/2 66/2
66/16 68/2 69/15 72/23 74/25
79/10 79/13 79/19 80/15 80/18
80/22 81/16 88/4 88/4 94/23
96/23 98/17 103/4 107/23
109/23 109/25
who's [4]   15/13 23/4 23/4
78/12
whole [4]   11/14 48/16 100/4
109/25
whom [3]   30/22 71/12 76/10
whose [1]   104/12
why [16]   10/11 10/13 22/4
27/25 36/10 36/14 37/14 70/1
76/18 76/23 76/24 77/6 89/19
89/24 91/19 92/22

will [10]   5/16 10/23 15/20
20/19 23/17 23/18 23/18 25/16
25/19 61/13
WILLIAM [2]   1/17 3/18
willing [10]   38/19 47/22 48/1
48/11 49/14 52/12 52/17 53/9
84/24 110/4
window [1]   65/13
wish [2]   92/10 92/24
withdrawal [2]   90/1 90/5
within [5]   12/11 13/5 99/25
108/18 109/14
without [6]   29/8 95/3 97/3
102/4 111/2 111/4
witness [18]   17/8 17/15 17/15
17/25 18/23 25/16 28/25 29/16
30/15 54/21 59/18 60/2 60/4
61/19 62/4 62/14 62/15 62/16
78/10 87/13 93/22
witnesses [9]   2/2 18/2 23/16
29/11 29/14 54/23 55/4 62/6
112/4
won't [3]   49/14 79/25 112/24
word [1]   84/3
wording [2]   44/3 85/22
words [6]   44/11 44/12 85/9
85/13 88/21 106/11
work [3]   39/25 52/5 68/17
worker [2]   16/9 20/20
working [3]   31/19 31/22 63/7
worried [2]   39/23 52/5
would [62]   4/5 4/25 5/17 5/24
5/24 6/8 7/3 7/3 7/11 15/4
15/6 15/12 15/23 16/1 17/4
18/24 20/22 21/5 25/2 25/18
27/4 29/14 29/16 29/21 30/12
39/9 40/9 43/3 43/13 55/20
61/15 62/10 63/21 64/21 68/8
70/12 70/23 71/9 71/10 73/18
74/3 74/25 76/12 76/13 84/15
84/17 85/11 85/22 86/20 91/3
91/14 96/21 100/9 101/16
105/14 106/9 109/8 109/14
110/15 111/12 111/14 112/2
wouldn't [2]   27/25 68/21
write [1]   45/14
writing [1]   60/25
written [6]   57/22 57/25 58/6
58/25 59/12 109/18
wrong [1]   101/7
wrote [9]   56/21 56/23 57/15
57/21 58/1 58/7 58/7 58/8
60/24

**Y**

yeah [16]   3/16 17/17 17/19
18/19 27/17 28/23 29/1 46/4
51/20 69/13 75/25 87/11 87/15
112/6 112/9 112/17
year [7]   21/19 27/19 58/24
99/4 99/21 100/25 102/13
years [12]   4/25 5/4 7/18 7/19
8/2 8/25 31/1 44/3 62/25 74/19
86/7 86/8
yes [101]   18/1 18/17 19/14
20/14 20/18 21/15 22/11 23/5
24/25 25/4 26/5 29/25 31/21
32/8 32/15 34/15 35/15 35/23
36/1 36/3 36/21 37/17 37/19
37/21 37/23 38/8 38/14 38/18
40/18 40/24 41/21 41/23 42/2
42/2 42/11 42/14 43/1 43/9
43/11 43/15 43/19 44/11 44/14

**Y**

yes... [38] 40/23 45/24 46/1
46/13 47/21 48/5 50/5 50/7
50/11 50/15 50/21 50/23 50/25
51/2 51/5 51/5 51/11 51/14
51/22 54/5 55/21 56/10 57/21
57/24 63/9 63/12 63/22 64/4
66/4 66/6 66/8 66/15 67/12
67/12 67/14 68/16 69/6 69/10
69/16 69/25 70/7 70/13 71/14
72/19 72/22 73/6 74/13 74/16
75/22 76/8 79/2 81/1 83/15
86/4 87/5 88/8 94/18 107/22
yet [1]   111/10
you [518]
you tell [1]   72/16
you'd [1]   53/18
you'll [3]   17/25 62/12 112/15
you're [25]   3/14 20/13 22/1
26/11 42/1 42/3 46/18 49/20
50/19 55/4 55/20 59/14 66/10
73/5 73/16 88/22 97/16 97/17
100/17 105/8 110/2 110/22
111/8 111/18 113/4
you've [9]   23/5 23/7 23/8 23/8
26/16 63/2 102/24 107/18
109/23
your [171]
Your Honor [86]   3/20 4/1 4/4
4/11 4/14 4/15 4/17 4/21 5/7
5/9 5/11 5/13 5/21 7/8 7/13
7/17 8/11 9/7 9/12 10/3 10/8
10/10 10/19 11/2 11/16 11/17
13/14 15/8 17/12 17/23 23/15
25/5 25/19 28/14 28/20 29/4
29/9 29/15 36/16 41/5 41/8
46/21 52/20 52/22 55/11 55/22
58/20 59/3 60/3 61/14 61/21
62/5 75/24 78/9 78/13 87/8
87/24 87/25 89/1 90/15 90/18
92/5 94/2 94/4 94/16 97/6
98/25 99/1 99/2 99/5 100/3
100/20 101/3 101/5 101/6
101/17 102/25 103/24 104/9
107/1 107/2 107/4 107/5 108/2
111/21 112/18
yourself [3]   58/6 71/4 87/20
yourselves [1]   3/6

**Z**

Ziploc [2]   67/10 69/22