```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND
2                     NORTHERN DIVISION

3   UNITED STATES OF AMERICA,   :  CRIMINAL NO.:

4          Plaintiff,           :  JKB-10-0271

5      vs.                      :

6   PATRICK FITZGERALD KENNEDY, :  Baltimore, Maryland

7          Defendant.           :  April 12th, 2012

8
              *   *   *   *   *   *   *   *   *   *   *
9
        The above-entitled case came on for jury trial before the
10
    Honorable James K. Bredar, United States District Judge.
11
              *   *   *   *   *   *   *   *   *   *   *
12

13                     A P P E A R A N C E S

14

15   For the Government:

16        Deborah Johnston, AUSA

17        Arun G. Rao, AUSA

18   For the Defendant:

19        William C. Brennan, Jr., Esquire

20        Brett J. Cook, Esquire

21

22

23

24   Christine T. Asif, RPR, CRR

25   Official Court Reporter
```

```
1              P R O C E E D I N G S
2              THE COURT:  Good morning.  Be seated, please.  Any
3  matters we need to take outside the hearing of the jury?
4              MS. JOHNSTON:  I don't believe so, Your Honor.
5              THE COURT:  Mr. Brennan?
6              MR. BRENNAN:  No, thank you.
7              THE COURT:  Who's next, Ms. Johnston?
8              MS. JOHNSTON:  We have Dr. Parmele here.
9              THE COURT:  Okay.
10             MS. JOHNSTON:  She should be very short.
11             THE COURT:  And how does the day look to you at this
12  point?
13             MS. JOHNSTON:  We're hoping we can move very quickly
14  today.
15             THE COURT:  Well, yesterday afternoon I thought we
16  made a lot of progress.  And, so, hopefully we're hitting our
17  rhythm here and we'll do a little bit better and catch up a
18  little bit.  At some point later this morning or perhaps at
19  noon I'll have proposed jury instructions for both sides in
20  anticipation of our conference at the conclusion of the day.
21  We'll kind of see how things go.  I'm generally planning that
22  we'll do that at the end of today but, if we get backed up a
23  little bit, it might be able to put that over until tomorrow
24  morning.
25             MS. JOHNSTON:  And, Your Honor, we drafted a proposed
```

1    verdict sheet that I've given to defense counsel.  I know we

2    have to correct a couple of typos --

3              THE COURT:  I have one, as well.  Why don't you wait

4    and see if you like mine.

5              MS. JOHNSTON:  Oh, terrific.

6              THE COURT:  We'll try to pick that up for you maybe

7    during the morning break.  All right.  That's pretty much

8    everything on my list.  So we're ready?  Let's bring them in.

9              MR. BRENNAN:  Yes, Your Honor.

10             (Jury entered the courtroom.)

11             THE COURT:  Be seated, please.  Good morning, ladies

12   and gentlemen.  We're ready to begin the third day of our

13   trial.  Ms. Johnston, you may call your next witness.

14             MS. JOHNSTON:  Your Honor, the government would call

15   Dr. Parmele.

16             THE COURT:  Come all the way up, ma'am.  And if you

17   would stand right next to the jury box.  Face the clerk over

18   here.  And raise your right hand.

19                        DR. KATERINA T. PARMELE,

20   called as a witness, being first duly sworn, was examined and

21   testified as follows:

22             THE WITNESS:  Yes, ma'am.

23             THE CLERK:  You may be seated.  Please state your

24   name loudly and clearly into the microphone and spell your name

25   for the record.

4

Direct Examination Dr. Katerina T. Parmele

```
1              THE WITNESS:  Katerina Tsapls Parmele.
2    K-a-t-e-r-i-n-a, T-s-a-p-l-s, P-a-r-m-e-l-e.
3              THE CLERK:  Thank you.
4                      DIRECT EXAMINATION
5    BY MS. JOHNSTON:
6    Q    Good morning, Dr. Parmele.
7    A    Good morning.
8    Q    Could you briefly give us some information about your
9    training and background?
10   A    Sure.  I graduated college at Harvard, went to medical
11   school at University of Pennsylvania, residency at University
12   of Pittsburgh.  I did one year of an attending physician year
13   at Mercy Hospital of Pittsburgh.  And then since then I've been
14   at Calvert Memorial Hospital.
15   Q    What is your position at Calvert Memorial Hospital?
16   A    I'm an emergency physician.
17   Q    Are you board certified in any area?
18   A    Yes.
19   Q    And what areas are those?
20   A    Emergency medicine.
21   Q    What are your duties and responsibilities at Calvert
22   Memorial?
23   A    My job is to see patients, stabilize them, address their
24   medical complaints, treat them, and wish them well.
25   Q    And what shift do you work?
```

Direct Examination Dr. Katerina T. Parmele

1   A    I work the night shift.

2   Q    And did you work last night?

3   A    I did.

4   Q    Okay.  You came here directly from work?

5   A    Yes.

6   Q    Calling your attention to the evening hours of March 23rd,

7   2009 into the early morning hours of March 24th, 2009, did you

8   have occasion to be working then?

9   A    Yes.

10   Q    And did you during the course of that evening see a

11   patient identified as Harrison Waite?

12   A    Yes.

13   Q    Can you describe his condition when he arrived at the

14   emergency room?

15   A    Yes.  His condition was essentially deceased.  He had no

16   vital signs.

17   Q    And what, if anything, was done once he arrived at the

18   emergency room?

19   A    I may need my chart just to refresh my memory.

20   Q    Sure.  If I could have R6, please.

21        THE COURT:  R6.

22        MS. JOHNSTON:  Showing you what's been marked as R6

23   for identification purposes.

24        THE COURT:  R6 for identification only.

25   Q    (BY MS. JOHNSTON)  Do you recognize those?

Cross-examination Dr. Katerina T. Parmele

1   A    Yes.  These are the emergency department records.

2   Q    And take a moment to review those.

3   A    Yes.  And please repeat your question.

4   Q    My question is:  What, if any, steps did you take with

5   regards to Mr. Waite once he arrived with no vital signs?

6   A    Okay.  Just getting to my part.  Okay.  So, he was

7   examined, found to have no vital signs.  And at that time

8   apparently he had received -- I guess I reviewed the history

9   from the paramedics.  And he had received multiple rounds of

10   medications prior to arrival.  On arrival to the emergency

11   department he received two additional rounds of sodium

12   bicarbonate.  And at that time when there was no change in his

13   condition and he never regained any cardiac activity, both by

14   monitor and also by a bedside sonogram that I performed, I

15   pronounced him dead at 23:29.

16   Q    23:29 on March 23rd?

17   A    Yes, on March 23rd.

18   Q    Of 2009?

19   A    Of 2009.

20          MS. JOHNSTON:  I have no further questions.

21          THE COURT:  Cross?

22          MR. BRENNAN:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24   BY MR. BRENNAN:

25   Q    Good morning, Dr. Parmele.

Cross-examination Dr. Katerina T. Parmele

1    A    Good morning.

2    Q    My name is William Brennan.  Mr. Brett Cook and I

3    represent Patrick Sweeney.  Should I ask you a question that

4    you do not understand, please ask me to repeat it.

5    A    Yes.

6    Q    You told the ladies and gentlemen of the jury that

7    Harrison Waite essentially arrived deceased at the hospital; is

8    that correct?

9    A    Yes.

10   Q    And that was because there was no respiration, correct?

11   A    Correct.

12   Q    There was no heartbeat, there was no pulse, correct?

13   A    Correct.

14   Q    And the body was cool to the touch?

15   A    I don't know about the cool to the touch.  I have

16   documented peri cyanosis and mottled, but I don't remember

17   about the temperature.

18            THE COURT:  Cyan, ma'am?

19            THE WITNESS:  Cyanosis.

20            THE COURT:  Cyanosis.  He was cyanotic.

21            THE WITNESS:  Cyanotic, yes.

22   Q    (BY MR. BRENNAN)  There was -- and I think as part of R6,

23   Doctor -- do you have R6 in front of you?

24   A    Yes.

25   Q    And you told us that you reviewed the -- talked to the EMS

Cross-examination Dr. Katerina T. Parmele

1   people and reviewed those in helping make your diagnosis?

2   A    That's part of the history.

3   Q    Sure.  Okay.  Well, the other part, Doctor -- flip to --

4   oh, you have that page open.  This page here, Doctor, that you

5   have open is part of R6.  Is that note there something that you

6   would also rely on part of your records?  Do you see the top of

7   the page here?

8   A    This is my note.

9   Q    That is your note?

10  A    That is my note.

11  Q    So, your note that you made -- I don't need to stand next

12  to you, Doctor.  So, that -- the page that you have open,

13  Doctor, in front of you reads, "per EMS" --

14            MS. JOHNSTON:  Objection.

15            MR. BRENNAN:  Well, let me ask the question this way.

16            THE COURT:  Stop.  Sustained.

17  Q    (BY MR. BRENNAN)  Let me ask the question this way.  As

18  part of what you were doing as the emergency room physician in

19  dealing with Harrison Waite, the patient that had come in that

20  evening, you spoke to the EMS people; is that correct?

21  A    Yes.

22  Q    Okay.  And did the EMS people tell you --

23            MS. JOHNSTON:  Objection.

24            THE COURT:  Sustained.

25  Q    (BY MR. BRENNAN)  Well, is this note that you have written

Cross-examination Dr. Katerina T. Parmele

1    here, Doctor, a medical record that you keep in the ordinary

2    course of business?

3    A    Yes.

4    Q    Okay.  And it's a note that you made as the emergency room

5    physician on the evening of March 23/24, 2009; is that correct?

6    A    Yes.

7    Q    And this is part of the records of Calvert Memorial

8    Hospital?

9    A    Yes.

10            MR. BRENNAN:  Your Honor, I would offer into

11   evidence, Your Honor, Government Exhibit R6.

12            THE COURT:  Any objection?

13            MS. JOHNSTON:  No objection.

14            THE COURT:  R6 is received.

15            MR. BRENNAN:  Court's indulgence one moment.

16   Q    (BY MR. BRENNAN)  Doctor, the page that you have open is a

17   note that you told us that you made -- that's your handwriting

18   that appears on the top?

19   A    Yes.

20   Q    And that's a note that you made after discussions with the

21   EMS people that brought the patient to the hospital; is that

22   correct?

23   A    Yes.

24            MR. BRENNAN:  Okay.  Nothing further.  Thank you,

25   Your Honor.

Redirect Examination Dr. Katerina T. Parmele

1          THE COURT:  Redirect?

2                     REDIRECT EXAMINATION

3    BY MS. JOHNSTON:

4    Q    Dr. Parmele, in terms of that information, that's

5    information that you got from one of the EMTs; is that correct?

6    A    Apparently, yes.  "Per EMS."  I don't specifically

7    remember that night.

8    Q    And you don't --

9    A    I'm going by the chart.

10   Q    And you don't know who gave you that information?

11   A    No, I do not know.

12   Q    And you don't know where that person got the information?

13   A    Correct.  When we get information it could be a summary of

14   many people saying what happened.

15   Q    And, indeed, that note itself would not have changed your

16   determination that Mr. Waite was dead when he arrived in the

17   hospital?

18   A    No.

19   Q    Or your treatment of him; is that correct?

20   A    That is correct.

21             MS. JOHNSTON:  Nothing further.

22             THE COURT:  Well, R6 is now in evidence and there's

23   been extensive reference to this portion of R6.  But it's

24   not -- it's not in view of the Court or the jury.

25             MR. BRENNAN:  I have it here, Your Honor.

Cross-examination Dr. Katerina T. Parmele

```
 1              MS. JOHNSTON:  Your Honor, certainly we can put it
 2    up.
 3              THE COURT:  Can you put it on the screen, whatever
 4    note it is you've been referring to?
 5              MR. BRENNAN:  And the old joke about doctor's
 6    handwriting.  Your handwriting actually looks very good,
 7    Doctor.
 8              THE WITNESS:  Thank you.
 9              MR. BRENNAN:  Just so we're clear, can you read that
10    note to us, please?
11              THE COURT:  They teach handwriting at Harvard, I
12    heard.
13              THE WITNESS:  It's a minor.  "Per EMS, patient's
14    girlfriend heard him vomiting at approximately 9:45 p.m. then
15    found him unresponsive at 10:30.  Patient was asystolic on EMS
16    arrival and remained that way despite epi atropine."
17              THE COURT:  What does "asystolic" mean?
18              THE WITNESS:  That means there is -- in laymen's
19    terms it would be flat line.
20              THE COURT:  Flat line?
21              THE WITNESS:  There is no cardiac activity
22    whatsoever.
23                         RECROSS-EXAMINATION
24    BY MR. BRENNAN:
25    Q    And I'm sorry, I didn't mean to interrupt the Court.
```

Redirect Examination Dr. Katerina T. Parmele

```
1    What's E-P-I and atropine?

2    A    Epi is short for epinephrine, and atropine.

3    Q    I take it those are medications?

4    A    Yes.

5              THE COURT:  All right.  Ms. Johnston, now any

6    redirect from you?

7                    REDIRECT EXAMINATION

8    BY MS. JOHNSTON:

9    Q    Just one or two questions, Doctor.  Again, I asked you:

10   Do you know where that information actually came from?

11   A    I do not.

12   Q    And do you know whether or not it's accurate information?

13   A    No, I do not.  We often can have hearsay.  We write down

14   what we heard and then just go about our business.

15             MS. JOHNSTON:  I have nothing further.

16             THE COURT:  May this witness be excused as far as the

17   government's concerned?

18             MS. JOHNSTON:  Yes, Your Honor.

19             THE COURT:  Mr. Brennan?

20             MR. BRENNAN:  Yes, Your Honor.

21             THE COURT:  Doctor, you're excused.  Thank you.

22             THE WITNESS:  Thank you.

23             THE COURT:  Okay.  Who's next?

24             MR. RAO:  The government calls Dr. Barry Levine.

25             THE COURT:  Dr. Barry Levine.  Please come forward,
```

Direct Examination Dr. Barry Levine

1    sir, all the way up here past the jury box to the witness

2    stand.  And then remain standing and face the clerk over here,

3    if you would.

4            THE CLERK:  Please raise your right hand.

5                    DR. BARRY LEVINE,

6    called as a witness, being first duly sworn, was examined and

7    testified as follows:

8            THE WITNESS:  I do.

9            THE CLERK:  Please be seated.  State your name loudly

10    and clearly into the microphone and spell your name for the

11    record.

12            THE WITNESS:  My name is Barry Levine, L-e-v-i-n-e.

13            THE COURT:  Your witness.

14            MR. RAO:  Thank you, Your Honor.

15                    DIRECT EXAMINATION

16    BY MR. RAO:

17    Q    Good morning.

18    A    Good morning.

19    Q    Mr. Levine, what's your occupation?

20    A    I'm chief toxicologist for the Office of the Chief Medical

21    Examiner for the State of Maryland.

22    Q    And what is a toxicologist?

23    A    Toxicology is the study of harmful effects of chemicals on

24    biological systems.  Specifically I'm a forensic toxicologist.

25    A forensic toxicologist applies the principles of toxicology

Direct Examination Dr. Barry Levine

1    for the purposes of the law.

2    Q    How long have you been a forensic toxicologist?

3    A    I have been a forensic toxicologist since 1983.

4    Q    And by whom are you currently employed?

5    A    I'm currently employed by the State of Maryland, the

6    Office of the Chief Medical Examiner.

7    Q    Are you associated with any other institutions right now?

8    A    Yes.  I also work on a part-time basis as a forensic

9    toxicologist for the Armed Forces Medical Examiner.

10   Q    And how long have you been employed by the Office of the

11   Chief Medical Examiner?

12   A    I have been with the Medical Examiner's Office since 1983.

13   Since the end of 1991 I've been chief toxicologist.

14   Q    As chief toxicologist, what are your responsibilities?

15   A    I have two responsibilities as chief toxicologist.  My

16   primary responsibility is to oversee the laboratory that does

17   alcohol, drug, and other toxic substance testing on medical

18   examiner cases, on specimens submitted on medical examiner

19   cases.  I also have a secondary responsibility to oversee the

20   state's drunk and drug driving program.

21   Q    Now, if you could tell us the procedures that are followed

22   by the toxicology laboratory with respect to analysis.

23   A    Yes.  The autopsies are performed by the pathologists or

24   the medical examiners.  In the process of doing their gross

25   examination, they collect biological specimens from the body.

Direct Examination Dr. Barry Levine

1    They label and place the specimens in appropriate containers

2    and then those specimens are sent to the laboratory.

3         Once in the laboratory, we give them a unique number

4    for -- each case gets its own toxicology number.  We document

5    what we receive and compare it to what information is given to

6    us on the toxicology request sheet which accompanies the

7    specimens.

8         We then follow our usual protocol for testing specimens.

9    That protocol includes doing a test for alcohol, drinking

10   alcohol, and other alcohols on all cases.  If the medical

11   examiner or pathologist requests, we will then do some -- we

12   will do testing for drugs.  That process involves testing of

13   drugs for both therapeutic drugs and abused drugs.

14        Depending on the specimens that we receive we'll determine

15   which specimen we select for that screening process.  Any drugs

16   which we identify in our screening process we will then do a

17   quantitation in the -- usually in the blood that's submitted in

18   the case.  The data is -- all the data that is generated on a

19   case is reviewed by myself or by the deputy chief toxicologist.

20   And a report is issued based on the findings.  That report will

21   then go back to the medical examiner of the case.

22   Q    We will talk about that report in a minute.  Before we do

23   that, if you could describe your educational background.

24   A    Yes, I have a bachelor's degree in chemistry from what was

25   then Loyola College and I guess is now Loyola University,

Direct Examination Dr. Barry Levine

1    Maryland.  And a Ph.D. in toxicology from the Medical College

2    of Virginia.

3    Q    And, once upon graduation from the Medical College of

4    Virginia, if you could run through your professional background

5    from that point?

6    A    I received my degree Ph.D. at the end of 1982.  In 1983 I

7    became employed by the Medical Examiner's Office as an

8    assistant toxicologist.  In 1989 I became employed also by the

9    Armed Forces Medical Examiner system.  At that time I was full

10   time with the Armed Forces and part time with the State of

11   Maryland.  In 19 -- the end of 1991 I became chief

12   toxicologist.  And that became a full-time position.  And I

13   went to part time with the Armed Forces Medical Examiner.

14   Q    What licenses and certifications do you hold in your

15   field?

16   A    I am a Diplomate of the American Board of Forensic

17   Toxicology and the American Board of Clinical Chemistry and

18   Toxicology.  To get that status, you need to have an earned

19   Ph.D. in an appropriate science.  You then need to have a

20   certain number of years of experience in the field.  And then

21   you need to pass an exam.  And, once you pass the exam, you

22   receive the diplomate status.  And then you need -- to maintain

23   that status you need to participate in a certain number of

24   hours or points in continuing education every year to maintain

25   it.

Direct Examination Dr. Barry Levine

1    Q    And when were you board certified?

2    A    ABF, the American board of Forensic Toxicology, I was

3    certified in 1986.  The American Board of Clinical Chemistry,

4    1988.

5    Q    Are you affiliated with any universities?

6    A    Yes.  I have an appointment as a clinical associate

7    professor in the department of pathology here at the University

8    of Maryland.

9    Q    And what courses do you teach there?

10   A    I teach a course in forensic toxicology on a rotating

11   basis.  I also teach -- have taught in the basic toxicology

12   course.

13   Q    What else do you spend your professional time on?

14   A    You don't think I'm busy enough?

15   Q    Sounds like you're capable of quite a bit.

16   A    Well, one of the responsibilities of both of my positions

17   involves doing research and education.  So, I've explained the

18   education part of it.  I also conduct a number of -- publish a

19   number of papers in the field in peer reviewed journals.  And

20   I've also edited a book on forensic toxicology.

21   Q    How many articles have you published?

22   A    I believe about over a hundred peer reviewed articles.

23   And that doesn't include the book chapters and review articles.

24   Q    And what sorts of topics did you discuss in these

25   articles?

Direct Examination Dr. Barry Levine

1    A    They've related to different aspects of forensic

2    toxicology.  We've done some work on interpreting morphine

3    concentrations in postmortem specimens, done some papers on

4    alcohol, different case reports on unusual type of drug deaths,

5    drug distribution studies in deceased individuals.

6    Q    How many toxicology examinations have you conducted?

7    A    Well, I've been with the office for almost 29 years.  We

8    average 3500 cases a year.  I've signed or seen just about all

9    of the data -- all the cases since the end of 1991 when I

10   became chief.  So, that's 20 years times 35 -- say at least

11   70,000 cases for the Medical Examiner's Office alone.  And that

12   doesn't include the cases I've reviewed with the Armed Forces

13   Medical Examiner.

14   Q    How often have you testified in court?

15   A    I have testified as an expert witness in toxicology about

16   150 to 200 times in civilian court, military court, Federal

17   Court, and about two-thirds of the counties in this state and

18   Baltimore City.

19   Q    And how many times were you qualified as an expert in the

20   field of forensic toxicology and permitted to give expert

21   testimony?

22   A    Just about all of those were as an expert witness.

23   Q    What subjects did you testify on?

24   A    Interpreting postmortem findings, alcohol results,

25   interpreting drug results, drug analysis, alcohol analysis.

Direct Examination Dr. Barry Levine

1  Q    What awards have you received in the course of your

2  career?

3  A    2009, I received the Gettler Award from the American

4  Academy of Forensic Sciences.  I got an award from a military

5  laboratory organization in the early 90s, as well.

6            MR. RAO:  Your Honor, at this time the government

7  would ask that Dr. Levine be qualified as an expert in the

8  field of forensic toxicology.

9            THE COURT:  Voir dire?

10            MR. BRENNAN:  No voir dire.  And we do not object to

11  Dr. Levine being considered an expert, Your Honor.

12            THE COURT:  Ladies and gentlemen, most witnesses are

13  not permitted to come into court and just offer their opinions

14  about subjects that are in controversy in this case, but

15  there's an exception to that.  We have a special classification

16  of witness called expert witness.  And if a person has the

17  requisite training and experience and qualifications, and if

18  the Court so finds, then that person is qualified as an expert

19  witness.  And that means that they're permitted to offer their

20  opinion on subjects within their expertise that might otherwise

21  be beyond the regular knowledge or experience or education of

22  lay people who are serving on a jury.  And Dr. Levine I find is

23  in this category.  He is qualified as an expert witness.  And,

24  so, he'll now be permitted to give opinion testimony within his

25  field of expertise, which is forensic toxicology.

Direct Examination Dr. Barry Levine

1    Q      (BY MR. RAO)  Dr. Levine, tell the jury:  What is heroin

2    in general terms?

3    A      Heroin is a narcotic.  It is -- the chemical name is

4    diacetylmorphine.  So it's structurally very similar to

5    morphine.

6    Q      And are you familiar with the effects of heroin in the

7    human body?

8    A      Yes.

9    Q      Are there generally accepted scientific principles in your

10   field as to the effects of heroin in the human body?

11   A      Yes.

12   Q      What are some of those general principles?

13   A      Well, narcotics in general, heroin being one of them,

14   is -- the reason why one takes narcotics therapeutically is

15   that it reduces pain.  It's used to treat -- when you have pain

16   you take a narcotic.  It also has some other effects.  The

17   effect that heroin will also cause a euphoric effect.  So that

18   means, when one takes it, one gets a good feeling associated

19   with it.

20          There's also a -- the downside effects to using narcotics

21   is that they can cause central nervous system depression.

22   Meaning depressing the brain's ability to function compared to

23   its abilities normally.  In certain cases when the morphine or

24   the narcotic concentration is high enough, the breathing center

25   in the brain is depressed, meaning that the drug causes you to

Direct Examination Dr. Barry Levine

1   stop breathing.  And, once you stop breathing, you die.

2   Q    What factors affect the precise effects in a particular

3   case?

4   A    Well, there are individual differences to the effects.  Of

5   course, the dose can affect the degree of CNS, central nervous

6   system depression.  How one administers the drug can also -- or

7   how one takes the drug can also be an effect, have an effect.

8   Also one's tolerance:  How often one uses the drug; how used to

9   the drug one is can also affect the individual differences as

10  to the effects of the drugs.

11  Q    What are some of the common side effects from heroin use?

12  A    The primary side effect in living people is the fact that

13  it causes central nervous system depression.  So you get -- you

14  feel drowsy.  It also can cause nausea and vomiting.  And,

15  again, if the dose is too high or there's too much in your

16  system, it can cause you to stop breathing.

17  Q    In your experience, when do these kind of side effects

18  typically occur?

19  A    It's really a function of how the drug is administered.

20  If, for example, the drug is administered intravenously, so put

21  directly into the blood stream, the effects can start occurring

22  very rapidly.  If one takes the drug by mouth, the effects can

23  take somewhat longer to materialize.

24  Q    Based upon your training and experience, would someone

25  using heroin and then falling asleep thereafter and then not

Direct Examination Dr. Barry Levine

1  waking up, being entirely nonresponsive, would that be

2  consistent with heroin intoxication?

3  A    Yes.

4  Q    Based upon your training and experience, would someone

5  using heroin, again, falling asleep and not waking up -- excuse

6  me, I'm sorry.  Using cocaine, falling asleep, and then not

7  waking up or being entirely unresponsive, would that be

8  consistent with a cocaine overdose?

9  A    Generally not.  Cocaine is a -- unlike narcotics or like

10  heroin, cocaine is a central nervous system stimulant.  So, you

11  would have increase in brain activity.  Cocaine can cause death

12  in a number of ways.  It can cause -- even in what would be

13  considered recreational doses it can cause the heart to start

14  beating irregularly, which can cause death.  Cocaine in large

15  amounts can actually cause increased central nervous system

16  stimulation leading to seizures, and seizures can cause death.

17  But generally one doesn't die from cocaine as a result of just

18  falling asleep.

19  Q    What's the typical duration of the effects of heroin?

20  A    Well, it's a function of the dose.  Generally the effects

21  of heroin last for a few hours.

22  Q    How quickly could the effects on -- how quickly could the

23  onset of the effects of heroin arrive?

24  A    Well, if the drug is administered intravenously, the

25  effect can be within minutes.  Because the intravenous method

Direct Examination Dr. Barry Levine

1    of getting the drug into the body introduces the drug directly

2    into the bloodstream.  And, once directly into the bloodstream,

3    the blood is circulated throughout the body and very rapidly

4    reaches the brain where it has its effect.

5    Q    Mr. Levine, were you requested to provide assistance with

6    the examination of some specimens obtained from a deceased

7    individual by the name of Harrison Waite in March of 2009?

8    A    Yes.

9    Q    Did you, in fact, respond to that request?

10   A    Yes.

11   Q    And did you supervise and participate in the examination

12   of certain blood and urine specimens taken from that deceased

13   individual?

14   A    Yes.

15   Q    Who did you assist with that examination?

16   A    The specimens were collected, or the collection was

17   overseen by -- the medical examiner of that case was Dr.

18   Vincenti.

19   Q    Was that Dr. Donna Vincenti?

20   A    Yes.

21   Q    Now, what steps did you take to assist Dr. Vincenti with

22   her examination?

23   A    After her -- she performs the gross part of her autopsy,

24   she submits -- she collects samples and submits them to the

25   laboratory.

Direct Examination Dr. Barry Levine

1   Q    When you say gross part of her autopsy, what are you

2   referring to?

3   A    The part where she actually looks at the specimens as

4   she -- as she performs the dissection.  Gross, as opposed to

5   microscopic.  She may, depending on the case, may also look at

6   different tissues and organs under the microscope.  When I say

7   gross, she actually visually looks at specimens during the

8   autopsy process.

9   Q    Okay.  And then once that's conducted what is your

10  involvement?

11  A    The laboratory's involvement at her request is to do a

12  drug screen on the case.  As I said earlier, we do alcohol in

13  every case, so she gets that automatically.  Because of the

14  nature of the case in her opinion she wanted to have drug

15  testing done.  So, as a result, since she wanted the drug

16  testing done, the laboratory followed its protocol in

17  performing the drug testing.

18  Q    And what -- what drugs are screened for in the initial

19  drug test?

20  A    The initial drug screen looks for a large number of --

21  large cross section of both therapeutic and abused drugs.  For

22  instance, we look for narcotics such as morphine, codeine,

23  hydrocodone, Oxycodone.  We look for a number of drugs that are

24  prescribed therapeutically as narcotics.  We also look for a

25  number of other therapeutic drugs such as antidepressants,

Direct Examination Dr. Barry Levine

1   neuroleptic drugs, antihistamines, some cardioactive drugs.

2   So, we look for a large group of therapeutic drugs.

3       We also will look for a large group of abused drugs,

4   including cocaine, Phencyclidine, Ecstasy, amphetamine,

5   methamphetamine.  And, of course, we look for morphine and

6   6-acetylmorphine as indicators of heroin use.

7   Q    And, the drug screen you're talking about, what substance

8   is actually being tested?

9   A    Could you repeat the question?

10  Q    What substance is being tested?  Are you looking at blood?

11  Are you looking at urine?

12  A    The specimen that we select depends on the specimens that

13  we receive.  Usually we will look for drugs in urine initially

14  to do a screening.  Drugs are present in higher concentrations

15  in the urine, so it's easier to find them.  Plus drugs are

16  usually present in the urine for a longer period of time.  So,

17  again, it's easier to find them.  Any drugs that we identify in

18  the urine we will then go to the blood and perform a

19  quantitation.

20  Q    And are those the steps that were conducted in this case?

21  A    Yes.

22  Q    Showing you what's been marked as Government's Exhibit

23  R5B.

24            THE COURT:  R5B.

25  Q    (BY MR. RAO)  What is that?

Direct Examination Dr. Barry Levine

1    A    This is a copy of a toxicology report that would have been

2    issued back to Dr. Vincenti on Mr. Waite.

3    Q    Can you see the date in the left-hand corner?

4    A    The date is Friday March 27th, 2009, which would have been

5    the date that the report was signed.

6    Q    And is that your signature in the corner?

7    A    Yes, it is.  In the left corner.  To the right is Dr.

8    Vincenti's.

9    Q    And does this report truly and accurately reflect results

10   of the testing that you conducted at the request of Dr.

11   Vincenti?

12   A    Yes.

13   Q    I want to start with the first line with the words

14   reading, "blood heart," under, "specimen submitted."  What does

15   that refer to?

16   A    One of the specimens that are routinely collected during

17   the autopsy is the blood from the heart.

18   Q    And what kind of test is conducted?

19   A    The first line indicates that -- as in the first line in

20   just about all of our reports -- indicates that the heart blood

21   was tested for ethanol.  And that we did not find any ethanol

22   or drinking alcohol.

23   Q    This is the alcohol test you were referring to previously?

24   A    Yes.  This is what -- we will do this on every case.

25   Q    Now, turning to -- and in this case what was the result of

Direct Examination Dr. Barry Levine

1    that test?

2    A    We did not find any alcohol in the blood.

3    Q    Turning to the second through the sixth lines of this

4    report.  What tests do those lines reference?

5    A    Those lines represent the urine drug screening.  We did

6    our comprehensive testing that I described earlier on the urine

7    specimen that was submitted in this case.  And Lines 2 through

8    6 indicate the positive results -- or, indicate the findings of

9    that drug testing process.

10   Q    And what drugs were detected in that test?

11   A    We found morphine, 6-monoacetylmorphine, codeine, and

12   cocaine and metabolites.

13   Q    And, again, what's morphine?

14   A    Morphine is the narcotic that's detected when someone uses

15   heroin.

16   Q    What about 6-monoacetylmorphine?

17   A    6-monoacetylmorphine is the intermediary between -- that

18   the body produces in between the use of heroin and the

19   production of morphine.  Heroin is converted in the body in a

20   two-step process; first to 6-monoacetylmorphine, and then to

21   morphine.  The significance of finding the 6-monoacetylmorphine

22   in this case is that it indicates that the individual had taken

23   heroin.

24   Q    As opposed to simply taking morphine alone?

25   A    Yes.  Since we all know morphine is a therapeutic drug,

Direct Examination Dr. Barry Levine

```
 1    it's possible -- if someone takes morphine as a result of a
 2    medical prescription, we would pick up morphine, as well.  The
 3    morphine that we detect is not different than the morphine that
 4    we would detect if someone uses heroin.  What's different --
 5    the way we know that heroin was used in this case is that we
 6    find the intermediary between heroin and morphine, the
 7    6-monoacetylmorphine.
 8    Q    Turning to the results immediately below
 9    6-monoacetylmorphine.  "Codeine positive," what was the
10    significance of that?
11    A    We oftentimes find codeine when someone takes heroin.
12    Because the process of making heroin also makes acetylcodeine.
13    And the body will break down acetylcodeine to codeine just the
14    same way the body breaks down the acetylmorphine to morphine.
15    Q    Now, turning now to the last two lines of the urine
16    screen, what substance was detected in the second-to-last line
17    of the urine screen portion of the report?
18    A    Our routine testing process also detected cocaine and
19    metabolites.
20    Q    What are metabolites?
21    A    Metabolites are the biological breakdown product.  As I
22    was describing with heroin, 6-monoacetylmorphine and morphine
23    are biological breakdown products.  Cocaine also has biological
24    breakdown products, different biological breakdown products
25    than heroin will produce.  But in general the body will take --
```

Direct Examination Dr. Barry Levine

1   when a substance is introduced into the body, the body will try

2   to change that chemical structure so as to be better able to

3   get rid of it.  And that process is called metabolism.

4       And we identified two metabolites of cocaine that we

5   routinely detect.  And we just -- by office convention, we call

6   them M metabolites.  So, in our routine testing process we

7   identified cocaine and we also identified two metabolites of

8   cocaine.

9   Q    Now, from the urine test, turning back to the heroin, can

10  you tell when the heroin was last used by the deceased

11  individual?

12  A    Given the fact that we found 6-monoacetylmorphine in the

13  urine, that would suggest that the use had -- last use had

14  probably been within six to eight hours.

15  Q    And why is that?

16  A    6-monoacetylmorphine is rapidly broken down in the body to

17  morphine.  As the time passes between the use of the heroin,

18  the more and more of the 6-monoacetylmorphine is converted into

19  morphine.  And morphine will remain in the body for a longer

20  period of time than the 6-monoacetylmorphine.  The fact that we

21  still found the 6-monoacetylmorphine in the urine suggests a

22  closer time or shorter time frame since last use than had we

23  not found it.

24  Q    From the urine test, is it possible to determine the

25  concentration of heroin, the amount of heroin that was used?

Direct Examination Dr. Barry Levine

1   A     No.

2   Q     How long is cocaine typically present in a person's urine

3   sample?

4   A     Cocaine, one can detect the use of cocaine within -- a

5   positive urine cocaine metabolite will indicate use within the

6   past couple of days at least.  The fact that we found parent

7   drug, again I would shorten the time frame to that.  Again,

8   it's really a function of how much they use.  But generally

9   within the day.  The fact that we found parent drug in the

10  urine suggests that it was -- it was shorter time to last use

11  than a couple of days.

12  Q     Now, moving away from the urine test, what was the next

13  test that was conducted after the urine screen?

14  A     As I described earlier, any positive results in the urine

15  of significance we would then quantitate in the blood.  And we

16  did so in this case.  We don't routinely quantitate

17  6-monoacetylmorphine in the blood, so there wouldn't be a line

18  item for that.  However, we do quantitate the morphine, the

19  codeine, and cocaine and its major metabolite Benzoylecgonine,

20  and they're all quantitated in blood.

21  Q     Again, why were those items selected for quantitation?

22  A     Morphine and codeine, because we found them in the urine

23  is why we would quantitate them in the blood.  Benzoylecgonine

24  we would specifically also quantitate in the blood.  It helps a

25  little bit in the interpretation of the blood cocaine

Direct Examination Dr. Barry Levine

1    concentrations if had, in this case, there been positive blood

2    cocaine.

3    Q    Now, with respect to the first line of the blood heart

4    screen that was conducted subsequent to the urine test, what

5    was the result of that test as to the free morphine that was

6    found?

7    A    When we quantitate morphine in the blood, we quantitate

8    the active form of morphine.  There are two forms of morphine

9    that can be circulating in the body.  There's the free form,

10   which is the active form.  That's the part -- that's the type

11   of morphine that can actually get in the brain and cause the

12   effects that I described earlier.

13        There's also a second type, an inactive type of morphine,

14   which is bound to something, which doesn't have the activity.

15   So, when I say free morphine -- or when we quantitate morphine

16   in the blood, we quantitate the free morphine.

17   Q    What can you tell us about this particular concentration

18   of free morphine in the blood heart specimen?

19   A    This blood free morphine concentration is in the range of

20   morphine concentrations that we see in heroin deaths.

21   Q    Is the concentration shown here necessarily fatal?

22   A    Not necessarily.  There's -- there can be an overlap

23   between drug -- free morphine concentrations that are seen in

24   people that die from heroin deaths, or that will die from -- of

25   other violent type of deaths where this would be an incidental

Direct Examination Dr. Barry Levine

1    finding.

2    Q    But in your experience this concentration is consistent

3    with heroin overdose deaths?

4    A    Yes.

5    Q    Looking at the concentration of heroin in this blood

6    specimen, can you tell how much heroin was ingested by the

7    deceased?

8    A    No, I can't tell you -- it's unreliable to predict the

9    dose from a postmortem blood concentration.

10   Q    Can you tell when the heroin found in the blood heart

11   specimen was ingested by the deceased individual?

12   A    Well, I would use the urine, positive for

13   6-monoacetylmorphine, to give the general time frame of six to

14   eight hours.  That means the use would have been within that

15   six to eight hours.  It doesn't necessarily mean it had to be

16   six or eight hours.

17   Q    So, the time period for ingestion could have been much

18   shorter; is that correct?

19   A    Yes.

20   Q    How short could it have been?

21   A    It could have been minutes.

22        MR. RAO:  No further questions.  Thank you, Your

23   Honor.

24        THE COURT:  Cross-examination.

25        MR. BRENNAN:  Thank you, Your Honor.

Cross-examination Dr. Barry Levine

```
1              CROSS-EXAMINATION
2   BY MR. BRENNAN:
3   Q    Good morning, Dr. Levine.
4   A    Good morning.
5   Q    My name is William Brennan.  And Mr. Cook and I represent
6   Patrick Sweeney in this trial.  And, should I ask you a
7   question that you do not understand, please ask me to repeat
8   it.
9   A    Yes.
10  Q    Now, the -- I guess beginning with the -- well, you told
11  us that both heroin and cocaine can cause a death in an
12  individual, correct?
13  A    Yes.
14  Q    But heroin and cocaine will typically cause a death in
15  opposite ways?
16  A    Yes.
17  Q    In the sense that morphine -- or, excuse me, heroin is a
18  suppressant, that is, it will suppress the central nervous
19  system, the breathing activity in particular, correct?
20  A    Yes.
21  Q    Whereas cocaine is a stimulant.  And that will increase
22  the heart rate and things like that, correct?
23  A    Yes.
24  Q    So, cocaine deaths would be, as you indicated, seizures or
25  irregular heartbeat or the heart beating too fast, correct?
```

Cross-examination Dr. Barry Levine

1   A    Yes.   That's the mechanism of cocaine deaths, either one

2   of those.

3   Q    I'm sorry.  I didn't mean to interrupt or cut you off.

4   But you also know from your experience -- and, indeed, you've

5   got -- you've written monographs about heroin deaths in

6   Maryland, have you not?

7   A    Yes.

8   Q    Okay.  So, you're experienced in that area, Doctor,

9   correct?

10  A    Yes.

11  Q    Okay.  Addicts will sometimes use both heroin and cocaine

12  together, what's known -- and if they inject or they use it

13  together as what's known as a speedball, correct?

14  A    That's correct.

15  Q    And if they smoke it it's known as moon rocks, correct?

16  A    I -- I don't know what it's called.  But I'll take your --

17  I accept that.

18  Q    All right.  I heard about it.

19  A    I would hope so.

20  Q    So, what an addict will sometimes do is -- there are

21  negative effects of taking morphine -- excuse me.  I keep

22  saying morphine.

23       There are negative effects to taking heroin, that is --

24  let me ask it this way:  Heroin will give you a euphoric

25  feeling, correct?

Cross-examination Dr. Barry Levine

1    A    Yes.

2    Q    And you told us about that.  But heroin, if taken in a

3    certain dose, it can also give you what's known as the nod; it

4    will cause you to pass out right away, correct?

5    A    Yes.

6    Q    Okay.  So, addicts will sometimes want to prolong the

7    euphoric effect of heroin and avoid the nod.  So they'll take a

8    stimulant such as cocaine.  And that's where the combination of

9    drugs comes into play, correct?

10   A    Yes.  That's a pharmacological basis for combining.

11   Q    Right.  That's better said than I.  In laymen's terms, the

12   speedball -- the addicts who will then do what's known as a

13   speedball take the heroin to get the euphoric effect and the

14   cocaine to keep them awake so they can have the euphoric effect

15   longer, correct?

16   A    That's effectively true, yes.

17   Q    And the problem that addicts have when they do that is the

18   cocaine effect may wear off sooner than the heroin, correct?

19   A    There has to be very accurate titration of their doses to

20   avoid negative things like death, yes.

21   Q    Right.  So, active titration.  Help us with titrations.

22   A    Well, they need to -- they need -- and the thing is the

23   taking of these drugs in an abuse situation is not an exact

24   science.  Plus they don't necessarily know the exact doses that

25   they're getting.  So, if they were to take too much of one

Cross-examination Dr. Barry Levine

1    versus the other, either one -- the potential positive

2    antagonistic effects can be offset by the negative effects of

3    the -- each one of those drugs individually can produce.

4    Q    Right.  So the problem the addict has or the abuser has is

5    you've got to figure out what the purity of the heroin is,

6    right?

7    A    Yes.

8    Q    And you've got the purity of the cocaine.  And you try to

9    figure it out and take it together.  And, if you don't get it

10   right, bad things can happen such as death?

11   A    Yes.

12   Q    And, so, in a speedball situation where you have both

13   cocaine as well as heroin present, cocaine can contribute to

14   the death in the sense that, if you don't get the dosage right,

15   that can lead to the death; cocaine, as well as just the

16   heroin, correct?

17   A    Yes.

18   Q    Now, one of the effects of heroin is it will cause nausea

19   or vomiting, correct?

20   A    Yes.

21   Q    Okay.  So, a -- and you typically don't see that with

22   cocaine, correct?

23   A    I don't recall that being an effect of cocaine.

24   Q    Okay.  So that the vomiting would be the result of the use

25   of heroin and you typically would not see that with cocaine?

Cross-examination Dr. Barry Levine

1    A    Generally.

2    Q    Now, the effects of heroin are entirely dependant on the

3    dosage and the tolerance of the individual, correct?

4    A    They're two major components, yes.

5    Q    All right.  They would be the two major components,

6    correct?

7    A    The amount used, and one's tolerance.  Route of

8    administration would also probably be a factor.

9    Q    Fair enough.  I meant to mention that.  So, by route of

10   administration, heroin can be smoked, for example?

11   A    Yes.

12   Q    Can be absorbed through the nasal cavities, correct?

13   A    Yes.

14   Q    It can be taken orally?

15   A    Yes.

16   Q    And it can be intramuscular; that is, you just pop it into

17   the muscle, correct?

18   A    Yes.

19   Q    Or it can be injected directly into a vein?

20   A    That's correct.

21   Q    Which would be mainlining?

22   A    Yes.

23   Q    Okay.  So the route of or the manner of ingestion will

24   affect the -- how fast the effects are felt, correct?

25   A    Yes.

Cross-examination Dr. Barry Levine

```
 1   Q    So, I guess the least fast --
 2   A    Slowest.
 3   Q    Slowest.  I haven't had enough coffee.  The slowest would
 4   be taking it orally, correct?
 5   A    Yes.
 6   Q    Okay.  And then what about the nasal cavity versus
 7   intramuscular?
 8   A    I don't know.  They would -- I would say that the
 9   intramuscular and the intranasal would be slower than
10   intravenous or smoking.  Generally smoking is quite rapid;
11   almost as rapid as intravenous.
12   Q    Okay.  But clearly the most rapid, the fastest way for
13   heroin to get in the body, is what they call mainlining or
14   shooting it right into a vein, right into the blood, correct?
15   A    Yes.
16   Q    And that affects it almost immediately because it goes
17   right to the brain --
18   A    Yes.
19   Q    -- and starts affecting the breathing and other mechanisms
20   of the body, correct?
21   A    Yes.
22   Q    Okay.  So, on heroin overdoses or heroin deaths, you have
23   seen situations where, if a person mainlines it or shoots it
24   right into a vein, that person can -- I guess the street phrase
25   would be fall out right away, correct?
```

Cross-examination Dr. Barry Levine

1    A    Yes.  We've had cases of heroin deaths that have been

2    rapid.  And we've had cases of heroin deaths that have been

3    more delayed than that.

4    Q    Okay.  And some of them have been so rapid the needle's

5    still been in the arm; you've seen those, haven't you?

6    A    I haven't seen the needles.  But I've seen the cases where

7    they've found that, yes.

8    Q    Fair enough.  You've seen the cases and you've read the

9    reports?

10   A    Yes, yes.

11   Q    Okay.  So, you cannot tell us, then, based on your

12   pharmacological examination of the toxicology report in this

13   case as to whether or not it was a rapid heroin death in this

14   case or a slow heroin death?

15   A    Beyond the fact that we found 6-acetylmorphine in that

16   time frame that I discussed on direct examination, no, I can't.

17   Q    Okay.  So the speculation -- well speculation.  Could have

18   been fall out, nodded off and fell out right away; or it could

19   have taken -- what's the outside time of a heroin overdose

20   death, Doctor?

21   A    I've seen them reported to be out 8, 10 hours.

22   Q    Okay.

23   A    So, that can be -- that would probably -- I've read and

24   we've had cases where they've been almost instantaneous and

25   then we've had more delayed deaths.

Cross-examination Dr. Barry Levine

1   Q    Okay.  Now one of the, I guess, factors that -- not

2   necessarily within the ambit of your expertise, but maybe -- is

3   the condition of the body when the body is found.  That is,

4   whether or not the body has been dead for a while or cool to

5   the touch, for example?

6   A    What would impact the toxicology examination --

7   Q    Right.

8   A    -- would generally be whether the body was fresh versus

9   decomposed.

10  Q    And --

11  A    And, when I say fresh, you know, I'm talking about death

12  has occurred within hours and then transported to a facility

13  where the body is refrigerated.

14  Q    Okay.  So, based on your toxicology examination in this

15  case, Doctor, you cannot tell the ladies and gentlemen of the

16  jury how long it took the heroin to suppress the central

17  nervous system in this case can you, Doctor?

18  A    I can't tell you whether the death occurred within minutes

19  or hours.

20  Q    You cannot?

21  A    That's correct.

22           MR. BRENNAN:  Okay.  Court's indulgence a moment,

23  Your Honor.

24  Q    (BY MR. BRENNAN)  So, do you have -- all right.  This is

25  the -- what's known as the tox record in this case; is that

Cross-examination Dr. Barry Levine

1    correct, Doctor?

2    A    Yes.

3    Q    And we can clearly rule out ethanol -- meaning alcohol --

4    as a contributing factor, correct?

5    A    Yes.

6    Q    And, as you said, the following drugs appear in the urine,

7    in the morphine.  The 6-monoacetylmorphine, which is a

8    breakdown of heroin, correct?

9    A    Yes.

10   Q    The codeine.  And we also again show cocaine as a

11   contributing factor, correct?

12   A    We show the presence of cocaine in the urine.

13   Q    Presence of cocaine in the urine.  Correct.  Fair enough.

14   All right.  Now, this number right here, the 230, okay, Mr. Rao

15   asked you a question, I believe he phrased it about in the

16   range.  What did you mean by range?  I mean, what does that

17   number really say to us, if anything?

18   A    What it says is that this blood morphine -- free morphine

19   concentration is in the range where, in the absence of any

20   other findings from the pathologist, that this amount of --

21   that it means that the heroin or the morphine could have

22   accounted for death.

23   Q    All right.  And is that range as low as 75 and as high as

24   375?  Or what is that range?  Or do you know?

25   A    It can vary.  We've had concentrations that have accounted

Redirect Examination Dr. Barry Levine

1    for death as low as 50 micrograms per liter.

2    Q    Okay.

3    A    We've also had some much higher.  Most of the cases that

4    we see have a free morphine concentration in heroin deaths of

5    between 100 and 300, 400 micrograms per liter.  So, that's why

6    I said this was in the range that we usually see.

7    Q    Okay.  But a death -- you have seen cases where death

8    could occur with as little as 50 micrograms per liter in the

9    blood, correct?

10   A    Yes.

11   Q    And also on the high end did you say 4, 500 micrograms?

12   A    We've seen them over a thousand.

13   Q    Over a thousand?

14   A    Yes.

15   Q    Okay.  So, again, this number on this range can't -- you

16   can't really extrapolate from this number here of 230 what the

17   actual dosage of the heroin was; is that correct, Doctor?

18   A    That's correct.

19            MR. BRENNAN:  Court's indulgence, Your Honor.

20            THE COURT:  Yes.

21            MR. BRENNAN:  Nothing further, Your Honor.  Thank

22   you.

23            THE COURT:  Redirect.

24                    REDIRECT EXAMINATION

25   BY MR. RAO:

Redirect Examination Dr. Barry Levine

1   Q    Dr. Levine, on cross defense counsel asked you about the

2   concept known as speedballing or using cocaine and heroin in

3   conjunction to achieve a desired effect.

4   A    Yes.

5   Q    Based upon your training and experience, would somebody

6   using heroin and a little bit of cocaine, as well, and then not

7   waking up, would that be consistent with an overdose from

8   heroin or from cocaine?

9             MR. BRENNAN:  Objection, Your Honor.

10            THE COURT:  What's the basis for the objection?

11            MR. BRENNAN:  Foundation, Your Honor.

12            THE COURT:  Well, no, I'm going to overrule it if the

13   doctor can answer it.  The question, that I have a little

14   trouble with the question.  But perhaps, Doctor, you can answer

15   it.

16            THE WITNESS:  The symptomatology -- the symptoms that

17   you're describing are more consistent with a heroin overdose.

18   Q    (BY MR. RAO)  And in terms of mainlining heroin, injecting

19   it directly into the vein, are your findings in this case

20   consistent with somebody mainlining heroin?  That is, injecting

21   it directly into the vein?

22   A    I can't specify the route of administration.  But

23   intravenous injection would be one way that -- would be

24   consistent with the findings of this tox report.

25   Q    With the results that we see here?

Redirect Examination Dr. Barry Levine

1   A    Yes.

2   Q    Now, you testified that the outside range of time in which

3   someone could potentially have consumed heroin and then

4   overdose would be in the neighborhood of up to 10 hours on the

5   outer edge; is that correct?

6   A    Yes, that's what I've read in the scientific literature.

7   It's in that range.  We usually -- from the lab's point of

8   view, we identify the -- the drugs in the biological material.

9   And then we would report back to the medical examiner.  And

10  then they make their ruling.  And we wouldn't necessarily get

11  involved as to whether this was a rapid death or a delayed

12  death.  The medical examiner would rule the death due to the

13  heroin.

14  Q    But if that were to occur, if the heroin would have been

15  ingested on the outer edge, about 10 hours, would some of the

16  effects of the use of heroin be visible during that intervening

17  10-hour period before the death actually occurred?

18  A    Yes.  I would expect to see the CNS depression.

19  Q    Okay.  The CNS depression, you're referring to some of the

20  central nervous signs?

21  A    Yes.

22  Q    The clammy skin, the sleepiness?

23  A    Yes.

24          MR. RAO:  No further questions, Your Honor.

25          THE COURT:  May this witness be excused?

Direct Examination Dr. Donna M. Vincenti

```
 1             MR. BRENNAN:  Yes, Your Honor.

 2             THE COURT:  Government?

 3             MR. RAO:  Yes.

 4             THE COURT:  Doctor, you're excused.  Thank you.  Next

 5   government witness.

 6             MR. RAO:  The government calls Dr. Donna Vincenti.

 7             THE COURT:  Please come forward, ma'am all, the way

 8   to the witness stand.  Remain on your feet and face the clerk.

 9             THE CLERK:  Please raise your right hand.

10                     DR. DONNA MARIE VINCENTI,

11   called as a witness, being first duly sworn, was examined and

12   testified as follows:

13             THE WITNESS:  Yes.

14             THE CLERK:  Please be seated.

15             THE WITNESS:  Thank you.

16             THE CLERK:  State your name loudly and clearly into

17   the microphone and spell your name for the record.

18             THE WITNESS:  Donna Marie Vincenti.  And that's

19   V-i-n-c-e-n-t-i.

20             THE CLERK:  Thank you.

21             THE COURT:  Your witness.

22             MR. RAO:  Thank you, Your Honor.

23                      DIRECT EXAMINATION

24   BY MR. RAO:

25   Q    Dr. Vincenti, where are you currently employed?
```

Direct Examination Dr. Donna M. Vincenti

1    A    At the Office of the Chief Medical Examiner in Baltimore,

2    Maryland.

3    Q    How long have you been employed there?

4    A    Approximately -- or almost six years.

5    Q    Are you a medical doctor?

6    A    Yes.

7    Q    And are you a licensed physician?

8    A    Yes.

9    Q    Now, describe your educational background and training.

10   A    Well, I received my undergraduate degree from St. Mary's

11   College of Maryland, and my medical degree from Ross University

12   School of Medicine.  I then went to Albany Medical Center for

13   my pathology residency.  And from there I went to the Office of

14   the Chief Medical Examiner to do my fellowship in forensic

15   pathology.  And that is where I currently work, which is the

16   Medical Examiner's Office.

17   Q    And what are your day-to-day responsibilities as a medical

18   examiner?

19   A    Well, at the Medical Examiner's Office we perform

20   autopsies; we determine cause and manner of death; and generate

21   reports based on our findings.

22   Q    And approximately how many autopsies have you conducted?

23   A    It's a little over 1800.

24   Q    What's the term forensic pathology, what does that mean?

25   A    Well, pathology by itself is the study of diseases and

Direct Examination Dr. Donna M. Vincenti

1  disease processes.  So that was the original training.

2  Forensic pathology is a subspecialty of that.  We also look at

3  natural disease processes, but we also look at cases that

4  involve trauma.

5  Q    Are you a member of any specialized medical scientific

6  groups or associations?

7  A    A few, yes.

8  Q    And what are those?

9  A    The American Academy of Forensic Sciences, the United

10  States and Canadian Academy of Pathologists, the College of

11  American Pathology, and the American Society of Clinical

12  Pathologists.

13  Q    Have you been granted any board certifications?

14  A    Yes.  I'm board certified in forensic as well as anatomic

15  pathology.

16  Q    And in -- have you authored any publications in the field

17  of pathology?

18  A    Not in the field of pathology.

19  Q    In any scientific publications in general?

20  A    Yes.  From undergrad; undergraduate school.

21  Q    Now, in what courts -- have you testified before as an

22  expert in forensic pathology?

23  A    Yes.

24  Q    And in what courts did you testify as an expert in

25  forensic pathology?

Direct Examination Dr. Donna M. Vincenti

1    A    I've testified in 11 counties in the State of Maryland

2    including Anne Arundel, Baltimore City as well Baltimore

3    County, Carroll County, Calvert County, Cecil County, Howard

4    County, Prince George's County, Montgomery County, Washington

5    County, and St. Mary's County.  In addition to that, I've

6    testified in Washington, D.C. and Federal Court here in the

7    city.

8    Q    And on those occasions were you certified as an expert in

9    forensic pathology?

10   A    Yes.

11             MR. RAO:  Your Honor, I'd ask that Dr. Vincenti be

12   declared an expert in the field of pathology.

13             THE COURT:  Voir dire?

14             MR. BRENNAN:  No, thank you, Your Honor.  We agree

15   Dr. Vincenti is an expert.

16             THE COURT:  Dr. Vincenti is so qualified and may give

17   expert opinion testimony.

18   Q    (BY MR. RAO)  Dr. Vincenti, calling your attention to

19   March 24th of 2009.  Did you have occasion to perform an

20   autopsy on that date?

21   A    Yes.

22   Q    And was that autopsy performed on an individual identified

23   as Harrison Waite?

24   A    Yes.

25   Q    And did you prepare a written report as a result of that

Direct Examination Dr. Donna M. Vincenti

1    autopsy?

2    A    Yes.

3    Q    I show you what's been marked as Government's Exhibit R5.

4    R5 and R5A.  Excuse me.  To be clear, I'm showing Exhibit R5A.

5    Do you recognize that?

6    A    Yes.

7    Q    And what is that?

8    A    That is the front page of the autopsy report on Mr. Waite.

9    Q    And do you have a copy of that report in front of you, as

10   well?

11   A    I do.

12   Q    If you could describe for the Court the general protocol

13   followed when you are given a body to examine such as that of

14   Mr. Waite.

15   A    During the course of an autopsy we do what's known as an

16   external examination and an internal examination.  The external

17   examination means we look at the outside of the body.  So, we

18   document everything from hair color to scars, any trauma that

19   they may have.

20        The internal examination means that we do have to open up

21   the body to look at the organs inside.  We're looking for any

22   natural diseases or trauma.  That also involves looking at the

23   brain, so we do have to open up the head to do that.

24        We document what we see during the course of those

25   examinations.  Fluid and specimens are also taken for

Direct Examination Dr. Donna M. Vincenti

1   toxicology at this time.

2   Q    In this case can you describe what observations you made

3   upon conducting the initial external examination of Mr. Waite?

4   A    So, during the external examination we had a young man who

5   looked like he was the stated age, which was 29 years old.  He

6   weighed 183 pounds and he was 6 feet in height.  He had a few

7   scattered scars here and there.  A few tattoos.  Some small

8   abrasions here and there.  Nothing that was really big.  Some

9   of those abrasions were healing, so they were older; some of

10  them were a little more fresh.

11       Also there were -- there was evidence of medical

12  intervention, which means that, you know, during the course of

13  emergency resuscitation the emergency personnel will try and,

14  you know, shock them back to life or put a tube down their

15  throat.  So, we document anything that they left behind.

16  Q    Among the findings did you note an abrasion on the left

17  side of his forehead --

18  A    Yes.

19  Q    -- on the external examination?

20  A    I'm sorry.  Yes.

21  Q    Any other evidence of trauma visible on the body from your

22  external examination?

23  A    Well, he had the abrasion on the left side of the

24  forehead.  He had an abrasion on his right wrist.  He had two

25  bruises on the right arm.  He had another bruise that was on

Direct Examination Dr. Donna M. Vincenti

1    the right elbow.  And two small abrasions that were on the back

2    of the right hand.

3    Q    All right.  Were these -- any significant trauma or

4    significant -- any signs of significant impact of any kind?

5    A    No.

6    Q    Your report also makes note to blood-tinged foaming around

7    the oral cavity.  What is that consistent with?

8    A    Usually when we see someone that has foam either coming

9    out of the mouth or nose, it's referred to as a foam cone,

10   because it does literally look like a cone coming out of the

11   nose or mouth.  That indicates usually some sort of pulmonary

12   edema or an increase of fluid in the lungs.

13   Q    What manner of death is that typically associated with,

14   again?

15   A    Manner?

16   Q    Manner of death, yes.  A pulmonary edema, what is that?

17   A    A buildup of fluid in the lungs can be caused by a variety

18   of things.  As far as causes of death, it can be from someone

19   who is in chronic heart failure, it can be from narcotic

20   overdose.  Sometimes people who have near-drowning episodes can

21   have pulmonary edema.  There are a variety of reasons.

22   Q    So, upon concluding your external examination, did you

23   then do an internal observation of the body?

24   A    Yes.

25   Q    And what observations did you make when conducting that

Direct Examination Dr. Donna M. Vincenti

1   internal examination?

2   A    During the internal examination the most pertinent

3   findings were that his lungs were very heavy, which goes along

4   with the pulmonary edema or the fluid in the lungs.  And

5   therefore goes along with the foam cone that we saw.  His heart

6   was slightly heavier than normal.  And I think those were

7   actually the main findings, but the most important was the

8   heaviness of the lungs.

9   Q    Was there any internal evidence of blunt force or any kind

10  of penetrating injury?

11  A    No.

12  Q    And directing your attention specifically to the portion

13  of the report referred to as respiratory system, in that area

14  what specific observations did you make?

15  A    Well, we had the weight of the lungs, which was very

16  heavy.  Normally the lungs can be anywhere between 3 to 500

17  grams.  And his right lung weighed 1090 grams and his left

18  weighed 780 grams.  There was also some of this foam that we

19  saw on the external examination in the upper airway, which

20  means like in the trachea, in the bronchi that are going down

21  into the lungs.

22  Q    Okay.  In addition to the physical examination portion of

23  the autopsy, was laboratory work also done in this case?

24  A    Yes.

25  Q    And what kind of laboratory work was that?

Direct Examination Dr. Donna M. Vincenti

1    A    We had fluid collected for toxicologic analysis.

2    Q    And what kind of fluids were collected?

3    A    We had heart blood as well as urine in this case.

4    Q    And where were those samples taken?

5    A    The blood was taken from the heart, and the urine was

6    taken from the urinary bladder.

7    Q    And who examined -- was any examination conducted of those

8    samples?

9    A    Then the -- once the samples are taken, they go up to our

10   toxicology lab, which is also in the medical examiner's office.

11   Q    And did they prepare a report in connection with the

12   autopsy?

13   A    They did.

14   Q    Let me show you Government's Exhibit R5B.  Do you

15   recognize that?

16   A    Yes.

17   Q    Okay.  Is that the toxicology report that was associated

18   with the autopsy examination that you conducted?

19   A    Yes.

20   Q    Now, did you examine that toxicology report as part of

21   your autopsy?

22   A    Yes.

23   Q    And what did you notice upon examining that report?

24   A    Well, looking at this report, if you look at the samples

25   that are under where it says blood heart, which is referring to

Direct Examination Dr. Donna M. Vincenti

1    the heart blood, there's the presence of free morphine.  And

2    then looking at the urine samples, you can also see that the

3    morphine is positive.  In addition to that we have

4    6-monoacetylmorphine, which is positive; codeine, which is

5    positive; and cocaine and metabolites, which is positive.

6    Q    What role did the findings of the toxicology report

7    ultimately play in your examination?

8    A    Well, the findings of the autopsy report definitely went

9    in conjunction with the findings in the toxicology.

10   Q    Now, this toxicology report that you have before you

11   reflects the presence of cocaine in the system; is that right?

12   A    In the urine.

13   Q    In the urine.  Did you form an opinion to a degree of

14   reasonable medical certainty as to whether cocaine contributed

15   to the death in this case?

16   A    Well, we do refer to our forensic toxicologist when we're

17   interpreting the findings of a toxicology report.  And the

18   absence of cocaine or its metabolites in the heart blood

19   indicated that it did not play an effect -- play a role, excuse

20   me.

21              THE COURT:  I'm sorry, ma'am?

22              THE WITNESS:  Play a role.  I didn't mean to say play

23   an effect.

24              THE COURT:  You're saying it did or did not play a

25   role?

Direct Examination Dr. Donna M. Vincenti

1          THE WITNESS:  It did not --

2          THE COURT:  It did not play a role?

3          THE WITNESS:  -- play a role, excuse me.

4   Q    (BY MR. RAO)  Based upon the completed autopsy that was

5   then conducted, in totality, within the bounds of reasonable

6   medical certainty did you form an opinion as to the cause of

7   death in this case?

8   A    Yes.

9   Q    And what was that opinion?

10  A    Heroin intoxication.

11  Q    How did you form that opinion?  What kind of diagnosis was

12  that?

13  A    Well, it was based on the combined findings of the autopsy

14  itself and the toxicology and the circumstances surrounding the

15  death.  Every time we have a case, we look at all of those

16  elements to determine cause and manner of death.

17       Now, in this case we have a 29-year-old otherwise healthy

18  man, who at autopsy doesn't have significant trauma, and he

19  does not have a significant disease process.  There's no sign

20  of an acute natural disease, for example, a stroke.  And

21  there's no sign of a chronic disease that led to an acute issue

22  or an acute cause of death.

23       That in combination with the toxicology report that shows

24  us that he has morphine in his system, and =6-mam or

25  6-monoacetylmorphine in the urine, which is a breakdown product

Direct Examination Dr. Donna M. Vincenti

1   of heroin.  And then discussing those findings with our

2   forensic toxicologist, all of that led to the cause of death.

3   Q    So, is there a particular set of symptoms or findings that

4   are required in order for a forensic pathologist to diagnose

5   the cause of death as heroin intoxication?

6   A    There's no set of symptoms that are required.

7   Q    Would the description of someone being nonresponsive but

8   with vomit coming out of them be consistent with the diagnosis

9   of heroin intoxication?

10  A    Yes.  That could be consistent yes.

11  Q    Would the description of somebody nodding off, falling

12  asleep, and never waking up, would that be consistent with a

13  diagnosis of heroin intoxication?

14  A    Yes.

15  Q    After somebody passes away, what happens to the gastric

16  contents, typically?

17  A    Well, when someone passes away we could have a few things

18  happen.  The muscles in the body are all relaxed now after

19  death.  So, the sphincter that's keeping the gastric contents

20  in the stomach, that's now open.  So, the gastric contents can

21  move up and down the food tract basically without being stopped

22  by the sphincter.  So, the stomach contents can move from the

23  stomach.

24  Q    Could rolling or moving a body cause the stomach contents

25  to come out of the mouth?

Direct Examination Dr. Donna M. Vincenti

1   A    Yes, that could definitely happen.

2           MR. RAO:  No further questions.  Thank you.

3           THE COURT:  Cross-examination?

4           MR. BRENNAN:  Thank you, Your Honor.

5           THE COURT:  Actually, Mr. Brennan, looking at the

6   time I see that it's a little past 11:00 o'clock.  Why don't we

7   take the morning break before we begin the cross-examination.

8   So, 15 minutes, ladies and gentlemen.

9       During that time, as I cautioned you yesterday, please do

10  not discuss the case with anyone.  Do not discuss the case even

11  among yourselves.  You must wait until after you've heard all

12  of the evidence, the closing arguments, and my instructions as

13  to the law before you begin to discuss and deliberate on this

14  case.

15      Do not look at any news articles or reports that touch

16  upon this case or the issues that it presents or any articles

17  or reports that relate to any of the participants in the case.

18  Avoid all contact with any of the participants in the trial.

19  Do not make any independent investigation of the law or the

20  facts of the case.  Do not look up anything related to this

21  case on the Internet.  Do not consult an encyclopedia or a

22  dictionary.  15-minute recess.

23           (Jury left the courtroom.)

24           THE COURT:  Ms. Griffith will provide you with copies

25  of the proposed jury instructions and verdict form.  15

Direct Examination Dr. Donna M. Vincenti

1   minutes.

2               (A recess was taken.)

3               THE COURT:  Be seated, please.  Any matters to take

4   up outside the jury?

5               MS. JOHNSTON:  No, Your Honor.

6               THE COURT:  Both sides have received copies of the

7   proposed instructions and verdict form, correct?  Ms. Johnston?

8               MS. JOHNSTON:  Your Honor, I didn't see the verdict

9   form.  Maybe I missed it.

10              THE COURT:  No problem.  We'll get that to you before

11  lunch.  But you did get the instructions, true, Mr. Brennan?

12              MR. BRENNAN:  We did, yes, Your Honor.

13              THE COURT:  Very good.

14              MR. BRENNAN:  And I'm going show the witness, Your

15  Honor, a photograph that's on my iPad.  I will print it out

16  later because I prefer not to make my iPad an exhibit, Your

17  Honor.  So, I will print it --

18              THE COURT:  Dangerous, Mr. Brennan.  It could become

19  very expensive.  Without objection?

20              MS. JOHNSTON:  No.  Well, we'll see what -- yeah, I

21  don't --

22              THE COURT:  Well, you've seen the image.

23              MS. JOHNSTON:  We've seen the image.  I don't know

24  what the questions are going to be.

25              THE COURT:  But, as to the image itself, we're on the

Direct Examination Dr. Donna M. Vincenti

1    record right now, can we agree that this image is to be

2    received in evidence?

3            MS. JOHNSTON:  Provided that the witness recognizes

4    it and agrees that it's what --

5            THE COURT:  Well, what's it a picture of?

6            MR. BRENNAN:  Well, I'll approach the witness ask the

7    witness first and then come back and --

8            MS. JOHNSTON:  I don't anticipate any problems with

9    it, Your Honor.

10           THE COURT:  All right.  And strategically you would

11   prefer to handle it that way rather than do it right now and

12   get it taken care of?

13           MR. BRENNAN:  I can do it right now, Your Honor.

14           THE COURT:  Given the odd method of presentation, I'd

15   prefer to just get it dealt with.

16       What is this?  A picture from a journal or something?

17           MR. BRENNAN:  Yes, Your Honor.  I'm going ask the

18   doctor about the antecubital fossa and if she recognizes that.

19   Antecubital fossa.

20           MR. RAO:  Your Honor, that's fine with the

21   government.

22           THE COURT:  So, you're not going to object to the

23   admission of this image?

24           MR. RAO:  No, Your Honor.

25           THE COURT:  All right.  So, this will be labeled,

Cross-examination Dr. Donna M. Vincenti

```
1    what?  Marked what.  Defendant's --
2              MR. COOK:  Defendant's Exhibit 3, Your Honor.
3              THE COURT:  Defendant's 3.  And it's received in
4    evidence.  And it's a photo of -- I'm going to say a needle in
5    an arm, because I'm -- I have no medical training.
6              THE WITNESS:  That's what I thought too, Your Honor.
7              THE COURT:  Okay.  Defense Exhibit No. 3 is received.
8         Let's bring the jurors in.
9              (Jury entered the courtroom.)
10             THE COURT:  Be seated, please.
11             MR. Brennan, cross-examination.
12             MR. BRENNAN:  Thank you, Your Honor.
13             THE COURT:  Doctor, of course you remain under oath.
14             THE WITNESS:  Yes, sir.
15                           CROSS-EXAMINATION
16   BY MR. BRENNAN:
17   Q    Good morning, Doctor.
18   A    Good morning.
19   Q    My name is William Brennan.  Mr. Cook and I represent
20   Patrick Sweeney in this case.  I'm going to ask you some
21   questions.  And should I ask you a question you do not
22   understand, please ask me to repeat it.
23   A    Okay.
24   Q    Now, when -- in your role as a physician at the Office of
25   the Chief Medical Examiner and you do an autopsy, you do two
```

Cross-examination Dr. Donna M. Vincenti

1   things:  You diagnose, if you will, the cause of death, and

2   classify the manner of death, correct?

3   A    Correct.

4   Q    Okay.  And that's -- there are two separate concepts; is

5   that correct?

6   A    Correct.

7   Q    Okay.  And you have identified -- I think it's before you,

8   Doctor -- Government's Exhibit R5A.  Do you have that in front

9   of you?

10  A    Yes.

11  Q    Okay.  And so we have the cover sheet.  And on the cover

12  sheet we show that the body was found at 10:38 p.m. on the --

13  March 23rd, 2009, correct?

14  A    Correct.

15  Q    Okay.  And then you have the cause of death, which we will

16  talk about, which was heroin intoxication, correct?

17  A    Correct.

18  Q    And the manner of death you have a number of choices.  It

19  can be natural; it can be accidental; it can be suicide; it can

20  be homicide; or it can be undetermined.  And you have checked

21  the box "undetermined" as to the manner of death, correct,

22  Doctor?

23  A    That is correct.

24  Q    Okay.  And the -- how injury occurred, you have concluded

25  that it is unknown how the injury occurred; is that correct?

Cross-examination Dr. Donna M. Vincenti

1  A    Correct.

2  Q    All right.  And then when you go to the last page -- and,

3  I'm sorry, I highlighted my copy.  But the -- again you said

4  that the -- there we go, heroin intoxication.  Which is what

5  your diagnosis was, or cause of death, excuse me.  Manner of

6  death is undetermined.  And then you noted that postmortem

7  toxicology testing for drugs was positive for morphine which

8  was found in both the heart blood and the urine.  Metabolic

9  heroin, which is the 6-monoacetylmorphine, which is the

10 breakdown of the heroin correct?

11 A    Correct.

12 Q    That was found in the urine, the metabolic heroin.  And

13 then codeine in the urine and cocaine and metabolites positive

14 in the urine, as well, correct?

15 A    Correct.

16 Q    And you told us that you also in reaching your diagnoses

17 did so in conjunction with a forensic toxicologist who's also

18 an employee of the Office of the Chief Medical Examiner,

19 correct?

20 A    Correct.

21 Q    And that would be Dr. Barry Levine, who his specialty is

22 he's the chief toxicologist for the State of Maryland, correct?

23 A    Correct.

24 Q    Okay.  And you've heard -- have you heard the term

25 speedball, what a speedball is?

Cross-examination Dr. Donna M. Vincenti

1    A    Yes.

2    Q    All right.  That's a combination of both cocaine and

3    heroin, correct?

4    A    Correct.

5    Q    And the reason an addict or someone using drugs would use

6    a speedball is heroin would have a euphoric effect, that is

7    sort of suppress the central nervous system; and, if taken in

8    sufficient quantity would cause them to nod out or pass out, if

9    you will, correct?

10   A    Correct.

11   Q    Cocaine, on the other hand, is a stimulant which keeps the

12   central nervous system activated.  So, if you use the two in

13   conjunction with one another, that is, use the heroin for the

14   euphoric effect and the cocaine for the stimulant effect, you,

15   in effect, stay awake and get the benefit of the euphoric

16   effect of the heroin; and the cocaine causes you to do that,

17   correct?

18   A    Correct.

19   Q    All right.  So, if a person were using both cocaine and

20   heroin at the same time, then cocaine would be a contributing

21   factor to the person's reaction to the heroin, correct?

22   A    Could you repeat that?

23   Q    Sure.

24   A    I'm sorry.

25   Q    That might be one of the questions I said you may not

Cross-examination Dr. Donna M. Vincenti

1    understand.

2    A    Okay.

3    Q    Let me rephrase it --

4    A    Okay.

5    Q    -- in this fashion.

6    A    Thank you.

7    Q    Heroin and cocaine break down, if you will.  That is, the

8    chemical properties of each of those drugs breaks down at a

9    different rate in the body, correct?

10   A    Correct.

11   Q    So the body, in effect, metabolizes them at different

12   rates, correct?

13   A    Correct.

14   Q    So, for -- the body's effect of heroin may be longer or

15   shorter, depending on what the dosage of heroin is in relation

16   to the cocaine, correct?

17   A    Correct.

18   Q    So, an addict would have to get it right to stay awake for

19   the euphoric effect of the heroin by using the correct amount

20   of cocaine?

21   A    I suppose so.

22   Q    Okay.  And so in that instance, if cocaine usage is used

23   by an addict to maintain the euphoric effect, cocaine would be

24   a contributing factor to the heroin overdose, correct?

25   A    It would depend on if the cocaine was in the blood, if it

Cross-examination Dr. Donna M. Vincenti

1    were a contributing factor.  You're talking about it

2    contributing to their high.  But this is referring -- you're

3    talking about contributing to the cause of death.

4    Q    Yeah.  Yes, let's discuss that topic.  The cause of

5    death -- well, the body does a couple things.  Cocaine in and

6    of itself can clearly cause the death of an individual by

7    increasing the metabolic rate, or heart rate; for example, the

8    heart -- can get rapid breathing; they can cause a person to

9    have a seizure; and they can, I think, stroke out from using

10   too much cocaine, correct?

11   A    Correct.

12   Q    Okay.  Heroin has the opposite effect.  It suppresses

13   everything, correct?

14   A    Correct.

15   Q    All right.  So, you're not telling us that you've seen any

16   evidence that there was a stroke or damage to the heart,

17   although you really can't tell based on this autopsy in terms

18   of damage to the heart, can you?

19   A    From the gross findings with the naked eye.

20   Q    All right.  So, from the naked eye you didn't see any

21   heart damage.  But you would agree that the most case -- for

22   correct diagnosis of heart damage, you have to do microscopic

23   examination, correct?

24   A    If you want to see small microscopic areas of scarring,

25   then you would need to do a microscopic section.

1   Q    Sure.  Okay.  So, you basically are not saying that there

2   was scar -- and there's no evidence of stroke in the brain,

3   correct?

4   A    Correct.

5   Q    Okay.  So, you're basically saying that on the one hand

6   cocaine did not cause a metabolic change in the body that would

7   have caused -- the cocaine in and of itself would have caused

8   the death, correct?

9   A    Correct.

10  Q    However, if cocaine used in conjunction with heroin to

11  maintain the person to be awake and have the heroin euphoria

12  last longer, in that situation cocaine would have been a

13  contributing factor to the drug usage in this case, correct,

14  Doctor?

15  A    Contributed to the drug usage, yes.

16  Q    To the drug usage.  And then you would have to rely really

17  on the toxicologist who would be in the best position to talk

18  about the effects of the -- on the body of the use of those two

19  drugs in conjunction, correct?

20  A    Correct.

21  Q    And that would be Dr. Barry Levine who works in the Office

22  of the Chief Medical Examiner, as do you, as well, Doctor --

23  A    Yes.

24  Q    -- correct?  Now, the -- your autopsy also talks about

25  lividity; okay?  And lividity is where the blood stays on one

Cross-examination Dr. Donna M. Vincenti

1    side -- I got that wrong.  Let me start again.

2         Where the blood -- when the body dies, the heart stops

3    beating and the blood then collects on a certain side of the

4    body, correct?

5    A    Correct.

6    Q    And it stays there because the heart's no longer working,

7    the capillaries are no longer working, the blood coalesces

8    there?

9    A    Correct.

10   Q    And, so, oftentimes a medical examiner can tell if a body

11   has been moved by if a body, for example, a body died on their

12   back, the blood would be -- the lividity would be shown on the

13   posterior portion of the body, correct?

14   A    Correct.

15   Q    So, if the body were found face down, a forensic

16   pathologist or the police can say:  Well, the body has moved

17   because the lividity is on the posterior and the body is found

18   face down?

19   A    Depending on the time frame.

20   Q    Depending on the time frame.  And the lividity starts

21   within --

22   A    It can be as early 30 minutes in some people or a couple

23   hours.

24   Q    Right.  So, lividity can start within 30 minutes?

25   A    Uh-huh.

Cross-examination Dr. Donna M. Vincenti

```
 1   Q    And once lividity occurs, it's what they call in medical
 2   terminology fixed, correct?
 3   A    It starts around 30 minutes to two hours.  And then it
 4   takes hours for it to become fixed.  And, once it's fixed, then
 5   it won't move when the body is moved.  But it does take a while
 6   for that lividity to become what's known as fixed.
 7   Q    Okay.  And in this case when you examined the body of Mr.
 8   Harrison Waite, the lividity was fixed on the posterior portion
 9   of the body; that is, on the back?
10   A    Correct.
11   Q    Okay.  And there was no evidence of lividity being fixed
12   on the front portion of the body, correct?
13   A    I just want to double-check, if that's okay.
14   Q    Sure.
15   A    Thank you.  That is correct, on the posterior surface.
16   Q    On the posterior surface.
17   A    On the back.
18   Q    For laymen's terms, that's the back?
19   A    The back.
20   Q    Okay.  Now, the other thing that you do, Doctor, as a --
21   you do an external examination on the body.  And just so, I
22   guess -- you were taking a look -- there we go.
23        The question I just asked you about is lividity was
24   present and fixed on the posterior surface of the body, except
25   in areas exposed to pressure.  That is the area that I just
```

Cross-examination Dr. Donna M. Vincenti

1   asked you about, correct, Doctor?

2   A      That is correct.

3              THE COURT:  What exhibit are we in?

4              MR. BRENNAN:  That is, I believe, Government Exhibit,

5   Your Honor, R5A.

6              THE COURT:  Thank you.

7   Q    (BY MR. BRENNAN)  Now, evidence of therapy.  But the

8   evidence of therapy, Doctor, you also noticed -- again, same

9   exhibit, Your Honor -- a needle puncture mark was on the left

10  antecubital fossa, did I see that -- pronounce that correctly?

11  A      Antecubital fossa.

12  Q      Antecubital fossa.

13  A      Yes.

14  Q      Okay.  So, just so the jury will know what we're talking

15  about, that is -- would be the left arm?

16  A      Correct.

17  Q      It's the bend of the elbow?

18  A      Uh-huh.

19  Q      And, where the bend of the elbow occurs, there's both an

20  artery and a vein very close to the surface in that location;

21  is that correct, Doctor?

22  A      Correct.

23  Q      Okay.  So, a -- we have a -- and this I think is going to

24  be Defense Exhibit 3, Your Honor.

25             THE COURT:  Already received.

Cross-examination Dr. Donna M. Vincenti

1              MR. BRENNAN:   Thank you, Your Honor.

2    Q    (BY MR. BRENNAN)   That is what's known as the antecubital

3    fossa; is that right, Doctor?

4    A    Correct.

5    Q    Okay.  And it's right by the elbow joint.  And this

6    diagram shows -- in red are the arteries, which would be the

7    arterial blood; is that correct?

8    A    Correct.

9    Q    And that's the blood that's going away from the heart; is

10   that right?

11   A    Yes.

12   Q    Okay.  And that's being -- and typically in medical

13   journals arteries are shown in red, correct?

14   A    That is correct.

15   Q    And the blue lines are the veins, which show the blood

16   flow to the heart; is that correct?

17   A    Correct.

18   Q    Going the other direction, if you will?

19   A    Uh-huh, yes.

20   Q    And show a -- actually, this has a photograph of a needle,

21   in effect, being placed into a vein in the antecubital fossa;

22   is that correct?

23   A    Correct.

24   Q    Okay.  And in this -- and in your autopsy, Doctor, you

25   identified a needle puncture mark was on the left antecubital

Cross-examination Dr. Donna M. Vincenti

1    fossa; is that correct?

2    A    Yes.

3    Q    Okay.  And that was not -- and the IV that was used for

4    medical intervention to put some drugs into -- or, excuse me --

5    some therapeutic medicine into Mr. Waite was actually put on

6    his leg; is that correct, Doctor?

7    A    He had an intraosseus catheter that was in his leg, which

8    serves the same purpose.

9    Q    Sure.

10   A    And they attempted to put a line in his left antecubital

11   fossa.

12   Q    Okay.  So, are you -- then is that notation that I've

13   asked you about, is that medical intervention?  Or would that

14   be a syringe for the purpose of mainlining heroin?  Or can you

15   tell us what that needle puncture mark is there?

16   A    Well, I saw a needle puncture.  And then I went to the

17   medical records that we received to see if they had tried to

18   put a line in in that area.  And they did, indeed, try to put a

19   line in that area.  So I put that under medical intervention.

20   Q    All right.  Fine.  So, then, if heroin were injected into

21   the body of Mr. Waite, we have no other evidence that you found

22   of a needle puncture mark; is that right?

23   A    I did not see another needle puncture mark.

24   Q    Okay.  So, this -- what's up on the screen -- you believe

25   is consistent with medical therapy, correct?

Cross-examination Dr. Donna M. Vincenti

1    A    Correct.

2    Q    And there's no other evidence on the body of Mr. Waite

3    that would be consistent with injecting heroin into his body;

4    is that your testimony?

5    A    There were no puncture marks that I could see.  There are

6    some needles that have very small points and sometimes we just

7    don't see those puncture marks.  He also had some tattoos.  You

8    might not see a puncture mark in a tattoo.

9    Q    In the course of making your forensic diagnosis in this

10   case, Doctor, were you supplied any syringes that were

11   recovered at the scene to examine the diameter of the syringes

12   to ascertain how thick a needle it was?

13   A    No, we do not get those at our office.

14   Q    You do not get those?

15   A    No.

16   Q    All right.  So, you do not know -- so, you basically -- as

17   I understand today, you cannot tell the ladies and gentlemen of

18   the jury what the method of ingestion of the heroin was in this

19   case; is that right?

20   A    That is true.

21   Q    Could have been swallowed; is that right?

22   A    Sure.

23   Q    Could have been smoked?

24   A    True.

25   Q    Could have been put in the nasal cavity, correct?

Cross-examination Dr. Donna M. Vincenti

1   A    That is true.

2   Q    Or could have been intermuscular; that is, stick it in

3   your arm?

4   A    True.

5   Q    Or he could have mainlined it, put it right into a vein?

6   A    Correct.

7   Q    But -- and you know, Doctor, from your experience -- or is

8   this more in the area of Dr. Levine's area of expertise -- the

9   amount of time it takes for heroin to have an effect on a

10  person's body when you ingest it in those various methods that

11  you just talked about?

12  A    That might be a question more suited for a forensic

13  toxicologist.

14  Q    A forensic toxicologist.  Fair enough.  So you, then,

15  cannot give us an opinion, then, Doctor, today as to how long

16  after whatever means it was that Mr. Waite injected this

17  heroin; you can't tell us whether he would have nodded off

18  immediately or whether it would have taken a couple hours?

19  A    Again, the only thing I can tell you is from what I have

20  read in regards to someone taking heroin.  So --

21  Q    Okay.  Meaning the medical literature?

22  A    Medical literature.

23  Q    All right.  Fair enough.  Okay.  So, you read studies in

24  the medical literature concerning the amount of time for

25  heroin.  But, based upon your examination of the deceased in

Cross-examination Dr. Donna M. Vincenti

1    this case, Mr. Harrison Waite, and the forensic autopsy that

2    you conducted, and also the consultation with Dr. Barry Levine,

3    the chief toxicologist for the State of Maryland, you cannot

4    tell this jury here today whether or not Mr. Waite mainlined it

5    and nodded off right away; or whether he fell asleep; or how

6    long it took based on your examination, what you know about

7    this case; is that correct, Doctor?

8    A    Correct.

9    Q    Do you know, Doctor -- again is this your area of

10   expertise or Dr. Levine -- in terms of when you take heroin it

11   typically would cause nausea; is that right?

12   A    Once again, I have read that.

13   Q    You have read that?

14   A    Yes.

15   Q    Okay.

16   A    Narcotics can cause nausea.

17   Q    Okay.  So, narcotics, that is, the central nervous system

18   suppression, oftentimes will cause nausea?

19   A    It can.  It depends on the dosage.  It depends on the

20   person, from what I've read.

21   Q    Again, that was my next examination in terms of the dosage

22   in this case.  You really can't tell the ladies and gentlemen

23   of the jury what the dosage was that would have caused any of

24   the fatal events that occurred in Mr. Waite; is that correct?

25   A    That is correct.

Redirect Examination Dr. Barry Levine

1           MR. BRENNAN:  Court's indulgence.

2           THE COURT:  Yes.

3           MR. BRENNAN:  Nothing further.  Thank you, Doctor.

4           THE COURT:  Redirect.

5                        REDIRECT EXAMINATION

6   BY MR. RAO:

7   Q    Starting where Mr. Brennan just left off.  Does the dosage

8   affect your finding regarding the manner and cause of death?

9   Would the dosage of heroin have any effect on your conclusion

10  that heroin intoxication was the cause of death here?

11  A    I usually don't have that information, what kind of dosage

12  someone took.

13  Q    So, it wouldn't affect the ultimate conclusion regarding

14  cause of death; is that correct?

15  A    Correct.

16  Q    Now, you were questioned about speedballing and the effect

17  of cocaine used in conjunction with heroin.  Does the presence

18  of cocaine in this case at all change your conclusion that the

19  cause of death was heroin intoxication?

20  A    No.

21  Q    Does the lack of a finding of the method of ingestion of

22  heroin in this case, does that lack of finding change in any

23  way your opinion that the cause of death in this case was

24  heroin intoxication?

25  A    No.

Direct Examination Cari Ray

```
1              MR. RAO:  No other questions.  Thank you.
2              THE COURT:  May the witness be excused?
3              MR. BRENNAN:  Yes, Your Honor.
4              THE COURT:  Government agree?
5              MR. RAO:  Yes.  Thank you, Your Honor.
6              THE COURT:  Doctor, you're excused.  Thank you.
7         Next witness.
8              MS. JOHNSTON:  Our next witness would be Cari Ray,
9    Your Honor.
10             THE COURT:  Cari Ray.  Stand and face the clerk,
11   ma'am.
12             THE CLERK:  Please raise your right hand.
13                         CARI RAY,
14   called as a witness, being first duly sworn, was examined and
15   testified as follows:
16             THE WITNESS:  Yes, ma'am.
17             THE CLERK:  Please be seated.  State your name loudly
18   and clearly into the microphone and spell your name for the
19   record.
20             THE WITNESS:  Cari Ray, C-a-r-i, R-a-y.
21             THE CLERK:  Thank you.
22                      DIRECT EXAMINATION
23   BY MS. JOHNSTON:
24   Q    Good morning, Ms. Ray.  Where are you employed?
25   A    Currently I'm employed at St. Mary's County Sheriff's
```

Direct Examination Cari Ray

1    Office as a backup investigator.

2    Q    And how long have you been employed there?

3    A    Since November of 2011.

4    Q    Where did you work prior to joining St. Mary's County?

5    A    Calvert County Sheriff's Office.

6    Q    And how many years did you work at the Calvert County

7    Sheriff's Office?

8    A    Nine years.

9    Q    And in what different capacities?

10   A    As I started off, I did -- I worked on the patrol unit and

11   then went to narcotics for two years.  And then transferred to

12   investigations for five years.  And then I went back to patrol

13   for the last year and a half that I was there as a corporal.

14   Q    Now, calling your attention to March of 2009, what was

15   your assignment at that time?

16   A    I was a detective in the investigative unit.

17   Q    Can you describe for us what the duties are for a

18   detective in an investigative unit with the Calvert County

19   Sheriff's Department?

20   A    We're unlike a lot of different departments; is that we're

21   not broke up, the investigative team.  We do whatever case is

22   assigned to us.  So, we could handle a child abuse, a homicide,

23   an armed robbery.  It just depends on whatever comes in.  We're

24   kind of cross-trained.

25   Q    And about how many detectives do you have in Calvert

Direct Examination Cari Ray

1   County?

2   A    There's about 10.  About 10 or 12 of us.

3   Q    Now, calling your attention to the evening of March 23rd

4   of 2009, were you working that evening?

5   A    Yes, ma'am.

6   Q    And what was your assignment that night?

7   A    I was a detective.

8   Q    Did there come a time when you responded to a radio call?

9   A    Yes.

10  Q    And where did you respond to?

11  A    I responded to a residence located in the Beach area, up

12  north in Calvert County.

13  Q    And who responded with you?

14  A    Sergeant Tim Fridman.  He and I responded at the same

15  time.  And then there were patrol units that were already on

16  scene when we got there.

17  Q    Do you recall Corporal Wilson?  Was he present?

18  A    Yes, ma'am.

19  Q    Do you know approximately what time you arrived?

20  A    I do not.  I know it was late in the evening.

21  Q    Did you prepare a report?

22  A    Yes, ma'am.

23  Q    And was that report prepared close in time to the event?

24  A    Yes.

25           MS. JOHNSTON:  Can I have this marked as the next O

Direct Examination Cari Ray

1    exhibit please?  For identification only.  I believe it's O5,
2    Your Honor.
3              THE COURT:  O5.  You're right.  O5 is next.
4         What is this?  Is it the Ray report?
5              MS. JOHNSTON:  It is the report, yes, Your Honor.
6    The Ray report.
7              THE COURT:  And it's for identification only.
8              MS. JOHNSTON:  That's correct, Your Honor.
9    Q    (BY MS. JOHNSTON)  Would reviewing that report refresh
10   your recollection as to some of the details?
11   A    Yes.  There's also a first page that should be on here.
12   It's should say -- handwritten.  It should say, "death
13   investigation."
14   Q    Does this contain the body of your report?
15   A    It contains the narrative.
16   Q    Which would be the body of your report?
17   A    Yes.
18   Q    Would you take a moment to look at that and see if that
19   refreshes your recollection as to some of the details.
20   A    Okay.
21   Q    Detective, have you had a chance to review it?
22   A    Yes.  Sorry.  I was still reading it.
23   Q    If you would just put it to the side.  And, if you need to
24   refer to it to refresh your recollection, let us know.
25   A    Okay.

Direct Examination Cari Ray

1    Q    Do you recall now the address you responded to?

2    A    It was on Ridge Road.

3    Q    And do you know approximately what time you responded?

4    A    It was 22:38 hours.

5    Q    And what occurred at 22:38 hours?

6    A    The 911 call came out.

7    Q    Do you know approximately how quickly after that you would

8    have arrived at the address?

9    A    Probably within, I would say, 20 minutes.

10   Q    And, when you got to the address, was anyone else present

11   at the address?

12   A    Yes.  Patrol units and the EMTs were present.

13   Q    Where did you go upon arriving there?

14   A    I went to the ambulance to see.  They were working on the

15   gentleman that they had called out on the call, a 29-year-old

16   male.  So, I looked in to see what his appearance was and

17   possibly if they could tell me what the prognosis might be.

18   Q    Okay.  Did you get a prognosis from them?

19   A    They were in full CPR at that point.  And, I mean, just

20   from my past history and his coloring and stuff it didn't look

21   good.

22   Q    Can you describe what you observed in terms of the

23   patient?

24   A    He was blue from the nipple line up to his head.  And then

25   he had blood coming out of his nose and vomit coming out of his

Direct Examination Cari Ray

1    mouth.

2    Q    Upon making those observations, where did you go after

3    that?

4    A    I went into the house.

5    Q    Did you meet any people inside the house?

6    A    I actually -- as soon as I started to get up to the house,

7    I saw DFC Dinton that was close to the doorway.  So, I told him

8    I needed him to follow the ambulance to the hospital and stay

9    with the body until I could get down there to relieve him.  And

10   then we would call the ME's office also to meet us down at the

11   hospital.

12   Q    And why were you doing that?

13   A    Just precautionary, more than anything.  Just to follow --

14   since he was young, we didn't really know what was going on at

15   that point.  So, until I could talk to everyone else I wanted

16   to make sure, because they were getting ready to leave, that at

17   least that base was covered.

18   Q    Okay.  And what was your role in terms of the

19   investigation that occurred at Ridge Road?

20   A    At that point for the death investigation, I would have

21   been the lead detective.

22   Q    And in what circumstances do you do an investigation -- a

23   death investigation?

24   A    We get called on almost all deaths that occur in Calvert

25   County.  We do a death investigation report.  And I say all, as

Direct Examination Cari Ray

1   in the Sheriff's Office itself gets called.  If a patrol

2   officer gets there and, say, the person is elderly or someone

3   who is already ill, under the care of a doctor, and it's not a

4   surprise or, you know, they were already very, very ill, if the

5   doctor signs off on the death report, then most of the time

6   they'll notify investigations.  We'll go over the case with

7   them over the phone but we won't respond.

8        In this situation with him being a younger male, and they

9   were in full CPR at that point, I mean, he was 29 years old, we

10  knew until I got in there to find out did he have a medical

11  history, did he not, you know, I just wanted to treat it -- it

12  was still under investigation at that point until I could

13  determine what kind of case it was going to be.

14  Q    And what steps did you take to determine what kind of case

15  it was going to be?

16  A    I spoke to Deputy Wilson, DFC Wilson, and asked him if he

17  had talked to anybody; you know, what the circumstances were

18  around it.  Because he had been there for a few minutes at that

19  point.  To be able to determine what was going on.  He had told

20  me that --

21            MR. BRENNAN:  Objection.

22            THE COURT:  Sustained.

23  Q    (BY MS. JOHNSTON)  Based upon what Detective Wilson told

24  you, or Deputy Wilson told you, what did you do?

25  A    I then started to interview the girlfriend, Ashley.  And

Direct Examination Cari Ray

1    we actually went to the bathroom, because she was pretty upset,

2    to go talk in there.

3    Q    Can you describe her appearance?

4    A    She was crying hysterically, trying to catch her breath.

5    She was very, very physically upset.  She appeared to be under

6    the influence of something from her eyes.

7    Q    Can you tell us what it was about her that caused you to

8    think she was under the influence of something?

9    A    Her pupils were pinpoint, super-small.

10   Q    What about her speech?

11   A    It was fine.  She was just upset.  She was crying and just

12   trying to get her breath and stuff.

13   Q    Other than the pinpoint of her eyes, was there anything

14   else about her behavior that caused you to think she was under

15   the influence of something?

16   A    No, not really.

17   Q    What occurred when you went into the bathroom with her?

18   A    She -- I finally just tried to talk her down to calm down

19   a little bit and talk to me.  She was very -- she's young and

20   she was very concerned about the situation, itself, and

21   Harrison, what he had been doing and what she had been doing.

22   And she had just gotten a job on base.  And, so, she started

23   kind of contradicting what she had told Deputy Wilson.  So, I

24   had to kind of redirect her to come back to the point at hand.

25   That it wasn't about her.  That it was about somebody else at

Direct Examination Cari Ray

1  this point.  So then she started to tell me what happened that
2  night.
3  Q    And what -- what, if anything, did she say to you
4  regarding -- strike that.
5       Did you confront her concerning your observations of her
6  eyes?
7  A    Yes.
8  Q    And what did you say to her?
9  A    I told her she was high and she was under the influence of
10  something and she needed to, you know, come clean with me and
11  tell me.  Because, if she lied to me about that, then what else
12  was she going to lie to me about.
13  Q    And what did she tell you?
14  A    She finally -- I mean, after coercing her, she finally
15  told me that she had done cocaine.  She had done two lines of
16  cocaine.
17  Q    What do you mean by coercing her?
18  A    Just explaining to her that either she can cooperate with
19  me or she's not going to cooperate.  But that I knew she was
20  under the influence of something.  And, if she doesn't
21  cooperate, I'm going to think there's more going on to the
22  scene than what is there.
23       So, she was young.  I understood she was young.  She was
24  scared.  She had a very, very good job and she was concerned we
25  were going to tell her job that she had used cocaine.

Direct Examination Cari Ray

1   Q    Now, you indicated that there were some contradictions.

2   Was -- what were those contradictions relating to, if you can

3   recall?

4   A    Pardon?

5   Q    As you can recall them.

6   A    It was two years ago, it's hard to recall.  But she -- she

7   told Deputy Wilson directly pretty quickly what had happened

8   that evening.  And went through the events fairly quickly.  And

9   a lot of times that happens with people because they're in

10  uniform --

11           MR. BRENNAN:  Objection to opinion, Your Honor.  A

12  lot of times, other cases.

13           THE COURT:  Sustained.  Next question.

14  Q    (BY MS. JOHNSTON)  In addition, she having told Deputy

15  Wilson very quickly what had happened, what were the

16  contradictions that you felt she was giving you initially?

17  A    Her saying she wasn't high.  That she wasn't sure what was

18  going on.  When I knew that she did know what was going on.

19  She had a time lapse in between that.  When I walked in, she

20  walked down a hallway to a bathroom.  So I don't know if she

21  had time to think about it.

22  Q    All right.  And, other than the denial of being under the

23  influence of drugs, were there any other contradictions that

24  you noted?

25  A    No.

Direct Examination Cari Ray

1    Q    Did you subsequently obtain a statement from her?

2    A    Yes.

3    Q    And was that consistent with what you had been told by

4    Deputy Wilson?

5    A    Yes.

6    Q    Now, and again going back to Ms. Smith, you've indicated

7    the pinpoint eyes.  Was there -- what was there about her

8    behavior that indicated she was under the influence of any

9    drugs?

10   A    It was mainly her eyes and her slurred speech.

11   Q    Anything else?

12   A    Not really.

13   Q    Were her -- was she able to respond to your questions?

14   A    Uh-huh.

15   Q    You have to say yes or no.

16   A    She was alert, coherent.

17   Q    Excuse me?

18   A    She was alert, coherent.

19   Q    In the absence of the pinpoint eyes, would you have

20   concluded she was under the influence of any drugs?

21   A    Not really.  I don't think I would have pushed as hard to

22   find out if she was under the influence, asked her as much as

23   what I did.  I knew that she was not telling the truth because

24   of her eyes.

25   Q    And, when you say not telling the truth, not telling the

Direct Examination Cari Ray

1    truth about what?

2    A    Just her being under the influence.

3    Q    And did you, in fact, then obtain a statement from her?

4    A    Yes.

5    Q    And, again, was that generally consistent with what you

6    had been told?

7    A    Yes.

8    Q    From Deputy Wilson?

9    A    Yes.

10   Q    Now, in addition to speaking with Ms. Smith, did you speak

11   with anyone else in the residence?

12   A    Yes.

13   Q    And who else did you speak with?

14   A    The two roommates.

15   Q    Would that have been Patrick Kennedy and Sara Conner?

16   A    Yes.

17   Q    Was there any indication that those individuals were under

18   the influence of any drugs?

19   A    No.

20   Q    And how would you describe their behavior that night?

21   A    They were upset.  Sara was upset because she had known

22   Harrison for a long time since they were kids.  Her

23   boyfriend's --

24        MR. BRENNAN:  Objection.  Something else, Your Honor.

25        Withdraw the objection.

Direct Examination Cari Ray

```
1              THE COURT:  Withdrawn.  You may continue.

2              THE WITNESS:  Her boyfriend was upset.  But, I mean,

3    he wasn't crying, or -- I think he was just upset at the fact

4    that he was -- somebody died in his house.

5    Q    (BY MS. JOHNSTON)  In addition to speaking with them, did

6    you conduct a further investigation in the residence?

7    A    Yes.

8    Q    And what was done?

9    A    I went down to the basement and met up with the other

10   officers that were down there.  Which was Sergeant Fridman and

11   Deputy Wilson.  They had already started a search of the area

12   where Harrison Waite was renting.

13   Q    And were items recovered?

14   A    Yes.

15   Q    And what was done with those items?

16   A    They were packaged to be placed in evidence.  And then at

17   that point then they were given to Deputy Wilson to take back

18   to the sheriff's office.

19   Q    And was that done under your supervision?

20   A    Yes.

21   Q    In addition to seizing the items -- strike that.

22        What items did you seize?

23   A    Drug paraphernalia and a controlled dangerous substance.

24   Q    Let me show you what has already been produced D1, D1A,

25   D2, D3 and D4.
```

Direct Examination Cari Ray

1              THE COURT:  All in evidence.

2      Q    (BY MS. JOHNSTON)  Do those appear to be the items that

3      you seized?

4      A    Uh-huh.

5      Q    You have to say yes or no.

6      A    Yes.  I apologize.

7      Q    And what did you direct Deputy Wilson to do with those

8      items?

9      A    To take them back and put them in the property room; drop

10     them into property.

11     Q    In addition to seizing those items, did you take custody

12     of any other items in the basement bedroom of Mr. Waite?

13     A    Yes.  We take control of anything that looks of value.

14     Since we didn't have next of kin that was there for us to

15     release those items to them, I took them with me until I could

16     notify next of kin.  Which was a wallet containing some items.

17     And then his phone.  It's in my report, all the items that were

18     seized.

19     Q    Will looking at your report --

20     A    Yes, ma'am.

21     Q    -- refresh your recollection concerning what items of

22     value you seized?

23          Take a moment and look at your report.

24     A    Okay.

25     Q    Can you now tell us what items of value that you took into

Direct Examination Cari Ray

1    custody?

2    A    Yes, ma'am.  His wallet.  It had 32 dollars in money.

3    Some credit cards, his driver's license, Social Security card,

4    a brown watch, a silver watch, and his cell phone.

5    Q    The wallet, were there any fifty-dollar bills in the

6    wallet?

7    A    No.

8    Q    And did you, in fact, count the currency that was in the

9    wallet?

10   A    Yes.

11   Q    And it was how much?

12   A    $32.

13   Q    And what ultimately did you do with those items?

14   A    I took those with me to the -- well, I took those with me.

15   And then I went to the hospital.  And his mother and mother's

16   boyfriend and sister were at the hospital.  So, then I gave the

17   items to his mom; I released them there.

18   Q    Now, were you the person in charge of this investigation?

19   A    Yes.

20   Q    After you took the valuables and Deputy Wilson took the

21   evidence, was anything else done in terms of examining the

22   scene?

23   A    Yeah, we took pictures.  I notified DFC Cress, Detective

24   Cress in the narcotics unit.

25   Q    And why did you notify Detective Cress?

Cross-examination Cari Ray

1   A    Because at that point it was a possible heroin overdose.

2   Q    And, so, why would you notify Detective Cress of a heroin

3   overdose?

4   A    We don't deal with the CDS part of it.  We don't deal with

5   the drug part of it in investigations.  That's what narcotics

6   deals with.  Anything outside of the actual death investigation

7   itself, that goes to the narcotics unit.

8   Q    And was your investigation concluded at the house that

9   night when you left?

10  A    Almost.  The only thing else that completely closed out

11  the death investigation was receiving the autopsy report.  Once

12  we receive that, then we close it out.

13  Q    And did you follow the standard procedures for handling a

14  death investigation?

15  A    Yes.

16          MS. JOHNSTON:  Court's indulgence.

17          THE COURT:  Yes.

18          MS. JOHNSTON:  Nothing further.

19          THE COURT:  Cross-examination.

20          MR. BRENNAN:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22  BY MR. BRENNAN:

23  Q    Good afternoon, Officer Ray.  My name is William Brennan.

24  And Mr. Cook and I represent Mr. Patrick Sweeney in this case.

25  If I should ask you a question that you do not understand,

Cross-examination Cari Ray

1    please ask me to repeat it.

2    A    Yes, sir.

3    Q    Fair enough?

4    A    Yes, sir.

5    Q    Okay.  Now, Ms. Johnston asked you a question about the

6    police report that you have in front of you.  You said there

7    should have been a cover sheet; is that correct?

8    A    Yes, sir.

9    Q    For identification only -- well, is this what you're

10   talking about?

11   A    Yes.

12   Q    Okay.  So now, these three documents together, that

13   completes your report?

14   A    Yes.  This is Page 1, 2 and 3.

15   Q    Fair enough.  Okay.  And, this report, Page 1 is styled as

16   "death report"; is that correct?

17   A    Yes.

18   Q    And, the handwriting on there, is that your handwriting?

19   A    Yes.

20          THE COURT:  Referring to O5.

21          MR. BRENNAN:  I may need to mark this for

22   identification only.

23          MS. JOHNSTON:  Your Honor, I have no objection to

24   adding that to O5 for the record because it's the cover sheet.

25          THE COURT:  Because it is the cover sheet to the Ray

Cross-examination Cari Ray

1    report.  Is that it?

2              MR. BRENNAN:  It is the cover sheet to the Ray

3    report.

4              THE COURT:  All right.  Let's modify Exhibit O5 in

5    the form in which it was marked for identification previously

6    by the addition of the cover sheet.  It continues to be O5

7    marked for identification.

8    Q    (BY MR. BRENNAN)  Now, Officer Ray, you -- one of the

9    things you did in the course of your death investigation was

10   that you examined the body; is that correct?

11   A    I physically just looked at the body.  I didn't touch it

12   to do an examination.

13   Q    You physically looked at the body; is that correct?

14   A    Yes, I just looked at the body.

15   Q    And you -- when you observed the body, you observed Mr.

16   Waite was about 6 feet, weighed 160 pounds; is that correct?

17   A    If that's what's in my report, yes.

18   Q    Your report's in front of you and you're free to look at

19   that.  On Page 3, the second paragraph up from the bottom.

20        Does that refresh your recollection?

21   A    Yes, sir.

22   Q    About six feet, 160 pounds?

23   A    Uh-huh.

24   Q    At the time she examined him his lips and chest were blue;

25   is that correct?

Cross-examination Cari Ray

1   A     Yes.

2   Q     And the other thing that you observed when you looked at

3   his body was needle marks in the crease of his arm; is that

4   correct?

5   A     Yes.

6   Q     Now, the way you phrased that sentence is you have it --

7   well, did you notice it on his right arm or his left arm, these

8   needle marks that you described for us?

9   A     I put in my report the right arm.

10   Q     Okay.  Because the way it reads is he had needle marks on

11   the right crease of his arm?

12   A     Okay.

13   Q     So, did you mean by that the right arm, I take it?

14   A     I assume, yes, sir.

15   Q     Okay.  I show you what's been marked and admitted into

16   evidence the right -- or the crease of the arm that we're

17   talking about is right here, depicted in that picture.  Do you

18   agree with that?

19             THE COURT:  Referring to Defense Exhibit 3?

20             MR. BRENNAN:  That's correct, Your Honor.

21   Q     (BY MR. BRENNAN)  Do you see that on the screen?

22   A     Yes.

23   Q     All right.  So, when you saw needle marks, it would be in

24   that area of Mr. Waite's body that you saw the needle marks?

25   A     Yes.

Cross-examination Cari Ray

1  Q    Okay.  And you believe you saw those on the right arm, not

2  the left arm?

3  A    It says "right crease."  I would assume that I meant the

4  right arm, yes.

5  Q    Okay.

6  A    It's been two years, sir.

7  Q    I understand.  And the question is:  Right from your

8  direction or right from his direction?  I mean -- so --

9  A    If I put, "right crease," I would assume that I meant the

10 right arm; which would be his right arm, not looking at --

11 Q    His right arm?

12 A    Correct.

13 Q    Okay.  But you're not sure, but you also could -- you

14 would agree that, if you had been in a hurry that evening, you

15 could have been looking at from your perspective, which could

16 have been your left, his right?

17 A    No.

18 Q    No.  So, you're pretty sure that it was the right arm that

19 you saw the needle marks on and not the left arm?

20 A    I'm pretty sure, yes, sir.

21 Q    All right.  Well, are you more than pretty sure?  Are you

22 very sure that you saw needle marks on Mr. Harrison Waite in

23 the crease of his elbow on his right arm, not on his left arm?

24 A    Sir, by my report -- it was two years ago.  Like I said, I

25 don't remember.  But if it's in my report that it was on the

Cross-examination Cari Ray

1  right crease of the arm, I would assume that it meant the right
2  arm.
3  Q    Fair enough.  Okay.  Now, you spoke with -- when you
4  arrived there you spoke with Ms. Ashley Smith; is that correct?
5  A    Yes.
6  Q    And you -- did you notice any vomit on her?
7  A    I don't recall.
8  Q    All right.  You didn't make a note of it in your report,
9  though, did you?
10  A    I did, is that what you said?
11  Q    Did you or did you not?
12  A    I don't recall.
13  Q    Okay.
14  A    Can I look at my report?
15  Q    Sure.
16  A    Okay.  I don't see anything in here where I noted that she
17  had vomit on her.
18  Q    Okay.  And she had been -- you said you went to the
19  bathroom -- she had been to the bathroom.  She cleaned herself
20  up before she spoke to you?
21  A    She said she vomited.  I just took her word for that she
22  had vomited.
23  Q    All right.  She told you that she had vomited?
24  A    Yes.
25  Q    But you didn't see any evidence of any vomit on her person

1    at the time?

2    A    I don't recall seeing anything.

3    Q    Well, actually, let's get back to the police report for a

4    moment.

5         Basically -- what police academy did you attend?

6    A    I attended two.  The Indiana Criminal Justice Academy, and

7    the Southern Maryland Criminal Justice Academy.

8    Q    All right.  At the academy, they did tell you the

9    importance of writing a police report, correct?

10   A    Correct.

11   Q    One of the reasons -- and they tell you to put down

12   everything that you observed that evening and everything that

13   you saw with your eyes and everything that you heard because

14   you never know later on what's important, correct?

15   A    That's correct.

16   Q    All right.  So, they tell you the necessity to put down

17   right then and there when it's fresh in your mind so that later

18   on you'll have it?

19   A    That's correct.

20   Q    Because not -- that's why we all take notes; we can't

21   remember everything, right?

22   A    Right.

23   Q    So, things that you saw that were important that evening

24   you put in your report.  You made no note that Ms. Ashley Smith

25   had any vomit on her that evening, correct?

Cross-examination Cari Ray

1   A    Correct.

2   Q    At no time did Ashley Smith ever tell you that she moved

3   Mr. Harrison Waite's body, correct?

4   A    I believe she did.  She tried to wake him up.

5   Q    Fair enough.  She tried to wake him up.  She was unable to

6   wake him up.

7   A    Right.

8   Q    But, after he had fallen off the bed, she had never told

9   you that she made any effort to move his body, correct?

10  A    Correct.

11  Q    All right.  And further she told you that, when she went

12  to a house earlier that evening, that Harrison went into the

13  house and was gone for about ten minutes, correct?

14  A    Yes.

15  Q    And that -- and you made a note of that; you put that in

16  your report, correct?

17  A    Yes.

18  Q    And, as you just told us a few moments ago, she told you

19  that she, herself, had vomited; is that correct?

20  A    Yes.

21  Q    Okay.  And that when she awoke, according to her version,

22  that she noticed that Mr. Harrison Waite was cold to the touch,

23  right?

24  A    Yes.

25  Q    And that his lips were blue.

Cross-examination Cari Ray

1      And, in fact, you noticed that he was basically blue from
2  the mid-chest up, correct?
3  A    Yes.
4  Q    Now, you said you -- what time was it that you took -- oh,
5  before we get to that.
6      So, when you spoke to Ms. Ashley Smith, originally she was
7  concerned about her own welfare or her own situation?
8  A    Yes.
9  Q    She had a good job at the base; you learned that?
10 A    Yes.
11 Q    And, by the base, we're referring to the Patuxent River
12 Naval Air Station, correct?
13 A    Yes.
14 Q    All right.  Just go south from -- go down Route 4 across
15 the bridge and you're down at Lexington Park, right?
16 A    Yes.
17 Q    Okay.  So, she was concerned about her own welfare, about
18 her job.  And that's why she basically lied to Officer Wilson,
19 because she was concerned about her own self at that time,
20 correct?
21 A    I don't think she lied to Officer Wilson.  She was denying
22 that she was under the influence of cocaine.  But everything
23 else was consistent.
24 Q    All right.  She was denying her own involvement in drug
25 usage, correct?

Cross-examination Cari Ray

1    A    That's correct.

2    Q    Because she was concerned about her own welfare that

3    evening, correct?

4    A    That's correct.

5    Q    But you observed her, based on your training and

6    experience as a police officer, to be under the influence?

7    A    Yes.

8    Q    Okay.  Her pupils were dilated.  Would you say her speech

9    was slurred?

10   A    She had slurred speech, yes.

11   Q    All right.  Now, did she seem agitated?

12   A    I mean, she was upset.  She had just found somebody dead.

13   Q    Okay.

14   A    So, she was nervous.  I don't necessarily know.  In that

15   context, I think it was appropriate.

16   Q    All right.  Well, but you made a -- but you told -- well,

17   were you ever a patrol officer?

18   A    Yes.

19   Q    Okay.  And I assume during -- as a patrol officer you

20   would make stops of persons driving down the road?

21   A    Yes.

22   Q    And you would have to, I take it as a patrol officer, make

23   DWI arrests?

24   A    Yes.

25   Q    All right.  And, based on your training and experience,

Cross-examination Cari Ray

1    you'd go into court and testify whether or not someone was

2    under the influence, correct?

3    A    Yes.

4    Q    So, based on your training and experience as a police

5    officer, having been a patrol officer, you made the

6    determination that Ms. Ashley Smith was under the influence?

7    A    Yes.

8    Q    Okay.  And you know that cocaine can be an upper -- can

9    agitate the body, right?

10   A    Yes.

11   Q    And dilate the pupils?

12   A    Yes.

13   Q    All right.  And that's what you observed, possible cocaine

14   intoxication?

15   A    Yes.

16   Q    And that's consistent with what she told you, that she had

17   done two lines of cocaine?

18   A    Yes.

19   Q    And, so, your observation of a person who's agitated,

20   away, pumped up, things like that, would be consistent with

21   what she told you, two lines of cocaine?

22            MS. JOHNSTON:  Objection.

23            THE COURT:  Basis?

24            MS. JOHNSTON:  He's assuming facts -- the witness

25   didn't testify.  The witness didn't say she was agitated.

Cross-examination Cari Ray

1    Counsel's --

2              THE COURT:  Overruled.

3    Q    (BY MR. BRENNAN)  Is that correct?

4    A    I told you how she was acting was consistent with what was

5    going on around her.

6    Q    And it was also consistent with having used two lines of

7    cocaine?

8    A    I don't know how it's going to affect her.  It could

9    affect you and affect her totally different.  But at that time,

10   yes, she was upset.  I mean, she had just woke up next to

11   somebody dead.  So, how she was acting was consistent with how

12   I would assume that I would act if I just woke up next to

13   somebody dead.

14   Q    Right.  Let me ask you this:  You're an experienced police

15   officer, correct?

16   A    Yes.

17   Q    And you just told us that in your opinion as a police

18   officer she was under the influence of cocaine?

19   A    Yes.  Her pupils, yes.  It was her eyes that gave it away.

20   Q    And as an experienced officer trained to observe how

21   people act when they're under the influence of drugs?

22   A    That's correct.  And everybody acts differently.

23             MR. BRENNAN:  For the record I wouldn't know how I

24   would act under the influence of cocaine.

25             MS. JOHNSTON:  Objection, Your Honor.

Cross-examination Cari Ray

1          THE COURT:  Sustained.  Let's move on to something
2   substantive.
3   Q    (BY MR. BRENNAN)  All right.  Now, so, you then pushed her
4   and she then made this correction; is that correct?  Or
5   admission that we talked about?
6   A    That she admitted that she was under the influence?
7   Q    Yes.
8   A    Yes.
9   Q    Okay.  Now, you took some photographs there; is that
10   correct?
11   A    Yes.
12   Q    Approximately what time was it that you were doing the
13   photographs?
14   A    I don't know what time it was I took the photos.
15   Q    What time did you clear the scene, do you know?
16   A    I don't know what time I cleared the scene.
17   Q    Okay.
18   A    I'd have to look at my dispatch log.
19   Q    Now, one of the things -- again, you're free to look at
20   your report, Page 3, about midway down where it says, "I took
21   pictures of the bedroom."  Do you see that paragraph?
22   A    Uh-huh.
23   Q    All right.  And you said you found numerous needles,
24   correct?
25   A    Yes.

Cross-examination Cari Ray

```
1    Q    It says on top of the desk was a small --
2              THE COURT:  Is this document in evidence?
3              MS. JOHNSTON:  Objection.  Objection.
4              THE COURT:  Sustained.
5    Q    (BY MR. BRENNAN)  Did you see a small silver scale on the
6    dresser?
7    A    That's what I have in my -- that's what I have in my
8    report.
9    Q    Did you take a photograph of the small silver scale on the
10   dresser?
11   A    I took a photo of the dresser from back.
12   Q    Okay.  Did you notice whether or not there was any residue
13   on the small silver scale that you observed on the dresser?
14   A    No.
15   Q    You can't remember?
16   A    I can't remember, no.
17   Q    You can't remember.  And you just told us and the only
18   photograph that you believe is available of this small silver
19   scale on the dresser is the far-away photograph that you took
20   of just the general dresser, correct?
21   A    Yes.
22   Q    And you did not seize or take into police possession the
23   small silver scale?
24   A    No.
25   Q    And, other than the photographs, I take it you did no
```

Cross-examination Cari Ray

1  crime scene diagram of the scene; is that correct?

2  A    I did not.

3  Q    Okay.  And you did a cursory search of -- well, first of

4  all, to your knowledge no member of the Calvert County

5  Sheriff's Department ever did a search of the upstairs of the

6  residence; is that correct?

7  A    No, we did not.

8  Q    Okay.  And, the downstairs, you did just sort of a cursory

9  search of the other rooms that were downstairs; is that right?

10  A    The other officers did.

11  Q    The other officers did?

12  A    Yes.

13  Q    So what room -- did you actually search anything, Officer?

14  A    No, I don't believe so.  I mean, I walked around to see

15  what all they had found.  And then they were the ones who

16  bagged it up and stuff.  And I told them just to take it to the

17  office so that we could drop it into property.

18  Q    Okay.  So, you actually did not participate in the search;

19  you just took photographs?

20  A    The photos.  And took written statements of everyone.

21  Q    Okay.  And, so, you don't know whether or not they

22  searched items of clothing of Mr. Harrison Waite, pockets and

23  things like that; is that correct?

24  A    No, sir.

25          MR. BRENNAN:  All right.  Court's indulgence.

Cross-examination Cari Ray

```
1        I think these are in evidence on the board, Your Honor.
2   They were on the board but I think I have the large ones here,
3   Your Honor.  So, it's Government Exhibit P3 and P4.  The large
4   board that was up there.
5            THE COURT:  Right.  And do you want to display that
6   or you want put it on the document camera?
7            MR. BRENNAN:  I was going the use these photos, Your
8   Honor, that are already in evidence.
9            THE COURT:  You can.  I'm just asking you:  Are you
10  going to display them on the large board or put them on the
11  document camera?
12           MR. BRENNAN:  I'm going to put them on the document
13  camera.
14           THE COURT:  Okay.  P3 and P4 are already in.
15      Ladies and gentlemen, these are just different copies of
16  the exact same picture that you saw on the foam core board.
17  He's going to show them on the electronic system.
18           MR. BRENNAN:  Now, the small scale that we're talking
19  about --
20           THE COURT:  This is P4.
21           MR. BRENNAN:  It's P4, Your Honor.  Excuse me, it's
22  P3, Your Honor.
23           THE COURT:  P3, yes.
24  Q   (BY MR. BRENNAN)  Are you able to show the ladies and
25  gentlemen of the jury the small scale?
```

Cross-examination Cari Ray

1   A    (Indicating).

2   Q    All right.  I think if you touch it hard it will make a

3   blue arrow.

4              THE COURT:  It's there.  Well, you --

5              MR. BRENNAN:  All right.  Sorry, I'm looking at the

6   photo.  Thought the arrow was going to appear right in front of

7   me, Judge.

8   Q    (BY MR. BRENNAN)  I'm sorry.  I think if you hit the

9   bottom left, it will clear.  Let's try that again.

10       Okay.  Now can you point to where the scale is?

11  A    (Indicating).

12  Q    Okay.  That's the small scale that you saw on the bureau?

13  A    Yes.

14  Q    All right.  And that's the only photograph that we have of

15  that; is that correct?

16  A    Yes.

17              THE COURT:  P3.

18  Q    (BY MR. BRENNAN)  Now I'll show you -- it's P4 now.  And I

19  think you have to hit the bottom left; that will clear the

20  arrow.  There you go.

21       And has it been moved or is it still shown in that photo

22  there?

23  A    (Indicating).

24  Q    Right there.  Okay.  Same small scale.  And that scale was

25  not seized or taken into possession by the Calvert County

Redirect Examination Cari Ray

1    Sheriff's Department?

2    A    No, Calvert County did not take it into possession.

3    Q    Okay.  And that scale is used for weighing small

4    quantities of substances, correct?

5    A    Yes, whatever somebody wants to weigh something with.

6            MR. BRENNAN:  Nothing further, Your Honor.  Thank

7    you.

8            THE COURT:  Redirect.

9            MS. JOHNSTON:  Just a couple questions.

10                    REDIRECT EXAMINATION

11   BY MS. JOHNSTON:

12   Q    In preparing your report that we have marked before you as

13   O5, counsel asked you some questions about that.  Did you -- in

14   referencing what Ms. Smith said to you about Mr. Waite being

15   cold to the touch, do you recall those questions?

16   A    What he just asked me?  Is that what you said?

17   Q    Yes.

18   A    Yes, ma'am.

19   Q    And that information you put in your report; is that

20   correct?

21   A    Yes, ma'am.

22   Q    Now, in typing up this report, did you sit with Ms. Smith

23   and ask her to review this to make sure everything in it was

24   accurate?

25   A    No.

Redirect Examination Cari Ray

1    Q    Okay.  So, what did you use to write this report?

2    A    My recollection and her written statement.

3    Q    Let me have this marked as O6.

4         THE COURT:  O6.

5    Q    (BY MS. JOHNSTON)  Can you tell us what O6 is?

6    A    Her -- Ashley Smith's written statement.

7    Q    And is that the written statement she gave you that night?

8    A    Yes.

9    Q    And how long is it?

10   A    Three pages.

11   Q    Including a couple of questions and answers?

12   A    Yes.

13   Q    In that statement, did Ms. Smith ever tell you that Mr.

14   Waite went inside the house?

15   A    Can I look at the statement --

16   Q    Please do.

17   A    -- to refresh my memory?  Thank you.

18        She didn't say specifically in this that he went inside.

19   She told me that he had gone inside, but you can tell by the

20   statement -- can I read the statement?

21   Q    Detective Ray, you can certainly read the statement.

22   Please do.

23        MR. BRENNAN:  Just that sentence, I assume.

24        THE COURT:  The whole statement is in.

25        MS. JOHNSTON:  Read the --

Redirect Examination Cari Ray

1          MR. BRENNAN:  I thought it was just marked for

2    identification, Your Honor.

3          THE COURT:  She didn't put that qualification on it.

4    It's in, O6.

5          MS. JOHNSTON:  Please read the entire statement.

6          THE COURT:  Well, hold on.  Mr. Brennan's asked for a

7    moment.

8          MR. BRENNAN:  May we approach, Your Honor?

9          THE COURT:  Yes.

10         (Bench conference on the record.)

11         MR. BRENNAN:  I clearly note the local rule that,

12    when an exhibit is mentioned, it's admitted.  And I know that

13    rule.  I thought that it was being used as the other police

14    reports were being used, to refresh the witness's recollection.

15    So, I was not as fast on the take as I should have been.  And I

16    apologize to the Court for that.

17       Having said that, however, I don't really have an

18    objection.  The only thing I think we should redact on Page 3

19    Your Honor, in the past --

20         THE COURT:  Hold on.  I can't hear you.  What do you

21    need?  Speak up louder.

22         MR. BRENNAN:  May I just --

23         THE COURT:  Yes.

24         MR. BRENNAN:  I'm okay.  The brains of the outfit --

25    I withdraw my objection.

Redirect Examination Cari Ray

```
1              THE COURT:  Mr. Cook knew what was going on every
2    step of the way.  That's what you're telling me, Mr. Brennan.
3              MR. BRENNAN:  That's correct.
4              THE COURT:  So, any objection with respect to O6 is
5    withdrawn.  And O6 remains an admitted exhibit in full.
6              MR. BRENNAN:  Thank you, Your Honor.
7              MS. JOHNSTON:  Your Honor, just for the record, we
8    have it redacted with tape that can be removed.  So, we'd like
9    to replace the first page that redacts her personal home
10   address.
11             THE COURT:  You want her address to appear or to not
12   appear?
13             MS. JOHNSTON:  To not appear.
14             THE COURT:  Do you have any objection to her address?
15             MR. BRENNAN:  Ours is like that.
16             MS. JOHNSTON:  What I'm saying is that the exhibit
17   copy has removable tape.
18             THE COURT:  Oh, we don't want that.
19             MS. JOHNSTON:  Can we substitute that?
20             THE COURT:  Later, over a break, substitute a
21   photocopy that's otherwise exactly the same as the version that
22   was received; as just that the redactions will then be on the
23   actual piece of paper, as opposed to, by virtue of whatever
24   that is, the tape, I guess, that was used to cover up the
25   personal identifying information.
```

Redirect Examination Cari Ray

1           MS. JOHNSTON:   Thank you.

2           (The following proceedings were had in open court.)

3           THE COURT:   You may continue.

4    Q    (BY MS. JOHNSTON)  You may read the statement.  Perhaps if

5    I could put it up on the screen so everyone can see it.

6         Whose handwriting is that?

7    A    It's Ashley's.

8    Q    Okay.  Can you read what she wrote?

9    A    It says, "Arrived at Harrison's at 4:30.  Harrison got in

10   the shower.  We planned on going to dinner.  We went to

11   Heavenly Chicken around five-ish.  When we left a guy named

12   Patrick called him.  Harrison told me was buying pills for a

13   guy named Mike that he worked with.  He asked if I minded if we

14   stopped since we were in Dunkirk.  I said, 'Sure,' gave him my

15   empty pill bottle.  He was gone about ten minutes.  Got back in

16   the car.  We came home, changed clothes, we had sex, laid in

17   bed for a while.  My phone rang and I went to the back door" --

18   is that "door" -- "for less than two minutes.  When I came back

19   he was nodding off.  I didn't think anything of it.  He falls

20   asleep all the time.  I laid back down.  About fifteen minutes

21   later I had to pee.  When I came back, he was out.  I also went

22   to sleep.  About an hour later I realized he was not snoring.

23   Went to wake him up.  He fell head-first on the floor, started

24   puking everywhere, but making no noise.  His lips were blue.

25   And" -- something around his eyes.  "He was puking constantly

Redirect Examination Cari Ray

1    all over me and him.  Tried doing CPR.  Ran upstairs screaming.

2    Sara and Pat, they called 911."

3    Q    And then there's some question and answers?

4    A    Yes.  I wrote the questions, she wrote the answers.

5         "When did you do cocaine?"

6         Answer:  "Two lines at 6:30 p.m."

7         Question:  "Did you see him do anything?"

8         Answer:  "No."

9         Question:  "When he was puking, did he make any noise?

10        Answer:  "No, it was just a constant flow."

11        Question:  "Did you ever see him do" -- you have to go

12   down a little bit more.  Thank you.  "Do drugs?

13        Answer:  "Yes.  He took a Percocet three weeks ago."

14        Question:  "Did you ever know him to do heroin?

15        Answer:  "No."

16        Question:  "Did he ever told you he did in the past?"

17        Answer:  "Yes.  Said he was very addicted to it.  Plus he

18   used to sell."

19        Question:  "Can you describe Pat's house?"

20        Answer:  "Brick, one-story.  Pat's dad's house.  Pat lives

21   with Harrison's mom."

22        Question:  "Do you want to add anything to this?"

23        Answer:  "No."

24             MS. JOHNSTON:  I have no questions.

25             THE COURT:  Thank you.  May this witness be excused?

Redirect Examination Cari Ray

```
1              MR. BRENNAN:  Yes, Your Honor.
2              THE COURT:  As far as the government's concerned?
3              MS. JOHNSTON:  Yes, Your Honor.
4              THE COURT:  You are excused, ma'am.
5              THE WITNESS:  Thank you, sir.
6              THE COURT:  Who's next?
7              MR. RAO:  The government calls Steven Demchuk, Drug
8    Enforcement Administration.
9              THE COURT:  Demchuk.
10             MR. RAO:  Demchuk, yes, Your Honor.
11             THE COURT:  How to you spell that?
12             MR. RAO:  D-e-m-c-h-u-k.
13             THE COURT:  Thank you.  Please come forward, sir, all
14   the way to the witness stand.  Remain on your feet and face the
15   clerk.
16             THE CLERK:  Please raise your right hand.
17                  STEVEN MICHAEL DEMCHUK,
18   called as a witness, being first duly sworn, was examined and
19   testified as follows:
20             THE WITNESS:  I do.
21             THE CLERK:  Please be seated.  State your name loudly
22   and clearly into the microphone and spell your name for the
23   record.
24             THE WITNESS:  Steven Michael Demchuk, D-e-m-c-h-u-k.
25             THE CLERK:  Thank you.
```

Direct Examination Steven M. Demchuk

```
1              THE COURT:  Your witness.
2                      DIRECT EXAMINATION
3    BY MR. RAO:
4    Q    Good morning -- good afternoon, Mr. Demchuk.
5    A    Good afternoon.
6    Q    Where are you currently employed?
7    A    I'm employed as a forensic chemist by the United States
8    Department of Justice, Drug Enforcement Administration in
9    Largo, Maryland.
10   Q    And how long have you been employed there?
11   A    Approximately 34 years.
12   Q    What are your duties?
13   A    My duties are to analyze samples of suspected narcotics
14   and dangerous drugs and upon occasion testify in court as to
15   results and methods of my analysis.
16   Q    What's your official position?
17   A    Senior forensic chemist.
18   Q    And how long have you served as a senior forensic chemist
19   with the Drug Enforcement Administration?
20   A    Approximately 15 years.
21   Q    What's your academic background as it relates to chemistry
22   and controlled substances?
23   A    I have a bachelor of science degree in chemistry from
24   Southampton College of Long Island University in New York.
25   And, upon entering the DEA, underwent a six-month DEA-conducted
```

Direct Examination Steven M. Demchuk

1    course in the analysis of drugs.  And with my continued

2    employment have attended approximately 12 short courses in

3    different instrumentation and aspects of forensic chemistry.

4    Q    How many years of experience do you have in analyzing

5    suspected drug exhibits?

6    A    It would be my whole career.

7    Q    And what professional societies do you belong to?

8    A    I'm a member of the Mid-Atlantic Association of Forensic

9    Scientists.

10   Q    Do you have any specialized training in forensic science

11   and drug identification that we haven't covered already?

12   A    No, sir.

13   Q    Have you testified previously as an expert concerning your

14   analyses?

15   A    Yes, sir.

16   Q    Approximately how many times?

17   A    Approximately 320 times.

18   Q    And in how many different courts, approximately?

19   A    In state and local courts in Virginia, West Virginia,

20   South Carolina, Alabama, and Ohio.

21   Q    And approximately how many suspected drug exhibits have

22   you examined?

23   A    Over 22,000 exhibits.

24   Q    Have you previously analyzed substances that were later

25   determined to contain heroin?

Direct Examination Steven M. Demchuk

1    A    Yes, sir.

2    Q    Approximately how many?

3    A    Approximately 3,000 times.

4              MR. RAO:  Your Honor, at this time I'd ask that Mr.

5    Demchuk be qualified as an expert witness in the field of

6    forensic chemistry.

7              THE COURT:  Voir dire?

8              MR. COOK:  No voir dire.  No objection to him being

9    qualified as an expert.

10             THE COURT:  Mr. Demchuk will be permitted to testify

11   as to his opinions within his field of expertise, forensic

12   chemistry.

13             MR. RAO:  Thank you, Your Honor.

14   Q    (BY MS. JOHNSTON)  When drug evidence arrives at the crime

15   lab, what is the standard operating procedure?

16   A    Evidence would come to the lab either by hand delivered or

17   Registered Mail, return receipt.  And it would be checked in by

18   the evidence custodian located in the vault.  And when we would

19   be assigned a case we would be assigned the case; we would go

20   to the vault; the evidence technician would pull that case and

21   give it to us.  And at that time we would inspect it to make

22   sure it had not been opened or tampered with in any fashion

23   before we accepted that evidence for analysis.

24   Q    And each time drug evidence is tested, what happens?

25   A    A report is generated with the summary of our results and

Direct Examination Steven M. Demchuk

1   also a case file with all the charts and spectra of our file.

2   And this would be handed into the supervisor for checking.  And

3   then it would go through the laboratory director for checking.

4   And then, such time, then it would be approved and the report

5   would go out to the originating office.

6   Q    Each time a test is done, is the sealed bag itself logged

7   out of the vault where the evidence is kept?

8   A    The evidence -- once we would be assigned a case, it would

9   remain in our personal lockbox until such time as the case was

10  finished.  In which case, we would seal it and return it back

11  to the main vault.

12  Q    And do you put your initials on it indicating that you had

13  handled the evidence?

14  A    My initials are all over the evidence as to when -- on the

15  actual heat seal when I received it, when I opened it, on the

16  inner bags.  I would initial and laboratory number on the

17  original bags, on the evidence stickers, inside the bag, and on

18  the outside of the bag.

19  Q    Handing you what's being marked as Government's Exhibit

20  DO7, I believe, and DO8 for identification.

21          THE COURT:  Wait a minute.  Hold on just a second,

22  Counsel.

23      I don't have a designation DO.

24          MR. RAO:  I'm sorry, O7 and O8.

25          THE COURT:  So, new exhibits.

Direct Examination Steven M. Demchuk

```
1            MR. RAO:  New exhibits, O7 and O8.  For
2    identification only.
3            THE COURT:  Marked for identification only O7 and O8.
4    Q    (BY MR. RAO)  Starting with O7, do you recognize what that
5    is?
6    A    Neither one is marked.
7    Q    I'm sorry.  O7 being the document marked with laboratory
8    number for Exhibit No. 1.
9            THE COURT:  Well, is it marked or isn't it?
10           MR. RAO:  We need to actually put a physical sticker
11   on it.
12           THE COURT:  Yeah.  You've got to do that.
13   Q    (BY MR. RAO)  Starting with O7, can you tell us what we're
14   looking at there?
15   A    Government's Exhibit O7 is a copy of my report from my
16   reanalysis that I had performed on case laboratory No. 3089658.
17   And attached to that is a copy of my worksheet, the front and
18   back.  And all the paperwork that I generated with all the
19   spectra and all attached to that.
20   Q    And --
21           THE COURT:  Okay.  So that's the Demchuk analysis
22   report with worksheet and lab paperwork.  That's the
23   description of O7.  Do you accept that, Counsel?
24           MR. RAO:  Yes, Your Honor.
25           THE WITNESS:  And also attached is the original
```

Direct Examination Steven M. Demchuk

1   chemist analysis of the report.

2   Q   (BY MR. RAO)  Now, does that report pertain to or relate

3   to a particular drug exhibit, as well?

4   A   Excuse me?

5   Q   Does that report reference a particular drug exhibit that

6   was being tested?

7   A   It would be, yes, sir, Exhibit No. 1.

8           THE COURT:  Well, we have no Exhibit No. 1, Counsel.

9   So what are we referring to?

10          MR. RAO:  I'm showing this witness what's been marked

11  D1 -- I'm sorry D1A.

12          THE COURT:  D1A.  All right.  Try to straighten that

13  out with your witness.  What relates to what here?

14          MR. RAO:  Exhibit O7 relates to Exhibits D1 and D1A,

15  which I'm now handing to the witness.

16          THE COURT:  Is that correct, sir?  Mr. Demchuk?

17          THE WITNESS:  Government's Exhibit O7 relates to

18  laboratory No. 3089658, Exhibit 1.  And Government's Exhibit

19  D1A is the original heat seal and the evidence enclosed for

20  3089658.  And also Government's Exhibit D1 is the original

21  packaging that was included in Government's Exhibit D1A, which

22  was sent out for fingerprint analysis.

23  Q   (BY MR. RAO)  Okay.  Now, were the procedures that we just

24  talked about described -- that you described with respect to

25  the handling of drug evidence, was that followed with respect

Direct Examination Steven M. Demchuk

1    to items D1 and -- excuse me -- D1 and D1A?

2    A    Yes, sir.

3    Q    Now, did you have the opportunity to conduct an

4    examination of item D1A in this case?

5    A    Yes, sir, I did.

6    Q    Okay.  Were you the first forensic chemist to conduct an

7    examination of that item?

8    A    No, sir.

9    Q    Who was the first chemist to actually examine that item?

10   A    It was forensic chemist Norman Newby.

11   Q    Okay.  And is Mr. Norman Newby still employed by the DEA?

12   A    No, sir.  He's retired.

13   Q    Now, what was the condition of the bag when you first

14   received it, item D1A?

15   A    Government's Exhibit D1A, when I received it, it was in

16   sealed, un-tampered condition.

17   Q    And what test did you perform with respect to Government's

18   Exhibit D1A?

19   A    I mean, I had originally opened this evidence twice.  Once

20   there was just a request for fingerprints.  And then the second

21   time there was a request to do the actual analysis.

22   Q    And, so, the second time that you opened the evidence,

23   what kind of analysis did you perform?

24   A    Okay.  I performed gas chromatography with mass spectral

25   chromatography, infrared spectroscopy, and a gas chromatography

1    screening.

2    Q    Okay.  Let's start with the first test.  Tell us the first

3    test you conducted, again?

4    A    Gas chromatography with mass spectral chromatography.

5    Q    What does that test involve?

6    A    It involves basically injecting, putting a sample in a

7    liquid, along running with blanks.  Injecting these samples on

8    an instrument where we go -- it would get highly volatilized

9    and very high temperatures.  And, as it would travel through a

10   column -- so, any components that are in the column would have

11   different rates that it would come out of the column.  And at

12   the end of the column it would be bombarded by electrons in a

13   breakdown pattern fragmentation --

14            THE COURT:  Could I see counsel, please?

15            (Bench conference on the record.)

16            THE COURT:  Is there a dispute about whether this is

17   heroin or not?

18            MR. COOK:  No.

19            THE COURT:  Okay.

20            MR. RAO:  Then I'll jump ahead.  They didn't want to

21   stipulate.

22            THE COURT:  He's the forensic chemist; he did the

23   normal chemistry test; what did the test reveal; it was heroin.

24   Is there any doubt in your mind --

25            MR. RAO:  No, that's fine.  There wasn't a

Direct Examination Steven M. Demchuk

1    stipulation in this matter, so I wasn't sure what the area was

2    counsel wanted to explore.

3             THE COURT:  Counsel?

4             MR. COOK:  There was a stipulation discussed.  We

5    wouldn't stipulate.  But there's --

6             THE COURT:  I'm not trying to push it.

7             MR. RAO:  Then I'll jump ahead.

8             THE COURT:  If it's not a dispute in the case,

9    then --

10             MR. RAO:  Okay.  That's fine.

11             MR. COOK:  Thank you.

12             (The following proceedings were had in open court.)

13   Q    (BY MR. RAO)  After conducting some of the tests that you

14   just told us about, did you come to an opinion to a reasonable

15   degree of scientific certainty as to the nature of the

16   substance?

17   A    Yes, sir.

18   Q    And what was that opinion?

19   A    That it contained heroin hydrochloride.

20   Q    Were there any other substances that you also found

21   present in Exhibit D1A?

22   A    Yes, sir.

23   Q    And what was that?

24   A    I found the sugar mannitol present.

25   Q    And what is mannitol?

Direct Examination Steven M. Demchuk

1   A     It's a sugar, which is just used for creating bulk in a

2   sample.

3   Q     Is it -- is mannitol a toxic substance?

4   A     No, sir.

5   Q     All right.  Now, what did you do with Exhibit D1A after

6   you finished your analysis?

7   A     After I was done with my analysis on Government's Exhibit

8   D1A, I reweighed the remaining portion of the sample; placed it

9   back into a new plastic bag, which I provided; affixed evidence

10  labels containing my signature, the date of sealing, and the

11  case number in my handwriting; along with the other open flaps

12  that were obtained from opening the bag originally; affixed an

13  evidence label to this open portion; heat sealed it by means of

14  a heating bar.  And at such time I replaced it in my lockbox

15  until such time as I returned it back to the DEA vault.

16  Q     And now is it in substantially the same condition as when

17  you returned it to the vault as it appears before you?

18  A     Yes, sir.

19  Q     Okay.  Handing you what has been marked Exhibits D2, D3,

20  and D4.  Starting with D2, can you tell the jury what is that

21  item?

22  A     D2 relates to our laboratory No. 92314, which I had the

23  occasion to perform a reanalysis upon.

24  Q     And were the procedures that you just described with

25  respect to handling of drug evidence followed with respect to

Direct Examination Steven M. Demchuk

1    that exhibit, as well?

2    A     Yes, sir.

3    Q     Okay.  And did you perform an analysis on Exhibit D2 to

4    determine the nature of the substance?

5    A     Yes, sir.

6    Q     And what was -- based upon that test that was conducted,

7    do you have an opinion to a reasonable degree of scientific

8    certainty as to the nature of that substance in item D2?

9    A     Yes.

10   Q     And what was that substance?

11   A     Inside Government's Exhibit D2 I found cocaine

12   hydrochloride.

13   Q     And were there any other substances detected along with

14   cocaine hydrochloride during the test that you conducted?

15   A     Yes, sir.  Phenyltetrahydroimidazothiazole.

16   Q     And what is that?

17   A     It's a compound used in the veterinary practice for

18   treating heartworms in dogs.  But, according to all the samples

19   I've seen, it's a very common cut used in cocaine.

20   Q     Okay.  When you say, "a cut," what do you mean by that?

21   A     To add bulk to the sample.  And I also found the sugar

22   inositol present.

23   Q     And what is inositol?

24   A     A sugar.

25   Q     Is it a dilutant?

Direct Examination Steven M. Demchuk

1    A    Diluant.

2    Q    Diluant.  Excuse me.  And what is that?

3    A    Something to add bulk, again, to a sample.

4    Q    Okay.  D2, after you conducted your reanalysis, did you

5    reseal the package and return it to the vault?

6    A    Yes, sir.

7    Q    And it's in substantially the same condition as when you

8    examined it -- when you conducted your examination of it?

9    A    Yes, sir.

10   Q    Turning now to D3, which is also in front of you.  Can you

11   tell the jury what is Government's Exhibit D3?

12   A    Government's Exhibit D3 relates to our laboratory No.

13   92315.  And it is a glass pipe, which I had occasion to do a

14   reanalysis on.

15   Q    And, again, that bag, is that also in substantially the

16   same condition as when you initially conducted your examination

17   and then returned it to the lab, to the vault?

18   A    The pipe is broken inside but the seals are intact inside.

19   Q    So, when you examined it, the pipe was actually intact?

20   A    If I could reflect my notes to see.

21   Q    Certainly.  You've got O7 and O8 before you.  If you could

22   take a look.

23   A    My notes reflect that it was an intact pipe.

24   Q    Okay.  So, at some point -- but the seal is still intact;

25   is that correct?

1   A    Yes, sir.

2   Q    Okay.  Now, did you perform an analysis on Exhibit D3 to

3   determine the nature of the substance contained therein?

4   A    Yes, sir.

5   Q    And, based upon the analysis and the test conducted, do

6   you have any opinion to a reasonable degree of scientific

7   certainty as to the nature of that substance?

8   A    Yes, sir.

9   Q    And what is that opinion?

10  A    I found tetrahydrocannabinol, which is the main

11  ingredient, active ingredient, in marijuana.

12  Q    Were you able to conclude whether or not marijuana itself

13  was contained in that exhibit?

14  A    I ran the marijuana test, a series of them, but one gave a

15  not-so-great color test.  So I did not -- without all the tests

16  being positive, I cannot call it marijuana.

17  Q    Did you observe some plant matter, though, in the course

18  of conducting your examination?

19  A    Yes, sir.  And some -- the indicative hairs of marijuana.

20  But one color test gave me a murky color.  So I could not call

21  it positive on that.

22  Q    And turning now to D4, which is also in front of you.  If

23  you could tell the jury what is that on?

24  A    Government's Exhibit D4 relates to our laboratory No.

25  92316, which is a spoon with residue.  And also inside is a

Cross-examination Steven M. Demchuk

1    vial with liquid.  And I had occasion to perform analysis upon

2    that.

3    Q    Okay.  And, upon performing an analysis of that, did

4    you -- did you come to an opinion within a reasonable degree of

5    scientific certainty as to the nature of that substance

6    containing -- on the spoons in item D4?

7    A    Yes, sir.

8    Q    And what was that substance?

9    A    This was heroin residue I found in the liquid.

10   Q    Okay.  And is that bag now in substantially the same

11   condition as when you returned it to the vault upon the

12   conclusion of your examination?

13   A    Yes, sir.

14            MR. RAO:  No other questions, Your Honor, thank you.

15            THE COURT:  Cross.

16                        CROSS-EXAMINATION

17   BY MR. COOK:

18   Q    Good afternoon, Mr. Demchuk.

19   A    Good afternoon.

20   Q    Do you still have Government's Exhibit -- I think it's 7,

21   O7 and O8, in front of you?

22   A    Yes, sir.

23   Q    Why don't you take a look at Government's Exhibit O7,

24   which has been marked for identification only.  And -- well,

25   the jurors can't see it.  But there's a number of columns about

Cross-examination Steven M. Demchuk

1    halfway down the page.  And the first column is called "exhibit
2    number"; is that correct?
3    A    Yes, sir.
4    Q    Okay.  And there's a column over toward the right, it says
5    something about CONC or purity.  What's that column for?
6    A    Oh, concentration or purity.
7    Q    What should be put in that column?
8    A    If we would do a full analysis, we would do a quantitation
9    by gas chromatography as to the percent of purity of the drug.
10   But, being a reanalysis, it's lab policy not to do a
11   concentration or a purity test.
12   Q    So, you did not do a concentration or purity test relating
13   to what you're reporting, Government's Exhibit O7, right?
14   A    That's correct.
15   Q    So, you can't say what the purity or concentration of
16   heroin in that substance was?
17   A    No, I cannot.
18   Q    Okay.  And the same would also be true for Government's
19   Exhibit O8, which was marked for identification only.  The
20   three substances, the cocaine and the THC and the heroin
21   residue, you can't testify what the concentration or purity of
22   the actual drug in those substances is; is that correct?
23   A    That's correct.
24   Q    Okay.  Now let me ask you this:  You describe different
25   substances that are sometimes mixed with the heroin or the

Redirect Examination Steven M. Demchuk

1    cocaine.  You called it, "cut," right?

2    A    Yes, sir.

3    Q    And I guess, being a chemist, you see all kinds of

4    different substances with different samples, different types of

5    cut; is that correct?

6    A    That's correct.

7    Q    And do you have any way in your laboratory to compare,

8    say, one sample of heroin, which has this specific type of cut

9    used with it, with maybe another sample from another unrelated

10   case?  Is there a way for your lab to do that?

11   A    No, sir.

12   Q    Okay.  So, you didn't do that in this case.  There isn't

13   even a way to do it.

14   A    What I did was identify what was in the compound, period.

15            MR. COOK:  Thank you.  No further questions.

16            THE COURT:  Redirect.

17                        REDIRECT EXAMINATION

18   BY MR. RAO:

19   Q    Mr. Demchuk, you testified on direct that you were doing a

20   reanalysis of this; is that right?

21   A    Yes.

22   Q    And do you know why a reanalysis was done in this case?

23            MR. COOK:  Objection.

24            THE COURT:  Basis?

25            MR. COOK:  Just relevance.

Redirect Examination Steven M. Demchuk

```
1              THE COURT:  Overruled.
2              THE WITNESS:  The original chemist had retired and
3    the government chose not to bring him back to do the testimony.
4    Q    (BY MR. RAO)  And, so, in order to -- you were then
5    assigned to conduct a new analysis of this substance; is that
6    right?
7    A    Yes, sir.
8    Q    Okay.  And you did not conduct a purity concentration --
9    or, test of the purity or concentration of the drug; is that
10   right?
11   A    That's correct.
12   Q    Was a purity or concentration test done by the prior
13   chemist?
14             MR. COOK:  Objection.
15             THE COURT:  Well, overruled as to this question.  Yes
16   or no, was a purity test done by the original chemist?
17             THE WITNESS:  Yes, Your Honor.
18             THE COURT:  Next question.
19             MR. RAO:  What was the result of that test?
20             MR. COOK:  Objection.
21             THE COURT:  Sustained.  Lack of foundation, for one
22   thing.
23             MR. RAO:  No other questions, Your Honor.
24             THE COURT:  May this witness be excused, Mr. Cook?
25             MR. COOK:  Yes, Your Honor.
```

Redirect Examination Steven M. Demchuk

```
1              THE COURT:  And Mr. Rao?

2              MR. RAO:  Yes, the witness may be excused.

3              THE COURT:  You may be excused.

4              THE WITNESS:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6         Ladies and gentlemen, it's lunchtime.  Time to take a

7    recess.  Don't discuss this case with anyone during lunch.

8    Don't discuss it among yourselves.  Don't look at any news

9    articles or reports that touch upon this case or the issues

10   that it presents or any such articles or reports relating to

11   any participants in the case.  Avoid all contact with any of

12   the participants in the trial.

13        Do not make any independent investigation of the law or

14   the facts in this case.  Do not look up anything on the

15   Internet.  Do not consult an encyclopedia or a dictionary.

16        It's 1:05 on my watch.  Let's return at 2:15.  That's one

17   hour and ten minutes.

18              (Jury left the courtroom.)

19              THE COURT:  We have proposed verdict forms for you.

20   Ms. Griffith, if you would distribute those.  Any matters that

21   need to be taken up outside the hearing of the jury?

22              MS. JOHNSTON:  I don't believe so, Your Honor.

23              MR. COOK:  No, Your Honor.

24              THE COURT:  So, an hour and ten minutes, 2:15,

25   Counsel.
```

Direct Examination Jeff Dye

```
 1                    (A recess was taken.)

 2              THE COURT:  Anything to take up outside the hearing

 3    of the jury?

 4              MS. JOHNSTON:  No, Your Honor.

 5              THE COURT:  Bring them in.

 6              (Jury entered the courtroom.)

 7              THE COURT:  Be seated, please.  The government may

 8    call its next witness.

 9              MR. RAO:  Government calls Jeff Dye.

10              THE COURT:  Sir, if you would stand and face the

11    clerk.

12              THE CLERK:  Raise your right hand.

13                          JEFF DYE,

14    called as a witness, being first duly sworn, was examined and

15    testified as follows:

16              THE WITNESS:  I do.

17              THE CLERK:  Please be seated.  State your name loudly

18    and clearly into the microphone and spell your name for the

19    record.

20              THE WITNESS:  Jeff Dye.  The last name is D-y-e.

21              THE COURT:  Your witness, Counsel.

22              MR. RAO:  Thank you, Your Honor.

23                        DIRECT EXAMINATION

24    BY MR. RAO:

25    Q    Good afternoon.
```

Direct Examination Jeff Dye

```
1    A    Hi.

2    Q    Mr. Dye, where are you employed?

3    A    Bradley Mechanical.

4    Q    And what is Bradley Mechanical?

5    A    It's a commercial air conditioning company.

6    Q    How long have you been employed there?

7    A    I'm the owner, president, 22 years.

8    Q    And where is that business located?

9    A    Sterling, Virginia.

10   Q    And, as president, what are your duties and

11   responsibilities?

12   A    Pretty much all the administrative work.  Estimating.  I

13   do, obviously, the payroll.  Different -- pretty much

14   everything.  It's a small company.  We only have 12 people.

15   Q    Understood.  Did you ever know someone by the name of

16   Harrison Waite?

17   A    Yes, Harrison Waite worked for me.

18   Q    In what capacity did he work for you?

19   A    He was an apprentice, an HVAC apprentice.  He worked four

20   and a half years.

21   Q    And how was he -- how did he come to be employed by you?

22   A    Through another employee that grew up in the neighborhood

23   with him, Donnie Jacobs.

24   Q    How long did Mr. Waite work for you?

25   A    Four and a half years.
```

Direct Examination Jeff Dye

1    Q    And what sort of things did he do?

2    A    He did duct work.  Some -- refrigeration piping and chill

3    water piping and stuff.  He was very versatile; he was a good

4    employee.

5    Q    Was he prompt to work?

6    A    Yes.

7    Q    Was he a reliable employee?

8    A    Yes, he was.

9    Q    While he was working for you, what were his typical

10   working hours?

11   A    6:00 a.m. to 2:00 p.m.

12   Q    And, in connection with his employment at Bradley

13   Mechanical, what sort of items was he issued by Bradley

14   Mechanical?

15   A    All the employees have cell phones.  He had a

16   commercial -- he had a vehicle, a van.  And they have a company

17   credit card to pay for gas and stuff.

18   Q    Okay.  I want to show you on the screen in front of you;

19   if you look to your right there's a computer screen.  On that

20   screen I'm showing you what's been marked as Government Exhibit

21   R1A.  All right.  Under, "subject number," there, there's a

22   telephone number.  Do you recognize that telephone number?  Are

23   you familiar with that telephone number?

24   A    Yeah.  It mean, it's Harry's number.  I only know that

25   because of the records I provided.  But, I mean, Harry.  On my

1   cell phone it said "Harry."  So, I didn't know his number.

2   Q    So, who was using that telephone number between June of

3   2008 and about March 2009?  March 24th, 2009?

4   A    Harry was.

5   Q    When you say Harry, you're referring to Harrison Waite?

6   A    Harrison Waite, yes.

7   Q    Okay.  For what period of time during his employment with

8   you was Mr. Waite assigned that telephone number?

9   A    Probably the last three and a half years that he worked

10  for me.

11  Q    And during that three and a half year period was anyone

12  else assigned to that particular telephone number?

13  A    No.  Everybody has their own phone.

14  Q    To your knowledge, did any other employees of Bradley

15  Mechanical ever use that telephone number?

16  A    No, not to my knowledge.  I mean, I paid all the bills, so

17  I would check it -- I mean, I didn't check every phone call.

18  But obviously I would assume.  To my knowledge, Harry was the

19  only one using that phone.

20  Q    Okay.  Do you also know somebody by the name of Michael

21  Toszer?

22  A    Yes.  Michael works for me.

23  Q    He currently works for you?

24  A    Yes.  He's been working for 18 years at Bradley.

25  Q    Is he a full-time or part-time employee?

Direct Examination Jeff Dye

1    A    Full-time.

2    Q    And what are his typical hours of work?

3    A    6:00 a.m. to 2:00 p.m.

4    Q    In connection with his -- how long has he been an employee

5    for you, again?

6    A    It's almost 18 years.

7    Q    Okay.  And, in connection with his employment with Bradley

8    Mechanical, how long -- what items has he been issued by

9    Bradley Mechanical?

10   A    He has the same.  It's -- he has a cell phone, a company

11   credit card, and a company vehicle.  And then he's got a few

12   more tools; he's got more power tools.  He's a little more

13   versatile.  So, he's got -- anything that's not a hand tool we

14   provide.

15   Q    Now, with respect to company vehicles, do you keep GPS

16   trackers or any other kinds of devices on the company vehicles?

17   A    I do not.

18   Q    Okay.  Now, I want to show you what's marked as Government

19   Exhibit R2A.  The second page of Exhibit R2A.  And there where

20   it says, "subject number."  Do you recognize that telephone

21   number?

22   A    Yeah.  That's Michael's cell phone number.

23   Q    When you say Michael, you're referring to Michael --

24   A    Michael Toszer.

25   Q    Okay.  And has Michael Toszer been the user of that

Direct Examination Jeff Dye

1    telephone number for the entirety of his employment, for the

2    duration of the time that that cell phone had been issued to

3    him by Bradley Mechanical?

4    A    Yes.  He's probably had that phone for between 10 and 11

5    years.

6    Q    To your knowledge -- same question as before -- has anyone

7    else at Bradley Mechanical ever been assigned that telephone

8    number?

9    A    No.

10   Q    Okay.  And to your knowledge have any other employees ever

11   used that telephone number at Bradley Mechanical?

12   A    No, not to my knowledge.

13              MR. RAO:  Okay.  No further questions.  Thank you.

14              THE COURT:  Cross.

15              MR. COOK:  No questions for this witness.

16              THE COURT:  May the witness be excused?

17              MR. COOK:  Yes.

18              MR. RAO:  Yes, sir.

19              THE COURT:  You're excused, sir.  Thank you.

20              MR. RAO:  The government calls Detective Ricky Cress.

21              THE COURT:  Come on up, sir, to the witness stand.

22   Remain on your feet and face the clerk, please.

23              THE CLERK:  Please raise your right hand.

24                   DETECTIVE RICHARD CRESS,

25   called as a witness, being first duly sworn, was examined and

Direct Examination Detective Richard Cress

1    testified as follows:

2              THE WITNESS:  I do.

3              THE CLERK:  Please be seated.  State your name loudly

4    and clearly into the microphone and spell your name for the

5    record.

6              THE WITNESS:  Richard Cress, C-r-e-s-s.

7              THE CLERK:  Thank you.

8              THE COURT:  Your witness, Counsel.

9                          DIRECT EXAMINATION

10   BY MR. RAO:

11   Q    Good afternoon, Detective.  Please tell us by whom are you

12   currently employed.

13   A    I'm a narcotic detective with the Calvert County Sheriff's

14   Office.

15   Q    And how long have you been so employed?

16   A    I've been with the Calvert County Sheriff's Office for 12

17   years.

18   Q    And what is your current position?

19   A    Narcotic detective.

20   Q    And, as a narcotics detective, what are your duties?

21   A    Investigate narcotic-related offenses or crimes.

22   Q    Now, directing your attention to May 21st of 2010, were

23   you working on that day?

24   A    Yes, I was.

25   Q    At approximately 2:30 p.m. were you located at 9101 Hall

Direct Examination Detective Richard Cress

1    Court in Owings, Maryland in Calvert County?

2    A    Yes.

3    Q    Why were you at that location at that day?

4    A    To attempt to serve a district court indictment, federal

5    indictment warrant.

6    Q    And who else was working with you on that day?

7    A    Sergeant Roscoe Jones and Deputy Mike Tomlison.

8    Q    And at that approximate date time and location, did you

9    make an arrest?

10   A    Yes, we did.

11   Q    And what was the name of the individual in whose arrest

12   you assisted with?

13   A    Patrick Sweeney.

14   Q    Do you see Patrick Sweeney in the courtroom here today?

15   A    Yes.  He's to my right with a black jacket and a maroon

16   shirt.

17            MR. RAO:  Your Honor, ask the record reflect the

18   witness has identified the defendant.

19            THE COURT:  So reflect.

20            MR. RAO:  Now, why did you go to 1901 Hall's Court in

21   Owings in Calvert County, Maryland to -- on March -- on May

22   21st of 2010?

23            MR. BRENNAN:  Objection, Your Honor, relevancy.

24            THE COURT:  Let me see counsel.

25            (Bench conference on the record.)

Direct Examination Detective Richard Cress

 1                THE COURT:  I brought you up here because I don't

 2     want this discussion in the hearing of the jury because it

 3     might be sensitive.  But you already said why he went there.

 4                MR. BRENNAN:  Well, but I don't think it's the arrest

 5     of Mr. Sweeney, Your Honor.  The arrest, beyond that I don't

 6     know what's relevant at this point in time on May 2010.

 7     It's -- the counts in this case charge events that occurred on

 8     March 23, 2009.  This is more than a year later.

 9                THE COURT:  Well, I have a more superficial issue.

10     And that is the door's open on why he went there.  That's

11     already been asked, answered.  He's covering it again.  Beyond

12     that, are you planning to go beyond that?

13                MR. RAO:  Yes, I am.  There was some evidence that

14     was recovered in connection with his visit to that location on

15     that date that's relevant to this charge.

16                THE COURT:  Give me a proffer.

17                MS. JOHNSTON:  It's a cell phone that was recovered.

18     It's the same cell phone number that was used during the calls

19     in 2009 was recovered.

20                MR. BRENNAN:  Just the cell phone, that's fine.  I

21     thought it was something else that was coming in, Your Honor.

22                MR. RAO:  At this time, Your Honor.

23                MR. BRENNAN:  What do you mean at this time?

24                MR. RAO:  Depending on how the rest of the evidence

25     plays out.

Direct Examination Detective Richard Cress

1          THE COURT:  I can't hear you, Counsel.

2          MR. RAO:  I'm sorry.  Depending how the rest of the

3    evidence plays out, we may recall him with respect to some

4    additional items.  There were some narcotics that were

5    recovered.  And, if you recall, Judge Messitte had issued a

6    ruling, a limited ruling, allowing under certain circumstances

7    for some of the drugs that were recovered from the residence at

8    that time to be included insofar as they related to

9    distribution.  And, so, should the evidence point in that

10   direction, we would want to recall Officer Cress at that time

11   to deal with that evidence.  We don't plan on introducing --

12         THE COURT:  In any case, it's not ripe now.  And it's

13   not going to happen during this examination of this witness.

14         MR. RAO:  Yes.

15         MR. BRENNAN:  That's why I came up, Your Honor.

16         (The following proceedings were had in open court.)

17         THE COURT:  Why don't you ask the question again, Mr.

18   Rao.  I'm not sure the witness is going to remember the

19   question.

20         MR. RAO:  Sure.

21   Q    (BY MR. RAO)  Okay.  Why did you go to 9101 Hall's Court

22   in Owings in Calvert County, Maryland on May 21st, 2010?

23   A    In the attempt to serve a federal district court

24   indictment.

25   Q    I'm showing you what's been marked as Government's P10.

Direct Examination Detective Richard Cress

1  Do you recognize the residence that's depicted in that

2  photograph?

3  A    Yes, I do.

4  Q    And what is that?

5  A    That is the address that I responded to.

6  Q    What happened after you responded to the residence?

7  A    I knocked on the front door and made contact with a male.

8  Q    And did you speak to that male?

9  A    Yes, I did.

10 Q    What, if anything, did you say to the man who answered the

11 door?

12 A    I advised him that I had an arrest warrant for Patrick

13 Sweeney.  Was he home and could I come in and get him.

14 Q    And was --

15        THE COURT:  Let me see counsel.

16        (Bench conference on the record.)

17        THE COURT:  I don't want any inadvertent blurts here.

18 Can I assume this witness knows what's in bounds and what's out

19 of bounds, at least at this time?

20        MR. RAO:  Yes, that's correct.

21        THE COURT:  All right.  Thank you.

22        (The following proceedings were had in open court.)

23        THE COURT:  Go ahead, Counsel.

24 Q    (BY MR. RAO)  And after speaking with this individual did

25 you have an opportunity to go inside the residence?

Direct Examination Detective Richard Cress

```
1   A    Yes, I did.
2   Q    And was Mr. Sweeney, the defendant, inside the residence
3   at that time?
4   A    Yes, he was.
5   Q    Where was he in that residence?
6   A    In the basement of the residence.
7   Q    And what -- where did you -- what happened when you
8   encountered the defendant in the basement of the residence?
9   A    I made contact with him in the basement of the residence.
10  I advised him that he had an indictment, an arrest warrant, and
11  that he needed to go with me.
12  Q    Okay.  What else did you see in the basement -- in the
13  basement in the great room as you came in?
14  A    I located a phone inside of that room.  There was some
15  medical equipment in that room, as well.
16  Q    Okay.  And how did that phone come to your attention?
17  A    We had brief conversation about the medical -- his medical
18  condition.  And he advised that he needed to make contact with
19  his nurse that was supposed to come to the residence later on
20  that day.  He directed -- he pointed to a phone that was
21  plugged in in the wall and said that he needed to call the
22  nurse.
23  Q    Okay.  And did you then subsequently retrieve the
24  telephone that he had indicated was plugged in on the floor?
25  A    Yes, I did.
```

Direct Examination Detective Richard Cress

1    Q    Showing you what's been marked as Government's Exhibit S1.

2    Do you recognize that?

3    A    Yes, I do.

4    Q    What is that?

5    A    It's the phone that I recovered from the residence.

6    Q    Okay.  Do you know sitting here today what the phone

7    number is that's associated with that telephone that's S1?

8    A    I do not recall.

9    Q    Okay.  Would viewing the internal contents of that

10   cellular telephone refresh your recollection as to the number

11   of that cellular telephone?

12   A    That's correct.

13   Q    Okay.  If you could remove the telephone from the bag.

14   Turn it on.  And pull it up to the screen that reflects what

15   number is associated with that particular handset.

16   A    The number is 1 (301) 661-5311.

17         THE COURT:  (301) 661-5311?

18         THE WITNESS:  Yes, sir.

19   Q    (BY MR. RAO)  Showing you what's been marked as

20   Government's Exhibit T6.  If you could, take a look at that

21   document.  And where it -- do you see that telephone number

22   that you've just pulled up reflected on that document anywhere?

23        Turn down to the section in yellow.

24   A    Yes, I do.

25   Q    Okay.  If I could hand you a pen.  If you could write the

Direct Examination Detective Richard Cress

```
 1    name "Sweeney" where that number appears.

 2              THE COURT:  On T6.

 3              MR. RAO:  On T6.  Just on one page.  Thank you.

 4         Who had the phone when you seized it?

 5              THE WITNESS:  It was plugged into the wall.

 6    Q    (BY MR. RAO)  Okay.  And Mr. Sweeney had just gestured at

 7    it, indicating the phone belonged to him; is that correct?

 8    A    That's correct.

 9              MR. RAO:  Okay.  No further questions.

10              THE COURT:  Cross.

11              MR. BRENNAN:  No questions.  Thank you.

12              THE COURT:  May the witness be excused?

13              MR. RAO:  Yes, Your Honor.  Thank you.  With leave

14    to -- not permanently excused.

15              THE COURT:  Okay.  Sir, you're not excused.  Your

16    testimony may be required at a later time during this trial.

17    So please remain in contact with the attorneys in the case to

18    see if and when your testimony might be required again.  You

19    may step down.

20         Next witness.

21              MS. JOHNSTON:  Our next witness would be Rajiv Nair.

22              THE COURT:  Rajiv Nair.  Please come all the way up,

23    sir, up by the witness stand here.  Remain on your feet and

24    face the clerk.

25              THE CLERK:  Please raise your right hand.
```

Direct Examination Rajiv Nair

```
 1                         RAJIV NAIR,
 2   called as a witness, being first duly sworn, was examined and
 3   testified as follows:
 4           THE CLERK:  Please be seated.  State your name loudly
 5   and clearly into the microphone and spell your name for the
 6   record.
 7           THE WITNESS:  Rajiv Nair.  R for Robert, A for apple,
 8   J for Julian, I for India, V for Victor.  Last name is Nair, N
 9   for Nancy, A for apple, I for India, R for Robert.
10           THE COURT:  Thank you, sir.  Would you pull the lower
11   part of the microphone down.  It will be easier to get right
12   near your lips there.  That's good.
13           Your witness, ma'am.
14           MS. JOHNSTON:  Thank you, Your Honor.
15                     DIRECT EXAMINATION
16   BY MS. JOHNSTON:
17   Q    Move your chair forward a little bit more if you're more
18   comfortable.
19        Mr. Nair, where do you work?
20   A    I work for AT&T Mobile.
21   Q    How long have you worked with AT&T Mobile?
22   A    More than five years.
23   Q    What is your current assignment?
24   A    I'm working as a senior RAN engineer.  RAN stands for
25   radio access network.
```

Direct Examination Rajiv Nair

1    Q     What are your duties as a senior RAN engineer?

2    A     My main duties are radio network planning, design,

3    optimization of the network to make sure the cell site is up

4    and running.  I have access to call record data and analysis of

5    the same.  And also the coverage analysis of the cell site;

6    like how much the cell site covers.  Details like quality,

7    coverage, like that.

8              THE COURT:  If you are able, could you speak in a

9    slightly louder voice or closer yet to the microphone and a

10   little bit more slowly?

11             THE WITNESS:  Yeah.

12             THE COURT:  Thank you very much, sir.

13   Q     (BY MS. JOHNSTON)  Do your ancillary duties including

14   serving as a custodian of records for AT&T Mobile?

15   A     Yes.

16   Q     As such, are you familiar with the records that are

17   created and maintained by AT&T Mobile in the ordinary course of

18   their business?

19   A     Yes.

20   Q     And did AT&T Mobile provide records pursuant to a subpoena

21   in this case?

22   A     Yes.

23   Q     Let me show you what's been marked as Government Exhibit

24   R3.  And I ask you if you've had occasion to view this disk.

25   A     Yeah, I've gone through that.  Thank you.

Direct Examination Rajiv Nair

1    Q    Can you tell us what's contained on R3?

2    A    It's basically customer informations, which have MC

3    number, mobile number, IMA number, handset numbers, and call

4    record data, which has a lot of parameters.

5    Q    For what telephone number is that data?

6    A    It's (301) 661-5311.

7    Q    Let me show you what's first -- the next document that's

8    been marked as R3A.  It will come up on your screen there.  I

9    ask you if you recognize that document.

10   A    Yes, ma'am.

11   Q    What is that?

12   A    That's the subscriber information of Veronica Sweeney.

13   Q    What telephone number?

14   A    Telephone number (301) 661-5311.

15   Q    And where is that phone -- who is that phone subscribed

16   to?

17   A    Subscribed to Veronica Sweeney.

18   Q    At what address?

19   A    9101 Hall Court, Owings, Maryland 20736.

20   Q    Are you able to tell us when that phone was active?

21   A    04/24/2007 to 08/04/2010.

22   Q    And during that time period did it maintain that same

23   telephone number, 661-5311?

24   A    Yes.

25   Q    I just want to show you what's been marked as R3C.  Do you

Direct Examination Rajiv Nair

1    see that document?

2    A    Yes, ma'am.

3    Q    And what is that?

4    A    It gives basically the call record data with cell

5    locations informations.

6    Q    And is that one of the pages of the records that you

7    provided on the disk to us?

8    A    Yes, ma'am.

9    Q    If we could start with the first column, can you tell us

10   what's contained in that first column?

11   A    It gives item No. 8569, gives the connection date and

12   time, seizure time.  Basically seizure time is the time from

13   the send button is pressed until it is connected to the

14   network.  It also gives origination number, dial number, and

15   termination number.  And also elapsed time, which gives like

16   the time from the phone is connected to the network until the

17   call end.  And also the LAC information with the --

18   Q    In terms of the first column, those would be the number of

19   items that you provided pursuant to our subpoena; is that

20   correct?

21   A    Yes, that's correct.

22   Q    The second column would give us the date.  That's the date

23   and time of a particular call; is that correct?

24   A    That's correct.

25   Q    Now, what is the seizure time?

Direct Examination Rajiv Nair

1    A    Seizure time is a time from the moment you press the send

2    button to the connection of the network, the time connected to

3    the network.

4    Q    And is that time different from the time when it's

5    connected to another telephone?

6    A    Yes.  You mean to say talk time?

7    Q    Yes.

8    A    Yes, it's different.  It's separate.  Like, the elapsed

9    time doesn't include the seizure time.

10   Q    So, what is included in the elapsed time?

11   A    Elapsed time is like, once it is connected to the network,

12   from that until the call's end.

13   Q    Once it's connected to the network till the call's end?

14   A    Correct.

15   Q    Whether or not someone answered the phone?

16   A    No.  It has to.  It has to.

17   Q    It has to be what?

18   A    It has to -- I mean, it could be a voice mail; or it has

19   to pick up -- the party picks up the call.

20   Q    So, the party picks up the call or it goes to voice mail?

21   A    It can be.  If it is --

22   Q    Excuse me?

23   A    If it is going to voice mail, then in that case that we

24   can also see that in the elapsed time.

25   Q    So, the elapsed time would include time going to voice

Direct Examination Rajiv Nair

1    mail?

2    A    Yes.

3    Q    And include times of actual communication?

4    A    Yes.

5    Q    But not the seizure time?

6    A    No.

7    Q    And then we have the originating number.  What does that

8    tell us?

9    A    The originating number says that's the alternating party.

10   For this -- like let's say, for example, 5311.  If you say that

11   it is the target number.  If the target number comes in the

12   originating number column, that means that number is initiating

13   the call.

14   Q    So that number is making an outgoing call?

15   A    An outgoing call, yes.

16   Q    And the next number, what is that?

17   A    That's the terminating number.

18   Q    And, the elapsed time, we've gone over.  Number dialed,

19   what does that column tell us?

20   A    That's the number to which the 5311 dialed.

21   Q    The following column is marked IMEI.  Can you tell us what

22   that is?

23   A    IMEI is International Mobile Station Equipment Identity

24   number.  The number corresponds to the handset number, which is

25   a unique number for the handset.

Direct Examination Rajiv Nair

1   Q     And to which number does that IMEI number go to?

2   A     The IMEI number goes to the target number.  Here it is

3   5311, the number ending in 5311.

4   Q     And then we have the IMSI number.  Can you tell us what

5   that is?

6   A     That's an IMSI number.  The International Mobile

7   Subscriber Identity number.  It also belongs to the target

8   number.  Here it is, ending in 5311.  That's basically called

9   similar number.

10  Q     So the IMEI and IMSI number throughout these records would

11  be the same?

12  A     Yes, ma'am.

13  Q     All these for the target number 5311?

14  A     Yes.  Unless you change the mobile number.

15  Q     Then we have the next column, which is a description

16  column.  Can you tell us what that is?

17  A     The description column, basically it provides the

18  description of origination and termination number type.  In the

19  sense, like let's say the last one, first call M2M, the caps M

20  represents AT&T Mobile, the network.  2 -- the caps M after 2,

21  that means like the dialed number is also AT&T Mobile network

22  number.

23  Q     And the DIR?

24  A     It's an outgoing call, basically, in essence.

25  Q     And then the cell location.  Can you tell us what that

Direct Examination Rajiv Nair

1    information is?

2    A     The first number, 07987, that represents a location area

3    code, slash the site number, 15322, followed by the LAC longs.

4    Basically longitude and latitude of the cell site.

5    Q     And, with that information, are you able to plot or locate

6    those cell towers?

7    A     Yes.  That's correct.

8    Q     By using Google Map or another mapping program?

9    A     Yes, we can do that.

10   Q     And can anyone else do that, just using those numbers you

11   have there?

12   A     With that latitude and longitude, if you put it in the

13   Google, you can get the position, yes.

14   Q     After you enter those numbers?

15   A     Yes.  You can put it in Google.

16   Q     Now, with those cell sites, can you tell us what range the

17   cell site has?

18   A     It depends, again.  Basically, to take an example, like if

19   it is a downtown area like Baltimore and D.C. where there's a

20   lot of tall buildings, there will be a lot of propagation

21   losses for the signal of the base station which is

22   transmitting.  So, in places like downtown it could be, like,

23   as short as half a mile.  But if it is like if you go to a more

24   rural area, it can be like more than one mile, two miles, also.

25   Q     And do you have a general range for your cell sites at

Direct Examination Rajiv Nair

1    AT&T?

2    A    It depends, actually.  We cannot say that, no.

3    Q    Now, in looking at these records, if we could go down the

4    records, do you see the entry right above?

5    A    Yes, ma'am.

6    Q    And what was the date and time of that call?

7    A    I cannot see the dates, sorry.

8         For the call 8594?

9    Q    Yes.

10   A    The date is 03/24/2009.  Time 12:11 a.m.

11   Q    And was that an incoming or outgoing call from 5311?

12   A    It was an outgoing call.

13   Q    And what was the duration of that call?

14   A    It was four minutes, eight seconds.

15   Q    And what number was dialed by 661-5311?

16   A    It was dialed to (703) 928-5791.

17   Q    And, the terminating number, however, is a different

18   number.  Can you explain to us what a terminating number is?

19   A    Yeah.  Basically there are two types.  Basically it could

20   be two possible way.  One is like it could be call forwarded.

21   And another reason is like it could be a routing number, also;

22   the switch uses to route the call.  So, that's like a temporary

23   number, the routing number.

24   Q    Is that anything at all to do with what number 661-5311

25   called?

Direct Examination Rajiv Nair

1    A     No.

2    Q     And then again we have these letters in your description

3    column?

4    A     Yeah.  It basically says that the number is, again, AT&T

5    caps M2O.  O, basically it stands for other nonmobile number.

6    But there are cases, like if the switch doesn't have a table

7    where the mobile is not updated as where like, let's say in

8    this example, 703 number, if it is not updated in the table as

9    a mobile or it is not defined as a mobile, then the switch

10   categorizes that as O, as in nonmobile like that.

11   Q     And is that one of the problems with the switches, that

12   your switches don't have all of the other carriers' mobile

13   numbers?

14   A     That's one of them, yes.

15   Q     And, however, the record indicates that -- what number

16   originated the call and the number that received the call; is

17   that correct?

18   A     That's correct.

19   Q     And the number that received this call was the (703)

20   925-8791; is that correct?

21   A     Yes, that's correct.

22         THE COURT:  You want to restate that, Counsel?

23   Q     (BY MS. JOHNSTON)  And in regards to this record, although

24   there's a different terminating number, what does the record

25   tell us concerning the activity that occurred on March 24th at

1    12:11 a.m.?

2    A     The record says that the phone number ending at 5311

3    dialed the one ending with 5791.  And for the duration of 4:08

4    second.  And it was billed for 4:08.

5              THE COURT:  For the record, because I believe counsel

6    transposed her numbers, the number called was (703) 928-5791;

7    is that your testimony?

8              THE WITNESS:  Yes.

9              MS. JOHNSTON:  Thank you, Your Honor.

10       I have no further questions.

11             THE COURT:  Cross.

12             MR. COOK:  Court's indulgence.

13             No questions, Your Honor.

14             THE COURT:  May the witness be excused?

15             MR. COOK:  Yes, Your Honor.

16             MS. JOHNSTON:  Yes, Your Honor.

17             THE COURT:  Sir, you're excused.  Thank you.

18             THE WITNESS:  Thank you.

19             THE COURT:  Next witness.

20             MS. JOHNSTON:  Ryan Lombardo.

21             THE COURT:  Ryan Lombardo.  Sir, come all the way up

22   here to the witness stand.  Remain on your feet and turn and

23   face the clerk.

24             THE CLERK:  Please raise your right hand.

25                            RYAN LOMBARDO,

Direct Examination Ryan Lombardo

1  called as a witness, being first duly sworn, was examined and

2  testified as follows:

3              THE WITNESS:  I do.

4              THE CLERK:  You may be seated.  Please state your

5  name loudly and clearly into the microphone.  Spell your name

6  for the record.

7              THE WITNESS:  Okay.  Everything good?

8              THE CLERK:  Please speak loudly and clearly into the

9  microphone and spell your name for the record.

10             THE WITNESS:  All right.  Ryan Lombardo.  Ryan

11 Lombardo.

12             THE COURT:  Pull the microphone down by your face

13 there.  That's perfect.  Thank you, sir.

14             MS. Johnston, your witness.

15             MS. JOHNSTON:  Thank you.

16                        DIRECT EXAMINATION

17 BY MS. JOHNSTON:

18 Q    Mr. Lombardo, can you please tell us where you're

19 employed?

20 A    I am a contract employee with the DEA.

21 Q    And in what position?

22 A    Intelligence analyst.

23 Q    How long have you held that position?

24 A    Three years.

25 Q    And can you tell us what you do as an intelligence

Direct Examination Ryan Lombardo

1    analyst?

2    A    I work with the telephone records and the medical files of

3    doctors, looking for patterns and -- that would identify people

4    involved with the case or give leads for the investigators.

5    Q    And were you asked to review records in relation to this

6    case?

7    A    Yes.

8    Q    In reviewing records, are there any investigative tools

9    that you use?

10   A    Yes.

11   Q    Can you tell us what those are?

12   A    The first one I use is Pen-Link, which is a program that

13   helps me to analyze the records that are provided by the

14   telephone company looking for pattern.  The other one is Google

15   Earth, which helps me to plot the telephone calls that are

16   provided in the records.

17   Q    Now, in terms of Pen-Link, can you tell us what you do

18   when you receive records from the telephone company?

19   A    When I receive the record from the telephone company, I

20   load them into Pen-Link.  And from there I use different

21   systems within Pen-Link that allow me to analyze.  So, I upload

22   the records into Pen-Link.

23            THE COURT:  Can we have the spelling of the word --

24   this word that you're referring to that seems to begin with

25   "P"?

Direct Examination Ryan Lombardo

1   Q    (BY MS. JOHNSTON)  Pen-Link.  Can you --

2   A    Oh, Pen-Link.  I'm sorry.

3   Q    Can you please spell it for us?

4   A    P-e-n-l-i-n-k.

5        THE COURT:  Pen-Link.  Got you.  Thank you.

6   Q    (BY MS. JOHNSTON)  When you load the records into

7   Pen-Link, does it take all of the data that's in the records?

8   A    Yes.

9   Q    And how does it organize it?

10  A    It organize it by date, time, the telephone number, the

11  number that was dialed, the number that was called.

12  Q    Let me show you three disks in this case and ask you if

13  you can identify these three disks.

14  A    Okay.

15  Q    Showing you R1, R2, and R3 for the record.

16  A    Okay.

17  Q    Starting with R1, can you tell us what R1 is?

18  A    Those are the records that were provided by the telephone

19  company for telephone number (703) 856-5771.

20  Q    And R2?

21  A    Those are the records for telephone number (703) 928-5791.

22  Q    And R3?

23  A    Telephone records for telephone number (301) 661-5311.

24  Q    And what did you do with each one of these disks?

25  A    I loaded the information into Pen-Link.

Direct Examination Ryan Lombardo

```
1              THE COURT:  Is it counsel's intention to offer R1,

2    R2, and R3?

3              MS. JOHNSTON:  For identification, Your Honor.

4              THE COURT:  Okay.  R3, by my records -- the clerk

5    will check me -- but by my records R3 has been admitted.

6              MS. JOHNSTON:  Well, then we'll admit the other two,

7    then, to be complete.

8              THE COURT:  Any objection?

9              MR. BRENNAN:  No, Your Honor.

10             THE COURT:  R1, R2, R3 are all received.  Thank you.

11   Q    (BY MS. JOHNSTON)  Now, once you had those records loaded

12   into Pen-Link, did you -- what kind of investigation did you

13   conduct to see if there was any association between those

14   records?

15   A    I looked to see the amount of contact between the three

16   numbers during certain particular months to see if there was

17   overlap between the telephone numbers and the amount of -- the

18   amount of contact, basically.

19   Q    Let me show you first what's been marked and admitted as

20   Government's Exhibit T1.  And I'll put this up on the screen.

21        Do you see what's been marked as Government's Exhibit T1?

22   A    Yes.

23   Q    And what is that?

24   A    This is a master list of all of the records reflecting the

25   contact between Sweeney, Waite, and Toszer.
```

Direct Examination Ryan Lombardo

1    Q    And the respective telephone numbers there?

2    A    Yes.

3    Q    And who prepared that chart?

4    A    I did.

5    Q    In regards to Government's Exhibit R1, R2, and R3, were

6    those records used to compile this chart?

7    A    Yes.

8    Q    And what does this chart then contain?

9    A    This chart contains all the contact between the three of

10   them.  And, looking at the chart here, the target record is the

11   record that the information was used from.  And looking at --

12   do you want me -- looking at No. 1, the first line, it says

13   that -- it shows that target record (703) 856-5771 received an

14   incoming call from (703) 928-5791 on November 2nd, 2008 at

15   5:22:31 p.m. for a duration of one minute and 44 seconds.  And

16   it also showed that -- the beginning and end location of a cell

17   site for that particular phone call.

18   Q    And the beginning and ending location of that cell site

19   would be for which number?

20   A    For the target record number, which is (703) 856-5771.

21   Q    What time period is covered by this entire exhibit, going

22   to the last page?

23   A    November 2nd, 2008 to March 25th, 2009.

24   Q    And are all of the contacts between those three numbers

25   that were in the records, R1, R2, and R3, reflected in this

Direct Examination Ryan Lombardo

1    list?

2    A    Yes.

3    Q    You referenced Line 1.  Is there any relationship between

4    the contact listed in Line 1 and the contact listed in Line 2?

5    A    Yes.

6    Q    Can you explain that to us?

7    A    The first line shows us that telephone number (703) 856

8    received an incoming call from (703) 928-5791.  The second line

9    shows that 5791 called 5771.  It's an incoming and outgoing

10   call.

11   Q    But the beginning location and ending location for Line 2

12   is for which phone?

13   A    For the target record.

14   Q    Which would be the phone ending in 5791?

15   A    Yes.

16   Q    Now, because T1 shows two records, in essence, for some of

17   the contacts between those phones, did you take some months and

18   excise out the duplicate records?

19   A    In the master list?  No.

20   Q    No, not in the master list.  As a result -- after you put

21   the master list together --

22   A    Yes.

23   Q    -- did you then make an effort to determine how many

24   actual contacts there were between these three telephone

25   numbers?

Direct Examination Ryan Lombardo

1    A    Yes.

2    Q    Let me show you what's been marked as Government's Exhibit

3    T2.  Can you tell us what T2 is?

4    A    This is the contact between telephone number

5    (301) 661-5311, (703) 856-5771, and (703) 928-5791 in December

6    2008.

7    Q    And what's the difference between this portion of the

8    December record in T2 and the portion of T1 that covers

9    December 2008?

10   A    I removed the duplicates telephone calls.  Meaning that I

11   took out the record for -- that were duplicate for but one

12   telephone call, I removed one of them.

13   Q    And in this instance how did you choose which target

14   record to include on the chart?

15   A    Because with the target record I used the record that had

16   a complete time down to the seconds.  For example, the first

17   one is two minutes and 22 second and -- or, 22 minutes and 59

18   seconds.

19   Q    Now, are there some -- were there some contents where they

20   only showed up on one of the parties' call records?

21   A    Yes.

22   Q    And what did you do with those?

23   A    Those, I left them there.

24   Q    And the beginning and ending location for these records

25   goes with what number?

Direct Examination Ryan Lombardo

1    A    The target record?

2    Q    Yes.  Goes with the target record?

3    A    Yes.

4    Q    So if, for instance, on the first call they have listed

5    there on December 1st at 2:22:59, is that an incoming or

6    outgoing call from your target phone of 571 --

7    A    That's an outgoing call.

8    Q    To 5771?

9    A    Yes.

10   Q    Now, in order to obtain the cell site location for 5771,

11   would you have to go back to that Target 1 list?

12   A    The master list, yes.

13   Q    Let me show you what's been marked as Government Exhibit

14   T3.  Let me stop for a second.  Before I do that, looking at

15   T2.  On the last page of T2 there's a second box.  What does

16   that box tell us?

17   A    The total number of contact.

18   Q    Okay.  What do you mean by a contact?

19   A    Between telephone calls, record.  From the records.

20   Between the two parties.

21   Q    And what -- how did you determine those numbers?

22   A    I removed the duplicates and then I counted.

23   Q    And how many contacts were there between Mr. Waite and Mr.

24   Toszer's telephone during December 2008?

25   A    40.

Direct Examination Ryan Lombardo

1   Q    And how many contacts during December 2008 were there

2   between Mr. Sweeney and Mr. Waite's cell phone?

3   A    39.

4   Q    And between -- during the same December 2008, how many

5   contacts between Mr. Sweeney and Mr. Toszer's phones?

6   A    26.

7   Q    Now, are you able to say whether or not there was actual

8   conversation during those calls, or who was speaking on those

9   calls?

10  A    No.

11  Q    Now, let's show you what's been marked as Government's

12  Exhibit T3.

13  A    This is the contact between (301) 661-5311, (703)

14  856-5771, and (703) 928-5791 in January 2009.  And, again, I

15  removed the duplicates.

16  Q    Excuse me?

17  A    I removed the duplicates in this chart, too.

18  Q    And is that formatted the same way as the December chart?

19  A    Yes.

20  Q    If we went back to T1 we could actually locate those calls

21  as well as the reciprocal --

22  A    Yes.

23  Q    -- record if it's there for the other phone?

24  A    Yes.

25  Q    Once again, did you determine how many contacts there were

Direct Examination Ryan Lombardo

1    between those lines?

2    A     Yes, I did.

3    Q     Showing you the last page, can you tell us how many

4    contacts there were between Mr. Waite and Mr. Toszer's phone in

5    January of 2009?

6    A     24.

7    Q     And how many contacts between Mr. Sweeney and Mr. Waite's

8    phone?

9    A     58.

10   Q     And, finally, Mr. Sweeney and Mr. Toszer's phone?

11   A     34.

12   Q     Calling your attention to Government's Exhibit T4.

13   A     Okay.

14   Q     Can you tell us what that is?

15   A     This is the contacts between (301) 661-5311, (703)

16   856-5771, and (703) 928-5791 in February of 2009.

17   Q     Did you compile that chart the same way you did the

18   previous two?

19   A     Yes.

20   Q     And did you count up the number of contacts between the

21   telephones?

22   A     Yes.

23   Q     Tell us what the number of contacts were, beginning with

24   Mr. Waite and Mr. Toszer.

25   A     29.

Direct Examination Ryan Lombardo

1    Q    And between Mr. Sweeney and Mr. Waite?

2    A    34.

3    Q    And between Mr. Sweeney and Mr. Toszer?

4    A    22.

5    Q    Calling your attention to Government's Exhibit T5.  Can

6    you tell us what T5 is?

7    A    Yes.  This is the contacts between (301) 661-5311,

8    (703) 586-5771, and (703) 928-5791 in March of 2009.

9    Q    And, once again, did you compile this chart from T1 the

10   same as the previous ones?

11   A    Yes.

12   Q    Can you tell us what the total number of contacts were

13   between March 1st and March 25th, 2009 between Mr. Waite and

14   Mr. Toszer?

15   A    20.

16   Q    And between Mr. Sweeney and Mr. Waite?

17   A    10.

18   Q    And between Mr. Sweeney and Mr. Toszer?

19   A    9.

20            MS. JOHNSTON:  Your Honor, if I could use an easel

21   and place a board up there.

22            THE COURT:  Sure.

23            MS. JOHNSTON:  Thank you.

24   Q    (BY MS. JOHNSTON)  Do you recognize T6 and T1 that are on

25   this board?

Direct Examination Ryan Lombardo

1   A    Yes.

2   Q    And did you prepare both of those exhibits?

3   A    Yes.

4   Q    Talking first about T6, can you tell us what we have on

5   T6?

6   A    The telephone contact chart for March 23rd, 2009 at 3:00

7   p.m. through March 24th, 2009 at 12:11 a.m.

8   Q    And whose phone numbers are reflected on that chart?

9   A    Target number (703) 856-5771, (703) 928-5791, (301)

10  661-5311.

11  Q    Now, there's color coding there.  Can you tell us what the

12  color coding represents?

13  A    The contact between Mr. Waite and Mr. Toszer is the

14  orange, Sweeney and Waite is yellow, and Sweeney and Toszer is

15  the blue.

16  Q    Now, in terms of these columns going across, can you

17  explain what's in each column?

18  A    I'm sorry, can you repeat that?

19  Q    Yes.  In terms of the columns going across, can you

20  explain to us what's in each column of the chart?

21  A    Okay.  The target record is the record that was used to

22  get the information for that particular call.  The date is the

23  date of the telephone call.  And then the time of the telephone

24  call and the duration of the telephone call.  And then the I/O

25  number is the incoming or outgoing number of that particular

Direct Examination Ryan Lombardo

1    call.  The beginning location is the location, the cell site

2    location, for the target record.  And the beginning latitude

3    and longitude locate the cell site for that tower.

4    Q    And then the last column?

5    A    And then the beginning location is the location of the

6    target record number.

7    Q    Okay.  Can you tell us how many calls we have on this

8    chart?

9    A    The number?  22.

10   Q    Let me back up for a second.

11   A    I'm sorry.

12   Q    There's a break down here on the first entry here.  Why is

13   there a break there?

14   A    Why is there a break?

15   Q    Yes.

16   A    To separate the different telephone calls.

17   Q    Okay.  And there's a break after the second entry there.

18   A    Yes.

19   Q    And there's only one entry for those two calls.  Why is

20   that?

21   A    Because I did not have the records for telephone number

22   (240) 577-0979.

23   Q    So, you don't know where that phone was; you don't know

24   anything about those records?

25   A    No, I do not.

Direct Examination Ryan Lombardo

1    Q    Now, for the next call, 4:08:06, how many entries do you

2    have there?

3    A    Two.

4    Q    Is that one call or two calls?

5    A    That's one call between Toszer and Waite.  The first line,

6    the 6:01 duration, Mr. Toszer called Mr. Waite.  And then the

7    second one shows that Mr. Waite received a call from Mr.

8    Toszer.

9    Q    Okay.  And the first line is from whose records?

10   A    From the target record, which was Mr. Toszer's.

11   Q    And the beginning location would be latitude and the B

12   longitude; and the location of Germantown refers to which

13   phone?

14   A    The target record phone.

15   Q    Which is whose phone?

16   A    Mr. Toszer.

17   Q    The second line is the record for whose phone?

18   A    Mr. Waite's.

19   Q    And the location latitude and longitude and the B

20   location?

21   A    Would be for Mr. Waite's.

22   Q    And where was that located?  Or the cell site for that

23   located?

24   A    Mr. Toszer was in Germantown, and Mr. Waite was in

25   Sunderland and Owings along Route 2.

Direct Examination Ryan Lombardo

1   Q    Can you describe for us how you determined that location?

2   A    I took -- after putting the records into Pen-Link.

3   Through Pen-Link I loaded the records into Google Earth.

4   Google Earth then plots it onto the map.  And, zooming in, I

5   low -- that's how I identified the location, through the cell

6   site through the latitude and longitude of the cell site

7   information.

8   Q    And then you actually zoom in and see where it is?

9   A    Yes.

10   Q    Now, if we continue, then.  The next set of orange records

11   for March 23rd at 4:25:12, is that one call or two calls?

12   A    That one shows that -- that's one call that shows Mr.

13   Toszer received an incoming call from Mr. Waite at 4:25:12 p.m.

14   for a duration of one minute and 13 seconds.  And the location

15   of his cell site was in Germantown.  The next shows that Mr.

16   Waite called Mr. Toszer at 2:45:12 p.m., a minute and 14

17   seconds duration, and his cell phone hit off of Trappe,

18   Maryland.

19   Q    Mr. Lombardo, I'm going to give you a laser.  I've also

20   put it up on the screen, as well.

21   A    Okay.  Where would you like me to start?

22   Q    If you could start, then, after the last call between Mr.

23   Toszer and Mr. Waite.  What was the next activity that you

24   detected in reviewing the records of these three phones?

25   A    The next one was Mr. Sweeney -- I'm sorry -- Mr. Sweeney

Direct Examination Ryan Lombardo

1   called Mr. Waite at 5:17 p.m. for 26 seconds.  And his cell

2   site location placed him in Greater Landover along Route 50.

3   And the following record, which is for the same telephone call,

4   shows that Mr. Waite received an incoming call from Mr. Sweeney

5   at 5:17:36 p.m. for 27 seconds.  And that placed him in

6   Sunderland and Huntingtown along Route 4.

7   Q       And the next contact between any of these three phones?

8   A       The next one shows that Mr. Sweeney called Mr. Waite on

9   March 23rd, 2009 at 5:35 p.m. for 18 seconds.  And his cell

10  site location placed him along Route 2 in Largo.  For the same

11  telephone call Mr. Waite's record showed that he received an

12  incoming call from Mr. Sweeney on 5:35:16 for 20 seconds and

13  that placed him in Dunkirk and along Route 4.  Then, that call,

14  Mr. Sweeney called Mr. Waite at 5:53 p.m. for a duration of 16

15  seconds.  And his location placed him at the location of

16  Dunkirk and Route 4.  The record for Mr. Waite for that same

17  call shows that he received an incoming call from Mr. Sweeney

18  at 5:53:43 p.m. for a duration of 17 seconds.  And his cell

19  site information placed him in Dunkirk along Route 4.

20  Q       And, from those telephone calls between Mr. Waite and Mr.

21  Toszer and Mr. Waite and Mr. Sweeney, did you produce a map as

22  a result of putting those numbers, those longitudes and

23  latitudes, into Google?

24  A       Yes.

25  Q       Let me show you what's marked as C1, which is up on the

Direct Examination Ryan Lombardo

1   board.  And I'll put up on the screen.  Here can you tell us
2   what C1 is?
3   A    This is the calls between Mr. Sweeney, Mr. Toszer, and Mr.
4   Waite on March 23rd, 2009.
5   Q    Can you tell us what the red circles depict?
6   A    The red circles show Mr. Sweeney's calls, where his cell
7   towers -- the cell towers that his cell phone activated when he
8   made that call.
9   Q    And why is it a circle if the cell tower is in a specific
10  point?
11  A    That was placed through Google Earth.
12  Q    And why is there a circle?
13  A    Because of the longitude and latitude of a cell tower.
14  Q    And where is the cell tower physically located in relation
15  to the circle?
16  A    In the middle of the red circle.
17  Q    And did you -- in addition to it being placed there, did
18  you actually compare what was happening in Google Map with
19  yourself plotting the longitude and the latitude?
20  A    Yes.  I manually looked for it myself by plotting the
21  longitude and latitude.
22  Q    Does that accurately reflect --
23  A    Yes.
24  Q    -- the location of those cell sites?
25  A    Yes.

Direct Examination Ryan Lombardo

1   Q     In addition to the red circles, there appear to be some

2   blue items up there in the far left-hand corner.  Could you

3   tell us where those are?

4   A     That is the area of the cell tower that Mr. Toszer's cell

5   phone hit off of when he made the phone call.  The longitude

6   and latitude placed Mr. Toszer's calls in that area.

7   Q     Okay.  Why are those marked outlined in blue shaped

8   differently than the red circles?

9   A     Because this area is the area that was the cell tower was

10  activated when he made that phone call.

11  Q     And is that a different carrier and a different company

12  than Mr. Sweeney's?

13  A     Yes.

14  Q     Finally, if we could go down further.  Did you also plot

15  Mr. Waite's calls?

16  A     Yes.

17  Q     Can you show us where those are?

18  A     Those are the black ones.  And those show where Mr.

19  Waite's cell phone hit the cell tower; what areas he activated

20  when he made the phone calls.

21  Q     And it looks like one is on the other side of the bay?

22  A     Yes.  This is the cell tower that was activated when he

23  made the 4:25 -- 4:25 call.  But, according to his records, it

24  shows that he made a telephone call after that that placed him

25  over here.

Direct Examination Ryan Lombardo

1  Q    And is -- based on your review of records like that, is it

2  unusual for someone to have used a cell site across a body of

3  water --

4  A    No.

5  Q    And, once again, did you also, by checking the longitude

6  and latitude there, find that that was the location of these

7  cell sites towers?

8  A    Yes.

9  Q    Now, are you able to say precisely where the telephone was

10  when it was being used?

11  A    No.

12  Q    And what are you telling us, then?

13  A    I am telling you that his cell phone activated the cell

14  tower in that area.  That is the area that he activated.

15         THE COURT:  What's the significance of the push pin

16  symbol?

17         THE WITNESS:  I'm sorry?

18         THE COURT:  What is the significance of the push pin

19  symbol?

20         THE WITNESS:  The push pins were placed there so that

21  I could enter the information.  For example, the Sweeney 5:17

22  p.m., I pushed the push pin there so I could enter that

23  information to show what call that was.

24         THE COURT:  Okay.  The push pin has no locational

25  significance?

Direct Examination Ryan Lombardo

1          THE WITNESS:  No, it's just an identifier.

2          THE COURT:  Thank you.

3    Q   (BY MS. JOHNSTON)  And the -- for example, the push pin

4    that refers to Sweeney 5:17 p.m. call, does that correspond to

5    the circle where you placed the push pin?

6    A    Yes.

7    Q    The actual location of the cell tower for that circle is

8    where?

9    A    In the center of the circle.

10   Q    And likewise for the push pins up here by Mr. Toszer's?

11   A    Those are just identifiers for the -- for Mr. Toszer's,

12   the cell tower is in the center of that circle.

13   Q    Well, Mr. Toszer doesn't have a circle?

14   A    No.  But in the -- in the center of this pie here in the

15   corner.  Based on this is the area covered, this cell tower is

16   at the corner of these two pies.

17   Q    So, where my pen is?

18   A    Yes.

19   Q    Right in the center of the pies?

20   A    Yes.

21   Q    And were you asked also to look at a series of calls that

22   occurred in February of 2009?

23   A    Yes.

24   Q    Let me show you what's been marked as T7.  Do you

25   recognize that?

Direct Examination Ryan Lombardo

1    A    Yes.  Can you --

2    Q    Okay.

3    A    This is the telephone contacts on February 17th to

4    February 20th, between Mr. Toszer and Mr. Waite and Mr.

5    Sweeney.

6    Q    Did you likewise plot some of those calls, as well?

7    A    Yes.

8    Q    I show you the chart that has Government's Exhibit T7, M1,

9    and C4.  Do you recognize those items?

10   A    Yes.

11            THE COURT:  You referred to T7, C1 --

12            MS. JOHNSTON:  No.  M1, Your Honor.

13            THE COURT:  M as in Mary?

14            MS. JOHNSTON:  M as in Mary.  And C2.

15            THE COURT:  It was M1 and C2?

16            MS. JOHNSTON:  M1, C2.

17            THE COURT:  Thank you.

18            MS. JOHNSTON:  Court's indulgence one moment.

19   Q    (BY MS. JOHNSTON)  Beginning again with T7, can you tell

20   us what information you've put on the table that's marked T7?

21   A    The target record is the record that I used to show the --

22   for the information for this particular phone call.  The date

23   of the call, the time of the call, the duration, the incoming

24   or outgoing number for that particular call, and the beginning

25   and ending location for the target record number.

Direct Examination Ryan Lombardo

1   Q    And the -- and how is it color coded?

2   A    The red is the contact between -- I mean, the blue is the

3   contact between Mr. Sweeney and Mr. Toszer.  And the yellow is

4   the contact between Mr. Sweeney and Mr. Waite.

5   Q    And the calls as listed here, are they each individual

6   calls, or are some of them duplicate records?

7   A    I'm sorry, repeat that?

8   Q    Are the calls here individual calls, or are they -- are

9   there some calls with reciprocal records?

10  A    Those are separate.

11  Q    They have reciprocal records?

12  A    Yes.

13  Q    So, you have the records for both calls?

14  A    Yes.

15  Q    Beginning with the first one, what does the first two

16  records show us?

17  A    The first two records show that -- the first record shows

18  that Mr. Toszer called Mr. Sweeney on February 17th, 2009 at

19  7:22:18 a.m.  And then the second record shows that Mr. Toszer

20  called Mr. Sweeney on 2/17/2009 at 7:23:54 a.m.

21  Q    And does it give you a longitude and a latitude for the --

22  A    Yes, for the target record.

23  Q    I'll put up on the screen here what's been marked as C2.

24  On the board here, this exhibit is marked C4; is that correct?

25  A    Yes.

Direct Examination Ryan Lombardo

1    Q    And those are the records for which date?

2    A    Between -- February 20th, 2009.

3    Q    And looking at up on the screen, do you recognize that

4    now?

5    A    These are the calls between Sweeney and Toszer on

6    2/17/2009.

7    Q    And the first call that you just referenced, is that call

8    contained on this chart?

9    A    Yes.

10   Q    Okay.  Can you show us where that is, using the pointer?

11   A    On the --

12   Q    Can you show us on T7 -- we discussed a call at 7:25 --

13   at 7:22:18 a.m. and 7:23:54 a.m.  Is that call plotted on C2 on

14   February 17th?

15   A    On this map, yes.  On this screen, yeah.

16   Q    On the screen, yes.  On C2.  Can you show us where that

17   call is plotted on C2 that's on the screen, not up on the

18   board?

19   A    Okay.  That is --

20   Q    Use the -- I think you can actually touch the screen and

21   show us.

22   A    Okay.  That is -- 7:22:18 is right here in this area, in

23   the blue that's covered.  And then for Mr. Sweeney that call

24   was over here.

25   Q    Okay.  Can you again mark it on the screen.

Direct Examination Ryan Lombardo

```
1    A    Right there.

2    Q    Now, was there further contact that morning between Mr.

3    Sweeney and Mr. Toszer's phone?

4    A    This one --

5    Q    Looking at T7, was there further contact between Mr.

6    Sweeney and Mr. Toszer's phone?

7    A    On February 17th?

8    Q    Yes.

9    A    No.  That's between Mr. Sweeney and Mr. Waite.

10   Q    Okay.  And what time did Mr. Sweeney and Mr. Waite talk to

11   each other?

12   A    At 2:46:25 p.m. and 5:09:51.

13             THE COURT:  Can we delete the arrows?

14   Q    (BY MS. JOHNSTON)  Looking at February 17th at 7:24:18

15   a.m., and 7:26 a.m., who was that call between?

16   A    That's between Mr. Toszer and Mr. Sweeney.

17   Q    Now, on that call --

18             MR. RAO:  Sorry, Your Honor.  I'm trying to clear it.

19             THE COURT:  Right.  I appreciate it.  Let's try to

20   get the arrows out and get the image back.

21             MS. JOHNSTON:  Your Honor, perhaps the Court needs to

22   take the afternoon recess, and we can fix this issue.

23             THE COURT:  I accept the suggestion.

24             MS. JOHNSTON:  Thank you, Your Honor.

25             THE COURT:  Ladies and gentlemen, we're going to take
```

Direct Examination Ryan Lombardo

1    the 15-minute afternoon recess.  Don't discuss the case with

2    anyone, not among yourselves.  Don't read any news articles or

3    reports that touch upon this case or the participants in it,

4    participants in the case.  Don't make any independent

5    investigation related to this case on the Internet.  Do not

6    consult any encyclopedias or dictionaries with respect to terms

7    or matters that are before you here.  15-minute recess.

8              (Jury left the courtroom.)

9              THE COURT:  Mr. Lombardo, how much longer do you

10   think he'll be on?

11             MS. JOHNSTON:  Maybe another 20 minutes.

12             THE COURT:  Okay.  And then he'll be cross-examined.

13      Any estimates on the length of that?

14             MR. BRENNAN:  Yeah.  I may have 45 minutes, maybe,

15   Your Honor.  Maybe more.

16             THE COURT:  Okay.  Sounds like that will be the end

17   of the day.  And we'll find out where we stand at that point.

18   15 minutes.

19             (A recess was taken.)

20             THE COURT:  Any matters to take up outside the

21   hearing of the jury, Counsel?

22             MS. JOHNSTON:  No, sir.

23             MR. BRENNAN:  No, Your Honor.

24             THE COURT:  Bring them in.

25             (Jury entered the courtroom.)

Direct Examination Ryan Lombardo

1          THE COURT:  Be seated please.  Mr. Lombardo, you

2   remain under oath.  Ms. Johnston, you can continue.

3   Q   (BY MS. JOHNSTON)  Mr. Lombardo, I think when we left off

4   you had talked about the three calls that happened on February

5   17th between Mr. Sweeney and Mr. Toszer.  We're looking at

6   Government's Exhibit C2, which is on the screen.  And did you

7   plot the cell site location for those three calls that occurred

8   on February 17th between Mr. Toszer and Mr. Sweeney?

9   A   Yes.

10  Q   And, again, the yellow pins here are -- have nothing to do

11  with the location of the cell tower; is that correct?

12  A   Correct.

13  Q   And where would the cell tower be for Mr. Sweeney's calls

14  on those -- for those three calls on February 17th?

15  A   In the center of the circle, the red circle.

16  Q   And Mr. Toszer's calls on the 17th would be where?

17  A   The blue, the blue area.

18  Q   Okay.  And not where the yellow pin is, but where would

19  the cell tower be in relation to the blue area?

20  A   In the corner of that pie where it comes together.

21  Q   Where the pie comes together --

22  A   Yes.

23  Q   -- both pieces of the pie come together?

24  A   Yes.

25  Q   Now, going back to T7, were there also calls between Mr.

Direct Examination Ryan Lombardo

1    Toszer and Mr. Sweeney that occurred on February the 18th?

2    A    Yes.

3    Q    In terms of February 18th, there's a call at 7:25 in the

4    morning.  Who is that call between?

5    A    That is Mr. Toszer receiving an incoming call from Mr.

6    Sweeney.

7    Q    And the call underneath that is what?

8    A    Mr. Waite receiving an incoming call from Mr. Sweeney.

9    Q    And then the next call?

10   A    Is Mr. Sweeney calling Mr. Toszer.  And then the following

11   two calls is Mr. Toszer calling Mr. Sweeney.

12   Q    And then on the 19th is there any contact between Mr.

13   Toszer and Mr. Sweeney?

14   A    Yes.  At 6:49 Mr. Toszer called Mr. Sweeney.

15   Q    And on February 20th of 2009, were there any calls between

16   Mr. Toszer and Mr. Sweeney?

17   A    Yes.

18   Q    And when were those calls?

19   A    At 8:57 a.m., 8:00 o'clock, 57 seconds a.m., 9:06:08 a.m.,

20   Mr. Toszer called Mr. Sweeney.  And at 4:55 p.m. Mr. Sweeney

21   received an incoming call from Mr. Toszer.  And at 4:55:47 Mr.

22   Toszer called Mr. Sweeney.

23   Q    Now, with regard to those calls that occurred on February

24   20th, did you plot those calls, as well?

25   A    Yes.

Direct Examination Ryan Lombardo

1   Q    Showing you what's been marked as Government's Exhibit C4,

2   which is on the board and on the screen, can you tell us what

3   that is?

4   A    This is the calls between Mr. Sweeney and Mr. Toszer on

5   2/20/09.

6   Q    And when was the first contact between them on 2/20/09?

7   A    At 8:57 a.m.

8   Q    And where was Mr. Toszer's phone at 8:00 o'clock and 57

9   that morning?

10  A    In the area of Manassas.

11  Q    And where was Mr. Sweeney's -- where was the cell site for

12  Mr. Sweeney's phone at that time?

13  A    That was not recorded on the call records.

14  Q    Okay.  And can you explain to us why it was not recorded?

15  A    Because that was a voice mailbox call.  And the telephone

16  records do not record the cell site information for the voice

17  mailbox.

18  Q    So who was leaving a message for whom?

19  A    Mr. Toszer -- Mr. Toszer called Mr. Sweeney.

20  Q    Now, the next call after that is at 9:00 o'clock, and --

21  9:06 and eight seconds; is that correct?

22  A    Yes.

23  Q    And who made that call?

24  A    Mr. Toszer called Mr. Sweeney.

25  Q    And, again, can you tell us where the cell site was that

Direct Examination Ryan Lombardo

1    Mr. Toszer used for that call?

2    A    That was in the Manassas area.

3    Q    And do you know where Mr. Sweeney's phone was at that

4    time?

5    A    No.

6    Q    Again, why not?

7    A    Voice mailbox.

8    Q    And, again, it was Mr. Toszer leaving a message for Mr.

9    Sweeney?

10   A    Yes.

11   Q    Now, the next contact you had between those two phones was

12   on February 20th at what time?

13   A    4:55.  Mr. Sweeney received an incoming call from Mr.

14   Toszer.

15   Q    Again, where --

16   A    I'm sorry.

17   Q    And where was Mr. Toszer's phone when he made that call to

18   Mr. Sweeney?

19   A    In this blue area right here.  The blue indicates Mr.

20   Toszer.

21   Q    All right.  And, again, in terms of where the cell site

22   information is, it has nothing to do with the yellow pins; is

23   that correct?

24   A    Yes, that's correct.

25   Q    Now, in regard to the cell site location for Mr. Toszer

Direct Examination Ryan Lombardo

1  making that call, where would that cell site be in relation to

2  those two pie pieces?

3  A    Right there in the middle where they come together.

4  Q    And are you able to show us where -- were you able to plot

5  where Mr. Sweeney's phone was when Mr. Toszer made that call at

6  4:55 p.m. on February 20?

7  A    Yes.  The red circle indicates Mr. Sweeney.  The cell

8  tower was in the middle of the red circle.

9  Q    Now, there is some other items also noted on that map.

10  Can you tell us what those are?

11  A    These items are the address of Wendy's, Trick Trucks, and

12  Burger King.

13  Q    And what do the pins represent in relation to those items?

14  A    That is where they are geographically.

15  Q    We have only two pins there.  Can you explain to us why

16  there are only two pins there?

17  A    Trick Trucks and Burger King are directly over the top of

18  each other, as far as geographically when I did it on Google.

19  Q    Are they in the same shopping center?

20  A    Yes.

21  Q    Now, going to December, let me show you what's been marked

22  as Government's -- let me back up.  Let's stay with that chart,

23  T7.

24          THE COURT:  T7?

25          MS. JOHNSTON:  T7.

Direct Examination Ryan Lombardo

1    Q    (BY MS. JOHNSTON)   The map there next to it, does that map

2    reflect the area where you placed the cell sites on?

3    A    I can't see the map.

4    Q    I'm sorry.  It's right behind you on the board.  As you

5    placed the sites on C4.

6    A    This is for February?

7    Q    For February, yes.

8    A    Yes.

9    Q    Do you see the map behind you?

10   A    Yes.

11   Q    Does that map correlate with a portion of the area that's

12   depicted on the aerial map that's next to it, C4?

13   A    Yes.

14   Q    Now, in addition, in regards to the activity on February

15   20th, I want to show you what's been marked as C4A.  Can you

16   tell us what C4A is?

17   A    This is Sweeney and Toszer calls that took place after

18   4:55 p.m. on February the 20th, 2009.

19   Q    Were those calls between them?

20   A    No.  The 4:55 call was the one between them.  And then it

21   shows the calls that took place after they made the phone call.

22   Q    Was the 4:55 p.m. call the last call in the records

23   between Mr. Toszer and Mr. Sweeney on February 20th?

24   A    Yes.

25   Q    In regard to C4A, can you describe for us what's depicted

Direct Examination Ryan Lombardo

1    on here in regards to Mr. Sweeney's phone and his call

2    activity?

3    A    Okay.  At 4:55, the red circle indicates where Mr. Sweeney

4    was.  And then at 4:35 it shows him leaving the area after

5    4:55.

6    Q    At what time?

7    A    5:35.

8    Q    Okay.  And was there a yellow pin there that reflects

9    that?

10   A    Yes, right there.

11   Q    And where was his -- what cell tower did he use when he --

12   for his next call?

13   A    The next one is 5:43, which is right there in the center

14   of that circle.  And then, 5:54 p.m., he was here.  And then at

15   6:15 the cell site location placed him here.  And then at 7:47

16   p.m., there.  And then at 8:03 p.m., this red circle there.

17   Q    And were you able also to track where Mr. Toszer's phone

18   was after 4:55?

19   A    Mr. Toszer's phone, there was only one call after 4:55.

20   And that was at 6:51:54 p.m.  And that placed him up in this

21   area where the blue indicates.

22   Q    Okay.  And that would be up in Montgomery County around

23   the Gaithersburg, Germantown area?

24   A    Yes.

25   Q    Now, in addition to these calls, did you have occasion to

Direct Examination Ryan Lombardo

1    examine the telephone contacts that occurred in December of

2    2008 between December 8th and December 10th of 2008?

3    A     Yes.

4    Q     Showing you what's been marked as T8.  Do you recognize

5    that chart?

6    A     Yes.  This is the telephone contact between Mr. Waite, Mr.

7    Sweeney, Mr. Toszer on December 8th to December 10th, 2008.

8    The target record is the record that -- the information came

9    from for that particular phone call.  And then the date of the

10   call, the time, the duration.  The I/O is the incoming and

11   outgoing number.  And the beginning and ending location for the

12   telephone of the target record.

13   Q     And, again, what do the color coordinates mean?

14   A     The orange is the contact between Mr. Waite and Mr.

15   Toszer.  The yellow is the contact between Mr. Sweeney and Mr.

16   Waite.  And the blue is the contact between Mr. Sweeney and Mr.

17   Toszer.

18   Q     Okay.  So, calling your attention to the calls on December

19   8th, can you tell us what the first two calls are?

20   A     The first call is Mr. Waite receiving an incoming call

21   from Mr. Sweeney on December 8th at 9:35 a.m. for a duration of

22   two minutes and 55 seconds.  And the beginning location and end

23   location.  And the second line is Mr. Waite receiving an

24   incoming call from Mr. Sweeney on December 8th, 2008 at 11:59

25   a.m. for a duration of four minutes and 36 seconds.

Direct Examination Ryan Lombardo

1    Q    And the next one?

2    A    The next one is a telephone call between Mr. Toszer and

3    Mr. Waite.  Mr. Toszer called Mr. Waite on December 8th, 2008

4    at 3:18:29 p.m. for a duration of 13 seconds.

5    Q    Okay.  And the next?

6    A    Continue?

7    Q    Yes, please.

8    A    Okay.  The next one is Mr. Toszer calling Mr. Sweeney on

9    December 8th at 4:37:17 p.m. for a duration of a minute and

10   seven seconds.  The following one is Mr. Toszer receiving an

11   incoming call from Mr. Sweeney on December 8th at 6:18:48 p.m.

12   for a duration of four minutes and 57 seconds.  The next one is

13   Mr. Toszer receiving an incoming call from Mr. Sweeney on

14   December 8th at 7:15:46 p.m., for a duration of one minute and

15   five seconds.

16   Q    Now, with regard to those calls that occurred between Mr.

17   Toszer and Mr. Sweeney, were you able to plot a map as to the

18   location of the cell sites that those two phones utilized for

19   their communications with each other?

20   A    Yes.

21   Q    Let me show you what's been marked as Government's Exhibit

22   C6.

23   A    Okay.

24   Q    Again, could you briefly explain to us where Mr. Toszer's

25   telephone was for each of the calls you just described?  And

Direct Examination Ryan Lombardo

1   Mr. Sweeney's phone, as well?

2   A     Okay.  The telephone call between Mr. Toszer and Mr.

3   Sweeney for the 7:15 p.m. call.  Mr. Toszer is up in Montgomery

4   County in the blue area.  And Mr. Sweeney is in the red area

5   down here at 7:15 p.m.

6   Q     Are you able to mark where Mr. Sweeney's phone was?

7   A     Down in Prince George's -- I'm sorry, you mean the

8   location?

9   Q     Yes, the location.

10  A     Yes.  The red, this red circle here indicates where he was

11  at 7:15.

12  Q     And for the 6:18 p.m. call?

13  A     6:18, Mr. Toszer is up here in Montgomery County in the

14  blue.  And Mr. Sweeney is here in the red in Prince George's.

15  Q     And the 4:37 call?

16  A     4:37 places Mr. Toszer up in Montgomery County in the

17  blue.  And Mr. Sweeney was in the District of Columbia at 4:37

18  p.m.

19  Q     And, again, when you say he was in the District of

20  Columbia, you're talking about the cell site that the phone

21  accesses; is that correct?

22  A     Yes.

23  Q     Do you know actually where either one of these people were

24  when they utilized that cell site?

25  A     No.

Direct Examination Ryan Lombardo

1    Q    Now, going back to Government's Exhibit T8, there are a

2    series of telephone calls on December 9th.

3    A    Yes.

4    Q    Can you review those calls for us?

5    A    Okay.  The first one places Mr. Toszer calling Mr. Sweeney

6    at 1:37:01 p.m. for a duration of 21 seconds.  The next one is

7    Mr. Toszer calling Mr. Sweeney for -- at 2:07:34 p.m. for a

8    duration of 32 seconds.  The next one is -- the orange is Mr.

9    Toszer calling Mr. Waite at 2:17:30 p.m. for a duration of two

10   minutes and nine seconds.  And then the next one is Mr. Waite

11   calling Mr. Sweeney at 3:21:23 p.m. for a duration of three

12   seconds.

13        The next one is Mr. Toszer receiving an incoming call from

14   Mr. Sweeney on 5:43:30 p.m. for a duration of 13 seconds.  The

15   next one, which is the second orange one, is Mr. Toszer calling

16   Mr. Waite at 5:50:19 p.m. for a duration of 59 seconds.  The

17   following one is Mr. Toszer calling Mr. Sweeney at 5:49:09 p.m.

18   for a duration of 53 seconds.  The next one is Mr. Waite

19   calling Mr. -- receiving an incoming call from Mr. Sweeney at

20   6:44:34 p.m. for a duration of five seconds.  The following one

21   is Mr. Waite receiving an incoming call from Mr. Sweeney at

22   6:48:50 p.m. for a duration of 16 seconds.  The following one

23   is Mr. Toszer receiving an incoming call from Mr. Sweeney at

24   8:25:05 p.m. for a duration of nine minutes and 39 seconds.

25        The next one is Mr. Toszer receiving an incoming call from

Direct Examination Ryan Lombardo

1    Mr. Sweeney at 8:37 p.m. for a duration of 33 seconds.  And the

2    last one is Mr. Waite receiving an incoming call from Mr.

3    Sweeney on 8:54:50 p.m. for a duration of four seconds.  And

4    that completes the 9th.

5    Q    Now, did you also prepare an -- did you also plot the

6    location of Mr. Sweeney and Mr. Toszer's telephones for those

7    telephone calls?

8    A    Yes.

9    Q    Can you review with us where the Toszer phone and the

10   Sweeney phone were during the times they were in contact with

11   each other on December 9th of 2008?

12   A    Okay.  The blue is Mr. Toszer.  Okay.  For the 8:25 -- I'm

13   sorry.

14       Okay.  The ones I have plotted on here, Mr. Sweeney 8:25

15   and 8:37 p.m. call place him here.  And then Mr. Toszer's 8:25

16   and 8:37 place him up here in Montgomery County.  And the --

17   Mr. Sweeney's 5:43 and 5:49 p.m. call place him here, in the

18   red right there.

19   Q    Okay.  And that one you have like three circles of red

20   together.  Can you explain why it's done that way and not just

21   the big circle as you've used previously for Mr. Sweeney?

22   A    I had to manually plot that based on the longitude and

23   latitude of the records.  DEA provides intelligence with a list

24   that they receive from the telephone companies, the cell site

25   locations that we load into Pen-Link, and then through Google

Direct Examination Ryan Lombardo

1    Earth.  But there are sometimes when there might be a cell site

2    location missing in the record that DEA provides.

3    Q    So, what do you have to do then?

4    A    Then I have to look at the record of a telephone --

5    records.  And look at the longitude and latitude and manually

6    plot it.

7    Q    And is that what you did in this instance?

8    A    Yes.  And where the push pin is in this instance is where

9    the cell tower is.

10   Q    Now, while you used Google Map and the database at DEA to

11   create these circles and the pie figures for the other cell

12   sites that we've seen so far, what did you do to make sure

13   those were accurate?

14   A    I cross-checked them.  I plotted them using Google Earth

15   and then I manually plotted them.

16   Q    And were they the same?

17   A    They were the same.

18   Q    Now, going back to Government's Exhibit T8, were there any

19   contacts on that date between Mr. Toszer and Mr. Sweeney?

20   A    On December --

21   Q    On December 10th of 2008, going back to T8.

22   A    Yes.  Yes, there was contact between Mr. Sweeney and Mr.

23   Toszer.  The first one is Mr. Sweeney called Mr. Toszer at 2:06

24   p.m. for a duration of 39 seconds.  The next one was Mr.

25   Toszer called Mr. Sweeney at 2:45, or 2:44:55 p.m., for a

1    duration of 23 seconds.  And then the following one is Mr.

2    Toszer called Mr. Sweeney at 2:47:35 p.m. for a duration of a

3    minute and 29 seconds.

4    Q    Now, during that time period was there any contact between

5    Mr. Waite and Mr. Sweeney?

6    A    Yes.  At 4:14 p.m. for a duration of a second.

7    Q    So, that's about an hour and a half after that call; is

8    that fair to say?

9    A    Yes.

10   Q    Did you also plot those calls on December 10th?

11   A    Yes.

12   Q    We have gone through 6 and 7.  Referring here to C8.  Do

13   you recognize that?

14   A    Yes.

15   Q    And what is that?

16   A    That is the -- that is the calls between Sweeney and

17   Toszer on December 10th, 2008.

18            THE COURT:  C6, C7, C8, all received as far as the

19   government's concerned?

20            MS. JOHNSTON:  Yes, Your Honor.

21            THE COURT:  Agreed, Mr. Brennan?

22            MR. BRENNAN:  Yes, Your Honor.

23   Q    (BY MS. JOHNSTON)  Okay.  Now looking at C8, either up

24   there on the board or here on the screen.  Can you tell us

25   where Mr. Toszer's phone was and where Mr. Sweeney's phone was

Direct Examination Ryan Lombardo

1    during their contact the afternoon of December 10th?

2    A    Okay.  The first telephone call that took place between

3    Mr. Toszer and Mr. Sweeney, Mr. Toszer was in the area of

4    Manassas down here at 2:03:24 p.m. and Mr. Sweeney was in the

5    area of the District of Columbia, the red circle, at 2:06 p.m.

6         The second call, which was at 2:44:55, between Mr. Sweeney

7    and Mr. Toszer, places them both in the area of District of

8    Columbia.  And they overlapped each other.  They -- I'm

9    sorry --

10   Q    Continue.

11   A    Oh, okay.  The cell towers overlapped each other.  If you

12   look closely between -- in the red circle you will see the

13   blue, which represents Mr. Toszer.  And the 2:44:55 and the

14   2:47:35 p.m. call both overlap each other.  Which show that

15   they hit off the cell towers in the same area.

16   Q    If I show you C8B, does that show just one of the calls?

17   A    I'm sorry.  This is the call that Mr. Sweeney received the

18   call from Mr. Toszer at 2:44 p.m.

19   Q    So, is that call included on C8?

20   A    Yes.

21   Q    But on C8B it's just the one call that we're looking at?

22   A    Yes.

23   Q    Can you describe to us where the overlap is?

24   A    The overlap, if you look at the red, is Mr. Sweeney.  Mr.

25   Toszer is the blue within the red circle.

Direct Examination Ryan Lombardo

```
1    Q    And, again, when we're talking about the cell site, it's
2    located in the center of the red circle?
3    A    Yes.
4    Q    And at the corner of the pie?
5    A    Yes.
6    Q    Here, C8C, what does that show us?
7    A    This is December 10th, 2008.  Mr. Sweeney received a call
8    from Mr. Toszer at 2:47 p.m.  This shows the overlap once
9    again.
10            MS. JOHNSTON:  Court's indulgence.
11       I have nothing further.
12            THE COURT:  The last three were C8A, C8B and C8C?
13            MS. JOHNSTON:  There's no C8A, Your Honor.  Just B
14   and C.
15            THE COURT:  Just B and C.  My mistake.
16       Agreed, Mr. Brennan?
17            MR. BRENNAN:  Yes, Your Honor.
18            THE COURT:  So -- and with respect to the other C
19   exhibits, C3?
20            MS. JOHNSTON:  There is no C3, Your Honor.
21            THE COURT:  Thank you.  C4B?
22            MR. BRENNAN:  I just saw the problem on our end, Your
23   Honor.  We were looking for C3.
24            THE COURT:  C4B.
25            MS. JOHNSTON:  I don't believe there's a C4B, Your
```

Direct Examination Ryan Lombardo

```
 1    Honor.  Just let me check on my -- yes, Your Honor, C4B was
 2    marked.  That was the cell site with Mr. Sweeney's phone on it.
 3              THE COURT:  There was no reference to it.  But if
 4    there's no objection --
 5              MS. JOHNSTON:  Let me double-check, Your Honor, and
 6    I'll --
 7              MR. BRENNAN:  We have a C4A.  We don't have a C4B,
 8    Your Honor.
 9              THE COURT:  There has not yet been a reference to
10    C4B.
11              MS. JOHNSTON:  Then there is no C4B.
12              THE COURT:  Then there is no C4B.  Okay.  C5?
13              MS. JOHNSTON:  C5 was not used, Your Honor.  No, we
14    did not use C5, Your Honor.
15              THE COURT:  And will not?
16              MS. JOHNSTON:  We will not be using C5.
17              THE COURT:  All right.  Just to make the record on
18    the C exhibits, then.  The following C exhibits are received:
19    C1, C2, C4, C4A, C6, C7, C8, C8B, C8C.  Does the clerk agree?
20              THE CLERK:  Yes, sir.
21              THE COURT:  And no other C exhibits have been
22    received.  Is that the government's view?
23              MS. JOHNSTON:  Yes, Your Honor.  There will be no
24    other C exhibits.
25              THE COURT:  Okay.  But has the Court got the record
```

Cross-examination Ryan Lombardo

```
1    correct; that's the point.

2              MS. JOHNSTON:  Yes.

3              THE COURT:  Mr. Brennan, do you agree that the

4    Court's record is correct?

5              MR. BRENNAN:  Yes, Your Honor.

6              THE COURT:  Cross-examination.

7              MR. BRENNAN:  Thank you, Your Honor.

8              THE COURT:  And, while we're at it, T1 through T8 all

9    received, correct?

10             MS. JOHNSTON:  Yes, sir.

11             THE COURT:  Defense agrees?

12             MR. COOK:  Yes, Your Honor.

13             THE COURT:  Thank you.

14             MR. BRENNAN:  Those numbers were again, Your Honor,

15   so we're all on the same --

16             THE COURT:  T1 through 8 received.

17             MR. BRENNAN:  Thank you, Your Honor.

18             THE COURT:  No other T exhibits received.

19             There's a lot of recordkeeping during a trial, ladies

20   and gentlemen.  Apologies.  But we have to make sure we got it

21   exactly right.

22                          CROSS-EXAMINATION

23   BY MR. BRENNAN:

24   Q    Good afternoon, Mr. Lombardo.

25   A    Good afternoon.
```

Cross-examination Ryan Lombardo

```
1    Q    My name is William Brennan.  Mr. Cook and I represent Mr.

2    Sweeney.  Should I ask you a question that you do not

3    understand, please ask me to repeat it.  I'll be more than

4    happy to do so.

5    A    Okay.

6    Q    Fair enough?

7    A    Good.

8    Q    All right.  Now, basically what you did in this case is

9    you took three different disks, which are labeled R1, R2, and

10   R3.  And they were disks that had electronic records from the

11   phone companies, correct?

12   A    Correct.

13   Q    Okay.  And DEA -- I guess you work for a contractor that

14   works for the DEA; is that correct?

15   A    Yeah, correct.

16   Q    Okay.  So, the company you work for has purchased a

17   program called Pen-Link.  You take the three disks with the

18   telephone numbers on it; you put up Pen-Link on the computer;

19   and you load the data in.  Is that correct?

20   A    DEA purchased the records, yes.

21   Q    All right.  DEA purchased the software.  Okay.  And you

22   just put the -- you load the information in, supplied

23   electronically by the phone companies.  And then you -- based

24   on that, you eliminated certain things and you prepared these

25   charts?
```

Cross-examination Ryan Lombardo

1   A    Correct.

2   Q    Okay.  Now, with respect to -- so, that would take care of

3   the R1, R2, and R3.  And then you did the T1 through T8, which

4   are the colored charts that Ms. Johnston has asked you about,

5   correct?

6   A    Correct.

7   Q    Okay.  And then you did the C ones, which were the

8   locations of the towers, correct?

9   A    Correct.

10  Q    All right.  So, to speak with precision here, what we're

11  really talking about when we talk about Mr. Sweeney, Mr. Waite,

12  and Mr. Toszer, is really what we're talking about is cell

13  phone -- or handset in the lingo of this telephone company --

14  one handset connecting to another handset, correct?

15  A    Correct.

16  Q    Okay.  And we've identified who most probably was using

17  those handsets at that particular time, correct?

18  A    Correct.

19  Q    But you can't sit here and tell this jury that you know on

20  a specific day Mr. Patrick Sweeney spoke to Mr. Michael Toszer.

21  You can just -- that's right, correct?

22  A    Correct.

23  Q    So, all you can really do is say the handset was connected

24  to the handset at a certain time?

25  A    Correct.

Cross-examination Ryan Lombardo

1    Q    So, speaking with precision, that's what you can say?

2    A    Correct.

3    Q    Correct.  And then when we address the issue of the cell

4    phone towers, again during your testimony there was some

5    discussion:  Well, Mr. Sweeney was here and Mr. Toszer was

6    there and Mr. Waite was there.

7         That's really incorrect, isn't it?  To say where any

8    individual was?

9    A    Correct.

10   Q    Right.  Because all that you can really say is that a call

11   was routed through a specific cell phone tower, right?

12   A    Correct.

13   Q    And that does not give you the location of the handset,

14   much less the individual, correct?

15   A    Correct.

16   Q    Okay.  And you know from your experience that each of

17   these cell phone towers has a radius?

18   A    Correct.

19   Q    And, say, for example, in downtown Washington the radius

20   could be a mere city block, because there's a lot of cell phone

21   traffic and the carriers have to be able to accommodate all

22   traffic, correct?

23   A    Correct.

24   Q    So, the towers could be literally -- on K Street for

25   example, each block on K Street would have a cell phone tower?

Cross-examination Ryan Lombardo

1   A     Correct.

2   Q     But in rural areas the radius is much greater?

3   A     Correct.

4   Q     And, indeed, one of the indications here in this case is

5   that it could be 25 miles, correct?

6   A     It's my understanding through contact with the telephone

7   company it's a range of one to three miles.

8   Q     One to three miles.  However -- okay.  So, you just told

9   us it's one to three miles.  So, could you hit the bottom and

10  get rid of that arrow left -- I think that will get --

11            THE COURT:  Touch the screen, lower left.

12            THE WITNESS:  Okay.

13  Q     (BY MR. BRENNAN)  Thank you, Mr. Lombardo.  Now, so what

14  you're telling us, then, is if the phone companies are telling

15  you one-to-three-mile radius, if that information is

16  accurate -- and I'll take it out of this so we're looking at

17  it -- in looking at Government's Exhibit C1, and with a

18  one-to-three-mile radius, we see Mr. Waite -- or I almost used

19  the incorrect word.  The Waite cell phone placed a call at 4:25

20  p.m. on the date of March 23, 2009.  It's an important date in

21  this case.  Placed a phone call over there.  And that is in

22  Trappe, Maryland; is that correct?

23  A     Correct.

24  Q     And Trappe, Maryland is on the Eastern Shore of Maryland.

25  Do you go to Ocean City at all?

Cross-examination Ryan Lombardo

1   A     Yes.

2   Q     Okay.  And, you have to go down Route 50, as opposed to

3   the other way, you go through Trappe, Maryland, right?

4   A     Correct.

5   Q     And Trappe, Maryland is south of Easton and north of

6   Cambridge?

7   A     Correct.

8   Q     So, the telephone companies are telling you that it's a

9   one-to-three-mile radius, then these records would indicate

10  that Mr. Waite's cell phone was routed through a tower in

11  Trappe, Maryland.  And we know it's Trappe, Maryland because on

12  Government Exhibit T6, that call, which is the -- let me zoom

13  out -- the 4:25 on the 23rd.  Can you see that, sir?

14  A     Yes.

15  Q     All right.  On the 23rd of March, 2009, at 4:25, that

16  phone call with the Waite handset was routed through Trappe,

17  Maryland.  And you've plotted that on this.  And showing,

18  again, Trappe, Maryland over here, correct?

19  A     Correct.

20  Q     So, this one-to-three-mile radius would place Mr. Waite on

21  the other side of the Chesapeake Bay, somewhere south of Easton

22  and north of Cambridge, correct?

23  A     Can you repeat that?

24  Q     That call on 4:25 --

25  A     Hit off of that cell tower.

Cross-examination Ryan Lombardo

1   Q    -- hit off of that cell tower.

2   A    Correct.

3   Q    Now, it could be, as you said, that the cell phone towers

4   only have a radius of one to three miles.  Or, in fact, some

5   cell towers have a much greater radius than that, correct?

6   A    Correct.

7   Q    And we know Mr. Waite's residence was here in Chesapeake

8   Beach, Maryland; is that correct?

9   A    Correct.

10  Q    And we have a -- this notation where my finger is, if you

11  can see that?

12  A    Yes.

13  Q    We have a Waite -- the Waite cell phone -- or the Waite

14  handset.  Let's use the correct nomenclature.  The Waite

15  handset made a phone call that was routed through a cell tower

16  here at 5:17.  And eight minutes later -- that's pretty good

17  traveling -- was routed through a cell tower on the other side

18  of the Chesapeake Bay, south of Easton, north of Cambridge;

19  right?  Eight minutes later?

20  A    From the 5:17 call?

21  Q    Yeah.  There's a Waite call at 5:17.  I'm sorry, I

22  misspoke.  Okay.  I misspoke.  There's a Waite call at 4:08.

23  And then 17 minutes later there's a Waite phone call at 4:25,

24  correct?

25  A    Correct.

Cross-examination Ryan Lombardo

1    Q     So, either one of two things.  Either he got somehow

2    miraculously from one side of the bay to the other; or, in

3    fact, these have a much greater radius than you just told us,

4    correct?

5    A     Correct.

6    Q     So, when you have done the -- oh, and the other thing, by

7    the way, on these maps that you have done.  These maps also --

8    do they have a scale on them?  Do you know how many miles we're

9    talking about here on these maps that you did?

10   A     With the circles, as far as --

11   Q     How many miles.  I mean is there a -- a scale on here?

12   A     In regards to?

13   Q     Well, usually you look at a map it's got, you know, how

14   many miles; an inch is a mile; this, that, and the other thing.

15   There's no scale on here; is that correct?

16   A     Correct.

17   Q     All right.  So, these circles that you have drawn on these

18   maps really do not accurately reflect the real radius of any of

19   these cell towers, correct?

20   A     Correct.

21   Q     So, it would be misleading to show that, for example, the

22   Sweeney phone call at 5:17 really occurred within that red

23   circle, because we just don't know --

24   A     Okay.

25   Q     -- what the radius is for that tower, correct?

Cross-examination Ryan Lombardo

1   A    For that particular tower, no.

2   Q    Right.  And, likewise, the Sweeney phone call at 5:35, it

3   would be wrong and incorrect to interpret this map that that

4   red radius shows that the Sweeney handset was within that red

5   circle at the time that call was made, correct?

6   A    Correct.

7   Q    And, likewise, for the Sweeney phone call at 5:53 p.m. on

8   that date, it would be wrong and it would be a mistake to

9   assume that that -- the Sweeney handset was within that red

10  circle when that phone call was made on that date and time,

11  correct?

12  A    Correct.

13  Q    All right.  And, likewise, for -- and we know that because

14  the Waite call that went through Trappe, Maryland at 4:25, it

15  would be wrong to assume that Mr. -- whoever used the Waite

16  handset was within that circle in Trappe, Maryland at 4:25 p.m.

17  for that call, correct?

18  A    Based on what I said, correct.

19  Q    Right.  So, when we look at these, these maps that you

20  have prepared, and they are all -- so the record is clear, C1,

21  C2, C4, C4A, C6, C7, C8, C8B, and C8C, we really cannot rely on

22  the red circles, the blue circles, or the black circles on any

23  of those maps to accurately show where the handset was on each

24  of those dates and times, correct?

25  A    I'm not sure -- I misspoke on your question.  The red

Cross-examination Ryan Lombardo

1   indicate the area that the cell tower covers.

2   Q    Where did you get that from?

3   A    That -- what -- that -- when Pen-Link loads the

4   information into Google Earth, according to the longitude and

5   latitude.

6   Q    So, the -- so, then, go back to my question, then.  So

7   Pen-Link loaded this.  And then has got the Waite cell phone or

8   the Waite handset --

9   A    Yes.

10  Q    -- within that radius?

11  A    That's the area of the cell tower that was activated.

12  Q    Okay.  So, what you're telling us is that the computer

13  program that Pen -- that the DEA contractor used in this case

14  shows that that radius there, depicted on the screen, is

15  accurate.  And your testimony is that, based on that computer

16  program, the Waite handset had to have been within that black

17  semicircle at 4:25 p.m. on that date and time -- on that date

18  and time?

19  A    No.

20  Q    No.  That's wrong, isn't it?

21  A    Correct.

22  Q    So, are all the black semicircles wrong?

23  A    No.

24  Q    Just that one?

25  A    I'm not following your -- what I want to say is the black

1    area is the cell tower range area of the -- that the cell phone

2    hit off of.

3    Q    Right.  What I'm -- my question --

4    A    But the range of it -- okay.

5    Q    My question is this, Mr. Lombardo:  You have prepared

6    these maps?

7    A    Correct.

8    Q    All right.  The government has introduced the maps.  The

9    maps have three colors on them.  They have red for Mr.

10   Sweeney -- excuse me -- red for the Sweeney handset, blue for

11   the Toszer handset, and black for the Waite handset, correct?

12   A    Correct.

13   Q    But what I'm asking you is the size of the circles or the

14   pie shapes or whatever it is on these maps does not accurately

15   reflect the radius of that cell tower, correct?

16   A    Correct.

17   Q    All right.  And, in fact, the radius of the cell towers

18   could be much larger than what is depicted on all of these

19   exhibits, correct?

20   A    Correct.

21   Q    So, it would be a mistake to say that necessarily the

22   Sweeney handset was within any of those red circles that appear

23   on that map, correct?

24   A    Correct.

25   Q    Likewise, it would be a mistake to conclude that the

Cross-examination Ryan Lombardo

1    Toszer cell phone -- excuse me -- the Toszer handset was within

2    any of those pie shapes that appear on that map, correct, sir?

3    A    Correct.

4    Q    Now, put up on the screen T8.  Do you see that on your

5    screen?

6    A    Yes.

7    Q    For some reason it's not on the computer --

8    A    It's T8.

9    Q    All right.  Now, this shows -- the color coding for

10   handset contact between December 8, 2008, and December 10,

11   2008; is that correct?

12   A    Correct.

13   Q    All right.  And you color coded it down here with Waite

14   and Toszer handsets are in orange.  Sweeney and Waite handsets

15   are in yellow.  And Sweeney and Toszer handsets are in blue,

16   correct?

17   A    Correct.

18   Q    And, at the risk of asking the obvious, the colors are all

19   kind of intermixed on this exhibit, correct?

20   A    Correct.

21   Q    And here again on Government Exhibit T7.  Do you see that

22   up on the screen, sir?

23   A    Yes.

24   Q    All right.  And that's for telephone contact on February

25   17 through February 20, 2009.  Do you see that, sir?

Cross-examination Ryan Lombardo

```
1    A     Yes.

2    Q     All right.  And, again, you've color coded it to show that

3    there was Sweeney and Waite cell phone contact and Sweeney and

4    Toszer cell phone contact on that date, correct?

5    A     Correct.

6    Q     Intermingled.  But on Government Exhibit T6 -- do you see

7    that on the screen, sir?

8    A     Yes.

9    Q     Okay.  That then is for telephone contact between the

10   various handsets from March 23, 2009 beginning at 3:00 p.m.

11   through March 24, 2009 at 12:11 a.m.  You with me?

12   A     Yes.

13   Q     All right.  And, again, you've used the color coding here

14   at the bottom which shows Waite and Toszer in the orange,

15   Sweeney and Waite handsets in the yellow, and Sweeney and

16   Toszer handsets in the blue, correct?

17   A     Correct.

18   Q     And they are not intermingled, are they, sir?  They are

19   in, rather -- in a sequence, correct?

20   A     Correct.

21   Q     And what we show is, using Waite and Toszer, the orange,

22   Waite and Toszer have contact on the 23rd beginning at 4:06 --

23   or, excuse me -- 4:08.  Do you see that?

24   A     Yes.

25   Q     Another call at 4:25.  So, those are the two calls that
```

Cross-examination Ryan Lombardo

1    are recorded between the handset of Waite and the handset of

2    Toszer on March 23, 2009.  A call that's recorded at 4:08 and a

3    call that's recorded at 4:25, correct?

4    A    Correct.

5    Q    All right.  We've already established about that 4:25 call

6    that went through the Trappe tower on the other side of the

7    bay.

8    A    Correct.

9    Q    And the earlier call from the Waite handset had actually

10   gone through the tower that's at Sunderland and Owings,

11   Maryland, which is at Route 2 in Calvert County, correct?

12   A    Correct.

13   Q    All right.  So that, based on your examination of the

14   records, is the last contact between the handset of Waite and

15   the handset of Toszer on March 23, 2009 was at 4:25 p.m.,

16   correct?

17   A    Correct.

18   Q    And your examination of all these records and all these

19   disks does not show any other contact on the date of March 23,

20   2009 between the Waite handset and the Toszer handset, other

21   than what's shown on this chart, correct, sir?

22   A    For March 23rd?

23   Q    March 23rd.

24   A    Correct.

25   Q    All right.  Then the Sweeney handset and the Waite handset

Cross-examination Ryan Lombardo

1    was after the Toszer and Waite handset contact, correct?

2    A    Correct.

3    Q    All right.  So, we established there's two calls there?

4    A    Yes.

5    Q    And then there are one, two, three calls.  And all three

6    of those calls between the Sweeney and Waite handsets occurred

7    after the Waite and Toszer calls earlier that day at 4:25,

8    right?

9    A    Correct.

10   Q    So, at 5:17 there was contact between the two handsets;

11   5:35 there was contact; and at 5:53, correct?

12   A    Correct.

13   Q    All right.  And then there was, again, a contact between

14   the Sweeney handset and the Toszer handset beginning really

15   after midnight on the 23rd where it had turned into the next

16   day at 12:11, correct?

17   A    Correct.

18   Q    So, it reflects three contacts between the Sweeney handset

19   and the Toszer handset after midnight on the 24th, right?

20   A    Correct.

21   Q    And there was -- so, unlike the other, T8, where all the

22   calls are intermingled during the day, on the 23rd they

23   actually follow a sequence, correct, sir?

24   A    Correct.

25             MR. BRENNAN:  Court's indulgence, Your Honor.

Redirect Examination Ryan Lombardo

```
1                THE COURT:  Yes.
2                MR. BRENNAN:  Nothing further.  Thank you, Your
3   Honor.
4                THE COURT:  Redirect.
5                MS. JOHNSTON:  A few questions.  Thank you, Your
6   Honor.
7                        REDIRECT EXAMINATION
8   BY MS. JOHNSTON:
9   Q    Mr. Lombardo, in plotting any of these maps, did you
10  verify the location of the cell site utilized by each one of
11  these handsets when the particular calls were made?
12  A    Yes.
13  Q    And does the center of these circles -- what does that
14  represent, the center of each of the red circles represent?
15  A    Where the tower -- the cell tower that was hit with the
16  telephone call.
17  Q    So that for any particular telephone call reflected on
18  that map --
19  A    Yes.
20  Q    -- is the cell site that was utilized by Mr. Sweeney's
21  phone to make that call located in the center of that circle?
22               MR. BRENNAN:  Objection, leading, Your Honor --
23               THE WITNESS:  Yes.
24               MR. BRENNAN:  -- on redirect.
25               THE COURT:  Sustained.  Don't lead.
```

Redirect Examination Ryan Lombardo

1   Q    (BY MS. JOHNSTON)  With regard to each one of the C maps,

2   where you have a red circle, what does that red circle depict?

3   A    The telephone number of Mr. Sweeney.  The red circle is --

4   represent the cell site of the longitude and latitude of that

5   cell phone, that call.

6   Q    Okay.  Let me back up again.  Do we -- are you able to say

7   where a handset or a telephone was when it was being used?

8   A    No.

9   Q    Are you able to say who was talking on the phone?

10  A    No.

11  Q    Are you able to say who held the handset?

12  A    No.

13  Q    Okay.  What are you able to tell us in regards to that

14  cell site location?

15  A    That that particular handset hit that cell tower at that

16  longitude and latitude.

17  Q    At the time and date reflected on the charts?

18  A    Yes.

19  Q    And does that hold true for each one of those red circles?

20  A    Correct, yes.

21  Q    Now, with regards to the black area that you showed for

22  Mr. Waite's phone, do you recall those maps?

23  A    Yes.

24  Q    Can you tell us what that black area is depicted on each

25  one of those maps?

Redirect Examination Ryan Lombardo

```
1    A    That is the cell site, cell tower area.  The cell site

2    that the -- according to Mr. Waite's records, the longitude and

3    latitude that that handset hit off of.

4    Q    To make a call?

5    A    Yes.

6    Q    To make the call that particular date and time?

7    A    Yes.

8    Q    Have you at any point told anyone that that was where Mr.

9    Sweeney or Mr. Waite was when he made a call?

10   A    No.

11   Q    And are you able -- have you ever told anyone that that

12   was where Mr. Sweeney was within a particular circle when he

13   made the call?

14   A    No.

15   Q    What are you telling us by either the circle or the black

16   squares?

17   A    That is where the cell tower is that the handset hit off

18   of, whenever that call was made.

19   Q    Likewise, with the blue diamonds that you showed --

20   A    Yes.

21   Q    -- for Mr. Toszer's Sprint phone, what does that depict?

22   A    That showed where the cell tower is that that particular

23   handset hit off of when that phone call was made.

24   Q    And what steps did you take to personally verify the

25   information that a particular cell site was in either the red
```

Redirect Examination Ryan Lombardo

1    circle or at the joining of the pie section for Mr. Toszer's

2    phone or Mr. Sweeney's red circle or for Mr. Waite's?

3    A    I manually -- I looked at the telephone records and I

4    manually plotted the longitude and latitude according to the

5    telephone records.  In that step I did not use Pen-Link, I used

6    it manually.

7    Q    And does the chart accurately reflect Mr. Sweeney -- the

8    cell site Mr. Sweeney hit as being the center of each one of

9    those circles?

10   A    Yes, correct.

11             MS. JOHNSTON:  I have nothing further.

12             THE COURT:  May the witness be excused, Mr. Brennan?

13             MR. BRENNAN:  Yes, Your Honor.  Thank you.

14             THE COURT:  Government agree?

15             MS. JOHNSTON:  Yes, Your Honor.

16             THE COURT:  Mr. Lombardo, you are excused.  Let me

17   see counsel.

18             (Bench conference on the record.)

19             THE COURT:  So, who's next?

20             MS. JOHNSTON:  Mr. Toszer is next.

21             THE COURT:  I imagine that will take a while.

22             MS. JOHNSTON:  It will take a while.

23             THE COURT:  What do you have after Mr. Toszer?

24             MS. JOHNSTON:  We have a witness, Mr. Harden.  And I

25   believe Sara Conner.  And perhaps Deborah Kennedy, who is the

1    fingerprint.  I'm still waiting to hear about the stipulation

2    that the prescription bottle was examined for fingerprints or

3    latents.

4            THE COURT:  There were no latent prints.

5            MS. JOHNSTON:  No, there were no latent prints of

6    value.

7            THE COURT:  Where are you on that?

8            MS. JOHNSTON:  And probably the case agent, Your

9    Honor.

10            MR. BRENNAN:  Oh, well, we want to speak.  Since

11    there's no identifiable prints, is the stipulation going to be

12    there just simply were no prints at all on the bottle?

13            MS. JOHNSTON:  I think I gave you the print.  I used

14    the language exactly on the record.

15            MR. BRENNAN:  We just want to talk to her on the

16    phone.

17            MS. JOHNSTON:  There are no identifiable prints.  It

18    doesn't say of value.  There were no identifiable prints.

19            MR. BRENNAN:  So, there's no partials or anything

20    like that?

21            MS. JOHNSTON:  There might be smudges.  There might

22    be -- I guess there could be partials.  There wouldn't be

23    anything that they could use to do a comparison.  That would be

24    a print of value, one they could compare.

25            MR. BRENNAN:  I think we have her phone number.

1    We're going to try to speak with her just to verify a couple

2    things.  We may be able to stipulate to that.

3                THE COURT:  Is she here today?

4                MR. BRENNAN:  No.  I have her scheduled to come in

5    tomorrow morning if need be.

6                THE COURT:  Very well.  Well, sort that out.  All

7    right.  So, Toszer's direct takes how long?

8                MS. JOHNSTON:  Maybe 45 minutes to an hour.

9                THE COURT:  Let's let the jury go and we'll finish

10   this conversation.

11               (The following proceedings were had in open court.)

12               THE COURT:  Ladies and gentlemen, if you'd be seated.

13               We've decided to sit for an additional six hours this

14   evening.  A little bit of levity.

15               JUROR:  Hooray.

16               THE COURT:  We're done for the day.  And I'm going

17   the excuse you for overnight.  Please do not -- let me talk

18   about this first.

19               In terms of planning, I think at this point it would

20   be very appropriate for you to plan that this trial will extend

21   into Monday.  So, in terms of planning your own personal

22   business and your own personal affairs, it's always risky to

23   make any kinds of front projections with respect to a trial and

24   how long it's going to last or when it's going to end.  But at

25   this point I'm reasonably confident that this trial will last

1    into tomorrow through the day and very likely into Monday.

2    Tomorrow I'll give you a prediction about Tuesday.  And I hope

3    that it is a prediction that we will not be sitting Tuesday.

4            But, just like the weather report on television, you

5    know, sometimes they can tell you a little bit about weather

6    that is far out there, starting to get some hits in that

7    regard.  At this point, Monday for sure.

8            So, don't discuss the case with anyone overnight.

9    Don't discuss it with your fellow jurors.  Do not discuss it

10   with any of your friends and family.  Again, you can confirm

11   that you're serving on a jury in federal court in a criminal

12   case.  The trial is expected to last through Monday.  That

13   you've been instructed, though, by the judge that you're not

14   allowed to talk to them about the case.  And that, if necessary

15   or appropriate, you can speak to them after the trial is over.

16           Don't read any news articles or look at news reports

17   that touch upon this case or the issues that it presents or the

18   participants in the trial.  Avoid all contact of any kind with

19   the participants in the trial.

20           Again, this point that I emphasize over and over.

21   Please, no independent investigation of the law or facts

22   relevant to this case.  Do not conduct Internet searches with

23   respect to the issues presented or the persons participating in

24   the trial.  Do not consult external sources such as

25   encyclopedias or dictionaries in reference to the issues and

1    the terms that have been presented to you here.

2            Please return promptly tomorrow at 9:30 so that we

3    can begin trial right on time.  Again, it's always good if

4    you're here at, say, 9:20 or so.  Again, if you have any

5    difficulty whatsoever, please advise my chambers or my

6    courtroom deputy, Ms. Moye, who will be returning and will be

7    with us tomorrow on the telephone numbers that she previously

8    provided to you.

9            You are excused now until 9:30 tomorrow morning.

10           (Jury left the courtroom.)

11           THE COURT:  So, continuing with our discussion.  Mr.

12   Toszer will be the next witness.  And his direct will take

13   approximately how long?

14           MS. JOHNSTON:  Your Honor, I'm going to estimate at

15   45 minutes, maybe an hour.

16           THE COURT:  Okay.  Cross?

17           MR. BRENNAN:  At least that, Your Honor.  And I

18   think, when you ask us at some point if there's a legal issue

19   to discuss, there is going to be one with respect to Mr.

20   Toszer.  I want to get into it right now.

21           THE COURT:  Sure.  Just give me the thumbnail.

22           MR. BRENNAN:  I'll give you thumbnail, Your Honor.

23           Clearly his contact that he had with Mr. Sweeney is

24   admissible.  However, Your Honor, there is hearsay -- I believe

25   the government's going to attempt to offer hearsay through Mr.

1    Toszer of what Mr. Waite said to him on March 23, 2009 on the

2    date of death.

3              THE COURT:  So, Toszer will testify that -- he was in

4    telephone conversation or personal conversation?

5              MR. BRENNAN:  A little unclear from the grand jury.

6    But he will testify.  And the concern that we have, Your Honor,

7    is that I don't think it falls under the exception of 803(3).

8    But, getting beyond that, Your Honor, it's really unclear what

9    was being said.  I'll proffer, if I may based, on the grand

10   jury.

11             THE COURT:  Understanding that the trial testimony

12   could be different.  But yes.

13             MR. BRENNAN:  Just to give sort of what the issue --

14   I'm trying to identify the issue, Judge.

15             THE COURT:  I appreciate it.

16             MR. BRENNAN:  So, there's a discussion with Mr. --

17   Mr. Toszer recounts a discussion he had with Mr. Waite, which

18   is -- and it is, "Whatever he was" -- "whatever he was buying,

19   I went in half with him on."

20             That's our concern one.

21             "You didn't know what you were going to get that

22   day?"

23             Answer:  "No.  No, ma'am."

24             THE COURT:  Okay.  Wait a minute.  Let's analyze

25   that.  He says -- he's in a conversation with Mr. Waite.

```
 1              MR. BRENNAN:  Right.

 2              THE COURT:  And he agrees -- wait until the door is

 3    shut.  Okay.  Thank you.  He agrees that he is in for half of

 4    whatever Mr. Waite is purchasing?

 5              MR. BRENNAN:  Right.  That's what he said.  Whatever

 6    he -- now, it's sort of premised on --

 7              THE COURT:  Well, how is that hearsay?

 8              MR. BRENNAN:  Well, because Mr. Waite's going to be

 9    buying something that day.  And that's going to be offered for

10    the truth.

11              Let me -- if I can continue the whole context of

12    this, Your Honor, because it may help the Court with this.

13              "So, you didn't know what you were going to get that

14    day?"

15              "No.  No, ma'am."

16              And then he says, "My discussion was he was going to

17    get it.  Later on after work he would call me and tell me

18    everything was good.  And then we would usually meet up."

19              And then there was a question from government

20    counsel.  Question:  "Basically he got it and then you paid for

21    it?"

22              Answer:  "He never got it," which is an answer I

23    like.

24              And then:  "So, you talked to" -- so then government

25    counsel says, "You talked about meeting somewhere after work."
```

1              "No, no, no.  What happened was he said he was

2    getting it after work."

3              And then question:  "So, you are going to pick it up

4    the next day?"

5              "Yes, ma'am."

6              And then the question:  "It was your understanding he

7    was going to purchase heroin and you were going to meet up the

8    next day."  So, it's not a quote from Mr. Waite that he was

9    going to purchase heroin.  "It was your understanding he was

10   going to purchase heroin."

11             And then later on he describes a call that he got

12   at -- between 4:00 or 5:00, which is probably one of the calls

13   we just heard about moments ago.  Probably one in Trappe,

14   Maryland.  But -- which was his girlfriend.  And he quotes him

15   as saying, "Everything was a go."

16             Question:  "What did that mean?"

17             "Everything's going to be good tomorrow."

18             And the question is:  "When he said everything was a

19   go, what was he meaning?"

20             "He was going to get heroin."

21             So there is a combination of this sort of planning,

22   direct quotes, understanding, and interpretation.  It's a

23   hodgepodge.  But what it is, Your Honor, is that all supposedly

24   quotes from a dead man about what maybe or maybe not was going

25   to occur.  And I think that, unlike the analysis that the Court

1    applied with respect to Ms. Smith where they were, you know,

2    right there together and going to do it directly, this is quite

3    a bit different, Your Honor.  So I think that's our concern

4    about that issue.

5         And 803(3), Your Honor, it's a funny rule.  And, when

6    I say funny, I meant the legal concept.  It says, "Then

7    existing mental, emotional, or physical condition."  And it

8    talks about the existing state of mind, emotion, sensation, or

9    physical condition.  And then it does say, "intent, plan,

10   motive, design, mental feeling, pain, and bodily health."

11        So, I mean, it seems to go to what your mental or

12   physical or emotional condition is, like bodily health and

13   pain, not to this amorphous, "Everything's a go."  And the

14   speaker overlaying an interpretation on this, "Everything's a

15   go."  And that's our concern about the testimony of Mr. Toszer

16   tomorrow, Your Honor.

17        THE COURT:  What about back to what we were

18   discussing yesterday?  What about a plan declarant -- that's

19   Mr. Waite -- then existing state of mind such as plan.

20   Describing what a plan is.

21        MR. COOK:  If I may, Your Honor, I think the phrase

22   from Mr. Waite, "Everything's a go," I don't know that that --

23   I mean, maybe in one person's interpretation might constitute a

24   plan.  But it's not plainly a plan.  It's different from

25   saying, "We're going to go to Pat's dad's house and get pills."

1    That's more of a plan.  "Everything's a go" --

2           THE COURT:  It's a projection based on information

3    and data that he's pulled together as to what's going to occur,

4    and according to his intention.

5           MR. COOK:  Or it could mean, "I have" -- "I got the

6    heroin.  It's 4:00 o'clock everything's a go.  I got what we

7    needed."

8           THE COURT:  Well, the question that really it

9    presents is:  Is it reliable without the declarant being here

10   and being subject to cross-examination?  And with that point

11   hanging in the air, I'll turn to the government and see what

12   they have to say about it.

13          I take it none of this came up in front of Judge

14   Messitte?

15          MS. JOHNSTON:  No, Your Honor.

16          THE COURT:  There was no motion in limine?

17          MS. JOHNSTON:  There was no motion in limine with

18   regards to this.

19          Your Honor, it's -- I appreciate counsel's using my

20   grand jury question.  And, of course, we have certain purposes

21   in grand jury.  But Mr. Toszer is going to testify that,

22   indeed, he had a conversation with Mr. Waite; they discussed

23   getting some heroin; Mr. Waite said he was going to --

24          THE COURT:  Certainly, Mr. Brennan, you have no

25   objection to Mr. Toszer characterizing the substance of the

1    conversation in which he was a participant with Mr. Waite?

2    What was -- "Well, Mr. Toszer what was the conversation about?"

3              "We were discussing getting some heroin."

4              MR. BRENNAN:  Well --

5              THE COURT:  I mean, that's Mr. Toszer's conversation

6    too, right?

7              MR. BRENNAN:  A discussion with Mr. Waite about

8    getting heroin, that's something being offered for its truth.

9    That's what they're just talking about, a plan.

10             MS. JOHNSTON:  Your Honor, I expect Mr. Toszer's

11   testimony to be that he had a conversation with --

12             MR. BRENNAN:  Judge, tell you what.  I'm going to sit

13   down and let Mr. Cook make the response.

14             THE COURT:  Ms. Johnston, I cut you off.  What did

15   you say?

16             MS. JOHNSTON:  I think it was Mr. Brennan who cut me

17   off.  And that's perfectly okay.  He's done it before.  I'm

18   sure it won't be the last time.

19             MR. Toszer's going to testify he had a conversation

20   with Mr. Waite.  They discussed getting heroin.  Mr. Waite said

21   he would ask Mr. Toszer if he wanted to go in halfs or split

22   it.  He said yes.  He would call him that night and let him

23   know if it was going to happen.

24             So he called him, told him it was a go, and that he

25   would get it to him.  They would make arrangements to get it

1    the next day because Mr. Toszer wasn't going to drive from

2    Germantown down to southern Maryland to pick any heroin up.

3            I mean, to me it is a -- classic statements by Mr.

4    Waite of his plan and his intent of what he was doing.  I don't

5    see how it doesn't fall under that.

6            I know that there's -- I can go back and pull some

7    cases for the Court if the Court thinks it's necessary.  It's

8    not our objection, it's the defendant's objection.  But what

9    Mr. Toszer's going to talk about is Mr. Waite's plan to get

10   heroin that night.  And that he was going to call Mr. Toszer

11   and let him know if it was going to happen.

12           And, so, he called Mr. Toszer and told him, yes, it

13   was a go, it was going to happen.  And, so, Mr. Toszer said

14   that he would catch up with him the next day so he could get

15   it.

16           So, I don't see how that does not come in, in Mr.

17   Waite's operative words, come in as evidence under 803(3) as

18   his plan and his intent of what he was going to do that night.

19           THE COURT:  Well, we'll see what the evidence looks

20   like when it's actually presented.  To me it looks like, to the

21   extent it is hearsay, it falls within 803(3).  "I'm back on

22   plan."  And it seems to be a conversation between the two of

23   them about what they're going to do and how it's all sort of

24   coming together and how it's coming along.  What their

25   intentions are and what their plan is.

1          So, that would seem to fit within the exception set

2     out in 803(3).

3          It strikes me that there maybe an alternative basis,

4     unfortunately for your side, Mr. Brennan, under which this is

5     admitted.  And I don't want introduce a contaminated theory to

6     the process that the government hasn't proffered.  But it also

7     strikes me possible -- perhaps some additional proof would be

8     required before the Court reaches this conclusion.  But it's

9     also possible that there's proof that Mr. Sweeney, Mr.

10    Toszer -- if I'm pronouncing his name correctly -- and Mr.

11    Waite were co-conspirators.  And part of a conspiracy to

12    distribute an illegal drug.

13         And if that were the case, then you're faced with the

14    prospect of statements of co-conspirators, Toszer and Waite,

15    being introduced against their co-conspirator, Mr. Sweeney.

16    That's another possibility that hangs in the air as far as I'm

17    concerned.

18         And, of course, in -- there are rules under

19    801(d)(2)(e), I think it is, it's not even hearsay.  It's

20    defined out of the rule.

21         I'm happy to entertain more argument at the moment

22    this testimony is presented and to consider then whether it's

23    admissible in the exact context in which it's presented.  But

24    at this point, the night before, it looks like admissible

25    testimony.

```
 1                All right.  Any other issues?
 2                MR. BRENNAN:  No, thank you, Your Honor.  I think
 3     that was all the evidentiary that we had identified for
 4     tomorrow, Your Honor.
 5                THE COURT:  Okay.  So, Toszer, that's like two hours.
 6     We start at 9:30.  We're done with him by 11:30 or 12:00.  You
 7     have these other two or three witnesses.  They're short?
 8                MS. JOHNSTON:  They should be, Your Honor.
 9                THE COURT:  So, no more than half an hour for each?
10                MS. JOHNSTON:  That's fair.
11                THE COURT:  So, another hour and a half of testimony
12     there.  Which carries us to the lunch break and then into the
13     early afternoon.  And then we turn to the defendant's case.
14                And what's that looking like at this point?  Do you
15     know yet if your client's going to testify?
16                MR. BRENNAN:  I do not.  I think, in all candor, I
17     think it's going to depend on how Mr. Toszer goes.
18                THE COURT:  Yeah.  Okay.  Well, I think it was
19     accurate what I projected for the jury about Monday.  Counsel
20     doesn't disagree with that?
21                MR. BRENNAN:  And one of our witnesses -- one of the
22     practicalities.  One of our witnesses came up lame for
23     tomorrow.
24                THE COURT:  Physically lame, substances going to be
25     lame?
```

1          MR. BRENNAN:  Again, late in the day I got to watch

2    my choice of words, Judge.  One of the witnesses late yesterday

3    suddenly said that he's unavailable tomorrow, much to our

4    dismay.  So we may have to continue that Monday.

5          MS. JOHNSTON:  Your Honor, we have had any number of

6    witnesses that we have actually put out to have to be here in

7    order.  We have Mr. Toszer, whose kids had to be put on a plane

8    so they can get back to their mother because he can't drive

9    them tomorrow.  This mention that witness has an excuse,

10   they're just not available, they're under subpoena, they need

11   to be here.  Which is something that we've told our witnesses

12   repeatedly.  We have somebody else who needs to catch a flight

13   tomorrow at 1:00 o'clock.  So, we have Sara Conner, who's in a

14   police academy and going to miss testing tomorrow.

15          THE COURT:  Well, yeah.  I'm almost wondering,

16   though, before we fully air this out whether it's kind of moot.

17   Because I'm not sure Mr. Brennan is going to be finished by

18   tomorrow, regardless.  So, he might still -- you know, he might

19   not be able to get to the witnesses until Monday.

20          I think in general, Mr. Brennan, you should take the

21   position with your witnesses that, you know, they need to be

22   here tomorrow afternoon.  Is this witness under subpoena?

23          MR. BRENNAN:  No, Your Honor.

24          THE COURT:  Well, that's problematic.  Do you need a

25   subpoena?

1              MR. BRENNAN:  We -- no.

2              THE COURT:  All right.  My expectation is we're not

3    going to stop and wait for witnesses.  Trial time is a scarce

4    commodity.

5              MR. BRENNAN:  I just wanted to mention that.  I mean,

6    the reality is I was erring on the side of caution.  I think

7    Mr. Cook's reminded me that probably 90 percent we're not going

8    to call that witness.  But I just wanted to address it with the

9    Court this afternoon and err on the side of the caution.

10             THE COURT:  Yeah.  Trial's always scheduled for

11   through Tuesday and Friday of this week.  And, if we're on one

12   of those days then we're at the end of having to call that

13   witness up to that point, then we need to hear from that

14   witness and they're not here, then the next question is going

15   to be are they under subpoena.  And if they're not under

16   subpoena, the likely result is that we're at the end of our

17   testimony.  But let's not borrow trouble and see what happens

18   tomorrow.

19             All right.  Let's adjourn to chambers and see if we

20   make some progress on jury instructions.

21             (The proceedings were concluded.)

22

23             I, Christine Asif, RPR, CRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
     record of proceedings in the above-entitled matter.

24
                       _____/s/_____
25                         Christine T. Asif
                         Official Court Reporter

```
 1                            INDEX
 2
      Witness Name                                    Page
 3
      Dr. Katerina T. Parmele
 4
         Direct Examination By Ms. Johnston.................. 4
 5
         Cross-examination By Mr. Brennan ................... 6
 6
         Redirect Examination By Ms. Johnston .............. 10
 7
         Recross-examination By Mr. Brennan................. 11
 8
         Redirect Examination By Ms. Johnston .............. 12
 9
      Dr. Barry Levine
10
         Direct Examination By Mr. Rao...................... 13
11
         Cross-examination By Mr. Brennan .................. 33
12
         Redirect Examination By Mr. Rao ................... 42
13
      Dr. Donna M. Vincenti
14
         Direct Examination By Mr. Rao...................... 45
15
         Cross-examination By Mr. Brennan .................. 60
16
         Redirect Examination By Mr. Rao ................... 75
17
      Cari Ray
18
         Direct Examination By Ms. Johnston................. 76
19
         Cross-examination By Mr. Brennan .................. 91
20
         Redirect Examination By Ms. Johnston ............. 108
21
      Steven M. Demchuk
22
         Direct Examination By Mr. Rao..................... 115
23
         Cross-examination By Mr. Cook..................... 128
24
         Redirect Examination By Mr. Rao .................. 130
25
```

```
1                           INDEX (con't)

2

3    Witness Name                                        Page

     Jeff Dye
4
         Direct Examination By Mr. Rao........................ 133
5
     Detective Richard Cress
6
         Direct Examination By Mr. Rao........................ 139
7
     Rajiv Nair
8
         Direct Examination By Ms. Johnston.................. 147
9
     Ryan Lombardo
10
         Direct Examination By Ms. Johnston.................. 158
11
         Cross-examination By Mr. Brennan ................... 200
12
         Redirect Examination By Ms. Johnston ............... 215
13

14

15

16

17

18

19

20

21

22

23

24

25
```

< Dates >
04/24/2007
    149:21.
2/17/2009 179:20.
2/17/2009. 180:6.
2/20/09 185:6.
2/20/09. 185:5.
December 10, 2008
    211:10.
December 1st
    165:5.
December 2008
    164:5, 164:9,
    165:24, 166:1,
    166:4.
December 8, 2008
    211:10.
December 8th 190:2,
    190:7, 190:18,
    190:21, 191:9,
    191:11, 191:14.
December 8th, 2008
    190:24, 191:3.
December 9th 193:2,
    194:11.
February 17
    211:24.
February 17th
    178:3, 180:14,
    181:7, 181:14,
    183:4, 183:8,
    183:14.
February 17th, 2009
    179:18.
February 18th
    184:3.
February 20
    187:6.
February 20, 2009
    211:25.
January 2009
    166:14.
March 1st 168:13.
March 2009 136:3.
March 23, 2009
    141:8, 204:20,
    212:10, 213:2,
    213:15, 213:19,
    223:1.
March 23/24, 2009

9:5.
March 23rd 6:16,
    6:17, 78:3,
    172:11, 213:22,
    213:23.
March 23rd, 2009
    5:6, 61:13,
    169:6, 173:9,
    174:4.
March 24, 2009
    212:11.
March 24th 48:19,
    156:25.
March 24th, 2009
    5:7, 136:3,
    169:7.
March 25th, 2009
    162:23, 168:13.
March 27th, 2009
    26:4.
March, 2009
    205:15.
May 2010 141:6.
May 21st 139:22,
    140:21.
May 21st, 2010
    142:22.
November 2nd, 2008
    162:14, 162:23.
"two 113:6.
$32. 90:12.
.
.
< 0 >.
03/24/2009.
    155:10.
07987 154:2.
08 157:3.
08/04/2010.
    149:21.
.
.
< 1 >.
1 92:14, 92:15,
    120:8, 145:16,
    162:12, 163:4,
    165:11.
1. 119:8, 120:7,
    120:18, 163:3.
10 39:21, 44:4,

44:15, 78:2,
    138:4.
10-hour 44:17.
10. 78:2, 168:17.
100 42:5.
1090 52:17.
10:30. 11:15.
10:38 61:12.
10th 190:2, 190:7,
    195:21, 196:10,
    196:17, 197:1,
    198:7.
11 48:1, 138:4.
11:00 57:6.
11:30 231:6.
11:59 190:24.
12 78:2, 116:2,
    134:14, 139:16.
12:00. 231:6.
12:11 155:10,
    157:1, 169:7,
    212:11, 214:16.
12th 1:13.
13 172:14, 191:4,
    193:14.
14 172:16.
15 57:8, 57:25,
    115:20, 182:18.
15-minute 57:22,
    182:1, 182:7.
150 18:16.
15322 154:3.
16 173:14,
    193:22.
160 93:16, 93:22.
17 173:18,
    206:23.
17th 183:16.
18 136:24, 137:6,
    173:9.
1800. 46:23.
183 50:6.
18th 184:1.
19 16:11.
1901 140:20.
1982. 16:6.
1983 16:6.
1983. 14:3,
    14:12.
1986. 17:3.

1988. 17:4.
1989 16:8.
1991 14:13, 16:11,
 18:9.
19th 184:12.
1:00 232:13.
1:05 132:16.
1:37:01 193:6.
.
.
< 2 >.
2 27:7, 92:14,
 153:20, 163:4,
 163:11, 173:10,
 213:11.
2. 171:25.
20 18:10, 80:9,
 173:12, 182:11.
20. 168:15.
200 18:16.
2008 136:3, 190:2,
 194:11, 195:21.
2008. 190:7,
 196:17, 198:7.
2009 6:18, 19:3,
 23:7, 77:14,
 78:4, 141:19,
 167:5, 177:22,
 184:15.
2009. 6:19, 48:19,
 167:16, 168:8,
 180:2, 188:18.
2010 139:22,
 140:22.
2011. 77:3.
2012 1:13.
20736. 149:19.
20th 178:4, 180:2,
 184:15, 184:24,
 186:12, 188:15,
 188:18, 188:23.
21 193:6.
22 134:7, 164:17.
22,000 116:23.
22. 168:4, 170:9.
22:38 80:4, 80:5.
23 196:1.
230 41:14, 42:16.
23:29 6:16.
23:29. 6:15.

23rd 205:13,
 205:15, 212:22,
 214:15, 214:22.
24. 167:6.
240 170:22.
24th 214:19.
25 204:5.
26 173:1.
26. 166:6.
27 173:5.
29 18:7, 50:5,
 82:9, 196:3.
29-year-old 55:17,
 80:15.
29. 167:25.
2:00 135:11,
 137:3.
2:03:24 197:4.
2:06 195:23,
 197:5.
2:07:34 193:7.
2:15 132:24.
2:15. 132:16.
2:17:30 193:9.
2:22:59 165:5.
2:30 139:25.
2:44 197:18.
2:44:55 195:25,
 197:6, 197:13.
2:45 195:25.
2:45:12 172:16.
2:46:25 181:12.
2:47 198:8.
2:47:35 196:2,
 197:14.
.
.
< 3 >.
3 52:16, 60:2,
 60:7, 69:24,
 93:19, 94:19,
 103:20, 110:18.
3,000 117:3.
3. 60:3, 92:14.
30 67:22, 67:24,
 68:3.
300 42:5.
301 145:16, 145:17,
 149:6, 149:14,
 160:23, 164:5,

166:13, 167:15,
 168:7, 169:9.
3089658 120:18.
3089658. 119:16,
 120:20.
32 90:2, 193:8.
320 116:17.
33 194:1.
34 115:11.
34. 167:11,
 168:2.
35 18:10.
3500 18:8.
36 190:25.
375 41:24.
39 193:24,
 195:24.
39. 166:3.
3:00 169:6,
 212:10.
3:18:29 191:4.
3:21:23 193:11.
.
.
< 4 >.
4 42:11, 99:14,
 157:3.
4. 173:6, 173:13,
 173:16, 173:19.
40. 165:25.
400 42:5.
44 162:15.
45 182:14, 220:8,
 222:15.
4:00 225:12,
 227:6.
4:06 212:22.
4:08 213:2.
4:08. 157:4,
 206:22, 212:23.
4:08:06 171:1.
4:14 196:6.
4:25 175:23,
 204:19, 205:13,
 205:15, 205:24,
 206:23, 208:14,
 208:16, 209:17,
 213:3, 213:5,
 213:15, 214:7.
4:25. 212:25.

4:25:12 172:11,
   172:13.
4:30. 112:9.
4:35 189:4.
4:37 192:15,
   192:16, 192:17.
4:37:17 191:9.
4:55 184:20, 187:6,
   188:18, 188:20,
   188:22, 189:3,
   189:18.
4:55. 186:13,
   189:5, 189:19.
4:55:47 184:21.
.
.
< 5 >.
50 42:1, 42:8,
   205:2.
50. 173:2.
500 42:11, 52:16.
53 193:18.
5311 152:20, 153:3,
   153:13, 155:11,
   157:2.
5311. 152:10,
   153:3, 153:8.
55 190:22.
57 184:19, 185:8,
   191:12.
571 165:6.
577-0979 170:22.
5771 165:8,
   165:10.
5771. 163:9.
5791 163:9,
   163:14.
5791. 157:3.
58. 167:9.
586-5771 168:8.
59 164:17,
   193:16.
5:00 225:12.
5:09:51. 181:12.
5:17 173:1, 176:21,
   177:4, 206:20,
   207:22, 214:10.
5:17. 206:16,
   206:21.
5:17:36 173:5.

5:22:31 162:15.
5:35 173:9, 208:2,
   214:11.
5:35. 189:7.
5:35:16 173:12.
5:43 189:13,
   194:17.
5:43:30 193:14.
5:49 194:17.
5:49:09 193:17.
5:50:19 193:16.
5:53 173:14, 208:7,
   214:11.
5:53:43 173:18.
5:54 189:14.
.
.
< 6 >.
6 27:8, 50:6,
   93:16, 196:12.
6-acetylmorphine
   25:6, 39:15.
6-monoacetylmorphin
   e 27:11, 27:16,
   27:17, 27:20,
   27:21, 28:7,
   28:9, 28:22,
   29:12, 29:16,
   29:18, 29:20,
   29:21, 30:17,
   32:13, 41:7,
   54:4, 55:25,
   62:9.
661-5311 145:16,
   145:17, 149:6,
   149:14, 149:23,
   155:15, 155:24,
   160:23, 164:5,
   166:13, 167:15,
   168:7, 169:10.
6:00 135:11,
   137:3.
6:01 171:6.
6:15 189:15.
6:18 192:12,
   192:13.
6:18:48 191:11.
6:30 113:6.
6:44:34 193:20.
6:48:50 193:22.

6:49 184:14.
6:51:54 189:20.
.
.
< 7 >.
7 128:20.
7. 196:12.
70,000 18:11.
703 155:16, 156:8,
   156:19, 157:6,
   160:19, 160:21,
   162:13, 162:14,
   162:20, 163:7,
   163:8, 164:5,
   166:13, 166:14,
   167:15, 167:16,
   168:8, 169:9.
75 41:23.
780 52:18.
7:15 192:3,
   192:5.
7:15. 192:11.
7:15:46 191:14.
7:22:18 179:19,
   180:13, 180:22.
7:23:54 179:20,
   180:13.
7:24:18 181:14.
7:25 180:12,
   184:3.
7:26 181:15.
7:47 189:15.
.
.
< 8 >.
8 39:21, 200:16.
801(d)(2)(e
   230:19.
803(3) 226:5,
   229:17.
803(3). 223:7,
   229:21, 230:2.
856 163:7.
856-5771 160:19,
   162:13, 162:20,
   164:5, 166:14,
   167:16, 169:9.
8569 150:11.
8594 155:8.
8:00 184:19,

185:8.
8:03 189:16.
8:25 194:12,
   194:14, 194:15.
8:25:05 193:24.
8:37 194:1, 194:15,
   194:16.
8:54:50 194:3.
8:57 184:19,
   185:7.
.
.
< 9 >.
9. 168:19.
90 233:7.
90s 19:5.
9101 139:25,
   142:21, 149:19.
911 80:6.
911. 113:2.
92314 124:22.
92315. 126:13.
92316 127:25.
925-8791 156:20.
928-5791 155:16,
   157:6, 160:21,
   162:14, 163:8,
   164:5, 166:14,
   167:16, 168:8,
   169:9.
9:00 185:20.
9:06 185:21.
9:06:08 184:19.
9:20 222:4.
9:30 222:2,
   222:9.
9:30. 231:6.
9:35 190:21.
9:45 11:14.
9th 194:4.
=6-mam 55:24.
_____/s/_____
   _____ 233:27.
.
.
< A >.
a.m. 135:11, 137:3,
   155:10, 157:1,
   169:7, 179:19,
   179:20, 180:13,

181:15, 184:19,
   185:7, 190:21,
   190:25, 212:11.
ABF 17:2.
abilities 20:23.
ability 20:22.
able 2:23, 29:2,
   82:19, 86:13,
   106:24, 127:12,
   148:8, 149:20,
   154:5, 166:7,
   176:9, 187:4,
   189:17, 191:17,
   192:6, 203:21,
   216:6, 216:9,
   216:11, 216:13,
   217:11, 220:2,
   232:19.
above 155:4.
above-entitled
   1:18, 233:25.
abrasion 50:16,
   50:23, 50:24.
abrasions 50:8,
   50:9, 51:1.
absence 41:19,
   54:18, 86:19.
absorbed 37:12.
abuse 35:23,
   77:22.
abused 15:13,
   24:21, 25:3.
abuser 36:4.
academic 115:21.
Academy 19:4, 47:9,
   47:10, 97:5,
   97:6, 97:7, 97:8,
   232:14.
accept 34:17,
   119:23, 181:23.
accepted 20:9,
   117:23.
access 147:25,
   148:4.
accesses 192:21.
accidental 61:19.
accommodate
   203:21.
accompanies 15:6.
according 98:21,

125:18, 175:23,
   209:4, 217:2,
   218:4, 227:4.
accounted 41:22,
   41:25.
accurate 12:12,
   35:19, 108:24,
   195:13, 204:16,
   209:15, 231:19.
accurately 26:9,
   174:22, 207:18,
   208:23, 210:14,
   218:7.
acetylcodeine
   28:12, 28:13.
acetylmorphine
   28:14.
achieve 43:3.
across 99:14,
   169:16, 169:19,
   176:2.
act 102:12, 102:21,
   102:24.
acting 102:4,
   102:11.
activated 63:12,
   174:7, 175:10,
   175:19, 175:22,
   176:13, 176:14,
   209:11.
active 31:8, 31:10,
   35:21, 127:11,
   149:20.
activity 6:13,
   11:21, 22:11,
   31:14, 33:19,
   156:25, 172:23,
   188:14, 189:2.
acts 102:22.
actual 42:17, 91:6,
   111:23, 118:15,
   121:21, 129:22,
   152:3, 163:24,
   166:7, 177:7.
Actually 11:6,
   12:10, 22:15,
   24:3, 24:7, 25:8,
   31:11, 44:17,
   52:7, 57:5,
   70:20, 71:5,

81:6, 83:1, 97:3,
105:13, 105:18,
119:10, 121:9,
126:19, 155:2,
166:20, 172:8,
174:18, 180:20,
192:23, 213:9,
214:23, 229:20,
232:6.
acute 55:20, 55:21,
55:22.
add 113:22, 125:21,
126:3.
addict 34:20, 36:4,
63:5, 64:18,
64:23.
addicted 113:17.
Addicts 34:11,
35:6, 35:12,
35:17.
adding 92:24.
addition 48:5,
52:22, 54:3,
85:14, 87:10,
88:5, 88:21,
89:11, 93:6,
174:17, 175:1,
188:14, 189:25.
additional 6:11,
142:4, 220:13,
230:7.
address 4:23, 80:1,
80:8, 80:10,
80:11, 111:10,
111:11, 111:14,
143:5, 149:18,
187:11, 203:3,
233:8.
adjourn 233:19.
administered 21:19,
21:20, 22:24.
administers 21:6.
Administration
37:8, 37:10,
43:22, 114:8,
115:8, 115:19.
administrative
134:12.
admissible 222:24,
230:23, 230:24.

admission 59:23,
103:5.
admit 161:6.
admitted 94:15,
103:6, 110:12,
111:5, 161:5,
161:19, 230:5.
advise 222:5.
advised 143:12,
144:10, 144:18.
aerial 188:12.
affairs 220:22.
affect 21:2, 21:5,
21:9, 37:24,
75:8, 75:13,
102:8, 102:9.
affecting 38:19.
affects 38:16.
affiliated 17:5.
affixed 124:9,
124:12.
afternoon 2:15,
91:23, 115:4,
115:5, 128:18,
128:19, 133:25,
139:11, 181:22,
182:1, 197:1,
200:24, 200:25,
231:13, 232:22,
233:9.
age 50:5.
agent 219:8.
agitate 101:9.
agitated 100:11,
101:19, 101:25.
ago 85:6, 95:24,
98:18, 225:13.
ago. 113:13.
agree 48:14, 59:1,
65:21, 76:4,
94:18, 95:14,
199:19, 200:3,
218:14.
Agreed 196:21,
198:16.
agrees 59:4,
200:11, 224:2,
224:3.
ahead 122:20,
123:7, 143:23.

Air 99:12, 134:5,
227:11, 230:16,
232:16.
airway 52:19.
Alabama 116:20.
Albany 46:12.
alcohol 14:17,
15:9, 15:10,
18:4, 18:24,
18:25, 24:12,
26:22, 26:23,
27:2, 41:3.
alcohols 15:10.
alert 86:16,
86:18.
allow 159:21.
allowed 221:14.
allowing 142:6.
Almost 18:7, 38:11,
38:16, 39:24,
46:4, 81:24,
91:10, 137:6,
204:18, 232:15.
alone 18:11,
27:24.
Already 69:25,
78:15, 82:3,
82:4, 88:11,
88:24, 106:8,
106:14, 116:11,
141:3, 141:11,
213:5.
alternating
152:9.
alternative
230:3.
although 65:17,
156:23.
ambit 40:2.
ambulance 80:14,
81:8.
AMERICA 1:5.
American 16:16,
16:17, 17:2,
17:3, 19:3, 47:9,
47:11.
Among 50:16, 57:11,
132:8, 182:2.
amorphous 226:13.
amount 29:25, 37:7,

41:20, 64:19,
73:9, 73:24,
161:15, 161:17,
161:18.
amounts 22:15.
amphetamine 25:4.
analyses 116:14.
analysis 14:22,
18:25, 53:1,
115:15, 116:1,
117:23, 119:21,
120:1, 120:22,
121:21, 121:23,
124:6, 124:7,
125:3, 127:2,
127:5, 128:1,
128:3, 129:8,
131:5, 148:4,
148:5, 225:25.
analyst 158:22,
159:1.
analyze 115:13,
159:13, 159:21,
223:24.
analyzed 116:24.
analyzing 116:4.
anatomic 47:14.
ancillary 148:13.
Anne 48:2.
Answer 43:13,
43:14, 113:6,
113:8, 113:10,
113:13, 113:15,
113:17, 113:20,
113:23, 223:23,
224:22.
answered 141:11,
143:10, 151:15.
answers 109:11,
113:3, 113:4.
antagonistic
36:2.
Antecubital 59:18,
59:19, 69:10,
69:11, 69:12,
70:2, 70:21,
70:25, 71:10.
anticipate 59:8.
anticipation
2:20.

antidepressants
24:25.
antihistamines
25:1.
anybody 82:17.
Apologies 200:20.
apologize 89:6,
110:16.
Apparently 6:8,
10:6.
appear 41:6, 89:2,
107:6, 111:11,
111:12, 111:13,
175:1, 210:22,
211:2.
appearance 80:16,
83:3.
appeared 83:5.
appears 9:18,
124:17, 146:1.
apple 147:7,
147:9.
applied 226:1.
applies 13:25.
appointment 17:6.
appreciate 181:19,
223:15, 227:19.
apprentice
134:19.
approach 59:6,
110:8.
appropriate 15:1,
16:19, 100:15,
220:20, 221:15.
approved 118:4.
approximate
140:8.
Approximately
11:14, 46:4,
46:22, 78:19,
80:3, 80:7,
103:12, 115:11,
115:20, 116:2,
116:16, 116:17,
116:18, 116:21,
117:2, 117:3,
139:25, 222:13.
April 1:13.
areas 4:19, 65:24,
68:25, 175:19,

204:2.
argument 230:21.
arguments 57:12.
arm 39:5, 50:25,
60:5, 69:15,
73:3, 94:3, 94:7,
94:9, 94:11,
94:13, 94:16,
95:1, 95:2, 95:4,
95:10, 95:11,
95:18, 95:19,
95:23, 96:1,
96:2.
Armed 14:9, 16:9,
16:10, 16:13,
18:12, 77:23.
around 51:6, 68:3,
82:18, 102:5,
105:14, 112:11,
112:25, 189:22.
arrangements
228:25.
arrest 140:9,
140:11, 141:4,
141:5, 143:12,
144:10.
arrests 100:23.
arrival 6:10,
11:16.
arrive 22:23.
Arrived 5:13, 5:17,
6:5, 7:7, 10:16,
78:19, 80:8,
96:4, 112:9.
arrives 117:14.
arriving 80:13.
arrow 107:3, 107:6,
107:20, 204:10.
arrows 181:13,
181:20.
arterial 70:7.
arteries 70:6,
70:13.
artery 69:20.
articles 17:21,
17:22, 17:23,
17:25, 57:15,
57:16, 132:9,
132:10, 182:2,
221:16.

Arun 1:33.
Arundel 48:2.
ascertain 72:12.
Ashley 82:25, 96:4,
    97:24, 98:2,
    99:6, 101:6,
    109:6, 112:7.
Asif 1:47, 233:23,
    233:28.
asleep 21:25, 22:5,
    22:6, 22:18,
    56:12, 74:5,
    112:20.
aspects 18:1,
    116:3.
assigned 77:22,
    117:19, 118:8,
    131:5, 136:8,
    136:12, 138:7.
assignment 77:15,
    78:6, 147:23.
assist 23:15,
    23:21.
assistance 23:5.
assistant 16:8.
assisted 140:12.
associate 17:6.
associated 14:7,
    20:18, 51:13,
    53:17, 145:7,
    145:15.
Association 116:8,
    161:13.
associations
    47:6.
assume 94:14, 95:3,
    95:9, 96:1,
    100:19, 102:12,
    109:23, 136:18,
    143:18, 208:9,
    208:15.
assuming 101:24.
asystolic 11:15,
    11:17.
AT&T 147:20,
    147:21, 148:14,
    148:17, 148:20,
    153:20, 153:21,
    155:1, 156:4.
atropine 12:1,

12:2.
atropine. 11:16.
attached 119:17,
    119:19, 119:25.
attempt 140:4,
    142:23, 222:25.
attempted 71:10.
attend 97:5.
attended 97:6,
    116:2.
attending 4:12.
attention 5:6,
    48:18, 52:12,
    77:14, 78:3,
    139:22, 144:16,
    167:12, 168:5,
    190:18.
attorneys 146:17.
AUSA 1:31, 1:33.
authored 47:16.
automatically
    24:13.
autopsies 14:23,
    46:20, 46:22.
autopsy 23:23,
    24:1, 24:8,
    26:17, 48:20,
    48:22, 49:1,
    49:8, 49:15,
    52:23, 53:12,
    53:18, 53:21,
    54:8, 55:4,
    55:13, 55:18,
    60:25, 65:17,
    66:24, 70:24,
    74:1, 91:11.
available 104:18,
    232:10.
average 18:8.
Avoid 35:7, 35:20,
    57:18, 132:11,
    221:18.
awake 35:14, 63:15,
    64:18, 66:11.
Award 19:3, 19:4.
awards 19:1.
away 30:12, 35:4,
    38:25, 39:18,
    56:15, 56:17,
    70:9, 74:5,

101:20, 102:19.
awoke 98:21.
.
.
< B >.
bachelor 15:24,
    115:23.
backed 2:22.
background 4:9,
    15:23, 16:4,
    46:9, 115:21.
backup 77:1.
bad 36:10.
bag 118:6, 118:17,
    118:18, 121:13,
    124:9, 124:12,
    126:15, 128:10,
    145:13.
bagged 105:16.
bags 118:16,
    118:17.
Baltimore 1:11,
    18:18, 46:1,
    48:2, 154:19.
bar 124:14.
Barry 12:24, 12:25,
    13:5, 13:12,
    62:21, 66:21,
    74:2, 234:17.
base 81:17, 83:22,
    99:9, 99:11,
    154:21.
Based 15:20, 21:24,
    22:4, 39:11,
    40:14, 43:5,
    46:21, 55:4,
    55:13, 65:17,
    73:25, 74:6,
    82:23, 100:5,
    100:25, 101:4,
    125:6, 127:5,
    176:1, 177:15,
    194:22, 201:23,
    208:18, 209:15,
    213:13, 223:9,
    227:2.
basement 88:9,
    89:12, 144:6,
    144:8, 144:9,
    144:12, 144:13.

basic 17:11.
Basically 56:21,
   66:1, 66:5,
   72:16, 97:5,
   99:1, 99:18,
   122:6, 149:2,
   150:4, 150:12,
   153:8, 153:17,
   153:24, 154:4,
   154:18, 155:19,
   156:4, 156:5,
   161:18, 201:8,
   224:20.
Basis 14:8, 17:11,
   35:10, 43:10,
   101:23, 130:24,
   230:3.
bathroom 83:1,
   83:17, 85:20,
   96:19.
Bay 175:21, 205:21,
   206:18, 207:2,
   213:7.
Beach 78:11,
   206:8.
beating 22:14,
   33:25, 67:3.
became 16:7, 16:8,
   16:11, 16:12,
   18:10.
become 58:18, 68:4,
   68:6.
bed 98:8, 112:17.
bedroom 89:12.
bedroom. 103:21.
bedside 6:14.
begin 3:12, 57:7,
   57:13, 159:24,
   222:3.
Beginning 33:10,
   162:16, 162:18,
   163:11, 164:24,
   167:23, 170:1,
   170:2, 170:5,
   171:11, 178:19,
   178:24, 179:15,
   190:11, 190:22,
   212:10, 212:22,
   214:14.
behavior 83:14,

86:8, 87:20.
behind 50:15,
   188:4, 188:9.
believe 2:4, 17:22,
   41:15, 69:4,
   71:24, 79:1,
   95:1, 98:4,
   104:18, 105:14,
   118:20, 132:22,
   157:5, 198:25,
   218:25, 222:24.
belong 116:7.
belonged 146:7.
belongs 153:7.
below 28:8.
Bench 110:10,
   122:15, 140:25,
   143:16, 218:18.
bend 69:17,
   69:19.
benefit 63:15.
Benzoylecgonine
   30:19, 30:23.
best 66:17.
better 2:17, 29:2,
   35:11.
Beyond 19:21,
   39:15, 141:5,
   141:11, 141:12,
   223:8.
bicarbonate 6:12.
big 50:8, 194:21.
billed 157:4.
bills 90:5,
   136:16.
biological 13:24,
   14:25, 28:21,
   28:23, 28:24,
   44:8.
bit 2:17, 2:18,
   2:23, 17:15,
   30:25, 43:6,
   83:19, 113:12,
   147:17, 148:10,
   220:14, 221:5,
   226:3.
black 140:15,
   175:18, 208:22,
   209:16, 209:22,
   209:25, 210:11,

216:21, 216:24,
   217:15.
bladder 53:6.
blanks 122:7.
block 203:20,
   203:25.
blood-tinged
   51:6.
bloodstream 23:2.
blue 70:15, 80:24,
   93:24, 98:25,
   99:1, 107:3,
   112:24, 169:15,
   175:2, 175:7,
   179:2, 180:23,
   183:17, 183:19,
   186:19, 189:21,
   190:16, 192:4,
   192:14, 192:17,
   194:12, 197:13,
   197:25, 208:22,
   210:10, 211:15,
   212:16, 217:19.
blunt 52:9.
blurts 143:17.
Board 4:17, 16:16,
   16:17, 17:1,
   17:2, 17:3,
   47:13, 47:14,
   106:1, 106:2,
   106:4, 106:10,
   106:16, 168:21,
   168:25, 174:1,
   179:24, 180:18,
   185:2, 188:4,
   196:24.
bodily 226:10,
   226:12.
bombarded 122:12.
book 17:20,
   17:23.
borrow 233:17.
bottle 112:15,
   219:2, 219:12.
bottom 93:19,
   107:9, 107:19,
   204:9, 212:14.
bound 31:14.
bounds 55:5,
   143:18, 143:19.

box 3:17, 13:1,
    61:21, 165:15,
    165:16.
boyfriend 87:23,
    88:2, 90:16.
Bradley 134:3,
    134:4, 135:12,
    135:13, 136:14,
    136:24, 137:7,
    137:9, 138:3,
    138:7, 138:11.
brain 20:22, 20:25,
    22:11, 23:4,
    31:11, 38:17,
    49:23, 66:2.
brains 110:24.
break 3:7, 28:13,
    57:7, 64:7,
    111:20, 170:12,
    170:13, 170:14,
    170:17, 231:12.
breakdown 28:21,
    28:23, 28:24,
    41:8, 55:25,
    62:10, 122:13.
breaks 28:14,
    64:8.
breath 83:4,
    83:12.
breathing 20:24,
    21:1, 21:16,
    33:19, 38:19,
    65:8.
Bredar 1:20.
Brennan11 234:13.
Brennan200
    235:21.
Brennan33 234:21.
Brennan6 234:9.
Brennan60 234:29.
Brennan91 234:37.
Brett 1:39, 7:2.
Brick 113:20.
bridge 99:15.
brief 144:17.
briefly 4:8,
    191:24.
Bring 3:8, 60:8,
    131:3, 133:5,
    182:24.

broke 77:21.
broken 29:16,
    126:18.
bronchi 52:20.
brought 9:21,
    141:1.
brown 90:4.
bruise 50:25.
bruises 50:25.
buildings 154:20.
buildup 51:17.
bulk 124:1, 125:21,
    126:3.
bureau 107:12.
Burger 187:12,
    187:17.
business 9:2,
    12:14, 134:8,
    148:18, 220:22.
busy 17:14.
button 150:13,
    151:2.
buying 112:12,
    223:18, 224:9.
.
.
< C >.
C-a-r-i 76:20.
C-r-e-s-s 139:6.
C. 198:14,
    198:15.
C1 173:25, 174:2,
    178:11, 199:19,
    204:17, 208:20.
C2 178:14, 178:15,
    178:16, 179:23,
    180:13, 180:16,
    180:17, 183:6,
    199:19, 208:21.
C3 198:19, 198:20,
    198:23.
C4 178:9, 179:24,
    185:1, 188:5,
    188:12, 199:19,
    208:21.
C4A 188:15, 188:16,
    188:25, 199:7,
    199:19, 208:21.
C4B 198:21, 198:24,
    198:25, 199:1,

199:7, 199:10,
    199:11, 199:12.
C5 199:12, 199:13,
    199:14, 199:16.
C6 191:22, 196:18,
    199:19, 208:21.
C7 196:18, 199:19,
    208:21.
C8 196:12, 196:18,
    196:23, 197:19,
    199:19, 208:21.
C8A 198:12,
    198:13.
C8B 197:16, 197:21,
    198:12, 199:19,
    208:21.
C8C 198:6, 198:12,
    199:19, 208:21.
Calling 5:6, 48:18,
    77:14, 78:3,
    167:12, 168:5,
    184:10, 184:11,
    190:18, 191:8,
    193:5, 193:7,
    193:9, 193:11,
    193:15, 193:17,
    193:19.
calm 83:18.
Calvert 4:14, 4:15,
    4:21, 9:7, 48:3,
    77:5, 77:6,
    77:18, 77:25,
    78:12, 81:24,
    105:4, 107:25,
    108:2, 139:13,
    139:16, 140:1,
    140:21, 142:22,
    213:11.
Cambridge 205:6,
    205:22, 206:18.
camera 106:6,
    106:11, 106:13.
Canadian 47:10.
candor 231:16.
capable 17:15.
capacities 77:9.
capacity 134:18.
capillaries 67:7.
caps 153:19,
    153:20, 156:5.

car 112:16.
card 90:3, 135:17,
   137:11.
cardiac 6:13,
   11:21.
cardioactive
   25:1.
cards 90:3.
care 59:12, 82:3,
   202:2.
career 19:2,
   116:6.
Cari 76:8, 76:10,
   76:13, 76:20,
   234:33.
Carolina 116:20.
carrier 175:11.
carriers 156:12,
   203:21.
carries 231:12.
Carroll 48:3.
cases 14:18, 14:19,
   15:10, 18:8,
   18:9, 18:11,
   18:12, 20:23,
   39:1, 39:2, 39:6,
   39:8, 39:24,
   42:3, 42:7, 47:3,
   85:12, 156:6,
   229:7.
catch 2:17, 83:4,
   229:14, 232:12.
categorizes
   156:10.
category 19:23.
catheter 71:7.
caused 51:17, 66:7,
   74:23, 83:7,
   83:14.
causes 20:25,
   21:13, 51:18,
   63:16.
caution 233:6,
   233:9.
cautioned 57:9.
cavities 37:12.
cavity 38:6, 51:7,
   72:25.
CDS 91:4.
Cecil 48:3.

cellular 145:10,
   145:11.
Center 20:24,
   46:12, 177:9,
   177:12, 177:14,
   177:19, 183:15,
   187:19, 189:13,
   198:2, 215:13,
   215:14, 215:21,
   218:8.
central 20:21,
   21:5, 21:13,
   22:10, 22:15,
   33:18, 40:16,
   44:20, 63:7,
   63:12, 74:17.
certain 16:20,
   16:23, 20:23,
   23:12, 35:3,
   67:3, 142:6,
   161:16, 201:24,
   202:24, 227:20.
Certainly 11:1,
   109:21, 126:21,
   227:24.
certainty 54:14,
   55:6, 123:15,
   125:8, 127:7,
   128:5.
certifications
   16:14, 47:13.
certified 4:17,
   17:1, 17:3,
   47:14, 48:8.
certify 233:23.
chair 147:17.
chambers 222:5,
   233:19.
chance 79:21.
change 6:12, 29:2,
   66:6, 75:18,
   75:22, 153:14.
changed 10:15,
   112:16.
chapters 17:23.
characterizing
   227:25.
charge 90:18,
   141:7, 141:15.
chart 5:19, 10:9,

162:3, 162:6,
   162:8, 162:9,
   162:10, 164:14,
   166:17, 166:18,
   167:17, 168:9,
   169:6, 169:8,
   169:20, 170:8,
   178:8, 180:8,
   187:22, 190:5,
   213:21, 218:7.
charts 118:1,
   201:25, 202:4,
   216:17.
check 136:17,
   161:5, 199:1.
checked 61:20,
   117:17.
checking 118:2,
   118:3, 176:5.
chemical 20:3,
   29:2, 64:8.
chemicals 13:23.
chemist 115:7,
   115:17, 115:18,
   120:1, 121:6,
   121:9, 121:10,
   122:22, 130:3,
   131:2, 131:13,
   131:16.
Chemistry 15:24,
   16:17, 17:3,
   115:21, 115:23,
   116:3, 117:6,
   117:12, 122:23.
Chesapeake 205:21,
   206:7, 206:18.
chest 93:24.
Chicken 112:11.
Chief 13:20, 14:6,
   14:11, 14:13,
   14:14, 14:15,
   15:19, 16:11,
   18:10, 46:1,
   46:14, 60:25,
   62:18, 62:22,
   66:22, 74:3.
child 77:22.
chill 135:2.
choice 232:2.
choices 61:18.

choose 164:13.
chose 131:3.
Christine 1:47,
    233:23, 233:28.
chromatography
    121:24, 121:25,
    122:4, 129:9.
chronic 51:19,
    55:21.
circles 174:5,
    174:6, 175:1,
    175:8, 194:19,
    195:11, 207:10,
    207:17, 208:22,
    210:13, 210:22,
    215:13, 215:14,
    216:19, 218:9.
circulated 23:3.
circulating 31:9.
circumstances
    55:14, 81:22,
    82:17, 142:6.
City 18:18, 48:2,
    48:7, 203:20,
    204:25.
civilian 18:16.
clammy 44:22.
classic 229:3.
classification
    19:15.
classify 61:2.
clean 84:10.
cleaned 96:19.
clear 11:9, 49:4,
    103:15, 107:9,
    107:19, 181:18,
    208:20.
cleared 103:16.
Clearly 3:24,
    13:10, 38:12,
    41:3, 45:16,
    65:6, 76:18,
    110:11, 114:22,
    133:18, 139:4,
    147:5, 158:5,
    158:8, 222:23.
client 231:15.
Clinical 16:17,
    17:3, 17:6,
    47:11.

close 69:20, 78:23,
    81:7, 91:12.
closed 91:10.
closely 197:12.
closer 29:22,
    148:9.
closing 57:12.
clothes 112:16.
clothing 105:22.
CNS 21:5, 44:18,
    44:19.
co-conspirator
    230:15.
co-conspirators
    230:11, 230:14.
coalesces 67:7.
code 154:3.
coded 179:1,
    211:13, 212:2.
Codeine 24:22,
    27:11, 28:9,
    28:11, 28:13,
    30:19, 30:22,
    41:10, 54:4,
    62:13.
coding 169:11,
    169:12, 211:9,
    212:13.
coercing 84:14,
    84:17.
coffee 38:3.
coherent 86:16,
    86:18.
cold 98:22,
    108:15.
collect 14:25.
collected 23:16,
    26:16, 53:1,
    53:2.
collection 23:16.
collects 23:24,
    67:3.
College 4:10,
    15:25, 16:1,
    16:3, 46:11,
    47:10, 115:24.
color 49:18,
    127:15, 127:20,
    169:11, 169:12,
    179:1, 190:13,

    211:9, 211:13,
    212:2, 212:13.
colored 202:4.
coloring 80:20.
colors 210:9,
    211:18.
Columbia 192:17,
    192:20, 197:5,
    197:8.
column 122:10,
    122:11, 122:12,
    129:1, 129:4,
    129:5, 129:7,
    150:9, 150:10,
    150:18, 150:22,
    152:12, 152:19,
    152:21, 153:15,
    153:16, 153:17,
    156:3, 169:17,
    169:20, 170:4.
columns 128:25,
    169:16, 169:19.
combination 35:8,
    55:23, 63:2,
    225:21.
combined 55:13.
combining 35:10.
comes 35:9, 77:23,
    152:11, 183:20,
    183:21.
comfortable
    147:18.
coming 51:8, 51:10,
    56:8, 80:25,
    141:21, 229:24.
commercial 134:5,
    135:16.
commodity 233:4.
common 21:11,
    125:19.
communication
    152:3.
communications
    191:19.
companies 194:24,
    201:11, 201:23,
    204:14, 205:8.
company 134:5,
    134:14, 135:16,
    137:10, 137:11,

137:15, 137:16,
159:14, 159:18,
159:19, 160:19,
175:11, 201:16,
202:13, 204:7.
compare 15:5,
130:7, 174:18,
219:24.
compared 20:22.
comparison
219:23.
compile 162:6,
167:17, 168:9.
complaints 4:24.
complete 161:7,
164:16.
completed 55:4.
completely 91:10.
completes 92:13,
194:4.
components 37:4,
37:5, 122:10.
compound 125:17,
130:14.
comprehensive
27:6.
computer 135:19,
201:18, 209:12,
209:15, 211:7.
con't 235:1.
CONC 129:5.
concentration
20:24, 29:25,
31:17, 31:19,
31:21, 32:2,
32:5, 32:9,
41:19, 42:4,
129:6, 129:11,
129:12, 129:15,
129:21, 131:8,
131:9, 131:12.
concentrations
18:3, 25:14,
31:1, 31:20,
31:23, 41:25.
concept 43:2,
226:6.
concepts 61:4.
concern 223:6,
223:20, 226:3,

226:15.
concerned 12:17,
83:20, 84:24,
99:7, 99:17,
99:19, 100:2,
114:2, 196:19,
230:17.
concerning 73:24,
84:5, 89:21,
116:13, 156:25.
conclude 127:12,
210:25.
concluded 61:24,
86:20, 91:8.
concluded.
233:21.
concluding 51:22.
conclusion 2:20,
75:9, 75:13,
75:18, 128:12,
230:8.
condition 5:13,
5:15, 6:13, 40:3,
121:13, 121:16,
124:16, 126:7,
126:16, 128:11,
144:18, 226:9,
226:12.
condition. 226:7.
conditioning
134:5.
conduct 17:18,
88:6, 121:3,
121:6, 131:5,
131:8, 161:13,
221:22.
conducted 18:6,
24:9, 25:20,
26:10, 26:18,
30:13, 31:4,
46:22, 53:7,
53:18, 55:5,
74:2, 122:3,
125:6, 125:14,
126:4, 126:8,
126:16, 127:5.
conducting 50:3,
51:25, 123:13,
127:18.
cone 51:9, 51:10,

52:5.
conference 2:20,
110:10, 122:15,
140:25, 143:16,
218:18.
confident 220:25.
confirm 221:10.
confront 84:5.
conjunction 43:3,
54:9, 62:17,
63:13, 66:10,
66:19, 75:17.
connected 150:13,
150:16, 151:2,
151:5, 151:11,
151:13, 202:23.
connecting
202:14.
connection 53:11,
135:12, 137:4,
137:7, 141:14,
150:11, 151:2.
Conner 87:15,
218:25, 232:13.
consider 230:22.
considered 19:11,
22:13.
consistent 22:2,
22:8, 32:2, 43:7,
43:17, 43:20,
43:24, 51:7,
56:8, 56:10,
56:12, 71:25,
72:3, 86:3, 87:5,
99:23, 101:16,
101:20, 102:4,
102:6, 102:11.
conspiracy
230:11.
constant 113:10.
constantly
112:25.
constitute
226:23.
consult 57:21,
132:15, 182:6,
221:24.
consultation
74:2.
consumed 44:3.

contacts 162:24,
  163:17, 163:24,
  165:23, 166:1,
  166:5, 166:25,
  167:4, 167:7,
  167:15, 167:20,
  167:23, 168:7,
  168:12, 178:3,
  190:1, 195:19,
  214:18.
contain 79:14,
  116:25, 162:8.
contained 123:19,
  127:3, 127:13,
  149:1, 150:10,
  180:8.
containers 15:1.
containing 89:16,
  124:10, 128:6.
contains 79:15,
  162:9.
contaminated
  230:5.
contents 56:16,
  56:19, 56:20,
  56:22, 56:24,
  145:9, 164:19.
context 100:15,
  224:11, 230:23.
Continue 88:1,
  112:3, 172:10,
  183:2, 191:6,
  197:10, 224:11,
  232:4.
continued 116:1.
continues 93:6.
continuing 16:24,
  222:11.
contract 158:20.
contractor 201:13,
  209:13.
contradicting
  83:23.
contradictions
  85:1, 85:2,
  85:16, 85:23.
contribute 36:13.
Contributed 54:14,
  66:15.
contributing 41:4,

41:11, 63:20,
  64:24, 65:1,
  65:2, 65:3,
  66:13.
control 89:13.
controlled 88:23,
  115:22.
controversy
  19:14.
convention 29:5.
conversation
  144:17, 166:8,
  220:10, 223:4,
  223:25, 227:22,
  228:1, 228:2,
  228:5, 228:11,
  228:19, 229:22.
converted 27:19,
  29:18.
Cook128 234:45.
cool 7:14, 7:15,
  40:4.
cooperate 84:18,
  84:19, 84:21.
coordinates
  190:13.
copies 57:24, 58:6,
  106:15.
copy 26:1, 49:9,
  62:3, 111:17,
  119:15, 119:17.
core 106:16.
corner 26:3, 26:6,
  26:7, 175:2,
  177:15, 177:16,
  183:20, 198:4.
Corporal 77:13,
  78:17.
correction 103:4.
correctly 69:10,
  230:10.
correlate 188:11.
correspond 177:4.
corresponds
  152:24.
Counsel 3:1, 43:1,
  102:1, 108:13,
  118:22, 119:23,
  120:8, 122:14,
  123:2, 123:3,

132:25, 133:21,
  139:8, 140:24,
  142:1, 143:15,
  143:23, 156:22,
  157:5, 161:1,
  182:21, 218:17,
  224:20, 224:25,
  227:19, 231:19.
count 90:8,
  167:20.
counted 165:22.
counties 18:17,
  48:1.
counts 141:7.
County 48:3, 48:4,
  48:5, 76:25,
  77:4, 77:5, 77:6,
  77:18, 78:1,
  78:12, 81:25,
  105:4, 107:25,
  108:2, 139:13,
  139:16, 140:1,
  140:21, 142:22,
  189:22, 192:4,
  192:13, 192:16,
  194:16, 213:11.
couple 3:2, 30:6,
  30:11, 65:5,
  67:22, 73:18,
  108:9, 109:11,
  220:1.
course 5:10, 9:2,
  17:10, 17:12,
  19:1, 21:5, 25:5,
  49:15, 49:24,
  50:12, 60:13,
  72:9, 93:9,
  116:1, 127:17,
  148:17, 227:20,
  230:18.
courses 17:9,
  116:2.
court. 112:2,
  123:12, 142:16,
  143:22, 220:11.
courtroom 140:14,
  222:6.
courtroom. 3:10,
  57:23, 60:9,
  132:18, 133:6,

182:8, 182:25,
222:10.
courts 47:21,
47:24, 116:18,
116:19.
cover 61:11, 92:7,
92:24, 92:25,
93:2, 93:6,
111:24.
coverage 148:5,
148:7.
covered 81:17,
116:11, 162:21,
177:15, 180:23.
covering 141:11.
covers 148:6,
164:8, 209:1.
CPR 80:19, 82:9,
113:1.
crease 94:3, 94:11,
94:16, 95:9,
95:23, 96:1.
crease. 95:3.
create 195:11.
created 148:17.
creating 124:1.
credit 90:3,
135:17, 137:11.
Cress 90:23, 90:24,
90:25, 91:2,
138:20, 138:24,
139:6, 142:10,
235:9.
crime 105:1,
117:14.
crimes 139:21.
Criminal 1:5, 97:6,
97:7, 221:11.
Cross 6:21, 24:21,
43:1, 128:15,
138:14, 146:10,
157:11, 222:16.
cross-checked
195:14.
Cross-examination
6:23, 32:24,
33:1, 57:3, 57:7,
60:11, 60:15,
91:19, 91:21,
128:16, 200:6,

200:22, 227:10,
234:9, 234:21,
234:29, 234:37,
234:45, 235:21.
cross-examined
182:12.
cross-trained
77:24.
CRR 1:47, 233:23.
crying 83:4, 83:11,
88:3.
currency 90:8.
current 139:18,
147:23.
Currently 14:4,
14:5, 45:25,
46:15, 76:25,
115:6, 136:23,
139:12.
cursory 105:3,
105:8.
custodian 117:18,
148:14.
custody 89:11,
90:1.
customer 149:2.
cut 34:3, 125:19,
125:20, 130:1,
130:5, 130:8,
228:14, 228:16.
Cyan 7:18.
Cyanosis 7:16,
7:19, 7:20.
Cyanotic 7:20,
7:21.
.
.
< D >.
D-e-m-c-h-u-k
114:12, 114:24.
D-y-e 133:20.
D1 88:24, 120:11,
120:14, 120:20,
121:1.
D1A 88:24, 120:11,
120:12, 120:14,
120:19, 120:21,
121:1, 121:4,
121:11, 121:15,
121:18, 123:21,

124:5, 124:8.
D2 88:25, 124:19,
124:20, 124:22,
125:3, 125:8,
125:11, 126:4.
D3 88:25, 124:19,
126:10, 126:11,
126:12, 127:2.
D4 88:25, 124:20,
127:22, 127:24,
128:6.
dad 113:20,
226:25.
damage 65:16,
65:18, 65:21,
65:22.
Dangerous 58:18,
88:23, 115:14.
data 15:18, 18:9,
148:4, 149:4,
149:5, 150:4,
160:7, 201:19,
227:3.
database 195:10.
date 26:3, 26:4,
26:5, 48:20,
124:10, 140:8,
141:15, 150:11,
150:22, 155:6,
155:10, 160:10,
169:22, 169:23,
178:22, 180:1,
190:9, 195:19,
204:20, 208:8,
208:10, 209:17,
212:4, 213:19,
216:17, 217:6,
223:2.
dates 155:7,
208:24.
day 2:11, 2:20,
3:12, 30:9,
139:23, 140:3,
140:6, 144:20,
182:17, 202:20,
214:7, 214:16,
214:22, 220:16,
221:1, 223:22,
224:9, 224:14,
225:4, 229:1,

229:14, 232:1.
day-to-day 46:17.
day. 225:8.
days 30:6, 30:11,
    233:12.
DEA 115:25, 121:11,
    124:15, 158:20,
    194:23, 195:2,
    195:10, 201:13,
    201:14, 201:20,
    201:21, 209:13.
Dea-conducted
    115:25.
dead 6:15, 10:16,
    40:4, 100:12,
    102:11, 102:13,
    225:24.
deal 91:4,
    142:11.
dealing 8:19.
deals 91:6.
dealt 59:15.
deaths 18:4, 31:20,
    31:24, 31:25,
    32:3, 33:24,
    34:1, 34:5,
    38:22, 39:1,
    39:2, 39:25,
    42:4, 81:24.
Deborah 218:25.
Deborah Johnston
    1:31.
deceased 5:15, 7:7,
    18:5, 23:6,
    23:12, 29:10,
    32:7, 32:11,
    73:25.
December 164:8,
    166:18, 187:21,
    190:1, 190:2,
    190:7, 195:20,
    195:21, 196:10,
    196:17, 197:1,
    198:7.
decided 220:13.
declarant 226:18,
    227:9.
declared 48:12.
decomposed 40:9.
Defendant 1:13,

1:35, 60:1, 60:2,
    60:3, 140:18,
    144:2, 144:8,
    229:8, 231:13.
Defense 3:1, 43:1,
    60:7, 69:24,
    94:19, 200:11.
defined 156:9,
    230:20.
definitely 54:8,
    57:1.
degree 15:24, 16:6,
    21:5, 46:10,
    46:11, 54:13,
    115:23, 123:15,
    125:7, 127:6,
    128:4.
delayed 39:3,
    39:25, 44:11.
delete 181:13.
deliberate 57:13.
delivered 117:16.
Demchuk 114:7,
    114:9, 114:10,
    114:17, 114:24,
    115:4, 117:5,
    117:10, 119:21,
    120:16, 128:18,
    130:19, 234:41.
denial 85:22.
denying 99:21,
    99:24.
Department 6:1,
    6:11, 17:7,
    77:19, 105:5,
    108:1, 115:8.
departments
    77:20.
depend 64:25,
    231:17.
dependant 37:2.
Depending 15:14,
    24:5, 64:15,
    67:19, 67:20,
    141:24, 142:2.
depends 25:12,
    74:19, 77:23,
    154:18, 155:2.
depict 174:5,
    216:2, 217:21.

depicted 94:17,
    143:1, 188:12,
    188:25, 209:14,
    210:18, 216:24.
depressed 20:25.
depressing 20:22.
depression 20:21,
    21:6, 21:13,
    44:18, 44:19.
Deputy 15:19,
    82:16, 82:24,
    83:23, 85:7,
    85:14, 86:4,
    87:8, 88:11,
    88:17, 89:7,
    90:20, 140:7,
    222:6.
describe 5:13,
    15:23, 46:9,
    49:12, 50:2,
    77:17, 80:22,
    83:3, 87:20,
    113:19, 129:24,
    172:1, 188:25,
    197:23.
described 27:6,
    30:14, 31:12,
    94:8, 120:24,
    124:24, 191:25.
describes 225:11.
Describing 28:22,
    43:17, 226:20.
description 56:7,
    56:11, 119:23,
    153:15, 153:17,
    153:18, 156:2.
design 148:2,
    226:10.
designation
    118:23.
desired 43:3.
desk 104:1.
despite 11:16.
Details 79:10,
    79:19, 148:6.
detect 28:3, 28:4,
    29:5, 30:4.
detected 27:10,
    27:14, 28:16,
    28:18, 125:13,

172:24.
Detective 77:16,
   77:18, 78:7,
   79:21, 81:21,
   82:23, 90:23,
   90:25, 91:2,
   109:21, 138:20,
   138:24, 139:11,
   139:13, 139:19,
   139:20, 235:9.
detectives 77:25.
determination
   10:16, 101:6.
determine 15:14,
   29:24, 46:20,
   55:16, 82:13,
   82:14, 82:19,
   125:4, 127:3,
   163:23, 165:21,
   166:25.
determined 116:25,
   172:1.
devices 137:16.
DFC 81:7, 82:16,
   90:23.
diacetylmorphine
   20:4.
diagnose 56:4,
   61:1.
diagnoses 62:16.
diagnosis 8:1,
   55:11, 56:8,
   56:13, 62:5,
   65:22, 72:9.
diagram 70:6,
   105:1.
dial 150:14.
dialed 152:18,
   152:20, 153:21,
   155:15, 155:16,
   157:3, 160:11.
diameter 72:11.
diamonds 217:19.
dictionaries 182:6,
   221:25.
dictionary 57:22,
   132:15.
die 21:1, 22:17,
   31:24.
died 67:11, 88:4.

dies 67:2.
difference 164:7.
differences 21:4,
   21:9.
Different 18:1,
   18:4, 24:6, 28:3,
   28:4, 28:24,
   64:9, 64:11,
   77:9, 77:20,
   102:9, 106:15,
   116:3, 116:18,
   122:11, 129:24,
   130:4, 134:13,
   151:4, 151:8,
   155:17, 156:24,
   159:20, 170:16,
   175:11, 201:9,
   223:12, 226:3,
   226:24.
differently 102:22,
   175:8.
difficulty 222:5.
dilate 101:11.
dilated 100:8.
Diluant 126:1,
   126:2.
dilutant 125:25.
dinner 112:10.
Dinton 81:7.
Diplomate 16:16,
   16:22.
DIR 153:23.
dire 19:9, 19:10,
   48:13, 117:7,
   117:8.
Direct 4:4, 13:15,
   39:16, 45:23,
   76:22, 89:7,
   115:2, 130:19,
   133:23, 139:9,
   147:15, 158:16,
   220:7, 222:12,
   225:22, 234:7,
   234:19, 234:27,
   234:35, 234:43,
   235:7, 235:11,
   235:15, 235:19.
directed 144:20.
directing 52:12,
   139:22.

direction 70:18,
   95:8, 142:10.
directly 5:4,
   21:21, 23:1,
   23:2, 37:19,
   43:19, 43:21,
   85:7, 187:17,
   226:2.
director 118:3.
disagree 231:20.
discuss 17:24,
   57:10, 57:13,
   65:4, 132:7,
   132:8, 182:1,
   221:8, 221:9,
   222:19.
discussed 39:16,
   123:4, 180:12,
   227:22, 228:20.
discussing 56:1,
   226:18, 228:3.
discussion 141:2,
   203:5, 222:11,
   223:16, 223:17,
   224:16, 228:7.
discussions 9:20.
disease 47:1, 47:3,
   55:19, 55:20,
   55:21.
diseases 46:25,
   49:22.
disk 148:24,
   150:7.
disks 160:12,
   160:13, 160:24,
   201:9, 201:10,
   201:17, 213:19.
dismay 232:4.
dispatch 103:18.
display 106:5,
   106:10.
dispute 122:16,
   123:8.
dissection 24:4.
distribute 132:20,
   230:12.
distribution 18:5,
   142:9.
District 1:1, 1:2,
   1:20, 140:4,

142:23, 192:17,
192:19, 197:5,
197:7.
DIVISION 1:3.
DO7 118:20.
DO8 118:20.
doctors 159:3.
document 15:4,
49:18, 49:24,
50:15, 104:2,
106:6, 106:11,
106:12, 119:7,
145:21, 145:22,
149:7, 149:9,
150:1.
documented 7:16.
documents 92:12.
dogs 125:18.
doing 8:18, 14:24,
15:9, 17:17,
81:12, 83:21,
103:12, 113:1,
130:19, 229:4.
dollars 90:2.
done 5:17, 18:2,
18:3, 24:15,
24:16, 52:23,
84:15, 88:8,
88:15, 88:19,
90:21, 101:17,
118:6, 124:7,
130:22, 131:12,
131:16, 194:20,
207:6, 207:7,
220:16, 228:17,
231:6.
Donna 23:19, 45:6,
45:10, 45:18,
234:25.
Donnie 134:23.
door 112:17,
112:18, 141:10,
143:7, 143:11,
224:2.
doorway 81:7.
dosage 36:14, 37:3,
42:17, 64:15,
74:19, 74:21,
74:23, 75:7,
75:9, 75:11.

dose 21:5, 21:15,
22:20, 32:9,
35:3.
doses 22:13, 35:19,
35:24.
double-check 68:13,
199:5.
doubt 122:24.
downside 20:20.
downstairs 105:8,
105:9.
downtown 154:19,
154:22, 203:19.
drafted 2:25.
drawn 207:17.
dresser 104:6,
104:10, 104:11,
104:13, 104:19,
104:20.
drinking 15:9,
26:22.
drive 229:1,
232:8.
driver 90:3.
driving 14:20,
100:20.
drop 89:9,
105:17.
drowsy 21:14.
drunk 14:20.
duct 135:2.
due 44:12.
duly 3:20, 13:6,
45:11, 76:14,
114:18, 133:14,
138:25, 147:2,
158:1.
Dunkirk 112:14,
173:13, 173:16,
173:19.
duplicate 163:18,
164:11, 179:6.
duplicates 164:10,
165:22, 166:15,
166:17.
duties 4:21, 77:17,
115:12, 115:13,
134:10, 139:20,
148:1, 148:2,
148:13.

DWI 100:23.
Dye 133:9, 133:13,
133:20, 134:2,
235:5.
.
.
< E >.
E-P-I 12:1.
earlier 24:12,
27:6, 30:14,
31:12, 98:12,
213:9, 214:7.
early 5:7, 19:5,
67:22, 231:13.
earned 16:18.
Earth 159:15,
172:3, 172:4,
174:11, 195:1,
195:14, 209:4.
easel 168:20.
easier 25:15,
25:17, 147:11.
Eastern 204:24.
Easton 205:5,
205:21, 206:18.
Ecstasy 25:4.
edema 51:12, 51:16,
51:21, 52:4.
edge 44:5, 44:15.
edited 17:20.
education 16:24,
17:17, 17:18,
19:21.
educational 15:23,
46:9.
effect 20:17, 21:7,
21:12, 22:25,
23:4, 35:7,
35:13, 35:14,
35:18, 36:23,
43:3, 54:19,
54:23, 63:6,
63:14, 63:15,
63:16, 64:11,
64:14, 64:19,
64:23, 65:12,
70:21, 73:9,
75:9, 75:16.
effectively
35:16.

effects 13:23,
    20:6, 20:10,
    20:16, 20:20,
    21:2, 21:4,
    21:10, 21:11,
    21:17, 21:21,
    21:22, 22:19,
    22:20, 22:22,
    22:23, 31:12,
    34:21, 34:23,
    36:2, 36:18,
    37:2, 37:24,
    44:16, 66:18.
effort 98:9,
    163:23.
Eight 29:14, 32:14,
    32:15, 32:16,
    155:14, 185:21,
    206:16, 206:19.
Either 34:1, 36:1,
    51:8, 84:18,
    117:16, 192:23,
    196:23, 207:1,
    217:15, 217:25.
Elapsed 150:15,
    151:8, 151:10,
    151:11, 151:24,
    151:25, 152:18.
elbow 51:1, 69:17,
    69:19, 70:5,
    95:23.
elderly 82:2.
electronic 106:17,
    201:10.
electronically
    201:23.
electrons 122:12.
elements 55:16.
eliminated
    201:24.
Emergency 4:16,
    4:20, 5:14, 5:18,
    6:1, 6:10, 8:18,
    9:4, 50:13.
emotion 226:8.
emotional 226:7,
    226:12.
emphasize 221:20.
employed 14:4,
    14:5, 14:10,

16:7, 16:8,
    45:25, 46:3,
    76:24, 76:25,
    77:2, 115:6,
    115:7, 115:10,
    121:11, 134:2,
    134:6, 134:21,
    139:12, 139:15,
    158:19.
employee 62:18,
    134:22, 135:4,
    135:7, 136:25,
    137:4, 158:20.
employees 135:15,
    136:14, 138:10.
employment 116:2,
    135:12, 136:7,
    137:7, 138:1.
empty 112:15.
EMS 7:25, 8:13,
    8:20, 8:22, 9:21,
    11:13, 11:15.
EMS. 10:6.
Emts 10:5, 80:12.
enclosed 120:19.
encountered
    144:8.
encyclopedia 57:21,
    132:15.
encyclopedias
    182:6, 221:25.
end 2:22, 14:13,
    16:6, 16:11,
    18:9, 42:11,
    122:12, 150:17,
    151:12, 151:13,
    162:16, 182:16,
    190:22, 198:22,
    220:24, 233:12,
    233:16.
ending 153:3,
    153:8, 157:2,
    157:3, 162:18,
    163:11, 163:14,
    164:24, 178:25,
    190:11.
Enforcement 114:8,
    115:8, 115:19.
engineer 147:24,
    148:1.

enough 17:14,
    20:24, 37:9,
    38:3, 39:8,
    41:13, 73:14,
    73:23, 92:3,
    92:15, 96:3,
    98:5, 201:6.
enter 154:14,
    176:21, 176:22.
entered 3:10, 60:9,
    133:6, 182:25.
entering 115:25.
entertain 230:21.
entire 110:5,
    162:21.
entirely 22:1,
    22:7, 37:2.
entirety 138:1.
entries 171:1.
entry 155:4,
    170:12, 170:17,
    170:19.
Epi 11:16, 12:2.
epinephrine 12:2.
episodes 51:20.
Equipment 144:15,
    152:23.
err 233:9.
erring 233:6.
Esquire 1:37,
    1:39.
essence 153:24,
    163:16.
essentially 5:15,
    7:7.
established 213:5,
    214:3.
estimate 222:14.
estimates 182:13.
Estimating
    134:12.
ethanol 26:21,
    41:3.
euphoria 66:11.
euphoric 20:17,
    34:24, 35:7,
    35:13, 35:14,
    63:6, 63:14,
    63:15, 64:19,
    64:23.

evening 5:6, 5:10,
  8:20, 9:5, 78:3,
  78:4, 78:20,
  85:8, 95:14,
  97:12, 97:23,
  97:25, 98:12,
  100:3, 220:14.
event 78:23.
events 74:24, 85:8,
  141:7.
Everybody 102:22,
  136:13.
everyone 81:15,
  105:20, 112:5.
Everything 3:8,
  49:18, 65:13,
  97:12, 97:13,
  97:21, 99:22,
  108:23, 134:14,
  158:7, 224:18,
  225:15, 225:17,
  225:18, 226:13,
  226:14, 226:22,
  227:1, 227:6.
everywhere
  112:24.
evidentiary
  231:3.
exact 35:23, 35:24,
  106:16, 230:23.
exactly 111:21,
  200:21, 219:14.
exam 16:21.
examinations 18:6,
  49:25.
examine 49:13,
  53:20, 72:11,
  121:9, 190:1.
examined 3:20, 6:7,
  13:6, 45:11,
  53:7, 68:7,
  76:14, 93:10,
  93:24, 114:18,
  116:22, 126:8,
  126:19, 133:14,
  138:25, 147:2,
  158:1, 219:2.
Examiner 13:21,
  14:6, 14:9,
  14:11, 14:12,

  14:18, 15:11,
  15:21, 16:7,
  16:9, 16:13,
  18:11, 18:13,
  23:17, 44:9,
  44:12, 46:1,
  46:14, 46:16,
  46:18, 46:19,
  53:10, 60:25,
  62:18, 66:22,
  67:10.
examiners 14:24.
examining 53:23,
  90:21.
example 21:20,
  37:10, 40:5,
  55:20, 65:7,
  67:11, 152:10,
  154:18, 156:8,
  164:16, 176:21,
  177:3, 203:19,
  203:25, 207:21.
except 68:24.
exception 19:15,
  223:7, 230:1.
excise 163:18.
Excuse 22:5, 33:17,
  34:21, 49:4,
  54:19, 55:3,
  62:5, 71:4,
  86:17, 106:21,
  120:4, 121:1,
  126:2, 151:22,
  166:16, 210:10,
  211:1, 212:23,
  220:17, 232:9.
excused 12:16,
  12:21, 44:25,
  45:4, 76:2, 76:6,
  113:25, 114:4,
  131:24, 132:2,
  132:3, 138:16,
  138:19, 146:12,
  146:14, 146:15,
  157:14, 157:17,
  218:12, 218:16,
  222:9.
Exhibits 116:5,
  116:21, 116:23,
  118:25, 119:1,

  120:14, 124:19,
  169:2, 198:19,
  199:18, 199:21,
  199:24, 200:18,
  210:19.
existing 226:7,
  226:8, 226:19.
expect 44:18,
  228:10.
expectation
  233:2.
expected 221:12.
expensive 58:19.
experience 16:20,
  19:17, 19:21,
  21:17, 21:24,
  22:4, 32:2, 34:4,
  43:5, 73:7,
  100:6, 100:25,
  101:4, 116:4,
  203:16.
experienced 34:8,
  102:14, 102:20.
expert 18:15,
  18:19, 18:20,
  18:22, 19:7,
  19:11, 19:16,
  19:18, 19:23,
  47:22, 47:24,
  48:8, 48:12,
  48:15, 48:17,
  116:13, 117:5,
  117:9.
expertise 19:20,
  19:25, 40:2,
  73:8, 74:10,
  117:11.
explain 155:18,
  163:6, 169:17,
  169:20, 185:14,
  187:15, 191:24,
  194:20.
explained 17:17.
explaining 84:18.
explore 123:2.
exposed 68:25.
extend 220:20.
extensive 10:23.
extent 229:21.
external 49:16,

50:3, 50:4,
    50:19, 50:22,
    51:22, 52:19,
    68:21, 221:24.
extrapolate
    42:16.
eye 65:19, 65:20.
eyes 83:6, 83:13,
    84:6, 86:7,
    86:10, 86:19,
    86:24, 97:13,
    102:19, 112:25.
.
.
< F >.
Face 3:17, 13:2,
    45:8, 67:15,
    67:18, 76:10,
    114:14, 133:10,
    138:22, 146:24,
    157:23, 158:12.
faced 230:13.
facility 40:12.
fact 21:12, 23:9,
    29:12, 29:20,
    30:6, 30:9,
    39:15, 87:3,
    88:3, 90:8, 99:1,
    206:4, 207:3,
    210:17.
factor 37:8, 41:4,
    41:11, 63:21,
    64:24, 65:1,
    66:13.
factors 21:2,
    40:1.
facts 57:20,
    101:24, 132:14,
    221:21.
failure 51:19.
Fair 37:9, 39:8,
    41:13, 73:14,
    73:23, 92:3,
    92:15, 96:3,
    98:5, 196:8,
    201:6, 231:10.
fairly 85:8.
fall 38:25, 39:18,
    229:5.
fallen 98:8.

falling 21:25,
    22:5, 22:6,
    22:18, 56:11.
falls 112:19,
    223:7, 229:21.
familiar 20:6,
    135:23, 148:16.
family 221:10.
far 12:16, 51:18,
    114:2, 175:2,
    187:18, 195:12,
    196:18, 207:10,
    221:6, 230:16.
far-away 104:19.
fashion 64:5,
    117:22.
fast 33:25, 37:24,
    38:1, 110:15.
fastest 38:12.
fatal 31:21,
    74:24.
February 167:16,
    177:22, 178:4,
    180:2, 184:1,
    184:15, 184:23,
    186:12, 188:6,
    188:7, 188:14,
    188:18, 188:23.
Federal 18:16,
    48:6, 140:4,
    142:23, 221:11.
feel 21:14.
feeling 20:18,
    34:25, 226:10.
feet 45:8, 50:6,
    93:16, 93:22,
    114:14, 138:22,
    146:23, 157:22.
fell 39:18, 74:5,
    112:23.
fellow 221:9.
fellowship 46:14.
felt 37:24,
    85:16.
few 22:21, 47:7,
    50:6, 50:7,
    56:17, 82:18,
    98:18, 137:11,
    215:5.
field 16:15, 16:20,

17:19, 18:20,
    19:8, 19:25,
    20:10, 47:16,
    47:18, 48:12,
    117:5, 117:11.
fifteen 112:20.
fifty-dollar
    90:5.
figure 36:5,
    36:9.
figures 195:11.
file 118:1.
files 159:2.
Finally 83:18,
    84:14, 167:10,
    175:14.
find 19:22, 25:15,
    25:17, 26:21,
    27:2, 28:6,
    28:11, 82:10,
    86:22, 176:6,
    182:17.
finding 27:21,
    32:1, 75:8,
    75:21, 75:22.
findings 15:20,
    18:24, 27:8,
    41:20, 43:19,
    43:24, 46:21,
    50:16, 52:3,
    52:7, 54:6, 54:8,
    54:9, 54:17,
    55:13, 56:1,
    56:3, 65:19.
finds 19:18.
Fine 59:20, 71:20,
    83:11, 122:25,
    123:10, 141:20.
finger 206:10.
fingerprint 120:22,
    219:1.
fingerprints
    121:20, 219:2.
finish 220:9.
finished 118:10,
    124:6, 232:17.
fit 230:1.
five 77:12, 147:22,
    191:15, 193:20.
five-ish 112:11.

fix 181:22.
fixed 68:2, 68:4,
    68:6, 68:8,
    68:11, 68:24.
flaps 124:11.
Flat 11:19,
    11:20.
flight 232:12.
flip 8:3.
floor 112:23,
    144:24.
flow 70:16.
flow. 113:10.
Fluid 49:25, 51:12,
    51:17, 52:4,
    53:1.
fluids 53:2.
foam 51:8, 51:9,
    52:5, 52:18,
    106:16.
foaming 51:6.
follow 15:8, 81:8,
    81:13, 91:13,
    214:23.
followed 14:21,
    24:16, 49:13,
    120:25, 124:25,
    154:3.
following 41:6,
    112:2, 123:12,
    142:16, 143:22,
    152:21, 173:3,
    184:10, 191:10,
    193:17, 193:20,
    193:22, 196:1,
    199:18, 209:25,
    220:11.
follows 3:21, 13:7,
    45:12, 76:15,
    114:19, 133:15,
    139:1, 147:3,
    158:2.
food 56:21.
force 52:9.
Forces 14:9, 16:9,
    16:10, 16:13,
    18:12.
foregoing 233:24.
forehead 50:17,
    50:24.

form 31:8, 31:9,
    31:10, 54:13,
    55:6, 55:11,
    57:25, 58:7,
    58:9, 93:5.
formatted 166:18.
forms 31:8,
    132:19.
forward 12:25,
    45:7, 114:13,
    147:17.
forwarded 155:20.
fossa 59:18, 59:19,
    69:10, 69:11,
    69:12, 70:3,
    70:21, 71:1,
    71:11.
found 6:7, 11:15,
    27:11, 29:12,
    29:21, 29:23,
    30:6, 30:9,
    30:22, 31:6,
    32:10, 39:7,
    39:15, 40:3,
    61:12, 62:8,
    62:12, 67:15,
    67:17, 71:21,
    100:12, 103:23,
    105:15, 123:20,
    123:24, 125:11,
    125:21, 127:10,
    128:9.
Foundation 43:11,
    131:21.
Four 134:19,
    134:25, 155:14,
    190:25, 191:12,
    194:3.
fragmentation
    122:13.
frame 29:22, 30:7,
    32:13, 39:16,
    67:19, 67:20.
free 31:5, 31:9,
    31:15, 31:16,
    31:18, 31:19,
    31:23, 41:18,
    42:4, 54:1,
    93:18, 103:19.
fresh 40:8, 40:11,

    50:10, 97:17.
Friday 26:4,
    233:11.
Fridman 78:14,
    88:10.
friends 221:10.
front 7:23, 8:13,
    49:8, 49:9, 61:8,
    68:12, 92:6,
    93:18, 107:6,
    119:17, 126:10,
    127:22, 128:21,
    135:18, 143:7,
    220:23, 227:13.
full 16:9, 80:19,
    82:9, 111:5,
    129:8.
Full-time 16:12,
    136:25, 137:1.
fully 232:16.
function 20:22,
    21:19, 22:20,
    30:8.
funny 226:5,
    226:6.
.
.
< G >.
G. 1:33.
Gaithersburg
    189:23.
Gas 121:24, 121:25,
    122:4, 129:9,
    135:17.
gastric 56:15,
    56:19, 56:20.
gave 10:10, 90:16,
    102:19, 109:7,
    112:14, 127:14,
    127:20, 219:13.
general 20:2,
    20:12, 20:13,
    28:25, 32:13,
    47:19, 49:12,
    104:20, 154:25,
    232:20.
Generally 2:21,
    20:9, 22:9,
    22:17, 22:20,
    30:8, 37:1,

38:10, 40:8,
87:5.
generate 46:20.
generated 15:18,
117:25, 119:18.
gentleman 80:15.
gentlemen 3:12,
7:6, 19:12,
40:15, 57:8,
72:17, 74:22,
106:15, 106:25,
132:6, 181:25,
200:20, 220:12.
geographically
187:14, 187:18.
George 48:4, 192:7,
192:14.
Germantown 171:12,
171:24, 172:15,
189:23, 229:2.
gestured 146:6.
gets 15:4, 20:18,
24:13, 82:1,
82:2.
getting 6:6, 23:1,
35:25, 81:16,
223:8, 225:2,
227:23, 228:3,
228:8, 228:20.
Gettler 19:3.
girlfriend 11:14,
82:25, 225:14.
Give 4:8, 15:3,
18:20, 19:24,
32:13, 34:24,
35:3, 48:16,
73:15, 117:21,
141:16, 150:22,
159:4, 172:19,
179:21, 203:13,
221:2, 222:21,
222:22, 223:13.
Given 3:1, 15:5,
29:12, 49:13,
59:14, 88:17.
gives 150:4,
150:11, 150:14,
150:15.
giving 85:16.
glass 126:13.

go. 225:15, 226:13,
226:15.
Google 154:8,
154:13, 154:15,
159:14, 172:3,
172:4, 173:23,
174:11, 174:18,
187:18, 194:25,
195:10, 195:14,
209:4.
gotten 83:22.
GPS 137:15.
graduated 4:10.
graduation 16:3.
grams 52:17,
52:18.
grand 223:5, 223:9,
227:20, 227:21.
granted 47:13.
great 144:13.
Greater 173:2,
204:2, 206:5,
207:3.
grew 134:22.
Griffith 57:24,
132:20.
Gross 14:24, 23:23,
24:1, 24:4, 24:7,
65:19.
group 25:2, 25:3.
groups 47:6.
guess 6:8, 15:25,
33:10, 38:1,
38:24, 40:1,
68:22, 111:24,
130:3, 201:13,
219:22.
guy 112:11,
112:13.

.

.

< H >.
hair 49:18.
hairs 127:19.
half 77:13, 134:20,
134:25, 136:9,
136:11, 154:23,
196:7, 223:19,
224:3, 231:9,
231:11.

halfs 228:21.
halfway 129:1.
Hall 139:25,
140:20, 142:21,
149:19.
hallway 85:20.
hand 3:18, 13:4,
45:9, 51:2,
63:11, 66:5,
76:12, 83:24,
114:16, 117:16,
133:12, 137:13,
138:23, 145:25,
146:25, 157:24.
handed 118:2.
Handing 118:19,
120:15, 124:19.
handle 59:11,
77:22.
handled 118:13.
handling 91:13,
120:25, 124:25.
handsets 202:17,
211:14, 211:15,
212:10, 212:15,
212:16, 214:6,
214:10, 215:11.
handwriting 9:17,
11:6, 11:11,
92:18, 112:6,
124:11.
handwritten
79:12.
hanging 227:11.
hangs 230:16.
happen 36:10,
56:18, 57:1,
142:13, 228:23,
229:11, 229:13.
happened 10:14,
84:1, 85:7,
85:15, 143:6,
144:7, 183:4,
225:1.
happening 174:18.
happens 56:15,
85:9, 117:24,
233:17.
happy 201:4,
230:21.

hard 85:6, 86:21,
    107:2.
Harden 218:24.
harmful 13:23.
Harrison 5:11, 7:7,
    8:19, 23:7,
    48:23, 68:8,
    74:1, 83:21,
    87:22, 88:12,
    95:22, 98:3,
    98:12, 98:22,
    105:22, 112:9,
    112:12, 113:21,
    134:16, 134:17,
    136:5, 136:6.
Harry 135:24,
    135:25, 136:4,
    136:5, 136:18.
Harry. 136:1.
Harvard 4:10,
    11:11.
he'll 19:24,
    182:10, 182:12.
head 49:23,
    80:24.
head-first
    112:23.
healing 50:9.
health 226:12.
health. 226:10.
healthy 55:17.
hear 110:20, 142:1,
    219:1, 233:13.
heard 11:12, 11:14,
    12:14, 34:18,
    57:11, 62:24,
    97:13, 225:13.
hearing 2:3,
    132:21, 133:2,
    141:2, 182:21.
hearsay 12:13,
    222:24, 222:25,
    224:7, 229:21,
    230:19.
heart 22:13, 26:14,
    26:17, 26:20,
    31:3, 31:18,
    32:10, 33:22,
    33:25, 51:19,
    52:5, 53:3, 53:5,

53:25, 54:1,
    54:18, 62:8,
    65:7, 65:8,
    65:16, 65:18,
    65:21, 65:22,
    67:2, 67:6, 70:9,
    70:16.
heartbeat 7:12,
    33:25.
heartworms
    125:18.
heat 118:15,
    120:19, 124:13.
heating 124:14.
Heavenly 112:11.
heavier 52:6.
heaviness 52:8.
heavy 52:3,
    52:16.
height 50:6.
held 158:23,
    216:11.
Help 35:21,
    224:12.
helping 8:1.
helps 30:24,
    159:13, 159:15.
hereby 233:23.
heroin. 225:10,
    225:20, 228:3.
herself 96:19,
    98:19.
high 20:24, 21:15,
    41:23, 42:11,
    65:2, 84:9,
    85:17, 122:9.
higher 25:14,
    42:3.
highlighted 62:3.
highly 122:8.
history 6:8, 8:2,
    80:20, 82:11.
Hit 107:8, 107:19,
    172:17, 175:5,
    175:19, 197:15,
    204:9, 205:25,
    206:1, 210:2,
    215:15, 216:15,
    217:3, 217:17,
    217:23, 218:8.

hits 221:6.
hitting 2:16.
hodgepodge
    225:23.
Hold 16:14, 110:6,
    110:20, 118:21,
    216:19.
home 111:9, 112:16,
    143:13.
homicide 61:20,
    77:22.
Honorable 1:20.
Hooray 220:15.
hope 34:19,
    221:2.
hopefully 2:16.
hoping 2:13.
Hospital 4:13,
    4:14, 4:15, 7:7,
    9:8, 9:21, 10:17,
    81:8, 81:11,
    90:15, 90:16.
hour 112:22,
    132:17, 132:24,
    196:7, 220:8,
    222:15, 231:9,
    231:11.
hours 5:6, 5:7,
    16:24, 22:21,
    29:14, 32:14,
    32:15, 32:16,
    39:21, 40:12,
    40:19, 44:4,
    44:15, 67:23,
    68:3, 68:4,
    73:18, 80:4,
    80:5, 135:10,
    137:2, 220:13,
    231:5.
house 81:4, 81:5,
    81:6, 88:4, 91:8,
    98:12, 98:13,
    109:14, 113:19,
    113:20, 226:25.
Howard 48:3.
human 20:7,
    20:10.
hundred 17:22.
Huntingtown
    173:6.

hurry 95:14.
HVAC 134:19.
hydrochloride
    123:19, 125:12,
    125:14.
hydrocodone
    24:23.
hysterically
    83:4.
.
.
< I >.
I. 35:11.
I/O 169:24,
    190:10.
identifiable
    219:11, 219:17,
    219:18.
identification
    5:23, 5:24, 79:1,
    79:7, 92:9,
    92:22, 93:5,
    93:7, 110:2,
    116:11, 118:20,
    119:2, 119:3,
    128:24, 129:19,
    161:3.
identified 5:11,
    29:4, 29:7,
    48:22, 61:7,
    70:25, 140:18,
    172:5, 202:16,
    231:3.
identifier 177:1.
identifiers
    177:11.
identify 15:16,
    25:17, 44:8,
    130:14, 159:3,
    160:13, 223:14.
identifying
    111:25.
Identity 152:23,
    153:7.
ill 82:3, 82:4.
illegal 230:12.
IMA 149:3.
image 58:22, 58:23,
    58:25, 59:1,
    59:23, 181:20.

imagine 218:21.
IMEI 152:21,
    152:23, 153:1,
    153:2, 153:10.
immediately 28:8,
    38:16, 73:18.
impact 40:6,
    51:4.
importance 97:9.
important 52:7,
    97:14, 97:23,
    204:20.
IMSI 153:4, 153:6,
    153:10.
in. 3:8, 60:8,
    77:23, 106:14,
    109:24, 133:5,
    182:24, 201:19.
inactive 31:13.
inadvertent
    143:17.
inch 207:14.
incidental 31:25.
include 17:23,
    18:12, 151:9,
    151:25, 152:3,
    164:14.
included 120:21,
    142:8, 151:10,
    197:19.
includes 15:9.
Including 25:4,
    48:2, 109:11,
    148:13.
incoming 155:11,
    162:14, 163:8,
    163:9, 165:5,
    169:25, 172:13,
    173:4, 173:12,
    173:17, 178:23,
    184:5, 184:8,
    184:21, 186:13,
    190:10, 190:20,
    190:24, 191:11,
    191:13, 193:13,
    193:19, 193:21,
    193:23, 193:25,
    194:2.
incorrect 203:7,
    204:19, 208:3.

increase 22:11,
    33:21, 51:12.
increased 22:15.
increasing 65:7.
independent 57:19,
    132:13, 182:4,
    221:21.
INDEX 234:1,
    235:1.
India 147:8,
    147:9.
Indiana 97:6.
indicate 27:8,
    30:5, 205:9,
    209:1.
indicated 33:24,
    54:19, 85:1,
    86:6, 86:8,
    144:24.
indicates 26:19,
    26:20, 27:22,
    51:11, 156:15,
    186:19, 187:7,
    189:3, 189:21,
    192:10.
Indicating 107:1,
    107:11, 107:23,
    118:12, 146:7.
indication 87:17.
indications
    204:4.
indicative
    127:19.
indicators 25:6.
indictment 140:4,
    140:5, 142:24,
    144:10.
individual 21:4,
    21:9, 23:7,
    23:13, 27:22,
    29:11, 32:11,
    33:12, 37:3,
    48:22, 65:6,
    140:11, 143:24,
    179:5, 179:8,
    203:8, 203:14.
individually
    36:3.
individuals 18:5,
    87:17.

indulge 9:15,
    40:22, 42:19,
    75:1, 91:16,
    105:25, 157:12,
    178:18, 198:10,
    214:25.
influence 83:6,
    83:8, 83:15,
    84:9, 84:20,
    85:23, 86:8,
    86:20, 86:22,
    87:2, 87:18,
    99:22, 100:6,
    101:2, 101:6,
    102:18, 102:21,
    102:24, 103:6.
informations 149:2,
    150:5.
infrared 121:25.
ingest 73:10.
ingested 32:6,
    32:11, 44:15.
ingestion 32:17,
    37:23, 72:18,
    75:21.
ingredient
    127:11.
initial 24:18,
    24:20, 50:3,
    118:16.
initially 25:13,
    85:16, 126:16.
initials 118:12,
    118:14.
initiating
    152:12.
inject 34:12.
injected 37:19,
    71:20, 73:16.
Injecting 43:18,
    43:20, 72:3,
    122:6, 122:7.
injection 43:23.
injury 52:10,
    61:24, 61:25.
inner 118:16.
inositol 125:22,
    125:23.
Inside 49:21, 81:5,
    109:14, 109:18,

109:19, 118:17,
    125:11, 126:18,
    127:25, 143:25,
    144:2, 144:14.
insofar 142:8.
inspect 117:21.
instance 24:22,
    64:22, 164:13,
    165:4, 195:7,
    195:8.
instantaneous
    39:24.
institutions
    14:7.
instructed
    221:13.
instructions 2:19,
    57:12, 57:25,
    58:7, 58:11,
    233:20.
instrument 122:8.
instrumentation
    116:3.
intact 126:18,
    126:19, 126:23,
    126:24.
Intelligence
    158:22, 158:25,
    194:23.
intent 226:9,
    229:4, 229:18.
intention 161:1,
    227:4.
intentions
    229:25.
intermediary 27:17,
    28:6.
Intermingled 212:6,
    212:18, 214:22.
intermixed
    211:19.
intermuscular
    73:2.
internal 49:16,
    49:20, 51:23,
    52:1, 52:2, 52:9,
    145:9.
International
    152:23, 153:6.
Internet 57:21,

132:15, 182:5,
    221:22.
interpret 208:3.
interpretation
    30:25, 225:22,
    226:14, 226:23.
Interpreting 18:2,
    18:24, 18:25,
    54:17.
interrupt 11:25,
    34:3.
intervening
    44:16.
intervention 50:12,
    71:4, 71:13,
    71:19.
interview 82:25.
intoxication 22:2,
    55:10, 56:5,
    56:9, 56:13,
    61:16, 62:4,
    75:10, 75:19,
    75:24, 101:14.
intramuscular
    37:16, 38:7,
    38:9.
intranasal 38:9.
intraosseus 71:7.
intravenous 22:25,
    38:10, 38:11,
    43:23.
intravenously
    21:20, 22:24.
introduce 230:5.
introduced 29:1,
    210:8, 230:15.
introduces 23:1.
introducing
    142:11.
Investigate
    139:21.
investigation
    57:19, 81:19,
    81:20, 81:22,
    81:23, 81:25,
    82:12, 88:6,
    90:18, 91:6,
    91:8, 91:11,
    91:14, 93:9,
    132:13, 161:12,

182:5, 221:21.
investigation.
    79:13.
investigations
    77:12, 82:6,
    91:5.
investigative
    77:16, 77:18,
    77:21, 159:8.
investigator
    77:1.
investigators
    159:4.
involve 47:4,
    122:5.
involved 44:11,
    159:4.
involvement 24:10,
    24:11, 99:24.
involves 15:12,
    17:17, 49:22,
    122:6.
ipad 58:15,
    58:16.
irregular 33:25.
irregularly
    22:14.
Island 115:24.
issue 55:21, 141:9,
    181:22, 203:3,
    222:18, 223:13,
    223:14, 226:4.
issued 15:20, 26:2,
    135:13, 137:8,
    138:2, 142:5.
issues 57:16,
    132:9, 221:17,
    221:23, 221:25,
    231:1.
item 30:18, 121:4,
    121:7, 121:9,
    121:14, 124:21,
    125:8, 128:6,
    150:11.
items 30:21, 88:13,
    88:15, 88:21,
    88:22, 89:2,
    89:8, 89:11,
    89:12, 89:15,
    89:16, 89:17,

89:21, 89:25,
    90:13, 90:17,
    105:22, 121:1,
    135:13, 137:8,
    142:4, 150:19,
    175:2, 178:9,
    187:9, 187:11,
    187:13.
itself 10:15,
    46:25, 55:14,
    58:25, 65:6,
    66:7, 82:1,
    83:20, 91:7,
    118:6, 127:12.
IV 71:3.
.
.
< J >.
J. 1:39.
jacket 140:15.
Jacobs 134:23.
James 1:20.
January 167:5.
Jeff 133:9, 133:13,
    133:20, 235:5.
JKB-10-0271 1:7.
job 4:23, 83:22,
    84:24, 84:25,
    99:9, 99:18.
Johnston10
    234:11.
Johnston108
    234:39.
Johnston12
    234:15.
Johnston147
    235:15.
Johnston158
    235:19.
Johnston215
    235:23.
Johnston4 234:7.
Johnston76
    234:35.
joining 77:4,
    218:1.
joint 70:5.
joke 11:5.
Jones 140:7.
journal 59:16.

journals 17:19,
    70:13.
Judge 1:20, 107:7,
    142:5, 221:13,
    223:14, 227:13,
    228:12, 232:2.
Julian 147:8.
jump 122:20,
    123:7.
June 136:2.
JUROR 220:15.
jurors 60:8,
    128:25, 221:9.
Justice 97:6, 97:7,
    115:8.
.
.
< K >.
K-a-t-e-r-i-n-a
    4:2.
K. 1:20.
Katerina 3:19, 4:1,
    234:5.
keep 9:1, 34:21,
    35:14, 137:15.
keeping 56:19.
keeps 63:11.
Kennedy 87:15,
    218:25.
kept 118:7.
kids 87:22,
    232:7.
kin 89:14, 89:16.
kind 2:21, 21:17,
    26:18, 51:4,
    52:9, 52:25,
    53:2, 55:11,
    75:11, 77:24,
    82:13, 82:14,
    83:23, 83:24,
    121:23, 161:12,
    211:19, 221:18,
    232:16.
kinds 130:3,
    137:16, 220:23.
King 187:12,
    187:17.
knocked 143:7.
knowledge 19:21,
    105:4, 136:14,

136:16, 136:18,
138:6, 138:10,
138:12.
known 34:12, 34:13,
34:15, 35:3,
35:12, 40:25,
43:2, 49:15,
68:6, 70:2,
87:21.
knows 143:18.
.
.
< L >.
L-e-v-i-n-e
13:12.
lab 44:7, 53:10,
117:15, 117:16,
119:22, 126:17,
129:10, 130:10.
label 15:1,
124:13.
labeled 59:25,
201:9.
labels 124:10.
laboratory 14:16,
14:22, 15:2,
15:3, 19:5,
23:25, 24:11,
24:16, 52:23,
52:25, 118:3,
118:16, 119:7,
119:16, 120:18,
124:22, 126:12,
127:24, 130:7.
LAC 150:17,
154:3.
Lack 75:21, 75:22,
131:21.
Ladies 3:11, 7:6,
19:12, 40:15,
57:8, 72:17,
74:22, 106:15,
106:24, 132:6,
181:25, 200:19,
220:12.
laid 112:16,
112:20.
lame 231:22,
231:24, 231:25.
Landover 173:2.

language 219:14.
lapse 85:19.
large 22:14, 24:20,
24:21, 25:2,
25:3, 106:2,
106:3, 106:10.
larger 210:18.
Largo 115:9,
173:10.
laser 172:19.
Last 5:2, 22:21,
28:15, 29:10,
29:13, 29:22,
30:10, 62:2,
66:12, 77:13,
133:20, 136:9,
147:8, 153:19,
162:22, 165:15,
167:3, 170:4,
172:22, 188:22,
194:2, 198:12,
213:14, 220:24,
220:25, 221:12,
228:18.
late 78:20, 232:1,
232:2.
latent 219:4,
219:5.
latents 219:3.
Later 2:18, 58:16,
97:14, 97:17,
111:20, 112:21,
112:22, 116:24,
141:8, 144:19,
146:16, 206:16,
206:19, 206:23,
224:17, 225:11.
latitude 154:4,
154:12, 170:2,
171:11, 171:19,
172:6, 174:13,
174:19, 174:21,
175:6, 176:6,
179:21, 194:23,
195:5, 209:5,
216:4, 216:16,
217:3, 218:4.
latitudes 173:23.
law 14:1, 57:13,
57:19, 132:13,

221:21.
lay 19:22.
laymen 11:18,
35:11, 68:18.
lead 36:15, 81:21,
215:25.
leading 22:16,
215:22.
leads 159:4.
learned 99:9.
least 18:10, 30:6,
38:1, 81:17,
143:19, 222:17.
leave 81:16,
146:13.
leaving 185:18,
186:8, 189:4.
led 55:21, 56:2.
left 26:7, 50:15,
50:16, 50:23,
52:17, 57:23,
69:9, 69:15,
70:25, 71:10,
75:7, 91:9, 94:7,
95:2, 95:16,
95:19, 95:23,
107:9, 107:19,
112:11, 132:18,
164:23, 182:8,
183:3, 204:10,
204:11, 222:10.
left-hand 26:3,
175:2.
leg 71:6, 71:7.
legal 222:18,
226:6.
length 182:13.
less 112:18,
203:14.
letters 156:2.
Levine 12:24,
12:25, 13:5,
13:12, 13:19,
19:7, 19:11,
19:22, 20:1,
23:5, 33:3, 43:1,
62:21, 66:21,
73:8, 74:2,
74:10, 234:17.
levity 220:14.

Lexington 99:15.
license 90:3.
licensed 46:7.
licenses 16:14.
lie 84:12.
lied 84:11, 99:18,
  99:21.
life 50:14.
likely 221:1,
  233:16.
Likewise 177:10,
  178:6, 208:2,
  208:7, 208:13,
  210:25, 217:19.
limine 227:16,
  227:17.
limited 142:6.
Line 11:19, 11:20,
  26:13, 26:19,
  28:16, 30:17,
  31:3, 71:10,
  71:18, 71:19,
  80:24, 162:12,
  163:3, 163:4,
  163:7, 163:8,
  163:11, 171:5,
  171:9, 171:17,
  190:23.
Lines 27:3, 27:4,
  27:5, 27:7,
  28:15, 70:15,
  84:15, 101:17,
  101:21, 102:6,
  113:6, 167:1.
lingo 202:13.
lips 93:24, 98:25,
  112:24, 147:12.
liquid 122:7,
  128:1, 128:9.
list 3:8, 161:24,
  163:1, 163:19,
  163:20, 163:21,
  165:11, 165:12,
  194:23.
listed 163:4,
  165:4, 179:5.
liter 42:1, 42:5,
  42:8.
literally 51:10,
  203:24.

literature 44:6,
  73:21, 73:22,
  73:24.
little 2:17, 2:18,
  2:23, 30:25,
  42:8, 43:6,
  43:13, 46:23,
  50:10, 57:6,
  83:19, 113:12,
  137:12, 147:17,
  148:10, 220:14,
  221:5, 223:5.
lives 113:20.
lividity 66:25,
  67:12, 67:17,
  67:20, 67:24,
  68:1, 68:6, 68:8,
  68:11, 68:23.
living 21:12.
load 159:20, 160:6,
  194:25, 201:19,
  201:22.
loaded 160:25,
  161:11, 172:3,
  209:7.
loads 209:3.
local 110:11,
  116:19.
locate 154:5,
  166:20, 170:3.
located 78:11,
  117:18, 134:8,
  139:25, 144:14,
  171:22, 171:23,
  174:14, 198:2,
  215:21.
locational
  176:24.
locations 150:5,
  194:25, 202:8.
lockbox 118:9,
  124:14.
log 103:18.
logged 118:6.
Lombardo 157:20,
  157:21, 157:25,
  158:10, 158:11,
  158:18, 172:19,
  182:9, 183:1,
  183:3, 200:24,

204:13, 210:5,
  215:9, 218:16,
  235:17.
Long 14:2, 14:10,
  30:2, 40:16,
  46:3, 73:15,
  74:6, 77:2,
  87:22, 109:9,
  115:10, 115:18,
  115:24, 134:6,
  134:24, 137:4,
  137:8, 139:15,
  147:21, 158:23,
  220:7, 220:24,
  222:13.
longer 21:23,
  25:16, 29:19,
  35:15, 64:14,
  66:12, 67:6,
  67:7, 182:9.
longitude 154:4,
  154:12, 170:3,
  171:12, 171:19,
  172:6, 174:13,
  174:19, 174:21,
  175:5, 176:5,
  179:21, 194:22,
  195:5, 209:4,
  216:4, 216:16,
  217:2, 218:4.
longitudes
  173:22.
longs 154:3.
looked 50:5, 80:16,
  93:11, 93:13,
  93:14, 94:2,
  161:15, 174:20,
  218:3.
Looking 25:10,
  25:11, 32:5,
  49:21, 49:22,
  53:24, 54:2,
  57:5, 89:19,
  95:10, 95:15,
  107:5, 119:14,
  155:3, 159:3,
  159:14, 162:10,
  162:11, 162:12,
  165:14, 180:3,
  181:5, 181:14,

183:5, 196:23,
197:21, 198:23,
204:16, 204:17,
231:14.
looks 11:6, 24:3,
24:7, 24:20,
89:13, 175:21,
229:19, 229:20,
230:24.
losses 154:21.
lot 2:16, 77:20,
85:9, 85:12,
149:4, 154:20,
200:19, 203:20.
louder 110:21,
148:9.
loudly 3:24, 13:9,
45:16, 76:17,
114:21, 133:17,
139:3, 147:4,
158:5, 158:8.
low 41:23, 42:1,
172:5.
lower 147:10,
204:11.
Loyola 15:25.
lunch 58:11, 132:7,
231:12.
lunchtime 132:6.
lung 52:17.
lungs 51:12, 51:17,
52:3, 52:4, 52:8,
52:15, 52:16,
52:21.
.

.

< M >.
M. 234:25,
234:41.
M1 178:8, 178:12,
178:15, 178:16.
M2M 153:19.
M2O 156:5.
ma'am 3:16, 3:22,
7:18, 45:7,
54:21, 76:11,
76:16, 78:5,
78:18, 78:22,
89:20, 90:2,
108:18, 108:21,

114:4, 147:13,
149:10, 150:2,
150:8, 153:12,
155:5.
ma'am. 223:23,
224:15, 225:5.
Mail 117:17,
151:18, 151:20,
151:23, 152:1.
mailbox 185:15,
185:17, 186:7.
main 52:7, 118:11,
127:10, 148:2.
mainlined 73:5,
74:4.
mainlines 38:23.
mainlining 37:21,
38:13, 43:18,
43:20, 71:14.
mainly 86:10.
maintain 16:22,
16:24, 64:23,
66:11, 149:22.
maintained
148:17.
major 30:19, 37:4,
37:5.
male 80:16, 82:8,
143:7, 143:8.
man 50:4, 55:18,
143:10, 225:24.
Manassas 185:10,
186:2, 197:4.
Manner 37:23,
46:20, 51:13,
51:15, 51:16,
55:16, 61:2,
61:18, 61:21,
62:5, 75:8.
mannitol 123:24,
123:25, 124:3.
manually 174:20,
194:22, 195:5,
195:15, 218:3,
218:4, 218:6.
Map 154:8, 172:4,
173:21, 174:18,
180:15, 187:9,
188:1, 188:3,
188:9, 188:11,

188:12, 191:17,
195:10, 207:13,
208:3, 210:23,
211:2, 215:18.
mapping 154:8.
maps 207:7, 207:9,
207:18, 208:19,
208:23, 210:6,
210:8, 210:9,
210:14, 215:9,
216:1, 216:22,
216:25.
March 23:7, 77:14,
140:21, 168:8.
Marie 45:10,
45:18.
marijuana 127:11,
127:12, 127:14,
127:16, 127:19.
mark 69:9, 70:25,
71:15, 71:22,
71:23, 72:8,
92:21, 180:25,
192:6.
marks 72:5, 72:7,
94:3, 94:8,
94:10, 94:23,
94:24, 95:19,
95:22.
maroon 140:15.
Mary 46:10, 48:5,
76:25, 77:4,
178:13, 178:14.
mass 121:24,
122:4.
master 161:24,
163:19, 163:20,
163:21, 165:12.
material 44:8.
materialize
21:23.
matter 123:1,
127:17, 233:25.
matters 2:3, 58:3,
132:20, 182:7,
182:20.
MC 149:2.
Meaning 20:22,
20:25, 41:3,
73:21, 164:10,

225:19.
means 11:18, 19:19,
    20:18, 32:14,
    41:21, 49:17,
    49:20, 50:12,
    52:20, 73:16,
    124:13, 152:12,
    153:21.
meant 37:9, 95:3,
    95:9, 96:1,
    226:6.
Mechanical 134:3,
    134:4, 135:13,
    135:14, 136:15,
    137:8, 137:9,
    138:3, 138:7,
    138:11.
mechanism 34:1.
mechanisms 38:19.
medications 6:10,
    12:3.
Medicine 4:20,
    46:12, 71:5.
meet 81:5, 81:10,
    224:18, 225:7.
meeting 224:25.
member 47:5, 105:4,
    116:8.
Memorial 4:14,
    4:15, 4:22,
    9:7.
memory 5:19,
    109:17.
mental 226:7,
    226:10, 226:11.
mention 37:9,
    232:9, 233:5.
mentioned 110:12.
Mercy 4:13.
mere 203:20.
message 185:18,
    186:8.
Messitte 142:5,
    227:14.
met 88:9.
Metabolic 62:8,
    62:12, 65:7,
    66:6.
metabolism 29:3.
metabolite 30:5,

30:19.
Metabolites 27:12,
    28:19, 28:20,
    28:21, 29:4,
    29:6, 29:7, 54:5,
    54:18, 62:13.
metabolizes
    64:11.
methamphetamine
    25:5.
method 22:25,
    59:14, 72:18,
    75:21.
methods 73:10,
    115:15.
Michael 114:17,
    114:24, 136:20,
    136:22, 137:22,
    137:23, 137:24,
    137:25, 202:20.
micrograms 42:1,
    42:5, 42:8,
    42:11.
microphone 3:24,
    13:10, 45:17,
    76:18, 114:22,
    133:18, 139:4,
    147:5, 147:11,
    148:9, 158:5,
    158:9, 158:12.
microscope 24:6.
microscopic 24:5,
    65:22, 65:24,
    65:25.
Mid-atlantic
    116:8.
mid-chest 99:2.
middle 174:16,
    187:3, 187:8.
midnight 214:15,
    214:19.
midway 103:20.
Mike 112:13,
    140:7.
mile 154:23,
    154:24, 207:14.
miles 154:24,
    204:5, 204:7,
    204:8, 204:9,
    206:4, 207:8,

207:11, 207:14.
military 18:16,
    19:4.
mind 97:17, 122:24,
    226:8, 226:19.
minded 112:13.
mine 3:4.
minor 11:13.
minute 15:22,
    118:21, 162:15,
    172:14, 172:16,
    191:9, 191:14,
    196:3, 223:24.
miraculously
    207:2.
misleading
    207:21.
missed 58:9.
missing 195:2.
misspoke 206:22,
    208:25.
mistake 198:15,
    208:8, 210:21,
    210:25.
mixed 129:25.
Mobile 147:20,
    147:21, 148:14,
    148:17, 148:20,
    149:3, 152:23,
    153:6, 153:14,
    153:20, 153:21,
    156:7, 156:9,
    156:12.
modify 93:4.
mom 90:17.
mom. 113:21.
moment 6:2, 9:15,
    40:22, 79:18,
    89:23, 97:4,
    110:7, 151:1,
    178:18, 230:21.
moments 98:18,
    225:13.
Monday 220:21,
    221:1, 221:7,
    221:12, 231:19,
    232:4, 232:19.
money 90:2.
monitor 6:14.
monographs 34:5.

Montgomery 48:4,
  189:22, 192:3,
  192:13, 192:16,
  194:16.
months 161:16,
  163:17.
moon 34:15.
moot 232:16.
morning 2:2, 2:18,
  2:24, 3:7, 3:11,
  4:6, 4:7, 5:7,
  6:25, 7:1, 13:17,
  13:18, 33:3,
  33:4, 57:7,
  60:17, 60:18,
  76:24, 115:4,
  181:2, 184:4,
  185:9, 220:5,
  222:9.
mother 90:15,
  232:8.
motion 227:16,
  227:17.
motive 226:10.
mottled 7:16.
mouth 21:22, 51:9,
  51:11, 56:25,
  81:1.
Move 2:13, 56:21,
  56:22, 68:5,
  98:9, 103:1,
  147:17.
moved 67:11, 67:16,
  68:5, 98:2,
  107:21.
moving 30:12,
  56:24.
Moye 222:6.
multiple 6:9.
murky 127:20.
muscle 37:17.
muscles 56:18.
myself 15:19,
  174:20.
  .
  .
< N >.
Nair 146:21,
  146:22, 147:1,
  147:7, 147:8,

  147:19, 235:13.
naked 65:19,
  65:20.
named 112:11,
  112:13.
Nancy 147:9.
Narcotic 20:3,
  20:16, 20:24,
  27:14, 51:19,
  139:13, 139:19.
narcotic-related
  139:21.
Narcotics 20:13,
  20:14, 20:20,
  22:9, 24:22,
  24:24, 74:16,
  74:17, 77:11,
  90:24, 91:5,
  91:7, 115:13,
  139:20, 142:4.
narrative 79:15.
nasal 37:12, 38:6,
  72:25.
natural 47:3,
  49:22, 55:20,
  61:19.
nature 24:14,
  123:15, 125:4,
  125:8, 127:3,
  127:7, 128:5.
nausea 21:14,
  36:18, 74:11,
  74:16, 74:18.
Naval 99:12.
near 147:12.
near-drowning
  51:20.
necessarily 31:21,
  31:22, 32:15,
  35:24, 40:2,
  44:10, 100:14,
  210:21.
necessary 221:14,
  229:7.
necessity 97:16.
need 2:3, 5:19,
  8:11, 16:18,
  16:19, 16:21,
  16:22, 16:23,
  35:22, 65:25,

  79:23, 92:21,
  110:21, 119:10,
  132:21, 220:5,
  232:10, 232:21,
  232:24, 233:13.
needed 81:8, 84:10,
  144:11, 144:18,
  144:21.
needed. 227:7.
needle 39:4, 60:4,
  69:9, 70:20,
  70:25, 71:15,
  71:16, 71:22,
  71:23, 72:12,
  94:3, 94:8,
  94:10, 94:23,
  94:24, 95:19,
  95:22.
needles 39:6, 72:6,
  103:23.
needs 181:21,
  232:12.
negative 34:21,
  34:23, 35:20,
  36:2.
neighborhood 44:4,
  134:22.
Neither 119:6.
nervous 20:21,
  21:5, 21:13,
  22:10, 22:15,
  33:18, 40:17,
  44:20, 63:7,
  63:12, 74:17,
  100:14.
network 147:25,
  148:2, 148:3,
  150:14, 150:16,
  151:2, 151:3,
  151:11, 151:13,
  153:20, 153:21.
neuroleptic 25:1.
New 115:24, 118:25,
  119:1, 124:9,
  131:5.
Newby 121:10,
  121:11.
news 57:15, 132:8,
  182:2, 221:16.
night 5:1, 5:2,

10:7, 78:6, 84:2,
   87:20, 91:9,
   109:7, 228:22,
   229:10, 229:18,
   230:24.
Nine 77:8, 193:10,
   193:24.
nipple 80:24.
nod 35:3, 35:7,
   63:8.
nodded 39:18,
   73:17, 74:5.
nodding 56:11,
   112:19.
noise 112:24,
   113:9.
nomenclature
   206:14.
none 227:13.
nonmobile 156:5,
   156:10.
nonresponsive 22:1,
   56:7.
noon 2:19.
normal 52:6,
   122:23.
Normally 20:23,
   52:16.
Norman 121:10,
   121:11.
north 78:12, 205:5,
   205:22, 206:18.
NORTHERN 1:3.
nose 51:9, 51:11,
   80:25.
not-so-great
   127:15.
notation 71:12,
   206:10.
note 8:5, 8:8, 8:9,
   8:10, 8:11, 8:25,
   9:4, 9:17, 9:20,
   10:15, 11:4,
   11:10, 50:16,
   51:6, 96:8,
   97:24, 98:15,
   110:11.
noted 62:6, 85:24,
   96:16, 187:9.
notes 97:20,

126:20, 126:23.
Nothing 9:24,
   10:21, 12:15,
   42:21, 50:8,
   75:3, 91:18,
   108:6, 183:10,
   186:22, 198:11,
   215:2, 218:11.
notice 53:23, 94:7,
   96:6, 104:12.
noticed 69:8,
   98:22, 99:1.
notified 90:23.
notify 82:6, 89:16,
   90:25, 91:2.
November 77:3.
number. 137:20.
numbers 149:3,
   154:10, 154:14,
   156:13, 157:6,
   161:16, 161:17,
   162:1, 162:24,
   163:25, 165:21,
   169:8, 173:22,
   200:14, 201:18,
   222:7.
numerous 103:23.
nurse 144:19,
   144:22.
.
.
< O >.
o'clock 57:6,
   184:19, 185:8,
   185:20, 227:6,
   232:13.
O5 79:1, 79:3,
   92:20, 92:24,
   93:4, 93:6,
   108:13.
O6 109:3, 109:4,
   109:5, 110:4,
   111:4, 111:5.
O7 118:24, 119:1,
   119:3, 119:4,
   119:7, 119:13,
   119:15, 119:23,
   120:14, 120:17,
   126:21, 128:21,
   128:23, 129:13.

O8 118:24, 119:1,
   119:3, 126:21,
   128:21, 129:19.
oath 60:13,
   183:2.
object 19:10,
   59:22.
Objection 8:14,
   8:23, 9:12, 9:13,
   43:9, 43:10,
   58:19, 82:21,
   85:11, 87:24,
   87:25, 92:23,
   101:22, 102:25,
   104:3, 110:18,
   110:25, 111:4,
   111:14, 117:8,
   130:23, 131:14,
   131:20, 140:23,
   161:8, 199:4,
   215:22, 227:25,
   229:8.
observation 51:23,
   101:19.
observations 50:2,
   51:25, 52:14,
   81:2, 84:5.
observe 102:20,
   127:17.
observed 80:22,
   93:15, 94:2,
   97:12, 100:5,
   101:13, 104:13.
obtain 86:1, 87:3,
   165:10.
obtained 23:6,
   124:12.
obvious 211:18.
obviously 134:13,
   136:18.
occasion 5:8,
   48:19, 115:14,
   124:23, 126:13,
   128:1, 148:24,
   189:25.
occasions 48:8.
occupation 13:19.
occur 21:18, 42:8,
   44:14, 81:24,
   225:25, 227:3.

occurred 40:12,
40:18, 44:17,
61:24, 61:25,
74:24, 80:5,
81:19, 83:17,
141:7, 156:25,
177:22, 183:7,
184:1, 184:23,
190:1, 191:16,
207:22, 214:6.
occurring 21:21.
occurs 68:1,
69:19.
Ocean 204:25.
odd 59:14.
offenses 139:21.
offer 9:10, 19:13,
19:19, 161:1,
222:25.
offered 224:9,
228:8.
Office 13:20, 14:6,
14:10, 14:12,
16:7, 18:7,
18:11, 29:5,
46:1, 46:13,
46:16, 46:19,
53:10, 60:24,
62:18, 66:21,
72:13, 77:1,
77:5, 77:7,
81:10, 82:1,
88:18, 105:17,
118:5, 139:14,
139:16.
Officer 82:2,
91:23, 93:8,
99:18, 99:21,
100:6, 100:17,
100:19, 100:22,
101:5, 102:15,
102:18, 102:20,
105:13, 142:10.
officers 88:10,
105:10, 105:11.
Official 1:49,
115:16, 233:29.
offset 36:2.
often 12:13, 18:14,
21:8.

oftentimes 28:11,
67:10, 74:18.
Ohio 116:20.
old 11:5, 50:5,
82:9.
older 50:9.
on. 223:19.
Once 5:17, 6:5,
15:3, 16:3,
16:21, 21:1,
23:2, 24:9, 53:9,
68:1, 68:4,
74:12, 91:11,
118:8, 121:19,
151:11, 151:13,
161:11, 166:25,
168:9, 176:5,
198:8.
one-story 113:20.
one-to-three-mile
204:15, 204:18,
205:9, 205:20.
one. 223:20.
ones 105:15, 106:2,
168:10, 175:18,
194:14, 202:7.
onset 22:23.
open 8:4, 8:5,
8:12, 9:16,
49:20, 49:23,
56:20, 112:2,
123:12, 124:11,
124:13, 141:10,
142:16, 143:22,
220:11.
opened 117:22,
118:15, 121:19,
121:22.
opening 124:12.
operating 117:15.
operative 229:17.
opinion 19:20,
19:24, 24:14,
48:17, 54:13,
55:6, 55:9,
55:11, 73:15,
75:23, 85:11,
102:17, 123:14,
123:18, 125:7,
127:6, 127:9,

128:4.
opinions 19:13,
117:11.
opportunity 121:3,
143:25.
opposed 24:4,
27:24, 111:23,
205:2.
opposite 33:15,
65:12.
optimization
148:3.
oral 51:7.
orally 37:14,
38:4.
orange 169:14,
172:10, 190:14,
193:8, 193:15,
211:14, 212:14,
212:21.
order 56:4, 131:4,
165:10, 232:7.
ordinary 9:1,
148:17.
organization
19:5.
organize 160:9,
160:10.
organs 24:6,
49:21.
original 47:1,
118:17, 119:25,
120:19, 120:20,
131:2, 131:16.
originally 99:6,
121:19, 124:12.
originated
156:16.
originating 118:5,
152:7, 152:9,
152:12.
origination 150:14,
153:18.
otherwise 19:20,
55:17, 111:21.
outer 44:5,
44:15.
outfit 110:24.
outgoing 152:14,
152:15, 153:24,

155:11, 155:12,
163:9, 165:6,
165:7, 169:25,
178:24, 190:11.
outlined 175:7.
outside 2:3, 39:19,
44:2, 49:17,
58:4, 91:6,
118:18, 132:21,
133:2, 182:20.
overdose 22:8,
32:3, 39:19,
43:7, 43:17,
44:4, 51:20,
64:24, 91:1,
91:3.
overdoses 38:22.
overlap 31:22,
161:17, 197:14,
197:23, 197:24,
198:8.
overlapped 197:8,
197:11.
overlaying
226:14.
overnight 220:17,
221:8.
overrule 43:12.
Overruled 102:2,
131:1, 131:15.
oversee 14:16,
14:19.
overseen 23:17.
Owings 140:1,
140:21, 142:22,
149:19, 171:25,
213:10.
own 15:4, 99:7,
99:17, 99:19,
99:24, 100:2,
136:13, 220:21,
220:22.
owner 134:7.
Oxycodone 24:23.
.
.
< P >.
P-a-r-m-e-l-e
4:2.
P-e-n-l-i-n-k

160:4.
P10 142:25.
P3 106:3, 106:14,
106:22, 106:23,
107:17.
P4 106:3, 106:14,
106:20, 106:21,
107:18.
package 126:5.
packaged 88:16.
packaging 120:21.
Page 8:4, 8:7,
8:12, 9:16, 49:8,
62:2, 79:11,
92:14, 92:15,
93:19, 103:20,
110:18, 111:9,
129:1, 137:19,
146:3, 162:22,
165:15, 167:3,
234:3, 235:3.
pages 109:10,
150:6.
paid 136:16,
224:20.
pain 20:15, 226:10,
226:13.
paper 111:23.
papers 17:19,
18:3.
paperwork 119:18,
119:22.
paragraph 93:19,
103:21.
paramedics 6:9.
parameters 149:4.
paraphernalia
88:23.
Pardon 85:4.
parent 30:6,
30:9.
Park 99:15.
Parmele 2:8, 3:15,
3:19, 4:1, 4:6,
6:25, 10:4,
234:5.
part 6:6, 7:22,
8:2, 8:3, 8:5,
8:6, 8:18, 9:7,
16:10, 16:13,

17:18, 23:23,
24:1, 24:3,
31:10, 53:20,
91:4, 91:5,
147:11, 230:11.
part-time 14:8,
136:25.
partials 219:19,
219:22.
participant
228:1.
participants 57:17,
57:18, 132:11,
132:12, 182:3,
182:4, 221:18,
221:19.
participate 16:23,
23:11, 105:18.
participating
221:23.
particular 21:2,
31:17, 33:19,
56:3, 120:3,
120:5, 136:12,
145:15, 150:23,
161:16, 162:17,
169:22, 169:25,
178:22, 178:24,
190:9, 202:17,
208:1, 215:11,
215:17, 216:15,
217:6, 217:12,
217:22, 217:25.
parties 164:20,
165:20.
party 151:19,
151:20, 152:9.
pass 16:21, 35:4,
63:8.
passes 29:17,
56:15, 56:17.
past 13:1, 30:6,
57:6, 80:20,
110:19, 113:16.
Pat 113:2, 113:19,
113:20, 226:25.
pathologist 15:11,
41:20, 56:4,
67:16.
Pathologists 14:23,

47:10, 47:12.
Pathology 17:7,
  46:13, 46:15,
  46:24, 46:25,
  47:2, 47:11,
  47:15, 47:17,
  47:18, 47:22,
  47:25, 48:9,
  48:12.
Patient 5:11, 8:19,
  9:21, 11:13,
  11:15, 80:23.
patients 4:23.
Patrick 7:3, 33:6,
  60:20, 87:15,
  91:24, 112:12,
  140:13, 140:14,
  143:12, 202:20.
PATRICK FITZGERALD
  KENNEDY 1:11.
Patrol 77:10,
  77:12, 78:15,
  80:12, 82:1,
  100:17, 100:19,
  100:22, 101:5.
pattern 122:13,
  159:14.
patterns 159:3.
Patuxent 99:11.
pay 135:17.
payroll 134:13.
pee 112:21.
peer 17:19,
  17:22.
Pen 145:25, 177:17,
  209:13.
Pen-link 159:12,
  159:17, 159:20,
  159:21, 159:22,
  160:1, 160:2,
  160:5, 160:7,
  160:25, 161:12,
  172:2, 172:3,
  194:25, 201:17,
  201:18, 209:3,
  209:7, 218:5.
penetrating
  52:10.
Pennsylvania
  4:11.

people 8:1, 8:20,
  8:22, 9:21,
  10:14, 19:22,
  21:12, 31:24,
  51:20, 67:22,
  81:5, 85:9,
  102:21, 134:14,
  159:3, 192:23.
Per 8:13, 10:6,
  11:13, 42:1,
  42:5, 42:8.
percent 129:9,
  233:7.
Percocet 113:13.
perfect 158:13.
perfectly 228:17.
perform 25:18,
  46:19, 48:19,
  121:17, 121:23,
  124:23, 125:3,
  127:2, 128:1.
performed 6:14,
  14:23, 48:22,
  119:16, 121:24.
performing 24:17,
  128:3.
performs 23:23,
  24:4.
Perhaps 2:18,
  43:14, 112:4,
  181:21, 218:25,
  230:7.
peri 7:16.
period 25:16,
  29:20, 32:17,
  44:17, 130:14,
  136:7, 136:11,
  149:22, 162:21,
  196:4.
permanently
  146:14.
permitted 18:20,
  19:13, 19:19,
  19:24, 117:10.
person 10:12,
  19:16, 19:18,
  30:2, 38:23,
  38:24, 63:19,
  63:21, 65:8,
  66:11, 73:10,

74:20, 82:2,
  90:18, 96:25,
  101:19, 226:23.
personal 111:9,
  111:25, 118:9,
  220:21, 220:22,
  223:4.
personally
  217:24.
personnel 50:13.
persons 100:20,
  221:23.
perspective
  95:15.
pertain 120:2.
pertinent 52:2.
Ph 16:1, 16:6,
  16:19.
pharmacological
  35:10, 39:12.
Phencyclidine
  25:4.
Phenyltetrahydroimi
  dazothiazole
  125:15.
phones 135:15,
  163:17, 166:5,
  172:24, 173:7,
  186:11, 191:18.
photo 60:4, 104:11,
  107:6, 107:21.
photocopy 111:21.
photograph 58:15,
  70:20, 104:9,
  104:18, 104:19,
  107:14, 143:2.
photographs 103:9,
  103:13, 104:25,
  105:19.
photos 103:14,
  105:20, 106:7.
phrase 38:24,
  226:21.
phrased 41:15,
  94:6.
physical 52:22,
  119:10, 226:7,
  226:9, 226:12.
Physically 83:5,
  93:11, 93:13,

174:14, 231:24.
physician 4:12,
    4:16, 8:18, 9:5,
    46:7, 60:24.
pick 3:6, 28:2,
    151:19, 225:3,
    229:2.
picks 151:19,
    151:20.
picture 59:5,
    59:16, 94:17,
    106:16.
pictures 90:23,
    103:21.
pie 177:14, 183:20,
    183:21, 183:23,
    187:2, 195:11,
    198:4, 210:14,
    211:2, 218:1.
piece 111:23.
pieces 183:23,
    187:2.
pies 177:16,
    177:19.
pill 112:15.
pills 112:12.
pills. 226:25.
pin 176:15, 176:18,
    176:22, 176:24,
    177:3, 177:5,
    183:18, 189:8,
    195:8.
pinpoint 83:9,
    83:13, 86:7,
    86:19.
pins 176:20,
    177:10, 183:10,
    186:22, 187:13,
    187:15, 187:16.
pipe 126:13,
    126:18, 126:19,
    126:23.
piping 135:2,
    135:3.
Pittsburgh 4:12,
    4:13.
place 15:1, 168:21,
    188:17, 188:21,
    194:15, 194:16,
    194:17, 197:2,

205:20.
Placed 70:21,
    88:16, 124:8,
    173:2, 173:5,
    173:10, 173:13,
    173:15, 173:19,
    174:11, 174:17,
    175:6, 175:24,
    176:20, 177:5,
    188:2, 188:5,
    189:15, 189:20,
    204:19, 204:21.
places 154:22,
    192:16, 193:5,
    197:7.
plainly 226:24.
Plaintiff 1:7.
plan 142:11,
    220:20, 226:9,
    226:18, 226:19,
    226:20, 226:24,
    227:1, 228:9,
    229:4, 229:9,
    229:18, 229:25.
plan. 229:22.
plane 232:7.
planned 112:10.
planning 2:21,
    141:12, 148:2,
    220:19, 220:21,
    225:21.
plant 127:17.
plastic 124:9.
Play 35:9, 54:7,
    54:19, 54:22,
    54:24, 55:2,
    55:3.
plays 141:25,
    142:3.
plot 154:5, 159:15,
    175:14, 178:6,
    183:7, 184:24,
    187:4, 191:17,
    194:5, 194:22,
    195:6, 196:10.
plots 172:4.
plotted 180:13,
    180:17, 194:14,
    195:14, 195:15,
    205:17, 218:4.

plotting 174:19,
    174:20, 215:9.
plugged 144:21,
    144:24, 146:5.
Plus 25:15, 35:24,
    113:17.
pockets 105:22.
point 2:12, 2:18,
    16:5, 44:7,
    81:20, 82:9,
    82:12, 83:24,
    88:17, 91:1,
    107:10, 126:24,
    141:6, 142:9,
    174:10, 217:8,
    220:19, 220:25,
    221:7, 221:20,
    222:18, 227:10,
    230:24, 231:14,
    233:13.
point. 80:19,
    81:15, 82:19,
    84:1, 182:17,
    200:1.
pointed 144:20.
pointer 180:10.
points 16:24,
    72:6.
police 67:16, 92:6,
    97:3, 97:5, 97:9,
    100:6, 101:4,
    102:14, 102:17,
    104:22, 110:13,
    232:14.
policy 129:10.
pop 37:16.
portion 10:23,
    28:17, 52:12,
    52:22, 67:13,
    68:8, 68:12,
    124:8, 124:13,
    164:7, 164:8,
    188:11.
position 4:15,
    16:12, 66:17,
    115:16, 139:18,
    154:13, 158:21,
    158:23, 232:21.
positions 17:16.
positive 27:8,

28:9, 30:5,
30:14, 31:1,
32:12, 36:1,
54:3, 54:4, 54:5,
62:7, 62:13,
127:16, 127:21.
possession 104:22,
107:25, 108:2.
possibility
230:16.
possible 28:1,
29:24, 91:1,
101:13, 155:20,
230:7, 230:9.
possibly 80:17.
posterior 67:13,
67:17, 68:8,
68:15, 68:16,
68:24.
postmortem 18:3,
18:24, 32:9,
62:6.
potential 36:1.
potentially 44:3.
pounds 50:6, 93:16,
93:22.
power 137:12.
practicalities
231:22.
practice 125:17.
precautionary
81:13.
precise 21:2.
precisely 176:9.
precision 202:10,
203:1.
predict 32:8.
prediction 221:2,
221:3.
prefer 58:16,
59:11, 59:15.
premised 224:6.
prepare 48:25,
53:11, 78:21,
169:2, 194:5.
prepared 78:23,
162:3, 201:24,
208:20, 210:5.
preparing 108:12.
prescribed 24:24.

prescription 28:2,
219:2.
Presence 41:12,
41:13, 54:1,
54:11, 75:17.
present 25:14,
25:16, 30:2,
36:13, 68:24,
78:17, 80:10,
80:12, 123:21,
123:24, 125:22.
presentation
59:14.
presented 221:23,
222:1, 229:20,
230:22, 230:23.
presents 57:16,
132:10, 221:17,
227:9.
president 134:7,
134:10.
press 151:1.
pressed 150:13.
pressure 68:25.
Pretty 3:7, 83:1,
85:7, 95:18,
95:20, 95:21,
134:12, 134:13,
206:16.
previous 167:18,
168:10.
previously 26:23,
93:5, 116:13,
116:24, 194:21,
222:7.
primary 14:16,
21:12.
Prince 48:4, 192:7,
192:14.
principles 13:25,
20:9, 20:12.
print 58:15, 58:17,
219:13, 219:24.
prints 219:4,
219:5, 219:11,
219:12, 219:17,
219:18.
prior 6:10, 77:4,
131:12.
Probably 29:14,

37:8, 39:23,
80:9, 136:9,
138:4, 202:16,
219:8, 225:12,
225:13, 233:7.
problem 35:17,
36:4, 58:10,
198:22.
problematic
232:24.
problems 59:8,
156:11.
procedure 117:15.
procedures 14:21,
91:13, 120:23,
124:24.
proceedings 112:2,
123:12, 142:16,
143:22, 220:11,
233:21, 233:25.
process 14:24,
15:12, 15:15,
15:16, 24:8,
27:9, 27:20,
28:12, 28:18,
29:3, 29:6,
55:19, 230:6.
processes 47:1,
47:3.
produce 28:25,
36:3, 173:21.
produced 88:24.
produces 27:18.
product 28:21,
55:25.
production 27:19.
products 28:23,
28:24.
professional 16:4,
17:13, 116:7.
professor 17:7.
proffer 141:16,
223:9.
proffered 230:6.
prognosis 80:17,
80:18.
program 14:20,
154:8, 159:12,
201:17, 209:13,
209:16.

progress 2:16,
  233:20.
projected 231:19.
projection 227:2.
projections
  220:23.
prolong 35:6.
prompt 135:5.
promptly 222:2.
pronounce 69:10.
pronounced 6:15.
pronouncing
  230:10.
proof 230:7,
  230:9.
propagation
  154:20.
properties 64:8.
property 89:9,
  89:10, 105:17.
proposed 2:19,
  2:25, 57:25,
  58:7, 132:19.
prospect 230:14.
protocol 15:8,
  15:9, 24:16,
  49:12.
provide 23:5,
  57:24, 137:14,
  148:20.
Provided 59:3,
  124:9, 135:25,
  150:7, 150:19,
  159:13, 159:16,
  160:18, 222:8.
provides 153:17,
  194:23, 195:2.
publications 47:16,
  47:19.
publish 17:18.
published 17:21.
puking 112:24,
  112:25, 113:9.
Pull 117:20,
  145:14, 147:10,
  158:12, 229:6.
pulled 145:22,
  227:3.
pulmonary 51:11,
  51:16, 51:21,

52:4.
pulse 7:12.
pumped 101:20.
puncture 69:9,
  70:25, 71:15,
  71:16, 71:22,
  71:23, 72:5,
  72:7, 72:8.
pupils 83:9, 100:8,
  101:11, 102:19.
purchase 225:7,
  225:9, 225:10.
purchased 201:16,
  201:20, 201:21.
purchasing 224:4.
purity 36:5, 36:8,
  129:5, 129:6,
  129:9, 129:11,
  129:12, 129:15,
  129:21, 131:8,
  131:9, 131:12,
  131:16.
purpose 71:8,
  71:14.
purposes 5:23,
  14:1, 227:20.
pursuant 148:20,
  150:19.
push 123:6, 176:15,
  176:18, 176:20,
  176:22, 176:24,
  177:3, 177:5,
  177:10, 195:8.
pushed 86:21,
  103:3, 176:22.
putting 122:6,
  172:2, 173:22.
.
.
< Q >.
qualification
  110:3.
qualifications
  19:17.
qualified 18:19,
  19:7, 19:18,
  19:23, 48:16,
  117:5, 117:9.
quality 148:6.
quantitate 30:15,

30:16, 30:18,
  30:23, 30:24,
  31:7, 31:15,
  31:16.
quantitated
  30:20.
quantitation 15:17,
  25:19, 30:21,
  129:8.
quantities 108:4.
quantity 63:8.
questioned 75:16.
questions 6:20,
  12:9, 32:22,
  44:24, 57:2,
  58:24, 60:21,
  63:25, 76:1,
  86:13, 108:9,
  108:13, 108:15,
  109:11, 113:4,
  113:24, 128:14,
  130:15, 131:23,
  138:13, 138:15,
  146:9, 146:11,
  157:10, 157:13,
  215:5.
quickly 2:13,
  22:22, 80:7,
  85:7, 85:8,
  85:15.
quite 17:15, 38:10,
  226:2.
quote 225:8.
quotes 225:14,
  225:22, 225:24.
.
.
< R >.
R-a-y 76:20.
R1 160:15, 160:17,
  161:1, 161:10,
  162:5, 162:25,
  201:9, 202:3.
R1A 135:21.
R2 160:15, 160:20,
  161:2, 161:10,
  162:5, 162:25,
  201:9, 202:3.
R2A 137:19.
R3 148:24, 149:1,

160:15, 160:22,
161:2, 161:4,
161:5, 161:10,
162:5, 162:25,
201:10, 202:3.
R3A 149:8.
R3C 149:25.
R5 49:3, 49:4.
R5A 49:4, 61:8,
69:5.
R5B 25:23, 25:24,
53:14.
R6 5:20, 5:21,
5:22, 5:24, 7:22,
7:23, 8:5, 9:11,
9:14, 10:22,
10:23.
radio 78:8, 147:25,
148:2.
radius 203:17,
203:19, 204:2,
204:15, 204:18,
205:9, 205:20,
206:4, 206:5,
207:3, 207:18,
207:25, 208:4,
209:10, 209:14,
210:15, 210:17.
Raise 3:18, 13:4,
45:9, 76:12,
114:16, 133:12,
138:23, 146:25,
157:24.
Rajiv 146:21,
146:22, 147:1,
147:7, 235:13.
RAN 113:1, 127:14,
147:24, 148:1.
rang 112:17.
range 31:19, 41:16,
41:19, 41:23,
41:24, 42:6,
42:15, 44:2,
44:7, 154:16,
154:25, 204:7,
210:1, 210:4.
Rao115 234:43.
Rao13 234:19.
Rao130 234:47.
Rao133 235:7.

Rao139 235:11.
Rao42 234:23.
Rao45 234:27.
Rao75 234:31.
rapid 38:10, 38:11,
38:12, 39:2,
39:4, 39:13,
44:11, 65:8.
rapidly 21:22,
23:3, 29:16.
rate 33:22, 64:9,
65:7.
rates 64:12,
122:11.
rather 59:11,
212:19.
Ray 76:8, 76:10,
76:13, 76:20,
76:24, 79:4,
79:6, 91:23,
92:25, 93:2,
93:8, 109:21,
234:33.
reaches 23:4,
230:8.
reaching 62:16.
reaction 63:21.
Read 11:9, 39:8,
39:23, 44:6,
73:20, 73:23,
74:12, 74:13,
74:20, 109:20,
109:21, 109:25,
110:5, 112:4,
112:8, 182:2,
221:16.
reading 26:14,
79:22.
reads 8:13,
94:10.
ready 3:8, 3:12,
81:16.
real 207:18.
reality 233:6.
realized 112:22.
really 21:19, 30:8,
41:17, 42:16,
50:8, 65:17,
66:16, 74:22,
81:14, 83:16,

86:12, 86:21,
110:17, 202:11,
202:12, 202:23,
203:7, 203:10,
207:18, 207:22,
208:21, 214:14,
223:8, 227:8.
reanalysis 119:16,
124:23, 126:4,
126:14, 129:10,
130:20, 130:22.
reason 20:14, 63:5,
155:21, 211:7.
reasonable 54:14,
55:5, 123:14,
125:7, 127:6,
128:4.
reasonably
220:25.
reasons 51:21,
97:11.
recall 36:23,
78:17, 80:1,
85:3, 85:5, 85:6,
96:7, 96:12,
97:2, 108:15,
142:3, 142:5,
142:10, 145:8,
216:22.
receipt 117:17.
receive 15:5,
15:14, 16:22,
25:13, 91:12,
159:18, 159:19,
194:24.
receiving 91:11,
184:5, 184:8,
190:20, 190:23,
191:10, 191:13,
193:13, 193:19,
193:21, 193:23,
193:25, 194:2.
recess 57:22, 58:2,
132:7, 133:1,
181:22, 182:1,
182:7, 182:19.
reciprocal 166:21,
179:9, 179:11.
recognize 5:25,
49:5, 53:15,

119:4, 135:22,
137:20, 143:1,
145:2, 149:9,
168:24, 177:25,
178:9, 180:3,
190:4, 196:13.
recognizes 59:3,
59:18.
recollection 79:10,
79:19, 79:24,
89:21, 93:20,
109:2, 110:14,
145:10.
record. 110:10,
122:15, 140:25,
143:16, 218:18.
recorded 185:13,
185:14, 213:1,
213:2, 213:3.
recordkeeping
200:19.
recounts 223:17.
recovered 72:11,
88:13, 141:14,
141:17, 141:19,
142:5, 142:7,
145:5.
recreational
22:13.
Recross-examination
11:23, 234:13.
redact 110:18.
redacted 111:8.
redactions
111:22.
redacts 111:9.
Redirect 10:1,
10:2, 12:6, 12:7,
42:23, 42:24,
75:4, 75:5,
83:24, 108:8,
108:10, 130:16,
130:17, 215:4,
215:7, 215:24,
234:11, 234:15,
234:23, 234:31,
234:39, 234:47,
235:23.
reduces 20:15.
refer 26:15, 54:16,

79:24.
reference 10:23,
27:4, 120:5,
199:3, 199:9,
221:25.
referenced 163:3,
180:7.
referencing
108:14.
referred 51:9,
52:13, 178:11.
Referring 11:4,
24:2, 26:23,
44:19, 53:25,
65:2, 92:20,
94:19, 99:11,
120:9, 136:5,
137:23, 159:24,
196:12.
refers 171:12,
177:4.
reflect 26:9,
126:20, 126:23,
140:17, 140:19,
174:22, 188:2,
207:18, 210:15,
218:7.
reflected 145:22,
162:25, 169:8,
215:17, 216:17.
reflecting
161:24.
reflects 54:11,
145:14, 189:8,
214:18.
refresh 5:19, 79:9,
79:24, 89:21,
93:20, 109:17,
110:14, 145:10.
refreshes 79:19.
refrigerated
40:13.
refrigeration
135:2.
regained 6:13.
regard 184:23,
186:25, 188:25,
191:16, 216:1,
221:7.
regarding 75:8,

75:13, 84:4.
regardless
232:18.
regards 6:5, 73:20,
156:23, 162:5,
188:14, 189:1,
207:12, 216:13,
216:21, 227:18.
Registered
117:17.
regular 19:21.
relate 57:17,
120:2.
related 18:1,
57:20, 142:8,
182:5.
relates 115:21,
120:13, 120:14,
120:17, 124:22,
126:12, 127:24.
relating 85:2,
129:12, 132:10.
relation 64:15,
159:5, 174:14,
183:19, 187:1,
187:13.
relationship
163:3.
relaxed 56:18.
release 89:15.
released 90:17.
relevance 130:25.
relevancy 140:23.
relevant 141:6,
141:15, 221:22.
reliable 135:7,
227:9.
relieve 81:9.
rely 8:6, 66:16,
208:21.
Remain 13:2, 29:19,
45:8, 60:13,
114:14, 118:9,
138:22, 146:17,
146:23, 157:22,
183:2.
remained 11:16.
remaining 124:8.
remains 111:5.
remember 7:16,

10:7, 95:25,
97:21, 104:15,
104:16, 104:17,
142:18.
reminded 233:7.
removable 111:17.
remove 145:13.
removed 111:8,
164:10, 164:12,
165:22, 166:15,
166:17.
renting 88:12.
repeat 6:3, 7:4,
25:9, 33:7,
60:22, 63:22,
92:1, 169:18,
179:7, 201:3,
205:23.
repeatedly
232:12.
rephrase 64:3.
replace 111:9.
replaced 124:14.
reported 39:21.
Reporter 1:49,
233:29.
reporting 129:13.
reports 18:4,
26:20, 39:9,
46:21, 57:15,
57:17, 110:14,
132:9, 132:10,
182:3, 221:16.
represent 7:3,
27:5, 33:5,
60:19, 91:24,
187:13, 201:1,
215:14, 216:4.
represents 153:20,
154:2, 169:12,
197:13.
request 15:6, 23:9,
24:11, 26:10,
121:20, 121:21.
requested 23:5.
requests 15:11.
required 56:4,
56:6, 146:16,
146:18, 230:8.
requisite 19:17.

reseal 126:5.
research 17:17.
residence 78:11,
87:11, 88:6,
105:6, 142:7,
143:1, 143:6,
143:25, 144:2,
144:5, 144:6,
144:8, 144:9,
144:19, 145:5,
206:7.
residency 4:11,
46:13.
residue 104:12,
127:25, 128:9,
129:21.
respect 14:22,
31:3, 111:4,
120:24, 120:25,
121:17, 124:25,
137:15, 142:3,
182:6, 198:18,
202:2, 220:23,
221:23, 222:19,
226:1.
respective 162:1.
respiration 7:10.
respiratory
52:13.
respond 23:9,
78:10, 82:7,
86:13.
responded 78:8,
78:11, 78:13,
78:14, 80:1,
80:3, 143:5,
143:6.
response 228:13.
responsibilities
4:21, 14:14,
14:15, 17:16,
46:17, 134:11.
responsibility
14:16, 14:19.
rest 141:24,
142:2.
restate 156:22.
result 22:17,
24:15, 26:25,
28:1, 31:5,

36:24, 48:25,
131:19, 163:20,
173:22, 233:16.
results 18:24,
18:25, 26:9,
27:8, 28:8,
30:14, 43:25,
115:15, 117:25.
resuscitation
50:13.
retired 121:12,
131:2.
retrieve 144:23.
return 117:17,
118:10, 126:5,
132:16, 222:2.
returned 124:15,
124:17, 126:17,
128:11.
returning 222:6.
reveal 122:23.
review 6:2, 17:23,
79:21, 108:23,
159:5, 176:1,
193:4, 194:9.
reviewed 6:8, 7:25,
8:1, 15:19,
17:19, 17:22,
18:12.
reviewing 79:9,
159:8, 172:24.
reweighed 124:8.
rhythm 2:17.
Richard 138:24,
139:6, 235:9.
Ricky 138:20.
rid 29:3, 204:10.
Ridge 80:2,
81:19.
ripe 142:12.
risk 211:18.
risky 220:22.
River 99:11.
Road 80:2, 81:19,
100:20.
robbery 77:23.
Robert 147:7,
147:9.
rocks 34:15.
role 54:6, 54:19,

54:22, 54:25,
55:2, 55:3,
60:24, 81:18.
rolling 56:24.
room 5:14, 5:18,
8:18, 9:4, 89:9,
105:13, 144:13,
144:14, 144:15.
roommates 87:14.
rooms 105:9.
Roscoe 140:7.
Ross 46:11.
rotating 17:10.
rounds 6:9, 6:11.
Route 37:7, 37:9,
37:23, 43:22,
99:14, 155:22,
171:25, 173:2,
173:6, 173:10,
173:13, 173:16,
173:19, 205:2,
213:11.
routed 203:11,
205:10, 205:16,
206:15, 206:17.
routine 28:18,
29:6.
routinely 26:16,
29:5, 30:16.
routing 155:21,
155:23.
RPR 1:47, 233:23.
rule 41:3, 44:12,
110:11, 110:13,
226:5, 230:20.
rules 230:18.
ruling 44:10,
142:6.
run 16:4.
running 122:7,
148:4.
rural 154:24,
204:2.
Ryan 157:20,
157:21, 157:25,
158:10, 235:17.
.
.
< S >.
S1 145:1, 145:7.

sample 30:3, 122:6,
124:2, 124:8,
125:21, 126:3,
130:8, 130:9.
samples 23:24,
53:4, 53:8, 53:9,
53:24, 54:2,
115:13, 122:7,
125:18, 130:4.
Sara 87:15, 87:21,
113:2, 218:25,
232:13.
saw 52:5, 52:19,
71:16, 81:7,
94:23, 94:24,
95:1, 95:19,
95:22, 97:13,
97:23, 106:16,
107:12, 198:22.
saying 10:14,
34:22, 54:24,
66:1, 66:5,
85:17, 111:16,
225:15, 226:25.
says 41:18, 53:25,
95:3, 103:20,
104:1, 112:9,
129:4, 137:20,
152:9, 156:4,
157:2, 162:12,
223:25, 224:16,
224:25, 226:6.
scale 104:5, 104:9,
104:13, 104:19,
104:23, 106:18,
106:25, 107:10,
107:12, 107:24,
108:3, 207:8,
207:11, 207:15.
scar 66:2.
scarce 233:3.
scared 84:24.
scarring 65:24.
scars 49:18,
50:7.
scattered 50:7.
scene 72:11, 78:16,
84:22, 90:22,
103:15, 103:16,
105:1.

scheduled 220:4,
233:10.
School 4:11, 46:12,
47:20.
science 16:19,
35:24, 115:23,
116:10.
Sciences 19:4,
47:9.
scientific 20:9,
44:6, 47:5,
47:19, 123:15,
125:7, 127:6,
128:5.
Scientists 116:9.
screaming 113:1.
screened 24:18.
screening 15:15,
15:16, 25:14,
27:5, 122:1.
seal 118:10,
118:15, 120:19,
126:24.
sealed 118:6,
121:16, 124:13.
sealing 124:10.
seals 126:18.
search 88:11,
105:3, 105:5,
105:9, 105:13,
105:18.
searched 105:22.
searches 221:22.
seated 2:2, 3:11,
3:23, 13:9,
45:14, 58:3,
60:10, 76:17,
114:21, 133:7,
133:17, 139:3,
147:4, 158:4,
183:1, 220:12.
second 27:3, 31:13,
93:19, 118:21,
121:20, 121:22,
137:19, 150:22,
157:4, 163:8,
164:17, 165:14,
165:15, 170:10,
170:17, 171:7,
171:17, 179:19,

190:23, 193:15,
196:6, 197:6.
second-to-last
28:16.
secondary 14:19.
section 24:21,
65:25, 145:23,
218:1.
Security 90:3.
seeing 97:2.
seem 100:11,
230:1.
seems 159:24,
226:11, 229:22.
seen 18:8, 31:23,
38:23, 39:5,
39:6, 39:8,
39:21, 42:7,
42:12, 58:22,
58:23, 65:15,
125:19, 195:12.
seize 88:22,
104:22.
seized 89:3, 89:18,
89:22, 107:25,
146:4.
seizing 88:21,
89:11.
Seizure 65:9,
150:12, 150:25,
151:1, 151:9,
152:5.
seizures 22:16,
33:24.
select 15:15,
25:12.
selected 30:21.
self 99:19.
sell. 113:18.
semicircle
209:17.
semicircles
209:22.
send 150:13,
151:1.
Senior 115:17,
115:18, 147:24,
148:1.
sensation 226:8.
sense 33:17, 36:14,

153:19.
sensitive 141:3.
sent 15:2,
120:22.
sentence 94:6,
109:23.
separate 61:4,
151:8, 170:16,
179:10.
sequence 212:19,
214:23.
Sergeant 78:14,
88:10, 140:7.
series 127:14,
177:21, 193:2.
serve 140:4,
142:23.
served 115:18.
serves 71:8.
serving 19:22,
148:14, 221:11.
set 56:3, 56:6,
172:10, 230:1.
seven 191:10.
sex 112:16.
shaped 175:7.
shapes 210:14,
211:2.
sheet 3:1, 15:6,
61:11, 61:12,
92:7, 92:24,
92:25, 93:2,
93:6.
Sheriff 76:25,
77:5, 77:7,
77:19, 82:1,
88:18, 105:5,
108:1, 139:13,
139:16.
shift 4:25, 5:1.
shirt 140:16.
shock 50:14.
shooting 38:14.
shoots 38:23.
shopping 187:19.
Shore 204:24.
short 2:10, 12:2,
32:20, 116:2,
154:23, 231:7.
shorten 30:7.

shorter 29:22,
30:10, 32:18,
64:15.
showed 162:16,
164:20, 173:11,
216:21, 217:19,
217:22.
shower 112:10.
Showing 5:22,
25:22, 49:4,
120:10, 135:20,
142:25, 145:1,
145:19, 160:15,
167:3, 185:1,
190:4, 205:17.
shown 31:21, 67:12,
70:13, 107:21,
213:21.
shows 55:23, 70:6,
162:13, 163:7,
163:9, 163:16,
171:7, 172:12,
172:15, 173:4,
173:8, 173:17,
175:24, 179:17,
179:19, 188:21,
189:4, 198:8,
208:4, 209:14,
211:9, 212:14.
shut 224:3.
side 21:11, 21:12,
21:17, 50:17,
50:23, 67:1,
67:3, 79:23,
175:21, 205:21,
206:17, 207:2,
213:6, 230:4,
233:6, 233:9.
sides 2:19, 58:6.
sign 55:19,
55:21.
signal 154:21.
signature 26:6,
124:10.
signed 18:8,
26:5.
significance 27:21,
28:10, 30:15,
176:15, 176:18,
176:25.

significant 51:3,
51:4, 55:18,
55:19.
signs 5:16, 6:5,
6:7, 44:20, 51:4,
82:5.
silver 90:4, 104:5,
104:9, 104:13,
104:18, 104:23.
similar 20:4,
153:9.
simply 27:24,
219:12.
sister 90:16.
sit 108:22, 202:19,
220:13, 228:12.
sites 154:16,
154:25, 174:24,
176:7, 188:2,
188:5, 191:18,
195:12.
sitting 145:6,
221:3.
situation 35:23,
36:12, 66:12,
82:8, 83:20,
99:7.
situations 38:23.
six 29:14, 32:13,
32:15, 32:16,
46:4, 93:22,
220:13.
six-month 115:25.
sixth 27:3.
size 210:13.
skin 44:22.
slash 154:3.
sleep 112:22.
sleepiness 44:22.
slightly 52:6,
148:9.
slow 39:14.
slower 38:9.
Slowest 38:2,
38:3.
slowly 148:10.
slurred 86:10,
100:9, 100:10.
small 50:7, 51:1,
65:24, 72:6,

104:1, 104:5,
104:9, 104:13,
104:18, 104:23,
106:18, 106:25,
107:12, 107:24,
108:3, 134:14.
Smith 86:6, 87:10,
96:4, 97:24,
98:2, 99:6,
101:6, 108:14,
108:22, 109:6,
109:13, 226:1.
smoke 34:15.
smoked 37:10,
72:23.
smoking 38:10.
smudges 219:21.
snoring 112:22.
Social 90:3.
societies 116:7.
Society 47:11.
sodium 6:11.
software 201:21.
somebody 43:5,
43:20, 56:11,
56:15, 83:25,
88:4, 100:12,
102:11, 102:13,
108:5, 136:20,
232:12.
somehow 207:1.
someone 21:24,
22:4, 27:14,
28:1, 28:4,
28:11, 44:3,
51:8, 51:18,
56:7, 56:17,
63:5, 73:20,
75:12, 82:2,
101:1, 134:15,
151:15, 176:2.
Sometimes 34:11,
34:20, 35:6,
51:20, 72:6,
129:25, 195:1,
221:5.
somewhat 21:23.
somewhere 205:21,
224:25.
sonogram 6:14.

soon 81:6.
sooner 35:18.
Sorry 11:25, 22:6,
34:3, 50:20,
54:21, 62:3,
63:24, 79:22,
107:5, 107:8,
118:24, 119:7,
120:11, 142:2,
155:7, 160:2,
169:18, 170:11,
172:25, 176:17,
179:7, 181:18,
186:16, 188:4,
192:7, 194:13,
197:9, 197:17,
206:21.
sort 51:11, 63:7,
105:8, 135:1,
135:13, 220:6,
223:13, 224:6,
225:21, 229:23.
sorts 17:24.
Sounds 17:15,
182:16.
sources 221:24.
South 99:14,
116:20, 205:5,
205:21, 206:18.
Southampton
115:24.
Southern 97:7,
229:2.
speaker 226:14.
speaking 87:10,
88:5, 143:24,
166:8, 203:1.
special 19:15.
specialized 47:5,
116:10.
specialty 62:21.
specific 52:14,
130:8, 174:9,
202:20, 203:11.
Specifically 10:6,
13:24, 30:24,
52:12, 109:18.
specify 43:22.
specimen 15:15,
25:12, 26:14,

27:7, 31:18,
32:6, 32:11.
specimens 14:18,
14:25, 15:1,
15:2, 15:7, 15:8,
15:14, 18:3,
23:6, 23:12,
23:16, 24:3,
24:7, 25:12,
26:16, 49:25.
spectra 118:1,
119:19.
spectral 121:24,
122:4.
spectroscopy
121:25.
speculation
39:17.
speech 83:10,
86:10, 100:8,
100:10.
speedball 34:13,
35:12, 35:13,
36:12, 62:25,
63:6.
speedballing 43:2,
75:16.
Spell 3:24, 13:10,
45:17, 76:18,
114:11, 114:22,
133:18, 139:4,
147:5, 158:5,
158:9, 160:3.
spelling 159:23.
spend 17:13.
sphincter 56:19,
56:22.
split 228:21.
spoke 8:20, 82:16,
96:3, 96:4,
96:20, 99:6,
202:20.
spoon 127:25.
spoons 128:6.
Sprint 217:21.
squares 217:16.
St. 46:10, 48:5,
76:25, 77:4.
stabilize 4:23.
Stand 3:17, 8:11,

13:2, 45:8,
76:10, 114:14,
133:10, 138:21,
146:23, 157:22,
182:17.
standard 91:13,
117:15.
standing 13:2.
stands 147:24,
156:5.
start 21:21, 22:13,
26:13, 67:1,
67:24, 122:2,
150:9, 172:21,
172:22, 231:6.
started 77:10,
81:6, 82:25,
83:22, 84:1,
88:11, 112:23.
Starting 75:7,
119:4, 119:13,
124:20, 160:17,
221:6.
starts 38:19,
67:20, 68:3.
State 3:23, 13:9,
13:21, 14:5,
14:20, 16:10,
18:17, 45:16,
48:1, 62:22,
74:3, 76:17,
114:21, 116:19,
133:17, 139:3,
147:4, 158:4,
226:8, 226:19.
stated 50:5.
statement 86:1,
87:3, 109:2,
109:6, 109:7,
109:13, 109:15,
109:20, 109:21,
109:24, 110:5,
112:4.
statements 105:20,
229:3, 230:14.
States 1:1, 1:5,
1:20, 47:10,
115:7.
Station 99:12,
152:23, 154:21.

status 16:18,
16:22, 16:23.
stay 63:15, 64:18,
81:8, 187:22.
stays 66:25,
67:6.
stenographic
233:24.
step 111:2, 146:19,
218:5.
steps 6:4, 23:21,
25:20, 82:14,
217:24.
Sterling 134:9.
Steven 114:7,
114:17, 114:24,
234:41.
stick 73:2.
sticker 119:10.
stickers 118:17.
stimulant 22:10,
33:21, 35:8,
63:11, 63:14.
stimulation
22:16.
stipulate 122:21,
123:5, 220:2.
stipulation 123:1,
123:4, 219:1,
219:11.
stomach 56:20,
56:22, 56:23,
56:24.
Stop 8:16, 21:1,
21:16, 165:14,
233:3.
stopped 56:21,
112:14.
stops 67:2,
100:20.
straighten
120:12.
strategically
59:10.
stream 21:21.
Street 38:24,
203:24, 203:25.
strike 84:4,
88:21.
strikes 230:3,

230:7.
stroke 55:20, 65:9,
    65:16, 66:2.
structurally
    20:4.
structure 29:2.
studies 18:5,
    73:23.
study 13:23,
    46:25.
stuff 80:20, 83:12,
    105:16, 135:3,
    135:17.
styled 92:15.
subject 135:21,
    137:20, 227:10.
subjects 18:23,
    19:14, 19:20.
submits 23:24.
submitted 14:18,
    15:17, 27:7.
submitted. 26:14.
subpoena 148:20,
    150:19, 232:10,
    232:22, 232:25,
    233:15, 233:16.
Subscribed 149:15,
    149:17.
Subscriber 149:12,
    153:7.
subsequent 31:4.
subsequently 86:1,
    144:23.
subspecialty
    47:2.
substance 14:17,
    25:7, 25:10,
    28:16, 29:1,
    88:23, 123:16,
    124:3, 125:4,
    125:8, 125:10,
    127:3, 127:7,
    128:5, 128:8,
    129:16, 131:5,
    227:25.
substances 108:4,
    115:22, 116:24,
    123:20, 125:13,
    129:20, 129:22,
    129:25, 130:4,

231:24.
substantially
    124:16, 126:7,
    126:15, 128:10.
substantive
    103:2.
substitute 111:19,
    111:20.
suddenly 232:3.
sufficient 63:8.
sugar 123:24,
    124:1, 125:21,
    125:24.
suggest 29:13.
suggestion
    181:23.
suggests 29:21,
    30:10.
suicide 61:19.
suited 73:12.
summary 10:13,
    117:25.
Sunderland 171:25,
    173:6, 213:10.
super-small 83:9.
superficial
    141:9.
supervise 23:11.
supervision
    88:19.
supervisor 118:2.
supplied 72:10,
    201:22.
suppose 64:21.
supposed 144:19.
supposedly
    225:23.
suppress 33:18,
    40:16, 63:7.
suppressant
    33:18.
suppresses 65:12.
suppression
    74:18.
surface 68:15,
    68:16, 68:24,
    69:20.
surprise 82:4.
surrounding
    55:14.

suspected 115:13,
    116:5, 116:21.
Sustained 8:16,
    8:24, 82:22,
    85:13, 103:1,
    104:4, 131:21,
    215:25.
swallowed 72:21.
switch 155:22,
    156:6, 156:9.
switches 156:11,
    156:12.
sworn 3:20, 13:6,
    45:11, 76:14,
    114:18, 133:14,
    138:25, 147:2,
    158:1.
symbol 176:16,
    176:19.
symptomatology
    43:16.
symptoms 43:16,
    56:3, 56:6.
syringe 71:14.
syringes 72:10,
    72:11.
system 16:9, 20:21,
    21:6, 21:13,
    21:16, 22:10,
    22:15, 33:19,
    40:17, 52:13,
    54:11, 55:24,
    63:7, 63:12,
    74:17, 106:17.
systems 13:24,
    159:21.
.
.
< T >.
T-s-a-p-l-s 4:2.
T. 1:47, 3:19,
    233:28, 234:5.
T1 161:20, 161:21,
    163:16, 164:8,
    166:20, 168:9,
    168:24, 200:8,
    200:16, 202:3.
T2 164:3, 164:8,
    165:15.
T3 165:14,

166:12.
T4 167:12.
T5 168:5, 168:6.
T6 145:20, 146:2,
    146:3, 168:24,
    169:4, 169:5,
    205:12, 212:6.
T7 177:24, 178:8,
    178:11, 178:19,
    178:20, 180:12,
    181:5, 183:25,
    187:23, 187:24,
    187:25, 211:21.
T8 190:4, 193:1,
    195:18, 195:21,
    200:8, 202:3,
    211:4, 211:8,
    214:21.
table 156:6, 156:8,
    178:20.
taken. 58:2, 133:1,
    182:19.
talked 7:25, 73:11,
    82:17, 103:5,
    120:24, 183:4,
    224:24, 224:25.
talks 66:24,
    226:8.
tall 154:20.
tampered 117:22.
tape 111:8, 111:17,
    111:24.
Target 152:11,
    153:2, 153:7,
    153:13, 162:10,
    162:13, 162:20,
    163:13, 164:13,
    164:15, 165:1,
    165:2, 165:6,
    165:11, 169:9,
    169:21, 170:2,
    170:6, 171:10,
    171:14, 178:21,
    178:25, 179:22,
    190:8, 190:12.
tattoo 72:8.
tattoos 50:7,
    72:7.
taught 17:11.
teach 11:11, 17:9,

17:10, 17:11.
team 77:21.
technician
    117:20.
telephones 167:21,
    194:6.
television 221:4.
temperature 7:17.
temperatures
    122:9.
temporary 155:22.
ten 98:13, 112:15,
    132:17, 132:24.
term 46:24,
    62:24.
terminating 152:17,
    155:17, 155:18,
    156:24.
termination 150:15,
    153:18.
terminology 68:2.
terms 10:4, 11:19,
    20:2, 35:11,
    43:18, 65:17,
    68:18, 74:10,
    74:21, 80:22,
    81:18, 90:21,
    150:18, 159:17,
    169:16, 169:19,
    182:6, 184:3,
    186:21, 220:19,
    220:21, 222:1.
terrific 3:5.
test 15:9, 24:19,
    26:18, 26:23,
    27:1, 27:10,
    29:9, 29:24,
    30:12, 30:13,
    31:4, 31:5,
    118:6, 121:17,
    122:2, 122:3,
    122:5, 122:23,
    125:6, 125:14,
    127:5, 127:14,
    127:15, 127:20,
    129:11, 129:12,
    131:9, 131:12,
    131:16, 131:19.
tested 25:8, 25:10,
    26:21, 117:24,

120:6.
testified 3:21,
    13:7, 18:14,
    18:15, 44:2,
    45:12, 47:21,
    48:1, 48:6,
    76:15, 114:19,
    116:13, 130:19,
    133:15, 139:1,
    147:3, 158:2.
testify 18:23,
    47:24, 101:1,
    101:25, 115:14,
    117:10, 129:21,
    223:3, 223:6,
    227:21, 228:19,
    231:15.
testimony 18:21,
    19:24, 48:17,
    72:4, 131:3,
    146:16, 146:18,
    157:7, 203:4,
    209:15, 223:11,
    226:15, 228:11,
    230:22, 230:25,
    231:11, 223:17.
testing 14:17,
    15:8, 15:12,
    24:15, 24:16,
    24:17, 26:10,
    27:6, 27:9,
    28:18, 29:6,
    62:7, 232:14.
tests 27:4, 123:13,
    127:15.
tetrahydrocannabino
    l 127:10.
THC 129:20.
theory 230:5.
therapeutic 15:13,
    24:21, 24:25,
    25:2, 27:25,
    71:5.
therapeutically
    20:14, 24:24.
therapy 69:7, 69:8,
    71:25.
thereafter 21:25.
therein 127:3.
they'll 35:7,

82:6.
They've 18:1, 39:7,
    39:24.
thick 72:12.
thinks 229:7.
third 3:12.
though 96:9,
    127:17, 221:13,
    232:16.
thousand 42:13.
thousand. 42:12.
throat 50:15.
throughout 23:3,
    153:10.
thumbnail 222:21,
    222:22.
till 151:13.
Tim 78:14.
tissues 24:6.
titration 35:19,
    35:21.
titrations 35:21.
today 2:14, 2:22,
    72:17, 73:15,
    74:4, 140:14,
    145:6, 220:3.
together 34:12,
    34:13, 36:9,
    92:12, 163:21,
    183:20, 183:21,
    183:23, 187:3,
    194:20, 226:2,
    227:3, 229:24.
tolerance 21:8,
    37:3, 37:7.
Tomlison 140:7.
Tomorrow 2:23,
    220:5, 221:1,
    221:2, 222:2,
    222:7, 222:9,
    226:16, 231:4,
    231:23, 232:3,
    232:9, 232:13,
    232:14, 232:18,
    232:22, 233:18.
tomorrow. 225:17.
took 40:16, 74:6,
    75:12, 89:15,
    89:25, 90:14,
    90:20, 90:23,

96:21, 99:4,
    103:9, 103:14,
    103:20, 104:11,
    104:19, 105:19,
    105:20, 113:13,
    164:11, 172:2,
    188:17, 188:21,
    197:2, 201:9.
tool 137:13.
tools 137:12,
    159:8.
top 8:6, 9:18,
    104:1, 187:17.
topic 65:4.
topics 17:24.
total 165:17,
    168:12.
totality 55:5.
totally 102:9.
Touch 7:14, 7:15,
    40:5, 57:15,
    93:11, 98:22,
    107:2, 108:15,
    132:9, 180:20,
    182:3, 204:11,
    221:17.
toward 129:4.
towers 154:6,
    174:7, 176:7,
    197:11, 197:15,
    202:8, 203:4,
    203:17, 203:24,
    206:3, 206:5,
    207:19, 210:17.
tox 40:25, 43:24.
toxic 14:17,
    124:3.
toxicologic 53:1.
toxicologist 13:20,
    13:22, 13:24,
    13:25, 14:2,
    14:3, 14:9,
    14:13, 14:14,
    14:15, 15:19,
    16:8, 16:12,
    54:16, 56:2,
    62:17, 62:22,
    66:7, 73:13,
    73:14, 74:3.
trachea 52:20.

track 189:17.
trackers 137:16.
tract 56:21.
traffic 203:21,
    203:22.
trained 102:20.
training 4:9,
    19:17, 21:24,
    22:4, 43:5, 46:9,
    47:1, 60:5,
    100:5, 100:25,
    101:4, 116:10.
transcript
    233:24.
transferred
    77:11.
transmitting
    154:22.
transported
    40:12.
transposed 157:6.
Trappe 172:17,
    204:22, 204:24,
    205:3, 205:5,
    205:11, 205:16,
    205:18, 208:14,
    208:16, 213:6,
    225:13.
trauma 47:4, 49:18,
    49:22, 50:21,
    51:3, 55:18.
travel 122:9.
traveling 206:17.
treat 4:24, 20:15,
    82:11.
treating 125:18.
treatment 10:19.
Trial 1:18, 3:13,
    33:6, 57:18,
    132:12, 146:16,
    200:19, 220:20,
    220:23, 220:25,
    221:12, 221:15,
    221:18, 221:19,
    221:24, 222:3,
    223:11, 233:3,
    233:10.
Trick 187:11,
    187:17.
Tried 71:17, 83:18,

98:4, 98:5,
113:1.
trouble 43:14,
233:17.
Trucks 187:11,
187:17.
True 35:16, 58:11,
72:20, 72:24,
73:1, 73:4,
129:18, 216:19.
truly 26:9.
truth 86:23, 86:25,
87:1, 224:10,
228:8.
Try 3:6, 29:1,
36:8, 50:13,
71:18, 107:9,
120:12, 181:19,
220:1.
trying 83:4, 83:12,
123:6, 181:18,
223:14.
Tsapls 4:1.
tube 50:14.
Tuesday 221:2,
221:3, 233:11.
Turn 145:14,
145:23, 157:22,
227:11, 231:13.
turned 214:15.
Turning 26:25,
27:3, 28:8,
28:15, 29:9,
126:10, 127:22.
twice 121:19.
two-step 27:20.
two-thirds 18:17.
Two. 97:6, 171:3.
type 18:4, 31:10,
31:13, 31:25,
130:8, 153:18.
types 130:4,
155:19.
typical 22:19,
135:9, 137:2.
typically 21:18,
30:2, 33:14,
36:21, 36:25,
51:13, 56:16,
70:12, 74:11.

typing 108:22.
typos 3:2.
.
.
< U >.
ultimate 75:13.
ultimately 54:7,
90:13.
un-tampered
121:16.
unable 98:5.
unavailable
232:3.
unclear 223:5,
223:8.
undergrad 47:20.
undergraduate
46:10, 47:20.
underneath 184:7.
understand 7:4,
33:7, 60:22,
64:1, 72:17,
91:25, 95:7,
201:3.
Understanding
204:6, 223:11,
225:6, 225:9,
225:22.
Understood 84:23,
134:15.
underwent 115:25.
undetermined 61:20,
61:21, 62:6.
unfortunately
230:4.
uniform 85:10.
unique 15:3,
152:25.
unit 77:10, 77:16,
77:18, 90:24,
91:7.
United 1:1, 1:5,
1:20, 47:9,
115:7.
units 78:15,
80:12.
universities
17:5.
University 4:11,
15:25, 17:7,

46:11, 115:24.
unknown 61:25.
Unless 153:14.
unlike 22:9, 77:20,
214:21, 225:25.
unrelated 130:9.
unreliable 32:8.
unresponsive 11:15,
22:7.
until 2:23, 57:11,
81:9, 81:15,
82:10, 82:12,
89:15, 118:9,
124:15, 150:13,
150:16, 151:12,
222:9, 224:2,
232:19.
unusual 18:4,
176:2.
up. 224:18.
updated 156:7,
156:8.
upload 159:21.
upper 52:19,
101:8.
upset 83:1, 83:5,
83:11, 87:21,
88:2, 88:3,
100:12, 102:10.
upstairs 105:5,
113:1.
urinary 53:6.
usage 64:22, 66:13,
66:15, 66:16,
99:25.
user 137:25.
uses 21:8, 27:14,
28:4, 155:22.
Using 20:20, 21:25,
22:5, 22:6, 43:2,
43:6, 63:5,
63:19, 64:19,
65:9, 136:2,
136:19, 154:8,
154:10, 180:10,
195:14, 199:16,
202:16, 212:21,
227:19.
usual 15:8.
utilized 191:18,

192:24, 215:10,
215:20.
.
.
< V >.
V-i-n-c-e-n-t-i
45:19.
valuables 90:20.
value 89:13, 89:22,
89:25, 219:6,
219:18, 219:24.
van 135:16.
variety 51:17,
51:21.
various 73:10,
212:10.
vary 41:25.
vault 117:18,
117:20, 118:7,
118:11, 124:15,
124:17, 126:5,
126:17, 128:11.
vehicle 135:16,
137:11.
vehicles 137:15,
137:16.
vein 37:19, 38:14,
38:24, 43:19,
43:21, 69:20,
70:21, 73:5.
veins 70:15.
verdict 3:1, 57:25,
58:7, 58:8,
132:19.
verify 215:10,
217:24, 220:1.
Veronica 149:12,
149:17.
versatile 135:3,
137:13.
version 98:21,
111:21.
versus 36:1, 38:6,
40:8.
veterinary
125:17.
vial 128:1.
Victor 147:8.
view 10:24, 44:8,
148:24, 199:22.

viewing 145:9.
Vincenti 23:18,
23:19, 23:21,
26:2, 26:8,
26:11, 45:6,
45:10, 45:18,
45:25, 48:11,
48:15, 48:16,
48:18, 234:25.
violent 31:25.
Virginia 16:2,
16:4, 116:19,
134:9.
virtue 111:23.
visible 44:16,
50:21.
visit 141:14.
visually 24:7.
vital 5:16, 6:5,
6:7.
Voice 148:9,
151:18, 151:20,
151:23, 151:25,
185:15, 185:16,
186:7.
Voir 19:9, 19:10,
48:13, 117:7,
117:8.
volatilized
122:8.
vomit 56:8, 80:25,
96:6, 96:17,
96:25, 97:25.
vomited 96:21,
96:22, 96:23,
98:19.
vomiting 11:14,
21:14, 36:19,
36:24.
vs 1:9.
.
.
< W >.
Wait 3:3, 57:11,
118:21, 223:24,
224:2, 233:3.
waiting 219:1.
wake 98:4, 98:5,
98:6, 112:23.
waking 22:1, 22:5,

22:7, 43:7,
56:12.
walked 85:19,
85:20, 105:14.
wall 144:21,
146:5.
wallet 89:16, 90:2,
90:5, 90:6,
90:9.
wanted 24:14,
24:15, 81:15,
82:11, 123:2,
228:21, 233:5,
233:8.
wants 108:5.
warrant 140:5,
143:12, 144:10.
Washington 48:4,
48:6, 203:19.
watch 90:4, 132:16,
232:1.
water 135:3,
176:3.
ways 22:12,
33:15.
wear 35:18.
weather 221:4,
221:5.
week 233:11.
weeks 113:13.
weigh 108:5.
weighed 50:6,
52:17, 52:18,
93:16.
weighing 108:3.
weight 52:15.
welfare 99:7,
99:17, 100:2.
Wendy 187:11.
West 116:19.
Whatever 11:3,
73:16, 77:21,
77:23, 108:5,
111:23, 210:14,
223:18, 224:4,
224:5.
whatsoever 11:22,
222:5.
whenever 217:18.
Whereas 33:21.

Whether 12:12,
   39:13, 40:4,
   40:8, 40:18,
   44:11, 54:14,
   73:17, 73:18,
   74:4, 74:5,
   101:1, 104:12,
   105:21, 122:16,
   127:12, 151:15,
   166:7, 230:22,
   232:16.
whoever 208:15.
whole 109:24,
   116:6, 224:11.
whom 14:4, 139:11,
   185:18.
William 7:2, 33:5,
   60:19, 91:23,
   201:1.
William C. Brennan,
   Jr. 1:37.
Wilson 78:17,
   82:16, 82:23,
   82:24, 83:23,
   85:7, 85:15,
   86:4, 87:8,
   88:11, 88:17,
   89:7, 90:20,
   99:18, 99:21.
wish 4:24.
Withdraw 87:25,
   110:25.
Withdrawn 88:1,
   111:5.
within 19:20,
   19:24, 22:25,
   29:14, 30:4,
   30:5, 30:9,
   32:14, 40:2,
   40:12, 40:18,
   55:5, 67:21,
   67:24, 80:9,
   117:11, 128:4,
   159:21, 197:25,
   207:22, 208:4,
   208:9, 208:16,
   209:10, 209:16,
   210:22, 211:1,
   217:12, 229:21,
   230:1.

Without 56:21,
   58:19, 127:15,
   227:9.
witnesses 19:12,
   231:7, 231:21,
   231:22, 232:2,
   232:6, 232:11,
   232:19, 232:21,
   233:3.
woke 102:10,
   102:12.
wondering 232:15.
word 96:21, 159:23,
   159:24, 204:19.
words 26:13,
   229:17, 232:2.
work 4:25, 5:1,
   5:2, 5:4, 14:8,
   18:2, 46:15,
   52:23, 52:25,
   77:4, 77:6,
   134:12, 134:18,
   134:24, 135:2,
   135:5, 137:2,
   147:19, 147:20,
   159:2, 201:13,
   201:16, 224:17.
work. 224:25,
   225:2.
worked 77:10,
   112:13, 134:17,
   134:19, 136:9,
   147:21.
working 5:8, 67:6,
   67:7, 78:4,
   80:14, 135:9,
   135:10, 136:24,
   139:23, 140:6,
   147:24.
works 66:21,
   136:22, 136:23,
   201:14.
worksheet 119:17,
   119:22.
wrist 50:24.
write 12:13, 109:1,
   145:25.
writing 97:9.
written 8:25, 34:5,
   48:25, 105:20,

   109:2, 109:6,
   109:7.
wrote 112:8,
   113:4.
.
.
< Y >.
year 4:12, 16:24,
   18:8, 77:13,
   136:11, 141:8.
years 16:20, 18:7,
   18:10, 46:4,
   50:5, 77:6, 77:8,
   77:11, 77:12,
   82:9, 85:6, 95:6,
   95:24, 115:11,
   115:20, 116:4,
   134:7, 134:20,
   134:25, 136:9,
   136:24, 137:6,
   138:5, 139:17,
   147:22, 158:24.
yellow 145:23,
   169:14, 179:3,
   183:10, 183:18,
   186:22, 189:8,
   190:15, 211:15,
   212:15.
yesterday 2:15,
   57:9, 226:18,
   232:2.
York 115:24.
young 50:4, 81:14,
   83:19, 84:23.
younger 82:8.
yourself 174:19.
yourselves 57:11,
   132:8, 182:2.
.
.
< Z >.
zoom 172:8,
   205:12.
zooming 172:4.