```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
2                      NORTHERN DIVISION

3   UNITED STATES OF AMERICA,   :   CRIMINAL NO.:

4          Plaintiff,           :   JKB-10-0271

5      vs.                      :

6   PATRICK FITZGERALD SWEENEY, :   Baltimore, Maryland

7          Defendant.           :   April 11th, 2012

8
            *   *   *   *   *   *   *   *   *   *   *
9
        The above-entitled case came on for trial before the
10
    Honorable James K. Bredar, United States District Judge.
11
            *   *   *   *   *   *   *   *   *   *   *
12

13                      A P P E A R A N C E S

14

15  For the Government:

16      Deborah A. Johnston, AUSA

17      Arun G. Rao, AUSA

18  For The defendant:

19      William C. Brennan, Jr., Esquire

20      Brett J. Cook, Esquire

21

22

23

24  Christine T. Asif, RPR, CRR

25  Official Court Reporter
```

```
 1                    P R O C E E D I N G S
 2          THE COURT:  Good morning.  Be seated, please.  So
 3   yesterday after jury selection had been completed, my courtroom
 4   deputy communicated with Juror No. 1, who indicated that she
 5   had a medical appointment scheduled for Thursday at 3:00
 6   o'clock and asked to be excused from the jury in light of that.
 7   I rather summarily denied that request on the ground that a
 8   question that should have elicited an answer was put to the
 9   group during voir dire and there was no positive response.  And
10   we excused everybody else and were not in a position to fill
11   her seat, at least not so easily.  And we seemed to have some
12   acquiescence in that ruling.
13          Now this morning at about 22 minutes past 9:00
14   o'clock, my courtroom deputy received a telephone call from
15   Juror No. 1 indicating that she is having car trouble and
16   finding it difficult to get herself from Canton to the
17   courthouse, a distance of about a mile.  After some
18   conversation with my courtroom deputy, the idea of catching a
19   taxicab was floated, and is supposedly the strategy at the
20   moment.  But, frankly, I -- based on where we are in terms of
21   the schedule in this case, and our slow start, my inclination
22   is to give this about three more minutes until about 9:40, and
23   then seat Alternate No. 1 in Juror No. 1's place.  But I'm
24   happy to hear from counsel.
25          Ms. Johnston?
```

```
 1              MS. JOHNSTON:  Your Honor, I -- Court's indulgence.
 2              Your Honor, we don't have any objection to the
 3     Court's plan to replace Juror No. 1 with the first alternate.
 4     I must say, I have seen this happen before.  And it never
 5     ceases to amaze me that jurors can't wait until after they're
 6     selected to decide to tell the Court they have a medical
 7     problem or a trip they have planned.  It's not the first time.
 8     I don't know how more clearly you could have made the question.
 9              At the same time, we want jurors who are willing and
10     want to serve.  And, given these two, first the doctor's
11     appointment and now the car problem, we have no problems
12     replacing her with the first alternate.
13              THE COURT:  Thank you.
14              MR. BRENNAN:  We'll defer to the Court, Your Honor.
15     I guess which is a nice way of saying we don't really object.
16              THE COURT:  All right.  We'll see what happens here
17     for a few minutes.  Anything else to be taken up outside the
18     hearing of the jury, Counsel?
19              MS. JOHNSTON:  No.  We've shown counsel some boards
20     that we've had made with some of the exhibits.  We had e-mailed
21     those to them Monday.  In addition to that, they have the
22     individual -- the boards have individual exhibits on them.  So
23     they already have copies of those exhibits.  So, we've given
24     them to them.  If there are any issues with them I think they
25     will be raised at an appropriate time.
```

1          THE COURT:  These demonstrative exhibits, you're

2    going to use them during opening statement or during witness

3    examination or what?

4          MS. JOHNSTON:  Your Honor, these are going to be --

5    we are actually going to have them marked as exhibits.  They

6    have photographs on them and charts.  They will be not as

7    demonstrative but as the actual evidence.

8          THE COURT:  As the actual exhibits.

9          MS. JOHNSTON:  Yes.

10          THE COURT:  Okay.  Looking at one of them, which

11    seems to be on display, it's going to be hard -- well, I am

12    going to want you to turn it around.  But, while I can see it,

13    it's going to be hard to read that, isn't it?

14          MS. JOHNSTON:  Your Honor, one of the -- I would hope

15    not.  But one of the problems with using the smaller one, we

16    can't get the whole chart on the DOOR system.  You have to scan

17    back and forth to it.  So, I think it will be easier for a jury

18    to follow it when they're looking at the whole thing.

19          THE COURT:  So, where are you going to put it for

20    them to follow it?

21          MS. JOHNSTON:  On an easel in front of the jury

22    someplace.

23          THE COURT:  Yeah.  We have to sort that out.  The

24    problem is I need to be able to see what you're doing while

25    you're displaying it to the jury.

```
 1              MS. JOHNSTON:  I don't know.  I've not tried a case

 2   in this courtroom before, so I'm not sure what to expect.  And

 3   we have some of the photographs there.  And the Court has the

 4   individual exhibits in its book.

 5              THE COURT:  Including copies of the big charts?

 6              MS. JOHNSTON:  Not of the chart as it exists.  I can

 7   get the Court a copy of the chart as it exists so that the

 8   Court can have a paper copy of the chart.

 9              THE COURT:  And what about counsel?

10              MS. JOHNSTON:  Counsel has electronic copies of the

11   chart.

12              THE COURT:  Yeah.  All right.  Well, if you can get

13   me a small version of it so I can follow along, and don't

14   necessarily have to be looking at the same thing the jurors are

15   looking at, and still am able to track what you're doing,

16   that's acceptable.

17              MS. JOHNSTON:  We will make arrangements to do that.

18              THE COURT:  We just can't have a situation where I

19   can't see the face of a chart.  You're illustrating testimony

20   or argument with information that is on that and I can't track

21   what you're doing.

22              MS. JOHNSTON:  Your Honor, and I know with the two

23   witnesses, the first two witnesses this morning, we have five

24   photographs that are from the crime scene that are on the

25   chart.  But they are in your book, as well.
```

```
 1              THE COURT:  Yeah.  And marked in a way that it's easy
 2    for me to follow what you're doing, right?
 3              MS. JOHNSTON:  Exactly.  So, if we refer to P2, the
 4    Court will be able to look at P2, which is on the chart, but
 5    also in your book.
 6              THE COURT:  And will that be the document camera,
 7    too?  Or -- you don't have to.  I was just asking.
 8              MS. JOHNSTON:  We were going to use it just on the
 9    board, I believe.
10              THE COURT:  That's fine.  Okay.  Anything else?
11              MR. BRENNAN:  Your Honor, at -- there are two
12    witnesses that we believe will be offering some hearsay of the
13    deceased, Mr. Harrison Waite.  I spoke to counsel about it and
14    government counsel suggested just before that witness is called
15    might be the appropriate time to address that issue.  But what
16    it will be, Your Honor, is certain statements made by the
17    deceased that they intend to offer in through Ms. Ashley Smith
18    and through Mr. Michael Toszer.  So, at some point the Court
19    will have to rule on that.
20              THE COURT:  All right.  What's the government's
21    theory on the admissibility of the statements?
22              MS. JOHNSTON:  Your Honor, it's our position that
23    those statements are admissible under Rule 803 subsection C as
24    statements of mental and emotional and existing state of mind.
25    The statements that will come up with our second witness,
```

1    Ashley Smith, Ms. Smith was with Harrison Waite.  Mr. Waite and

2    Ms. Smith went out to dinner.  While they were out to dinner,

3    Mr. Waite received telephone calls that later will be

4    demonstrated to have come from Mr. Sweeney's phone.

5              As a result of those calls, Mr. Waite asked Ms. Smith

6    was it okay if they drove by Mr. Sweeney's parent's house

7    because he had to pick up some pills for Mike.  And Mike is his

8    coworker.  As a result of that -- and Ms. Smith said she told

9    him yes.

10             Mr. Waite then drove Ms. Smith's car over to Mr.

11   Sweeney's parent's house.  When they arrived out front of the

12   house, Mr. Waite asked Ms. Smith or said to Ms. Smith that he

13   didn't have anything to put the pills in, did she have anything

14   with her.  She gave him, handed him then, a prescription bottle

15   that she had finished the prescription that was in it.  So, it

16   was an empty prescription bottle.

17             He took that.  He crossed out her personal

18   information on it and took that with him to obtain the drugs

19   from Mr. Sweeney.  That pill bottle is later recovered in Mr.

20   Waite's bedroom with the remainder -- with some heroin in it.

21   So, it would be his statement to her, or asking her, was it all

22   right if they stopped by on their way home; stopped by Mr.

23   Sweeney's parent's house so he could meet with Mr. Sweeney to

24   pick up some pills for Mike.

25             And then the second statement would be his statement

1    asking her for the pill -- for something to put the pills in.

2    And she gave him her empty prescription bottle.  So, those

3    would be the statements.

4           We believe that one theory for their admissions is

5    under Rule 803(3).  And that is that it would show his then

6    existing state of mind; that it was his intent to go to meet

7    with Mr. Sweeney to obtain those pills.  And then to -- that he

8    intended -- or, took from her that pill bottle, and for the

9    purpose of placing the pills in it.  So, that --

10          THE COURT:  Well, I have a more fundamental question.

11   And that is:  What's the truth of the matter asserted in those

12   two comments?

13          MS. JOHNSTON:  Your Honor, that would -- the truth of

14   the --

15          THE COURT:  I'm not sure it's hearsay.

16          MS. JOHNSTON:  That would be another basis.

17          THE COURT:  Let me hear from Mr. Brennan.  I'm not

18   going make you defend his position.

19          How is it hearsay?  What's the --

20          MR. BRENNAN:  Mr. Cook and I -- it's his --

21          MR. COOK:  Geographically, I'll -- he doesn't want to

22   do it.  I'll do it.

23          THE COURT:  I like to do that with my clerks.

24   Unfortunately you can't do it in the courtroom.  You can pull

25   it off in chambers.  Mr. Cook.

1         MR. COOK:  Well, I think that for two reasons it

2  could be hearsay.  One is that what it's being offered to prove

3  is that Harrison --

4         THE COURT:  It's not what it's offered to prove; it's

5  what's asserted.

6         MR. COOK:  What's asserted -- the truth -- that

7  Harrison Waite was going to Patrick Sweeney's house, or Patrick

8  Sweeney's dad's house.

9         THE COURT:  Okay.  Let me hear the statement again as

10  you think you're going to offer it.

11         MS. JOHNSTON:  Your Honor, Ms. Smith is going to say

12  they were out to dinner.  Mr. Waite received some phone calls.

13  After those phone calls, he asked her was it all right if they

14  stopped by Pat's -- referring to Patrick Sweeney's father's

15  house.  Mr. Waite needed to see Mr. Sweeney to pick up some

16  pills for Mike.

17         THE COURT:  I don't think it's hearsay.  I don't see

18  how -- first of all, it's -- you're not attacking -- the way to

19  think about these kind of problems, I think, is let's suppose

20  you have the decedent alive and sitting here and you want to

21  cross-examine him.  What's the cross-examination sound like?

22         MR. COOK:  Mr. Brennan just brought up a point.  It

23  would be the cross-examination would focus on his intent of why

24  he was going to Patrick Sweeney's house.  Which in this

25  statement is to buy pills for his friend Mike.  So, I guess

1   there's really two hearsay issues:  One is the truth of the

2   matter asserted that he went to Patrick -- he was going to go

3   to Patrick Sweeney's house; and that he was going to buy pills

4   at Patrick Sweeney's house.

5           THE COURT:  Well, all right.  I'll think about that

6   one.  I'm not convinced.

7           But let's turn to 803(3), which is the premise that

8   the government says it's admissible even if it is hearsay:  A

9   statement of the declarant's then existing state of mind, such

10  as motive, intent, or plan, or emotional, sensory, or physical

11  condition such as mental feeling, pain, bodily health, but not

12  including a statement of memory or belief to prove the fact

13  remembered or believed unless it relates to the validity or

14  terms of the declarant's will.  And this is 803, so it doesn't

15  really matter whether the declarant is available or

16  unavailable.

17          Even if it's hearsay, why isn't it classic state of

18  mind?  He's telling what his plan is.

19          MR. COOK:  That's maybe a harder question to answer.

20          THE COURT:  I'm not going to make you answer it.  I'm

21  comfortable that, if it is hearsay, it's clearly admissible

22  under 803(3) as proffered.  We'll have to see how it actually

23  happens during the trial.

24          I'm still not convinced it's hearsay.  But I admit

25  I'm having a little bit of a harder time on that side of it.

1      You know, the truth of the matter asserted, he's

2  going to the house to get pills.  Maybe that's implicit.  So

3  maybe it is.  But even if it is hearsay, it clearly is

4  admissible under the exception at 803(3).

5      All right.  Well, I've stalled as long as I can here.

6      MR. BRENNAN:  I can think of more evidentiary

7  objections --

8      THE COURT:  Well, we could get Judge Grimm up here

9  and just have a sort of general conversation about the Rules of

10 Evidence; that will kill another half hour for sure.  But we're

11 not going to do that.  We're 20 minutes behind as it is.

12 That's it.  Bring them in.

13     Maybe you'll find her back there.  If she's not

14 there, tell Alternate No. 1 to take the No. 1 seat and

15 Alternate 2 to take Alternate No. 1's seat.  If she is there,

16 don't say anything.

17          (Jury entered the courtroom.)

18     THE COURT:  Be seated, please.

19     Good morning ladies, and gentlemen.

20     JURORS:  Good morning.

21     THE COURT:  We're slightly late in starting this

22 morning.  I had a couple of matters I needed to take up with

23 the lawyers before we began.  But we got that taken care of.

24     You'll notice, ladies and gentlemen, that when you

25 entered the courtroom this morning everyone is on their feet

1    including me.  And that's a little bit of symbolism that we

2    engage in here.  It's acknowledging the fact that you've now

3    been sworn as a jury.  You're not just the 14 individuals that

4    you were yesterday, but you are the jury empanelled in this

5    case and sworn to serve and ultimately deliver the verdict

6    here.

7          As such, you are really the -- you perform the

8    highest function in our justice system.  And, so, as a measure

9    of respect for you as jurors, everybody stands when you leave

10   the courtroom, and when you enter, including the judge.

11         I'm going to begin with some preliminary instructions

12   to you, and then we will begin the trial.

13         In this case, at the government's request, a grand

14   jury has charged The defendant, Patrick Fitzgerald Sweeney,

15   with commission of the following crimes:  First, Possession of

16   heroin on or about March 23rd, 2009, with intent to distribute

17   it.  Second, distribution of heroin on or about March 23rd,

18   2009, with death resulting from its use.  Third, use of a

19   cellular telephone between on or about March 18th, 2009 and on

20   or about March 23rd, 2009 in the commission of a felony,

21   to-wit -- which means specifically -- distribution of heroin.

22   The fourth accusation, which is actually set out in the fifth

23   count of the indictment, is the use of a cellular telephone

24   between on or about February 15, 2009 and on or about March 10,

25   2009 in the commission of a felony, to-wit, distribution of

1   heroin.  And the fifth count -- and the fifth accusation, which

2   is set out in the 7th count, use of a cellular telephone in or

3   about December of 2008 in the commission of a felony,

4   specifically distribution of heroin.

5          The defendant pleads not guilty.  And thus, he may

6   not be convicted on these charges unless and until, after a

7   trial, you, the jury, unanimously find him guilty beyond a

8   reasonable doubt.

9          The trial will proceed in the following way.  Each

10  party has the right to make an opening statement for the

11  purpose of outlining for you what that party expects to prove.

12  The government's lawyer will make the first opening statement,

13  and then The defendant's lawyer may choose whether to make an

14  immediate opening statement, to wait to make an opening

15  statement later in the trial, or to make no opening statement

16  at all.

17         The government will then present evidence.  After its

18  case has been presented through witnesses and exhibits, then

19  The defendant will have an opportunity to present evidence if

20  he wishes.  He's not required to do so.  If The defendant

21  elects to present evidence, then the government will be given

22  an opportunity to present rebuttal evidence in reply.

23         Each witness is first examined by the party who calls

24  the witness to testify.  And then the opposing party is

25  permitted to cross-examine the witness.

1          During the trial the lawyers may make objections to

2     the introduction of evidence or may make motions concerning the

3     law.  Arguments in connection with objections or motions are

4     usually made out of the hearing of the jury, either here at the

5     bench or after the jury has been excused from the courtroom.

6     This is because questions of law and admissibility of evidence

7     do not involve the jury.  They're decided by the judge.

8          It is the duty of a lawyer to make objections and

9     motions that the lawyer believes are proper.  You should not be

10    influenced by the fact that a lawyer has made objections or by

11    the number of objections that have been made.  You should draw

12    no conclusions from my rulings either as to the merits of the

13    case or as to my views regarding any witness or the case

14    itself.

15         After the conclusion of all of the evidence, the

16    lawyers will make their closing arguments.  In their arguments

17    the lawyers will point out to you what they contend the

18    evidence has shown and the conclusions they would like you to

19    draw from the evidence.  The government's lawyer will make the

20    first closing argument, and then The defendant's lawyer will

21    make a closing argument after that.  After The defendant's

22    argument the government will have an opportunity to make a

23    final argument in rebuttal to The defendant's argument.

24         What the lawyers say in their opening statements, in

25    their closing arguments, and in making objections and motions

1   during the trial is not evidence.

2          The reason the government goes first in each instance

3   is -- and the reason that the government is allowed rebuttal

4   time in closing argument -- is because the government has the

5   burden of proof.

6          After the conclusion of all of the evidence I will

7   instruct you as to the law applicable to this case.  You must

8   follow and apply the law as I will explain it to you.

9          After my instructions you will retire to the jury

10  room and begin your deliberations.  It will then be your

11  function and responsibility to decide the facts.  You must base

12  your findings only upon the testimony, the exhibits received,

13  the stipulations of the parties, and any conclusions that may

14  fairly be drawn from that evidence.

15         You may not conduct any independent research, either

16  by using printed materials or electronic means, such as the

17  Internet, about this case, its general or specific subject

18  matter, or anyone connected with the case.  Do not visit the

19  scene of any incident mentioned in the testimony or seek advice

20  from friends or acquaintances as to any issues in this case or

21  otherwise conduct investigation outside the courtroom.

22         The reason for this is that you must decide the case

23  only on the evidence you have heard and seen in the courtroom

24  and on nothing else.  To reiterate, ladies and gentlemen, it

25  would be a violation of your oath as jurors if during the trial

1    you were to, say, conduct a Google search concerning a person

2    or a subject that is a part of this trial.  Please don't do it.

3    Similarly, it would be improper for you to use an encyclopedia

4    to learn more about an issue before you.  Or even to look up in

5    a dictionary a word that you hear in the courtroom.  You must

6    decide the case on information presented to you here in court,

7    and not based on information that you acquire elsewhere.

8            The following general principles are intended to

9    assist you in judging the evidence and to guide you in the

10   performance of your duties as jurors during the course of the

11   trial.  You are the sole judges of whether testimony should be

12   believed.  In making this decision you may apply your own

13   common sense and everyday experiences.

14           In determining whether a witness should be believed

15   you should carefully judge all the testimony and evidence and

16   the circumstances under which each witness has testified.

17   Among the factors that you should consider are the following:

18   First, the witness's behavior on the stand and way of

19   testifying.  Second, the witness's opportunity to see or hear

20   the things about which testimony was given.  Third, the

21   accuracy of the witness's memory.  Fourth, whether the witness

22   had a motive not to tell the truth.  Fifth, whether the witness

23   has an interest in the outcome of the case.  Sixth, whether the

24   witness's testimony was consistent.  Seventh, whether the

25   witness's testimony was supported or contradicted by other

1    evidence.  And, eighth, whether and the extent to which the

2    witness's testimony in the court differed from the statements

3    made by the witness on any previous occasion.

4         You need not believe any witness even though the

5    testimony is uncontradicted.  You may believe all, part, or

6    none of the testimony of a witness.

7         You must consider and decide this case fairly and

8    impartially.  You should not be prejudiced for or against any

9    person because of that person's race, color, religion, age,

10   political or social views, wealth or poverty.  You should not

11   even consider such matters.

12        You should not conclude from any conduct or words of

13   mine that I favor one party or another, or that I believe or

14   disbelieve the testimony of any witness.  You, not I, are the

15   sole judges of the believability of witnesses and the weight of

16   the evidence.  You must not be influenced to favor or oppose

17   any person or party by my conduct during the course of the

18   trial.

19        This case will take approximately four days, maybe

20   five, to conclude, counting yesterday.  During that period

21   there will be recesses and adjournments of court when you will

22   be excused.  From this point forward until the case is over and

23   you've rendered your verdict, you may not discuss the case with

24   anyone who's not on the jury.  You may not discuss the case

25   even with each other during the trial.  You must wait until

1  after you have heard all of the evidence, closing arguments,

2  and my instructions on the law.

3          You may not expose yourself to any news articles or

4  reports that touch upon this case or issues it presents or

5  involving any of the participants in the case.

6          In fairness to both of the parties to this case, the

7  government and The defendant, you should keep an open mind

8  throughout the trial.  You should reach your final conclusions

9  only during your deliberations after having heard all of the

10  evidence, my instructions as to the law, and the lawyers'

11  closing arguments.  Until the trial is over you must avoid all

12  contact of any kind with any of the participants in the trial

13  except for common courtesies such as the exchange of greetings.

14  That includes the parties, the lawyers, the witnesses, and any

15  persons whom you see in close contact with those individuals.

16          Please remember that you must not use the Internet or

17  any device to communicate with anyone about the trial while you

18  are serving as jurors.  During recesses when you are outside

19  the courtroom you may turn on your cell phone or other device

20  and contact family members or others about matters that have no

21  relation to the trial.  While we are in the courtroom, however,

22  as I instructed you yesterday, all electronic device must be

23  turned off, not merely placed in silent or vibrate mode.  All

24  such devices must be turned off and may not be used while the

25  jury is deliberating upon its verdict.

1          If anyone needs to deliver an urgent message to you

2     while we're in the courtroom, that person may do so by

3     contacting my chambers.  And I think that telephone number was

4     provided yesterday to each of you.  And my staff will relay the

5     message to you.

6          These restrictions are necessary, ladies and

7     gentlemen, to ensure a fair trial.

8          Now we're ready to begin.  And, Mr. Rao, is the

9     government -- on behalf of the government, do you wish to

10    deliver an opening statement?

11         MR. RAO:  Yes, Your Honor.  Thank you.

12         THE COURT:  You may proceed.

13         MR. RAO:  Your Honor, defense counsel, ladies and

14    gentlemen of the jury, this is a case about the serious real

15    world consequences of drug dealing.  What sometimes happens is

16    that a user of drugs can overdose.  And sometimes a user of

17    drugs can pay the ultimate price.  Sometimes a life is lost as

18    a result of the use of drugs.

19         And on March 23rd, 2009 that's exactly what happened.

20    On March 23rd, 2009 The defendant, Patrick Sweeney, distributed

21    some heroin.  He distributed some heroin to his girlfriend's

22    son, a man named Harrison Waite.  And Mr. Waite used that

23    heroin and he died as a result.

24         Now, in the coming days you're going to hear some

25    details about The defendant's drug dealing activities back in

1   2008 and 2009.  You're going to hear from a man named Michael

2   Toszer, who was a coworker of Harrison Waite.  He was a

3   coworker of Harrison Waite back in 2008 and 2009.  And along

4   with Harrison he arranged some drug deals with The defendant.

5   He arranged those drug deals over the telephone, and then he

6   obtained heroin directly from The defendant.

7            You're also going to hear from The defendant's

8   girlfriend, Ashley Smith.  You're going hear that she was with

9   Harrison when Harrison actually obtained some heroin from The

10  defendant on March 23rd, 2009.

11           You're also going to hear from Harrison's roommate,

12  Patrick Kennedy.  Mr. Kennedy, along with Ms. Smith, found The

13  defendant unconscious and unresponsive on March 23rd of 2009

14  after Harrison had overdosed on some heroin he had received

15  from the defendant.

16           Now, in this case the proof is going to show that,

17  not just on a single occasion, but on multiple occasions

18  between December of 2008 and March of 2009, the defendant,

19  Patrick Sweeney, used his cell phone to arrange the

20  distribution of heroin to users of heroin:  To Harrison Waite

21  and to his coworker Michael Toszer.  And on one occasion, March

22  23rd, 2009, the person that the defendant gave the heroin to,

23  Harrison Waite -- Harrison Waite, who was the son of the

24  defendant's girlfriend -- died after using that heroin.  The

25  same heroin that he had received from that defendant earlier

1  that same day.

2           Now, the evidence in this case will establish on the

3  evening of March 23rd, 2009 some emergency personnel responded

4  to a 911 call.  It was a 911 call to a residence in Breezy

5  Point, which is a neighborhood up on a hill in Chesapeake

6  Beach, Maryland, which is located in Calvert County.

7           Upon arrival to the scene EMT officers, EMT first

8  responders, found Harrison Waite in his room, and he wasn't

9  responding in any way.  And later that night he was declared

10 dead at the Calvert Memorial Hospital in Calvert County.

11          And an autopsy was performed by the Office of the

12 Chief Medical Examiner for the State of Maryland and they

13 determined that the cause of death was heroin intoxication.

14          You're going to hear from some of Harrison's close

15 friends, this includes Ashley Smith, his girlfriend, Patrick

16 Kennedy, his roommate, and they're going to tell you about what

17 happened on the night of his death.  You're going to hear that

18 Ms. Smith, the victim's girlfriend, and Harrison went out to

19 dinner together that evening.  On the way home Harrison told

20 Ms. Smith he had to pick something up from the defendant.  And

21 so they drove to the defendant's parent's house.  And at that

22 location Harrison met with the defendant.

23          Before meeting with the defendant Harrison asked his

24 girlfriend, Ashley Smith, for a pill bottle, an empty pill

25 bottle.  Shortly thereafter, Harrison and Ms. Smith returned

1    home to the home in Breezy Point.  That was a home where

2    Harrison was living with Patrick Kennedy.  Harrison was renting

3    a room in the basement of that home.

4          They went back home.  You'll hear that Harrison

5    rubbed a little cocaine on his gums; that his girlfriend,

6    Ashley Smith, used a little cocaine; they had sex; and then

7    they watched a movie.  At some point in the evening, Ms. Smith

8    went upstairs to make a phone call on her cell phone.  And she

9    came back down a little while later and saw that the defendant

10   was unresponsive.  He was face down on the bed asleep.

11         Ms. Smith fell asleep, and she got up a little while

12   later.  She noticed that Harrison wasn't snoring, and that he

13   hadn't moved at all.  And then to her shock, to her horror, she

14   found that he was blue; that vomit was coming out of him.

15   There were some efforts to revive him after 911 was called, but

16   those were unsuccessful and he was pronounced dead, again at

17   Calvert Memorial Hospital, later that night.

18         So, the autopsy that was conducted by the Office of

19   the Medical Examiner revealed that the cause of Harrison's

20   death was heroin intoxication.

21         The police searched Harrison's bedroom later that

22   evening.  They found some drug paraphernalia in the bedroom.

23   They found a spoon and a syringe, some baggies of cocaine, and

24   a pill bottle.  A pill bottle with some heroin still inside it.

25   The same pill bottle that was empty when Ms. Smith gave it to

1    Harrison just before Harrison met with the defendant earlier

2    that evening.

3            You're also going to hear from Michael Toszer.

4    Michael Toszer was Harrison's former coworker at a local HVAC

5    company.  Mr. Toszer will testify that, between November of

6    2008 and March 23rd of 2009, he spoke with the defendant on

7    several occasions.  And he made arrangements to purchase heroin

8    from the defendant for his own personal use.  Specifically,

9    he's going to testify that he called the defendant on his cell

10   phone to make arrangements to pick up heroin on several

11   different occasions in December of 2008, and also again a few

12   weeks before Harrison's death in March of 2009.

13           Mr. Toszer will testify that he first met the

14   defendant through Harrison in November of 2008.  And that he

15   and Harrison drove around with the defendant when the defendant

16   attempted to obtain some drugs for them, but they weren't

17   successful that time.

18           Mr. Toszer will also testify that on that occasion in

19   November of 2008 he got the defendant's cell phone number and

20   that he began to communicate directly with the defendant to

21   obtain heroin directly from the defendant.  And that he did, in

22   fact, purchase heroin from the defendant on a number of

23   different occasions.

24           Mr. Toszer will also testify that on March 23rd of

25   2009 arrangements had been made for Harrison to obtain heroin

1    from the defendant for Harrison and Toszer to share.  You're

2    going to see telephone records which are going to corroborate

3    the contact between the defendant, between Harrison, between

4    Toszer, during the months leading up to Harrison's death on

5    March 23rd, 2009.

6            And, so, the grand jury sitting in the District of

7    Maryland has returned an indictment charging the defendant with

8    a number of counts.  On the screen before you you see Count 1.

9    And at the end of the trial Judge Bredar's going to provide you

10   with instructions for the elements of each of the counts I'm

11   going to go over.

12           For now, with respect to Count 1, it's important to

13   know this count concerns the defendant's possession of heroin

14   on March 23rd of 2009.  Turning now to Count 2, this count that

15   you see before you concerns the defendant's actual distribution

16   of heroin on March 23rd of 2009.  It's heroin that was later

17   used by Harrison later that same evening and which later

18   resulted in his death from heroin intoxication.  The last count

19   you'll have before you is Count 3.  And this is related to the

20   two other counts the judge mentioned a moment ago.  And this

21   count and the other two counts concern the defendant's use of a

22   cell phone to arrange the distribution of heroin.

23           The count before you concerns the use of the cell

24   phone in the days leading up to Harrison's death; that he

25   knowingly used that cell phone; and that he used it with the

1    intent to commit, cause, or facilitate the commission of a

2    crime.

3          And the other two counts concern the use of the cell

4    phone between February 16th of 2009 and March 10th of 2009 and

5    the use of the cell phone back in December of 2008, all with

6    respect to the distribution of heroin.

7          And, so, the evidence in this case is going to

8    establish beyond a reasonable doubt the defendant's guilt as to

9    all the counts in this case.

10         Now, as we all know, choices have consequences.

11   Sometimes those choices are intended; sometimes they're

12   unintended.  You're here today because of a series of choices

13   that the defendant, Patrick Sweeney, made back in March of 2009

14   and in 2008.  He chose to call Michael Toszer on the telephone

15   and arrange the distribution of heroin.  He chose to distribute

16   heroin on March 23rd of 2009 to Harrison Waite.

17         Now, on the evening of March 23rd, 2009 the tragic

18   result of that choice made by the defendant, the choice to

19   distribute heroin on that day, was the death of Harrison Waite.

20         At the end of the evidence I'm going to have a chance

21   to address you again along with my co-counsel, Ms. Johnston.

22   And at that time we're going to ask that you consider the

23   evidence fairly.  We're going to ask that you rely on your

24   common sense.  And we're going to ask you to find that the

25   United States has proven beyond a reasonable doubt the

1    defendant's guilt as to all the crimes charged.

2              Thank you.

3              THE COURT:  Thank you, Mr. Rao.

4              For the defense side, opening statement?

5              MR. COOK:  Yes, Your Honor.

6              THE COURT:  Thank you, Mr. Cook.

7              MR. COOK:  Good morning, Your Honor, government

8    counsel, ladies and gentlemen of the jury.  My name is Brett

9    Cook, Bill Brennan and I represent Patrick Sweeney.

10             The government just told you that the evidence in

11   this case is going to point to Patrick Sweeney.  They told you

12   this case is about Harrison Waite's overdose.  But this case is

13   about Patrick Sweeney.  But the evidence isn't going to point

14   to him.  The evidence is going to show that no one was with

15   Harrison Waite when he injected the heroin into his vein that

16   sadly killed him that night; that no one saw him purchase

17   heroin.  No one's going to be able to come in here and say

18   where he purchased it from, when he purchased it.  That's what

19   the evidence is going to show.  And that evidence does not

20   point to Patrick Sweeney.

21             The government talked a lot about Michael Toszer,

22   Ashley Smith, Patrick Kennedy.  These are all witnesses you're

23   going to hear from.  But remember during this trial that this

24   case is about Patrick Sweeney and what Patrick Sweeney did on

25   March 23rd, 2009.

1          As members of the jury, you are the sole finders of

2     facts in this case.  Now, Judge Bredar, he's in charge of the

3     law and he'll ensure that there's a fair trial and that the

4     parties get to present their cases.  But in this country,

5     remember, the Founding Fathers wanted the nonlawyers, the

6     people who are businessmen and teachers and nurses, people that

7     weren't trained in the law, to find the facts.  To cut through

8     all the evidence and all of the arguments and figure out what

9     actually happened.  And that's your job in this case.

10          Now, don't make any mistake.  It's the government's

11     burden to prove that Patrick Sweeney is guilty beyond a

12     reasonable doubt.  This isn't a chance for him to prove

13     anything.  He's presumed to be innocent.  He doesn't have to

14     prove anything.  This is the government's chance to try to

15     prove that he's guilty beyond a reasonable doubt.

16          And most of the evidence in this case is going to

17     come right off that witness stand.  The government's going to

18     ask witnesses questions; Mr. Brennan and I are going to ask

19     witnesses questions.  But it's what the witness says in

20     response, it's their answers, that's what you have got to pay

21     attention to.  You've got to listen carefully to the witnesses

22     and think about:  Do they really remember?  Are they telling

23     the truth?  Are they exaggerating about something?  Are they

24     guessing?  Are they speculating?  Use your common sense and

25     watch them.  Because that's where most of the evidence in this

1    case is going to come from.

2           And keep an open mind.  Because, as the judge told

3    you and as you saw this morning, the government's always going

4    to go first.  They're going to give their opening statement

5    first; they're going to ask their witnesses questions first;

6    and then Mr. Brennan and I always go last.  So, keep an open

7    mind because the full story is not always going to come out in

8    the first round.

9           At the end Ms. Johnston or Mr. Rao are going to make

10   a closing argument, and Mr. Brennan is going to make a closing

11   argument, and try to summarize all the evidence for you.  But

12   what we think and what the government thinks, none of that

13   matters.  It's what you think, what you find.  And that's why

14   it's so important that you pay careful attention to all of

15   these witnesses.

16          You know, you learned yesterday how comfortable these

17   chairs are and how uncomfortable it is back there.  But you're

18   here now and some of this testimony might drag a little bit;

19   around 3:30 you might get a little tired.  But you've got to

20   stick with it and pay really close attention because this is an

21   important case.  Someone died of a drug overdose.  So, it's

22   important for the government and it's important for Mr. Sweeney

23   because his liberty is at stake.

24          So, the question and the question that should be in

25   your mind the entire time is:  What is the government proving

1    that Patrick Sweeney did?  Specifically on March 23rd, 2009,

2    what did he do; what is the proof of what he did?

3              Well, you're going to hear that Harrison Waite -- and

4    I don't mean to make light of this.  It's very serious.  But he

5    died alone in his basement of a heroin overdose.  He died

6    alone; no one was with him.  You'll hear evidence that he hid

7    his heroin habit from his girlfriend; that he hid it from his

8    mother; from his housemates; that he wasn't open with this.  So

9    he died alone of a heroin overdose in hiding.

10             You'll hear from Mike Toszer.  That's one person that

11   Harrison Waite did not hide his heroin habit from.  Mike Toszer

12   and Harrison Waite used heroin together.  Sometimes Mike Toszer

13   actually bought heroin from Harrison Waite.  And you'll hear

14   evidence that Mike Toszer knew, himself, where to go to buy

15   heroin if he wanted to get it.  You'll also hear that Michael

16   Toszer's story to different people who have asked him has

17   changed over time.  And you'll hear about that.

18             You'll hear from Ashley Smith, who was Harrison

19   Waite's girlfriend at the time of his death.  And she didn't

20   even know he was using heroin at that time.  She'll -- you'll

21   hear evidence that there was some drug paraphernalia and some

22   cocaine and needles and the spoon that Mr. Rao mentioned; that

23   some of that was during a search of Harrison Waite's basement

24   bedroom.  But she didn't know that most of that stuff was

25   there.  Ashley Smith is not going to be able to tell you where

1  Harrison Waite got the heroin from.  She'd have to guess or

2  speculate to do that.

3          She will tell you about her own drug use with

4  Harrison Waite the night he died.  And you'll also hear some

5  evidence that her story hasn't always been the same about that

6  and she hasn't always been open about that.

7          The fact is that no one knows where the heroin came

8  from that killed Harrison Waite.  There -- the evidence is

9  certainly not going to point that it came from Patrick Sweeney.

10 But remember, it's not your job to figure out where it came

11 from.  Your only job is to figure out what Patrick Sweeney did

12 on March 23rd, 2009.

13         So at the end, after all of the evidence and after

14 all of the arguments and after Judge Bredar has instructed you

15 on the law, and you're applying your common sense, you have to

16 think:  What has the government really proven through Michael

17 Toszer and his drug use, and Ashley Smith and her drug use, and

18 Patrick Kennedy, all these people, what does it really prove

19 about what Patrick Sweeney did on March 23rd, 2009?

20         Patrick Sweeney has denied that he did this.  He

21 denies that he had any -- that he ever distributed heroin to

22 Harrison Waite.  And he has pled not guilty to these charges.

23         So, at the end of this, Mr. Brennan's going to get

24 back up here and he's going to make an argument and summarize

25 the evidence for you.  And then, just as now, we're going ask

1    that you return a verdict of not guilty.

2              Thank you.

3              THE COURT:  Thank you, Mr. Cook.

4              MR. COOK:  Thank you.

5              THE COURT:  That concludes the opening statements.

6              Is the government ready to call their first witness?

7              MS. JOHNSTON:  Yes, Your Honor.  The government calls

8    Patrick Kennedy.

9              MR. BRENNAN:  Your Honor, we would invoke Rule 615 on

10   the exclusion of witnesses, if the Court please.

11             THE COURT:  Yes.  Any persons who believe that they

12   will be called to give testimony during the trial of this case

13   are now forbidden from being in the courtroom during the

14   testimony of any other person who is actually testifying.

15             And, further, any person who is a witness in this

16   case is now forbidden from discussing their testimony with any

17   other person who is testifying until the conclusion of the

18   trial.  The witness sequestration rule is in effect.

19             Counsel, I remind you that I don't recognize your

20   witnesses.  Only you do.  So, it's incumbent upon you to keep a

21   sharp eye out to make sure that a witness hasn't inadvertently

22   wandered into the courtroom when, in fact, they should be

23   outside waiting to testify.

24             And the witness is where.

25             THE CLERK:  Please raise your right hand.

Direct Examination Patrick D. Kennedy by Mr. Rao

```
1                        PATRICK D. KENNEDY,
2     called as a witness, being first duly sworn, was examined and
3     testified as follows:
4                 THE WITNESS:  Yes, I do.
5                 THE CLERK:  Please be seated.  Please speak directly
6     into the microphone.  State your full name for the record and
7     spell your last name, please.
8                 THE WITNESS:  Patrick Daniel Kennedy.  K-e-n-n-e-d-y.
9                 THE CLERK:  Just come all the way up to the
10    microphone and just talk directly into it, please, so we all
11    may hear you.  Thank you.
12                THE COURT:  Your witness, Counsel.
13                MR. RAO:  Thank you, Your Honor.
14                        DIRECT EXAMINATION
15    BY MR. RAO:
16    Q    Good morning.
17    A    Good morning.
18    Q    Mr. Kennedy, where do you live currently?
19    A    Right now I live in North Beach.
20    Q    Okay.
21                THE COURT:  Mr. Kennedy, I'm sorry to interrupt you.
22    But your voice is quiet, which is perfectly fine.  But you need
23    to move very close to that microphone if your voice is going to
24    stay at that volume.  Thank you very much.  You may continue.
25    Q    (BY MR. RAO)  And how old are you?
```

Direct Examination Patrick D. Kennedy by Mr. Rao

1    A    39.

2    Q    Are you currently employed?

3    A    Yes.

4    Q    Where do you work?

5    A    I work for an insurance repair specialist.

6    Q    What is that company?  What do they do?

7    A    Restoration work for fires, trees.  You know, storms,

8    damage, water damage.

9    Q    So, what do your specific responsibilities entail?  What

10   do you do?

11   A    I'm a carpenter.

12   Q    Did you ever know someone by the name of Harrison Waite?

13   A    Yes.

14   Q    Who was he?

15   A    He was a friend, and a roommate.

16   Q    I want to show you what's been marked on the screen to

17   your right there, Government's Exhibit P1.

18        Do you recognize the person in that photograph?

19   A    Yes, I do.

20   Q    And who is that?

21   A    It's Harrison.

22   Q    How did you meet Harrison?

23   A    Through mutual friends, hanging out.

24   Q    And when and where was that, about?

25   A    I met him at a Halloween party.  I believe it was 2008.

Direct Examination Patrick D. Kennedy by Mr. Rao

```
 1    Q    Who did you meet him through?

 2    A    Through Sara and a couple other mutual friends.

 3    Q    Who's Sara?

 4    A    Sara's my girlfriend.

 5    Q    Okay.  How long had Sara known Harrison?

 6    A    Pretty much all her -- I guess all her life.

 7    Q    Did there come a time when Harrison became your roommate?

 8    A    Yes.

 9    Q    When was that?

10    A    The beginning of 2009.  Roughly February, I think.

11    Q    Okay.  Where were you living at that time?

12    A    In Breezy Point.

13    Q    Do you recall the address of your house in Breezy Point?

14    A    4879 Ridge Road.

15    Q    What kind of a building is that?

16    A    It's a house.

17    Q    It's a house.  Okay.  Who owned the house at that time?

18    A    I did.

19    Q    Take a look at the screen again.  I'm going to show you

20    what's been marked as Government's Exhibit P9.

21         Do you recognize that photograph, what's depicted in that

22    photograph?

23    A    Yes, I do.

24    Q    What is it?

25    A    It's the front of my house.  The front and side.
```

Direct Examination Patrick D. Kennedy by Mr. Rao

1    Q     This is the house that you were living in at the time that

2    Harrison Waite became your roommate; is that right?

3    A     Yes.

4    Q     If you could, describe for the jury the layout of the

5    house.  First, as you come in through the front door, what do

6    you see?

7    A     As you come in through the front door there would be a

8    living room.  And then straight forward to the back of the

9    house would be dining room, kitchen area.

10   Q     How many bedrooms are in the house?

11   A     Four.

12   Q     And where are those bedrooms located?

13   A     Three of them were upstairs and one of them was in the

14   basement.

15   Q     Okay.  Tell us a little bit more about the basement.

16   What's the layout of the basement?

17   A     If you walked into the front door, you would go to the

18   hallway and just do a U-turn and go down to the steps and then

19   basically do another U-turn and you would be into a TV area

20   room; large basement room, you know.  And, you go to the right,

21   you go down the hallway, and then there would be a bedroom

22   there.

23   Q     Is there a bathroom on the -- in the basement?

24   A     It's not -- it was roughed in but it wasn't finished.

25   Q     Okay.  So, at the time you were living there, there wasn't

Direct Examination Patrick D. Kennedy by Mr. Rao

```
1    a finished bathroom in the basement; is that right?

2    A    That's correct.

3    Q    Was there a house telephone?

4    A    No.

5    Q    So, there was no land line there?

6    A    I never had one hooked up.

7    Q    Okay.  How was cell phone reception at that house?

8    A    Very poor.

9    Q    So, if you wanted to make a cell phone call while you were

10   living there, what did you have to do?

11   A    Go outside and stand on one leg.

12   Q    Can you make -- could you make cell phone calls from the

13   basement?

14   A    Not at all.

15   Q    Now, how did it come about that Harrison Waite became your

16   roommate?

17   A    I was looking for some help with the house.  And he was

18   looking for a place to move to.

19   Q    Okay.  And how did you approach him about moving in?

20   A    He contacted Sara or somehow they got in contact.  It

21   was -- she was telling him that -- you know, looking for a

22   place, he was looking for a place, that we had one, because he

23   had mentioned it to her.

24   Q    And what's Sara's full name?

25   A    Sara Conner.
```

Direct Examination Patrick D. Kennedy by Mr. Rao

1    Q    And did there come a point when you and Harrison talked

2    directly about moving into the apartment?  Moving into the

3    house, excuse me.

4    A    Yes.

5    Q    Where was Harrison living at the time that he approached

6    you about moving in?

7    A    He was living at his mother's.

8    Q    Do you know whether anybody else was living with his

9    mother at that residence at that time?

10   A    I believe it was Mr. Sweeney was living with his mother.

11   Q    Do you see Mr. Sweeney here in court today?

12   A    Yes, I do.

13   Q    Could you point to him and describe something he's

14   wearing?

15   A    The gentleman in the black suit with the tie.

16            MR. RAO:  Your Honor, ask the record reflect the

17   witness identified the defendant.

18            MR. BRENNAN:  We agree that my client is Patrick

19   Sweeney.

20            THE COURT:  In that case, the record will so reflect.

21            MR. BRENNAN:  Black suits and ties doesn't quite do

22   it, Your Honor.

23            THE WITNESS:  Sorry.

24   Q    (BY MR. RAO)  So, did you and Harrison come to some kind

25   of agreement about the terms of him living at your house?

Direct Examination Patrick D. Kennedy by Mr. Rao

1    A    Yes, we did.

2    Q    And what sort of arrangements did you make with him?

3    A    That he just pay $600.  And just help keep a clean house.

4    Q    Did you have a contract written up or anything like that?

5    A    No, it was all verbal.

6    Q    What sort of rules did you guys set up?

7    A    Just clean up after yourself; keep the house clean.

8    Q    Okay.  How would you describe Harrison as a roommate?

9    A    Very good roommate.  Couldn't ask for anything more.

10   Q    Did he pay his rent on time?

11   A    Yes, he did.

12   Q    Did he follow through and clean the house?

13   A    Yes, he did.

14   Q    Do you know where Harrison worked at the time he was

15   living with you?

16   A    Not exactly, no.

17   Q    Do you know what kind of work he did in general?

18   A    It had to do with heating and air conditioning.

19   Q    What sort of things did the two of you do together as

20   roommates?

21   A    Hung out, drank.  Other than that, you know, we went out

22   for dinner.  He had his girlfriend, my girlfriend.

23   Q    Who was Harrison's girlfriend at that time?

24   A    Ashley Smith.

25   Q    Did you ever observe Harrison Waite using drugs while he

Direct Examination Patrick D. Kennedy by Mr. Rao

1   was your roommate?

2   A     No.

3   Q     During the time that Harrison Waite was living with you,

4   did you ever notice any change in his behavior?

5   A     No, not at all.

6   Q     When, about, did he move in?

7   A     I want to say it was in February.

8   Q     And about how long did he live at that house with you?

9   A     I guess almost two months.

10  Q     During that time, did you ever notice his behavior

11  becoming erratic in any way?

12  A     No.

13  Q     Mr. Kennedy, have you ever used drugs yourself?

14  A     Yes, sir.

15  Q     What kinds?

16  A     Marijuana.

17  Q     Any other drugs?

18  A     Percocets for my kidney stones.

19  Q     Okay.  Any other illegal drugs at all?

20  A     No, sir.

21  Q     You told us a minute ago that Harrison had a girlfriend

22  named Ashley Smith.  Did there come a time when she started

23  staying at the house, as well?

24  A     Yeah, gradually.  In that short time it did progress to

25  that, yes.

Direct Examination Patrick D. Kennedy by Mr. Rao

1   Q    Okay.  Towards the end of the time that Harrison was

2   living with you, about how regularly was Ashley also staying

3   there?

4   A    I guess probably the last two weeks.

5   Q    And, during those last two weeks, how often was she at the

6   house?

7   A    To the best of my recollection, it would probably be every

8   day for --

9   Q    I want to direct your attention now to March 23rd of 2009.

10  Did you work on that day?

11  A    Yes, I did.

12  Q    Where did you work?

13  A    I want to say Waldorf.

14  Q    Okay.  And generally what were your working hours at that

15  time?

16  A    7:00 to 3:00.

17  Q    So, what time did you have to leave the house for work?

18  A    About 6:00 o'clock.

19  Q    And do you recall when you left the house at around 6:00

20  o'clock -- is that about the time you left on March 23rd of

21  2009?

22  A    Yes.

23  Q    When you left the house at about 6:00 a.m., was Harrison

24  still at home?

25  A    I don't believe so.

Direct Examination Patrick D. Kennedy by Mr. Rao

1    Q    So, he left before you?

2    A    Yes.

3    Q    What time approximately did you get home that day?

4    A    Around 4:30.

5    Q    Was anybody at home when you arrived at home?

6    A    Yes.

7    Q    Who was at home?

8    A    Harrison and Ashley.

9    Q    Do you recall what they were doing?

10   A    Hanging out in the kitchen area.

11   Q    Did you talk to them?

12   A    Yes.

13   Q    What did you talk about?

14   A    It just was like, "What's up?  How you guys doing?"  I

15   just walked in the door.

16   Q    What was Harrison's mood when you saw him?

17   A    Seemed to be fine.

18   Q    Did they indicate where they were -- what their plans were

19   for the evening?

20   A    They said they were going to go get something to eat.

21   Q    Okay.  Did you go with them?

22   A    No.

23   Q    What did you do?

24   A    Stayed home.

25   Q    Was there -- did there come a point in the evening when

Direct Examination Patrick D. Kennedy by Mr. Rao

1     Harrison and Ashley came back to the house?

2     A    Yes.

3     Q    About -- approximately what time was that?

4     A    Around 6:00, 6:30.

5     Q    Did you talk to Harrison or Ashley when they got home that

6     evening?

7     A    Briefly.

8     Q    Do you recall what you discussed with them?

9     A    Just asked where they went and what are they going to do

10    for that evening.

11    Q    Do you recall what response, if any, they had?

12    A    They said they were just going to stay home and hang out

13    and watch TV.

14    Q    Was anybody else at home at that time?

15    A    No.

16    Q    Did anybody else come home later that evening?

17    A    Yes.

18    Q    Who else?

19    A    Sara.

20    Q    So, Sara Conner?

21    A    Yes.

22    Q    About what time did she come home?

23    A    Around 9:00.

24    Q    All right.  And did she stay home for the rest of the

25    evening?

Direct Examination Patrick D. Kennedy by Mr. Rao

1    A    Yes.

2    Q    Did anybody else come or go from the house that evening?

3    A    No.

4    Q    Did there come a time when you saw Ashley again later that

5    evening, after they had returned home?

6    A    Yes.

7    Q    About what time was that?

8    A    Had to have been after 10:00.

9    Q    And what happened?

10   A    She was screaming, saying, "Help, help".

11   Q    What did you do?

12   A    I ran downstairs.

13   Q    What were you doing when you first heard her screaming?

14   A    Sleeping.

15   Q    When you ran downstairs, what did you see when you got

16   downstairs?

17   A    I saw Harrison laying on the floor.

18   Q    What did he look like?

19   A    He looked pale; turning blue in the face.

20   Q    Mr. Kennedy, let me show you what's been marked Government

21   Exhibit P8.

22        Do you recognize what's depicted in that photograph?

23   A    Yeah, I could see it.

24   Q    And who is that in that photograph?

25   A    That's Harrison.

Direct Examination Patrick D. Kennedy by Mr. Rao

1    Q    And is that about how he appeared on March 23rd of 2009?

2    A    Yes, sir.

3    Q    When you ran downstairs after you heard Ashley?

4    A    Yup.

5    Q    What did you do next?

6    A    When I went in the room, I saw vomit on the floor.  I

7    tried to stick my fingers in his mouth.  I turned his head to

8    the side and pushed on his chest a few times.

9    Q    Did you notice any reaction by Harrison?

10   A    None.

11   Q    Did you see any movement?

12   A    No.

13   Q    Did you see any vomit?

14   A    Yes.

15   Q    Where did you see vomit?

16   A    On the floor, beside him.

17   Q    Where was Ashley while you were trying to clear Harrison's

18   airway?

19   A    I believe upstairs.  She was really freaked out.

20   Q    Did somebody call 911?

21   A    Yes.

22   Q    Do you recall who called 911?

23   A    I believe it was Sara.

24   Q    And did an ambulance eventually arrive?

25   A    Yes.

Direct Examination Patrick D. Kennedy by Mr. Rao

1   Q    Approximately how long did it take for the ambulance to

2   arrive?

3   A    30 minutes.

4   Q    While you were waiting for the paramedics, did you move

5   anything in Harrison's room?

6   A    No.

7   Q    Did Ashley Smith or Sara Conner, did either of them move

8   anything in Harrison's room?

9   A    No.

10  Q    Did you see any drugs when you went downstairs?

11  A    No.

12  Q    Did you see any drug paraphernalia when you went

13  downstairs?

14  A    No.

15  Q    Any syringes?

16  A    No.

17  Q    Any spoons?

18  A    No.

19  Q    Did you try to clean anything up before the paramedics

20  arrived?

21  A    No.

22  Q    What happened after the paramedics got there?

23  A    They went downstairs.  They came downstairs and just tried

24  to help him, but they said he had already passed.

25  Q    Did the police also come to your house that evening?

Direct Examination Patrick D. Kennedy by Mr. Rao

```
 1    A    Yes.

 2    Q    And did you speak to them at that time?

 3    A    Yes.

 4    Q    Did you give them permission to search your house?

 5    A    Yes, I did.

 6    Q    Do you know what was found?

 7    A    Yes.

 8    Q    What was found?

 9              MR. BRENNAN:  Objection, Your Honor.

10              THE COURT:  Sustained.

11    Q    (BY MR. RAO)  Had you ever seen any drugs in the house

12    before March 23rd of 2009?

13    A    No.

14    Q    Did you ever know Ashley Smith to have drugs at the house?

15    A    No.

16    Q    Did you ever know Sara Conner to have drugs at the house?

17    A    No.

18              THE COURT:  Is the exhibit currently depicted, P8,

19    Mr. Rao?

20              MR. RAO:  Yes, Your Honor.

21              THE COURT:  Thank you.

22    Q    (BY MR. RAO)  Mr. Kennedy, on the podium behind you are a

23    number of photographs.  Starting at the left they're marked P2

24    on the top row left corner, P3 in the middle, and P4 on the top

25    row on the right.
```

Direct Examination Patrick D. Kennedy by Mr. Rao

```
1         Do you recognize what's depicted in those photographs?
2    A    Yes, I do.  Yes, I do.
3    Q    And what do you -- what's depicted in those photographs?
4    A    Harrison's bedroom.
5    Q    Okay.  Now starting with P2, I'm going to hand you a
6    pointer and I'm going to ask you if you could point and
7    indicate where Harrison's body was lying when you first came to
8    the bedroom, downstairs from the bedroom, after you heard
9    Ashley Smith cry for help on March 23rd of 2009.
10        Okay.  Now, if you could show the jury where Mr. Waite --
11   where his body was when you came downstairs.
12   A    Laying right here in this area here.
13   Q    And which -- where was his head?
14   A    Right there.
15        MR. RAO:  The record will reflect the witness is
16   indicating on the floor depicted in the photograph of P2 near
17   the foot of the bed.
18        THE COURT:  The record will so reflect.
19   Q    (BY MR. RAO)  And you previously testified that you had
20   turned his body in some fashion when you attempted to clear his
21   airway?
22   A    No, sir.
23   Q    If you could describe to the jury.
24   A    I turned his head to the side.
25   Q    You turned his head to the side.  Excuse me.  Which
```

Direct Examination Patrick D. Kennedy by Mr. Rao

1   direction did you turn his head?

2   A     Towards the bed.

3   Q     Okay.  Now, on the bottom row do you see Photographs P5

4   and P6?  Do you recognize any of the items depicted in

5   Photographs P5 or P6?

6   A     Yes.

7   Q     And what is depicted in Photograph P5 that you recognize?

8   A     The spoon and the syringe -- syringes.

9   Q     Where did you first see the spoon and syringe; when did

10  you first see those items?

11  A     When the officers brought it to my attention.

12  Q     And when was that?

13  A     Later on that night.

14        MR. RAO:  Court's indulgence.

15  Q     (BY MR. RAO)  Mr. Kennedy, I want to go back to a

16  photograph that I showed you earlier, Government's Exhibit P9.

17  Again using that pointer, if you could indicate to the jury

18  where the front door of the residence is -- just use -- touch

19  the screen, I'm sorry.

20  A     The front door is right here.

21  Q     And where is the side door?

22  A     The side door is this red one here.

23  Q     Is there a direct access to the basement from the outside?

24  A     Around the back of the house there would be a sliding

25  glass door.  And then a door that's off of the laundry room.

Cross-examination Patrick D. Kennedy by Mr. Brennan

```
1   Q    Okay.  Is that exactly how your residence appeared back in
2   March of 2009, or have there been some renovations to that
3   residence?
4   A    Yeah.  I mean, just under the deck.  But I don't think
5   anything --
6   Q    But everything else is basically how it appeared on March
7   23rd, 2009?
8   A    Yeah.  I mean, the exterior, the landscaping has changed a
9   little bit.
10            MR. RAO:  No further questions, Your Honor.  Thank
11  you.
12            THE COURT:  Cross-examination.
13            MR. BRENNAN:  Thank you, Your Honor.
14                      CROSS-EXAMINATION
15  BY MR. BRENNAN:
16  Q    Good morning, Mr. Kennedy.
17  A    Good morning.
18  Q    My name is William Brennan.  Mr. Cook and I represent
19  Patrick Sweeney.  I want to ask you some questions this
20  morning.  And, should I ask you a question that you do not
21  understand, please ask me to repeat it.  Fair enough?
22  A    Yes, sir.
23  Q    Okay.  Now, let's start with the very last question that
24  government counsel asked you.  And I'll put it on the screen.
25  This is your -- this is the house you lived in on March 23,
```

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    2009; is that correct?

2    A    Yes, sir.

3    Q    But this picture was not taken on March 23, 2009; is that

4    correct?

5    A    Correct.

6    Q    Do you know when about this picture was taken, by any

7    chance?

8    A    No.

9    Q    Okay.  So, we've told -- you told the ladies and gentlemen

10   of the jury that the house appears the same as the front door,

11   the side door, but that down here that's been changed, correct?

12   A    Yes, sir.

13   Q    Okay.  Now, I'm going to ask you -- may I approach the

14   easel Your Honor?  Thank you.

15       Mr. Kennedy, are you able to draw -- you're a carpenter,

16   right?

17   A    Yes, sir.

18   Q    Are you able to draw for the ladies and gentlemen of the

19   jury a layout of the rooms on the first floor of your residence

20   as well as the layout of the rooms on the bottom floor of your

21   residence?

22   A    Yes, sir.

23   Q    Okay.  Could you step to the easel and do that for us,

24   please?  I'm going to label this -- see if this works.  The top

25   floor you can orient it any way you want to.  Just draw how the

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    layout of the rooms are on the top floor, sir.

2    A    From the top view, right?

3    Q    Yes, from the top view, right.  If you can do a three-

4    dimensional, fine.

5    A    (Complying).

6    Q    All right.  Could you just label it with your initials?

7         So, I take it this is the front of the house here,

8    correct?

9    A    Yes, sir.

10   Q    So, we come in the front door, as the government -- as Mr.

11   Rao asked you.  You walk in the front door.  What's that room

12   there?

13   A    Living room.

14   Q    Living room.  Okay.

15   A    Kitchen, dining room.

16   Q    Okay.

17   A    1, 2, 3, closet, hall bath, master bath.

18   Q    All right.  And, the bottom, do you call it the bottom

19   floor or the basement, sir?

20   A    Basement.

21   Q    I ask you to do the same thing for me on the basement

22   level.

23        And, by the way, up here, where are the stairs to get down

24   to the basement?

25   A    (Indicating).

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    Q    Thank you.  Do the same layout on the basement for me.

2    A    (Complying).

3    Q    All right.  What would this -- when you come down the

4    stairs, take the stairs exit here.  That's the rec room; okay?

5    These?

6    A    Bathroom.  It's not finished.

7    Q    Roughed-in bathroom.  Okay.  "S"?

8    A    Storage.

9    Q    Storage.  Okay.  What's R4?

10   A    Bedroom 4.  Harrison's room.

11   Q    That's Harrison's room.  And what's "B"?  That's

12   roughed-in bathroom.  And this area is?

13   A    Laundry room.

14   Q    Okay.  Thank you, sir.  Does this diagram that you've

15   drawn for us accurately reflect your residence on or about

16   March 23, 2009?

17   A    Yes, sir.

18   Q    Okay.  Thank you.  Now, you told us, Mr. Kennedy, that the

19   police arrived at your residence that evening, that's correct,

20   at about -- well, let me do it this way.

21        The EMTs arrived at about 10:44 that evening.  Does that

22   refresh your recollection what time they arrived?

23   A    Yes.

24   Q    Okay.  And the police arrived how much later; around the

25   same time or a few minutes later?  Do you remember when they

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    arrived?

2    A    Shortly after, I guess.

3    Q    Shortly thereafter.  Okay.  And you gave the police

4    permission to -- you said earlier -- search your residence; is

5    that correct?

6    A    Yes.

7    Q    Okay.  And they conducted that search and they left

8    shortly thereafter, correct?

9    A    No, sir.

10   Q    What time -- what time did they leave?

11   A    I can't recall.

12   Q    You can't recall?

13   A    It -- yeah, I can't recall.

14   Q    They were there for about an hour or so?

15   A    No.  Way longer than that.

16   Q    Okay.  Tell us how long they were there.

17   A    A few hours.

18   Q    A few hours.  Okay.  Had they left by midnight?

19   A    I can't recall, sir.

20   Q    Okay.  But at some point, 1 o'clock or 2 o'clock in the

21   morning, the police had clearly left your residence, correct?

22   A    Yes, sir.

23   Q    Okay.  At no time did they secure your residence with

24   crime scene tape; is that correct?

25   A    That's correct.

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    Q    Okay.  And they did not search your entire residence.

2    They just searched the bedroom downstairs; is that correct?

3    A    That's correct.

4    Q    Okay.  So, what you've drawn for us on the top level up

5    here -- that is, the living room, the dining room, the kitchen,

6    these three bedrooms, the master bath, the hall bath, and the

7    closet -- were not searched in any way, shape, or form by the

8    Calvert County Sheriff's Department that evening, correct, sir?

9    A    I can't recall.

10   Q    All right.  So, you have no recollection of them ever

11   searching the upstairs of the residence, correct?

12   A    That's correct.

13   Q    Okay.  Now, with respect to the downstairs, the only area

14   they searched downstairs was the bedroom, correct?

15   A    I didn't walk around with them when they did their search.

16   Q    Okay.  So, you can't tell us whether or not they ever

17   searched the laundry room, correct?

18   A    That's correct.

19   Q    You can't tell us whether or not they ever searched the

20   roughed-in bathroom, correct?

21   A    That is correct.

22   Q    You can't tell us whether or not they ever searched any

23   area of the rec room, correct?

24   A    Yes, that's correct.

25   Q    You can't tell us whether or not they ever searched the

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    storage area that opens to this bedroom, correct?

2    A    That's open to there.

3    Q    Opens to there?

4    A    Yes.

5    Q    But there's also in here, is there not, a separate closet

6    in the bedroom, correct?

7    A    Yes.  There's a closet, yes.

8    Q    Which side is the closet on, sir?

9    A    The closet would be on the left side.

10   Q    All right.  Sir, this is your house and you get to draw.

11   A    (Indicating).

12   Q    That's the closet right there.  Thank you, sir.  All

13   right.  Now -- so, you really can't tell us -- you know the

14   police didn't search the upstairs and you really can't tell us

15   what portion of the downstairs they searched; is that correct?

16   A    I can't tell you what part of the house they searched at

17   all.

18   Q    You can't tell what part they searched at all.  And you

19   saw no evidence of any fingerprint -- fingerprint powder in any

20   of the locations downstairs; is that correct, sir?

21   A    Yes, that's correct.

22   Q    Okay.  Now, these items that were shown here at the

23   bottom, which is P5 and P6, do you -- if you know, is that

24   what's shown in the drawer here up on P4, or do you know?

25   A    I don't know for sure.

Cross-examination Patrick D. Kennedy by Mr. Brennan

1   Q    Don't know for sure.  Okay.  So, when government counsel

2   asked you to identify P4 -- excuse me, P5 and P6 -- your clear

3   testimony to the ladies and gentlemen of this jury is that you

4   have never seen what's depicted in P5 and P6 at your residence,

5   correct?

6   A    That's correct.

7   Q    Okay.  And what's depicted in here -- and we have a spoon

8   with, what, burnt heroin residue?  Do you know that or not know

9   that?

10  A    I do not know that.

11  Q    You do not know that.  This smoking pipe, do you know if

12  that's a smoking pipe or what that's used for?

13  A    Yes.

14  Q    All right.  Have you ever seen that before?

15  A    No.

16  Q    All right.  So, what's depicted in these two photographs,

17  you're clear you've never seen this evidence of drug

18  paraphernalia in any way, shape, or form at your residence,

19  correct?

20  A    Before that night, no.

21  Q    Before that night.  And were you shown it that night as it

22  appears here?  Or were you shown it in a different form, sir?

23  A    I was shown it in a different form.

24  Q    They brought it upstairs?

25  A    Yes.

Cross-examination Patrick D. Kennedy by Mr. Brennan

1   Q    Okay.  Now, speaking of drug paraphernalia and drug usage,

2   let me make sure that we're certain.  During the time that

3   Harrison Waite lived at your residence in Breezy Point, Calvert

4   County, Maryland -- that would have been February through March

5   23rd of 2009, correct, sir?

6   A    Yes.

7   Q    Okay.  During that period of time you saw no evidence of

8   drug paraphernalia possessed by Harrison Waite, correct?

9   A    Correct.

10  Q    You saw no evidence of drug -- actual drugs, themselves,

11  by Harrison Waite during that period of time, correct, sir?

12  A    Correct.

13  Q    Also during that period of time you saw no evidence of

14  drug paraphernalia or drug usage by Ashley Smith during that

15  period of time, correct?

16  A    That is correct.

17  Q    And you've told the ladies and gentlemen of the jury that

18  your girlfriend, Sara Conner, and you also did not possess drug

19  paraphernalia during that period of time; is that correct, sir?

20  A    That's correct.

21  Q    And you also did not -- that is, neither you or Ms. Connor

22  possessed any evidence of -- any drugs during that period of

23  time, correct?

24  A    That's correct.

25  Q    All right.  And us also told us that, during that period

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    of time, February 2009 through March 23, 2009, you did not

2    observe Harrison Waite to be a drug user during that period of

3    time, correct, sir?

4    A    Correct.

5    Q    Okay.  Now -- and it's also fair to say that you did not

6    observe Ashley Smith to be a drug user during that period of

7    time, that is, February and March of 2009, correct?

8    A    Correct.

9    Q    All right.  Now, you told us that when you came downstairs

10   you saw Harrison Waite's body.  And his head was at the foot of

11   the bed; is that correct, sir?

12   A    Yes.

13   Q    All right.  Approach the witness, Your Honor?

14           THE COURT:  You don't have to ask.

15           MR. BRENNAN:  Thank you.

16   Q    (BY MR. BRENNAN)  I show you what's marked as government's

17   P2.  And I have a little rough picture of a diagram of a body,

18   if you will.  Was the body like this, or like this?  Or can

19   you -- are you able to recollect today, sir, how the body was,

20   where his head was and where his feet were, using that as a

21   rough diagram, sir?

22   A    (Indicating).

23   Q    Is that your best recollection where it was, sir?

24   A    Yes.

25           THE COURT:  Hold that up for --

Cross-examination Patrick D. Kennedy by Mr. Brennan

1          MR. BRENNAN:  I'm going to put it on the ELMO.

2     Q    (BY MR. BRENNAN)  I show you what's been marked and

3     admitted as Government P2.  And this is the head of the bed.

4     This is depicted where the pillows are; is that correct, sir?

5     A    Yes.

6     Q    Okay.  And, when you came down the stairs, you observed

7     Mr. Harrison Waite's feet over here; is that correct?  Where my

8     finger is?

9     A    Pretty much how you have the piece of paper there.

10    Q    The piece of paper.  So, his feet are extended this way

11    and his head is here; is that correct?

12    A    Yes.

13    Q    And you noticed some vomit on the floor over here by the

14    very foot of the bed; is that correct?

15         THE COURT:  Mr. Kennedy, do you see the image on your

16    screen at the right?

17         THE WITNESS:  Yes, sir.  I just was looking over that

18    way.

19         THE COURT:  Are you able to see it when you look that

20    way?

21         THE WITNESS:  Yes, sir.

22    Q    (BY MR. BRENNAN)  Thank you, Your Honor.

23         Whatever's easier for you, Mr. Kennedy.  So, where the

24    little purple diagram is, does that accurately reflect the

25    position that you observed Harrison Waite's body when you came

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    downstairs?

2    A    Yes.

3    Q    Okay.  And, this area here, is that where you observed

4    some vomit that is near the foot of the bed; is that correct,

5    sir?

6    A    I believe the vomit was more towards the picture.  It's

7    the dark -- I believe it's the dark image that's right there.

8    Q    All right.  I think you can touch the screen.  Well, maybe

9    not.  There we go.

10   A    (Indicating).

11   Q    Okay.  Thank you, sir.  That's where you observed the

12   vomit that would be next to his head; is that correct?

13   A    Yes.

14   Q    And you did not observe any vomit down towards the head of

15   the bed, which is where my finger is; is that correct, sir?

16   A    That's correct.

17   Q    Okay.  Now, also told us that you do not have a land line

18   in that residence, correct?

19   A    Correct.

20   Q    And the cell phone reception is poor, if not erratic,

21   sometimes in your residence; is that correct?

22   A    Correct.

23   Q    And it's virtually nonexistent in the basement, correct?

24   A    Correct.

25   Q    And even upstairs in the main portion of the residence it

Cross-examination Patrick D. Kennedy by Mr. Brennan

1   can come in and come out, correct?

2   A    Yeah.

3   Q    All right.

4   A    Not that well, though.

5   Q    I'm sorry?

6   A    Not as well.

7   Q    Not as well upstairs, right?

8   A    As being outside.

9   Q    I'm sorry?

10  A    Outside is pretty much your best chance.

11  Q    All right.  To make a phone call, you have to go outside?

12  A    Correct.

13  Q    All right.  Now, let's revisit March 23 of 2009.  I

14  realize that's a painful day for you, but let me ask you some

15  questions.  You arrived home from work at 4:30 p.m.  That's

16  4:30 in the afternoon on that day; is that correct?

17  A    Correct.

18  Q    And when you got home you saw Ashley Smith and Harrison

19  Waite at your residence, correct?

20  A    Correct.

21  Q    Everything appeared normal; is that right?

22  A    Yes.

23  Q    As a matter of fact, Harrison had walked your dog for you

24  that day; is that correct?

25  A    Yes, he did.

Cross-examination Patrick D. Kennedy by Mr. Brennan

1   Q    Yes, he did.  Okay.  And Ashley Smith and Harrison Waite

2   were there and they said they were going out to get something

3   to eat; is that correct?

4   A    Yes.

5   Q    All right.  And they left about 4:30 or thereabouts?

6   A    Thereabouts.

7   Q    Okay.  As a matter of fact, you got home at 4:30.  And did

8   either one of them take a shower before they went out to eat,

9   do you recollect?

10  A    All ready to go.

11  Q    They were ready to go.  Okay.  So, they left and they got

12  back at 6:00 or 7:00 o'clock?

13  A    Roughly.

14  Q    Roughly.  All right.  Are you able to tell us exactly what

15  time that he got home?

16  A    6:00 or 6:30, to the best I could remember.

17  Q    All right.  Do you remember, sir, testifying before the

18  grand jury on or about October 7 of 2009?

19  A    Yes, I remember.

20  Q    All right.  If I showed you what you testified before the

21  grand jury, that would refresh your recollection, sir, as to

22  exactly what time that they got back from -- had gone -- would

23  that refresh your recollection sir, as to what time they got

24  back from having dinner?

25  A    I'm sure it would.

Cross-examination Patrick D. Kennedy by Mr. Brennan

```
 1              MR. BRENNAN:  Okay.  On page 17, Counsel.
 2    Q   (BY MR. BRENNAN)  I would ask you to read it to yourself
 3    sir.  Not out loud; read it to yourself.  And I ask you if that
 4    refreshes your recollection where I put that star as to what
 5    time you believe they got back.
 6         Have you had a chance to read that sir?
 7    A    Right there where that star is at?
 8    Q    Well, yeah.  Read the question above it and the answer.
 9    A    Okay.  Yes, I have.
10    Q    And you were under oath, sir, when you testified before
11    the grand jury?
12    A    Yes.
13    Q    And at that time your best recollection at that time was
14    they got back from dinner at about 7:00 p.m. that evening,
15    correct?
16    A    Yes.
17    Q    All right.  And you observed them come in the house.  And,
18    again, nothing unusual.  You can't tell the jury that --
19    anything unusual that you observed about either Ashley Smith or
20    Harrison Waite that evening; is that correct?
21    A    That's correct.
22    Q    All right.  Harrison didn't appear subdued; he didn't
23    appear agitated.  He appeared normal to you, correct?
24    A    Yes.
25    Q    Likewise, Ashley Smith did not appear subdued or agitated.
```

Cross-examination Patrick D. Kennedy by Mr. Brennan

1   She appeared normal as well, correct?

2   A    Correct.

3   Q    No evidence that they were having a fight or a dispute,

4   correct?

5   A    Correct.

6   Q    Okay.  And they went down to the basement at that time,

7   7:00 o'clock, a little bit thereafter, correct?

8   A    Correct.

9   Q    And is it fair to say, sir, that after they went down to

10  the basement at 7:00 p.m. on March 23 you did not see them

11  again until Ashley woke you up; is that right?

12  A    That's correct.

13  Q    Okay.  So, you have no knowledge of what, if anything,

14  occurred between -- down in the basement of your residence

15  between 7:00 p.m. and the time that you were awoken at about

16  10:30, 10:15; is that correct?

17  A    That's correct.

18  Q    All right.  Now, you were asleep because, as you told us,

19  you're an early riser.  You have to get up -- actually, you

20  have to leave for work at about 6:00; is that correct?

21  A    That's correct.

22  Q    All right.  So, you were asleep.  And, the next thing you

23  know, Ashley Smith was, what; screaming, runs up.  Tell us what

24  you recollect, sir.

25  A    I recollect that she was screaming very loud from the

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    basement.

2    Q    All right.  Had she come upstairs or did you go down in

3    response to those screams?

4    A    She had came upstairs.

5    Q    She came upstairs.  And told you Harrison needs help,

6    correct?

7    A    Yes.  She said, "Help, help".

8    Q    "Help, help".  And you went downstairs and Ashley remained

9    upstairs, correct?

10   A    Yes.

11   Q    All right.  And, when you went downstairs, you observed

12   your friend, Harrison.  And at that time he was in the position

13   that you've described for us here on this exhibit, correct?

14   A    Correct.

15   Q    All right.  Other than turning him from side to side, you

16   did not move his body in any way, shape, or form; is that

17   correct, sir?

18   A    That is correct.

19   Q    Okay.

20   A    I turned his head.

21   Q    You turned his head.  Okay.  So, you didn't even turn the

22   position of his body; you turned his head to the side; is that

23   correct?

24   A    Yes.

25   Q    Okay.  And at that time he appeared -- as far as you were

Cross-examination Patrick D. Kennedy by Mr. Brennan

1   able to observe, he was not breathing; is that right?

2   A    That's correct.

3   Q    You checked his pulse -- did you check his pulse or

4   anything?

5   A    I can't remember.

6   Q    Okay.  He appeared blue; is that correct?

7   A    Just like the previous picture.

8   Q    Just like the previous picture.  Okay.  All right.  And

9   you attempted some -- attempted to clear his airway; is that

10  correct?

11  A    Yes.

12  Q    And some preliminary CPR?

13  A    Yes.

14  Q    And 911 was -- how much time went by between the time that

15  Ashley Smith came up crying and hysterical to when the 911 call

16  was placed; do you know, sir?

17  A    Time, I don't -- I can't tell you as far as time.

18  Q    Okay.

19  A    But I know I was told, I believe it was Sara, because

20  she -- I believe she came down.  I saw her out of the corner of

21  my eye.  I told her -- I know she saw Harrison and I told her

22  to call 911.

23  Q    Okay.  And, if I told you that the 911 call occurred at

24  9:30 -- excuse me -- 10:38 p.m. that evening, would that --

25  would you agree with that, sir?

Cross-examination Patrick D. Kennedy by Mr. Brennan

1   A    Yes.

2   Q    Okay.  Now, between the time that the 911 call was placed,

3   did you ever go upstairs or did you remain downstairs?

4   A    Yes, I went upstairs.

5   Q    You went upstairs.  When you went upstairs, was anyone

6   downstairs with Harrison Waite's body at that time?

7   A    No.

8   Q    Okay.  Did you do any search or examination of the room

9   when you first went downstairs?

10  A    No.

11  Q    Prior to the police doing their search of the room, had

12  you done any search of the room?

13  A    No.

14  Q    Okay.  To your knowledge, did either Sara Conner or Ashley

15  Smith do any search of the room prior to the police arriving?

16  A    No.

17  Q    Now, I may have misphrased this.  Did anyone do any search

18  of the room prior to the EMTs arriving?  Because I think the

19  EMTs arrived first; is that correct?

20  A    Yes.

21  Q    To your knowledge, sir, did anyone else do any search of

22  that room prior to the EMTs?

23  A    Repeat the question?

24  Q    Did anyone -- that is, you, Sara Conner, or Ashley

25  Smith -- do any search of the room -- that is, the basement

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    room where Harrison's body was found -- prior to the arrival of

2    the EMTs?

3    A    No.

4    Q    Let me -- so the record is clear, did either you, Sara

5    Conner, or Ashley Smith do any search of the room prior to the

6    arrival of the Calvert County Sheriff's Department?

7    A    No.

8         MR. BRENNAN:  Court's indulgence, Your Honor.

9    Q    (BY MR. BRENNAN)  And, as I said, I think I may have asked

10   you this.  But at no time did the Calvert County Sheriff's

11   Department ever secure your residence with crime scene tape.

12   Is that correct, sir?

13   A    No.

14   Q    Never secured the basement area of your house with any

15   crime scene tape or told you not to go there; is that correct,

16   sir?

17   A    No.

18   Q    Well, that's incorrect or is that correct.  Let me

19   rephrase.  Double negatives here.

20        To your knowledge, did any member of the Calvert County

21   Sheriff's Department secure your entire residence with crime

22   scene tape or call it a crime scene?

23   A    No.

24   Q    Okay.  To your knowledge, sir, did any member of the

25   Calvert County Sheriff's Department secure the basement area of

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    your residence with crime scene tape or call it a crime scene?

2    A    No.

3    Q    To your knowledge, sir, did any member of the Calvert

4    County Sheriff's Department secure the bedroom with crime scene

5    tape and call it a crime scene?

6    A    No.

7    Q    All right.  And, when they left that evening, whatever

8    time that was -- at 12, or 1, or 2, whatever time that was --

9    they turned the residence back over to you; is that correct?

10   A    Yes.

11   Q    Okay.  And you were at that time free to do with that room

12   whatever you pleased; is that correct?

13   A    Yes.

14   Q    All right.  And other people came the day -- the next day

15   or a day or two later and may have retrieved things, retrieved

16   items from that bedroom; is that correct?

17   A    Yes.

18   Q    As a matter of fact, Harrison Waite's mother came the next

19   day and retrieved some items from that bedroom; is that

20   correct?

21   A    Everything.

22   Q    Everything.  All right.  So, she the next day cleaned out

23   that bedroom, correct?

24   A    Correct.

25   Q    Okay.  And at some point did Harrison's employer also come

Cross-examination Patrick D. Kennedy by Mr. Brennan

1    and retrieve his cell phone?

2    A    I don't know.

3    Q    Okay.  All right.  Now, since you're a resident of Calvert

4    County, do you know where Dunkirk is?

5    A    Yes.

6    Q    All right.  Approximately how long does it take to drive

7    from your residence in Breezy Point up to Dunkirk?  Going the

8    speed limit.

9    A    25 minutes.

10   Q    25 minutes.  Do you know where Heavenly Chicken is in

11   Dunkirk, by any chance?

12   A    Yes.

13   Q    That would be the same 25 minutes to go from your home in

14   Breezy Point up to Heavenly Chicken up in Dunkirk?

15   A    Yes.

16   Q    This calls for a yes or no answer, sir.  Did you have a

17   conversation, yes or no, with Ashley Smith about what had

18   occurred in the basement that evening?

19   A    Yes.

20   Q    And is it fair to say that at no time did Ashley Smith say

21   that she observed Harrison Waite injecting heroin into his body

22   on March 23, 2009, correct?

23              MR. RAO:  Objection, Your Honor.

24              THE COURT:  Basis?

25              MR. RAO:  Withdrawn, Your Honor.

Redirect Examination Patrick D. Kennedy by Mr. Rao

1          THE COURT:  You may answer the question.

2          THE WITNESS:  Can you repeat the question?

3     Q    (BY MR. BRENNAN)  At no time did Ashley Smith tell you

4     that she observed Harrison Waite injecting heroin into his body

5     on March 23, 2009; is that correct, sir?

6     A    That's correct.

7          MR. BRENNAN:  I have no further questions, Your

8     Honor.

9          THE COURT:  Redirect.

10                    REDIRECT EXAMINATION

11    BY MR. RAO:

12    Q    Mr. Kennedy, picking up where Mr. Brennan just left off.

13    You spoke with Ashley Smith on March 20 -- on the evening of

14    March 23rd of 2009, morning of March 24th, 2009 after

15    Harrison's body was taken from the residence, correct?

16    A    Yes.

17    Q    What did Ashley Smith tell you at that time?

18          MR. BRENNAN:  Objection, Your Honor.

19          THE COURT:  Sustained.

20    Q    (BY MR. RAO)  Let's go back to the -- if I could get

21    the -- looking again at the diagram of your house that Mr.

22    Brennan had you draw a minute ago.  Looking at the basement

23    portion of the diagram, the room marked B, tell us, again, what

24    is that room?

25    A    That's where a bathroom would be.

Redirect Examination Patrick D. Kennedy by Mr. Rao

1    Q    Would be.  So, was that a finished bathroom at the time

2    that Harrison Waite was living at your residence?

3    A    No, it was not.

4    Q    Would someone be able to use any of the facilitates in

5    that bathroom?  Was there a toilet or a shower or anything like

6    that?

7    A    No.

8    Q    So, in order to use the bathroom in your residence at that

9    time, where would somebody in the basement have to go?

10   A    Up the steps into the hallway upstairs.

11            MR. RAO:  Your Honor, for clarity of the record, we

12   would like to have that marked as Government's Exhibit O1.

13            THE COURT:  The diagram?

14            MR. RAO:  The handwritten diagram by Mr. Kennedy.

15            THE COURT:  Okay.

16            MR. BRENNAN:  I'd like it as a defense exhibit, Your

17   Honor, but --

18            THE COURT:  We'll make it a joint exhibit.  How is

19   that?

20            MR. BRENNAN:  Thank you.

21            THE COURT:  And, your having referred to it, it is

22   admitted.  It's -- just making sure.  You didn't use the letter

23   J, did you, Mr. Rao, in your exhibits?

24            MR. RAO:  No.  And I think we've reserved an O

25   category for other miscellaneous exhibits.

Redirect Examination Patrick D. Kennedy by Mr. Rao

1          THE COURT:  We're going to make this joint exhibit,

2     or J1.  J1.

3          MR. RAO:  No other questions, Your Honor.  Thank you.

4          THE COURT:  May this witness be excused?

5          MR. RAO:  Yes --

6          MR. BRENNAN:  May we approach, Your Honor?

7          THE COURT:  You may.

8          (Bench conference on the record.)

9          MR. BRENNAN:  Yes.  Your Honor, I may not want to

10    excuse him, depending on what Ashley Smith says about any

11    conversation she had with him.  I may need to call him back.

12          THE COURT:  Fair enough.

13          MR. BRENNAN:  That's why I don't want to excuse him.

14          THE COURT:  While I've got you at the bench, take

15    only a very quick five-minute recess, right now, give everybody

16    a bathroom break.  Counsel, I have to take a sentencing at

17    12:15; I have a bench meeting at 1.  So, we'll be in recess

18    from 12:15 until 2 o'clock.  That's why the morning break will

19    be only a quick five minutes, as soon as this witness is off

20    the stand.

21          MR. BRENNAN:  Thank you, Your Honor.

22          (The following proceedings were had in open court.)

23          THE COURT:  Mr. Kennedy, you may step down.  You are

24    not yet excused.  So please remain in contact with counsel over

25    the course of the next few days to see if your presence will be

Redirect Examination Patrick D. Kennedy by Mr. Rao

1   required here again during the course of the trial.  But you

2   may step down for now.

3       Ladies and gentlemen, we're going to have a slightly

4   different schedule today because I have to take up another

5   matter over the lunch hour, which is going to take longer than

6   normal.  In fact, we'll recess at 12:15 for lunch today, which

7   is about 40 minutes from now.  And we'll be on recess until 2

8   o'clock to allow me to take care of the other court business

9   that is scheduled for that time.

10      In light of that, rather than taking a normal 15- minute

11  morning break right now, we're just going the take a

12  five-minute break to allow anyone to use the restroom as they

13  may need to.  And then we'll reconvene in five minutes.

14      Please follow these instructions during the recess.  Do

15  not discuss the case with anyone.  Do not discuss the case even

16  among yourselves.  You must wait until you've heard all the

17  evidence, the closing arguments, and the instructions as to the

18  law.  Do not allow yourselves to be exposed to any news

19  articles or reports that touch upon this case or the issues it

20  presents or any articles or reports that relate to any of the

21  participants in the case.

22      Avoid all contact with any of the participants in the

23  trial.  Do not make any independent investigation of the law or

24  the facts of this case.  Do not look up anything on the

25  Internet.  Do not consult an encyclopedia or a dictionary.

Redirect Examination Patrick D. Kennedy by Mr. Rao

1        I assure you over the course of the next four days you're

2    going to get very tired of hearing me say all that to you.  The

3    law requires that I do it and it's for a good reason.  So, as

4    you get tired of hearing it, maybe you can just think, "Wow

5    this must be a really important instruction, because he keeps

6    saying it," and then you'll be sure to comply with it.

7        Okay.  Very good.  Five minutes.

8            (A recess was taken.)

9            THE COURT:  Anything to take up outside the hearing

10   of the jury?

11           MR. BRENNAN:  Yes, Your Honor, the photograph that I

12   had the witness put the purple diagram on.

13           THE COURT:  Yes.

14           MR. BRENNAN:  I reviewed it with government counsel.

15   We're going to put Defense Exhibit 1 on that.  And I have taped

16   to the outside the location of where the witness marked it.  So

17   we're going to make this Defense Exhibit 1.

18           THE COURT:  And do you have an exhibit list, Mr.

19   Brennan?

20           MR. BRENNAN:  Yes.

21           MR. COOK:  We have one, Your Honor.  I just wrote one

22   this morning.

23           THE COURT:  More importantly, do I have one?

24           MR. COOK:  No.

25           MR. BRENNAN:  No.  Because we did not know this was

Redirect Examination Patrick D. Kennedy by Mr. Rao

1    going to be ours until the examination started.

2            THE COURT:  The twists and turns of trial practice.

3    So, let's get -- while during the -- this next witness, Ms.

4    Moye, could you get a witness list -- or, get an exhibit list

5    going for defense exhibits?

6            THE CLERK:  Sure.

7            THE COURT:  I appreciate that.  And, so, this will be

8    the defendant's -- did the government use D, the letter D?  I

9    think you did.

10           MS. JOHNSTON:  We did for drugs, yes, sir.

11           THE COURT:  All right.  So, we'll just call this the

12   defendant's Exhibit No. 1.  And it's received.

13       Anything else outside the hearing of the jury?

14           MS. JOHNSTON:  No, sir.

15           MR. BRENNAN:  No, Your Honor, thank you.

16           THE COURT:  I would be grateful if the Court security

17   officer would invite the jurors to return.

18           MS. JOHNSTON:  Your Honor, we have our witness here

19   in the courtroom.

20           THE COURT:  Very good.  She can come forward and

21   stand by the witness stand.  Ma'am, come on up.

22           (Jury entered the courtroom.)

23           THE COURT:  The government may call their next

24   witness.

25           MS. JOHNSTON:  Your Honor, our next witness would be

Direct Examination Ashley Smith by Ms. Johnston

```
1    Ms. Ashley Smith.
2              THE CLERK:  Please raise your right hand.
3                         ASHLEY NICOLE SMITH,
4    called as a witness, being first duly sworn, was examined and
5    testified as follows:
6              THE WITNESS:  Yes, ma'am.
7              THE CLERK:  Please be seated.  Please speak directly
8    into the microphone.
9              THE WITNESS:  Okay.
10             THE COURT:  State your full name for the record.
11             THE WITNESS:  Ashley Nicole Smith.
12             THE CLERK:  And spell your first name, please.
13             THE WITNESS:  A-s-h-l-e-y.
14             THE CLERK:  Thank you.
15             MS. JOHNSTON:  Ms. Smith, I think that chair will
16   actually move with you if you want to scooch it forward a
17   little bit.
18                         DIRECT EXAMINATION
19   BY MS. JOHNSTON:
20   Q    Good morning, Ms. Smith.
21   A    Good morning.
22   Q    How old are you?
23   A    I'm 24.
24   Q    And how far did you go in school?
25   A    I graduated high school.
```

Direct Examination Ashley Smith by Ms. Johnston

1    Q    And when did you graduate from high school?

2    A    2005.

3    Q    Are you presently employed?

4    A    No.

5    Q    No.  What do you do?

6    A    I'm a stay-at-home mom.

7    Q    And how many children do you have?

8    A    I have one.

9    Q    And how old is your child?

10   A    One.

11   Q    Now, I call your attention to early 2009.  Where were you

12   living at that time?

13   A    With my mother.

14   Q    And generally where was that?

15   A    In the Mechanicsville area.

16   Q    Were you working at that time?

17   A    Yes.

18   Q    What were you doing?

19   A    I was working on base for a government contractor.

20   Q    On what base?

21   A    Pax River Naval Base.

22   Q    Down in St. Mary's County?

23   A    Yes.

24   Q    Now, during that time, early 2009, did you have occasion

25   to meet an individual known as Harrison Waite?

Direct Examination Ashley Smith by Ms. Johnston

1   A     Yes.

2   Q     And where and how did you meet him?

3   A     I met him at a bar called Hulas in St. Mary's County.

4              THE COURT:  A bar called?

5              THE WITNESS:  A bar called Hulas.

6              THE COURT:  Hulas.  Thank you.

7   Q     (BY MS. JOHNSTON)  And approximately when was that?

8   A     In the beginning of February.

9   Q     And, after meeting him at the beginning of February, did

10  you start a relationship with Mr. Waite?

11  A     Yes.

12  Q     Was he working at that time?

13  A     Yes.

14  Q     Do you know where he was working?

15  A     Bradley Mechanical.

16  Q     And what did he do for Bradley Mechanical?

17  A     He was HVAC.

18  Q     Did he work full time or part time?

19  A     Full time.

20  Q     And where was he living when you first met him?

21  A     He was living -- when I first met him I think he was

22  living with his mother, still.  But he was in the process of

23  moving in with friends of his.  Like, all within the same week

24  he moved.

25  Q     You met him; he moved out of his mother's; and in with

Direct Examination Ashley Smith by Ms. Johnston

1    some friends?

2    A    Yeah.

3    Q    And do you recall his mother's name?

4    A    Tina.

5         THE COURT:  I'm sorry, ma'am.  I know it's tough.  If

6    you could speak up a little louder and closer to the

7    microphone.

8         THE WITNESS:  Tina.

9         THE COURT:  Tina.  Thank you.

10   Q    (BY MS. JOHNSTON)  Do you know where he lived with his

11   mother, Tina?

12   A    Waysons Corner, maybe.

13   Q    You said he was moving in with some friends.  Who were the

14   friends he was moving in with?

15   A    Patrick and Sara.

16   Q    Do you know Patrick's last name?

17   A    Patrick Kennedy.

18   Q    And Sara's last name?

19   A    Conner.

20   Q    Where did they live?

21   A    They lived in Breezy Point.

22   Q    And was it a house or an apartment?

23   A    A house.

24   Q    Can you tell us where in the house Harrison lived?

25   A    He rented the basement.

Direct Examination Ashley Smith by Ms. Johnston

1   Q    Now, after he moved in, how often did you go over to the

2   house?

3   A    Every day.

4   Q    And did that continue -- or, was that what you were doing

5   at the time that Harrison ultimately passed away on March 23rd?

6   A    Yes.

7   Q    Can you describe the layout of the house?

8   A    It was two stories.  Of course, he had the basement.

9   Upstairs was a kitchen, a dining room, a living room, two

10  bedrooms and a bathroom.  Well, there was two bathrooms

11  upstairs but there was none downstairs.  And then downstairs

12  was just like a living room area and one bedroom and a laundry

13  room.

14  Q    And who lived -- other than Harrison, Mr. Waite, Patrick

15  Kennedy, Sara Conner, anyone else living in that residence?

16  A    No.

17  Q    So, which bathroom would you use when you stayed over

18  there?

19  A    The upstairs one in the hallway.

20  Q    Likewise, is that the bathroom that Mr. Waite used, as

21  well?

22  A    Yes.

23  Q    Now, do you recall what hours Harrison Waite was working

24  in March of 2009?

25  A    He worked early.  He got up really early and he was off by

Direct Examination Ashley Smith by Ms. Johnston

1    3:00 o'clock, 2:30.

2    Q    When you say he got up really early, on the nights that

3    you spent the night there, approximately what time would he get

4    up?

5    A    He was up by 3:00, 3:30.

6    Q    And what time did he leave the house?

7    A    Not long afterwards.

8    Q    Do you know where he worked?

9    A    At the time he was working in Sterling, Virginia.

10   Q    And the time we're referring to is the end of March --

11   A    Right.

12   Q    -- shortly before he passed away?

13   A    Yes.

14   Q    What time would you get up and leave the house?

15   A    I was up and out of there by 5:30.

16   Q    Was it a drive to get from Breezy Point to where you

17   worked?

18   A    Yes.

19   Q    Approximately how long would it take?

20   A    An hour; hour and a half if there was traffic.

21   Q    And do you know what time Mr. Kennedy would leave the

22   house?

23   A    He left before me, but after Harrison.

24   Q    And how about Sara; do you know when she was leaving the

25   house?

Direct Examination Ashley Smith by Ms. Johnston

1    A    She left all different times.

2    Q    Do you know where she was working then?

3    A    JC Penny's.

4    Q    Do you know where she works now?

5    A    No.

6    Q    Now, calling your attention to March 23rd of 2009.

7    What -- do you remember whether or not you worked that day?

8    A    I did work that day.

9              THE COURT:  I'm sorry.  I did or --

10             THE WITNESS:  I did work that day.

11   Q    (BY MS. JOHNSTON)  Your regular hours?

12   A    I left work early that day.  I had a doctor's appointment,

13   so I had left early.

14   Q    Where did you go for your appointment?

15   A    I went to Leonardtown, which is in St. Mary's County.

16   Q    After you completed your medical appointment, where did

17   you go?

18   A    I went to Harrison's.

19   Q    Had you spoken to Harrison that day before arriving at his

20   house?

21   A    Uh-huh.

22   Q    You have to say, "Yes," or "No".

23   A    Yes.  Sorry.

24   Q    And how would you communicate with him?

25   A    Telephone.

Direct Examination Ashley Smith by Ms. Johnston

1    Q    By cell phone?

2    A    Yes.

3    Q    Had you made any plans in speaking with him?

4    A    Yes.  I called him when I was leaving.  And he was on his

5    way home from work.  And we made plans to meet at his house.

6    Q    Now, did you have a key for the house at that time?

7    A    No.

8    Q    Do you know approximately what time you arrived?

9    A    4:00, maybe 5:00.  Between 4:00 and 5:00.

10   Q    And who was there when you got there?

11   A    Patrick was there, and Harrison was there.

12   Q    What did -- what did you do at that point?

13   A    Harrison was getting out of the shower.  And, as soon as I

14   got there he was almost ready.  He was getting out of the

15   shower.  He got ready and we left.

16   Q    Where did you go?

17   A    We went to dinner.

18   Q    How did you get to dinner?

19   A    We took my car.

20   Q    What kind of car was that?

21   A    Pontiac Sunfire.

22   Q    And where did you go to dinner?

23   A    Heavenly Chicken.

24   Q    And where is that located?

25   A    Dunkirk.

Direct Examination Ashley Smith by Ms. Johnston

1    Q    Had you been there before?

2    A    No.

3    Q    And who selected the restaurant?

4    A    Harrison did.

5    Q    How long -- do you recall how long it took you to get

6    there?

7    A    25 minutes, maybe.

8    Q    Did you see anyone you knew while you were at dinner at

9    Heavenly Chicken?

10   A    No.

11   Q    What occurred while you were at the restaurant?

12   A    We were at dinner.  We got -- we argued over who was going

13   to pay for dinner.  And we just had normal conversation.  And

14   he had gotten a phone call.  And he asked me if on his way home

15   we could stop, and he was buying pills.

16           MR. BRENNAN:  Objection for the reasons previously

17   stated.

18           THE COURT:  Objection noted.  Overruled.  You may

19   answer, ma'am.

20   Q    (BY MS. JOHNSTON)  Please tell us what Harrison said to

21   you.

22   A    When we were at dinner, he got a phone call.  And he asked

23   if I minded if he stopped and he bought pills for a guy he

24   worked with on the way home.  It was on the way.  And I said I

25   didn't mind.  And he said that we were going to his mom's

Direct Examination Ashley Smith by Ms. Johnston

1   boyfriend, his parent's house.

2   Q    Now, before we -- before that conversation, you indicated

3   you were arguing over the bill?

4   A    Yes.

5   Q    What was the nature of that argument?

6   A    Just he always wanted to pay and I wanted to pay.  And,

7   so, we were just arguing over who was going to pay because we

8   both had cash.  So --

9   Q    Did you pay at your table or did you go to the cash

10  register?

11  A    We stood right next to each other at the cash register.

12  It wasn't like a fancy restaurant.  You ordered at the register

13  and sat down.

14  Q    While you were standing there, ultimately who did pay?

15  A    Harrison paid.

16  Q    Do you know about how much the bill was?

17  A    No more than $20, probably.

18  Q    And did you -- what, if any, observations did you make of

19  Harrison paying the bill?

20  A    He had money that day.  So, that's why he didn't mind.  He

21  really wanted to pay because he had money.

22  Q    How do you know he had money?

23  A    I could see he had -- I can't recall exactly how much

24  money he had, but I know he had at least a fifty.

25  Q    A fifty-dollar bill?

Direct Examination Ashley Smith by Ms. Johnston

1    A    A fifty-dollar bill.  And I want to say a hundred-dollar

2    bill, at least.

3    Q    Were there other bills, as well?

4    A    Yes.

5    Q    Did he -- was the fifty-dollar bill taken out of the

6    wallet and used to pay for dinner?

7    A    No.

8    Q    And you're not sure if there was a hundred in addition to

9    the fifty?

10   A    Right.  Yeah, I can't remember exactly how much he had.

11   Q    After dinner, what bills did he still have?

12   A    I'm not sure.

13   Q    After he paid for dinner?

14   A    Oh, after he paid for dinner he still had a fifty.  And,

15   if he had a hundred, I know he didn't -- he didn't pay with a

16   big bill.

17   Q    So, in addition to having still having the fifty, did he

18   have other multiple bills in his wallet?

19   A    Yes.

20   Q    Was it at -- before you paid for dinner or after you paid

21   for dinner that Harrison advised you where he wanted to go?

22   A    It was after he had paid for dinner.

23   Q    Had you ever been to Harrison's mother's boyfriend's

24   parent's house before?

25   A    No.

Direct Examination Ashley Smith by Ms. Johnston

1    Q    Did he mention any names when he referred to his mother's

2    boyfriend's parent's house?

3    A    Pat.

4    Q    Had you met Pat at that point?

5    A    Not like, "Hi, my name's Ashley," or anything.  I think I

6    might have seen him at his mom's house just in passing.  But I

7    had never, like, met him.

8    Q    And did you see him subsequent to March 23rd?

9    A    I had seen him before.

10   Q    Before March 23rd?

11   A    Yes.

12   Q    And did you also see him on March 23rd?

13   A    Yes.

14   Q    And after March 23rd?

15   A    Yes.

16   Q    Do you see the individual whom Mr. Waite referred to as

17   Pat, his mom's boyfriend, here in the courtroom?

18   A    Yes.

19   Q    Would you identify him for the record?

20   A    He's sitting right there.

21   Q    Okay.  Can you describe him by what he's wearing and what

22   he looks like?

23   A    He has a black suit on and gray hair.

24   Q    Is he wearing any glasses?

25   A    No.

Direct Examination Ashley Smith by Ms. Johnston

1              MS. JOHNSTON:  We'd ask the record reflect the

2    witness has identified the defendant, Patrick Sweeney.

3              THE COURT:  The record will so reflect.

4              MS. JOHNSTON:  Thank you, Your Honor.

5    Q    (BY MS. JOHNSTON)  When you left the restaurant, who was

6    driving?

7    A    Harrison.

8    Q    And where did you go?

9    A    We went to Pat's parent's house.

10   Q    Where is that in relation to the Heavenly Chicken?

11   A    I -- to take you there, I couldn't take you there now.  I

12   don't really remember.  It was on the way home.  It wasn't like

13   out of the way.  So, in the Dunkirk area.

14   Q    Do you recall about how long it took you to drive from

15   Heavenly Chicken to --

16   A    15 -- 15 minutes, I guess.

17   Q    Where did you go when you got there?

18   A    We just pulled in the driveway.  I stayed in the car.

19   Q    Did you observe any other vehicles in the driveway?

20   A    Pat's van was there.

21             MS. JOHNSTON:  Court's indulgence.

22        Your Honor, may I approach the witness?

23             THE COURT:  You don't have to ask.

24             MS. JOHNSTON:  It's a habit.  I'm sorry.

25             THE COURT:  I understand.

Direct Examination Ashley Smith by Ms. Johnston

```
1    Q    (BY MS. JOHNSTON)  I show you P10.  Do you recognize that

2    photograph?

3    A    Yes.

4              THE CLERK:  Ms. Johnston, what's the exhibit number?

5              MS. JOHNSTON:  P10.

6    Q    (BY MS. JOHNSTON)  Up here on the screen right next to

7    you.  And what is P10?  What is that a picture of?

8    A    This is a picture of his parent's -- Pat's parent's house.

9    Q    And, when you say Pat, are you referring to Mr. Sweeney

10   whom you've identified in court?

11   A    Yes.

12   Q    Can you use -- I think you can actually touch the

13   screen --

14   A    Okay.

15   Q    -- and leave a mark.

16   A    Okay.

17   Q    If you could show us where you -- your vehicle was.

18   A    We had pulled in right about here.

19   Q    And where was Mr. Sweeney's van?

20   A    He was parked further up closer to the garage.

21   Q    Was it facing towards the garage or facing out?

22   A    It was facing towards the garage.

23   Q    And was your vehicle facing up the driveway or out towards

24   the street?

25   A    Up the driveway.
```

Direct Examination Ashley Smith by Ms. Johnston

1    Q    Once -- do you know approximately what time you got there?

2    A    I really -- I'm not sure what time it was.

3    Q    What occurred when you got there?

4    A    We pulled up and he asked for -- he said, "Do you have

5    any" -- Harrison asked if there was anything that I had -- if I

6    had anything to put the pills in.  And I had just finished a

7    prescription that day.  So, I gave him my empty pill bottle.

8    And he took a green marker and scratched out my name so

9    everybody couldn't see my information.  And he got out of the

10   car.  He went up to Pat's van.  And they kind of went -- his

11   doors were open.  And he went in front of the van and they

12   talked -- we weren't there for no longer than a couple of

13   minutes.  And then he came back and got in the car and we left.

14   Q    Did you see the pill bottle when he got back in the car?

15   A    No.

16   Q    Now, you described using a green marker.  Where did the

17   marker come from?

18   A    He always had a Sharpie on him; at all times he always had

19   some kind of marker.  And he had -- before we went into dinner,

20   he had taken his marker out and put it in the car in, like, the

21   center console.  And he used that.

22   Q    Do you know why he carried a marker?

23   A    The type of work he did, he was always marking things.

24   Q    Now, when you got back to the -- approximately how long

25   did it take you to drive from Mr. Sweeney's parent's house back

Direct Examination Ashley Smith by Ms. Johnston

1   to Breezy Point?

2   A    Another 15, 20 minutes.

3   Q    And what did you do when you got back there?

4   A    We went downstairs.  We watched a movie.  We were --

5   usually we hung out with Pat and Sara.  But that night we had

6   stayed to ourselves in Harrison's room.  We watched a movie.

7   Just normal things.

8   Q    Okay.  Now, when you came in, do you know if anyone else

9   was present in the house?

10  A    Pat was there.  And I think Sara was there, too.

11  Q    Other than -- did you have any conversation with them?

12  A    No.

13  Q    When you went downstairs, do you recall what movie you

14  watched?

15  A    I can't remember what movie we watched.

16  Q    Now, while you were downstairs, in addition to watching a

17  movie, did you do anything else?

18  A    Just normal things that -- you know, nothing out of the

19  ordinary happened.

20  Q    Were there any drugs in the house when you went down

21  there --

22  A    Yes.

23  Q    -- in the basement?

24  A    Yes.

25  Q    Okay.

Direct Examination Ashley Smith by Ms. Johnston

1   A    I had done two lines of cocaine.

2   Q    Where was the -- where did you get the cocaine?

3   A    From Harrison.

4   Q    Did you see where he had it?

5   A    It was in a drawer.

6   Q    And was it in any container?

7   A    No.  It was in a baggie.

8   Q    You said it was in a baggie.  What color was the baggie?

9   A    Clear.  Like just a clear bag.

10  Q    And what did you do?

11  A    I did two lines of it.

12  Q    Did Harrison do any of it?

13  A    He -- they call it a gummy.  He just put some on his

14  mouth.  That was it.

15  Q    Had he used heroin -- strike that.

16       Had you used cocaine prior to that night?

17  A    A long time ago.

18  Q    Do you know where hair -- Mr. Waite got the cocaine?

19  A    No.

20  Q    After Mr. Waite rubbed the heroin on his -- inside of his

21  lip and you did the two lines --

22           MR. BRENNAN:  Judge, I think it was cocaine.

23           MS. JOHNSTON:  I'm sorry.  Strike that.

24           THE COURT:  It's sustained.  And you can rephrase.

25  Q    (BY MS. JOHNSTON)  After you consumed the cocaine and Mr.

Direct Examination Ashley Smith by Ms. Johnston

1    Waite rubbed it on his lip, you remained in the basement with

2    him; is that correct?

3    A    Yeah.  But at one point I did go upstairs and left him

4    downstairs.

5    Q    Was that after you finished watching the movie?

6    A    Yes.

7    Q    So, you went downstairs initially?

8    A    Uh-huh.  We watched TV; we watched our movie; I had done

9    the cocaine; and then I went back upstairs.

10   Q    Now, you said you hadn't done anything unusual down there

11   in the basement.  Everything was normal.  Did you engage in

12   sexual relations --

13   A    Yes.

14   Q    -- at some point that evening --

15   A    Yes.

16   Q    -- before you went upstairs?

17   A    Yes.

18   Q    Do you know approximately how long you were downstairs

19   before you went upstairs?

20   A    A few hours, because we -- yeah, a few hours.

21   Q    Because why?

22   A    We had watched a movie.  You know, we had done a couple

23   things.  It wasn't just like we were down there for ten

24   minutes; we were down there for a few hours.

25   Q    And the couple things you're talking about in addition to

Direct Examination Ashley Smith by Ms. Johnston

1   the lines of cocaine?

2   A    We had -- yeah, we did the coke, and watched the movie,

3   and had sex.  And that's when I went upstairs.

4   Q    And for what purpose did you go upstairs?

5   A    I went upstairs to use the bathroom, to get a drink, and

6   to call my mom.

7   Q    What was Mr. Waite doing when you left to go upstairs?

8   A    Laying on the bed.

9   Q    Was the TV still on, or off?  If you remember.

10  A    I don't remember.

11  Q    And how did you call your mother?

12  A    With my cell phone.

13  Q    And where were you in the house to call your mother?

14  A    Upstairs.

15  Q    And why did you go upstairs to call your mother?

16  A    Because there's no cell phone service downstairs.

17  Q    And why did you call your mother that night?

18  A    I call her every night.

19  Q    Do you know approximately how long you were upstairs

20  before you went back down to the basement?

21  A    10 to 15 minutes.

22  Q    What did you observe when you returned to the basement?

23  A    Harrison was face-down on the bed, and I thought he was

24  asleep.

25  Q    So, what did you do?

Direct Examination Ashley Smith by Ms. Johnston

1    A    Laid down beside him.

2    Q    Did you stay awake, fall asleep?

3    A    I fell asleep.  And I wasn't asleep long, 30, 45 minutes.

4    And I realized that he wasn't snoring or moving or anything.

5    And we had an air bed.  It was -- so, when I got off the bed,

6    the weight shifted and that's when he fell.  He rolled onto the

7    floor.  And that's when I knew something was wrong.

8    Q    What did you see?

9    A    Him, he was blue, his lips were blue, his eyes were

10   rolling back in his head, and he was throwing up.

11   Q    What do you mean, he was throwing up?

12   A    He was throwing -- he was puking, but he wasn't making any

13   noise.  Like, he wasn't moving.  Like, his eyes were rolling

14   back in his head.  There was no sound coming from him

15   whatsoever.

16   Q    Was there any gagging or coughing?

17   A    No sound, no.

18   Q    What did you do?

19   A    I remember, like, trying to, like, hold him and try to get

20   some kind of response.  I tried to do CPR.  I ran upstairs

21   yelling for Pat and Sara.  And they came downstairs and called

22   911.

23   Q    When you went over to Mr. Waite, what part of him did you

24   pick up?

25   A    His upper body.  I had my hands around him.

Direct Examination Ashley Smith by Ms. Johnston

1    Q    And where was the vomit at that time?

2    A    All over him, all over me, all over the floor.

3    Q    Could you see where it was coming from?

4    A    His mouth.

5    Q    After you went upstairs yelling for Mr. Kennedy and Miss

6    Conner, did all three of you go back downstairs?

7    A    Yes.

8    Q    And what happened when the three of you went back

9    downstairs?

10   A    They called 911.  And Patrick asked what I had done, what

11   we had done that night.  And, you know, what was wrong with

12   him.  And then he looked -- they were looking through his room

13   to see what had happened.  And I believe that he opened the

14   drawer and the -- like, the time all this had happened the cops

15   had gotten there.  And I remember him saying to me why did I

16   let him go to Pat Sweeney.

17   Q    Let's back up for a minute; okay?  When you first -- when

18   Mr. Waite first rolled out of the bed, you went over to him.

19   A    Right.

20   Q    How long were you there with him?

21   A    Five minutes, maybe.

22   Q    You said you tried CPR.  What did you try to do?

23   A    I tried to bring him back to life.  He wasn't breathing at

24   all.  I was trying to get air into him, but it was very hard

25   because he was throwing up.

Direct Examination Ashley Smith by Ms. Johnston

```
 1   Q    And, again, but he wasn't making any sounds --
 2   A    Right.
 3   Q    -- or gagging?
 4   A    No.
 5   Q    What were you seeing?
 6   A    Just puke coming right out of his mouth.  Constantly.
 7   Everywhere.
 8   Q    Then after that you went upstairs?
 9   A    Yes.
10   Q    What were you saying when you went upstairs?
11   A    I was yelling.  I have no idea what I was saying.  I know
12   I was frantic.  That something wasn't right.
13   Q    After that, Mr. Kennedy and Ms. Conner go downstairs with
14   you?
15   A    Right.
16   Q    How long are you down there then?
17   A    It didn't seem long at all before the cops and the
18   ambulance arrived.
19   Q    Now, who called 911?
20   A    Sara.
21   Q    And where was she when she called 911?
22   A    She was downstairs with us in the room with Harrison.
23   Q    Okay.  Did she have a cell phone downstairs?
24   A    Yes.
25   Q    Have you used your cell phone in the basement in that
```

Direct Examination Ashley Smith by Ms. Johnston

1  house?

2  A    It's hard to use it.  But you can use it.  It's not

3  impossible.

4  Q    Did you remain in the basement or did you go back

5  upstairs?

6  A    I stayed in the basement.

7  Q    Okay.  And do you recall whether or not Sara and Mr.

8  Kennedy went back upstairs?

9  A    I can't remember.

10  Q    Do you recall who arrived first; whether it was the EMT or

11  the sheriffs?

12  A    I can't remember.

13  Q    After the -- between the time that you went upstairs and

14  got Patrick and Sara to the time the EMT got there, did you

15  have any discussions with Patrick or Sara about Mr. Waite?

16  A    Yes.

17  Q    Okay.  What was your conversation with them about Mr.

18  Waite?

19  A    They asked what we did.

20          MR. BRENNAN:  Objection.

21          THE COURT:  What's the basis?

22          MR. BRENNAN:  Calls for hearsay, Your Honor, and

23  some -- may we approach?

24          THE COURT:  Yes.

25          (Bench conference on the record.)

Direct Examination Ashley Smith by Ms. Johnston

1          MR. BRENNAN:  Your Honor, I believe the answer would

2   be -- is, I think, Mr. Kennedy makes some accusations that, you

3   know, Patrick's a drug dealer, he's a heroin dealer, things

4   like that, that are his opinion.  And that was not elicited,

5   obviously, when Mr. Kennedy testified.  Your Honor, I don't

6   think it's admissible as hearsay through this witness.

7          MS. JOHNSTON:  It's my understanding, and albeit I'm

8   not quite -- this is my understanding based on my previous

9   conversations with this witness.  That this witness is going to

10  say that she was asked by Patrick, "What happened; what did you

11  all do?"  And she --

12          THE COURT:  "What happened," and what?

13          MS. JOHNSTON:  "What happened; what did you all do?"

14          THE COURT:  "What did you do?"

15          MS. JOHNSTON:  Right.  And she responds, "Well, we

16  went over to Pat's house and picked up some pills".  Or went --

17  "We stopped at Pat's house".  And that's what she's -- that was

18  going to be the end of it.  I wasn't going to ask her what Mr.

19  Kennedy said in response to that.  I was just going to stop it

20  there.  Just what she told him; what was his reaction; he was

21  angry.  And leave it at that.

22          MR. BRENNAN:  I'm fine with that.

23          THE COURT:  Yeah.  And it's also all admissible as

24  far as that goes.  So, the objection is overruled at this

25  point.  Let's see how the question and answer sequence actually

Direct Examination Ashley Smith by Ms. Johnston

1    goes.  But, if it goes as Ms. Johnston has just proffered,

2    there's nothing wrong with it.

3            MR. BRENNAN:  I agree.  My concern, Your Honor, was

4    that we would be hearing what Mr. Kennedy's opinion was as to

5    what occurred.  And that I object to.

6            THE COURT:  Right.  And, if that starts to emerge,

7    Ms. Johnston, stop your witness if I don't beat you to it.

8            MR. BRENNAN:  I may be the first on the trigger with

9    that one.

10           (The following proceedings were had in open court.)

11           THE COURT:  Overruled.  You may continue, Ms.

12   Johnston.

13   Q    (BY MS. JOHNSTON)  Ms. Smith, I believe we were talking

14   about the three of you being in the house before the EMTs got

15   there, correct?

16   A    Yes.

17   Q    During that time period, did there come a time when Mr.

18   Kennedy asked you a question?

19   A    He asked what we had done that night.

20   Q    And what did you tell him?

21   A    I told him that we had went to dinner, and that we had

22   stopped at Pat Sweeney's parent's house.

23   Q    And what was his reaction?

24   A    He got mad at me.

25   Q    Subsequent to that, did the -- at that point in time -- if

Direct Examination Ashley Smith by Ms. Johnston

1   I understood correctly, at that point in time nobody had

2   opened -- had anyone opened any of the drawers or looked around

3   the room?

4   A    No.

5   Q    Had you touched or moved anything in the room other than

6   trying to work with Mr. Waite?

7   A    No.

8   Q    Do you recall, in terms of Mr. Waite, where he was on the

9   bed prior to --

10  A    He was on --

11  Q    -- rolling out of the bed?

12  A    He was on his side of the bed.  Which is, if you're

13  looking at the bed, the right side of the bed.  And he had

14  rolled onto the floor.

15  Q    If I could have you look at some photographs.

16       Do you recognize these photographs that on top have been

17  marked as Government's P2 through P6?

18  A    Yes.

19  Q    I'm going to give you --

20  A    Okay.  Okay.

21  Q    If you could, starting with P2, tell us what we're looking

22  at.

23  A    That's his bed or our bed.  And that's where he slept.

24  And I was on that side.  And he was face-down right there.

25  Q    Now looking at -- if we could continue, what's P3 a

Direct Examination Ashley Smith by Ms. Johnston

1   picture of, the next photograph?

2   A    My side.  Like, where all my stuff would be.  And just the

3   TV and the other side of the room.

4   Q    Okay.  And then, looking at the third picture up there,

5   P3, P4, what is that a photo of?

6   A    That's the foot of the bed.  And his dresser.

7   Q    All right.  Now going back to P2, the very first picture

8   on the board, where were you sleeping on the bed?

9   A    Over here.

10  Q    So, the far left of the photograph?

11  A    Yes.

12  Q    And where was Mr. Waite?

13  A    On the right of the bed.

14  Q    When you got up to get out of the bed, where did you find

15  Mr. Waite when he rolled off the bed?

16  A    He was on the floor.  And I remember picking him up and

17  moving him, because I remember we ended up up here.  You can

18  see the stains on the floor from him.

19  Q    What's that on the floor?

20  A    The -- the throw-up.

21  Q    If I give you a pen, would you mind -- I ask you to circle

22  that area.  And mark it with a V for vomit, please.  And, while

23  you're marking the vomit, why don't you put your initials where

24  you were lying, and his initials where he was lying.

25  A    (Complying).

Direct Examination Ashley Smith by Ms. Johnston

1           THE COURT:  All on P2.

2           MS. JOHNSTON:  Thank you, Your Honor.

3           THE COURT:  Ms. Johnston, about how much longer on

4    direct?

5           MS. JOHNSTON:  Oh, probably about 15 minutes or so.

6           THE COURT:  Okay.  So, ladies and gentlemen, we will

7    stop at this point and take our lunch recess so that I can take

8    care of these other matters that I have to address.

9       Please don't discuss the case with anyone during the

10   recess, not even among yourselves.  Do not allow yourselves to

11   be exposed to any news articles or media about this case or any

12   of the issues it presents.  Don't seek to acquire any

13   information about the participants in the case.  Avoid all

14   contact with any of the participants in the trial.  Don't make

15   any independent investigation.

16      It's fine to use your cell phones during the lunch break

17   and to get out of the building and to take a walk.  Just don't

18   talk to anyone about the case.  We'll see you back at 2

19   o'clock.

20      Please take the jury out.

21           (Jury left the courtroom.)

22           (A recess was taken.)

23           THE COURT:  Ms. Smith, you're in the midst of your

24   testimony, so please don't discuss your testimony with anyone,

25   especially not the lawyers or anyone in the case.  And we'll

Direct Examination Ashley Smith by Ms. Johnston

1    see you back also at 2 o'clock.  And you may step down.

2         Anything else to take up outside the hearing of the jury

3    at this time, Counsel?

4              MS. JOHNSTON:  No, sir.

5              MR. BRENNAN:  No, Your Honor.

6              THE COURT:  We'll see you at 2 o'clock.

7         And, Mr. Call and Mr. Keating, are you ready?  Okay.  As

8    soon as counsel have moved away from their respective tables

9    we'll pick up with the next matter.

10             (A recess was taken.)

11             THE COURT:  Any issues we need to take up outside the

12   hearing of the jury?

13             MS. JOHNSTON:  Not that I'm aware of.

14             MR. BRENNAN:  No, thank you, Your Honor.

15             THE COURT:  All right.  Let's bring them in.

16             (Jury entered the courtroom.)

17             THE COURT:  Be seated please.  Ms. Smith may resume

18   the stand.  Ma'am, you remain under oath.  Counsel?

19             MS. JOHNSTON:  Thank you, Your Honor.

20   Q   (BY MS. JOHNSTON)  Now, Ms. Smith, after the emergency

21   people arrived, did you then go upstairs, or remain downstairs

22   in the bedroom?

23   A    I think I was kind of up and down.

24   Q    What do you mean by that?

25   A    Because I remember talking to my mom, talking to

Direct Examination Ashley Smith by Ms. Johnston

1    Harrison's mom, and being upstairs and downstairs.  Kind of all

2    over the place, really.

3    Q    And did you have any conversation with the medical

4    technician who was there?

5    A    I'm sure that I did.  I don't remember exactly what was

6    said.

7    Q    And for what purpose did you call Harrison's mother?

8    A    To let her know what had happened.  And that I would meet

9    her at the hospital.

10   Q    And do you know what telephone number you reached her

11   over?

12   A    No.

13   Q    What was your cell phone number at that time?

14   A    (240) 577-0979.

15            THE COURT:  A little bit slower and one more time

16   ma'am.

17            THE WITNESS:  Sorry.  (240) 577-0979.

18            THE COURT:  0979.  (240) 577-0979?

19            THE WITNESS:  Yes, sir.

20            THE COURT:  Thank you, ma'am.

21   Q    (BY MS. JOHNSTON)  Now, how many times did you talk to

22   Harrison's mother that night?

23   A    Twice.

24   Q    And what was the purpose of the second call?

25   A    To let her know that I would not be meeting her at the

Direct Examination Ashley Smith by Ms. Johnston

1    hospital.

2    Q    And why was that?

3    A    Because the paramedics, police, I forget exactly who it

4    was, had told me there was no reason to go to the hospital.

5    Q    And why was that?

6    A    Because Harrison had passed away.

7    Q    Now, did you remain at the house, then, when the police

8    got there?

9    A    Yes.

10   Q    Do you know how long -- did you stay there that entire

11   night?

12   A    No.  We left, my mom took me home.  It was early.  I don't

13   remember exactly what time it was but it was hours afterwards.

14   Q    How was it that you mother took you home?

15   A    In her car.  We drove in her car.

16   Q    So, at some point your mother came?

17   A    Yes.

18   Q    Was that after the police had gone?

19   A    No, she was there while the police were there.

20   Q    Now, while the police were there, did you speak with

21   multiple police officers?

22   A    Yes.

23   Q    All right.  Do you recall who the first officer was that

24   you spoke to?

25   A    It was a girl.  And I want to say her name was Cari Lee.

Direct Examination Ashley Smith by Ms. Johnston

1    For some reason that's sticking in my head.

2    Q    Okay.  So, there was a female detective that you spoke to?

3    A    Yes.

4    Q    Was she dressed in a uniform or was she in plain clothes?

5    A    I do not remember.

6    Q    And did you give her -- did you just speak to her, or did

7    you also give her a statement in writing?

8    A    I gave her a written statement.

9    Q    Was that after you spoke to her, or did you sit down and

10   write a statement without speaking to her?

11   A    I think it was while I was speaking to her I was writing

12   my statement.

13   Q    Now, when you initially -- when you were speaking to her,

14   were you completely truthful with her?

15   A    Yes.

16   Q    Okay.  Was there anything that you omitted in telling her

17   about what happened that night?

18   A    I did not tell her about the coke; that I had done the

19   cocaine that night.

20   Q    Okay.  And why didn't you tell her about the cocaine?

21   A    I was afraid.

22   Q    Afraid of what?

23   A    I knew that was wrong, I shouldn't have done that.  And I

24   didn't want to tell a police officer that I had done that.

25   Q    And what other concerns did you have?

Direct Examination Ashley Smith by Ms. Johnston

1   A    That they would think it was my fault.  And that I was

2   high or something and didn't do something right for Harrison.

3   Q    And were there -- were there other concerns that you had

4   in relation to you and your work?

5   A    Yes.  I didn't want to -- I had a clearance on base.  And

6   I knew that my clearance could be pulled.

7   Q    Now, did there come a time when you were -- when you

8   disclosed your cocaine use to the detective?

9   A    Yeah.  She had kind of pulled it out of me.  And she took

10  me aside, like, so, my mom and everybody wasn't standing there.

11  And that's when I just told her.  I just was honest with her

12  then at that point.

13  Q    Now, from the -- from the time you initially spoke with

14  her and any other officers there, was there anything different

15  about what you said regarding where you went that evening?

16  A    No.

17  Q    I want to show you what is marked as Government's Exhibit

18  T6, and if I --

19            THE COURT:  T6.

20            MS. JOHNSTON:  T6, Your Honor.  "T".

21  Q    (BY MS. JOHNSTON)  I ask you to look at T6 and tell me

22  whether or not you recognize any of the telephone numbers on

23  there.

24  A    I do.

25  Q    And whose number do you recognize?

Direct Examination Ashley Smith by Ms. Johnston

1   A    My number and Harrison's number.

2   Q    If you could label those with your last name and with

3   "Waite".  Put that up on the screen.

4        Can you tell us what number you labeled as your number and

5   what number you labeled as Mr. Waite's?

6   A    That's my number and that's Mr. Waite's number.

7   Q    Read off the numbers that you've labeled.

8   A    (240) 577-0979 is my number.  And Harrison's number was

9   (703) 856-5771.

10  Q    And had that been Harrison's number the entire time you

11  knew him?

12  A    Yes.

13  Q    Now, other than calling your number and calling Harrison

14  Waite's mother, did you call anyone else during that time

15  period from the time you ran upstairs to notify Pat and the

16  time that you went home that night?

17  A    No.

18  Q    Do you recall what number you used to contact Harrison's

19  mother?

20  A    No.

21  Q    Now, does your number appear again on this chart that's

22  been marked as T6?

23  A    Yes.

24  Q    And can you show us where that is?

25  A    Right here and right here.

Direct Examination Ashley Smith by Ms. Johnston

1    Q    And that would be, for the record, from 10:51, 11:05, and
2    11:11; is that correct?
3    A    Yes.
4    Q    Do you recognize that telephone number?
5    A    That's my number.  But the number called I do not
6    recognize.
7    Q    And do you have any recollection of what number you used
8    to contact Mr. Waite's mother that night?
9    A    No clue.
10   Q    I'm going to show you what's marked as Government's
11   Exhibit D1.
12           THE COURT:  D as in delta.
13           MS. JOHNSTON:  D as in dog, D as in dozen.
14           THE WITNESS:  That's my pill bottle.
15   Q    (BY MS. JOHNSTON)  I'll put it up on the screen so
16   everyone can see.
17        And what is that?
18   A    That's my pill bottle.
19   Q    Okay.  Is that a particular pill bottle?
20   A    That's the pill bottle I gave Harrison while we were at
21   Pat Sweeney's parent's house.
22   Q    Now, is there anything different about the way it appears
23   here today than it was when you gave it to Mr. Waite and you
24   last saw it in his hand?
25   A    Yes, you can read the writing.  That day it was more

Direct Examination Ashley Smith by Ms. Johnston

1    blacked out.  This is smudged and you see through it now.

2    Q    Did you ever see that bottle again on March 23rd or the

3    early morning hours of March 24th?

4    A    When the police were there.

5    Q    How did you see it then?

6    A    They had showed it to me.

7    Q    Were you asked any questions about it?

8    A    Yeah, because my name is on it.  And they wanted to know

9    what it was and --

10   Q    What did you tell them?

11   A    I had given it to Harrison that night under my impression

12   that he was getting pills.  And I had no idea; I did not see it

13   since and didn't know what was in it.

14   Q    Was there something in it when they showed it to you?

15   A    Yes.

16           MR. BRENNAN:  Objection, Your Honor.

17           THE COURT:  Basis?

18           MR. BRENNAN:  Calls for hearsay and expert testimony

19   what was in it.

20           THE COURT:  Not yet.  Overruled.  You can answer the

21   specific question that's in front of you:  Was there something

22   in it when they showed it to you?

23           THE WITNESS:  Yes.

24           THE COURT:  Next question.

25   Q    (BY MS. JOHNSTON)  Can you describe what it looked like?

Direct Examination Ashley Smith by Ms. Johnston

1    A     It looked like dirt.

2    Q     If you could please turn and look at the poster board up

3    next to you.  There's pictures at the bottom marked

4    Government's Exhibit P5 and P6.  Do you recognize those

5    photographs?

6    A     I do.

7    Q     Okay.  And what do you recognize about those photographs?

8    A     That's his sock drawer.  Well, at one time it was a sock

9    drawer.

10   Q     Had you ever seen any of the items that were in -- using

11   P5, had you ever seen any of those items in that sock drawer

12   before Harrison passed away?

13   A     A few items, like his deodorant and that smoking piece had

14   been in there; he kept that in there.  And, like, the lock and

15   stuff, that stuff stayed in there.

16   Q     Had you seen the spoon or the syringes before?

17   A     No.

18   Q     Had you ever gone into that drawer prior to Harrison's

19   passing away?

20   A     I was in that drawer that morning.

21   Q     For what purpose?

22   A     I had folded his clothes and put his socks away.

23   Q     And were any of those items in that drawer that morning?

24   A     No.

25   Q     What about the deodorant?

Cross-examination Ashley Smith by Mr. Brennan

1    A    Oh, yes.  I thought you were talking about the syringes.

2    The deodorant and, like, the smoking device, those things were

3    in there.

4    Q    And, when you say smoking device, what do you mean?

5    A    A bowl.  He smoked pot out of it occasionally.

6    Q    Can you use the lasers to show us what you're referring to

7    as the --

8    A    This was in there.  And these deodorants and that kind of

9    stuff was in there.

10   Q    Now, the item you just described as your prescription

11   bottle, is that present in any of those photographs?

12   A    Yeah.  It's right there.

13   Q    Now, once you left Mr. Sweeney's -- the parent's house,

14   did you and Harrison make any stops on the way home?

15   A    No.

16   Q    When you gave that pill bottle to Mr. Waite, was anything

17   in it?

18   A    No.

19            MS. JOHNSTON:  Court's indulgence.

20            THE COURT:  Yes.

21            MS. JOHNSTON:  Your Honor, we have nothing further at

22   this time.

23            THE COURT:  Thank you.  Cross-examination?

24            MR. BRENNAN:  Thank you, Your Honor.

25                      CROSS-EXAMINATION

```
 1   BY MR. BRENNAN:

 2   Q    Good afternoon, Ms. Smith.

 3   A    Good afternoon.

 4   Q    My name is William Brennan.  Mr. Cook and I represent Mr.

 5   Sweeney.  I'm going to ask you a series of questions.  And,

 6   should I ask you a question that you do not understand, please

 7   ask me to repeat it.  Fair enough?

 8   A    Fair.

 9   Q    Okay.  Now, on the day of March 23, 2009 -- that was a

10   Monday; is that correct?

11   A    Yes.

12   Q    Okay.  And you arrived at the Breezy Point residence after

13   work.  You got there at about 4:30 p.m. in the afternoon; is

14   that right?

15   A    Yes.

16   Q    Okay.  And Harrison was already there?

17   A    Yes.

18   Q    Is that correct?

19   A    Yes.

20   Q    And you told us that Patrick Kennedy was already there; is

21   that correct?

22   A    Yes.

23   Q    Okay.  And Harrison then proceeded to take a shower; is

24   that right?

25   A    Yup.  He was getting out of the shower.
```

Cross-examination Ashley Smith by Mr. Brennan

1   Q    Getting out of the shower?

2   A    Yes.

3   Q    So, he finished his shower, got dressed.  And the two of

4   you were going to go out to dinner that evening?

5   A    Yes.

6   Q    And you had planned that during the day; is that correct?

7   A    Yes.

8   Q    So, that was nothing unusual; it was going to go over to

9   see Harrison and the two of you were going to go out to dinner

10  as planned?

11  A    Correct.

12  Q    He did not seem upset to you or angry or anything like

13  that; is that correct?

14  A    Yes.

15  Q    Okay.  So, it took you about a half hour to go from the

16  Breezy Point Chesapeake Beach area of Calvert County up to

17  Dunkirk; is that correct?

18  A    Yes.

19  Q    Roughly 25 minutes, half hour?

20  A    Yes.

21  Q    All right.  So you leave Breezy Point, got there at 4:30,

22  Harrison finished his shower, got dressed, you left.  Would it

23  be fair to say you got up to Dunkirk between 5 and 5:30?

24  A    Probably like 5:30.

25  Q    5:30?

Cross-examination Ashley Smith by Mr. Brennan

1    A    Yeah.  Closer to 6.

2    Q    Spent about an hour having dinner?

3    A    Yes.

4    Q    So, that takes us to 6:30, correct?

5    A    Yes.

6    Q    Unfortunately the lady takes down --

7    A    I'm sorry I know.

8    Q    Okay.  And then it was your plan to go back to the Breezy

9    Point residence.  And, instead, Harrison told you that he had

10   to get some pills for a guy that he worked with named Mike,

11   correct?

12   A    He asked me if we could stop and get them.

13   Q    Asked your permission?

14   A    Yes.  If I minded.

15   Q    If you minded to go there and to stop.  Now, when you were

16   at the restaurant, you told us earlier about this -- I don't

17   want to call it a fight -- but disagreement as to who was going

18   to pay?

19   A    Right.

20   Q    And you recollect that there was -- that, at the time that

21   Harrison Waite went to pay, he had at least a fifty-dollar bill

22   in his wallet, correct?

23   A    Yes.

24   Q    But you're certainly not sure that he had a hundred-dollar

25   bill, correct?

Cross-examination Ashley Smith by Mr. Brennan

1   A    Right.  Yes.

2   Q    And you may have seen some other bills that he had there;

3   is that correct?

4   A    Yes.

5   Q    And he paid for it.  And you then -- it was after that

6   that he asked permission to make this stop?

7   A    Yes.

8   Q    Okay.  And you went to this residence that you had never

9   been before; is that correct?

10  A    Yes.

11  Q    Okay.  And it was shown to you earlier.  And you pulled,

12  what, halfway up the driveway?

13  A    We -- almost all the way up.

14  Q    Almost all the way up.  Well, I think this is Government

15  Exhibit P10.  It's on the screen.  I think the only one that

16  works by touching I think is your screen.  Where --

17  A    We --

18  Q    Okay.  You were?

19  A    Like right here.

20  Q    Right there.

21  A    Yeah.

22  Q    And the other vehicle was right up close to the garage; is

23  that correct?

24  A    Yeah.  It was right in front of us.  We parked right

25  behind it.  So, it wasn't, like, touching the garage; you know,

Cross-examination Ashley Smith by Mr. Brennan

1   there was still room --

2   Q    All right.

3   A    -- but it was right there.

4   Q    And you stayed in the vehicle the entire time?

5   A    Yes.

6   Q    Your car?

7   A    Yes.

8   Q    Never got out?

9   A    No.

10  Q    And Harrison Waite was gone for about ten minutes?

11  A    No.

12  Q    No.

13  A    We weren't there five minutes, total.

14  Q    All right.  Do you remember in the course of this matter

15  making a number of statements to various police officers; do

16  you recall that?

17  A    My written statement.

18  Q    Well, right.

19  A    Yeah.

20  Q    You would have been interviewed initially by -- you made

21  some statements to Officer Wilson; is that correct?

22  A    If it was that night, I'm not sure who took my --

23  Q    All right.  I'll be more than happy to -- if you need to

24  refresh your recollection, Ms. Smith, I'll be more than happy

25  to show these to you.

Cross-examination Ashley Smith by Mr. Brennan

1   A    Yes.

2   Q    Let's go through the number of statements that you made.

3   You made a statement to Officer Wilson that evening; do you

4   remember talking to him?

5   A    I do not remember talking to him.

6   Q    Okay.  Do you remember talking to an officer Cari Ray?

7   A    Yes.

8   Q    Okay.  And do you also remember talking to an Officer

9   Cress?

10  A    That night?

11  Q    Well, all right.

12  A    I remember talking to -- I don't remember talking to

13  Officer Cress that night.  But I do remember making a statement

14  to Officer Cress.

15  Q    Okay.  Do you remember talking to Officer Wilson at any

16  point?

17  A    No.

18  Q    Okay.  All right.  But you do remember talking to Officer

19  Cress at some point in relation to the 23rd, correct?

20  A    Yes.

21  Q    And, Officer Cress, is that the person that took a written

22  statement and an oral statement from you, or a recorded

23  statement from you?

24  A    He took the recorded statement.

25  Q    Took the recorded statement.  And then you also made a

Cross-examination Ashley Smith by Mr. Brennan

1   written statement to Officer Cari Ray; is that correct?

2   A    Yes.

3   Q    Okay.  And you also talked to the EMTs about what had

4   occurred that night because they were concerned about what they

5   should do for treatment for Harrison; is that correct?

6   A    Right.

7   Q    So, you also spoke to them.  And then later on you

8   appeared before the federal grand jury and also testified; is

9   that correct?

10  A    Yes.

11  Q    So, that's the number of statements that you have made

12  about this episode; is that correct?

13  A    Yes.

14  Q    Okay.  And I guess -- and what is, today, your best

15  estimate -- well, let me start it this way.

16       When you first pulled up at this residence, it's clear you

17  had never been to this residence before; is that correct?

18  A    Yes.

19  Q    As a matter of fact, you didn't even know that area of

20  Calvert County; is that correct?

21  A    Yes.

22  Q    You really had no idea where you were?

23  A    Right.

24  Q    All right.  And, when Harrison got out of the vehicle and

25  went up to speak to an individual, you could just see the

Cross-examination Ashley Smith by Mr. Brennan

1    silhouettes; is that correct?

2    A    I seen Pat walking in front of his van.

3    Q    All right.  So, it is your testimony today that you

4    immediately recognized Mr. Sweeney as the person that Harrison

5    was talking to?

6    A    Yes.

7    Q    Well, do you remember testifying -- making a statement on

8    an earlier occasion that you did not; you were unable to see

9    who he was talking with?

10   A    I do not remember.  Can I see it?

11        MR. BRENNAN:  Sure.  Court's indulgence a moment,

12   Your Honor.

13        All right.  Let me do it this way.

14        MS. JOHNSTON:  Your Honor, may we approach please?

15        THE COURT:  Yes.

16        (Bench conference on the record.)

17        MS. JOHNSTON:  Your Honor, counsel wants to

18   cross-examine -- has asked this witness a question presupposing

19   that she's made a statement that she couldn't identify Mr.

20   Sweeney at the house when they were there.  There's nothing in

21   her statements that said she could not see him.  Counsel -- I

22   don't know how counsel is going to proceed with this, but I'm

23   very concerned about asking questions that are based on facts

24   that are not provable, quite frankly.

25        THE COURT:  Anything that's happened so far can be

Cross-examination Ashley Smith by Mr. Brennan

1   successfully addressed on redirect.

2       Where are you going next?

3           MR. BRENNAN:  I'm going to show -- first of all, what

4   counsel said I was going and what I was doing was not where I

5   was going.  I'm going to ask her about some prior statements

6   that she made that I believe are inconsistent.  She's asked to

7   look at what she's made.  I'm more than willing to show the

8   witness that and ask her to read it to herself.

9           THE COURT:  If you do that, I'm sure that you won't

10  mischaracterize the content of any of the statements that you

11  have in your possession.  And, to the extent that you wish to

12  attempt to refresh the witness's recollection, of course you

13  can do that with literally anything.

14          MR. BRENNAN:  Right.

15          THE COURT:  And we'll just proceed accordingly.

16          MR. BRENNAN:  Thank you, Your Honor.

17          (The following proceedings were had in open court.)

18          THE COURT:  Okay.  Next question?

19          MR. BRENNAN:  Thank you, Your Honor.

20  Q   (BY MR. BRENNAN)  Ms. Smith, I'm going to show you a

21  statement, and ask you just to -- first of all, if you can

22  identify that document?

23  A   That's my statement I made that night.

24  Q   This is the statement that you wrote that night.  Does

25  this then freshen your mind -- the events that occurred that

Cross-examination Ashley Smith by Mr. Brennan

1   night were fresh in your mind when you made this statement?

2   A    Yeah.  I -- I was very traumatized at this time though,

3   so --

4   Q    Just read that to yourself, not out loud, right there

5   where it talks about what occurred at the house.

6   A    Okay.

7   Q    All right.  Does that refresh your recollection as to

8   whether or not you told the police that night that Harrison was

9   gone for about ten minutes when he was at this -- the residence

10  that's depicted here?

11  A    I may have said that.  But, today, thinking back as to

12  what happened, there -- my memory of it today is that he was

13  not gone ten minutes.  There's no way.

14  Q    So, what you're telling the jury is that your memory of

15  events the night of the -- what you wrote in your own

16  handwriting the night of the event is less accurate than your

17  recollection here in this courtroom some three years later?

18  A    Yes.

19  Q    Is that your testimony?

20  A    I am saying that I was very distraught, upset, and very

21  much in shock when I wrote that statement.

22  Q    Do you remember making -- I've already asked you about the

23  oral statement that was made.

24  A    Right.

25  Q    Okay.  Now, I have a transcript.  I want to show that to

Cross-examination Ashley Smith by Mr. Brennan

1    you.  I ask you to read that to yourself.

2    A    Okay.

3    Q    I can actually play it for you, but let's take a shot at

4    reading it.

5    A    Okay.

6         MS. JOHNSTON:  Your Honor, may we have those two

7    statements that are being shown marked as exhibits, at least

8    for identification purposes so that --

9         THE COURT:  It's at Mr. Brennan's option.

10        MR. BRENNAN:  Thank you, Your Honor.

11        THE COURT:  They haven't been offered; nor at this

12   point could they be.

13   Q    (BY MR. BRENNAN)  Read that quietly to yourself.  When

14   you've had an opportunity to do that, I'm going to ask you some

15   questions.

16   A    Okay.

17   Q    Okay.  Have you had a chance to read down to where my

18   finger is?

19   A    Yes.

20   Q    And the date of this statement was April 1st; is that

21   correct?

22   A    Yes.

23   Q    All right.  Now, let me ask the question again.  The

24   recorded statement that I just referenced was made on April

25   1st, 2009, which was eight days after the incident, correct?

Cross-examination Ashley Smith by Mr. Brennan

1    A    Yes.

2    Q    Okay.  And, having read that transcript, does that refresh

3    your recollection about again saying that Harrison was gone for

4    about ten minutes?

5    A    I said it because I just seen that I said it.  It was a

6    mistake.  I mean, today, as I remember things happened, he

7    wasn't gone ten minutes.

8    Q    Okay.

9    A    I realize I did say he was gone ten minutes.  But --

10   Q    And -- all right.  And do you remember also saying in that

11   recorded statement that, when you first pulled up, the lighting

12   was very poor; that you could not see who it was that Harrison

13   was talking with; is that correct?

14   A    That's what the statement says.

15   Q    Well, is that what you said at that time?

16   A    Yes.

17   Q    And it was only after that, when Mr. Waite returned to his

18   vehicle, did you then see the person known as Patrick Sweeney,

19   correct?

20   A    That's what the statement says.

21   Q    All right.  So, what you told the police in your recorded

22   statement on April 1st, 2009 was that, when you first pulled

23   up, you saw a silhouette of a person, you couldn't tell exactly

24   who it was at that time, correct?

25   A    Yes.

Cross-examination Ashley Smith by Mr. Brennan

1    Q    And Harrison was gone for about ten minutes, correct?

2    A    Yes.

3    Q    And then, when Harrison came back to the vehicle, it was

4    at that time you first saw Patrick Sweeney that evening,

5    correct?

6    A    That's what I told the police, yes.

7    Q    That's what you told the police eight days after the

8    incident?

9    A    Yes.

10   Q    Now, we've also asked you about Officer Cari Ray.  And you

11   told the jury you remember talking to Officer Cari Ray --

12   A    Yes.

13   Q    -- is that correct?

14        Do you remember telling Officer Cari Ray that Harrison

15   went into the house and was gone for about ten minutes and then

16   returned?

17   A    No, I do not remember saying that.

18   Q    Okay.  Take your time.  Take your time.  Read to yourself

19   what is written there.  I'm going to ask you whether or not

20   that refreshes your recollection about what you said to Officer

21   Cari Ray on, I believe, the 24th, the day after; March 24th,

22   2009.  Have you had a chance to read that to yourself?

23   A    Yes.

24   Q    Okay.  Do you remember telling Officer Cari Ray that

25   Harrison went into the house and was gone for about ten minutes

Cross-examination Ashley Smith by Mr. Brennan

1   and then returned?

2   A    I do not remember telling her that.

3   Q    Okay.  But it is clear in your mind that after --

4   according to your testimony -- after you gave -- you agree that

5   this is, in fact -- Government Exhibit D1, this is, in fact,

6   your pill bottle?

7   A    Yes, sir.

8   Q    And it's your testimony to the jury today that you

9   allegedly gave that to Harrison Waite in the car parked in the

10  driveway at the Sweeney residence?

11  A    Yes.

12  Q    And never saw it ever again?

13  A    Not until later that night.

14  Q    Not until the police showed it to you later that night?

15  A    Yes.

16  Q    And when they showed it to you you knew it was your pill

17  bottle at the time?

18  A    Yes.

19  Q    So, when Harrison Waite at the Sweeney residence

20  stopped -- and I will use the phrase that you used with the

21  police -- went into the house for ten minutes or was gone for

22  ten minutes --

23  A    He never went in the house.

24       MS. JOHNSTON:  Objection.  Assumes facts not in

25  evidence.

Cross-examination Ashley Smith by Mr. Brennan

```
 1              THE COURT:  Sustained.
 2    Q    (BY MR. BRENNAN)  I'll rephrase it.  At the Sweeney
 3    residence you handed this pill bottle to Harrison Waite.  Did
 4    not see what he did with it, correct?
 5    A    Correct.
 6    Q    According to you.  And never saw it again that evening
 7    until the police showed it to you, correct?
 8    A    Yes.
 9    Q    When Harrison Waite got back into the vehicle that evening
10    you did not see him with the pill bottle; is that correct?
11    A    Right.
12    Q    And did not see him with anything else in his possession,
13    correct?
14    A    Correct.
15    Q    And what you did not see him with is any of the items
16    depicted here in Government Exhibit 5; is that correct?
17    A    Right.
18    Q    Did not see him with any syringes; is that correct?
19    A    Yes.
20    Q    Did not see him with a spoon; is that correct?
21    A    Yes.
22    Q    Did not see him with any of this other material over here;
23    is that correct?
24    A    That might have been in the drawer.  I'm not really sure
25    what that is.  I'm not sure what that is.
```

Cross-examination Ashley Smith by Mr. Brennan

1  Q    All right.  So, what we know was in the drawer was this
2  you had seen before?
3  A    Yes.
4            THE COURT:  Refer to -- however that has been
5  identified previously.  The transcript doesn't understand
6  "this".
7            MR. BRENNAN:  The this before; I agree.
8  Q    (BY MR. BRENNAN)  What's that, a bong pipe?
9  A    A bowl yes.
10 Q    Smoking bowl?  What's that used for?
11 A    Marijuana.
12 Q    Okay.  That you had seen before?
13 A    Yes.
14 Q    The spoon that's depicted there with the burnt residue and
15 the syringe, you had not seen that before, ever?
16 A    No.
17 Q    The syringe that's here, you had not seen that before,
18 ever?
19 A    No.
20 Q    And the pill bottle, that's your pill bottle?
21 A    Yes.
22 Q    Now, when Harrison came out of the Sweeney residence
23 after -- how many minutes he had been in there?
24 A    He never went inside.
25 Q    Oh.  So, your testimony today is he never went inside?

Cross-examination Ashley Smith by Mr. Brennan

1   A    He never went inside.

2   Q    But you do agree that you told the police on an earlier

3   occasion that he had gone into the house?

4   A    I do not remember telling them that.  But I just read my

5   statement saying that I did say that.

6   Q    Okay.  All right.  You went back to Breezy Point.  It took

7   about a half hour to get back to Breezy Point; is that correct?

8   A    Yes.

9   Q    Okay.  So, we have -- where we were in our time line is

10  we've gotten you up to Dunkirk about 5:30; took about an hour

11  for dinner at Dunkirk, Heavenly Chicken?

12  A    Okay.

13  Q    We're at 6:30.  Stopped at the Sweeney residence for

14  however long that took.  And then another half-hour drive back

15  to Breezy Point, correct?

16  A    Yes.

17  Q    So, you're back at Breezy Point around 7:00 o'clock?

18  A    I don't remember what time we got home.

19  Q    Well, does that time line that I just asked you about fit

20  with your recollection of events --

21  A    Yes.

22  Q    -- that evening?

23  A    Yes.

24  Q    Okay.  So, from the time that you arrived back in Breezy

25  Point at 7:00 o'clock, and when you and Harrison went in -- and

Cross-examination Ashley Smith by Mr. Brennan

1   everything was fine between you and Harrison at that time,

2   correct?

3   A     Yes.

4   Q     He was not depressed?

5   A     No.

6   Q     He was not overly anxious?

7   A     No.

8   Q     There's nothing -- as far as you were concerned, there was

9   nothing unusual occurring with Harrison at this point in time

10  at 7:00 o'clock?

11  A     No, sir.

12  Q     I mean, according to your testimony.  And, as a matter of

13  fact, according to you Harrison said he had a good day at work

14  that day; he was upbeat and happy, correct?

15  A     Yes.

16  Q     Now, from that point in time -- and was -- did you see

17  Patrick Kennedy when you came back in the house at that time?

18  A     I do not recall.  I don't think I did.

19  Q     All right.  How about Sara Conner?

20  A     No.

21  Q     All right.  Between the time that you and Harrison Waite

22  got back to the residence at 7:00 o'clock, and the time that he

23  had fallen out of bed, the vomit coming from his mouth, would

24  you agree that, according to your testimony, he was out of your

25  presence for only about ten minutes that evening?

Cross-examination Ashley Smith by Mr. Brennan

1    A    Once we got home he was probably out of my presence ten,

2    fifteen minutes.

3    Q    Tops?

4    A    Yes.

5    Q    On one occasion?

6    A    Yes.

7    Q    So, every other minute between 7:00 o'clock and 10:38 when

8    the -- we'll use 10:30 as -- EMTs were called at 10:38.  So,

9    how about we use 10:30.

10        Between 7:00 o'clock and 10:30 Harrison, was only out of

11   your presence for ten, fifteen minutes, tops, correct?

12   A    Yes.

13   Q    According to your testimony.

14   A    Yes.

15   Q    And you told Ms. Johnston that you had done some laundry

16   that morning?

17   A    Yes.

18   Q    And you had put his socks away in the sock drawer?

19   A    Yes.

20   Q    I don't see any socks.  Is this the sock drawer we're

21   talking about right there, which I believe is P5?

22   A    Yes.

23   Q    All right.  And, so, we've already asked:  None of those

24   items there?

25   A    Right.

Cross-examination Ashley Smith by Mr. Brennan

1   Q     You have no idea where those items came from, correct?

2   A     Correct.

3   Q     And you would have to guess or speculate, correct?

4         Let me ask you.  You have no idea where those items came

5   from, correct?

6   A     Yes.  I know -- yes.

7   Q     All right.  Now --

8               THE COURT:  Yes, you have no idea; is that correct.

9               THE WITNESS:  Yes, I have no idea.  I'm sorry.

10  Q     (BY MR. BRENNAN)  Now, the -- when you came back to the

11  residence at 7:00 o'clock, you went downstairs.  And you called

12  it an ordinary evening; is that right?

13  A     Yes.

14  Q     Okay.  And you said that you watched television; you told

15  the jury that you did some cocaine; that you had sexual

16  relations with Mr. Waite.  In the sequence starting at 7:00

17  o'clock, what's the sequence of what you're telling us today

18  occurred?

19        You went downstairs at 7:00 o'clock.  Did you turn the TV

20  on?  Did you watch this movie we heard about?  Did you do the

21  cocaine first?  Did you have sex first?  What happened,

22  according to you?

23  A     We turned the movie on.  We turned the TV on.  We watched

24  the movie.  And during the movie the cocaine was done.  And we

25  had sex.

Cross-examination Ashley Smith by Mr. Brennan

```
 1   Q    Okay.  And you told the ladies and gentlemen of the jury
 2   that you did two lines of cocaine?
 3   A    Yes.
 4   Q    And that made you -- made you high?
 5   A    No, not really.  I wasn't -- no.
 6   Q    So, two lines wouldn't get you high on cocaine --
 7   A    They weren't --
 8   Q    -- is that your testimony?
 9   A    They were not huge lines at all.  It wasn't like I did a
10   lot.
11   Q    They were small lines of cocaine?
12   A    Yes.
13   Q    But you did two of them?
14   A    Yes.
15   Q    And Harrison then took some of the cocaine, according to
16   you.  And, what's known as a gummy, he put some on his gums; is
17   that correct?
18   A    Yes.
19   Q    And that was -- when was that?
20   A    During the night, while we were watching the movie.
21   Q    Watching the movie?
22   A    Yes, the movie was on.
23   Q    And is it your testimony that the cocaine had no effect on
24   you; didn't make you high; didn't make you fall asleep; didn't
25   make you anything?
```

Cross-examination Ashley Smith by Mr. Brennan

1    A    I remember I did throw up.

2    Q    You threw up.  Okay.  You went in the bathroom and puked.

3    Does cocaine do that to you?

4    A    It had in the past.  It had been a long time since I had

5    done it.

6    Q    All right.  So, it had been a long time.  So, according to

7    you, your body was not used to cocaine?

8    A    Right.

9    Q    And you did two lines; it made you sick?

10   A    Yes.

11   Q    Harrison put some on his gum.  Then you had sexual

12   relations with Harrison; is that right?

13   A    Yes.  I didn't throw up until after that, though.

14   Q    All right.  And then you got a phone call from your

15   mother?

16   A    I called her.

17   Q    You called her.  Did your phone ring in the basement?

18   A    No, I went upstairs.

19   Q    You went upstairs.  So, you left Harrison alone for ten

20   minutes.  And when was that that you left Harrison alone --

21   well, let me ask you this.  You went upstairs; you had a phone

22   call with your mother.  Is that the same time that you used the

23   bathroom and got a bottle of water from the kitchen?

24   A    Yes.

25   Q    All right.  So, your best estimate today is that was ten

Cross-examination Ashley Smith by Mr. Brennan

1    to fifteen minutes you left Harrison alone downstairs?

2    A    Yes.

3    Q    And that's -- the ten or fifteen minutes I was asking you

4    about earlier, that's the only time you left Harrison --

5    according to you -- the only time you left Harrison alone that

6    evening --

7    A    Yes.

8    Q    -- is that right?

9         All right.  And, when you came back downstairs after

10   leaving Harrison alone for this ten to fifteen minutes, what

11   was Harrison doing at that time?

12   A    Laying on the bed.

13   Q    Face-down?

14   A    Yes.

15   Q    And it did not appear anything unusual was occurring at

16   that time?

17   A    No.

18   Q    And you did not notice the burnt spoon depicted in Exhibit

19   5; is that correct?

20   A    Yeah, that wasn't open.

21   Q    You did not notice the syringe?

22   A    No.

23   Q    None of this material here was observable as having been

24   used in any way, shape, or form during this so-called ten to

25   fifteen minutes that you left Harrison alone?

Cross-examination Ashley Smith by Mr. Brennan

1   A    Right.

2   Q    And he's simply asleep face-down.  And that was not

3   unusual for Harrison, correct?

4   A    Right.

5   Q    Now, what time is it at this point?

6   A    I have no idea.  I do not remember what time it was.

7   Q    All right.  And you went to bed, fell asleep, next to

8   Harrison?

9   A    Yes.

10  Q    And do you remember Harrison, himself, getting ill and

11  vomiting before he fell off the bed?

12  A    No.

13  Q    All right.  Do you remember telling any of the EMTs that

14  Harrison, himself, had puked or vomited at about 9:45 that

15  evening?

16  A    No.

17  Q    You do not remember that?

18  A    I do not remember that.

19  Q    All right.  Let me show you this document.  I ask you to

20  read to yourself that sentence right there.  And, when you're

21  done reading it to yourself, I'm going to ask you a question.

22  A    Okay.

23  Q    All right.  Have you had a chance to read that?

24  A    Yes.

25  Q    Okay.  Do you remember telling an emergency medical

Cross-examination Ashley Smith by Mr. Brennan

1    technician that evening -- that is, the evening that Harrison

2    died -- that you heard him vomiting at 9:45, and found him

3    unresponsive at 10:30?  Do you remember saying that to an

4    emergency medical technician the night Harrison died?

5    A    No.

6    Q    Now, would you agree that it was approximately 10:30 when

7    you woke up and noticed that Harrison was unresponsive?

8    A    Today I'm not sure what time it was.  I really -- that

9    whole night after that happened is a time crunch; like, it's

10   hard to remember what time.

11   Q    Sure.  I understand.  And the 911 call was at 10:38, Ms.

12   Smith.  I can show you that; but that's what time it came in.

13   A    Right.

14   Q    So, we can use that as sort of a point that we know about?

15   A    Right, yes.

16   Q    And the EMTs arrived at 10:44?

17   A    Okay.

18   Q    Okay.  Again, I can show you those records if you need to

19   see them.

20   A    No.

21   Q    All right.  So, when you wake up and you realize that

22   something's wrong with Harrison, he's still face-down; is that

23   correct?

24   A    Yes.

25   Q    And he's cold to the touch; is that fair to say?

Cross-examination Ashley Smith by Mr. Brennan

1   A    I wouldn't say he was cold.  But I don't remember, to be

2   honest with you, to say that night -- I don't know if he was

3   cold or not.

4   Q    And then Ms. Johnston's already asked you about the side

5   of the bed.  But, if he had fallen out of the bed -- that is,

6   when you got up -- he would have fallen out and his head would

7   have been where that belt is; is that correct?

8   A    Exactly.  But I do remember, I moved him.

9   Q    Okay.  We'll get to that in a moment.  That's my next

10  question.  His head would have been -- he originally fell

11  out -- as a matter of fact, what occurred -- what occurred is

12  he -- when you got up, actually part of his upper body fell out

13  first and struck the floor; is that correct?

14  A    Yes.

15  Q    All right.  So, his head would have fallen out and struck

16  the floor right there where the belt is, correct?

17  A    Yes.

18  Q    And then, when you actually got up, the rest of his body

19  then fell out of the bed and his feet are where that X is; is

20  that correct?

21  A    Yes.

22  Q    Okay.  Now, at that point you went over to him and you

23  noticed that vomit was flowing from his mouth, correct?

24  A    Yes.

25  Q    Okay.  So, he was not -- he was making no sounds; he was

Cross-examination Ashley Smith by Mr. Brennan

1    not responsive; as far as you knew, he was not breathing,

2    and -- well, I have to ask the question.  I'm very sorry about

3    Harrison died.  But, in effect, the vomit was simply flowing

4    out of his mouth without any effort on his -- the stomach

5    wasn't causing this; is that correct?

6    A    Right.

7    Q    Okay.  At that point -- and Harrison was about six feet

8    tall, or was he taller?

9    A    He was about six-foot.

10   Q    Yeah.  Big fellow?

11   A    Yeah.

12   Q    All right.  And is it your testimony today that you

13   pivoted him around?

14   A    Yes.  I remember, I was frantic.  And I had his upper

15   body, and I -- there was more room up here and I remember

16   turning him.

17   Q    You turned him on his side?

18   A    I turned, like, his body -- like, I had him.  And I just

19   remember, like, moving him on the floor.

20   Q    Okay.

21   A    And just kind of turned him around.

22   Q    And would you agree you never told that to any of the

23   police or the EMTs that; that you ever moved his body?

24   A    I don't know if I told them that or not.

25   Q    All right.  We could go through and ask you to review your

Cross-examination Ashley Smith by Mr. Brennan

1   statements.  But would you agree that that's the first we've

2   heard that you actually moved his body is in this courtroom?

3   A    I may have said it in grand jury.  I told Ms. Johnston

4   about it.  I'm not sure.  I can't remember.

5   Q    I'll be more than happy to show you your grand jury.

6   A    That's fine.

7           THE COURT:  Is that a question?

8           MR. BRENNAN:  Well --

9           THE COURT:  It's -- let me answer my question.  It

10  wasn't a question.  Next question.

11  Q    (BY MR. BRENNAN)  All right.  At the risk of standing here

12  for ten or fifteen minutes while she reads the grand jury, Your

13  Honor.

14      All right.  So it's your recollection today that you might

15  have said that in the grand jury?

16  A    Right.  I do not remember if I said it or not.

17  Q    Okay.  Fair enough.  Fair enough.  Now, speaking of your

18  grand jury testimony and the various statements that you made

19  to Officer Cress, Officer Ray, Officer Wilson, the grand jury,

20  and here today, Ms. Johnston asked you on direct examination

21  about whether or not you had lied or misled the police; is that

22  correct?

23  A    Yes.

24  Q    Okay.  And, in fact, you admitted that you had, in fact,

25  lied and misled the police that evening; that is March 23,

Cross-examination Ashley Smith by Mr. Brennan

1    2009, correct?

2    A    I wouldn't say I lied.  I just didn't tell her that I had

3    done the drugs.

4    Q    All right.  You did not tell the police, in your view, the

5    entire story of what had occurred that evening, correct?

6    A    Yes.

7    Q    And that means that you lied or misled the police that

8    evening, correct?

9    A    Yes.

10   Q    Okay.  And one of the reasons that you lied or misled the

11   police that evening was you were concerned about yourself; that

12   is, what would happen to you, correct?

13   A    Yes.

14   Q    Is that right?

15   A    Yes.

16   Q    You were afraid that you would get in trouble because of

17   your involvement of -- in Harrison's death, correct?

18   A    I just didn't want to -- I felt bad.  Like I should have

19   been able to do something more.

20   Q    But you omitted the fact that you had used two lines of

21   cocaine, correct?

22   A    Yes.

23   Q    You omitted that Harrison had put cocaine on his own gums

24   that night, correct?

25   A    Yes.

Cross-examination Ashley Smith by Mr. Brennan

1    Q    All right.  And you lied because you didn't want to get in

2    trouble with the police; again, to protect yourself, correct?

3    A    Yes.

4    Q    And you also lied because you were concerned about your

5    security clearance at work, correct?

6    A    Yes.

7    Q    So, even though Harrison was dead, you were still lying to

8    protect yourself; is that correct, Ms. Smith?

9    A    I guess, yeah.

10   Q    And, so, your testimony today is that at no time on

11   Monday, March 23, 2009, did you ever see Harrison Waite inject

12   heroin into his body.

13   A    No.

14   Q    Is that your testimony today?

15   A    Yes.

16   Q    And your testimony today is that he was only out of your

17   presence for about ten to fifteen minutes that night, correct?

18   A    Yes.

19   Q    And you observed -- there was no reason -- that you were

20   not having a fight, he was not depressed, there was nothing

21   else going on that you could tell this jury about; is that --

22   that's your testimony today?

23   A    Yes.

24   Q    Everything was perfectly fine and for this magical ten to

25   fifteen minutes that's when Harrison used this heroin and died;

Cross-examination Ashley Smith by Mr. Brennan

1   is that your testimony?

2   A    Yes.

3   Q    And that during the --

4          THE COURT:  Have a -- we need an answer out loud if

5   you're able, ma'am.

6          THE WITNESS:  Yes.

7   Q    (BY MR. BRENNAN)  And it's further your testimony that the

8   items depicted in photograph 5 -- that is, the syringes, and

9   the spoon -- that you had never -- during the time that you

10  knew Harrison, you had never seen those items before, correct?

11  A    Yes.

12         MR. BRENNAN:  Court's indulgence, Your Honor.

13         THE COURT:  Yes.

14  Q    (BY MR. BRENNAN)  Did you -- there's not a photograph

15  that I can show you, Ms. Smith.  But did you ever see a small

16  silver scale in the bedroom downstairs?

17  A    Not that I can remember.

18  Q    I'm sorry?

19  A    Not that I can remember.

20  Q    And the location of that would have been -- let me -- my

21  paperwork here.  On top of the desk, did you ever see a small

22  silver scale at any time that evening?

23  A    No, not that I remember.

24         MR. BRENNAN:  All right.  I have no further

25  questions, Your Honor.  Thank you.

1          THE COURT:  Redirect.

2                    REDIRECT EXAMINATION

3   BY MS. JOHNSTON:

4   Q    Ms. Smith -- if I can approach the witness.  I'll show you

5   and -- I think I'll mark this as Government's Exhibit O1 for

6   the record.

7          THE COURT:  O1, what is it?

8          MS. JOHNSTON:  O1?  It is the written statement of

9   Ashley Smith.

10         THE COURT:  For identification.

11         MS. JOHNSTON:  For identification at this time.

12  Q    (BY MS. JOHNSTON)  Was that the written statement that Mr.

13  Brennan just was showing you?

14  A    Yes.

15  Q    And you gave that to Ms. Cari Ray?

16  A    Yes.

17  Q    At what time did you give her that statement?

18  A    12:45.

19  Q    In the morning?

20  A    Yes.

21  Q    On March 24th?

22  A    Yes.

23  Q    So, that would have been a couple hours after --

24  A    Yes.

25  Q    -- you tried to resuscitate Mr. Waite?

Redirect Examination Ashley Smith by Ms. Johnston

1    A    Yes.

2    Q    And in that statement what did you tell Detective Ray

3    about where you had been earlier that night?

4    A    What did I tell her?  That we went to dinner and we went

5    to Pat's dad's house.

6    Q    Did you tell her for what purpose you went to Pat's dad's

7    house?

8    A    Yes.  I said that Harrison was buying pills for a guy

9    named Mike that he worked with.

10   Q    And in that statement did you tell -- what did you tell

11   her about the pill bottle?

12   A    That I gave him the empty pill bottle.

13   Q    And in that statement what did you tell her about the

14   cocaine?

15   A    I didn't tell her until she asked.

16   Q    And what did you tell her when she asked?

17   A    That I did two lines.

18   Q    And how long was your written part of that statement?

19   A    How long was my statement?

20   Q    Yeah, how long was it?

21   A    About a page and a half.

22   Q    So, were there additional details that you could fill in

23   when people asked you questions about where you were or where

24   Harrison was?

25   A    Yeah.  It was very -- this is very short and not very

Redirect Examination Ashley Smith by Ms. Johnston

1    detailed, I guess you could say.

2    Q    But it was given roughly two hours after Mr. Harrison

3    Waite died?

4    A    Yes, ma'am.

5    Q    When counsel asked you about the recorded statement that

6    you gave to Detective Cress approximately a couple weeks later

7    on April 1st, and he showed you a transcript of that statement,

8    where did you tell Detective Cress you and Harrison Waite went

9    that night?

10   A    That we went to dinner and that we went to Pat's dad's

11   house.

12   Q    Did you describe where you went to dinner in that oral

13   statement that you made?

14   A    Yes, to Heavenly Chicken.

15   Q    And what did you tell him you gave to Mr. Waite at

16   Harrison -- at Mr. Sweeney's father's house?

17   A    An empty pill bottle.

18   Q    And in that statement -- I want to show it to you again,

19   and the transcript of that statement.

20        Did you tell Detective Cress whether or not you could see

21   Mr. Sweeney at any point in time while you were there?

22   A    I did.  I did tell him that, when Harrison was walking

23   around the van that was parked in the garage -- or, the

24   driveway -- that I could tell it was Pat when he walked around

25   the side door.

Redirect Examination Ashley Smith by Ms. Johnston

1  Q    So, having -- having looked at that statement and

2  refreshed your recollection, could you describe for us what you

3  saw once you were pulled into the driveway with Mr. Waite?

4  A    His -- Pat's work van was in the driveway.  And the doors

5  were open.  And Pat was in the front of the van; like -- looked

6  like he was maybe cleaning it out or something.  I'm not sure

7  what he was doing.  And Harrison got out and was in -- they

8  never got inside of the van.  And they went in the front of the

9  van.

10 Q    All right.  Now, did you see anyone else at that van other

11 than Mr. Sweeney and Mr. Waite?

12 A    No.

13 Q    When counsel asked you about seeing a silhouette

14 initially, who were you referring to?

15 A    Pat Sweeney.

16 Q    When you first saw that silhouette, were you able to see

17 Mr. Sweeney's face at that time?

18 A    I can't really remember.

19 Q    All right.  At some point prior to Mr. Waite returning to

20 the car, who did you see at the van with him?

21 A    Pat Sweeney.

22 Q    Did you see any other persons or any other silhouettes

23 that you didn't recognize?

24 A    No.

25 Q    And how many of the doors to the van were open?

Redirect Examination Ashley Smith by Ms. Johnston

1   A     The pass -- the front doors.  And he had the one side door

2   open.

3   Q     Counsel also asked you about a -- or showed you a police

4   report with some statements in it.  Do you recall that?

5   A     I'm sorry, say that again?

6   Q     Counsel showed you a police report?

7   A     Oh, yes.

8   Q     Does this appear to be the same police report that he

9   showed you?

10  A     Yes.

11  Q     Had you ever seen this report before?

12  A     No.

13  Q     Did Detective Ray ask you to review it to make sure that

14  her statements in there were accurate in terms of what you

15  recalled happening?

16  A     No.

17  Q     And, in looking at this statement, however, did she

18  accurately reflect what you told her about where you went that

19  night?

20          MR. BRENNAN:  Objection, leading, Your Honor.

21          THE COURT:  Sustained.  Don't lead.  You can

22  rephrase.

23  Q     (BY MS. JOHNSTON)  In that report of Detective Ray, can

24  you tell us what she reported concerning your statements?

25  A     You want me to tell you what she said?

Redirect Examination Ashley Smith by Ms. Johnston

1      MR. BRENNAN:  Well, I object to that, Your Honor.

2      MS. JOHNSTON:  Looking at the report, does that

3  refresh --

4      THE COURT:  Sustained.  Rephrase your question.

5  Q    (BY MS. JOHNSTON)  Does that refresh your recollection of

6  some of the things that you told Detective Ray that night?

7  A    Yes.

8  Q    Okay.  What did you tell her orally in addition to what

9  was in your statement about where you were that night?

10  A    As far as going to dinner and going to Pat's dad's house?

11  Q    What do you recall telling Detective Ray that night about

12  where you and Mr. Waite went?

13  A    I just remember telling her that we went to dinner and to

14  Pat's dad's house.  And we came home.  And that's the only

15  place we did go.  I didn't tell her we went anywhere else.

16  Q    What, if anything, did you -- do you recall telling her

17  orally about why you went to Pat's house?

18  A    Yes.

19  Q    What did you tell her orally about why you went to Pat's

20  house?

21  A    I told her because he asked if he could go get pills for

22  Tattoo Mike.

23  Q    And who is Tattoo Mike?

24  A    Mike is who he worked with.  He called him Tattoo Mike.

25  Q    Now, with regard to the drawer in the picture P4 up on the

Redirect Examination Ashley Smith by Ms. Johnston

1    board there, was that drawer opened or closed?

2    A    Closed.

3              THE COURT:  P4?

4              MS. JOHNSTON:  P4.

5              THE COURT:  P5 and P6?

6              MS. JOHNSTON:  No.  P4 is the top photograph, Your

7    Honor.

8              THE COURT:  Okay.  Can't see it.  Go ahead.

9    Q    (BY MS. JOHNSTON)  And do you know who opened that drawer?

10   A    I'm assuming the police.  I don't remember.

11   Q    You weren't in there when the drawer was opened?

12   A    Not that I remember.

13   Q    Were you in there when the police searched the room?

14   A    I don't -- I don't remember.

15   Q    And do you know what happened to the socks that you had in

16   that drawer?

17   A    Not a clue.

18   Q    Ms. Smith, do you actually recall talking to the emergency

19   medical technicians when they arrived?

20   A    No.

21   Q    Does anything here refresh your recollection of speaking

22   to them?

23   A    Not really.

24   Q    When you spoke to the police officers at the house that

25   night within minutes of -- or, hours of what happened there,

Redirect Examination Ashley Smith by Ms. Johnston

1    where did you tell them you had gone that night?

2    A    That we had went to dinner and to Pat Sweeney's dad's

3    house.

4    Q    For what purpose?

5    A    To get pills for the guy he worked with.

6    Q    And where were those pills put?

7    A    In my empty pill bottle.

8            MS. JOHNSTON:  Court's indulgence.

9        I have nothing further.

10           THE COURT:  May the witness be excused?

11           MR. BRENNAN:  Your Honor, on the very last question I

12   have some recross, if I may, on that very last question.

13           THE COURT:  The general rule, Mr. Brennan, is no

14   recross.  So, may she be excused?  You can call her in your

15   case if you need to.

16           MR. BRENNAN:  May we approach, Your Honor?

17           THE COURT:  Yeah.

18        (Bench conference on the record.)

19           MR. BRENNAN:  The question Ms. Johnston asked, I

20   mean, going back to the facts not in evidence, she says that

21   she saw the pills in the pill bottle.  I don't believe there's

22   any testimony that she ever saw the pills.

23           THE COURT:  I didn't hear that answer.

24           MS. JOHNSTON:  I didn't hear that question either.

25           THE COURT:  Let's have the --

Redirect Examination Ashley Smith by Ms. Johnston

1          MR. BRENNAN:  I just wanted to clear that up.

2          THE COURT:  That you thought you heard an answer that

3    there were pills in the pill bottle?

4          MR. BRENNAN:  I have no problems with the witness

5    saying that she gave the empty pill bottle to Harrison Waite.

6    I thought I heard either a question or answer; the very last

7    thing that Ms. Johnston said was:  Pills in the pill bottle

8    afterwards.

9          MS. JOHNSTON:  I don't remember saying that.

10         THE COURT:  Let's go back to the question and answer.

11   Can you -- I can't see it.  But counsel can both see it and you

12   can decide whether you've got an issue or not.

13         Off the record.

14         (Off the record.)

15         MR. BRENNAN:  Actually, if you will stipulate that

16   the pills weren't put in the pill bottle, I'm fine with that

17   Your Honor.

18         MS. JOHNSTON:  I will ask -- let me clarify that.

19         THE COURT:  I will allow you to reopen your redirect.

20   And then I will allow Mr. Brennan to ask a question or two if

21   he wants to after you have attempted to clarify what your

22   intention was.

23         MR. BRENNAN:  Thank you, Your Honor.

24         THE COURT:  I didn't hear anything.

25         (The following proceedings were had in open court.)

Recross—examination Ashley Smith by Mr. Brennan

1              THE COURT:  Ms. Johnston, one last area of inquiry?

2              MS. JOHNSTON:  Thank you, Your Honor.

3    Q    (BY MS. JOHNSTON)  Ms. Smith, the pill bottle you have

4    identified here in court?

5    A    Yes.

6    Q    The last time you saw it was where?

7    A    Was in the car at Sweeney's dad's house, giving it to

8    Harrison to supposedly put pills in.

9    Q    Did you see it after that point before the police got to

10   your house?

11   A    No.

12   Q    To Harrison's house?

13   A    No.

14              MS. JOHNSTON:  I have nothing further.

15              THE COURT:  When you gave the bottle to Mr. Waite,

16   did it have anything in it, or was it empty?

17              THE WITNESS:  It was empty.

18              THE COURT:  Recross.

19              MR. BRENNAN:  Thank you, Your Honor.

20                        RECROSS—EXAMINATION

21   BY MR. BRENNAN:

22   Q    And you never, until the police showed it to you in the

23   basement at 10:00 —— after the events of that evening, you had

24   never seen that pill bottle between time that you gave it to

25   Harrison Waite and the time it was showed to you by the police,

Recross-examination Ashley Smith by Mr. Brennan

1    correct?

2    A    Correct.

3              MR. BRENNAN:  Nothing further.  Thank you.

4              THE COURT:  May the witness be excused?

5              MR. BRENNAN:  The witness may be excused, Your Honor.

6              THE COURT:  As far as the government's concerned, as

7    well?

8              MS. JOHNSTON:  Absolutely, Your Honor.

9              THE COURT:  You are excused, ma'am.  Thank you.

10        Next witness?

11             MR. RAO:  At this time the government calls Joseph

12   Kelley.

13             THE COURT:  Joseph Kelley.

14        Please come all the way up to the witness stand, sir,

15   remain standing, and face the clerk.

16                        JOSEPH WILLIAM KELLEY,

17   called as a witness, being first duly sworn, was examined and

18   testified as follows:

19             THE WITNESS:  Yes.

20             THE CLERK:  Please be seated.  Please speak directly

21   into the microphone.  State your full name for the record and

22   spell your last name, please.

23             THE WITNESS:  Joseph William Kelley, K-e-l-l-e-y.

24             THE CLERK:  Thank you.

25             THE COURT:  Your witness, Counsel.

Direct Examination Joseph Kelley by Mr. Rao

1              MR. RAO:  Thank you, Your Honor.

2                     DIRECT EXAMINATION

3    BY MR. RAO:

4    Q     Good afternoon.

5    A     How are you?

6    Q     I'm well.  Where are you currently employed?

7    A     All American Ambulance.

8    Q     And what is your position?

9    A     EMT.

10   Q     How long have you worked at All American Ambulance?

11   A     A little over a year and a half.

12   Q     And where else do you work, aside from All American

13   Ambulance?

14   A     I volunteer at North Beach Fire Department.

15   Q     Where is the North Beach Fire Department located?  What

16   county?

17   A     Calvert County.

18   Q     How long have you volunteered there?

19   A     Six years.

20   Q     Okay.  As a volunteer firefighter at the North Beach Fire

21   Department what are your duties and responsibilities?

22   A     Well, I've been a Firefighter/EMT for six years.  And we

23   normally have duty crews a few times a month.  So, I just hang

24   out as much as possible to try to volunteer as much time as I

25   can.

Direct Examination Joseph Kelley by Mr. Rao

1    Q    Do you respond -- are you a first responder to the scene

2    of fires; is that right?

3    A    Fires and --

4    Q    Other emergencies, as well?

5    A    Yes.

6    Q    Now, what certifications did you obtain to become a

7    Firefighter/EMT?

8    A    I had to take a six-month class through the University of

9    Maryland to get my EMT certification.

10   Q    When did you get certified as an EMT?

11   A    September of 2006.

12   Q    When did you get certified as a firefighter?

13   A    June of 2006, I believe.

14   Q    Did you get any other training we haven't covered?

15   A    Rescue technician, hazmat operations.

16   Q    When did you get that certification?

17   A    Just throughout years through 2006 and 2008, I believe.

18   Q    Okay.  Where is the North Beach fire house located?

19   A    8536 Bayside Road in Chesapeake Beach, actually.

20   Q    Now, since becoming a volunteer Firefighter/EMT, about how

21   many emergency calls of some kind have you responded to?

22   A    Probably three to four thousand.

23   Q    I want to direct your attention to March 23rd of 2009.

24   Were you on duty at the Calvert County firehouse on that date?

25   A    Yes.

Direct Examination Joseph Kelley by Mr. Rao

1    Q    Where were you living at that time?

2    A    I was living at the firehouse.

3    Q    Okay.  Who else was working with you that evening on duty?

4    A    Daniel McGown and Jake Mettam.

5    Q    And on March 23rd of 2009 at approximately 10:36 in the

6    evening, were you notified of a 911 call?

7    A    Yes.

8    Q    What was that call for?

9    A    It went out for an unresponsive subject.

10   Q    And did you and the other volunteer firefighters you've

11   mentioned respond to that call?

12   A    Yes.

13   Q    Who was in charge that evening?

14   A    I was.

15   Q    Who was driving the response vehicle?

16   A    Daniel McGown.

17   Q    Was that an ambulance?  What was it?

18   A    It was an ambulance.

19   Q    What was the third individual; tell me his name again.

20   A    His name is Jake Mettam.

21   Q    What was his position?

22   A    He was -- we call it just a third.  He was pretty much my

23   helper; help me carry things.

24   Q    Where did you go that evening?

25   A    Ridge Road in Breezy Point.

Direct Examination Joseph Kelley by Mr. Rao

1    Q     Okay.  Did you go to a -- what kind of building did you go

2    to?

3    A     It was just a residence.

4    Q     How did you get there?

5    A     Responded down Bayside Road; left onto Breezy Point Road;

6    and I believe it's a right onto Ridge from there.

7    Q     About how long did it take you to arrive?

8    A     Five to eight minutes, approximately.

9    Q     And where is that residence that you responded to relative

10   to your response -- typical response area?

11   A     It's at the complete opposite end of our first -- it's

12   about as far as we go.

13   Q     Okay.  Now, when you got there, what did you do?

14   A     Immediately jumped out.  My third grabbed my gear.  Ran in

15   the house.  And checked to recall the ABCs.

16   Q     How did you know you had arrived at the right house?

17   A     Just they gave us the address upon dispatch.

18   Q     Was anybody outside when you --

19   A     Yeah, there were people -- or, I think it was, like, one

20   person outside.  We saw people flagging us down.

21   Q     Okay.  Do you know whether it was a man or woman who

22   flagged you down?

23   A     I don't recall.

24   Q     Where did you go?

25   A     It was down in the basement of the house.

Direct Examination Joseph Kelley by Mr. Rao

1   Q    And, when you got down to the basement of the house, what

2   did you see?

3   A    A man laying on the floor by his bed.  So, we --

4   Q    And what did you do?

5   A    The first thing I did was walked over and checked to see

6   if he was breathing or not.  And he wasn't breathing.  So, I

7   checked to see if his airway was clear.  And there was vomit in

8   his airway.  I checked to see if he had a pulse.  And he

9   didn't.  So, we started doing CPR.

10  Q    I want to show you what's been previously marked as P8 on

11  the screen in front of you.

12       Do you recognize the individual depicted in that

13  photograph?

14  A    Yes.

15  Q    Who is that?

16  A    That was the patient that night.

17  Q    Okay.  Does that photograph depict that patient as he

18  appeared at about the time you arrived on the scene that night?

19  A    Yeah, he was -- it's hard to tell here.  But you can see a

20  little bit in his ear he was blue from about here up from lack

21  of oxygen.

22  Q    So you're gesturing from about the middle --

23  A    From the nipple line up, yes.

24  Q    Okay.  And from that point up he was blue?

25  A    Yes.

Direct Examination Joseph Kelley by Mr. Rao

1    Q    So, did you check for his pulse when you first got there?

2    A    Yes.

3    Q    And were you able to detect any pulse?

4    A    No pulse.  No breathing.

5    Q    Okay.  So, what did you do?

6    A    The first thing we do is we roll them onto their side to

7    try to clear his airway of the vomit.  And then started chest

8    compressions.

9    Q    Okay.  What position was his body before you rolled him

10   onto his side?

11   A    He was just laying on his back at the end of the bed.

12   Q    I want you to look behind you to that chart.  The

13   photograph on the top left-hand corner of the chart behind you,

14   Government's Exhibit P2.  Do you recognize what's depicted in

15   that photograph?

16   A    Yes.

17   Q    What is that?

18   A    There is where he was laying right next to the bed, where

19   that circle is.

20   Q    Mr. Kelley, in front of you there's a pointer.  Grab that

21   pointer.

22   A    Yeah, right there.

23   Q    And what are you pointing at?

24   A    That's where his body was laying.  His head was right

25   about there where that is.  You can see there's vomit from

Direct Examination Joseph Kelley by Mr. Rao

1    where --

2    Q    Okay.  So, where the V is depicted on the photograph right

3    now, that's where his head was; is that right?

4    A    His head was right about here.  I remember his body was

5    laying right along there.

6    Q    And his legs were where?

7    A    His legs were about down there.

8    Q    Okay.  And you previously testified that you had to tilt

9    or rotate the body?  How did you do that?

10   A    Yeah.  We had to slide him away from the bed to be able to

11   get the crew around him to do CPR.

12   Q    Okay.  So, in what direction did you move him?

13   A    I think we tilted him towards that way, and then slid him

14   this way to about here.

15   Q    Okay.  So, you slid him towards the door that you had come

16   through --

17   A    Yes.

18   Q    -- is that correct?

19        And away from the bed that's depicted in that photograph?

20   A    Yeah.

21   Q    Did you change the direction of the body at all?

22   A    Not until we went to move him.  And that was -- we moved

23   him out on the back board.  So we strapped him onto that just

24   to get him out of the house.

25   Q    Now, you told us a moment ago about some vomit that you

Direct Examination Joseph Kelley by Mr. Rao

```
1    saw.  What -- how did that vomit appear?

2    A    Reddish.  Like, blood with food mixed in with it.

3    Q    Okay.  Was the patient -- was he actively vomiting when

4    you saw him?

5    A    No.  It was -- he had stuff that was in his mouth.  I

6    don't know if he vomited before he lost consciousness or what.

7    But it was already there when we got there.  No active vomiting

8    at all.

9    Q    Okay.  When you saw him, there was no active vomiting at

10   all?

11   A    No.

12   Q    Did you notice any movement at all in the body?

13   A    None.

14   Q    You told us before you performed CPR; is that correct?

15   A    Yes.

16   Q    Why did you perform CPR if he's entirely unresponsive?

17   A    That's the kind of training we go through pretty much; you

18   arrive and somebody's pulseless and not breathing, you

19   immediately start CPR.

20   Q    Did any other medical personnel arrive on the scene?

21   A    Yes.  Two people from an ambulance from Huntingtown

22   arrived and a medic unit arrived.

23   Q    I show you what's marked as Government's Exhibit P7.

24             THE COURT:  P7.

25   Q    (BY MR. RAO)  Now, do you see the airway that you just
```

Direct Examination Joseph Kelley by Mr. Rao

1    told me about a minute ago in that photograph?

2    A    Yes.

3    Q    Where is that?

4    A    The one that's sticking out of his mouth, the long clear

5    tube is the one that the paramedic put in when he arrived on

6    location.  And the green one sticking out of his nostril is the

7    one we put in on scene.

8    Q    So, the one you told me about a moment ago is the green

9    one; is that right?

10   A    Yeah.  That's the one we put in on scene.  When we met

11   with the medic, he put the other one in.

12   Q    Okay.  Did you speak to anybody else at the residence

13   other than other medical personnel?

14   A    I asked one person -- I don't remember who it was.  I just

15   asked whoever was there how old he was.

16   Q    Why did you ask that question?

17   A    Just curious because the hospital would want to know.  And

18   the medic would want to know.  Because the medic bases things

19   off age.

20   Q    Did you ask any other questions?

21   A    That was it.

22   Q    Do you remember whether anybody else who lived at the

23   residence was present downstairs in the basement while you were

24   performing medical treatment on this patient?

25   A    Not that I -- I think there was the one person.  I don't

Direct Examination Joseph Kelley by Mr. Rao

1   know if it was made male or female.  But whoever I asked how

2   old they were, how old the patient was.  And that was it.

3   Q    Okay.  Did you move anything in the basement bedroom?

4   A    No.

5               THE COURT:  Let me see counsel.

6               (Bench conference on the record.)

7               THE COURT:  In an effort to keep a trial like this as

8   civilized as possible, when you put a disturbing image up

9   because you have to, deal with it.  But once you're done asking

10  questions about it, pull it.

11              MR. RAO:  Thank you.

12              (The following proceedings were had in open court.)

13              THE COURT:  Next question?

14  Q    (BY MR. RAO)  For how long did you perform CPR while you

15  were there that evening?

16  A    On scene we did about two to three sets of CPR.  So, about

17  45 chest compressions.

18  Q    What happened after that?

19  A    That's when we loaded him onto the back board, strapped

20  him up, took him out to the stretcher, and put him in the

21  ambulance.

22  Q    And where was the patient taken?

23  A    Calvert Memorial Hospital.

24  Q    Did you ride in the ambulance?

25  A    Yes.

Cross-examination Joseph Kelley by Mr. Brennan

1    Q    Who else traveled with the patient?

2    A    Daniel McGown was the driver of the ambulance.  Jake

3    Mettam was in the back with me.  Two people from Huntingtown

4    Ambulance was in the back.  And the paramedic was in the back.

5    Q    And about how long did it take you to ride there?

6    A    Maybe ten minutes.

7    Q    What happened after you got to Calvert Memorial Hospital?

8    A    We took the patient in, I believe the first trauma room on

9    the right.  And took him in there.  And the hospital staff took

10   over patient care.  And pretty much kicked me out of the room

11   to minimize the amount of people in there.

12   Q    Did you have any other interaction with any of the

13   individuals who were present at the Ridge Road residence that

14   evening?

15   A    No.

16           MR. RAO:  No other questions, Your Honor.

17           THE COURT:  Cross.

18           MR. BRENNAN:  Thank you, Your Honor.

19                      CROSS-EXAMINATION

20   BY MR. BRENNAN:

21   Q    Good afternoon, Mr. Kelley.

22   A    How are you?

23   Q    Doing just fine, thank you.  My name is William Brennan.

24   Mr. Cook and I represent Mr. Sweeney.  I'm going to ask you

25   some questions.  If I ask you a question that you do not

Cross-examination Joseph Kelley by Mr. Brennan

1   understand, please ask me to repeat it.  Fair enough?

2   A    Sure.

3   Q    Back on March 23, 2009 you were a fairly experienced EMT;

4   is that correct?

5   A    Yes.

6   Q    Okay.  And you arrived at the residence at approximately

7   10:44 that evening; is that correct?

8   A    Yeah.  I don't remember the exact -- I remember it was

9   around 10:00 o'clock.  But, whatever you say.

10  Q    All right.  I'll show you a document that's about the --

11  do you recognize that document?

12  A    Yes.

13  Q    Okay.  What is it, first of all?

14  A    That's the -- it's called an EMS report.  It's a report

15  that I put into the computer system for the State of Maryland

16  to have on record.

17  Q    All right.  So, this is a report that you prepared?

18  A    Yes.

19  Q    Okay.  Great.  So, time at patient side, does that refresh

20  your recollection that it was --

21  A    Yeah.  10:44.

22  Q    -- 10:44?  Not to be picky about it, but it does say

23  February 23.  Can we all agree this was March 23rd?

24  A    Yes.

25  Q    But 10:44 was the correct time?

Cross-examination Joseph Kelley by Mr. Brennan

1    A    Yes.

2    Q    Okay.  Now, the -- when you arrived as an experienced

3    medical technician, you went downstairs.  And you are trained

4    to immediately make an assessment of what you have on hand,

5    correct?

6    A    Yes.

7    Q    Okay.  At that time it was clear that the patient was not

8    breathing, correct?

9    A    Yes.

10   Q    It was clear at that time that there was no pulse; is that

11   correct?

12   A    Yes.

13   Q    That both pupils were dilated, correct?

14   A    I don't recall that.

15   Q    Where it says, "eye assessment," and it's got left and

16   right, what's it say?

17   A    It says, "dilated".

18   Q    Does that refresh your recollection whether the pupils

19   were dilated?

20   A    Yes.

21   Q    Okay.  And the body was also cool to the touch; is that

22   correct?

23   A    Yes.

24   Q    Okay.  So, we have a patient that's not breathing, has no

25   pulse, both eyes are dilated, and the body was cold to the

Cross-examination Joseph Kelley by Mr. Brennan

```
1    touch.  In your judgment, the patient was dead; is that
2    correct?
3    A    Yes.
4    Q    Okay.  But you are trained, as are medical people, to --
5    and -- well, I take it you are not allowed to make a
6    pronouncement of death; is that correct?
7    A    That's correct.
8    Q    Okay.  So, even though it's your assessment that the body
9    is clearly dead, you are trained to begin CPR and do whatever?
10   A    Yes.
11   Q    Okay.  And one of the things that you do is also try to
12   ascertain what was going on with the victim prior to the victim
13   being dead?
14   A    Yes.
15   Q    Okay.  I'm going to show you -- do you remember talking to
16   anyone at the hospital and telling anyone at the hospital that
17   the patient's girlfriend heard him vomiting at 9:45 and found
18   him unresponsive at 10:30?
19   A    No, not that I recall.
20   Q    Not that you recall.  Let me show you this and see if this
21   refreshes your recollection.  Do you recognize this document at
22   all?  Take your time.
23   A    Yeah.  I believe that report was given by the paramedic on
24   scene.
25   Q    By the paramedic.
```

Cross-examination Joseph Kelley by Mr. Brennan

```
 1   A     Yeah.
 2   Q     So, keep walking back -- I don't mean to have my back to
 3   you --
 4   A     Oh, no, you're fine.
 5   Q     -- and ask you a question, Mr. Kelley.
 6         Who was the paramedic on the scene?
 7   A     Shannon Stockton.
 8   Q     Shannon Stockton.  And you believe that Shannon Stockton
 9   would have told the hospital that the patient's girlfriend
10   heard him vomiting at 9:45 --
11             MS. JOHNSTON:  Objection.
12             THE COURT:  Sustained.  It calls for speculation on
13   the part of this witness.  Next question.
14             MR. BRENNAN:  So, the document that I showed you does
15   not refresh your recollection that you ever told the hospital
16   that --
17             MS. JOHNSTON:  Objection.
18             THE COURT:  Sustained.
19             MS. JOHNSTON:  I ask the Court to instruct the jury.
20             THE COURT:  Sustained.  I'm finished.  Move on.
21             MR. BRENNAN:  Nothing further, Your Honor.  Thank
22   you.
23             THE COURT:  Redirect.
24             MR. RAO:  Nothing further, Your Honor.
25             THE COURT:  And the witness is to be excused?  Any
```

Cross-examination Joseph Kelley by Mr. Brennan

1    problem with that?

2            MR. BRENNAN:  I do not, no.  The witness may be

3    excused.  Thank you, Your Honor.

4            THE COURT:  Okay.  You may be excused.  Okay.  You

5    may step down.  Thank you, sir.

6        Ladies and gentlemen, it's time for our afternoon break.

7    We're going to take a 15-minute recess.  Don't discuss the case

8    with anyone during the break.  Don't discuss the case even

9    among yourselves.  Do not allow yourselves to be exposed to any

10   news articles or other media that touch upon this case or the

11   issues it presents.  Avoid all contacts with any of the

12   participants in the trial.  Don't make any independent

13   investigation of the law or the facts of this case.  Don't look

14   up anything relevant to this case on the Internet.  Don't

15   consult encyclopedias or dictionaries.  15 minutes.  I'd be

16   grateful if the Court security officer would take the jury out.

17   Thank you.

18            (Jury left the courtroom.)

19            THE COURT:  A couple of procedural matters, first.

20   Trials are supposed to be adversarial.  No problem at all with

21   respect to that.  But as a trial becomes more adversarial,

22   remember the basics.  No. 1, no speaking objections.  No. 2, as

23   a matter of procedure, if a witness was handled by one lawyer

24   for a side during examination, then I'm only going to entertain

25   objections from the lawyer who was examining previously.  I let

Cross-examination Joseph Kelley by Mr. Brennan

1    that one slide because we haven't specifically covered that and

2    everybody's entitled to one mistake.  But let's remember that

3    rule.  Anything else to take up not in front of the jury?

4            MS. JOHNSTON:  No, sir.

5            MR. BRENNAN:  No.  Thank you, Your Honor.

6            THE COURT:  15 minutes.  Thank you.

7            (A recess was taken.)

8            THE COURT:  Any issues to bring up?

9            MS. JOHNSTON:  No, Your Honor.

10           MR. BRENNAN:  No, thank you.

11           THE COURT:  Bring them in.

12           (Jury entered the courtroom.)

13           THE COURT:  Be seated, please.  Government, call your

14   next witness.

15           MS. JOHNSTON:  Your Honor, the government would call

16   Corporal Wilson.

17           THE COURT:  Mr. Wilson, please come forward.  All the

18   way up here to the witness stand and then stand and face the

19   clerk, sir.

20           THE CLERK:  Please raise your right hand.

21                       RICHARD WILSON,

22   called as a witness, being first duly sworn, was examined and

23   testified as follows:

24           THE WITNESS:  Yes.

25           THE CLERK:  Please be seated.  Please speak directly

Direct Examination Richard Wilson by Ms. Johnston

1    into the microphone.  State your full name for the record and

2    spell your last name, please.

3            THE WITNESS:  Richard Wilson.  W-i-l-s-o-n.

4            THE CLERK:  Thank you.

5            THE COURT:  Your witness ma'am.

6                        DIRECT EXAMINATION

7    BY MS. JOHNSTON:

8    Q    Corporal Wilson, where are you employed?

9    A    Calvert County Sheriff's Office.

10   Q    And how long you been employed there?

11   A    Ten years.

12   Q    What are your duties and responsibilities with the Calvert

13   County Sheriff's Department?

14   A    I'm a supervisor for road patrol.

15   Q    How long have you been a supervisor for road patrol?

16   A    Five years.

17   Q    In addition to being the supervisor, can you explain to us

18   what your duties are on road patrol as well as the patrol

19   officers you supervise?

20   A    Essentially we're the first responding officers to the

21   scenes.  When someone calls the police, we're the ones that get

22   the calls and the dispatch to the scenes.

23   Q    And have you worked on road patrol during your ten years

24   with the Sheriff's Department?

25   A    The entire time.

Direct Examination Richard Wilson by Ms. Johnston

1    Q    Now, calling your attention to March 23rd of 2009, did you

2    have occasion on that day to respond to a location in Breezy

3    Point?

4    A    Yes.

5    Q    And do you know approximately what time you responded?

6    A    It was after 10:30 at night.  I believe it was 10:38 or

7    10:39 in the evening.

8    Q    And where did you respond to?

9    A    I'm not sure of the numbers.  I believe it was on Ridge

10   Road.

11   Q    Did you prepare a report regarding that incident?

12   A    Yes, I did.

13   Q    Would reviewing that report help refresh your memory about

14   some of the details?

15   A    Yes.

16   Q    Can you identify that?

17   A    Yes.  This is a copy of the report I wrote.

18        MS. JOHNSTON:  Your Honor, I'd for the record like to

19   mark that as Government's Exhibit O2 for identification only.

20        THE COURT:  O2 for identification only, Corporal

21   Wilson's report.

22   Q    (BY MS. JOHNSTON)  Corporal Wilson, what was the address

23   that you responded to?

24   A    4879 Ridge Road, Chesapeake Beach, Maryland.

25   Q    When you arrived, were there any other emergency vehicles

Direct Examination Richard Wilson by Ms. Johnston

1    or police officers present?

2    A    There were fire department personnel, an ambulance,

3    whatever other vehicles they had.  Sergeant Fridman arrived

4    right at the same time frame as me, a couple seconds behind me.

5    Q    And what did you observe the emergency personnel people

6    doing when you arrived there?

7    A    They were in the back of an ambulance with the victim, Mr.

8    Waite.  They were performing CPR on him and getting ready to

9    transport him to Calvert Memorial Hospital.

10   Q    Were you able to observe his condition?

11   A    Yes.

12   Q    Can you describe what you observed?

13   A    Unconscious, unresponsive.  He was laying on a stretcher

14   in the back.

15   Q    Did you have any conversation with the medical people

16   about his condition?

17   A    I allowed them just to deal with what they were doing and

18   started to try to gather information from anyone else, the

19   other people that were on scene.

20   Q    Do you recall how many other people were there on the

21   scene?

22   A    Outside of emergency personnel there were three others

23   that I can recall.

24   Q    Okay.  And who -- do you recall who those people were?

25   A    Yeah.  One was Ashley Smith, Sara Conner, and Patrick

Direct Examination Richard Wilson by Ms. Johnston

1    Kennedy.

2    Q    And who were they in relation to the residence you were

3    at?

4    A    Mr. Kennedy and Ms. Conner lived at that residence.  And

5    Ms. Smith was there as a friend of Mr. Waite's.

6    Q    Do you recall where those three people were when you first

7    saw them?

8    A    I believe everyone was outside.

9    Q    And what did you do in regards to those people?

10   A    I started talking to them to try to figure out what

11   exactly was going on.

12   Q    And were they all together when you spoke with them?

13   A    No.

14   Q    Now, did -- who did you speak to?

15   A    First I spoke to Ms. Smith.

16   Q    And did she provide you with some information?

17   A    Yes, she did.

18   Q    Based upon that information, what did you do?

19        MR. BRENNAN:  I object to the witness reading the

20   report.

21        THE COURT:  Yes.  If you want to refresh his

22   recollection as to a specific point, please feel free.  But

23   once that's been accomplished, please re-cover the report and

24   continue with your examination.

25   Q    (BY MS. JOHNSTON)  As the result of speaking -- do you

Direct Examination Richard Wilson by Ms. Johnston

1  recall what Ashley Smith told you?

2  A    I remember she told me that --

3            MR. BRENNAN:  Objection, that calls for yes or no.

4            THE COURT:  It does.  Can you answer that yes or no?

5            THE WITNESS:  Yes.

6            THE COURT:  Do you recall?

7            THE WITNESS:  Yes.

8            THE COURT:  You do recall.  Next question.

9            MS. JOHNSTON:  What did she tell you?

10           MR. BRENNAN:  Objection.

11           THE COURT:  Any -- sustained.

12  Q    (BY MS. JOHNSTON)  Based upon what she told you, what did

13  you do?

14  A    I decided I would also need to speak with the other two

15  that were there and determine if there were any illegal drugs

16  in the residence that could have contributed to Mr. Waite's

17  condition.

18  Q    And who did you speak to?

19  A    I then spoke to Ms. Conner and Mr. Kennedy.

20  Q    And, based upon your conversations with them, what did you

21  do?

22  A    Searched the residence for illegal narcotics.

23  Q    Before you did that, did you ask anyone for permission to

24  search the residence?

25  A    I did not.  I was told that they had given permission to

Direct Examination Richard Wilson by Ms. Johnston

1    one of the other officers on the scene.

2    Q    Now, where did you search in the residence?

3    A    The downstairs basement area.

4    Q    And why did you search that area?

5    A    That's where Mr. Waite's room was, the room he was

6    renting.

7    Q    Can you describe how you searched the area?

8    A    Got downstairs, the -- he had a bedroom.  And then the

9    rest of the basement was, like, a rec room and a laundry room

10   area.  Just glanced around, looking for anything that appeared

11   to be of evidentiary value.  Inside his bedroom is where we

12   actually conducted a more thorough search and opened up

13   drawers, the closet and everything.

14   Q    And during the -- when you say, "we," who else was down

15   there with you, if you recall?

16   A    Sergeant Fridman was with me.

17   Q    And were you able to locate anything that you seized that

18   day?

19   A    Yes.

20   Q    Can you describe for us where you searched and what you

21   recovered?

22   A    I walked into his bedroom, and to the left there was a

23   desk with a key on top of it.  I opened up one of the drawers.

24   And inside the drawer I found suspected drugs and drug

25   paraphernalia inside it, which is what we seized.

Direct Examination Richard Wilson by Ms. Johnston

1   Q    And what did you do with it once you seized it?

2   A    I put it in the Calvert County Sheriff's Office property

3   held unit to keep it safe and have it there in case narcotics

4   detectives wanted to conduct a follow-up investigation.

5   Q    Can you turn and look at what has been marked and

6   introduced as Government's Exhibits P2, 3, 4 across the top and

7   5 and 6 on the bottom.

8        Do you recognize those photographs?

9   A    Yes.  Those are photographs of Mr. Waite's bedroom.

10  Q    And do those truly and accurately depict the way it was

11  when you conducted your search?

12  A    All except the dresser drawer was not opened when we

13  walked in.  We opened it up before the picture was taken.

14  Q    In addition to that drawer, did you open other drawers, as

15  well?

16  A    Yeah.  Every drawer and everything there was opened.  But

17  that was left open when we took the pictures because that's

18  where we found everything.

19  Q    When you say you found everything, what do you mean?

20  A    The drugs and drug paraphernalia.

21  Q    Were there any closets in the room?

22  A    I believe there was a closet to the right where the shoes

23  are on the floor, just to the right of that.

24  Q    And what did you do in relation to the closet?

25  A    We didn't find anything, any illegal items in the closet.

Direct Examination Richard Wilson by Ms. Johnston

1    Q    Well, did you search the closet?

2    A    Yes, we did search it.

3    Q    During the course of your search of the closet, what, if

4    anything, did you find?

5    A    No illegal items.

6    Q    Can you describe for us what the illegal items were that

7    you found in Mr. Waite's bedroom?

8    A    Yes.  In the drawer there's the multicolored glass pipe

9    that had marijuana residue in it.  There's a bag of syringe

10   needles with a couple other needles that are loose in the

11   drawer right next to a spoon.  The spoon had heroin residue in

12   the top of it and the bottom had burn marks from where it was

13   heated up to liquefy it.  There's also a red prescription pill

14   bottle in there.  And that pill bottle contained several brown

15   rock-like substance -- a brown rock-like substance that I

16   recognized as heroin.

17   Q    And why did you seize those items?

18   A    They're illegal drugs and they possibly contributed to the

19   condition he was in when I arrived.

20   Q    Now, after you completed your search of the basement, Mr.

21   Waite's bedroom in particular, did you leave the residence?

22   A    Not immediately.

23   Q    What else did you do while you were there?

24   A    Well, I was speaking with Detective Fridman and Detective

25   Ray, who were on scene.  And we were trying to figure out how

Direct Examination Richard Wilson by Ms. Johnston

1  everything was going to proceed from here.  And a death report

2  had to be prepared and who was going to handle that.  So, I

3  also collected all the seized items from Detective Fridman so

4  that I could put them in property held.

5  Q    Let me show you what have been marked as Government's

6  Exhibits D1, D2, D1A.

7       First let me show you what's been marked as D1.

8       Do you recognize that item?

9  A    Yes, ma'am.  This is the red prescription pill bottle.

10 Q    Now, the bag that is in that, is that the bag that you put

11 it in?

12 A    No.

13 Q    And do you know where it was sent after you seized it, put

14 it in your evidence storage compartment?

15 A    After I put it in our property, it was later collected by

16 a narcotics detective to be sent to a drug lab to be tested.

17 Q    Let me show you what's been marked as Government's Exhibit

18 D4.  Do you recognize anything in there?

19 A    Yes.  This is --

20 Q    What do you recognize?

21 A    I recognize the spoon.  There were these vials.  I don't

22 know what they contained.

23 Q    The vials weren't there when you seized this?

24 A    I don't recall them being there.

25 Q    Okay.  But you do recall the spoon?

Direct Examination Richard Wilson by Ms. Johnston

1    A    Yes.

2    Q    Let me show you D3.  Do you recognize that item?

3    A    The glass marijuana pipe, yes.

4    Q    Now, that appears to be broken.

5    A    Yes.

6    Q    What condition was it in when you recovered it?

7    A    It was in one piece.

8    Q    And is that depicted on the photograph?

9    A    Yes, ma'am.

10   Q    P5 and 6?

11   A    Yes, ma'am.

12   Q    Okay.  Can you use that laser pointer right there in front

13   of you to point to it?  There's a little button.

14   A    Right there.

15   Q    And then in addition to that were there any other items

16   that you recovered?

17   A    I believe there was a baggie of a white powder I

18   recognized as cocaine, also.

19   Q    And what did you do with that?

20   A    That would have been packaged with everything else.

21   Q    And placed where?

22   A    In the property held.

23   Q    Now, did you fingerprint anything in the house?

24   A    No.

25   Q    Why not?

Cross-examination Richard Wilson by Mr. Brennan

1   A    Based on the call we had, the totality of everything, it

2   didn't appear that there was any kind of assault or anything to

3   indicate that there was another person that we would be looking

4   for that could have committed a crime at the scene that we

5   would be looking for later.  Everything appeared to be it was a

6   drug overdose.  And, based on what Ms. Smith, Ms. Conner, and

7   Mr. Kennedy told us, it was just those three and Mr. Waite at

8   the residence prior to this event when we got there.  So, I had

9   no indication that there would be anyone else that we would

10  want to identify.

11  Q    Did the -- did you and the other members of the Calvert

12  County Sheriff's Department comply with your procedures and

13  processes for handling a scene of a drug overdose?

14  A    Yes.

15         MS. JOHNSTON:  Court's indulgence.

16      I have nothing further.

17         THE COURT:  Cross.

18         MR. BRENNAN:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20  BY MR. BRENNAN:

21  Q    Good afternoon, Officer Wilson.

22  A    Good afternoon.

23  Q    My name is William Brennan.  Mr. Cook and I represent Mr.

24  Sweeney.  And I'm going to ask you a few questions this

25  afternoon.  So, should I ask you a question that you do not

Cross-examination Richard Wilson by Mr. Brennan

1    understand, please ask me to repeat it.  Fair enough?

2    A    Yes, sir.

3    Q    Okay.  As of today or as of this year you've been a patrol

4    officer with the Calvert County Sheriff's Office for ten years;

5    is that correct?

6    A    Yes.

7    Q    Okay.  So, going back three years, you would have been a

8    patrol officer for about seven years at that time, correct?

9    A    Correct.

10   Q    And were you a supervisor at that time?

11   A    Yes.

12   Q    Okay.  So, you arrived at the residence of Ridge Road.

13   And you assessed what was going on, correct?

14   A    Correct.

15   Q    And you conducted a search of the residence?

16   A    Correct.

17   Q    Okay.  But you chose not to call the forensic services

18   team; is that right?

19   A    You mean -- we process scenes a lot ourselves in Calvert

20   County.  It's -- we only have two people that do it and they're

21   on call all the time.  A lot of times they're not available.

22   So we're expected to conduct our own evidence collection.

23   Q    So, you were the person who did the evidence collection on

24   Monday, March 23rd, 2009?

25   A    Detective Fridman is the one who photographed and seized

Cross-examination Richard Wilson by Mr. Brennan

```
1    it.  I took it from him to put in the property.
2    Q    Okay.  He took the photographs; you did the search?
3    A    Well, he was with there with me searching also.
4    Q    Let me ask you this:  You didn't make any effort to secure
5    the entire scene, correct?
6    A    The scene was secure.  We weren't letting people into the
7    house.
8    Q    Right.  But you at no time searched the upstairs of the
9    residence, correct?
10   A    I did not, no.
11   Q    Detective Fridman did not search it?
12   A    I don't know if he searched upstairs at all or not.
13   Q    You have no knowledge to tell this jury that any member of
14   law enforcement from Calvert County searched the upstairs of
15   the residence, correct?
16   A    Correct.
17   Q    Okay.  With respect to downstairs, you took a cursory
18   review of the other rooms in the basement, correct?
19   A    Correct.
20   Q    Did not do a thorough search of the other rooms
21   downstairs, correct?
22   A    Correct.
23   Q    Okay.  And the only room that you really focused on was
24   the bedroom that's depicted there, correct?
25   A    Correct.
```

Cross-examination Richard Wilson by Mr. Brennan

1    Q    All right.  And can you even tell us today how many other

2    rooms are in the basement area of the residence?

3    A    Not total, no.

4    Q    Not total.  And, as a matter of fact, you did not do a

5    crime scene diagram to demonstrate what other rooms are in the

6    basement, correct?

7    A    Correct.

8    Q    Okay.  And you did not do a diagram to indicate where

9    certain items were found, correct?

10   A    No.  It's why we took the pictures.

11   Q    That's why you took the pictures.  So, the -- did you --

12   were there any socks in that drawer that you recall, or were

13   you just able to open the drawer and see what's depicted in

14   Photograph 5 and 6 that's there?

15   A    I opened the drawer and the picture was taken.

16   Q    Okay.  So, you didn't have to remove any socks or any

17   clothing items to see what's depicted in Exhibits 5 and 6; is

18   that correct?

19   A    Not that I recall.

20   Q    Not that you recall.  Okay.  And Ms. Johnston showed you a

21   police report that you did.  Now, did you observe at any point,

22   Officer Wilson, a silver scale on top of a dresser?

23   A    I -- if I could look at my report to see if I have

24   anything in there.

25   Q    I didn't mean to interrupt you.  I'm sorry.  I'm going to

Cross-examination Richard Wilson by Mr. Brennan

1    show you your report and I'm going to show you another report

2    and see if that refreshes your recollection.

3    A    Okay.

4    Q    Is the first document I'm showing you your report, sir?

5    A    Yes.

6    Q    Yes.  Okay.  It says Corporal R. Wilson.  So, nothing gets

7    by me.  I take it that's your report; is that right?

8    A    Yes, sir.

9    Q    I show you another report which is not your report but I

10   ask you if that refreshes your recollection as to this silver

11   scale I asked you about.  And it's Detective Cari Ray's report.

12   A    Correct.

13   Q    Okay.  Read to yourself, not out loud, that paragraph

14   right there.  And I'm going to ask you a question about that.

15        Did you have a chance to read it?

16   A    Yes.

17   Q    Does that help refresh your recollection, sir, as to

18   whether or not there was a silver scale on top of the dresser

19   when you conducted the search of the residence?

20   A    No.

21   Q    It does not?

22   A    No.

23   Q    So, you don't recollect any silver scale being there?

24   A    No.

25   Q    Okay.  Let me show you this diagram that has Joint Exhibit

Cross-examination Richard Wilson by Mr. Brennan

```
 1    No. 1 on it.  Does this look like an accurate diagram of the
 2    basement of the residence?
 3    A    I wouldn't know if that's an accurate diagram or not.
 4    Q    So, you made no notes as to how many rooms or what was
 5    downstairs or anything like that; is that correct, sir?
 6    A    I know there was like a washing area, and an open area
 7    like a rec room type, and his bedroom.  As far as everything
 8    else goes, I couldn't tell you what it looked like.
 9    Q    Couldn't tell us what it looked like.  And took no
10    pictures and only did a cursory examination of those other
11    rooms, correct?
12    A    Correct.
13    Q    Do you recollect Officer Cari Ray being there at any time
14    that evening while you were there?
15    A    Yes.
16    Q    Okay.  When did she arrive in relation to your arrival, if
17    you know?
18    A    No idea.  Probably within 10, 15 minutes of me at the
19    absolute latest.
20    Q    Okay.  And at some point I take it the residence was
21    released, if you will, back to the owner; is that correct?
22    A    I imagine if they still live there.
23    Q    Well, all right.  Let me ask -- re-ask that rather
24    inartful question.  I take it that at some point that the
25    police involvement at that address at 4879 Ridge Road,
```

Cross-examination Richard Wilson by Mr. Brennan

1    Chesapeake Beach, Maryland ended that day?

2    A    I would imagine so.  I know when I left my involvement was

3    over.  I don't know if the detectives went back for any other

4    reason or anything.

5    Q    All right.  Were you then the last officer to leave then?

6    A    I don't believe I was.

7    Q    All right.  Do you know what time you left?

8    A    No clue.

9    Q    No clue.  Okay.  And, the report that Ms. Johnston asked

10   you about and that I've shown you, your recommendation was that

11   it be closed; is that correct?

12          MS. JOHNSTON:  Objection.

13          THE COURT:  Counsel approach.

14          (Bench conference on the record.)

15          THE COURT:  I'm trying to understand the question.

16   Your recollection is that it be closed; that what be closed?

17          MR. BRENNAN:  Well, here's the -- it's a rather

18   interesting report, Your Honor.  I'm not quite sure what I want

19   to do with it.  The report that this officer prepared says the

20   suspect is Harrison Waite III.

21          THE COURT:  The suspect is what?

22          MR. BRENNAN:  Harrison Waite III, the deceased.

23   Apparently he's a suspect in, I guess, possession of CDS.  And

24   he closes -- this officer recommends in the report that the

25   investigation be closed.  And the only place I'm going with

Cross-examination Richard Wilson by Mr. Brennan

1    that, as you may have gathered, is what the extent of the

2    investigation and examination of the residence was.

3              THE COURT:  The report itself is not in evidence.

4              MR. BRENNAN:  I agree.  And I'm not putting it in.

5              THE COURT:  And the questions that really imply and

6    even more the content of the report are technically improper.

7    I don't intervene unless counsel objects.  But, we're at the

8    bench.  And, so, I want to make sure we're not headed in that

9    direction.  I mean, you can talk about whether or not he closed

10   his investigation.

11             MR. BRENNAN:  Yeah.  Maybe I'll rephrase it.

12             THE COURT:  I'm not comfortable with it being so

13   closely tied to what's in a document that is, itself, not in.

14             MR. BRENNAN:  All right.  I think I went a bridge too

15   far with my question.  Let me back up one.

16             THE COURT:  Okay.  Very good.  The objection is

17   sustained.

18             (The following proceedings were had in open court.)

19             THE COURT:  Next question.

20             MR. BRENNAN:  Thank you, Your Honor.

21   Q    (BY MR. BRENNAN)  Let me ask it this way.  Is it fair to

22   say, Officer Wilson, that when you departed the residence at

23   Ridge Road, whatever time that was, that you closed the

24   investigation at that point, correct?

25   A    Any investigation that I was going to conduct, I was

Cross-examination Richard Wilson by Mr. Brennan

1    closing.

2    Q    You were closing?

3    A    Yeah.

4    Q    Okay.  So, when you departed, whatever time, that was it

5    as far as you're concerned?

6    A    For my part of it, yes.

7    Q    And you and Detective Fridman were the ones who took the

8    photographs, correct?

9    A    Detective Fridman took the photographs, yes.

10   Q    Under your direction?

11   A    Not under my direction.  He's a sergeant and he's a

12   detective.  He's taking the pictures --

13   Q    All right.

14   A    -- he knows need to be taken.

15   Q    So, he's the sergeant he gets to take the pictures; you're

16   the corporal and you get to do the search; is that the way that

17   works?

18   A    I get to do the paperwork.

19   Q    You get to do the paperwork.  Okay.  Fair enough.  And

20   then to your knowledge no officer, either detective, corporal,

21   sergeant, or whomever for Calvert County ever did a scene

22   diagram, correct?

23   A    Correct.

24   Q    And to your knowledge no corporal, sergeant, or detective

25   for Calvert County ever did a more thorough search of the

Redirect Examination Richard WIlson by Ms. Johnston

1    residence than what you've described here for us this

2    afternoon, correct?

3    A    Correct.

4    Q    And again as far as you know no corporal, sergeant, or

5    detective for Calvert County ever did any fingerprint

6    examination of any other portions of the residence, correct?

7    A    Correct.

8          MR. BRENNAN:  Nothing further, Your Honor.  Thank

9    you.

10          THE COURT:  Redirect.

11          MS. JOHNSTON:  Just couple of questions.

12                      REDIRECT EXAMINATION

13   BY MS. JOHNSTON:

14   Q    Counsel asked you to take a look at Detective Ray's report

15   to see if that refreshed your recollection.

16   A    Correct.

17   Q    Does that refresh your recollection concerning who took

18   the pictures at the residence?

19   A    It says Corporal Ray took the pictures.

20          THE COURT:  Says what, sir?

21          THE WITNESS:  It says Corporal Ray took the pictures.

22          THE COURT:  It says Corporal Ray took the pictures.

23          THE WITNESS:  Yes.

24   Q    (BY MS. JOHNSTON)  So, do you recall that Corporal Ray was

25   there?

Redirect Examination Richard WIlson by Ms. Johnston

1   A    Yes, I know she was on the scene.

2   Q    And Sergeant Fridman and you were conducting the search?

3   A    Yes.

4   Q    And your recollection here today was that Sergeant Fridman

5   took the pictures?

6   A    Yeah.  I thought Sergeant Fridman took the pictures.

7   Q    But those were the pictures that were taken; is that fair

8   to say?  Those on P2 through P6?

9   A    Yes.

10  Q    You're a patrol officer; is that correct?

11  A    Correct.

12  Q    What is your role in terms of conducting investigations

13  into someone's death?

14  A    For the great majority of them we have no role other than

15  maintaining the scene for the detectives.  There are certain

16  times where it's an obvious natural causes type death, in which

17  case we are allowed to contact the person's doctors that they

18  are seeing.  And if the doctor's are willing to sign off on the

19  death certificate, there is no investigation into it.  And we

20  go from there.

21       It also depends on the Medical Examiners's Office.  If

22  they require a autopsy, then a detective will be notified.  If

23  they don't require an autopsy and the person's doctor will sign

24  off on the death certificate, then I guess it's us doing an

25  investigation.  But it's not really an investigation, it's just

Redirect Examination Richard WIlson by Ms. Johnston

1    doing a death report at that point and documenting everything.

2    Q    And that's when it's apparent that someone died of natural

3    causes?

4    A    Correct.

5    Q    In an instance where you suspect an overdose death, who

6    handles the investigation?

7    A    That would be a detective.

8    Q    And who was the detective on the scene in this case?

9    A    Detective Ray and Sergeant Fridman were both detectives.

10   Q    And it was Detective Ray who had to do the investigation;

11   is that correct?

12   A    I believe she did the death report, which would make it

13   her investigation.

14   Q    And you assisted by collecting the evidence and taking it

15   back to the station?

16            MR. BRENNAN:  Objection, leading, Your Honor.

17            MS. JOHNSTON:  Strike that.

18            THE COURT:  Sustained.

19   Q    (BY MS. JOHNSTON)  Were you the primary person responsible

20   then with what was happening with the scene?

21   A    No.

22   Q    Who was the primary person?

23   A    It would have been Detective Ray.

24   Q    And what were you asked to do to assist Detective Ray?

25   A    To write a report based on my involvement and to take the

Redirect Examination Richard WIlson by Ms. Johnston

1   seized items back to the sheriff's office and put them in our

2   property held.

3        MS. JOHNSTON:  Court's indulgence.

4     I have nothing further.

5        THE COURT:  Thank you.  May the witness be excused?

6        MR. BRENNAN:  Yes, Your Honor.

7        THE COURT:  As far as the government's concerned?

8        MS. JOHNSTON:  Yes, sir.

9        THE COURT:  Corporal, you're excused.  You may

10  depart.  Thank you, sir.

11       THE WITNESS:  Thank you.

12       THE COURT:  Next witness?

13       MS. JOHNSTON:  Your Honor, I've spoken to defense

14  counsel.  We're going to call a witness out of turn, the Sprint

15  Telephone record custodian.

16       THE COURT:  Still a government witness, though?

17       MS. JOHNSTON:  Still a government witness, Your

18  Honor.  Joseph Trawicki.

19       THE CLERK:  Please raise your right hand.

20                 JOSEPH TRAWICKI,

21  called as a witness, being first duly sworn, was examined and

22  testified as follows:

23       THE WITNESS:  I swear.

24       THE CLERK:  Please be seated.  Please speak directly

25  into the microphone.  State your full name for the record and

Direct Examination Joseph Trawicki by Ms. Johnson

1    spell your last name, please.

2              THE WITNESS:  Joseph Trawicki.  T-r-a-w-i-c-k-i.

3              THE CLERK:  Thank you.

4                         DIRECT EXAMINATION

5    BY MS. JOHNSTON:

6    Q    Good afternoon Mr. Trawicki.

7    A    Good afternoon.

8    Q    Where are you employed?

9    A    Sprint Nextel.

10   Q    What do you for Sprint Nextel?

11   A    I am one of the records custodians.

12   Q    How many records custodians does Sprint Nextel have?

13   A    We have four full-time records custodians.

14   Q    What are your duties and responsibilities as a records

15   custodian?

16   A    My primary responsibility is to travel all over the

17   country and testify in court regarding records Sprint has

18   produced.

19   Q    For how long have you been assigned that duty?

20   A    Over two and a half years.

21   Q    Give us an idea of how many times you've had to testify in

22   court concerning Sprint records.

23   A    Probably close to 175 times.

24   Q    Are you appearing here in response to a subpoena for

25   records from the government?

Direct Examination Joseph Trawicki by Ms. Johnson

1    A    Yes, ma'am.

2    Q    I'm going to show you what's been marked as Government's

3    Exhibit R1 and put it up on the screen.  Do you see that disk?

4    A    Yes, ma'am.

5    Q    Have you had -- and that's marked for identification, Your

6    Honor.  Have you --

7              THE COURT:  R1 for identification only.

8    Q    (BY MS. JOHNSTON)  Have you had occasion to review that

9    disk?

10   A    Yes, I have.

11   Q    Can you tell us what's on that disk?

12   A    That is call detail records and cell site information as

13   well as some cheat sheets on how to read the records for (703)

14   856-5771.

15   Q    And, the records that are contained on R1, were those

16   created by Sprint in the ordinary course of Sprint's business?

17   A    Yes, they are.

18   Q    And what is Sprint Nextel?

19   A    Sprint is a wireless communications company.

20   Q    And were they created by individuals with knowledge of the

21   information that's contained in those records?

22   A    Yes, they are.

23   Q    And are they maintained in the regular course of the

24   business of Sprint?

25   A    Yes, ma'am.

Direct Examination Joseph Trawicki by Ms. Johnson

```
1   Q     Now, let me show you also what's been marked as
2   Government's Exhibit R2.  And I ask you if you had occasion --
3   for identification only.  Have you had occasion to review R2,
4   as well?
5   A     Yes, ma'am.
6   Q     What does R2 contain?
7   A     That is records, the call detail records, cell site
8   information, as well as the cheat sheets for -- I'm sorry I
9   can't see the whole number.  (703) 928-5791.
10            THE COURT:  What sheets?
11            THE WITNESS:  Cheat sheets, sir.
12            THE COURT:  Cheat sheets?
13            THE WITNESS:  Yes.  They explain how to read the
14  records.
15  Q     (BY MS. JOHNSTON)  What kind of information is on those
16  cheat sheets, if you might --
17  A     It's an explanation of what the columns and the call
18  detail records, what we call a CDR, which each call means and
19  how to interpret the cell site information.
20  Q     And were those records created and maintained in the same
21  fashion as the ones in R1?
22  A     Yes, ma'am.
23  Q     Let me show you what's been marked as R1A.  And I ask you
24  if you can identify this record.
25  A     Yes, ma'am.
```

Direct Examination Joseph Trawicki by Ms. Johnson

1   Q    And what is that?

2   A    It's the subscriber information on record for the

3   telephone number (703) 856-5771.

4   Q    And what does it tell us in terms of who was the

5   subscriber to that record?

6   A    The subscriber listed is Bradley Mechanical, Incorporated

7   of Sterling, Virginia.

8   Q    And does this document reflect what records you provided

9   in response to the subpoena?

10  A    Yes, ma'am.

11  Q    Can you just tell us what records you provided in response

12  to the subpoena?

13  A    We provided call detail records, which is a listing of

14  incoming and outgoing calls, as well as cell site information,

15  which is a location of cell sites or cell towers.

16  Q    And is that reflected on Page 2 of this record?

17  A    Yes, ma'am.

18  Q    And the date range for those records was what?

19  A    The date requested was 5/1/2008 through 3/25/2009.

20  Q    Were you able to provide all the records for that time

21  period?

22  A    Yes, ma'am.

23  Q    Let me next show you what's been marked as R2A.  And I ask

24  if you recognize those documents.

25  A    Yes, ma'am.

Direct Examination Joseph Trawicki by Ms. Johnson

1    Q    And what is the first sheet?

2    A    This is the cover sheet from our subpoena compliance

3    department over the return that includes the subscriber

4    information.

5              THE COURT:  Identification 2A?

6              MS. JOHNSTON:  No, Your Honor.

7              THE COURT:  2A.  2A is received.

8              MS. JOHNSTON:  Going to Page 2.

9              THE COURT:  R2A received.  What about R1A; what was

10   your intention in that regard?

11             MS. JOHNSTON:  To be admitted, Your Honor.

12             THE COURT:  So R1A identified and received.  R2A

13   identified and received.  R1 identification only.  R2

14   identification only.  You may continue.

15   Q    (BY MS. JOHNSTON)  Looking now at Page 2 of that exhibit.

16   A    That is the subscriber information for (703) 928-5791.

17   Q    And who is the subscriber for this second telephone

18   identified on R2A?

19   A    It is, once again, the Bradley Mechanical, Incorporated.

20   Q    And can you tell us what records were requested and

21   provided pursuant to the request?

22   A    The subscriber information as well as the call detail

23   records and cell site information.

24   Q    In regards to those records, are there literally thousands

25   of records on those two disks?

Direct Examination Joseph Trawicki by Ms. Johnson

1    A     Yes, ma'am.

2    Q     If I could show you R1F.  Can you tell us what we're

3    looking at here?

4    A     This is an excerpt of the call detail records for the

5    telephone number (703) 856-5771.

6    Q     And are the call detail records for (703) 856-5771 all

7    detailed in the same manner as this page?

8    A     Yes, ma'am.

9    Q     And would it be fair to say it consists of 179 pages?

10   A     Yes, ma'am.

11             THE COURT:  What exhibit are we on?

12             MS. JOHNSTON:  We are on R1F.

13             THE COURT:  R1F as in Frank?

14             MS. JOHNSTON:  As in Frank.

15             THE COURT:  Received.

16   Q     (BY MS. JOHNSTON)  If you could explain to us what each of

17   the columns represents as we go across.

18   A     The first column is entitled customer PTN.  PTN is

19   personal telephone number.  That is the number we ran the query

20   on.  The date is the date the phone call took place.  Call

21   initiation time is the time that the call began or the handset

22   connected to something.  Duration is how long a handset was

23   connected to something in number of seconds.  Type will be

24   inbound.  That's one where this handset rang.  Or outbound.

25   That's one where this handset picked up the phone and did the

Direct Examination Joseph Trawicki by Ms. Johnson

1    dialing.  Forwarded would be yes or no; was the call forwarded,

2    yes or no.  The most likely reason for a yes is that it's going

3    to this call's voice mail.

4         911, did it call 911, yes or no.  International will be

5    yes or no; was it a international number dialed, yes or no.

6    Called PTN, that is the phone number that rang.  Calling PTN,

7    that is the phone number that picked up the phone and did the

8    dialing.  And then originating and terminating cell site, the

9    last two columns, that's the cell tower that was used at both

10   the beginning of the call and again at the end of the call.

11   Q    And then, for example, if we just took the third call

12   that's listed there, can you tell us what -- whether that

13   was -- who made the call on that?

14   A    Telephone number (703) 856-5771 was called by (386)

15   679-7917.  The call was on March 23rd, 2009 at 1:22:45 p.m.

16   That's what time it began.  The handsets were in connection for

17   244 seconds.  And it was an inbound call to this number.

18   Q    And, the cell site columns, what do those tell us?

19   A    The important things to look at are the last two sets of

20   numbers separated by the hyphen.  In this case 165 is what we

21   call a LAC or a location area code.  The last set of numbers,

22   13463 in this case, is called a CID or a cellar identifier.

23   You would use the spreadsheets that are contained on those

24   compact disks to look up that particular LAC and CID and it

25   would give you the latitude -- the physical latitude and

Direct Examination Joseph Trawicki by Ms. Johnson

1    longitude of that cell tower.

2    Q    And the same for the terminating cell site?

3    A    That's correct.

4             THE COURT:  So, on the third telephone call your

5    testimony is that 856-5771 called (386) 679-7917?

6             THE WITNESS:  No, sir.  It's the other way around.

7    (386) 679-7917 called (703) 856-5771.

8             THE COURT:  And that's because we have a notation of

9    inbound in that type column?

10            THE WITNESS:  Yes, sir.  And, also, the calling PTN

11   column is the phone number of the person that picked up the

12   phone and did the dialing.

13            THE COURT:  Ms. Johnston, if I could ask you just to

14   remove that pen.  Thank you very much.

15            THE calling PTN is the phone that originates the

16   telephone call?

17            THE WITNESS:  That's correct.

18            THE COURT:  And the called PTN is the telephone that

19   receives the telephone call?

20            THE WITNESS:  That is correct, sir.

21            THE COURT:  And, so, when you call -- when you pull

22   up records for an individual phone, it will show both the calls

23   that were made out from that phone and the calls that came into

24   that phone?

25            THE WITNESS:  That is correct.

Direct Examination Joseph Trawicki by Ms. Johnson

1          THE COURT:  Thank you.

2     Q    (BY MS. JOHNSTON)  Now, the originating cell site and

3     terminating cell site, which phone are those the records for?

4     A    Those are the cell towers in use for the telephone number

5     we ran this report on, in this case (703) 856-5771.

6     Q    Regardless of whether that phone made the call or received

7     the call?

8     A    That's correct.  That's where this hand -- that's the

9     tower that this handset used.

10    Q    For the beginning and the end of the call?

11    A    That's correct.

12    Q    Now, with regard to the call initiation time, when does

13    that clock start if I have this Sprint cell phone?

14    A    On an inbound call, one where your phone is ringing, the

15    clock on these records will start when you pick up the phone.

16    On an outbound call on these records, the clock will start when

17    you dial, hit send, and you hear it start to ring -- you can

18    tell when it connects to the network and it starts to ring --

19    that's when the clock starts.

20    Q    So, it starts before someone answers the phone.

21    A    On an outbound call, that is correct.

22    Q    So, if we had records -- if two Sprint phones were calling

23    each other, would the duration time be the same on those

24    phones?

25    A    Probably not.

Direct Examination Joseph Trawicki by Ms. Johnson

1    Q    Explain that.

2    A    They're going -- the clock starts at different times.

3    Depending on how much ring time is involved, the clock on the

4    call making the outbound -- or on the handset making the

5    outbound call will be longer than the clock on the call that --

6    or, the handset that received the call.

7    Q    Now, on R1F, the last three entries reflect a duration of

8    zero seconds.  Can you explain why there would be a zero

9    second?

10   A    The zero second duration call indicates that it's a call

11   that never connected to anything.  The phone attempted to make

12   a call but it never actually connected.  The most common

13   reasons for this are somebody dialed and let it ring a few

14   times; nobody either answered or it did not go to voice mail on

15   the other end; and they hung up.  Or the call dropped before it

16   connected to anything.  Or it was a misdial and the call

17   failed.

18   Q    Now, if I could show you what's been marked as

19   Government's Exhibit R2C.  And I ask you if you recognize this

20   document.

21   A    Yes, ma'am.

22   Q    And what is this?

23   A    This is call detail records for the telephone number (703)

24   928-5791.

25   Q    The records that were contained in R2; is that correct?

Direct Examination Joseph Trawicki by Ms. Johnson

1   A    Yes, ma'am.

2   Q    And, again, is that a one-page sample of those records?

3   A    That is correct.

4   Q    And how many pages of those records?

5   A    This is one of the pages out of, it appears, 348 total.

6   Q    And do the columns represent the same information on this

7   as it did on the R1F documents?

8   A    Yes, ma'am.

9   Q    Now, with regard to the cell site information included in

10  the records, you indicated there was a code or a series of

11  pages that provided --

12  A    Yes.  There's a separate spreadsheet that contains in this

13  case a listing for all the towers in the Baltimore/Washington,

14  what we call the BAWA market.  And it has a LAC and a CID for

15  each cell tower, as well as the latitude and longitude for that

16  tower.

17  Q    And what do you do -- what does Sprint do with that

18  longitude and latitude?

19  A    If we need to find the location of a tower, we would plug

20  it into something like Google Maps or Microsoft Streets and

21  Trips, and that can show us a physical location of that tower.

22  Q    And are you able to actually zoom in and see the physical

23  tower?

24  A    It depends on how updated Google Maps is.

25  Q    Let me show you another exhibit.  It's marked as

Direct Examination Joseph Trawicki by Ms. Johnson

1    Government's Exhibit T1.   I call your attention to the first

2    two entries on that document.   Do you see those entries?

3    A     Yes, ma'am.

4    Q     Do you recognize those telephone numbers?

5    A     Yes, ma'am.

6    Q     And are those the telephone numbers you referenced on R1

7    and R2?

8    A     That is correct.

9    Q     Can you tell us why, if these are the same records for the

10   same -- strike that.

11         What are these first two columns referencing?

12   A     I believe they reference the same phone call; one

13   telephone number calling the other telephone number.

14   Q     Which number would be calling which?

15   A     This is not our document, but I believe (703) --

16              MR. BRENNAN:   Well, I object Your Honor, if he's

17   believing or guessing.

18              THE COURT:   Sustained.   Next question.

19              MS. JOHNSTON:   Court's indulgence one moment.

20         We'll mark these next two items as the next O exhibit.

21              THE COURT:   O3 and O4?

22              MS. JOHNSTON:   O3 and O4, Your Honor.

23   Q     (BY MS. JOHNSTON)   Do you recognize O3 and O4?

24   A     Yes, ma'am.

25   Q     And what are they?

Direct Examination Joseph Trawicki by Ms. Johnson

1   A    They are pages of the call detail records from the two

2   previously mentioned phones.

3   Q    Contained on the disk?

4   A    Yes, they are.

5            THE COURT:  So, which does O3 relate to?

6            MS. JOHNSTON:  Court's indulgence one moment.

7       Your Honor, if I could just have the Court's indulgence

8   one moment.

9       Your Honor, with the Court's permission, if I could

10  replace those two items with the correct page of the call

11  detail records.

12  Q    (BY MS. JOHNSTON)  Showing you what's marked as

13  Government's Exhibits O3 and O4.  Looking at the first one,

14  what record is that?

15  A    This is a page out of the call detail records for (703)

16  856-5771.

17  Q    Previously identified as R1?

18  A    Yes, ma'am.

19  Q    And O4?

20  A    This is a page out of the call detail records for (703)

21  928-5791.

22           THE COURT:  5791?

23           THE WITNESS:  Yes, sir.

24           THE COURT:  Okay.  Both received.

25  Q    (BY MS. JOHNSTON)  Now, looking at T1, and looking at O3,

Direct Examination Joseph Trawicki by Ms. Johnson

1    is that telephone call reflected on your records O3?

2    A    Yes, ma'am.

3    Q    Can you tell us where it is on there?

4    A    The 5:22:31 p.m. call.

5              THE COURT:  All right.  Let's back up.  O3 refers to

6    a particular telephone call; is that it?

7              MS. JOHNSTON:  No, Your Honor.  O3 refers to that

8    particular page of the records from Sprint.

9              THE COURT:  Does T1 refer to a particular telephone

10   call?

11             MS. JOHNSTON:  T1 at the very first line refers to a

12   particular telephone call.

13             THE COURT:  Okay.  First line of T1.  Can we pull

14   that up?  And I take it that T1 is the exhibit underneath the

15   top exhibit.  I can't see the mark.

16             MS. JOHNSTON:  It is, Your Honor.

17             THE COURT:  Is that marked T1, it's just cut off; is

18   that it?

19             MS. JOHNSTON:  Yes, Your Honor.

20             THE COURT:  I've got it now.  I see it.  Okay.  So,

21   you're directing the witness's attention to Line 1 of Exhibit

22   T1.  And you're asking him what about Line 1 of T1?

23             MS. JOHNSTON:  Does the information reflected on Line

24   1 of T1 appear on O3, the Sprint record?

25             THE COURT:  Can you answer that, sir?

Direct Examination Joseph Trawicki by Ms. Johnson

1           THE WITNESS:  Yes, it does, sir.

2    Q    (BY MS. JOHNSTON)  Are we able to see on O3 where that

3    record is?

4    A    It's the call at 5:22:31 p.m. that is for 104 seconds.

5    (703) 9 -- I'm sorry -- 926 -- 928-5791 called (703) 856-5771

6    at 5:22:31 p.m.

7    Q    And, likewise now on O4, looking at O4 and T1, second

8    line, is the call reflected on the second line of T1 reflected

9    on O4?

10   A    Yes, ma'am.

11   Q    And are we able to see it on the screen?

12   A    Yes, ma'am.  He was called at 5:25 p.m.

13   Q    So, are those records for the same call?

14   A    I believe they are, ma'am.

15   Q    And why do you believe they are?

16   A    Based on the durations of the calls.

17   Q    Now, however, looking at these records, there is a

18   difference in the time; is that correct?

19   A    Yes, ma'am.

20   Q    Can you explain to us why there would be a difference in

21   the time?

22   A    In 2008, the time of these records, the timing on the

23   Legacy Nextel switches was kept by hand.  So, even inside of a

24   market, inside the Baltimore/Washington market there are five

25   different switches.  This is one switch -- a phone in one

Direct Examination Joseph Trawicki by Ms. Johnson

1    switch calling another phone in another switch.  So, the

2    discrepancy in time, I am not surprised as the switch's time is

3    set -- was set by hand at this time rather than automated

4    across the network.

5    Q    And then there is -- on T1 there is a L and a C located

6    for both of those records.  Is that information that you could

7    obtain from using that table that you sent with us?

8    A    Yes.  Well, it refers to a LAC and a CID for both

9    handsets.  And you can determine the locations of those

10   towers -- for the towers on those LACS and CIDS from that other

11   spreadsheet.

12   Q    And then by using Google Map?

13   A    Yes, ma'am.

14   Q    Now, is there -- in terms of cell sites, is there a way --

15   when someone uses a Sprint phone, do we know which

16   particular -- whether the cell site that will be activated is

17   the closest one to the phone, or could it be another cell site?

18   A    Your handset is -- makes the choice of what cell site to

19   use.  It looks for the strongest signal.  And the strongest

20   available signal is what your handset will pick.  All things

21   being equal, the strongest signal will come from the closest

22   tower.  However, things such as terrain, urban density, and

23   volume of network traffic can all affect where the strongest

24   signal comes from.

25   Q    Can you tell us what generally is the range of a cell

1   site?

2   A    Nationwide the average is anywhere from two to ten mile

3   maximum.   In an urban area that skews towards the lower end of

4   the scale and possibly below that in the lower end of the

5   scale.

6   Q    Okay.  Meaning?

7   A    It can be smaller.

8   Q    In an urban area?

9   A    In a dense urban environment, it can be smaller than two

10   miles.

11   Q    And does the presence of water, a body of water in the

12   area, affect the cell site?

13   A    A large open area of water is actually very good for radio

14   frequency propagation.  There's nothing to interfere with the

15   radio frequency signal.  So it goes farther over the water than

16   it would, say, in a city environment.

17   Q    If you were on one side of the water you could use a cell

18   site on the other side of the water?

19   A    That's certainly possible.

20   Q    Now, in terms of the call records, if someone were to

21   receive a call and then received a second call, went over to

22   call waiting, how would the timing of the call on the first

23   call run?

24   A    The timing would run from beginning -- from the beginning

25   of the call to whenever the call ended.  There would be no flag

Cross-examination Joseph Trawicki by Mr. Brennan

1  or anything indicating that the call maybe was placed on hold

2  for a while.  It would just be the total duration of the call.

3  Q    Is it possible, then, in the records to have an overlap of

4  calls?

5  A    Yes.

6         MR. BRENNAN:  Objection, Your Honor.  Anything's

7  possible.

8         THE COURT:  Overruled.

9         THE WITNESS:  It is possible, ma'am.  That's not

10  unusual in a call -- a three-way calling or a call waiting

11  situation.

12  Q    (BY MS. JOHNSTON)  And do the records notate that there

13  was call waiting or --

14  A    No, ma'am.  There's just overlap in the times of the

15  calls.

16  Q    When would that first call then terminate if someone

17  switched over to call waiting?

18  A    Whenever one of the parties either hung up or the network

19  disconnected the call.

20         MS. JOHNSTON:  I have no other questions.

21         THE COURT:  Cross-examination.

22         MR. BRENNAN:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24  BY MR. BRENNAN:

25  Q    Good afternoon.  Is it Mr. Tarwacki?

Cross-examination Joseph Trawicki by Mr. Brennan

```
1    A    Trawicki, sir.

2    Q    I'm sorry?

3    A    Trawicki.

4    Q    Trawicki.  My name is William Brennan.  Mr. Cook and I

5    represent Patrick Sweeney in this matter.  If I ask you any

6    questions this afternoon that you do not understand, please ask

7    me to repeat myself.

8    A    Yes, sir.

9    Q    Fair enough?

10   A    Yes, sir.

11   Q    Okay.  Now, you talked about the LAC and the CID.  That

12   basically gives you the location of the cell tower, correct?

13   A    That's correct.

14   Q    Okay.  Can you tell the ladies and gentlemen of the jury

15   that a cell -- a handset, what you call cell phones -- a

16   handset will connect to a cell tower within a certain radius,

17   correct?

18   A    Yes, sir.

19   Q    Okay.  And in rural areas it might be, what, a ten-mile

20   radius?

21   A    Yes, sir.

22   Q    And in urban areas it could be two miles.  And, in fact,

23   in the city sometimes because of the traffic loads you could

24   literally have a cell tower, say, in downtown Washington on

25   every building, for example, correct?
```

Cross-examination Joseph Trawicki by Mr. Brennan

1   A    That's in very dense environments.  That's not uncommon.

2   Q    In a very dense environment, you can have a cell tower

3   every block; but in a rural area it could be as much as ten

4   miles, correct?

5   A    That's correct, sir.

6   Q    Okay.  And what the location of the cell tower shows you

7   is really what tower a certain call went through, correct?

8   A    That is correct.

9   Q    Okay.  Now, the technology is such that it would also show

10  you with more specificity as to where the handset was located

11  in relation to the cell tower, correct?

12  A    No, sir, not after the fact.

13  Q    Well, it shows -- the cell tower has receptors on it,

14  correct?

15  A    Yes, sir.  I'm sorry, I did not understand that's where

16  you were going.

17  Q    And the receptors have basically three sectors shaped like

18  a triangle, correct?

19  A    The prototype tower is triangular.

20  Q    Right.

21  A    Unfortunately for 2008 we do not know how the towers were

22  oriented specifically.

23  Q    Okay.  Because that was my next question.  Because the

24  cell towers are oriented -- as used what's called the azimuth

25  compass and pointed towards that, correct?

Cross-examination Joseph Trawicki by Mr. Brennan

1    A    That's correct.

2    Q    So -- and what that means is -- so we understand what

3    we're talking about, let me show you what's been marked Defense

4    Exhibit 2 up there on the screen.  Let me see if I can zoom in.

5    All right.  This is what we're talking about in terms of a

6    location or a receptor, a cell tower, correct?

7    A    Yes, sir.

8    Q    All right.  And if the handset -- and typically the

9    azimuth is located -- the top of the triangle typically would

10   be pointed in the north direction, correct?

11   A    At this time, yes, sir.

12   Q    At this time.  Okay.  And, so, basically, you could tell

13   that -- if this is pointed north, then you could tell that the

14   phone was -- excuse me -- the handset was located to the south

15   of the cell tower, correct?

16   A    Well, this is a prototype cell tower.  In reality, none of

17   them are -- well, there are -- I'm sure there are some that are

18   oriented this way.  But each tower is unique in that it has to

19   be rotated to fit the area it serves.  So we don't know where

20   the azimuths were at this time.

21   Q    Okay.  So, the bottom line is that you really can't tell

22   us, can't tell the jury, that -- where the handset was located

23   in relation to the cell tower?

24   A    That's correct.

25   Q    Okay.  You can't tell us whether it's on the north side,

Cross-examination Joseph Trawicki by Mr. Brennan

1   the south side, east or west side?

2   A     That's correct.

3   Q     All the best you can do is show us a radius -- in an urban

4   area, a city block; a rural area, ten miles -- of where that

5   handset could be located, correct?

6   A     That's correct.

7   Q     Okay.  And what we have on Government Exhibit R1 -- I

8   guess it's F.  And it's this site, this column here.  And you

9   kind of sort of give them a little bit of a name in the sense

10  that that's sort of the -- where this tower is sort of located,

11  right?

12  A     The site engineer that erected that cell tower, that was

13  in charge of erecting that cell tower, will usually name a

14  nearby geographical feature or a shopping center or a park or

15  something like that.

16  Q     Sure.  So, like, for example, where my pen is located,

17  that says, "Dunkirk".  But the real precise location is this

18  right here, which is the latitude and longitude that you can

19  use with either Google Maps or streets and -- Streets and Trips

20  of Microsoft?

21  A     That's correct.

22  Q     Okay.  And, again, it really just shows you the radius as

23  to where the phone would be?

24  A     It shows you the tower that was utilized by the handset.

25  Q     The tower that was utilized.  And typically the way the

Cross-examination Joseph Trawicki by Mr. Brennan

1   cell phones are programmed, they are programmed to go through

2   the strongest signal with the least battery usage, right?

3   Isn't there a two-part --

4   A    It will be the strongest available signal that it can

5   find.

6   Q    Strongest available signal okay.  Right.  But that -- so,

7   the way it's done is the strongest available signal, which is

8   usually but not always the closest cell tower?

9   A    That's correct.

10  Q    And the reason it's usually but not always is there could

11  be a building or geographic obstruction that would cause the

12  call to be routed through a cell tower that's further away, but

13  the signal would be stronger, correct?

14  A    That's correct.

15  Q    Okay.  So, when we look at the locations of these cell

16  towers, really what the information tells us on the location of

17  the cell tower is only that the call was routed through there,

18  but not necessarily that that was the closest.  You can't tell

19  us based on these records that that was necessarily the closest

20  cell tower in relation to where the handset was, correct?

21  A    That is correct.

22         MR. BRENNAN:  Okay.  Court's indulgence.  Nothing

23  further.  Thank you.

24         THE COURT:  Redirect.

25         MS. JOHNSTON:  I have nothing further, Your Honor.

1    We'd ask that the witness be excused.

2              THE COURT:  May the witness be excused?

3              MR. BRENNAN:  He may, Your Honor.  Thank you.

4              THE COURT:  You are excused, sir.

5              THE WITNESS:  Thank you, sir.

6              THE COURT:  Ladies and gentlemen, it's time to recess

7    for the day.  During this recess and overnight please obey the

8    following instructions.  Do not discuss the case with anyone.

9    Don't discuss it with your fellow jurors.  Do not discuss it

10   with any of your friends or family.  Recall what I told you

11   last night about how you're going have to put your family

12   members off for a few days and not get into anything about what

13   you're hearing about.  You're in the trial now, you've heard

14   some of the evidence, you've heard some of the witnesses, you

15   have a long ways to go.  But you can see how it would be

16   inappropriate to start to discuss some of what you've heard

17   with people who are not here participating, not serving on the

18   jury.  That could influence your assessment of things.  So

19   please don't do that at all.

20             Don't expose yourself to any news articles or reports

21   that touch upon this case or any of the issues that it presents

22   or the participants in the trial.  Avoid all contact of any

23   kind with any of the participants in the trial.

24             This most important theme that I keep sounding over

25   and over again:  Please do not make any independent

investigation of the law or the facts relevant to this case.

No Internet searches with respect to the issues presented or

the persons participating in the trial.  Do not consult

external sources such as encyclopedias or dictionaries in

reference to the issues and terms that have been presented to

you here.

Please return promptly tomorrow morning at 9:30.

And, again, it's a good idea to plan to get here at 9:15, 9:20,

something like that, so we can start promptly at 9:30.  And, of

course, if you have any difficulty whatsoever, please be in

touch with either my courtroom deputy clerk, Ms. Moye, you have

her telephone number, or my chambers.  Ladies and gentlemen,

you are excused for the evening.

(Jury left the courtroom.)

THE COURT:  Be seated, please.

How are we doing on progress, Ms. Johnston?

MS. JOHNSTON:  Making progress.  I think we're

probably maybe not going to rest until Friday at lunchtime,

would be my best estimate at this point.  We went a little

faster this afternoon than we had this morning, so we made some

more progress this afternoon than I thought we were going to.

So, I'm -- I -- though I don't think we're going to rest by the

end of the day tomorrow.  I think it will be Friday at

lunchtime.

THE COURT:  Okay.  Still half a day?

1            MR. BRENNAN:  Yes, Your Honor.

2            THE COURT:  Okay.  I think we'll still go ahead and

3     plan to hold our instructions conference tomorrow evening at

4     the close of the trial day.  So please be ready to review

5     instructions on that at that time.

6            Anything else that we need to take up outside the --

7     oh, one more thing I want to do at the close of the first day.

8     Let's make sort of a preliminary record on the status of

9     exhibits at this point.  We've got enough exhibits in this case

10    to make this procedure worthwhile.

11           Turning to the government's exhibit list.  First, no

12    C exhibits were addressed; none were received.  Beginning with

13    the D exhibits, the following are received in evidence, D1,

14    D1A, D2, D3, D4.  That's it.  No more D exhibits in evidence.

15    No M as in Mary exhibits are in evidence.  Turning to P as in

16    Paul exhibits.  The following have been received in evidence,

17    P1 P2, P3, P4, P5, P6, P7, P8, P9, P10.  No other P exhibits

18    have been received.

19           Turning to the R exhibits.  R1 marked for

20    identification but not received into evidence.  R1A received in

21    evidence.  R1F received in evidence.  R2 marked for

22    identification but not received in evidence.  R2A received in

23    evidence.  R2C received in evidence.  No other R exhibits

24    marked or received.  No S as in Sam exhibits received.

25           Turning to T as in Tom exhibits.  T1 received in

```
1    evidence, T6 received in evidence.  O as in Oscar exhibits.  O1
2    marked for identification but not received in evidence.  O2
3    marked for identification not received in evidence.  O3
4    received in evidence.  O4 received in evidence.
5          That's the status of the Government's Exhibits.
6    Before we turn to the other exhibits, any disagreement with the
7    Court's records.  First of all, Ms. Moye, do you and I agree?
8          THE CLERK:  Yes.
9          THE COURT:  Ms. Johnston?
10         MS. JOHNSTON:  Yes, we agree.
11         THE COURT:  Mr. Cook, we agree?
12         MR. BRENNAN:  Yes.
13         THE COURT:  Okay.  Joint exhibits, there's one.
14   Joint Exhibit No. 1, and it's been received in evidence.
15   Defendant's Exhibits, there are two.  1 and 2 both received in
16   evidence.
17         In agreement with respect to the joint exhibits and
18   the defendant's Exhibits.
19         THE CLERK:  Yes.
20         THE COURT:  Ms. Johnston, do you agree?
21         MS. JOHNSTON:  Your Honor, I'm trying to remember
22   what Defendant's 1 and 2 were.
23         THE COURT:  1 is a photograph of the small diagram of
24   the victim's remains.  And 2 is the cell phone chart with the
25   triangle on it.
```

1          MS. JOHNSTON:  Yes.

2          THE COURT:  Okay.  Are we in agreement, Ms. Johnston?

3          MS. JOHNSTON:  Yes, Your Honor.

4          THE COURT:  Are we in agreement, Mr. Cook?

5          MR. BRENNAN:  Yes.

6          THE COURT:  Okay.  Anything else to take up outside

7     their hearing?

8          MS. JOHNSTON:  No, sir.

9          MR. BRENNAN:  No, Your Honor.

10          THE COURT:  We're in recess for the evening.  And see

11    counsel about 9:20 tomorrow morning.  Hopefully the jurors will

12    be on time tomorrow and we will start promptly and make even

13    more progress.  And again remember instructions conference at

14    the close of the trial day tomorrow.  We're in recess.

15          (The proceedings were concluded.)

16

17          I, Christine Asif, RPR, CRR, do hereby certify that
      the foregoing is a correct transcript from the stenographic
      record of proceedings in the above-entitled matter.

18

          _____/s/_____
19                  Christine T. Asif
                  Official Court Reporter

20

21

22

23

24

25

```
1                          INDEX

2   Witness Name                                    Page

3   Patrick D. Kennedy

4       Direct Examination By Mr. Rao....................... 32

5       Cross-examination By Mr. Brennan ................... 49

6       Redirect Examination By Mr. Rao ................... 71

7   Ashley Smith

8       Direct Examination By Ms. Johnston................. 77

9       Cross-examination By Mr. Brennan ................... 114

10      Redirect Examination By Ms. Johnston .............. 146

11      Recross-examination By Mr. Brennan................. 155

12  Joseph Kelley

13      Direct Examination By Mr. Rao....................... 157

14      Cross-examination By Mr. Brennan ................... 167

15  Richard Wilson

16      Direct Examination By Ms. Johnston................. 174

17      Cross-examination By Mr. Brennan ................... 184

18      Redirect Examination By Ms. Johnston .............. 193

19  Joseph Trawicki

20      Direct Examination By Ms. Johnston................. 197

21      Cross-examination By Mr. Brennan ................... 214

22

23

24

25
```

< Dates >.
3/25/2009.
   200:19.
5/1/2008 200:19.
April 1st 125:20,
   148:7.
April 1st, 2009
   125:24, 126:22.
February 15, 2009
   12:24.
February 16th
   25:4.
February 2009
   58:1.
February 23
   168:23.
March 10, 2009
   12:24.
March 18th, 2009
   12:19.
March 20 71:13.
March 23 61:13,
   64:10.
March 23, 2009
   49:25, 50:3,
   52:16, 58:1,
   70:22, 71:5,
   115:9, 142:25,
   144:11, 168:3.
March 23rd 20:13,
   23:6, 23:24,
   24:14, 24:16,
   25:16, 40:9,
   40:20, 44:1,
   46:12, 47:9,
   57:4, 71:14,
   81:5, 83:6, 88:8,
   88:10, 88:12,
   88:14, 112:2,
   158:23, 159:5,
   168:23, 175:1.
March 23rd, 2009
   12:16, 12:17,
   12:20, 19:19,
   19:20, 20:10,
   20:21, 21:3,
   24:5, 25:17,
   26:25, 29:1,
   30:12, 30:19,
   49:6, 185:24,

   203:15.
March 24th 112:3,
   146:21.
March 24th, 2009
   71:14, 127:21.
October 7 62:18.
$20 86:17.
$600. 38:3.
(703) 208:15.
.
.
< 0 >.
0979. 106:18.
.
.
< 1 >.
1 2:4, 2:15, 2:23,
   3:3, 11:14,
   11:15, 24:12,
   51:17, 53:20,
   69:8, 75:15,
   172:22, 189:1,
   210:21, 210:22,
   210:24, 223:14,
   223:15, 223:22,
   223:23.
1. 24:8, 73:17,
   75:17, 76:12.
10 95:21, 189:18.
104 211:4.
10:00 155:23,
   168:9.
10:00. 43:8.
10:15 64:16.
10:30 64:16, 133:8,
   133:10, 139:3,
   139:6, 170:18,
   175:6.
10:30. 133:9.
10:36 159:5.
10:38 66:24, 133:7,
   139:11, 175:6.
10:38. 133:8.
10:39 175:7.
10:44 52:21,
   139:16, 168:7,
   168:22, 168:25.
10:44. 168:21.
10:51 111:1.
10th 25:4.

11:05 111:1.
11:11 111:2.
12 69:8.
12:15 73:17, 73:18,
   74:6.
12:45. 146:18.
13463 203:22.
14 12:3.
15 89:16, 92:2,
   95:21, 104:5,
   172:15, 173:6,
   189:18.
15- 74:10.
15-minute 172:7.
165 203:20.
17 63:1.
175 197:23.
179 202:9.
1:22:45 203:15.
.
.
< 2 >.
2 11:15, 24:14,
   51:17, 53:20,
   69:8, 73:18,
   74:7, 104:18,
   105:1, 105:6,
   172:22, 200:16,
   201:15, 217:4,
   223:15, 223:22,
   223:24.
2. 201:8.
20 11:11, 92:2.
2005. 78:2.
2006 158:13,
   158:17.
2006. 158:11.
2008 13:3, 20:1,
   20:3, 20:18,
   23:6, 23:11,
   23:19, 25:5,
   158:17, 211:22,
   216:21.
2008. 23:14, 25:14,
   33:25.
2009 20:13, 20:18,
   23:6, 23:25,
   25:4, 25:13,
   25:16, 40:21,
   44:1, 46:12,

49:2, 57:5, 58:7,
  62:18, 71:14,
  78:24, 81:24,
  159:5, 175:1.
2009. 20:1, 20:3,
  23:12, 24:14,
  24:16, 34:10,
  40:9, 47:9,
  61:13, 78:11,
  83:6, 158:23.
2012 1:13.
22 2:13.
23rd 120:19.
24. 77:23.
240 106:14, 106:17,
  106:18, 110:8.
244 203:17.
24th 127:21.
25 70:9, 70:10,
  70:13, 85:7,
  116:19.
2:30. 82:1.
2A 201:5, 201:7.
.
.
< 3 >.
3 51:17, 180:6.
3. 24:19.
30 45:3, 96:3.
348 207:5.
386 203:14, 204:5,
  204:7.
39. 33:1.
3:00 2:5, 82:1,
  82:5.
3:00. 40:16.
3:30 28:19.
3:30. 82:5.
.
.
< 4 >.
4 180:6.
4. 52:10.
40 74:7.
45 96:3, 166:17.
4879 34:14, 175:24,
  189:25.
4:00 84:9.
4:30 61:15, 61:16,
  62:5, 115:13,

116:21.
4:30. 41:4, 62:7.
.
.
< 5 >.
5 116:23, 129:16,
  137:19, 145:8,
  180:7, 187:14,
  187:17.
577-0979 106:14,
  106:17, 106:18,
  110:8.
5791 209:22.
5:00. 84:9.
5:22:31 210:4,
  211:4, 211:6.
5:25 211:12.
5:30 116:23,
  116:25, 131:10.
5:30. 82:15,
  116:24.
.
.
< 6 >.
6 180:7, 183:10,
  187:14, 187:17.
6. 117:1.
615 31:9.
679-7917 203:15,
  204:5, 204:7.
6:00 40:18, 40:19,
  40:23, 42:4,
  62:12, 62:16,
  64:20.
6:30 62:16,
  117:4.
6:30. 42:4,
  131:13.
.
.
< 7 >.
703 110:9, 198:13,
  199:9, 200:3,
  201:16, 202:5,
  202:6, 203:14,
  204:7, 205:5,
  206:23, 209:15,
  209:20, 211:5.
7:00 40:16, 62:12,
  63:14, 64:7,

64:10, 64:15,
  131:17, 131:25,
  132:10, 132:22,
  133:7, 133:10,
  134:11, 134:16,
  134:19.
7th 13:2.
.
.
< 8 >.
803 6:23, 10:14.
803(3) 10:7,
  10:22.
803(3). 8:5,
  11:4.
8536 158:19.
856-5771 110:9,
  198:14, 200:3,
  202:5, 202:6,
  203:14, 204:5,
  204:7, 205:5,
  209:16, 211:5.
.
.
< 9 >.
9 211:5.
911 21:4, 22:15,
  44:20, 44:22,
  66:14, 66:15,
  66:23, 67:2,
  98:19, 98:21,
  139:11, 159:6,
  203:4.
911. 66:22, 96:22,
  97:10.
926 211:5.
928-5791 199:9,
  201:16, 206:24,
  209:21, 211:5.
9:00 2:13.
9:00. 42:23.
9:15 221:8.
9:20 221:8,
  224:11.
9:30 66:24.
9:30. 221:7,
  221:9.
9:40 2:22.
9:45 138:14, 139:2,
  170:17, 171:10.

_____/s/_____
_____ 224:21.
.

< A >.
A-s-h-l-e-y
  77:13.
a.m. 40:23.
Abcs 160:15.
able 4:24, 5:15,
  6:4, 26:17,
  29:25, 50:15,
  50:18, 58:19,
  59:19, 62:14,
  66:1, 72:4,
  143:19, 145:5,
  149:16, 162:3,
  163:10, 176:10,
  179:17, 187:13,
  200:20, 207:22,
  211:2, 211:11.
above 63:8.
above-entitled
  1:18, 224:19.
absolute 189:19.
Absolutely 156:8.
acceptable 5:16.
access 48:23.
accomplished
  177:23.
According 128:4,
  129:6, 132:12,
  132:13, 132:24,
  133:13, 134:22,
  135:15, 136:6,
  137:5.
accordingly
  123:15.
accuracy 16:21.
accurate 124:16,
  150:14, 189:1,
  189:3.
accurately 52:15,
  59:24, 150:18,
  180:10.
accusation 12:22,
  13:1.
accusations
  100:2.
acknowledging

12:2.
acquaintances
  15:20.
acquiescence
  2:12.
acquire 16:7,
  104:12.
across 180:6,
  202:17, 212:4.
activated 212:16.
active 164:7,
  164:9.
actively 164:3.
activities 19:25.
actual 4:7, 4:8,
  24:15, 57:10.
Actually 4:5,
  10:22, 12:22,
  20:9, 27:9,
  29:13, 31:14,
  64:19, 77:16,
  90:12, 100:25,
  125:3, 140:12,
  140:18, 142:2,
  152:18, 154:15,
  158:19, 179:12,
  206:12, 207:22,
  213:13.
addition 3:21,
  87:8, 87:17,
  92:16, 94:25,
  151:8, 174:17,
  180:14, 183:15.
additional
  147:22.
address 6:15,
  25:21, 34:13,
  104:8, 160:17,
  175:22, 189:25.
addressed 123:1,
  222:12.
adjournments
  17:21.
admissibility 6:21,
  14:6.
admissible 6:23,
  10:8, 10:21,
  11:4, 100:6,
  100:23.
admissions 8:4.

admit 10:24.
admitted 59:3,
  72:22, 142:24,
  201:11.
adversarial 172:20,
  172:21.
advice 15:19.
advised 87:21.
affect 212:23,
  213:12.
Afraid 108:21,
  108:22, 143:16.
afternoon 61:16,
  115:2, 115:3,
  115:13, 157:4,
  167:21, 172:6,
  184:21, 184:22,
  184:25, 193:2,
  197:6, 197:7,
  214:25, 215:6,
  221:20, 221:21.
afterwards 82:7,
  107:13, 154:8.
age 17:9, 165:19.
agitated 63:23,
  63:25.
ago 24:20, 39:21,
  71:22, 93:17,
  163:25, 165:1,
  165:8.
agree 37:18, 66:25,
  101:3, 128:4,
  130:7, 131:2,
  132:24, 139:6,
  141:22, 142:1,
  168:23, 191:4,
  223:7, 223:10,
  223:11, 223:20.
agreement 37:25,
  223:17, 224:2,
  224:4.
ahead 152:8,
  222:2.
air 38:18, 96:5,
  97:24.
airway 44:18,
  47:21, 66:9,
  161:7, 161:8,
  162:7, 164:25.
albeit 100:7.

alive 9:20.
allegedly 128:9.
allow 74:8, 74:12,
   74:18, 104:10,
   154:19, 154:20,
   172:9.
allowed 15:3,
   170:5, 176:17,
   194:17.
Almost 39:9, 84:14,
   118:13, 118:14.
alone 29:5, 29:6,
   29:9, 136:19,
   136:20, 137:1,
   137:5, 137:10,
   137:25.
already 3:23,
   45:24, 115:16,
   115:20, 124:22,
   133:23, 140:4,
   164:7.
Alternate 2:23,
   3:3, 3:12, 11:14,
   11:15.
amaze 3:5.
Ambulance 44:24,
   45:1, 98:18,
   157:7, 157:10,
   157:13, 159:17,
   159:18, 164:21,
   166:21, 166:24,
   167:2, 167:4,
   176:2, 176:7.
AMERICA 1:5.
American 157:7,
   157:10, 157:12.
Among 16:17, 74:16,
   104:10, 172:9.
amount 167:11.
angry 100:21,
   116:12.
answer 2:8, 10:19,
   10:20, 63:8,
   70:16, 71:1,
   85:19, 100:1,
   100:25, 112:20,
   142:9, 145:4,
   153:23, 154:2,
   154:6, 154:10,
   178:4, 210:25.

answered 206:14.
answers 27:20,
   205:20.
anxious 132:6.
anybody 37:8, 41:5,
   42:14, 42:16,
   43:2, 160:18,
   165:12, 165:22.
apartment 37:2,
   80:22.
apparent 195:2.
Apparently
   190:23.
appear 63:22,
   63:23, 63:25,
   110:21, 137:15,
   150:8, 164:1,
   184:2, 210:24.
appeared 44:1,
   49:1, 49:6,
   61:21, 63:23,
   64:1, 65:25,
   66:6, 121:8,
   161:18, 179:10,
   184:5.
appearing 197:24.
appears 50:10,
   56:22, 111:22,
   183:4, 207:5.
applicable 15:7.
apply 15:8,
   16:12.
applying 30:15.
appointment 2:5,
   3:11, 83:12,
   83:14, 83:16.
appreciate 76:7.
Approach 36:19,
   50:13, 58:13,
   73:6, 89:22,
   99:23, 122:14,
   146:4, 153:16,
   190:13.
approached 37:5.
appropriate 3:25,
   6:15.
Approximately
   17:19, 41:3,
   42:3, 45:1, 70:6,
   79:7, 82:3,

82:19, 84:8,
   91:1, 91:24,
   94:18, 95:19,
   139:6, 148:6,
   159:5, 160:8,
   168:6, 175:5.
April 11th 1:13.
areas 215:19,
   215:22.
argued 85:12.
arguing 86:3,
   86:7.
argument 5:20,
   14:20, 14:21,
   14:22, 14:23,
   15:4, 28:10,
   28:11, 30:24,
   86:5.
Arguments 14:3,
   14:16, 14:25,
   18:1, 18:11,
   27:8, 30:14,
   74:17.
Around 4:12, 23:15,
   28:19, 40:19,
   41:4, 42:4,
   42:23, 48:24,
   52:24, 54:15,
   96:25, 102:2,
   131:17, 141:13,
   141:21, 148:23,
   148:24, 163:11,
   168:9, 179:10,
   204:6.
arrange 20:19,
   24:22, 25:15.
arranged 20:4,
   20:5.
arrangements 5:17,
   23:7, 23:10,
   23:25, 38:2.
arrival 21:7, 68:1,
   68:6, 189:16.
arrive 44:24, 45:2,
   160:7, 164:18,
   164:20, 189:16.
arrived 7:11, 41:5,
   45:20, 52:19,
   52:21, 52:22,
   52:24, 53:1,

61:15, 67:19,
84:8, 98:18,
99:10, 105:21,
115:12, 131:24,
139:16, 152:19,
160:16, 161:18,
164:22, 165:5,
168:6, 169:2,
175:25, 176:3,
176:6, 181:19,
185:12.
arriving 67:15,
67:18, 83:19.
articles 18:3,
74:19, 74:20,
104:11, 172:10,
220:20.
Arun 1:33.
ascertain 170:12.
aside 109:10,
157:12.
Asif 1:47, 224:17,
224:22.
asleep 22:10,
22:11, 64:18,
64:22, 95:24,
96:2, 96:3,
135:24, 138:2,
138:7.
assault 184:2.
asserted 8:11, 9:5,
9:6, 10:2,
11:1.
assessed 185:13.
assessment 169:4,
169:15, 170:8,
220:18.
assigned 197:19.
assist 16:9,
195:24.
assisted 195:14.
Assumes 128:24.
assuming 152:10.
assure 75:1.
attacking 9:18.
attempt 123:12.
attempted 23:16,
47:20, 66:9,
154:21, 206:11.
attention 27:21,

28:14, 28:20,
40:9, 48:11,
78:11, 83:6,
158:23, 175:1,
208:1, 210:21.
AUSA 1:31, 1:33.
automated 212:3.
autopsy 21:11,
22:18, 194:22,
194:23.
available 10:15,
185:21, 212:20,
219:4, 219:6,
219:7.
average 213:2.
Avoid 18:11, 74:22,
104:13, 172:11,
220:22.
awake 96:2.
aware 105:13.
away 81:5, 82:12,
105:8, 107:6,
113:12, 113:19,
113:22, 133:18,
163:10, 163:19,
219:12.
awoken 64:15.
azimuth 216:24,
217:9.
azimuths 217:20.
.
.
< B >.
bad 143:18.
bag 93:9, 181:9,
182:10.
baggie 93:7, 93:8,
183:17.
baggies 22:23.
Baltimore 1:11.
Baltimore/washingto
n 207:13,
211:24.
bar 79:3, 79:4,
79:5.
Base 15:11, 78:19,
78:20, 78:21,
109:5.
Based 2:20, 16:7,
100:8, 122:23,

177:18, 178:12,
178:20, 184:1,
184:6, 195:25,
211:16, 219:19.
bases 165:18.
basically 35:19,
49:6, 215:12,
216:17, 217:12.
basics 172:22.
Basis 8:16, 70:24,
99:21, 112:17.
bath 51:17, 54:6.
Bathroom 35:23,
36:1, 52:6, 52:7,
52:12, 54:20,
71:25, 72:1,
72:5, 72:8,
73:16, 81:10,
81:17, 81:20,
95:5, 136:2,
136:23.
bathrooms 81:10.
battery 219:2.
BAWA 207:14.
Bayside 158:19,
160:5.
Beach 21:6, 32:19,
116:16, 157:14,
157:15, 157:20,
158:18, 158:19,
175:24, 190:1.
beat 101:7.
became 34:7, 35:2,
36:15.
become 158:6.
becomes 172:21.
becoming 39:11,
158:20.
Bedroom 7:20,
22:21, 22:22,
29:24, 35:21,
47:4, 47:8,
52:10, 54:2,
54:14, 55:1,
55:6, 69:4,
69:16, 69:19,
69:23, 81:12,
105:22, 145:16,
166:3, 179:8,
179:11, 179:22,

180:9, 181:7,
181:21, 186:24,
189:7.
bedrooms 35:10,
35:12, 54:6,
81:10.
began 11:23, 23:20,
202:21, 203:16.
begin 12:11, 12:12,
15:10, 19:8,
170:9.
Beginning 34:10,
79:8, 79:9,
203:10, 205:10,
213:24, 222:12.
behalf 19:9.
behavior 16:18,
39:4, 39:10.
behind 11:11,
46:22, 118:25,
162:12, 162:13,
176:4.
belief 10:12.
believability
17:15.
believed 10:13,
16:12, 16:14.
believes 14:9.
believing 208:17.
below 213:4.
belt 140:7,
140:16.
Bench 14:5, 73:8,
73:14, 73:17,
99:25, 122:16,
153:18, 166:6,
190:14, 191:8.
beside 44:16,
96:1.
best 40:7, 58:23,
61:10, 62:16,
63:13, 121:14,
136:25, 218:3,
221:19.
beyond 13:7, 25:8,
25:25, 27:11,
27:15.
Big 5:5, 87:16,
141:10.
Bill 26:9, 86:3,

86:16, 86:19,
86:25, 87:1,
87:2, 87:5,
87:16, 117:21,
117:25.
bills 87:3, 87:11,
87:18, 118:2.
bit 10:25, 12:1,
28:18, 35:15,
49:9, 64:7,
77:17, 106:15,
161:20, 218:9.
Black 37:15, 37:21,
88:23.
blacked 112:1.
block 216:3,
218:4.
blood 164:2.
blue 22:14, 43:19,
66:6, 96:9,
161:20, 161:24.
board 6:9, 103:8,
113:2, 152:1,
163:23, 166:19.
boards 3:19,
3:22.
bodily 10:11.
bong 130:8.
book 5:4, 5:25,
6:5.
bottom 48:3, 50:20,
51:18, 55:23,
113:3, 180:7,
181:12, 217:21.
bought 29:13,
85:23.
bowl 114:5, 130:9,
130:10.
boyfriend 86:1,
87:23, 88:2,
88:17.
Bradley 79:15,
79:16, 200:6,
201:19.
break 73:16, 73:18,
74:11, 74:12,
104:16, 172:6,
172:8.
breathing 66:1,
97:23, 141:1,

161:6, 162:4,
164:18, 169:8,
169:24.
Bredar 1:20, 24:9,
27:2, 30:14.
Breezy 21:4, 22:1,
34:12, 34:13,
57:3, 70:7,
70:14, 80:21,
82:16, 92:1,
115:12, 116:16,
116:21, 117:8,
131:6, 131:7,
131:15, 131:17,
131:24, 159:25,
160:5, 175:2.
Brett 1:39, 26:8.
bridge 191:14.
Briefly 42:7.
Bring 11:12, 97:23,
105:15, 173:8,
173:11.
broken 183:4.
brought 9:22,
48:11, 56:24.
brown 181:14,
181:15.
building 34:15,
104:17, 160:1,
215:25, 219:11.
burden 15:5,
27:11.
burn 181:12.
burnt 56:8, 130:14,
137:18.
business 74:8,
198:16, 198:24.
businessmen 27:6.
button 183:13.
buy 9:25, 10:3,
29:14.
buying 85:15,
147:8.
.
.
< C >.
Calling 83:6,
110:13, 175:1,
203:6, 204:10,
204:15, 205:22,

208:13, 208:14,
212:1, 214:10.
Calls 7:3, 7:5,
9:12, 9:13,
13:23, 31:7,
36:12, 70:16,
99:22, 112:18,
156:11, 158:21,
171:12, 174:21,
174:22, 178:3,
200:14, 204:22,
204:23, 211:16,
214:4, 214:15.
Calvert 21:6,
21:10, 22:17,
54:8, 57:3, 68:6,
68:10, 68:20,
68:25, 69:3,
70:3, 116:16,
121:20, 157:17,
158:24, 166:23,
167:7, 174:9,
174:12, 176:9,
180:2, 184:11,
185:4, 185:19,
186:14, 192:21,
192:25, 193:5.
camera 6:6.
Canton 2:16.
car 2:15, 3:11,
7:10, 84:19,
84:20, 89:18,
91:10, 91:13,
91:14, 91:20,
107:15, 119:6,
128:9, 149:20,
155:7.
care 11:23, 74:8,
104:8, 167:10.
careful 28:14.
carefully 16:15,
27:21.
Cari 107:25, 120:6,
121:1, 127:10,
127:11, 127:14,
127:21, 127:24,
146:15, 188:11,
189:13.
carpenter 33:11,
50:15.

carried 91:22.
carry 159:23.
cases 27:4.
cash 86:8, 86:9,
86:11.
catching 2:18.
category 72:25.
cause 21:13, 22:19,
25:1, 219:11.
causes 194:16,
195:3.
causing 141:5.
CDR 199:18.
CDS 190:23.
ceases 3:5.
cellar 203:22.
cellular 12:19,
12:23, 13:2.
center 91:21,
218:14.
certain 6:16, 57:2,
187:9, 194:15,
215:16, 216:7.
certainly 30:9,
117:24, 213:19.
certificate 194:19,
194:24.
certification
158:9, 158:16.
certifications
158:6.
certified 158:10,
158:12.
certify 224:17.
chair 77:15.
chairs 28:17.
chambers 8:25,
19:3, 221:12.
chance 25:20,
27:12, 27:14,
50:7, 61:10,
63:6, 70:11,
125:17, 127:22,
138:23, 188:15.
change 39:4,
163:21.
changed 29:17,
49:8, 50:11.
charge 27:2,
159:13, 218:13.

charged 12:14,
26:1.
charges 13:6,
30:22.
charging 24:7.
chart 4:16, 5:6,
5:7, 5:8, 5:11,
5:19, 5:25, 6:4,
110:21, 162:12,
162:13, 223:24.
charts 4:6, 5:5.
Cheat 198:13,
199:8, 199:11,
199:12, 199:16.
check 66:3,
162:1.
checked 66:3,
160:15, 161:5,
161:7, 161:8.
Chesapeake 21:5,
116:16, 158:19,
175:24, 190:1.
chest 44:8, 162:7,
166:17.
Chicken 70:10,
70:14, 84:23,
85:9, 89:10,
89:15, 131:11,
148:14.
Chief 21:12.
child 78:9.
children 78:7.
choice 25:18,
212:18.
choices 25:10,
25:11, 25:12.
choose 13:13.
chose 25:14, 25:15,
185:17.
Christine 1:47,
224:17, 224:22.
CID 203:22, 203:24,
207:14, 212:8,
215:11.
CIDS 212:10.
circle 103:21,
162:19.
circumstances
16:16.
city 213:16,

215:23, 218:4.
civilized 166:8.
clarify 154:18,
  154:21.
clarity 72:11.
class 158:8.
classic 10:17.
clean 38:3, 38:7,
  38:12, 45:19.
cleaned 69:22.
cleaning 149:6.
Clear 44:17, 47:20,
  56:2, 56:17,
  66:9, 68:4, 93:9,
  121:16, 128:3,
  154:1, 161:7,
  162:7, 165:4,
  169:7, 169:10.
clearance 109:5,
  109:6, 144:5.
clearly 3:8, 10:21,
  11:3, 53:21,
  170:9.
CLERK 31:25, 32:5,
  32:9, 76:6, 77:2,
  77:7, 77:12,
  77:14, 90:4,
  156:15, 156:20,
  156:24, 173:19,
  173:20, 173:25,
  174:4, 196:19,
  196:24, 197:3,
  221:11, 223:8,
  223:19.
clerks 8:23.
client 37:18.
clock 205:13,
  205:15, 205:16,
  205:19, 206:2,
  206:3, 206:5.
close 18:15, 21:14,
  28:20, 32:23,
  118:22, 197:23,
  222:4, 222:7,
  224:14.
Closed 152:1,
  152:2, 190:11,
  190:16, 190:25,
  191:9, 191:23.
closely 191:13.

Closer 80:6, 90:20,
  117:1.
closes 190:24.
closest 212:17,
  212:21, 219:8,
  219:18, 219:19.
closet 51:17, 54:7,
  55:5, 55:7, 55:8,
  55:9, 55:12,
  179:13, 180:22,
  180:24, 180:25,
  181:1, 181:3.
closets 180:21.
closing 14:16,
  14:20, 14:21,
  14:25, 15:4,
  18:1, 18:11,
  28:10, 74:17,
  192:1, 192:2.
clothes 108:4,
  113:22.
clothing 187:17.
clue 111:9, 152:17,
  190:8, 190:9.
co-counsel 25:21.
cocaine 22:5, 22:6,
  22:23, 29:22,
  93:1, 93:2,
  93:16, 93:18,
  93:22, 93:25,
  94:9, 95:1,
  108:19, 108:20,
  109:8, 134:15,
  134:21, 134:24,
  135:2, 135:6,
  135:11, 135:15,
  135:23, 136:3,
  136:7, 143:21,
  143:23, 147:14,
  183:18.
code 203:21,
  207:10.
coke 95:2,
  108:18.
cold 139:25, 140:1,
  140:3, 169:25.
collected 182:3,
  182:15.
collecting
  195:14.

collection 185:22,
  185:23.
color 17:9, 93:8.
column 202:18,
  204:9, 204:11,
  218:8.
columns 199:17,
  202:17, 203:9,
  203:18, 207:6,
  208:11.
comes 212:24.
comfortable 10:21,
  28:16, 191:12.
coming 19:24,
  22:14, 96:14,
  97:3, 98:6,
  132:23.
comments 8:12.
commission 12:15,
  12:20, 12:25,
  13:3, 25:1.
commit 25:1.
committed 184:4.
common 16:13,
  18:13, 25:24,
  27:24, 30:15,
  206:12.
communicate 18:17,
  23:20, 83:24.
communicated 2:4.
communications
  198:19.
compact 203:24.
company 23:5, 33:6,
  198:19.
compartment
  182:14.
compass 216:25.
complete 160:11.
completed 2:3,
  83:16, 181:20.
completely
  108:14.
compliance 201:2.
comply 75:6,
  184:12.
Complying 51:5,
  52:2, 103:25.
compressions 162:8,
  166:17.

computer 168:15.
concern 24:21,
 25:3, 101:3.
concerned 121:4,
 122:23, 132:8,
 143:11, 144:4,
 156:6, 192:5,
 196:7.
concerning 14:2,
 16:1, 150:24,
 193:17, 197:22.
concerns 24:13,
 24:15, 24:23,
 108:25, 109:3.
conclude 17:12,
 17:20.
concluded.
 224:15.
concludes 31:5.
conclusion 14:15,
 15:6, 31:17.
conclusions 14:12,
 14:18, 15:13,
 18:8.
condition 10:11,
 176:10, 176:16,
 178:17, 181:19,
 183:6.
conditioning
 38:18.
conduct 15:15,
 15:21, 16:1,
 17:12, 17:17,
 180:4, 185:22,
 191:25.
conducted 22:18,
 53:7, 179:12,
 180:11, 185:15,
 188:19.
conducting 194:2,
 194:12.
conference 73:8,
 99:25, 122:16,
 153:18, 166:6,
 190:14, 222:3,
 224:13.
connect 215:16.
connected 15:18,
 202:22, 202:23,
 206:11, 206:12,

206:16.
connection 14:3,
 203:16.
connects 205:18.
Conner 36:25,
 42:20, 45:7,
 46:16, 57:18,
 67:14, 67:24,
 68:5, 80:19,
 81:15, 97:6,
 98:13, 132:19,
 176:25, 177:4,
 178:19, 184:6.
Connor 57:21.
consciousness
 164:6.
consequences 19:15,
 25:10.
consider 16:17,
 17:7, 17:11,
 25:22.
consistent 16:24.
consists 202:9.
console 91:21.
Constantly 98:6.
consult 74:25,
 172:15, 221:3.
consumed 93:25.
contact 18:12,
 18:15, 18:20,
 24:3, 36:20,
 73:24, 74:22,
 104:14, 110:18,
 111:8, 194:17,
 220:22.
contacted 36:20.
contacting 19:3.
contacts 172:11.
contain 199:6.
Contained 181:14,
 182:22, 198:15,
 198:21, 203:23,
 206:25, 209:3.
container 93:6.
contains 207:12.
contend 14:17.
content 123:10,
 191:6.
continue 32:24,
 81:4, 101:11,

102:25, 177:24,
 201:14.
contract 38:4.
contractor 78:19.
contradicted
 16:25.
contributed 178:16,
 181:18.
conversation 2:18,
 11:9, 70:17,
 73:11, 85:13,
 86:2, 92:11,
 99:17, 106:3,
 176:15.
conversations
 100:9, 178:20.
convicted 13:6.
convinced 10:6,
 10:24.
Cook 1:39, 8:20,
 8:21, 8:25, 9:1,
 9:6, 9:22, 10:19,
 26:5, 26:6, 26:7,
 26:9, 31:3, 31:4,
 49:18, 75:21,
 75:24, 115:4,
 167:24, 184:23,
 215:4, 223:11,
 224:4.
cool 169:21.
copies 3:23, 5:5,
 5:10.
cops 97:14,
 98:17.
copy 5:7, 5:8,
 175:17.
Corner 46:24,
 66:20, 80:12,
 162:13.
Corporal 173:16,
 174:8, 175:20,
 175:22, 188:6,
 192:16, 192:20,
 192:24, 193:4,
 193:19, 193:21,
 193:22, 193:24,
 196:9.
correctly 102:1.
corroborate 24:2.
coughing 96:16.

Count 12:23, 13:1,
    13:2, 24:8,
    24:12, 24:13,
    24:14, 24:18,
    24:19, 24:21,
    24:23.
counting 17:20.
country 27:4,
    197:17.
counts 24:8, 24:10,
    24:20, 24:21,
    25:3, 25:9.
County 21:6, 21:10,
    54:8, 57:4, 68:6,
    68:10, 68:20,
    68:25, 69:4,
    70:4, 78:22,
    79:3, 83:15,
    116:16, 121:20,
    157:16, 157:17,
    158:24, 174:9,
    174:13, 180:2,
    184:12, 185:4,
    185:20, 186:14,
    192:21, 192:25,
    193:5.
couple 11:22, 34:2,
    91:12, 94:22,
    94:25, 146:23,
    148:6, 172:19,
    176:4, 181:10,
    193:11.
course 16:10,
    17:17, 73:25,
    74:1, 75:1, 81:8,
    119:14, 123:12,
    181:3, 198:16,
    198:23, 221:10.
court. 73:22,
    101:10, 123:17,
    154:25, 166:12,
    191:18.
courtesies 18:13.
courthouse 2:17.
courtroom 2:3,
    2:14, 2:18, 5:2,
    8:24, 11:25,
    12:10, 14:5,
    15:21, 15:23,
    16:5, 18:19,

18:21, 19:2,
    31:13, 31:22,
    76:19, 88:17,
    124:17, 142:2,
    221:11.
courtroom. 11:17,
    76:22, 104:21,
    105:16, 172:18,
    173:12, 221:14.
cover 201:2.
covered 158:14,
    173:1.
coworker 7:8, 20:2,
    20:3, 20:21,
    23:4.
CPR 66:12, 96:20,
    97:22, 161:9,
    163:11, 164:14,
    164:16, 164:19,
    166:14, 166:16,
    170:9, 176:8.
created 198:16,
    198:20, 199:20.
Cress 120:9,
    120:13, 120:14,
    120:19, 120:21,
    142:19, 148:6,
    148:8, 148:20.
crew 163:11.
crews 157:23.
crime 5:24, 25:2,
    53:24, 68:11,
    68:15, 68:21,
    68:22, 69:1,
    69:4, 69:5,
    184:4, 187:5.
crimes 12:15,
    26:1.
CRIMINAL 1:5.
Cross 167:17,
    184:17.
CROSS-EXAMINATION
    9:21, 9:23,
    49:12, 49:14,
    114:23, 114:25,
    167:19, 184:19,
    214:21, 214:23.
cross-examine 9:21,
    13:25, 122:18.
crossed 7:17.

CRR 1:47, 224:17.
crunch 139:9.
cry 47:9.
crying 66:15.
curious 165:17.
currently 32:18,
    33:2, 46:18,
    157:6.
cursory 186:17,
    189:10.
custodian 196:15,
    197:15.
custodians 197:11,
    197:12, 197:13.
customer 202:18.
cut 27:7, 210:17.
.
.
.
< D >.
D. 32:1.
D1 111:11, 128:5,
    182:6, 182:7,
    222:13.
D1A 182:6,
    222:14.
D2 182:6, 222:14.
D3 183:2, 222:14.
D4 182:18,
    222:14.
dad 9:8, 147:5,
    147:6, 148:10,
    151:10, 151:14,
    153:2, 155:7.
damage 33:8.
Daniel 32:8, 159:4,
    159:16, 167:2.
dark 60:7.
date 125:20,
    158:24, 200:18,
    200:19, 202:20.
days 17:19, 19:24,
    24:24, 73:25,
    75:1, 125:25,
    127:7, 220:12.
dead 21:10, 22:16,
    144:7, 170:1,
    170:9, 170:13.
deal 166:9,
    176:17.
dealer 100:3.

dealing 19:15,
    19:25.
deals 20:4, 20:5.
death 12:18, 21:13,
    21:17, 22:20,
    23:12, 24:4,
    24:18, 24:24,
    25:19, 29:19,
    143:17, 170:6,
    182:1, 194:13,
    194:16, 194:19,
    194:24, 195:1,
    195:5, 195:12.
Deborah A. Johnston
    1:31.
deceased 6:13,
    6:17, 190:22.
decedent 9:20.
December 13:3,
    20:18, 23:11,
    25:5.
decide 3:6, 15:11,
    15:22, 16:6,
    17:7, 154:12.
decided 14:7,
    178:14.
decision 16:12.
deck 49:4.
declarant 10:9,
    10:14, 10:15.
declared 21:9.
defend 8:18.
Defense 19:13,
    26:4, 72:16,
    75:15, 75:17,
    76:5, 196:13,
    217:3.
defer 3:14.
deliberating
    18:25.
deliberations
    15:10, 18:9.
deliver 12:5, 19:1,
    19:10.
delta 111:12.
demonstrate
    187:5.
demonstrated 7:4.
demonstrative 4:1,
    4:7.

denied 2:7,
    30:20.
denies 30:21.
dense 213:9, 216:1,
    216:2.
density 212:22.
deodorant 113:13,
    113:25, 114:2.
deodorants 114:8.
depart 196:10.
departed 191:22,
    192:4.
Department 54:8,
    68:6, 68:11,
    68:21, 68:25,
    69:4, 157:14,
    157:15, 157:21,
    174:13, 174:24,
    176:2, 184:12,
    201:3.
Depending 73:10,
    206:3.
depends 194:21,
    207:24.
depict 161:17,
    180:10.
depicted 34:21,
    43:22, 46:18,
    47:1, 47:3,
    47:16, 48:4,
    48:7, 56:4, 56:7,
    56:16, 59:4,
    124:10, 129:16,
    130:14, 137:18,
    145:8, 161:12,
    162:14, 163:2,
    163:19, 183:8,
    186:24, 187:13,
    187:17.
depressed 132:4,
    144:20.
deputy 2:4, 2:14,
    2:18, 221:11.
describe 35:4,
    37:13, 38:8,
    47:23, 81:7,
    88:21, 112:25,
    148:12, 149:2,
    176:12, 179:7,
    179:20, 181:6.

described 65:13,
    91:16, 114:10,
    193:1.
desk 145:21,
    179:23.
detail 198:12,
    199:7, 199:18,
    200:13, 201:22,
    202:4, 202:6,
    206:23, 209:1,
    209:11, 209:15,
    209:20.
detailed 148:1,
    202:7.
details 19:25,
    147:22, 175:14.
detect 162:3.
Detective 108:2,
    109:8, 147:2,
    148:6, 148:8,
    148:20, 150:13,
    150:23, 151:6,
    151:11, 181:24,
    182:3, 182:16,
    185:25, 186:11,
    188:11, 192:7,
    192:9, 192:12,
    192:20, 192:24,
    193:5, 193:14,
    194:22, 195:7,
    195:8, 195:9,
    195:10, 195:23,
    195:24.
detectives 180:4,
    190:3, 194:15,
    195:9.
determine 178:15,
    212:9.
determined 21:13.
determining
    16:14.
device 18:17,
    18:19, 18:22,
    114:2, 114:4.
devices 18:24.
diagram 52:14,
    58:17, 58:21,
    59:24, 71:21,
    71:23, 72:13,
    72:14, 75:12,

187:5, 187:8,
188:25, 189:1,
189:3, 192:22,
223:23.
dial 205:17.
dialed 203:5,
206:13.
dialing 203:1,
203:8, 204:12.
dictionaries
172:15, 221:4.
dictionary 16:5,
74:25.
died 19:23, 20:24,
28:21, 29:5,
29:9, 30:4,
139:2, 139:4,
141:3, 144:25,
148:3, 195:2.
differed 17:2.
difference 211:18,
211:20.
different 23:11,
23:23, 29:16,
56:22, 56:23,
74:4, 83:1,
109:14, 111:22,
206:2, 211:25.
difficult 2:16.
difficulty
221:10.
dilated 169:13,
169:17, 169:19,
169:25.
dimensional 51:4.
dining 35:9, 51:15,
54:5, 81:9.
dire 2:9.
DIRECT 32:14, 40:9,
48:23, 77:18,
104:4, 142:20,
157:2, 158:23,
174:6, 197:4.
directing 210:21.
direction 48:1,
163:12, 163:21,
191:9, 192:10,
192:11, 217:10.
directly 20:6,
23:20, 23:21,

32:5, 32:10,
37:2, 77:7,
156:20, 173:25,
196:24.
dirt 113:1.
disagreement
117:17, 223:6.
disbelieve 17:14.
disclosed 109:8.
disconnected
214:19.
discrepancy
212:2.
discuss 17:23,
17:24, 74:15,
104:9, 104:24,
172:7, 172:8,
220:8, 220:9,
220:16.
discussed 42:8.
discussing 31:16.
discussions
99:15.
disk 198:3, 198:9,
198:11, 209:3.
disks 201:25,
203:24.
dispatch 160:17,
174:22.
display 4:11.
displaying 4:25.
dispute 64:3.
distance 2:17.
distraught
124:20.
distribute 12:16,
25:15, 25:19.
distributed 19:20,
19:21, 30:21.
distribution 12:17,
12:21, 12:25,
13:4, 20:20,
24:15, 24:22,
25:6, 25:15.
District 1:1, 1:2,
1:20, 24:6.
disturbing 166:8.
DIVISION 1:3.
doctor 3:10, 83:12,
194:18, 194:23.

doctors 194:17.
document 6:6,
123:22, 138:19,
168:10, 168:11,
170:21, 171:14,
188:4, 191:13,
200:8, 206:20,
208:2, 208:15.
documenting
195:1.
documents 200:24,
207:7.
dog 61:23,
111:13.
Doing 4:24, 5:15,
5:21, 6:2, 41:9,
41:14, 43:13,
67:11, 78:18,
81:4, 95:7,
123:4, 137:11,
149:7, 161:9,
167:23, 176:6,
176:17, 194:24,
195:1, 221:16.
done 67:12, 93:1,
94:8, 94:10,
94:22, 97:10,
97:11, 101:19,
108:18, 108:23,
108:24, 133:15,
134:24, 136:5,
138:21, 143:3,
166:9, 219:7.
DOOR 4:16, 35:5,
35:7, 35:17,
41:15, 48:18,
48:20, 48:21,
48:22, 48:25,
50:10, 50:11,
51:10, 51:11,
148:25, 150:1,
163:15.
doors 91:11, 149:4,
149:25, 150:1.
Double 68:19.
doubt 13:8, 25:8,
25:25, 27:12,
27:15.
downtown 215:24.
dozen 111:13.

drag 28:18.
drank 38:21.
draw 14:11, 14:19,
   50:15, 50:18,
   50:25, 55:10,
   71:22.
drawer 55:24, 93:5,
   97:14, 113:8,
   113:9, 113:11,
   113:18, 113:20,
   113:23, 129:24,
   130:1, 133:18,
   133:20, 151:25,
   152:1, 152:9,
   152:11, 152:16,
   179:24, 180:12,
   180:14, 180:16,
   181:8, 181:11,
   187:12, 187:13,
   187:15.
drawers 102:2,
   179:13, 179:23,
   180:14.
drawn 15:14, 52:15,
   54:4.
dressed 108:4,
   116:3, 116:22.
dresser 103:6,
   180:12, 187:22,
   188:18.
drink 95:5.
drive 70:6, 82:16,
   89:14, 91:25,
   131:14.
driver 167:2.
driveway 89:18,
   89:19, 90:23,
   90:25, 118:12,
   128:10, 148:24,
   149:3, 149:4.
driving 89:6,
   159:15.
dropped 206:15.
drove 7:6, 7:10,
   21:21, 23:15,
   107:15.
drug 19:15, 19:25,
   20:4, 20:5,
   22:22, 28:21,
   29:21, 30:3,

30:17, 45:12,
   56:17, 57:1,
   57:8, 57:10,
   57:14, 57:18,
   58:2, 58:6,
   100:3, 179:24,
   180:20, 182:16,
   184:6, 184:13.
drugs 7:18, 19:16,
   19:17, 19:18,
   23:16, 38:25,
   39:13, 39:17,
   39:19, 45:10,
   46:11, 46:14,
   46:16, 57:10,
   57:22, 76:10,
   92:20, 143:3,
   178:15, 179:24,
   180:20, 181:18.
duly 32:2, 77:4,
   156:17, 173:22,
   196:21.
Dunkirk 70:4, 70:7,
   70:11, 70:14,
   84:25, 89:13,
   116:17, 116:23,
   131:10, 131:11,
   218:17.
Duration 202:22,
   205:23, 206:7,
   206:10, 214:2.
durations 211:16.
duties 16:10,
   157:21, 174:12,
   174:18, 197:14.
duty 14:8, 157:23,
   158:24, 159:3,
   197:19.
.
.
< E >.
e-mailed 3:20.
ear 161:20.
earlier 20:25,
   23:1, 48:16,
   53:4, 117:16,
   118:11, 122:8,
   131:2, 137:4,
   147:3.
early 64:19, 78:11,

78:24, 81:25,
   82:2, 83:12,
   83:13, 107:12,
   112:3.
easel 4:21, 50:14,
   50:23.
easier 4:17,
   59:23.
easily 2:11.
east 218:1.
easy 6:1.
eat 41:20, 62:3,
   62:8.
effect 31:18,
   135:23, 141:3.
effort 141:4,
   166:7, 186:4.
efforts 22:15.
eight 125:25,
   127:7, 160:8.
eighth 17:1.
either 14:4, 14:12,
   15:15, 45:7,
   62:8, 63:19,
   67:14, 68:4,
   153:24, 154:6,
   192:20, 206:14,
   214:18, 218:19,
   221:11.
electronic 5:10,
   15:16, 18:22.
elects 13:21.
elements 24:10.
elicited 2:8,
   100:4.
ELMO 59:1.
elsewhere 16:7.
emerge 101:6.
emergencies
   158:4.
emergency 21:3,
   105:20, 138:25,
   139:4, 152:18,
   158:21, 175:25,
   176:5, 176:22.
emotional 6:24,
   10:10.
empanelled 12:4.
employed 33:2,
   78:3, 157:6,

174:8, 174:10,
197:8.
employer 69:25.
empty 7:16, 8:2,
21:24, 22:25,
91:7, 147:12,
148:17, 153:7,
154:5, 155:16,
155:17.
EMS 168:14.
EMT 21:7, 99:10,
99:14, 157:9,
158:9, 158:10,
168:3.
Emts 52:21, 67:18,
67:19, 67:22,
68:2, 101:14,
121:3, 133:8,
138:13, 139:16,
141:23.
encyclopedia 16:3,
74:25.
encyclopedias
172:15, 221:4.
end 24:9, 25:20,
28:9, 30:13,
30:23, 40:1,
82:10, 100:18,
160:11, 162:11,
203:10, 205:10,
206:15, 213:3,
213:4, 221:23.
ended 103:17,
190:1, 213:25.
enforcement
186:14.
engage 12:2,
94:11.
engineer 218:12.
enough 49:21,
73:12, 115:7,
142:17, 168:1,
185:1, 192:19,
215:9, 222:9.
ensure 19:7,
27:3.
entail 33:9.
enter 12:10.
entered 11:17,
11:25, 76:22,

105:16, 173:12.
entertain 172:24.
entire 28:25, 54:1,
68:21, 107:10,
110:10, 119:4,
143:5, 174:25,
186:5.
entirely 164:16.
entitled 173:2,
202:18.
entries 206:7,
208:2.
environment 213:9,
213:16, 216:2.
environments
216:1.
episode 121:12.
equal 212:21.
erected 218:12.
erecting 218:13.
erratic 39:11,
60:20.
especially
104:25.
Esquire 1:37,
1:39.
Essentially
174:20.
establish 21:2,
25:8.
estimate 121:15,
136:25, 221:19.
event 124:16,
184:8.
events 123:25,
124:15, 131:20,
155:23.
eventually 44:24.
everybody 2:10,
12:9, 73:15,
91:9, 109:10,
173:2.
everyday 16:13.
everyone 11:25,
111:16, 177:8.
Everything 49:6,
61:21, 69:21,
69:22, 94:11,
132:1, 144:24,
179:13, 180:16,

180:18, 180:19,
182:1, 183:20,
184:1, 184:5,
189:7, 195:1.
Everywhere 98:7.
evidentiary 11:6,
179:11.
exact 168:8.
Exactly 6:3, 19:19,
38:16, 49:1,
62:14, 62:22,
86:23, 87:10,
106:5, 107:3,
107:13, 126:23,
140:8, 177:11.
exaggerating
27:23.
EXAMINATION 4:3,
32:14, 67:8,
71:10, 76:1,
77:18, 142:20,
146:2, 157:2,
172:24, 174:6,
177:24, 189:10,
191:2, 193:6,
193:12, 197:4.
examined 13:23,
32:2, 77:4,
156:17, 173:22,
196:21.
Examiner 21:12,
22:19.
Examiners 194:21.
examining 172:25.
example 203:11,
215:25, 218:16.
except 18:13,
180:12.
exception 11:4.
excerpt 202:4.
exchange 18:13.
exclusion 31:10.
Excuse 37:3, 47:25,
56:2, 66:24,
73:10, 73:13,
217:14.
excused 2:6, 2:10,
14:5, 17:22,
73:4, 73:24,
153:10, 153:14,

156:4, 156:5,
156:9, 171:25,
172:3, 172:4,
196:5, 196:9,
220:1, 220:2,
220:4, 221:13.
existing 6:24, 8:6,
10:9.
exists 5:6, 5:7.
exit 52:4.
expect 5:2.
expected 185:22.
expects 13:11.
experienced 168:3,
169:2.
experiences
16:13.
expert 112:18.
Explain 15:8,
174:17, 199:13,
202:16, 206:1,
206:8, 211:20.
explanation
199:17.
expose 18:3,
220:20.
exposed 74:18,
104:11, 172:9.
extended 59:10.
extent 17:1,
123:11, 191:1.
exterior 49:8.
external 221:4.
eye 31:21, 66:21,
169:15.
eyes 96:9, 96:13,
169:25.
.
.
< F >.
F. 218:8.
face 5:19, 22:10,
43:19, 149:17,
156:15, 173:18.
Face-down 95:23,
102:24, 137:13,
138:2, 139:22.
facilitate 25:1.
facilitates 72:4.
facing 90:21,

90:22, 90:23.
fact 10:12, 12:2,
14:10, 23:22,
30:7, 31:22,
61:23, 62:7,
69:18, 74:6,
121:19, 128:5,
132:13, 140:11,
142:24, 143:20,
187:4, 215:22,
216:12.
factors 16:17.
facts 15:11, 27:2,
27:7, 74:24,
122:23, 128:24,
153:20, 172:13,
221:1.
failed 206:17.
Fair 19:7, 27:3,
49:21, 58:5,
64:9, 70:20,
73:12, 115:7,
115:8, 116:23,
139:25, 142:17,
168:1, 185:1,
191:21, 192:19,
194:7, 202:9,
215:9.
fairly 15:14, 17:7,
25:23, 168:3.
fairness 18:6.
fall 96:2,
135:24.
fallen 132:23,
140:5, 140:6,
140:15.
family 18:20,
220:10, 220:11.
fancy 86:12.
far 65:25, 66:17,
77:24, 100:24,
103:10, 122:25,
132:8, 141:1,
151:10, 156:6,
160:12, 189:7,
191:15, 192:5,
193:4, 196:7.
farther 213:15.
fashion 47:20,
199:21.

faster 221:20.
father 9:14,
148:16.
Fathers 27:5.
fault 109:1.
favor 17:13,
17:16.
feature 218:14.
February 34:10,
39:7, 57:4, 58:7,
79:8, 79:9.
federal 121:8.
feel 177:22.
feeling 10:11.
feet 11:25, 58:20,
59:7, 59:10,
140:19, 141:7.
fell 22:11, 96:3,
96:6, 138:7,
138:11, 140:10,
140:12, 140:19.
fellow 141:10,
220:9.
felony 12:20,
12:25, 13:3.
felt 143:18.
female 108:2,
166:1.
few 3:17, 23:11,
44:8, 52:25,
53:17, 53:18,
73:25, 94:20,
94:24, 113:13,
157:23, 184:24,
206:13, 220:12.
fifteen 133:2,
133:11, 137:1,
137:3, 137:10,
137:25, 142:12,
144:17, 144:25.
Fifth 12:22, 13:1,
16:22.
fifty 87:9,
87:17.
fifty-dollar 86:25,
87:1, 87:5,
117:21.
fifty. 86:24,
87:14.
fight 64:3, 117:17,

144:20.
figure 27:8, 30:10,
   30:11, 177:10,
   181:25.
fill 2:10,
   147:22.
final 14:23,
   18:8.
find 11:13, 13:7,
   25:24, 27:7,
   28:13, 103:14,
   180:25, 181:4,
   207:19, 219:5.
finders 27:1.
finding 2:16.
findings 15:12.
fine 6:10, 32:22,
   41:17, 51:4,
   100:22, 104:16,
   132:1, 142:6,
   144:24, 154:16,
   167:23, 171:4.
finger 59:8, 60:15,
   125:18.
fingerprint 55:19,
   183:23, 193:5.
fingers 44:7.
finished 7:15,
   35:24, 36:1,
   52:6, 72:1, 91:6,
   94:5, 116:3,
   116:22, 171:20.
Fire 157:14,
   157:15, 157:20,
   158:18, 176:2.
firefighter 157:20,
   158:12.
Firefighter/emt
   157:22, 158:7,
   158:20.
firefighters
   159:10.
firehouse 158:24,
   159:2.
Fires 33:7, 158:2,
   158:3.
fit 131:19,
   217:19.
Fitzgerald 12:14.
Five 5:23, 17:20,

73:19, 74:13,
   75:7, 97:21,
   119:13, 160:8,
   174:16, 211:24.
five-minute 73:15,
   74:12.
flag 213:25.
flagged 160:22.
flagging 160:20.
floated 2:19.
floor 43:17, 44:6,
   44:16, 47:16,
   50:19, 50:20,
   50:25, 51:1,
   51:19, 59:13,
   96:7, 97:2,
   102:14, 103:16,
   103:18, 103:19,
   140:13, 140:16,
   141:19, 161:3,
   180:23.
flowing 140:23,
   141:3.
focus 9:23.
focused 186:23.
folded 113:22.
follow 4:18, 4:20,
   5:13, 6:2, 15:8,
   38:12, 74:14.
follow-up 180:4.
following 12:15,
   13:9, 16:8,
   16:17, 73:22,
   101:10, 123:17,
   154:25, 166:12,
   191:18, 220:8,
   222:13, 222:16.
follows 32:3, 77:5,
   156:18, 173:23,
   196:22.
food 164:2.
foot 47:17, 58:10,
   59:14, 60:4,
   103:6.
forbidden 31:13,
   31:16.
foregoing 224:18.
forensic 185:17.
forget 107:3.
form 54:7, 56:18,

56:22, 56:23,
   65:16, 137:24.
former 23:4.
forth 4:17.
forward 17:22,
   35:8, 76:20,
   77:16, 173:17.
Forwarded 203:1.
found 20:12, 21:8,
   22:14, 22:22,
   22:23, 46:6,
   46:8, 68:1,
   139:2, 170:17,
   179:24, 180:18,
   180:19, 181:7,
   187:9.
Founding 27:5.
four 17:19, 75:1,
   158:22, 197:13.
Four. 35:11.
Fourth 12:22,
   16:21.
frame 176:4.
Frank 202:13,
   202:14.
frankly 2:20,
   122:24.
frantic 98:12,
   141:14.
freaked 44:19.
free 69:11,
   177:22.
frequency 213:14,
   213:15.
fresh 124:1.
freshen 123:25.
Friday 221:18,
   221:23.
Fridman 176:3,
   179:16, 181:24,
   182:3, 185:25,
   186:11, 192:7,
   192:9, 194:2,
   194:4, 194:6,
   195:9.
friend 9:25, 33:15,
   65:12, 177:5.
friends 15:20,
   21:15, 33:23,
   34:2, 79:23,

80:1, 80:13,
80:14, 220:10.
front 4:21, 7:11,
34:25, 35:5,
35:7, 35:17,
48:18, 48:20,
50:10, 51:7,
51:10, 51:11,
91:11, 112:21,
118:24, 122:2,
149:5, 149:8,
150:1, 161:11,
162:20, 173:3,
183:12.
Full 28:7, 32:6,
36:24, 77:10,
79:18, 79:19,
156:21, 174:1,
196:25.
full-time 197:13.
function 12:8,
15:11.
fundamental 8:10.
.
.
< G >.
G. 1:33.
gagging 96:16,
98:3.
garage 90:20,
90:21, 90:22,
118:22, 118:25,
148:23.
gather 176:18.
gathered 191:1.
gave 7:14, 8:2,
20:22, 22:25,
53:3, 91:7,
108:8, 111:20,
111:23, 114:16,
128:4, 128:9,
146:15, 147:12,
148:6, 148:15,
154:5, 155:15,
155:24, 160:17.
gear 160:14.
general 11:9,
15:17, 16:8,
38:17, 153:13.
generally 40:14,

78:14, 212:25.
gentleman 37:15.
gentlemen 11:19,
11:24, 15:24,
19:7, 19:14,
26:8, 50:9,
50:18, 56:3,
57:17, 74:3,
104:6, 135:1,
172:6, 215:14,
220:6, 221:12.
geographic
219:11.
geographical
218:14.
Geographically
8:21.
gesturing 161:22.
gets 188:6,
192:15.
Getting 84:13,
84:14, 112:12,
115:25, 116:1,
138:10, 176:8.
girl 107:25.
girlfriend 19:21,
20:8, 20:24,
21:15, 21:18,
21:24, 22:5,
29:7, 29:19,
34:4, 38:22,
38:23, 39:21,
57:18, 170:17,
171:9.
Give 2:22, 28:4,
31:12, 46:4,
73:15, 102:19,
103:21, 108:6,
108:7, 146:17,
197:21, 203:25,
218:9.
given 3:10, 3:23,
13:21, 16:20,
112:11, 148:2,
170:23, 178:25.
gives 215:12.
giving 155:7.
glanced 179:10.
glass 48:25, 181:8,
183:3.

glasses 88:24.
Google 16:1,
207:20, 207:24,
212:12, 218:19.
gotten 85:14,
97:15, 131:10.
Grab 162:20.
grabbed 160:14.
gradually 39:24.
graduate 78:1.
graduated 77:25.
grand 12:13, 24:6,
62:18, 62:21,
63:11, 121:8,
142:3, 142:5,
142:12, 142:15,
142:18, 142:19.
grateful 76:16,
172:16.
gray 88:23.
Great 168:19,
194:14.
green 91:8, 91:16,
165:6, 165:8.
greetings 18:13.
Grimm 11:8.
ground 2:7.
group 2:9.
guess 3:15, 9:25,
30:1, 34:6, 39:9,
40:4, 53:2,
89:16, 121:14,
134:3, 144:9,
148:1, 190:23,
194:24, 218:8.
guessing 27:24,
208:17.
guide 16:9.
guilt 25:8, 26:1.
guilty 13:5, 13:7,
27:11, 27:15,
30:22, 31:1.
gum 136:11.
gummy 93:13,
135:16.
gums 22:5, 135:16,
143:23.
guy 85:23, 117:10,
147:8, 153:5.
guys 38:6, 41:14.

.
.
< H >.
habit 29:7, 29:11,
  89:24.
hair 88:23,
  93:18.
half 11:10, 82:20,
  116:15, 116:19,
  131:7, 147:21,
  157:11, 197:20,
  221:25.
half-hour 131:14.
halfway 118:12.
hall 51:17, 54:6.
Halloween 33:25.
hallway 35:18,
  35:21, 72:10,
  81:19.
hand 31:25, 47:5,
  77:2, 111:24,
  169:4, 173:20,
  196:19, 205:8,
  211:23, 212:3.
handed 7:14,
  129:3.
handle 182:2.
handled 172:23.
handles 195:6.
handling 184:13.
hands 96:25.
handset 202:21,
  202:22, 202:24,
  202:25, 205:9,
  206:4, 206:6,
  212:18, 212:20,
  215:15, 215:16,
  216:10, 217:8,
  217:14, 217:22,
  218:5, 218:24,
  219:20.
handsets 203:16,
  212:9.
handwriting
  124:16.
handwritten
  72:14.
hang 42:12,
  157:23.
Hanging 33:23,

41:10.
happen 3:4,
  143:12.
happened 19:19,
  21:17, 27:9,
  43:9, 45:22,
  92:19, 97:8,
  97:13, 97:14,
  100:10, 100:12,
  100:13, 106:8,
  108:17, 122:25,
  124:12, 126:6,
  134:21, 139:9,
  152:15, 152:25,
  166:18, 167:7.
happening 150:15,
  195:20.
happens 3:16,
  10:23, 19:15.
happy 2:24, 119:23,
  119:24, 132:14,
  142:5.
hard 4:11, 4:13,
  97:24, 99:2,
  139:10, 161:19.
harder 10:19,
  10:25.
hazmat 158:15.
he'll 27:3.
head 44:7, 47:13,
  47:24, 47:25,
  48:1, 58:10,
  58:20, 59:3,
  59:11, 60:12,
  60:14, 65:20,
  65:21, 65:22,
  96:10, 96:14,
  108:1, 140:6,
  140:10, 140:15,
  162:24, 163:3,
  163:4.
headed 191:8.
health 10:11.
hear 2:24, 8:17,
  9:9, 16:5, 16:19,
  19:24, 20:1,
  20:7, 20:8,
  20:11, 21:14,
  21:17, 22:4,
  23:3, 26:23,

29:3, 29:6,
  29:10, 29:13,
  29:15, 29:17,
  29:18, 29:21,
  30:4, 32:11,
  153:23, 153:24,
  154:24, 205:17.
heard 15:23, 18:1,
  18:9, 43:13,
  44:3, 47:8,
  74:16, 134:20,
  139:2, 142:2,
  154:2, 154:6,
  170:17, 171:10,
  220:13, 220:14,
  220:16.
hearing 3:18, 14:4,
  75:2, 75:4, 75:9,
  76:13, 101:4,
  105:2, 105:12,
  220:13, 224:7.
hearsay 6:12, 8:15,
  8:19, 9:2, 9:17,
  10:1, 10:8,
  10:17, 10:21,
  10:24, 11:3,
  99:22, 100:6,
  112:18.
heated 181:13.
heating 38:18.
Heavenly 70:10,
  70:14, 84:23,
  85:9, 89:10,
  89:15, 131:11,
  148:14.
held 180:3, 182:4,
  183:22, 196:2.
Help 36:17, 38:3,
  43:10, 45:24,
  47:9, 65:5, 65:7,
  65:8, 159:23,
  175:13, 188:17.
helper 159:23.
hereby 224:17.
herself 2:16,
  123:8.
hid 29:6, 29:7.
hide 29:11.
hiding 29:9.
high 77:25, 78:1,

109:2, 135:4,
  135:6, 135:24.
highest 12:8.
hill 21:5.
hit 205:17.
Hold 58:25, 96:19,
  214:1, 222:3.
honest 109:11,
  140:2.
Honorable 1:20.
hooked 36:6.
hope 4:14.
Hopefully 224:11.
horror 22:13.
Hospital 21:10,
  22:17, 106:9,
  107:1, 107:4,
  165:17, 166:23,
  167:7, 167:9,
  170:16, 171:9,
  171:15, 176:9.
hour 11:10, 53:14,
  74:5, 82:20,
  116:15, 116:19,
  117:2, 131:7,
  131:10.
hours 40:14, 53:17,
  53:18, 81:23,
  83:11, 94:20,
  94:24, 107:13,
  112:3, 146:23,
  148:2, 152:25.
housemates 29:8.
huge 135:9.
Hulas 79:3, 79:5,
  79:6.
hundred 87:8,
  87:15.
hundred-dollar
  87:1, 117:24.
Hung 38:21, 92:5,
  206:15, 214:18.
Huntingtown 164:21,
  167:3.
HVAC 23:4, 79:17.
hyphen 203:20.
hysterical 66:15.
.
.
< I >.

idea 2:18, 98:11,
  112:12, 121:22,
  134:1, 134:4,
  134:8, 134:9,
  138:6, 189:18,
  197:21, 221:8.
Identification
  125:8, 146:10,
  146:11, 175:19,
  175:20, 198:5,
  198:7, 199:3,
  201:5, 201:13,
  201:14, 222:20,
  222:22, 223:2,
  223:3.
identified 37:17,
  89:2, 90:10,
  130:5, 155:4,
  201:12, 201:13,
  201:18, 209:17.
identifier
  203:22.
identify 56:2,
  88:19, 122:19,
  123:22, 175:16,
  184:10, 199:24.
III 190:20,
  190:22.
ill 138:10.
illegal 39:19,
  178:15, 178:22,
  180:25, 181:5,
  181:6, 181:18.
illustrating
  5:19.
image 59:15, 60:7,
  166:8.
imagine 189:22,
  190:2.
immediate 13:14.
Immediately 122:4,
  160:14, 164:19,
  169:4, 181:22.
impartially 17:8.
implicit 11:2.
imply 191:5.
important 24:12,
  28:14, 28:21,
  28:22, 75:5,
  203:19, 220:24.

importantly
  75:23.
impossible 99:3.
impression
  112:11.
improper 16:3,
  191:6.
in. 8:1, 11:12,
  91:6, 105:15,
  139:12, 155:8,
  165:11, 173:11,
  180:13, 191:4,
  191:13, 217:4.
inadvertently
  31:21.
inappropriate
  220:16.
inartful 189:24.
inbound 202:24,
  203:17, 204:9,
  205:14.
incident 15:19,
  125:25, 127:8,
  175:11.
inclination 2:21.
included 207:9.
includes 18:14,
  21:15, 201:3.
Including 5:5,
  10:12, 12:1,
  12:10.
incoming 200:14.
inconsistent
  123:6.
Incorporated 200:6,
  201:19.
incorrect 68:18.
incumbent 31:20.
independent 15:15,
  74:23, 104:15,
  172:12, 220:25.
indicate 41:18,
  47:7, 48:17,
  184:3, 187:8.
indicated 2:4,
  86:2, 207:10.
indicates 206:10.
Indicating 2:15,
  47:16, 51:25,
  55:11, 58:22,

60:10, 214:1.
indication 184:9.
indictment 12:23,
   24:7.
individual 3:22,
   5:4, 78:25,
   88:16, 121:25,
   159:19, 161:12,
   204:22.
individuals 12:3,
   18:15, 167:13,
   198:20.
indulgence 3:1,
   48:14, 68:8,
   89:21, 114:19,
   122:11, 145:12,
   153:8, 184:15,
   196:3, 208:19,
   209:6, 209:7,
   219:22.
influence 220:18.
influenced 14:10,
   17:16.
information 5:20,
   7:18, 16:6, 16:7,
   91:9, 104:13,
   176:18, 177:16,
   177:18, 198:12,
   198:21, 199:8,
   199:15, 199:19,
   200:2, 200:14,
   201:4, 201:16,
   201:22, 201:23,
   207:6, 207:9,
   210:23, 212:6,
   219:16.
initially 94:7,
   108:13, 109:13,
   119:20, 149:14.
initials 51:6,
   103:23, 103:24.
initiation 202:21,
   205:12.
inject 144:11.
injected 26:15.
injecting 70:21,
   71:4.
innocent 27:13.
inquiry 155:1.
Inside 22:24,

93:20, 130:24,
   130:25, 131:1,
   149:8, 179:11,
   179:24, 179:25,
   211:23, 211:24.
instance 15:2,
   195:5.
instead 117:9.
instruct 15:7,
   171:19.
instructed 18:22,
   30:14.
instruction 75:5.
instructions 12:11,
   15:9, 18:2,
   18:10, 24:10,
   74:14, 74:17,
   220:8, 222:3,
   222:5, 224:13.
insurance 33:5.
intend 6:17.
intended 8:8, 16:8,
   25:11.
intent 8:6, 9:23,
   10:10, 12:16,
   25:1.
intention 154:22,
   201:10.
interaction
   167:12.
interest 16:23.
interesting
   190:18.
interfere 213:14.
International
   203:4, 203:5.
Internet 15:17,
   18:16, 74:25,
   172:14, 221:2.
interpret 199:19.
interrupt 32:21,
   187:25.
intervene 191:7.
interviewed
   119:20.
intoxication 21:13,
   22:20, 24:18.
introduced 180:6.
introduction
   14:2.

investigation
   15:21, 74:23,
   104:15, 172:13,
   180:4, 190:25,
   191:2, 191:10,
   191:24, 191:25,
   194:19, 194:25,
   195:6, 195:10,
   195:13, 221:1.
investigations
   194:12.
invite 76:17.
invoke 31:9.
involve 14:7.
involved 206:3.
involvement 143:17,
   189:25, 190:2,
   195:25.
involving 18:5.
issue 6:15, 16:4,
   154:12.
issues 3:24, 10:1,
   15:20, 18:4,
   74:19, 104:12,
   105:11, 172:11,
   173:8, 220:21,
   221:2, 221:5.
item 114:10, 182:8,
   183:2.
items 48:4, 48:10,
   55:22, 69:16,
   69:19, 113:10,
   113:11, 113:13,
   113:23, 129:15,
   133:24, 134:1,
   134:4, 145:8,
   145:10, 180:25,
   181:5, 181:6,
   181:17, 182:3,
   183:15, 187:9,
   187:17, 196:1,
   208:20, 209:10.
itself 14:14,
   191:3, 191:13.
.
.
.
< J >.
J. 1:39.
J1 73:2.
Jake 159:4, 159:20,

167:2.
James 1:20.
JC 83:3.
JKB-10-0271 1:7.
job 27:9, 30:10,
    30:11.
Joint 72:18, 73:1,
    188:25, 223:13,
    223:14, 223:17.
Joseph 156:11,
    156:13, 156:16,
    156:23, 196:18,
    196:20, 197:2.
Judge 1:20, 11:8,
    12:10, 14:7,
    16:15, 24:9,
    24:20, 27:2,
    28:2, 30:14,
    93:22.
judges 16:11,
    17:15.
judging 16:9.
judgment 170:1.
jumped 160:14.
June 158:13.
Juror 2:4, 2:15,
    2:23, 3:3.
JURORS 3:5, 3:9,
    5:14, 11:20,
    12:9, 15:25,
    16:10, 18:18,
    76:17, 220:9,
    224:11.
justice 12:8.
.
.
< K >.
K-e-l-l-e-y
    156:23.
K-e-n-n-e-d-y
    32:8.
K. 1:20.
Keating 105:7.
keep 18:7, 28:2,
    28:6, 31:20,
    38:3, 38:7,
    166:7, 171:2,
    180:3, 220:24.
keeps 75:5.
Kelley 156:12,

156:13, 156:16,
    156:23, 162:20,
    167:21, 171:5.
kept 113:14,
    211:23.
key 84:6, 179:23.
kicked 167:10.
kidney 39:18.
kill 11:10.
killed 26:16,
    30:8.
Kind 9:19, 18:12,
    34:15, 37:24,
    38:17, 84:20,
    91:10, 91:19,
    96:20, 105:23,
    106:1, 109:9,
    114:8, 141:21,
    158:21, 160:1,
    164:17, 184:2,
    199:15, 218:9,
    220:23.
kinds 39:15.
Kitchen 35:9,
    41:10, 51:15,
    54:5, 81:9,
    136:23.
knowingly 24:25.
knowledge 64:13,
    67:14, 67:21,
    68:20, 68:24,
    69:3, 186:13,
    192:20, 192:24,
    198:20.
known 34:5, 78:25,
    126:18, 135:16.
knows 30:7,
    192:14.
.
.
< L >.
lab 182:16.
label 50:24, 51:6,
    110:2.
labeled 110:4,
    110:5, 110:7.
LAC 203:21, 203:24,
    207:14, 212:8,
    215:11.
lack 161:20.

LACS 212:10.
Ladies 11:19,
    11:24, 15:24,
    19:6, 19:13,
    26:8, 50:9,
    50:18, 56:3,
    57:17, 74:3,
    104:6, 135:1,
    172:6, 215:14,
    220:6, 221:12.
lady 117:6.
Laid 96:1.
land 36:5, 60:17.
landscaping 49:8.
large 35:20,
    213:13.
laser 183:12.
lasers 114:6.
last 24:18, 28:6,
    32:7, 40:4, 40:5,
    49:23, 80:16,
    80:18, 110:2,
    111:24, 153:11,
    153:12, 154:6,
    155:1, 155:6,
    156:22, 174:2,
    190:5, 197:1,
    203:9, 203:19,
    203:21, 206:7,
    220:11.
late 11:21.
Later 7:3, 7:19,
    13:15, 21:9,
    22:9, 22:12,
    22:17, 22:21,
    24:16, 24:17,
    42:16, 43:4,
    48:13, 52:24,
    52:25, 69:15,
    121:7, 124:17,
    128:13, 128:14,
    148:6, 182:15,
    184:5.
latest 189:19.
latitude 203:25,
    207:15, 207:18,
    218:18.
Laundry 48:25,
    52:13, 54:17,
    81:12, 133:15,

179:9.
law 14:3, 14:6,
  15:7, 15:8, 18:2,
  18:10, 27:3,
  27:7, 30:15,
  74:18, 74:23,
  75:3, 172:13,
  186:14, 221:1.
lawyer 13:12,
  13:13, 14:8,
  14:9, 14:10,
  14:19, 14:20,
  172:23, 172:25.
lawyers 11:23,
  14:1, 14:16,
  14:17, 14:24,
  18:10, 18:14,
  104:25.
Laying 43:17,
  47:12, 95:8,
  137:12, 161:3,
  162:11, 162:18,
  162:24, 163:5,
  176:13.
layout 35:4, 35:16,
  50:19, 50:20,
  51:1, 52:1,
  81:7.
lead 150:21.
leading 24:4,
  24:24, 150:20,
  195:16.
learn 16:4.
learned 28:16.
least 2:11, 86:24,
  87:2, 117:21,
  125:7, 219:2.
leave 12:9, 40:17,
  53:10, 64:20,
  82:6, 82:14,
  82:21, 90:15,
  100:21, 116:21,
  181:21, 190:5.
leaving 82:24,
  84:4, 137:10.
Lee 107:25.
left-hand 162:13.
leg 36:11.
Legacy 211:23.
legs 163:6,

163:7.
Leonardtown
  83:15.
less 124:16.
letter 72:22,
  76:8.
letting 186:6.
level 51:22,
  54:4.
liberty 28:23.
lied 142:21,
  142:25, 143:2,
  143:7, 143:10,
  144:1, 144:4.
life 19:17, 34:6,
  97:23.
light 2:6, 29:4,
  74:10.
lighting 126:11.
likely 203:2.
Likewise 63:25,
  81:20, 211:7.
limit 70:8.
Line 36:5, 60:17,
  131:9, 131:19,
  161:23, 210:11,
  210:13, 210:21,
  210:22, 210:23,
  211:8, 217:21.
lines 93:1, 93:11,
  93:21, 95:1,
  135:2, 135:6,
  135:9, 135:11,
  136:9, 143:20,
  147:17.
lip 93:21, 94:1.
lips 96:9.
liquefy 181:13.
list 75:18, 76:4,
  222:11.
listed 200:6,
  203:12.
listen 27:21.
listing 200:13,
  207:13.
literally 123:13,
  201:24, 215:24.
little 10:25, 12:1,
  22:5, 22:6, 22:9,
  22:11, 28:18,

28:19, 35:15,
  49:9, 58:17,
  59:24, 64:7,
  77:17, 80:6,
  106:15, 157:11,
  161:20, 183:13,
  218:9, 221:19.
live 32:18, 32:19,
  39:8, 80:20,
  189:22.
lived 49:25, 57:3,
  80:10, 80:21,
  80:24, 81:14,
  165:22, 177:4.
Living 22:2, 34:11,
  35:1, 35:8,
  35:25, 36:10,
  37:5, 37:7, 37:8,
  37:10, 37:25,
  38:15, 39:3,
  40:2, 51:13,
  51:14, 54:5,
  72:2, 78:12,
  79:20, 79:21,
  79:22, 81:9,
  81:12, 81:15,
  159:1, 159:2.
loaded 166:19.
loads 215:23.
local 23:4.
locate 179:17.
located 21:6,
  35:12, 84:24,
  157:15, 158:18,
  212:5, 216:10,
  217:9, 217:14,
  217:22, 218:5,
  218:10, 218:16.
location 21:22,
  75:16, 145:20,
  165:6, 175:2,
  200:15, 203:21,
  207:19, 207:21,
  215:12, 216:6,
  217:6, 218:17,
  219:16.
locations 55:20,
  212:9, 219:15.
lock 113:14.
longer 53:15, 74:5,

91:12, 104:3,
206:5.
longitude 204:1,
207:15, 207:18,
218:18.
look 6:4, 16:4,
34:19, 43:18,
59:15, 74:24,
102:15, 109:21,
113:2, 123:7,
162:12, 172:13,
180:5, 187:23,
189:1, 193:14,
203:19, 203:24,
219:15.
looked 43:19,
97:12, 102:2,
112:25, 113:1,
149:1, 149:5,
189:8, 189:9.
Looking 4:10, 4:18,
5:14, 5:15,
36:17, 36:18,
36:21, 36:22,
59:17, 71:21,
71:22, 97:12,
102:13, 102:21,
102:25, 103:4,
150:17, 151:2,
179:10, 184:3,
184:5, 201:15,
202:3, 209:13,
209:25, 211:7,
211:17.
looks 88:22,
212:19.
loose 181:10.
lost 19:17,
164:6.
lot 26:21, 135:10,
185:19, 185:21.
loud 63:3, 64:25,
124:4, 145:4,
188:13.
louder 80:6.
lower 213:3,
213:4.
lunch 74:5, 74:6,
104:7, 104:16.
lunchtime 221:18,

221:24.
lying 47:7, 103:24,
144:7.
.
.
< M >.
mad 101:24.
magical 144:24.
mail 203:3,
206:14.
main 60:25.
maintained 198:23,
199:20.
maintaining
194:15.
majority 194:14.
male 166:1.
man 19:22, 20:1,
160:21, 161:3.
manner 202:7.
Map 212:12.
Maps 207:20,
207:24, 218:19.
March 20:18, 23:12,
25:4, 25:13,
49:2, 58:7,
81:24, 82:10.
Marijuana 39:16,
130:11, 181:9,
183:3.
mark 90:15, 103:22,
146:5, 175:19,
208:20, 210:15.
marker 91:8, 91:16,
91:17, 91:19,
91:20, 91:22.
market 207:14,
211:24.
marking 91:23,
103:23.
marks 181:12.
Mary 78:22, 79:3,
83:15, 222:15.
Maryland 1:2, 1:11,
21:6, 21:12,
24:7, 57:4,
158:9, 168:15,
175:24, 190:1.
master 51:17,
54:6.

material 129:22,
137:23.
materials 15:16.
matter 8:11, 10:2,
10:15, 11:1,
15:18, 61:23,
62:7, 69:18,
74:5, 105:9,
119:14, 121:19,
132:12, 140:11,
172:23, 187:4,
215:5, 224:19.
matters 11:22,
17:11, 18:20,
28:13, 104:8,
172:19.
maximum 213:3.
Mcgown 159:4,
159:16, 167:2.
mean 29:4, 49:4,
49:8, 96:11,
105:24, 114:4,
126:6, 132:12,
153:20, 171:2,
180:19, 185:19,
187:25, 191:9.
Meaning 213:6.
means 12:21, 15:16,
143:7, 199:18,
217:2.
measure 12:8.
Mechanical 79:15,
79:16, 200:6,
201:19.
Mechanicsville
78:15.
media 104:11,
172:10.
medic 164:22,
165:11, 165:18.
Medical 2:5, 3:6,
21:12, 22:19,
83:16, 106:3,
138:25, 139:4,
152:19, 164:20,
165:13, 165:24,
169:3, 170:4,
176:15, 194:21.
meet 7:23, 8:6,
33:22, 34:1,

78:25, 79:2,
84:5, 106:8.
meeting 21:23,
73:17, 79:9,
106:25.
member 68:20,
68:24, 69:3,
186:13.
members 18:20,
27:1, 184:11,
220:12.
Memorial 21:10,
22:17, 166:23,
167:7, 176:9.
memory 10:12,
16:21, 124:12,
124:14, 175:13.
mental 6:24,
10:11.
mention 88:1.
mentioned 15:19,
24:20, 29:22,
36:23, 159:11,
209:2.
merely 18:23.
merits 14:12.
message 19:1,
19:5.
met 21:22, 23:1,
23:13, 33:25,
79:3, 79:20,
79:21, 79:25,
88:4, 88:7,
165:10.
Mettam 159:4,
159:20, 167:3.
Michael 6:18, 20:1,
20:21, 23:3,
23:4, 25:14,
26:21, 29:15,
30:16.
microphone 32:6,
32:10, 32:23,
77:8, 80:7,
156:21, 174:1,
196:25.
Microsoft 207:20,
218:20.
middle 46:24,
161:22.

midnight 53:18.
midst 104:23.
Mike 7:7, 7:24,
9:16, 9:25,
29:10, 29:11,
29:12, 29:14,
117:10, 147:9,
151:22, 151:23,
151:24.
mile 2:17, 213:2.
miles 213:10,
215:22, 216:4,
218:4.
mind 6:24, 8:6,
10:9, 10:18,
18:7, 28:2, 28:7,
28:25, 85:25,
86:20, 103:21,
123:25, 124:1,
128:3.
minded 85:23,
117:14, 117:15.
mine 17:13.
minimize 167:11.
minute 39:21,
71:22, 74:10,
97:17, 133:7,
165:1.
miscellaneous
72:25.
mischaracterize
123:10.
misdial 206:16.
misled 142:21,
142:25, 143:7,
143:10.
misphrased 67:17.
mistake 27:10,
126:6, 173:2.
mixed 164:2.
mode 18:23.
mom 78:6, 85:25,
88:6, 88:17,
95:6, 105:25,
106:1, 107:12,
109:10.
moment 2:20, 24:20,
122:11, 140:9,
163:25, 165:8,
208:19, 209:6,

209:8.
Monday 3:21,
115:10, 144:11,
185:24.
money 86:20, 86:21,
86:22, 86:24.
month 157:23.
months 24:4,
39:9.
mood 41:16.
morning 2:2, 2:13,
5:23, 11:19,
11:20, 11:22,
11:25, 26:7,
28:3, 32:16,
32:17, 49:16,
49:17, 49:20,
53:21, 71:14,
73:18, 74:11,
75:22, 77:20,
77:21, 112:3,
113:20, 113:23,
133:16, 146:19,
221:7, 221:20,
224:11.
mother 29:8, 37:7,
37:9, 37:10,
69:18, 78:13,
79:22, 79:25,
80:3, 80:11,
87:23, 88:1,
95:11, 95:13,
95:15, 95:17,
106:7, 106:22,
107:14, 107:16,
110:14, 110:19,
111:8, 136:15,
136:22.
motions 14:2, 14:3,
14:9, 14:25.
motive 10:10,
16:22.
mouth 44:7, 93:14,
97:4, 98:6,
132:23, 140:23,
141:4, 164:5,
165:4.
Move 32:23, 36:18,
39:6, 45:4, 45:7,
65:16, 77:16,

163:12, 163:22,
166:3, 171:20.
moved 22:13, 79:24,
79:25, 81:1,
102:5, 105:8,
140:8, 141:23,
142:2, 163:22.
movement 44:11,
164:12.
movie 22:7, 92:4,
92:6, 92:13,
92:15, 92:17,
94:5, 94:8,
94:22, 95:2,
134:20, 134:23,
134:24, 135:20,
135:21, 135:22.
Moving 36:19, 37:2,
37:6, 79:23,
80:13, 80:14,
96:4, 96:13,
103:17, 141:19.
Moye 76:4, 221:11,
223:7.
multicolored
181:8.
multiple 20:17,
87:18, 107:21.
mutual 33:23,
34:2.
myself 215:7.
.
.
< N >.
name 26:8, 32:6,
32:7, 33:12,
36:24, 49:18,
77:10, 77:12,
80:3, 80:16,
80:18, 88:5,
91:8, 107:25,
110:2, 112:8,
115:4, 156:21,
156:22, 159:19,
159:20, 167:23,
174:1, 174:2,
184:23, 196:25,
197:1, 215:4,
218:9, 218:13.
named 19:22, 20:1,

39:22, 117:10,
147:9.
names 88:1.
narcotics 178:22,
180:3, 182:16.
Nationwide 213:2.
natural 194:16,
195:2.
nature 86:5.
Naval 78:21.
near 47:16, 60:4.
nearby 218:14.
necessarily 5:14,
219:18, 219:19.
necessary 19:6.
need 4:24, 17:4,
32:22, 73:11,
74:13, 105:11,
119:23, 139:18,
145:4, 153:15,
178:14, 192:14,
207:19, 222:6.
needed 9:15,
11:22.
needles 29:22,
181:10.
needs 19:1, 65:5.
negatives 68:19.
neighborhood
21:5.
neither 57:21.
network 205:18,
212:4, 212:23,
214:18.
news 18:3, 74:18,
104:11, 172:10,
220:20.
Nextel 197:9,
197:10, 197:12,
198:18, 211:23.
nice 3:15.
Nicole 77:3,
77:11.
nights 82:2.
nipple 161:23.
nobody 102:1,
206:14.
noise 96:13.
None 17:6, 28:12,
44:10, 81:11,

133:23, 137:23,
164:13, 217:16,
222:12.
nonexistent
60:23.
nonlawyers 27:5.
nor 125:11.
normal 61:21,
63:23, 64:1,
74:6, 74:10,
85:13, 92:7,
92:18, 94:11.
normally 157:23.
North 32:19,
157:14, 157:15,
157:20, 158:18,
217:10, 217:13,
217:25.
NORTHERN 1:3.
nostril 165:6.
notate 214:12.
notation 204:8.
noted 85:18.
notes 189:4.
Nothing 15:24,
63:18, 92:18,
101:2, 114:21,
116:8, 122:20,
132:8, 132:9,
144:20, 153:9,
155:14, 156:3,
171:21, 171:24,
184:16, 188:6,
193:8, 196:4,
213:14, 219:22,
219:25.
notice 11:24, 39:4,
39:10, 44:9,
137:18, 137:21,
164:12.
noticed 22:12,
59:13, 139:7,
140:23.
notified 159:6,
194:22.
notify 110:15.
November 23:5,
23:14, 23:19.
numbers 109:22,
110:7, 175:9,

203:20, 203:21,
   208:4, 208:6.
nurses 27:6.
.
.
< O >.
o'clock 2:6, 2:14,
   40:18, 40:20,
   53:20, 62:12,
   64:7, 73:18,
   74:8, 82:1,
   104:19, 105:1,
   105:6, 131:17,
   131:25, 132:10,
   132:22, 133:7,
   133:10, 134:11,
   134:17, 134:19,
   168:9.
O1 72:12, 146:5,
   146:7, 146:8,
   223:1.
O2 175:19, 175:20,
   223:2.
O3 208:21, 208:22,
   208:23, 209:5,
   209:13, 209:25,
   210:1, 210:5,
   210:7, 210:24,
   211:2, 223:3.
O4 208:21, 208:22,
   208:23, 209:13,
   209:19, 211:7,
   211:9, 223:4.
oath 15:25, 63:10,
   105:18.
obey 220:7.
object 3:15, 101:5,
   151:1, 177:19,
   208:16.
Objection 3:2,
   46:9, 70:23,
   71:18, 85:16,
   85:18, 99:20,
   100:24, 112:16,
   128:24, 150:20,
   171:11, 171:17,
   178:3, 178:10,
   190:12, 191:16,
   195:16, 214:6.
objections 11:7,

14:1, 14:3, 14:8,
   14:10, 14:11,
   14:25, 172:22,
   172:25.
objects 191:7.
observable
   137:23.
observations
   86:18.
observe 38:25,
   58:2, 58:6,
   60:14, 66:1,
   89:19, 95:22,
   176:5, 176:10,
   187:21.
observed 59:6,
   59:25, 60:3,
   60:11, 63:17,
   63:19, 65:11,
   70:21, 71:4,
   144:19, 176:12.
obstruction
   219:11.
obtain 7:18, 8:7,
   23:16, 23:21,
   23:25, 158:6,
   212:7.
obtained 20:6,
   20:9.
obvious 194:16.
obviously 100:5.
occasion 17:3,
   20:17, 20:21,
   23:18, 78:24,
   122:8, 131:3,
   133:5, 175:2,
   198:8, 199:2,
   199:3.
occasionally
   114:5.
occasions 20:17,
   23:7, 23:11,
   23:23.
occurred 64:14,
   66:23, 70:18,
   85:11, 91:3,
   101:5, 121:4,
   123:25, 124:5,
   134:18, 140:11,
   143:5.

occurring 132:9,
   137:15.
offer 6:17, 9:10.
offered 9:2, 9:4,
   125:11.
offering 6:12.
Office 21:11,
   22:18, 174:9,
   180:2, 185:4,
   194:21, 196:1.
officers 21:7,
   48:11, 107:21,
   109:14, 119:15,
   152:24, 174:19,
   174:20, 176:1,
   179:1.
Official 1:49,
   224:23.
often 40:5, 81:1.
old 32:25, 77:22,
   78:9, 165:15,
   166:2.
omitted 108:16,
   143:20, 143:23.
Once 91:1, 114:13,
   133:1, 149:3,
   166:9, 177:23,
   180:1, 201:19.
one-page 207:2.
One. 10:6, 78:8,
   78:10, 101:9,
   191:15, 223:13.
ones 174:21, 192:7,
   199:21.
open 18:7, 28:2,
   28:6, 29:8, 30:6,
   55:2, 73:22,
   91:11, 101:10,
   123:17, 137:20,
   149:5, 149:25,
   150:2, 154:25,
   166:12, 180:14,
   180:17, 187:13,
   189:6, 191:18,
   213:13.
opened 97:13,
   102:2, 152:1,
   152:9, 152:11,
   179:12, 179:23,
   180:12, 180:13,

180:16, 187:15.
opening 4:2, 13:10,
    13:12, 13:14,
    13:15, 14:24,
    19:10, 26:4,
    28:4, 31:5.
Opens 55:1, 55:3.
operations
    158:15.
opinion 100:4,
    101:4.
opportunity 13:19,
    13:22, 14:22,
    16:19, 125:14.
oppose 17:16.
opposing 13:24.
opposite 160:11.
option 125:9.
oral 120:22,
    124:23, 148:12.
orally 151:8,
    151:17, 151:19.
order 72:8.
ordered 86:12.
ordinary 92:19,
    134:12, 198:16.
orient 50:25.
oriented 216:22,
    216:24, 217:18.
originally
    140:10.
originates
    204:15.
originating 203:8,
    205:2.
Oscar 223:1.
others 18:20,
    176:22.
otherwise 15:21.
ourselves 92:6,
    185:19.
outbound 202:24,
    205:16, 205:21,
    206:4, 206:5.
outcome 16:23.
outgoing 200:14.
outlining 13:11.
Outside 3:17,
    15:21, 18:18,
    31:23, 36:11,

48:23, 61:8,
    61:10, 61:11,
    75:9, 75:16,
    76:13, 105:2,
    105:11, 160:18,
    160:20, 176:22,
    177:8, 222:6,
    224:6.
overdose 19:16,
    26:12, 28:21,
    29:5, 29:9,
    184:6, 184:13,
    195:5.
overdosed 20:14.
overlap 214:3,
    214:14.
overly 132:6.
overnight 220:7.
Overruled 85:18,
    100:24, 101:11,
    112:20, 214:8.
own 16:12, 23:8,
    30:3, 124:15,
    143:23, 185:22.
owned 34:17.
owner 189:21.
oxygen 161:21.
.
.
< P >.
p.m. 61:15, 63:14,
    64:10, 64:15,
    66:24, 115:13,
    203:15, 210:4,
    211:4, 211:6,
    211:12.
P1 33:17, 222:17.
P10 90:1, 90:5,
    90:7, 118:15,
    222:17.
P2 6:3, 6:4, 46:23,
    47:5, 47:16,
    58:17, 59:3,
    102:17, 102:21,
    103:7, 104:1,
    162:14, 180:6,
    194:8, 222:17.
P3 46:24, 102:25,
    103:5, 222:17.
P4 46:24, 55:24,

56:2, 103:5,
    151:25, 152:3,
    152:4, 152:6,
    222:17.
P5 48:3, 48:5,
    48:7, 55:23,
    56:2, 56:4,
    113:4, 113:11,
    133:21, 152:5,
    183:10, 222:17.
P6 48:4, 48:5,
    55:23, 56:2,
    56:4, 102:17,
    113:4, 152:5,
    194:8, 222:17.
P7 164:23, 164:24,
    222:17.
P8 43:21, 46:18,
    161:10, 222:17.
P9 34:20, 48:16,
    222:17.
packaged 183:20.
Page 63:1, 147:21,
    200:16, 201:8,
    201:15, 202:7,
    209:10, 209:15,
    209:20, 210:8.
pages 202:9, 207:4,
    207:5, 207:11,
    209:1.
paid 86:15, 87:13,
    87:14, 87:20,
    87:22, 118:5.
pain 10:11.
painful 61:14.
pale 43:19.
paper 5:8, 59:9,
    59:10.
paperwork 145:21,
    192:18, 192:19.
paragraph 188:13.
paramedic 165:5,
    167:4, 170:23,
    170:25, 171:6.
paramedics 45:4,
    45:19, 45:22,
    107:3.
paraphernalia
    22:22, 29:21,
    45:12, 56:18,

57:1, 57:8,
57:14, 57:19,
179:25, 180:20.
parent 7:6, 7:11,
7:23, 21:21,
86:1, 87:24,
88:2, 89:9, 90:8,
91:25, 101:22,
111:21, 114:13.
park 218:14.
parked 90:20,
118:24, 128:9,
148:23.
part 16:2, 17:5,
55:16, 55:18,
79:18, 96:23,
140:12, 147:18,
171:13, 192:6.
participants 18:5,
18:12, 74:21,
74:22, 104:13,
104:14, 172:12,
220:22, 220:23.
participating
220:17, 221:3.
particular 111:19,
181:21, 203:24,
210:6, 210:8,
210:9, 210:12,
212:16.
parties 15:13,
18:6, 18:14,
27:4, 214:18.
party 13:10, 13:11,
13:23, 13:24,
17:13, 17:17,
33:25.
pass 150:1.
passed 45:24, 81:5,
82:12, 107:6,
113:12.
passing 88:6,
113:19.
past 2:13, 136:4.
patient 161:16,
161:17, 164:3,
165:24, 166:2,
166:22, 167:1,
167:8, 167:10,
168:19, 169:7,

169:24, 170:1,
170:17, 171:9.
PATRICK FITZGERALD
SWEENEY 1:11.
patrol 174:14,
174:15, 174:18,
174:23, 185:3,
185:8, 194:10.
Paul 222:16.
Pax 78:21.
pay 19:17, 27:20,
28:14, 28:20,
38:3, 38:10,
85:13, 86:6,
86:7, 86:9,
86:14, 86:21,
87:6, 87:15,
117:18, 117:21.
paying 86:19.
pen 103:21, 204:14,
218:16.
Penny 83:3.
people 27:6, 29:16,
30:18, 69:14,
105:21, 147:23,
160:19, 160:20,
164:21, 167:3,
167:11, 170:4,
176:5, 176:15,
176:19, 176:20,
176:24, 177:6,
177:9, 185:20,
186:6, 220:17.
Percocets 39:18.
perfectly 32:22,
144:24.
perform 12:7,
164:16, 166:14.
performance
16:10.
performed 21:11,
164:14.
performing 165:24,
176:8.
period 17:20, 57:7,
57:11, 57:13,
57:15, 57:19,
57:22, 57:25,
58:2, 58:6,
101:17, 110:15,

200:21.
permission 46:4,
53:4, 117:13,
118:6, 178:23,
178:25, 209:9.
permitted 13:25.
person 16:1, 17:9,
17:17, 19:2,
20:22, 29:10,
31:14, 31:15,
31:17, 33:18,
120:21, 122:4,
126:18, 126:23,
160:20, 165:14,
165:25, 184:3,
185:23, 194:17,
194:23, 195:19,
195:22, 204:11.
personal 7:17,
23:8, 202:19.
personnel 21:3,
164:20, 165:13,
176:2, 176:5,
176:22.
persons 18:15,
31:11, 149:22,
221:3.
phones 104:16,
205:22, 205:24,
209:2, 215:15,
219:1.
photo 103:5.
Photograph 33:18,
34:21, 34:22,
43:22, 43:24,
47:16, 48:7,
48:16, 75:11,
90:2, 103:1,
103:10, 145:8,
145:14, 152:6,
161:13, 161:17,
162:13, 162:15,
163:2, 163:19,
165:1, 183:8,
187:14, 223:23.
photographed
185:25.
Photographs 4:6,
5:3, 5:24, 46:23,
47:1, 47:3, 48:3,

48:5, 56:16,
102:15, 102:16,
113:5, 113:7,
114:11, 180:8,
180:9, 186:2,
192:8, 192:9.
phrase 128:20.
physical 10:10,
203:25, 207:21,
207:22.
pick 7:7, 7:24,
9:15, 21:20,
23:10, 96:24,
105:9, 205:15,
212:20.
picked 100:16,
202:25, 203:7,
204:11.
picking 71:12,
103:16.
picky 168:22.
picture 50:3, 50:6,
58:17, 60:6,
66:7, 66:8, 90:7,
90:8, 103:1,
103:4, 103:7,
151:25, 180:13,
187:15.
pictures 113:3,
180:17, 187:10,
187:11, 189:10,
192:12, 192:15,
193:18, 193:19,
193:21, 193:22,
194:5, 194:6,
194:7.
piece 59:9, 59:10,
113:13, 183:7.
pillows 59:4.
Pills 7:7, 7:13,
7:24, 8:1, 8:7,
8:9, 9:16, 9:25,
10:3, 11:2,
85:15, 85:23,
91:6, 100:16,
112:12, 117:10,
147:8, 151:21,
153:5, 153:6,
153:21, 153:22,
154:3, 154:7,

154:16, 155:8.
pipe 56:11, 56:12,
130:8, 181:8,
183:3.
pivoted 141:13.
place 2:23, 36:18,
36:22, 106:2,
151:15, 190:25,
202:20.
placed 18:23,
66:16, 67:2,
183:21, 214:1.
placing 8:9.
plain 108:4.
Plaintiff 1:7.
plan 3:3, 10:10,
10:18, 117:8,
221:8, 222:3.
planned 3:7, 116:6,
116:10.
plans 41:18, 84:3,
84:5.
play 125:3.
pleads 13:5.
pleased 69:12.
pled 30:22.
plug 207:19.
podium 46:22.
Point. 9:22, 22:1,
34:12, 80:21,
100:25, 109:12,
131:6, 159:25,
221:19, 222:9.
pointed 216:25,
217:10, 217:13.
pointer 47:6,
48:17, 162:20,
162:21, 183:12.
pointing 162:23.
political 17:10.
Pontiac 84:21.
poor 36:8, 60:20,
126:12.
portion 55:15,
60:25, 71:23.
portions 193:6.
position 2:10,
6:22, 8:18,
59:25, 65:12,
65:22, 157:8,

159:21, 162:9.
positive 2:9.
possess 57:18.
possessed 57:8,
57:22.
Possession 12:15,
24:13, 123:11,
129:12, 190:23.
possible 157:24,
166:8, 213:19,
214:3, 214:7,
214:9.
possibly 181:18,
213:4.
poster 113:2.
pot 114:5.
poverty 17:10.
powder 55:19,
183:17.
practice 76:2.
precise 218:17.
prejudiced 17:8.
preliminary 12:11,
66:12, 222:8.
premise 10:7.
prepare 175:11.
prepared 168:17,
182:2, 190:19.
prescription 7:14,
7:15, 7:16, 8:2,
91:7, 114:10,
181:13, 182:9.
presence 73:25,
132:25, 133:1,
133:11, 144:17,
213:11.
present 13:17,
13:19, 13:21,
13:22, 27:4,
92:9, 114:11,
165:23, 167:13,
176:1.
presented 13:18,
16:6, 221:2,
221:5.
presently 78:3.
presents 18:4,
74:20, 104:12,
172:11, 220:21.
presumed 27:13.

presupposing 122:18.
Pretty 34:6, 59:9, 61:10, 159:22, 164:17, 167:10.
previous 17:3, 66:7, 66:8, 100:8.
Previously 47:19, 85:16, 130:5, 161:10, 163:8, 172:25, 209:2, 209:17.
price 19:17.
primary 195:19, 195:22, 197:16.
principles 16:8.
printed 15:16.
Prior 67:11, 67:15, 67:18, 67:22, 68:1, 68:5, 93:16, 102:9, 113:18, 123:5, 149:19, 170:12, 184:8.
Probably 40:4, 40:7, 86:17, 104:5, 116:24, 133:1, 158:22, 189:18, 197:23, 205:25, 221:18.
problem 3:7, 3:11, 4:24, 172:1, 172:20.
problems 3:11, 4:15, 9:19, 154:4.
procedural 172:19.
procedure 172:23, 222:10.
procedures 184:12.
proceed 13:9, 19:12, 122:22, 123:15, 182:1.
proceeded 115:23.
proceedings 73:22, 101:10, 123:17, 154:25, 166:12,

191:18, 224:15, 224:19.
process 79:22, 185:19.
processes 184:13.
produced 197:18.
proffered 10:22, 101:1.
programmed 219:1.
progress 39:24, 221:16, 221:17, 221:21, 224:13.
promptly 221:7, 221:9, 224:12.
pronounced 22:16.
pronouncement 170:6.
proof 15:5, 20:16, 29:2.
propagation 213:14.
proper 14:9.
property 180:2, 182:4, 182:15, 183:22, 186:1, 196:2.
protect 144:2, 144:8.
prototype 216:19, 217:16.
provable 122:24.
prove 9:2, 9:4, 10:12, 13:11, 27:11, 27:12, 27:14, 27:15, 30:18.
proven 25:25, 30:16.
provide 24:9, 177:16, 200:20.
provided 19:4, 200:8, 200:11, 200:13, 201:21, 207:11.
proving 28:25.
PTN 202:18, 203:6, 204:10, 204:15, 204:18.
puke 98:6.
puked 136:2,

138:14.
puking 96:12.
pull 8:24, 166:10, 204:21, 210:13.
pulled 89:18, 90:18, 91:4, 109:6, 109:9, 118:11, 121:16, 126:11, 126:22, 149:3.
pulse 66:3, 161:8, 162:1, 162:3, 162:4, 169:10, 169:25.
pulseless 164:18.
pupils 169:13, 169:18.
purchase 23:7, 23:22, 26:16.
purchased 26:18.
purple 59:24, 75:12.
purpose 8:9, 13:11, 95:4, 106:7, 106:24, 113:21, 147:6, 153:4.
purposes 125:8.
pursuant 201:21.
pushed 44:8.
putting 191:4.
.
.
.
< Q >.
query 202:19.
questions 14:6, 27:18, 27:19, 28:5, 49:10, 49:19, 61:15, 71:7, 73:3, 112:7, 115:5, 122:23, 125:15, 145:25, 147:23, 165:20, 166:10, 167:16, 167:25, 184:24, 191:5, 193:11, 214:20, 215:6.
quick 73:15, 73:19.
quiet 32:22.

quietly 125:13.
quite 37:21, 100:8,
   122:24, 190:18.
.
.
< R >.
R. 188:6.
R1 198:3, 198:7,
   198:15, 199:21,
   201:13, 208:6,
   209:17, 218:7,
   222:19.
R1A 199:23, 201:9,
   201:12, 222:20.
R1F 202:2, 202:12,
   202:13, 206:7,
   207:7, 222:21.
R2 199:2, 199:3,
   199:6, 201:13,
   206:25, 208:7,
   222:21.
R2A 200:23, 201:9,
   201:12, 201:18,
   222:22.
R2C 206:19,
   222:23.
R4 52:9.
race 17:9.
radio 213:13,
   213:15.
radius 215:16,
   215:20, 218:3,
   218:22.
raise 31:25, 77:2,
   173:20, 196:19.
raised 3:25.
Ran 43:12, 43:15,
   44:3, 96:20,
   110:15, 160:14,
   202:19, 205:5.
rang 202:24,
   203:6.
range 200:18,
   212:25.
rather 2:7, 74:10,
   189:23, 190:17,
   212:3.
Ray 120:6, 121:1,
   127:10, 127:11,
   127:14, 127:21,

127:24, 142:19,
146:15, 147:2,
150:13, 150:23,
151:6, 151:11,
181:25, 188:11,
189:13, 193:14,
193:19, 193:21,
193:22, 193:24,
195:9, 195:10,
195:23, 195:24.
re-ask 189:23.
re-cover 177:23.
reach 18:8.
reached 106:10.
reaction 44:9,
   100:20, 101:23.
Read 4:13, 63:2,
   63:3, 63:6, 63:8,
   110:7, 111:25,
   123:8, 124:4,
   125:1, 125:13,
   125:17, 126:2,
   127:18, 127:22,
   131:4, 138:20,
   138:23, 188:13,
   188:15, 198:13,
   199:13.
reading 125:4,
   138:21, 177:19.
reads 142:12.
ready 19:8, 31:6,
   62:10, 62:11,
   84:14, 84:15,
   105:7, 176:8,
   222:4.
real 19:14,
   218:17.
reality 217:16.
realize 61:14,
   126:9, 139:21.
realized 96:4.
reason 15:2, 15:3,
   15:22, 75:3,
   107:4, 108:1,
   144:19, 190:4,
   203:2, 219:10.
reasonable 13:8,
   25:8, 25:25,
   27:12, 27:15.
reasons 9:1, 85:16,

143:10, 206:13.
rebuttal 13:22,
   14:23, 15:3.
rec 52:4, 54:23,
   179:9, 189:7.
recalled 150:15.
receive 213:21.
receives 204:19.
reception 36:7,
   60:20.
receptor 217:6.
receptors 216:13,
   216:17.
recess 73:15,
   73:17, 74:6,
   74:7, 74:14,
   75:8, 104:7,
   104:10, 104:22,
   105:10, 172:7,
   173:7, 220:6,
   220:7, 224:10,
   224:14.
recesses 17:21,
   18:18.
recognize 31:19,
   33:18, 34:21,
   43:22, 47:1,
   48:4, 48:7, 90:1,
   102:16, 109:22,
   109:25, 111:4,
   111:6, 113:4,
   113:7, 149:23,
   161:12, 162:14,
   168:11, 170:21,
   180:8, 182:8,
   182:18, 182:20,
   182:21, 183:2,
   200:24, 206:19,
   208:4, 208:23.
recognized 122:4,
   181:16, 183:18.
recollect 58:19,
   62:9, 64:24,
   64:25, 117:20,
   188:23, 189:13.
recommendation
   190:10.
recommends
   190:24.
reconvene 74:13.

record 32:6, 37:16,
    37:20, 47:15,
    47:18, 68:4,
    72:11, 77:10,
    88:19, 89:1,
    89:3, 111:1,
    146:6, 154:13,
    156:21, 168:16,
    174:1, 175:18,
    196:15, 196:25,
    199:24, 200:2,
    200:5, 200:16,
    209:14, 210:24,
    211:3, 222:8,
    224:19.
record. 73:8,
    99:25, 122:16,
    153:18, 154:14,
    166:6, 190:14.
recorded 120:22,
    120:24, 120:25,
    125:24, 126:11,
    126:21, 148:5.
recovered 7:19,
    179:21, 183:6,
    183:16.
Recross 153:12,
    153:14, 155:18.
RECROSS-EXAMINATION
    155:20.
red 48:22, 181:13,
    182:9.
Reddish 164:2.
Redirect 71:9,
    71:10, 123:1,
    146:1, 146:2,
    154:19, 171:23,
    193:10, 193:12,
    219:24.
Refer 6:3, 130:4,
    210:9.
reference 208:12,
    221:5.
referenced 125:24,
    208:6.
referencing
    208:11.
referred 72:21,
    88:1, 88:16.
referring 9:14,

82:10, 90:9,
    114:6, 149:14.
refers 210:5,
    210:7, 210:11,
    212:8.
reflect 37:16,
    37:20, 47:15,
    47:18, 52:15,
    59:24, 89:1,
    89:3, 150:18,
    200:8, 206:7.
reflected 200:16,
    210:1, 210:23,
    211:8.
refresh 52:22,
    62:21, 62:23,
    119:24, 123:12,
    124:7, 126:2,
    151:3, 151:5,
    152:21, 168:19,
    169:18, 171:15,
    175:13, 177:21,
    188:17, 193:17.
refreshed 149:2,
    193:15.
refreshes 63:4,
    127:20, 170:21,
    188:2, 188:10.
regard 151:25,
    201:10, 205:12,
    207:9.
regarding 14:13,
    109:15, 175:11,
    197:17.
Regardless 205:6.
regards 177:9,
    201:24.
register 86:10,
    86:11, 86:12.
regular 83:11,
    198:23.
regularly 40:2.
reiterate 15:24.
relate 74:20,
    209:5.
related 24:19.
relates 10:13.
relation 18:21,
    89:10, 109:4,
    120:19, 177:2,

180:24, 189:16,
    216:11, 217:23,
    219:20.
relations 94:12,
    134:16, 136:12.
relationship
    79:10.
relative 160:9.
relay 19:4.
released 189:21.
relevant 172:14,
    221:1.
religion 17:9.
rely 25:23.
remain 67:3, 73:24,
    99:4, 105:18,
    105:21, 107:7,
    156:15.
remainder 7:20.
remained 65:8,
    94:1.
remains 223:24.
remembered 10:13.
remind 31:19.
remove 187:16,
    204:14.
rendered 17:23.
renovations 49:2.
rent 38:10.
rented 80:25.
renting 22:2,
    179:6.
reopen 154:19.
repair 33:5.
Repeat 49:21,
    67:23, 71:2,
    115:7, 168:1,
    185:1, 215:7.
Rephrase 68:19,
    93:24, 129:2,
    150:22, 151:4,
    191:11.
replace 3:3,
    209:10.
replacing 3:12.
reply 13:22.
reported 150:24.
Reporter 1:49,
    224:23.
reports 18:4,

74:19, 74:20,
  220:20.
represent 26:9,
  49:18, 115:4,
  167:24, 184:23,
  207:6, 215:5.
represents
  202:17.
request 2:7, 12:13,
  201:21.
requested 200:19,
  201:20.
require 194:22,
  194:23.
required 13:20,
  74:1.
requires 75:3.
Rescue 158:15.
research 15:15.
reserved 72:24.
resident 70:3.
residue 56:8,
  130:14, 181:9,
  181:11.
respect 12:9,
  24:12, 25:6,
  54:13, 172:21,
  186:17, 221:2,
  223:17.
respective 105:8.
respond 158:1,
  159:11, 175:2,
  175:8.
Responded 21:3,
  158:21, 160:5,
  160:9, 175:5,
  175:23.
responder 158:1.
responders 21:8.
responding 21:9,
  174:20.
responds 100:15.
response 2:9,
  27:20, 42:11,
  65:3, 96:20,
  100:19, 159:15,
  160:10, 197:24,
  200:9, 200:11.
responsibilities
  33:9, 157:21,

174:12, 197:14.
responsibility
  15:11, 197:16.
responsible
  195:19.
responsive 141:1.
rest 42:24, 140:18,
  179:9, 221:18,
  221:22.
restaurant 85:3,
  85:11, 86:12,
  89:5, 117:16.
Restoration 33:7.
restrictions
  19:6.
restroom 74:12.
result 7:5, 7:8,
  19:18, 19:23,
  25:18, 177:25.
resulted 24:18.
resulting 12:18.
resume 105:17.
resuscitate
  146:25.
retire 15:9.
retrieve 70:1.
retrieved 69:15,
  69:19.
return 31:1, 76:17,
  201:3, 221:7.
returned 21:25,
  24:7, 43:5,
  95:22, 126:17,
  127:16, 128:1.
returning 149:19.
revealed 22:19.
review 141:25,
  150:13, 186:18,
  198:8, 199:3,
  222:4.
reviewed 75:14.
reviewing 175:13.
revisit 61:13.
revive 22:15.
Richard 173:21,
  174:3.
ride 166:24,
  167:5.
Ridge 34:14,
  159:25, 160:6,

167:13, 175:9,
  175:24, 185:12,
  189:25, 191:23.
ring 136:17,
  205:17, 205:18,
  206:3, 206:13.
ringing 205:14.
riser 64:19.
risk 142:11.
River 78:21.
Road 34:14, 158:19,
  159:25, 160:5,
  167:13, 174:14,
  174:15, 174:18,
  174:23, 175:10,
  175:24, 185:12,
  189:25, 191:23.
rock-like 181:15.
role 194:12,
  194:14.
roll 162:6.
rolled 96:6, 97:18,
  102:14, 103:15,
  162:9.
rolling 96:10,
  96:13, 102:11.
roommate 20:11,
  21:16, 33:15,
  34:7, 35:2,
  36:16, 38:8,
  38:9, 39:1.
roommates 38:20.
rooms 50:19, 50:20,
  51:1, 186:18,
  186:20, 187:2,
  187:5, 189:4,
  189:11.
rotate 163:9.
rotated 217:19.
rough 58:17,
  58:21.
roughed 35:24.
Roughed-in 52:7,
  52:12, 54:20.
Roughly 34:10,
  62:13, 62:14,
  116:19, 148:2.
round 28:8.
routed 219:12,
  219:17.

row 46:24, 46:25,
    48:3.
RPR 1:47, 224:17.
rubbed 22:5, 93:20,
    94:1.
Rule 6:19, 6:23,
    8:5, 31:9, 31:18,
    153:13, 173:3.
Rules 11:9, 38:6.
ruling 2:12.
rulings 14:12.
run 213:23,
    213:24.
runs 64:23.
rural 215:19,
    216:3, 218:4.
.
.
< S >.
sadly 26:16.
safe 180:3.
Sam 222:24.
sample 207:2.
Sara 34:2, 34:3,
    34:4, 34:5,
    36:20, 36:24,
    36:25, 42:19,
    42:20, 44:23,
    45:7, 46:16,
    57:18, 66:19,
    67:14, 67:24,
    68:4, 80:15,
    80:18, 81:15,
    82:24, 92:5,
    92:10, 96:21,
    98:20, 99:7,
    99:14, 99:15,
    132:19, 176:25.
sat 86:13.
saw 22:9, 26:16,
    28:3, 41:16,
    43:4, 43:17,
    44:6, 55:19,
    57:7, 57:10,
    57:13, 58:10,
    61:18, 66:20,
    66:21, 111:24,
    126:23, 127:4,
    128:12, 129:6,
    149:3, 149:16,

153:21, 153:22,
    155:6, 160:20,
    164:1, 164:4,
    164:9, 177:7.
saying 3:15, 43:10,
    75:6, 97:15,
    98:10, 98:11,
    124:20, 126:3,
    126:10, 127:17,
    131:5, 139:3,
    154:5, 154:9.
Says 10:8, 27:19,
    73:10, 126:14,
    126:20, 153:20,
    169:15, 169:17,
    188:6, 190:19,
    193:19, 193:20,
    193:21, 193:22,
    218:17.
scale 145:16,
    145:22, 187:22,
    188:11, 188:18,
    188:23, 213:4,
    213:5.
scan 4:16.
scenes 174:21,
    174:22, 185:19.
schedule 2:21,
    74:4.
scheduled 2:5,
    74:9.
school 77:24,
    77:25, 78:1.
scooch 77:16.
scratched 91:8.
screaming 43:10,
    43:13, 64:23,
    64:25.
screams 65:3.
screen 24:8, 33:16,
    34:19, 48:19,
    49:24, 59:16,
    60:8, 90:6,
    90:13, 110:3,
    111:15, 118:15,
    118:16, 161:11,
    198:3, 211:11,
    217:4.
Searched 22:21,
    54:2, 54:7,

54:14, 54:17,
    54:19, 54:22,
    54:25, 55:15,
    55:16, 55:18,
    152:13, 178:22,
    179:7, 179:20,
    186:8, 186:12,
    186:14.
searches 221:2.
searching 54:11,
    186:3.
seat 2:11, 2:23,
    11:14, 11:15.
seated 2:2, 11:18,
    32:5, 77:7,
    105:17, 156:20,
    173:13, 173:25,
    196:24, 221:15.
Second 6:25, 7:25,
    12:17, 16:19,
    106:24, 201:17,
    206:9, 206:10,
    211:7, 211:8,
    213:21.
seconds 176:4,
    202:23, 203:17,
    206:8, 211:4.
sectors 216:17.
secure 53:23,
    68:11, 68:21,
    68:25, 69:4,
    186:4, 186:6.
secured 68:14.
security 76:16,
    144:5, 172:16.
seeing 98:5,
    149:13, 194:18.
seek 15:19,
    104:12.
seem 98:17,
    116:12.
Seemed 2:11,
    41:17.
seems 4:11.
seen 3:4, 15:23,
    46:11, 56:4,
    56:14, 56:17,
    88:6, 88:9,
    113:10, 113:11,
    113:16, 118:2,

122:2, 126:5,
130:2, 130:12,
130:15, 130:17,
145:10, 150:11,
155:24.
seize 181:17.
seized 179:17,
179:25, 180:1,
182:3, 182:13,
182:23, 185:25,
196:1.
selected 3:6,
85:3.
selection 2:3.
send 205:17.
sense 16:13, 25:24,
27:24, 30:15,
218:9.
sensory 10:10.
sent 182:13,
182:16, 212:7.
sentence 138:20.
sentencing 73:16.
separate 55:5,
207:12.
separated 203:20.
September 158:11.
sequence 100:25,
134:16, 134:17.
sequestration
31:18.
Sergeant 176:3,
179:16, 192:11,
192:15, 192:21,
192:24, 193:4,
194:2, 194:4,
194:6, 195:9.
series 25:12,
115:5, 207:10.
serious 19:14,
29:4.
serve 3:10, 12:5.
serves 217:19.
service 95:16.
services 185:17.
serving 18:18,
220:17.
set 12:22, 13:2,
38:6, 203:21,
212:3.

sets 166:16,
203:19.
seven 185:8.
Seventh 16:24.
several 23:7,
23:10, 181:14.
sex 22:6, 95:3,
134:21, 134:25.
sexual 94:12,
134:15, 136:11.
Shannon 171:7,
171:8.
shape 54:7, 56:18,
65:16, 137:24.
shaped 216:17.
share 24:1.
sharp 31:21.
Sharpie 91:18.
She'd 30:1.
She'll 29:20.
sheet 201:1,
201:2.
sheets 198:13,
199:8, 199:10,
199:11, 199:12,
199:16.
Sheriff 54:8, 68:6,
68:10, 68:21,
68:25, 69:4,
174:9, 174:13,
174:24, 180:2,
184:12, 185:4,
196:1.
sheriffs 99:11.
shifted 96:6.
shock 22:13,
124:21.
shoes 180:22.
shopping 218:14.
short 39:24,
147:25.
Shortly 21:25,
53:2, 53:3, 53:8,
82:12.
shot 125:3.
shouldn't 108:23.
showed 48:16,
62:20, 112:6,
112:14, 112:22,
128:14, 128:16,

129:7, 148:7,
150:3, 150:6,
150:9, 155:22,
155:25, 171:14,
187:20.
shower 62:8, 72:5,
84:13, 84:15,
115:23, 115:25,
116:1, 116:3,
116:22.
Showing 146:13,
188:4, 209:12.
shown 3:19, 14:18,
55:22, 55:24,
56:21, 56:22,
56:23, 118:11,
125:7, 190:10.
shows 216:6,
216:13, 218:22,
218:24.
sick 136:9.
side 10:25, 26:4,
34:25, 44:8,
47:24, 47:25,
48:21, 48:22,
50:11, 55:8,
55:9, 65:15,
65:22, 102:12,
102:13, 102:24,
103:2, 103:3,
140:4, 141:17,
148:25, 150:1,
162:6, 162:10,
168:19, 172:24,
213:17, 213:18,
217:25, 218:1.
sign 194:18,
194:23.
signal 212:19,
212:20, 212:21,
212:24, 213:15,
219:2, 219:4,
219:6, 219:7,
219:13.
silent 18:23.
silhouette 126:23,
149:13, 149:16.
silhouettes 122:1,
149:22.
silver 145:16,

145:22, 187:22,
188:10, 188:18,
188:23.
Similarly 16:3.
simply 138:2,
141:3.
single 20:17.
sit 108:9.
site 198:12, 199:7,
199:19, 200:14,
201:23, 203:8,
203:18, 204:2,
205:2, 205:3,
207:9, 212:16,
212:17, 212:18,
213:1, 213:12,
213:18, 218:8,
218:12.
sites 200:15,
212:14.
sitting 9:20, 24:6,
88:20.
situation 5:18,
214:11.
Six 141:7, 157:19,
157:22.
six-foot 141:9.
six-month 158:8.
Sixth 16:23.
skews 213:3.
Sleeping 43:14,
103:8.
slept 102:23.
slid 163:13,
163:15.
slide 163:10,
173:1.
sliding 48:24.
slightly 11:21,
74:3.
slow 2:21.
slower 106:15.
small 5:13, 135:11,
145:15, 145:21,
223:23.
smaller 4:15,
213:7, 213:9.
smoked 114:5.
Smoking 56:11,
56:12, 113:13,

114:2, 114:4,
130:10.
smudged 112:1.
snoring 22:12,
96:4.
so-called 137:24.
social 17:10.
sock 113:8, 113:11,
133:18, 133:20.
socks 113:22,
133:18, 133:20,
152:15, 187:12,
187:16.
sole 16:11, 17:15,
27:1.
somebody 44:20,
72:9, 164:18,
206:13.
somehow 36:20.
Someone 28:21,
33:12, 72:4,
174:21, 194:13,
195:2, 205:20,
212:15, 213:20,
214:16.
someplace 4:22.
Sometimes 19:15,
19:16, 19:17,
25:11, 29:12,
60:21, 215:23.
son 19:22, 20:23.
soon 73:19, 84:13,
105:8.
Sorry 32:21, 37:23,
48:19, 61:5,
61:9, 80:5, 83:9,
83:23, 89:24,
93:23, 106:17,
117:7, 134:9,
141:2, 145:18,
150:5, 187:25,
199:8, 211:5,
215:2, 216:15.
sort 4:23, 11:9,
38:2, 38:6,
38:19, 139:14,
218:9, 218:10,
222:8.
sound 9:21, 96:14,
96:17.

sounding 220:24.
sounds 98:1,
140:25.
sources 221:4.
south 217:14,
218:1.
speaking 57:1,
84:3, 108:10,
108:11, 108:13,
142:17, 152:21,
172:22, 177:25,
181:24.
specialist 33:5.
specific 15:17,
33:9, 112:21,
177:22.
Specifically 12:21,
13:4, 23:8, 29:1,
173:1, 216:22.
specificity
216:10.
speculate 30:2,
134:3.
speculating
27:24.
speculation
171:12.
speed 70:8.
spell 32:7, 77:12,
156:22, 174:2,
197:1.
Spent 82:3,
117:2.
spoke 6:13, 23:6,
71:13, 107:24,
108:2, 108:9,
109:13, 121:7,
152:24, 177:12,
177:15, 178:19.
spoken 83:19,
196:13.
spoon 22:23, 29:22,
48:8, 48:9, 56:7,
113:16, 129:20,
130:14, 137:18,
145:9, 181:11,
182:21, 182:25.
spoons 45:17.
spreadsheet 207:12,
212:11.

spreadsheets
   203:23.
Sprint 196:14,
   197:9, 197:10,
   197:12, 197:17,
   197:22, 198:16,
   198:18, 198:19,
   198:24, 205:13,
   205:22, 207:17,
   210:8, 210:24,
   212:15.
St. 78:22, 79:3,
   83:15.
staff 19:4,
   167:9.
stains 103:18.
stairs 51:23, 52:4,
   59:6.
stake 28:23.
stalled 11:5.
stand 16:18, 27:17,
   36:11, 73:20,
   76:21, 105:18,
   156:14, 173:18.
standing 86:14,
   109:10, 142:11,
   156:15.
stands 12:9.
star 63:4, 63:7.
start 2:21, 49:23,
   79:10, 121:15,
   164:19, 205:13,
   205:15, 205:16,
   205:17, 220:16,
   221:9, 224:12.
started 39:22,
   76:1, 161:9,
   162:7, 176:18,
   177:10.
Starting 11:21,
   46:23, 47:5,
   102:21, 134:16.
starts 101:6,
   205:18, 205:19,
   205:20, 206:2.
State 6:24, 8:6,
   10:9, 10:17,
   21:12, 32:6,
   77:10, 156:21,
   168:15, 174:1,

196:25.
stated 85:17.
statements 6:16,
   6:21, 6:23, 6:24,
   6:25, 8:3, 14:24,
   17:2, 31:5,
   119:15, 119:21,
   120:2, 121:11,
   122:21, 123:5,
   123:10, 125:7,
   142:1, 142:18,
   150:4, 150:14,
   150:24.
States 1:1, 1:5,
   1:20, 25:25.
station 195:15.
status 222:8,
   223:5.
stay 32:24, 42:12,
   42:24, 96:2,
   107:10.
stay-at-home
   78:6.
Stayed 41:24,
   81:17, 89:18,
   92:6, 99:6,
   113:15, 119:4.
staying 39:23,
   40:2.
stenographic
   224:18.
step 50:23, 73:23,
   74:2, 105:1,
   172:5.
steps 35:18,
   72:10.
Sterling 82:9,
   200:7.
stick 28:20,
   44:7.
sticking 108:1,
   165:4, 165:6.
stipulate 154:15.
stipulations
   15:13.
Stockton 171:7,
   171:8.
stomach 141:4.
stones 39:18.
stood 86:11.

stop 85:15, 100:19,
   101:7, 104:7,
   117:12, 117:15,
   118:6.
Stopped 7:22, 9:14,
   85:23, 100:17,
   101:22, 128:20,
   131:13.
stops 114:14.
Storage 52:8, 52:9,
   55:1, 182:14.
stories 81:8.
storms 33:7.
story 28:7, 29:16,
   30:5, 143:5.
straight 35:8.
strapped 163:23,
   166:19.
strategy 2:19.
street 90:24.
Streets 207:20,
   218:19.
stretcher 166:20,
   176:13.
Strike 93:15,
   93:23, 195:17,
   208:10.
stronger 219:13.
Strongest 212:19,
   212:21, 212:23,
   219:2, 219:4,
   219:6, 219:7.
struck 140:13,
   140:15.
stuff 29:24, 103:2,
   113:15, 114:9,
   164:5.
subdued 63:22,
   63:25.
subject 15:17,
   16:2, 159:9.
subpoena 197:24,
   200:9, 200:12,
   201:2.
subscriber 200:2,
   200:5, 200:6,
   201:3, 201:16,
   201:17, 201:22.
subsection 6:23.
Subsequent 88:8,

101:25.
substance 181:15.
successful 23:17.
successfully
  123:1.
suggested 6:14.
suit 37:15,
  88:23.
suits 37:21.
summarily 2:7.
summarize 28:11,
  30:24.
Sunfire 84:21.
supervise 174:19.
supervisor 174:14,
  174:15, 174:17,
  185:10.
supported 16:25.
suppose 9:19.
supposed 172:20.
supposedly 2:19,
  155:8.
surprised 212:2.
suspect 190:20,
  190:21, 190:23,
  195:5.
suspected 179:24.
Sustained 46:10,
  71:19, 93:24,
  129:1, 150:21,
  151:4, 171:12,
  171:18, 171:20,
  178:11, 191:17,
  195:18, 208:18.
swear 196:23.
switch 211:25,
  212:1, 212:2.
switched 214:17.
switches 211:23,
  211:25.
sworn 12:3, 12:5,
  32:2, 77:4,
  156:17, 173:22,
  196:21.
symbolism 12:1.
syringe 22:23,
  48:8, 48:9,
  130:15, 130:17,
  137:21, 181:9.
syringes 45:15,

48:8, 113:16,
  114:1, 129:18,
  145:8.
system 4:16, 12:8,
  168:15.
.
.
< T >.
T-r-a-w-i-c-k-i
  197:2.
T. 1:47, 224:22.
T1 208:1, 209:25,
  210:9, 210:11,
  210:13, 210:14,
  210:17, 210:22,
  210:24, 211:7,
  211:8, 212:5,
  222:25.
T6 109:18, 109:19,
  109:20, 109:21,
  110:22, 223:1.
table 86:9,
  212:7.
tables 105:8.
taken. 75:8,
  104:22, 105:10,
  173:7.
talked 26:21, 37:1,
  91:12, 121:3,
  215:11.
talks 124:5.
tall 141:8.
taller 141:8.
tape 53:24, 68:11,
  68:15, 68:22,
  69:1, 69:5.
taped 75:15.
Tarwacki 214:25.
Tattoo 151:22,
  151:23, 151:24.
taxicab 2:19.
teachers 27:6.
team 185:18.
technically
  191:6.
technician 106:4,
  139:1, 139:4,
  158:15, 169:3.
technicians
  152:19.

technology 216:9.
television
  134:14.
tells 219:16.
Ten 94:23, 119:10,
  124:9, 124:13,
  126:4, 126:7,
  126:9, 127:1,
  127:15, 127:25,
  128:21, 128:22,
  132:25, 133:1,
  133:11, 136:19,
  136:25, 137:3,
  137:10, 137:24,
  142:12, 144:17,
  144:24, 167:6,
  174:11, 174:23,
  185:4, 213:2,
  216:3, 218:4.
ten-mile 215:19.
terminate 214:16.
terminating 203:8,
  204:2, 205:3.
terms 2:20, 10:14,
  37:25, 102:8,
  150:14, 194:12,
  200:4, 212:14,
  213:20, 217:5,
  221:5.
terrain 212:22.
tested 182:16.
testified 16:16,
  32:3, 47:19,
  62:20, 63:10,
  77:5, 100:5,
  121:8, 156:18,
  163:8, 173:23,
  196:22.
testify 13:24,
  23:5, 23:9,
  23:13, 23:18,
  23:24, 31:23,
  197:17, 197:21.
testifying 16:19,
  31:14, 31:17,
  62:17, 122:7.
theme 220:24.
themselves 57:10.
theory 6:21, 8:4.
Thereabouts 62:5,

62:6.
thereafter 21:25,
    53:3, 53:8,
    64:7.
thinking 124:11.
thinks 28:12.
Third 12:18, 16:20,
    103:4, 159:19,
    159:22, 160:14,
    203:11, 204:4.
thorough 179:12,
    186:20, 192:25.
though 17:4, 61:4,
    124:2, 136:13,
    144:7, 170:8,
    196:16, 221:22.
thousand 158:22.
thousands 201:24.
Three 2:22, 35:13,
    54:6, 97:6, 97:8,
    101:14, 124:17,
    158:22, 166:16,
    176:22, 177:6,
    184:7, 185:7,
    206:7, 216:17.
three- 51:3.
three-way 214:10.
threw 136:2.
throughout 18:8,
    158:17.
throw 136:1,
    136:13.
throw-up 103:20.
throwing 96:10,
    96:11, 96:12,
    97:25.
Thursday 2:5.
tie 37:15.
tied 191:13.
ties 37:21.
tilt 163:8.
tilted 163:13.
timing 211:22,
    213:22, 213:24.
Tina 80:4, 80:8,
    80:9, 80:11.
tired 28:19, 75:2,
    75:4.
to-wit 12:21,
    12:25.

Today 25:12, 37:11,
    58:19, 74:4,
    74:6, 111:23,
    121:14, 122:3,
    124:11, 124:12,
    126:6, 128:8,
    130:25, 134:17,
    136:25, 139:8,
    141:12, 142:14,
    142:20, 144:10,
    144:14, 144:16,
    144:22, 185:3,
    187:1, 194:4.
together 21:19,
    29:12, 38:19,
    177:12.
toilet 72:5.
Tom 222:25.
tomorrow 221:7,
    221:23, 222:3,
    224:11, 224:12,
    224:14.
top 46:24, 50:24,
    51:1, 51:2, 51:3,
    54:4, 102:16,
    145:21, 152:6,
    162:13, 179:23,
    180:6, 181:12,
    187:22, 188:18,
    210:15, 217:9.
Tops 133:3,
    133:11.
Toszer 6:18, 20:2,
    20:21, 23:3,
    23:4, 23:5,
    23:13, 23:18,
    23:24, 24:1,
    24:4, 25:14,
    26:21, 29:10,
    29:11, 29:12,
    29:14, 29:16,
    30:17.
total 119:13,
    187:3, 187:4,
    207:5, 214:2.
totality 184:1.
touch 18:4, 48:18,
    60:8, 74:19,
    90:12, 139:25,
    169:21, 170:1,

172:10, 220:21,
    221:11.
touched 102:5.
touching 118:16,
    118:25.
tough 80:5.
Towards 40:1, 48:2,
    60:6, 60:14,
    90:21, 90:22,
    90:23, 163:13,
    163:15, 213:3,
    216:25.
towers 200:15,
    205:4, 207:13,
    212:10, 216:21,
    216:24, 219:16.
track 5:15, 5:20.
traffic 82:20,
    212:23, 215:23.
tragic 25:17.
trained 27:7,
    169:3, 170:4,
    170:9.
training 158:14,
    164:17.
transcript 124:25,
    126:2, 130:5,
    148:7, 148:19,
    224:18.
transport 176:9.
trauma 167:8.
traumatized
    124:2.
travel 197:16.
traveled 167:1.
Trawicki 196:18,
    196:20, 197:2,
    197:6, 215:1,
    215:3, 215:4.
treatment 121:5,
    165:24.
trees 33:7.
Trials 172:20.
triangle 216:18,
    217:9, 223:25.
triangular
    216:19.
tried 5:1, 44:7,
    45:23, 96:20,
    97:22, 97:23,

146:25.
trigger 101:8.
trip 3:7.
Trips 207:21,
    218:19.
trouble 2:15,
    143:16, 144:2.
truly 180:10.
truth 8:11, 8:13,
    9:6, 10:1, 11:1,
    16:22, 27:23.
truthful 108:14.
try 27:14, 28:11,
    45:19, 96:19,
    97:22, 157:24,
    162:7, 170:11,
    176:18, 177:10.
trying 44:17,
    96:19, 97:24,
    102:6, 181:25,
    190:15, 223:21.
tube 165:5.
turn 4:12, 10:7,
    18:19, 48:1,
    65:21, 113:2,
    134:19, 180:5,
    196:14, 223:6.
turned 18:23,
    18:24, 44:7,
    47:20, 47:24,
    47:25, 65:20,
    65:21, 65:22,
    69:9, 134:23,
    141:17, 141:18,
    141:21.
Turning 24:14,
    43:19, 65:15,
    141:16, 222:11,
    222:15, 222:19,
    222:25.
turns 76:2.
TV 35:19, 42:13,
    94:8, 95:9,
    103:3, 134:19,
    134:23.
Twice 106:23.
twists 76:2.
two-part 219:3.
two. 223:15.
Type 91:23, 189:7,

194:16, 202:23,
    204:9.
typical 160:10.
typically 217:8,
    217:9, 218:25.
.
.
< U >.
U-turn 35:18,
    35:19.
ultimate 19:17.
ultimately 12:5,
    81:5, 86:14.
unable 122:8.
unanimously 13:7.
unavailable
    10:16.
uncomfortable
    28:17.
uncommon 216:1.
Unconscious 20:13,
    176:13.
uncontradicted
    17:5.
underneath
    210:14.
understand 49:21,
    89:25, 115:6,
    130:5, 139:11,
    168:1, 185:1,
    190:15, 215:6,
    216:15, 217:2.
understanding
    100:7, 100:8.
understood 102:1.
Unfortunately 8:24,
    117:6, 216:21.
uniform 108:4.
unintended 25:12.
unique 217:18.
unit 164:22,
    180:3.
United 1:1, 1:5,
    1:20, 25:25.
University 158:8.
unless 10:13, 13:6,
    191:7.
unresponsive 20:13,
    22:10, 139:3,
    139:7, 159:9,

164:16, 170:18,
    176:13.
unsuccessful
    22:16.
Until 2:22, 3:5,
    13:6, 17:22,
    17:25, 18:11,
    31:17, 64:11,
    73:18, 74:7,
    74:16, 76:1,
    128:13, 128:14,
    129:7, 136:13,
    147:15, 155:22,
    163:22, 221:18.
unusual 63:18,
    63:19, 94:10,
    116:8, 132:9,
    137:15, 138:3,
    214:10.
upbeat 132:14.
updated 207:24.
upper 96:25,
    140:12, 141:14.
upset 116:12,
    124:20.
urban 212:22,
    213:3, 213:8,
    213:9, 215:22,
    218:3.
urgent 19:1.
usage 57:1, 57:14,
    219:2.
user 19:16, 58:2,
    58:6.
users 20:20.
uses 212:15.
using 4:15, 15:16,
    20:24, 29:20,
    38:25, 48:17,
    58:20, 91:16,
    113:10, 212:7,
    212:12.
utilized 218:24,
    218:25.
.
.
< V >.
validity 10:13.
value 179:11.
van 89:20, 90:19,

91:10, 91:11,
122:2, 148:23,
149:4, 149:5,
149:8, 149:9,
149:10, 149:20,
149:25.
various 119:15,
142:18.
vehicle 90:17,
90:23, 118:22,
119:4, 121:24,
126:18, 127:3,
129:9, 159:15.
vehicles 89:19,
175:25, 176:3.
vein 26:15.
verbal 38:5.
verdict 12:5,
17:23, 18:25,
31:1.
version 5:13.
vials 182:21,
182:23.
vibrate 18:23.
victim 21:18,
170:12, 176:7,
223:24.
view 51:2, 51:3,
143:4.
views 14:13,
17:10.
violation 15:25.
Virginia 82:9,
200:7.
virtually 60:23.
visit 15:18.
voice 32:22, 32:23,
203:3, 206:14.
voir 2:9.
volume 32:24,
212:23.
volunteer 157:14,
157:20, 157:24,
158:20, 159:10.
volunteered
157:18.
vomit 22:14, 44:6,
44:13, 44:15,
59:13, 60:4,
60:6, 60:12,

60:14, 97:1,
103:22, 103:23,
132:23, 140:23,
141:3, 161:7,
162:7, 162:25,
163:25, 164:1.
vomited 138:14,
164:6.
vomiting 138:11,
139:2, 164:3,
164:7, 164:9,
170:17, 171:10.
vs 1:9.
.
.
< W >.
W-i-l-s-o-n
174:3.
wait 3:5, 13:14,
17:25, 74:16.
waiting 31:23,
45:4, 213:22,
214:10, 214:13,
214:17.
wake 139:21.
Waldorf 40:13.
walk 51:11, 54:15,
104:17.
walked 35:17,
41:15, 61:23,
148:24, 161:5,
179:22, 180:13.
walking 122:2,
148:22, 171:2.
wallet 87:6, 87:18,
117:22.
wandered 31:22.
wanted 27:5, 29:15,
36:9, 86:6,
86:21, 87:21,
112:8, 154:1,
180:4.
wants 122:17,
154:21.
washing 189:6.
Washington
215:24.
watch 27:25, 42:13,
134:20.
watched 22:7, 92:4,

92:6, 92:14,
92:15, 94:8,
94:22, 95:2,
134:14, 134:23.
Watching 92:16,
94:5, 135:20,
135:21.
water 33:8, 136:23,
213:11, 213:13,
213:15, 213:17,
213:18.
ways 220:15.
Waysons 80:12.
wealth 17:10.
wearing 37:14,
88:21, 88:24.
week 79:23.
weeks 23:12, 40:4,
40:5, 148:6.
weight 17:15,
96:6.
west 218:1.
Whatever 59:23,
69:7, 69:8,
69:12, 168:9,
170:9, 176:3,
191:23, 192:4.
whatsoever 96:15,
221:10.
Whenever 213:25,
214:18.
white 183:17.
whoever 165:15,
166:1.
whole 4:16, 4:18,
139:9, 199:9.
whom 18:15, 88:16,
90:10.
whomever 192:21.
William 49:18,
115:4, 156:16,
156:23, 167:23,
184:23, 215:4.
William C. Brennan,
Jr. 1:37.
willing 3:9, 123:7,
194:18.
Wilson 119:21,
120:3, 120:15,
142:19, 173:16,

173:17, 173:21,
174:3, 174:8,
175:21, 175:22,
184:21, 187:22,
188:6, 191:22.
wireless 198:19.
wish 19:9,
123:11.
wishes 13:20.
Withdrawn 70:25.
within 79:23,
152:25, 189:18,
215:16.
without 108:10,
141:4.
witnesses 5:23,
6:12, 13:18,
17:15, 18:14,
26:22, 27:18,
27:19, 27:21,
28:5, 28:15,
31:10, 31:20,
220:14.
woke 64:11,
139:7.
woman 160:21.
word 16:5.
words 17:12.
work 33:4, 33:5,
33:7, 38:17,
40:10, 40:12,
40:17, 61:15,
64:20, 79:18,
83:8, 83:10,
83:12, 84:5,
91:23, 102:6,
109:4, 115:13,
132:13, 144:5,
149:4, 157:12.
worked 38:14,
81:25, 82:8,
82:17, 83:7,
85:24, 117:10,
147:9, 151:24,
153:5, 157:10,
174:23.
working 40:14,
78:16, 78:19,
79:12, 79:14,
81:23, 82:9,

83:2, 159:3.
works 50:24, 83:4,
118:16, 192:17.
world 19:15.
worthwhile
222:10.
Wow 75:4.
write 108:10,
195:25.
writing 108:7,
108:11, 111:25.
written 38:4,
108:8, 119:17,
120:21, 121:1,
127:19, 146:8,
146:12, 147:18.
wrote 75:21,
123:24, 124:15,
124:21, 175:17.
.
.
< Y >.
year 157:11,
185:3.
years 124:17,
157:19, 157:22,
158:17, 174:11,
174:16, 174:23,
185:4, 185:7,
185:8, 197:20.
yelling 96:21,
97:5, 98:11.
yesterday 2:3,
12:4, 17:20,
18:22, 19:4,
28:16.
yourself 18:3,
38:7, 39:13,
63:2, 63:3,
124:4, 125:1,
125:13, 127:18,
127:22, 138:20,
138:21, 143:11,
144:2, 144:8,
188:13, 220:20.
yourselves 74:16,
74:18, 104:10,
172:9.
Yup 44:4, 115:25.
.

.
< Z >.
zero 206:8,
206:10.
zoom 207:22,
217:4.